**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**Docket No. 05-956 T**

**Judge Mary Ellen Coster Williams**

---

**DAVID S. LITMAN AND MALIA A. LITMAN,**

**Plaintiffs,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**PLAINTIFFS-COUNTERDEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........................................................................................ii

I. Summary -- The IRS Erroneously Assessed a $12.5 Million Income Tax Deficiency and a $2.5 Million Penalty Against the Litmans ........................................................... 1

II. The Undisputed Facts Demonstrate the Litmans' Right to Summary Judgment............ 4

- A. The Sale ........................................................................................................ 4
- B. The Appraisals of the Restricted Shares and the Federal Income Tax Returns...... 5
- C. Andrew Pells' Compensation .................................................................... 8
- D. The IRS's Audit and Its Assertion of a Penalty.................................................. 10

III. Settled Precedent, the IRS's Admissions, and the Appraisal Relied Upon by the Litmans Demonstrate that the Litmans are Entitled to Summary Judgment Because as a Matter of Law the Fair Market Value of the Stock was Less Than $16 Per Share ........................................................................................................ 12

IV. The IRS Had No Basis for Denying TMF Liquidating Trust's Deduction for Andrew Pells' Compensation ........................................................................ 15

V. The Litmans Are Entitled to a Refund of the IRS's $2.5 Million Accuracy-Related Penalty as a Matter of Law Because (1) No Underpayment of Taxes Occurred, and (2) They Reasonably Relied Upon Two Qualified Independent Appraisals When Reporting the Fair Market Value of the Restricted Shares. .......................................... 18

- A. Overview of Section 6662(a) Penalties ........................................................... 19
- B. Because the Litmans' Position Was Taken In Good Faith And With Reasonable Cause, the IRS's Assessment of Section 6662(a) Penalties is in Error ........................................................................................................ 21

VI. Conclusion ........................................................................................................ 24

## TABLE OF AUTHORITIES

**Page**

### CASES

*Adair v. Comm'r,* 54 T.C.M. (CCH) 705 (1987) ....................23

*Campbell v. United States*, 228 Ct. Cl. 661, 661 F.2d 209 (1981) ....................23

*Cook v. United States,* 46 Fed. Cl. 100, 114 (2000) ....................15

*Crocker v. Comm'r,* 75 T.C.M. (CCH) 2414 (1998) ....................20

*Custom Chrome, Inc. v. Comm'r,* 76 T.C.M. (CCH) 386 (1998), *rev'd on other grounds,* 217 F.3d 1117 (2000) ....................18

*Elliott's, Inc. v. Comm'r,* 716 F.2d 1241 (9th Cir. 1983), *aff'd,* 782 F.2d 1051 (1986) ....................16

*Estate of Gilford v. Comm'r*, 88 T.C. 38 (1987) ....................13, 23

*Estate of Gray v. Comm'r,* 66 T.C.M. (CCH) 254 (1999) ....................22

*Estate of Hendrickson v. Comm'r*, 78 T.C.M. (CCH) 322 (1999) ....................22

*Estate of Jung v. Comm'r,* 101 T.C. 412 (1993) ....................22

*Estate of Mellinger v. Comm'r,* 112 T.C. 26 (1999), *acq.* 1999 WL 33541675 ....................22

*Estate of Mitchell v. Comm'r,* 74 T.C.M. (CCH) 872 (1997), *vacated on other grounds,* 250 F.3d 697, *non-acq.*, 2005 WL 1318362 (2005) ....................22

*Estate of Piper v. Commissioner*, 72 T.C. 1062, 1087, 1979 WL 3788 (1979) ....................23

*Estate of Simplot v. Comm'r,* 112 T.C. 130, 182 (1999), *rev'd on other grounds,* 249 F.3d 1191 (9th Cir. 2001) ....................20, 21

*Estate of Sullivan v. Comm'r,* 45 T.C.M. (CCH) 1199 (1983) ....................23

*Jacobson v. Comm'r*, 78 T.C.M. (CCH) 930, 934 (1999) ....................20

*Mayson Mfg. Co. v. Comm'r,* 178 F.2d 115 (6th Cir. 1949) ....................16

*McDonald v. Comm'r*, 764 F.3d 322 (5th Cir 1985), *aff'g,* 45 T.C.M. (CCH) 1276 (1983) ...13

*Northlich, Stolley, Inc. v. United States,* 177 Ct. Cl. 435, 368 F.2d 272 (1966) ....................16

*Sather v. Comm'r*, 78 T.C.M. (CCH) 456 (1999), *rev'd on other grounds*, 251 F.3d 1168 (8th Cir. 2001).....20

*Schauerhamer v. Comm'r*, 73 T.C.M. (CCH) 2955 (1997).....20

*Sklar, Greenstein & Scheer v. Comm'r*, 113 T.C. 135 (1999).....20

**STATUTES**

I.R.C. § 83.....8, 17
I.R.C. § 162.....*passim*
I.R.C. §§ 671-678.....4
I.R.C. § 6501.....3, 11
I.R.C. § 6662.....*passim*
I.R.C. § 6663.....20
I.R.C. § 6664.....20, 22

**REGULATIONS**

Treas. Reg. § 1.162-7(a).....16
Treas. Reg. § 1.162-9.....16
Treas. Reg. § 1.6664-4(a).....20
Treas. Reg. § 1.6664-4(b)(1).....21, 22

**RULINGS**

Rev. Rul. 59-60, 1959, 1959-1 C.B. 237.....6
Rev. Rul 77-287, 1977-2 C.B. 319.....6, 13, 14, 23

**MISCELLANEOUS**

Shannon P. Pratt, et al., Valuing a Business, 395-407 (4th ed. 2003).....13
SEC Rule 144.....2, 5, 14, 23

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **DAVID S. LITMAN** | ) | |
| **and MALIA A. LITMAN** | ) | |
| | ) | |
| **Plaintiffs-Counterdefendants,** | ) | |
| | ) | |
| **V.** | ) | **No. 05-956T** |
| | ) | **(Judge Mary Ellen Coster Williams)** |
| **THE UNITED STATES** | ) | |
| | ) | |
| **Defendant-Counterplaintiff.** | ) | |

**PLAINTIFFS-COUNTERDEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Malia A. and David S. Litman (the "Litmans" or "Plaintiffs-Counterdefendants") file this Motion for Summary Judgment pursuant to Rule 56 of the United States Court of Federal Claims. In support of this Motion, Plaintiffs respectfully show the following:

## I. Summary -- The IRS Erroneously Assessed a $12.5 Million Income Tax Deficiency and a $2.5 Million Penalty Against the Litmans.

This income tax refund case primarily involves the fair market value of shares of restricted stock in Hotel Reservations Network, Inc. ("HRN") issued to a flow-through entity partially owned by the Litmans (the "TMF Liquidating Trust"). The fair market value of the restricted shares -- which was based upon the value determined in an appraisal obtained from a respected appraisal firm often used by the Internal Revenue Service (the "IRS") -- was used by the Litmans to report their portion of the capital gains tax recognized when the TMF Liquidating Trust received the restricted shares.

At the time the restricted HRN shares were issued, HRN was contemplating an initial public offering (an "IPO"). The shares to be issued in the IPO would be freely tradable on the NASDAQ exchange. The restricted HRN shares received by the TMF Liquidating Trust,

however, were not a part of the IPO. Rather, the restricted shares received by the TMF Liquidating Trust carried substantial restrictions on their sale. The restrictions included, among other things, one to four year contractual holding periods, SEC Rule 144 volume sale restrictions, and the requirement that HRN's parent company consent to any sale. In addition, the amount of stock offered in the IPO was approximately half of the number of restricted shares issued to the TMF Liquidating Trust. Even if it could sell its restricted shares, any attempt by the TMF Liquidating Trust to sell a substantial number of shares would flood the market, drastically reducing the market value and would impair investor confidence in HRN because the TMF Liquidating Trust was owned by HRN's CEO and President.

At the time it issued its notice of deficiency to the Litmans, the IRS was well aware that these onerous sale restrictions substantially reduced the value of the stock received by the TMF Liquidating Trust (when compared to the freely traded value of the stock). In her Revenue Agent's Report prepared before the notice of deficiency was issued, the IRS's examining agent acknowledged the valuation impact of the sale restrictions as follows:

> It is well settled that restrictions on the sale of stock reduce the stock's fair market value . . . [and] since the HRN stock was unregistered and subject to the resale restrictions of SEC Rule 144, this restriction limited this sale in the public marketplace and would generally justify a discount.

Proposed Findings of Uncontroverted Facts ("Findings") ¶ 78. The Litmans' counsel also presented the examining agent with a copy of the primary appraisal relied upon by the Litmans to report the value of the restricted shares in their 2000 Form 1040. This appraisal, which was prepared by an appraisal firm often used by the IRS in valuation disputes, detailed the commonly relied upon methodology employed by the appraiser to determine the valuation effect of the restrictions. But the IRS disregarded the appraisal provided by the Litmans and completely failed to obtain an appraisal of its own before issuing a deficiency notice. Ignoring the

substantial valuation impact of the sale restrictions and ignoring what the IRS recognized as "well-settled law," the IRS erroneously based both its $12.5 million tax deficiency and its $2.5 million penalty on the assumption that the stock received by the TMF Liquidating Trust was worth $16 per share -- the freely traded IPO price.

The fundamental question in this case is whether the IRS erroneously assessed a $12.5 million income tax deficiency and a $2.5 million accuracy related penalty under § 6662(a)[1] against the Litmans for calendar year 2000. This motion addresses the three issues that go to the heart of this fundamental question. The first issue is whether the fair market value of the restricted HRN shares received by the TMF Liquidating Trust was less than the $16 per share IPO price. The second issue is whether the TMF Liquidating Trust was entitled to a deduction, under § 162(a)(1), for compensation paid to Andrew Pells, TMF's key employee. The third issue is whether the IRS erred in asserting a $2.5 million "accuracy-related" penalty under § 6662 when the evidence conclusively demonstrates that (1) no underpayment of tax occurred and (2) the Litmans reasonably relied upon two independent appraisals from qualified and reputable appraisal firms in reporting the fair market value of the restricted HRN shares received.[2]

Because well established precedent, the IRS's admissions, and an unrebutted expert valuation of the conclusively demonstrate that the fair market value of the restricted HRN shares received by the TMF Liquidating Trust was $45,437,822 rather than the $160 million

[1] References to "§ ____" and "the Code" are to the specified section of the Internal Revenue Code of 1986, as amended, and the Code itself, unless otherwise indicated. References to "Treas. Reg. § __" and "the Regulations" are to the specified section of the regulations promulgated attendant to the Code and the Regulations themselves.

[2] The Litmans also assert that the IRS's deficiency and penalty is barred because the IRS failed to send a notice of deficiency to the Litmans last known address within the three year statute of limitations as required by § 6501(a). The Litmans are engaging in discovery on this issue and, in the event that this motion does not dispose of the entire case, intend to file a summary judgment motion addressing the limitations issue as well.

value asserted by the IRS, the Litmans are entitled to a summary judgment determining that the fair market value of the restricted shares received by the TMF Liquidating Trust was $45,437,822 or, alternatively, was less than $16 per share. In addition, because the summary judgment evidence conclusively demonstrates that the compensation paid to Andrew Pells by TMF Liquidating Trust was fair and reasonable and commensurate with the valuable services he provided to TMF Liquidating Trust and its predecessor, the IRS erred as a matter of law in denying the loss relating to TMF Liquidating Trust's deduction for such compensation under § 162(a)(1). Finally, because the summary judgment evidence conclusively demonstrates that (1) no underpayment of tax occurred, and (2) the Litmans reasonably relied upon two qualified and independent appraisals in reporting the value of the restricted shares received, the Litmans are entitled to summary judgment determining that the $2.5 million penalty assessed by the IRS under § 6662(a) was erroneous as a matter of law.

## II. The Undisputed Facts Demonstrate the Litmans' Right to Summary Judgment.

### A. The Sale

In May of 1999, all of the assets of TMF, Inc., a Subchapter S corporation in which the Litmans owned a fifty percent interest, were sold to USA Networks ("the 1999 Contract"). During 1999, TMF, Inc. was liquidated and its assets (including, without limitation, the sales proceeds and other rights under the 1999 Contract) and its liabilities were transferred to the TMF Liquidating Trust in which the Litmans (including trusts as to which the Litmans are treated as grantors under I.R.C. §§ 671-678) owned a fifty percent interest. The TMF Liquidating Trust was a flow-through entity taxed as a grantor type trust. Accordingly, all income and loss of the TMF Liquidating Trust were taxable to its grantors under I.R.C. §§ 671-678. Findings ¶¶ 12-17.

HRN was anticipating making an initial public offering of a portion of its common stock during February of 2000. Effective February 2, 2000, the 1999 Contract was amended ("the 2000 Amendment"). As a part of the 2000 Amendment ("the Transaction"), the TMF Liquidating Trust exchanged certain earn-out rights under the 1999 Contract for the right to receive restricted equity interests in the common stock of HRN. The shares of stock to be received by the TMF Liquidating Trust from the Transaction ("the Restricted Shares") were subject to onerous sale restrictions. These sale restrictions included, among other things, (1) contractual holding periods (the majority of the Restricted Shares were subject to a four year restriction on sale), (2) SEC Rule 144 volume restrictions on the number of Restricted Shares that could be sold after holding periods expired, (3) the requirement that approval of HRN's parent company be obtained before any Restricted Shares could be sold, (4) the practical market restriction on sale due to the fact that the TMF Liquidating Trust was owned by the CEO and President of HRN and would be subject to additional securities law restrictions, and (5) the public float was initially only half the size of the Restricted Shares issued to the TMF Liquidating Trust, so practically it could not be sold without drastically lowering the market price. The contractual sale restrictions are set forth in detail in the 2000 Amendment. These sale restrictions produced significant risk, particularly given the volatility of the NASDAQ and, more specifically, the volatility of dot.com and travel industry stocks during the relevant period. Findings ¶¶ 18-23.

**B. The Appraisals of the Restricted Shares and the Federal Income Tax Returns**

The TMF Liquidating Trust, and thus the Litmans, recognized capital gains on the receipt of the Restricted Shares based upon the fair market value of those shares when received. In determining the fair market value of the Restricted Shares, the Litmans knew that the substantial sale restrictions caused the Restricted Shares to be worth less than the initial public

offering price of the HRN stock, but we were not certain how much less. Because of this uncertainty, the Litmans sought professional appraisal help in determining the fair market value of the Restricted Shares. Of the 9,999,900 Restricted Shares issued in February 2000, none were permitted to be sold for at least one year, and most could not be sold for four years. The market price of HRN shares without the restrictions could rise and fall in the public market, and TMF Liquidating Trust could not take advantage of any of the increases during the restriction periods. Only after the expiration of four 4 years would all contractual restrictions on the Restricted Shares be removed. Findings ¶¶ 24-26.

To determine the fair market value of the Restricted Shares, the Litmans, along with Robert and Michele Diener, sought the help of Business Valuation Services, Inc. ("BVS"), a very reputable independent appraisal and valuation firm. BVS's expert opinion is often relied upon by individuals, corporations and even the Internal Revenue Service with respect to complex valuation matters. BVS prepared an independent appraisal report expressing its opinion of the appropriate discount for lack of marketability to be applied in determining the fair market value of the Restricted Shares received by the TMF Liquidating Trust. The BVS valuation analysis considered, among other things, the relevant sale restrictions imposed on the Restricted Shares, as well as the factors listed in Revenue Rulings 59-60 and 77-287. Findings ¶¶ 27-34.

Giving consideration to relevant sale restrictions, BVS determined that the appropriate lack of marketability discount to be applied to the anticipated IPO price of the HRN stock to determine the fair market value of the Restricted Shares was:

| Contractual Restriction Period | Discount |
|---|---|
| One year | 49.5% |
| Two years | 61.5% |
| Three years | 63.5% |
| Four years | 79.0% |

.

Applying these lack of marketability discounts to the $16 per share initial public offering price of the HRN stock, the following values were derived for the Restricted Shares:

| Contractual Restriction Period | IPO Price | Numbered of Restricted Shares Received | BVS Discount | Value | Per Share Value |
|---|---|---|---|---|---|
| One year | $16 | 1,959,960 | 49.5% | $15,836,477 | $8.08 |
| Two years | $16 | 489,990 | 61.5% | 3,018,338 | $6.16 |
| Three years | $16 | 489,990 | 63.5% | 2,861,542 | $5.84 |
| Four years | $16 | 7,059,960 | 79.0% | 23,721,465 | $3.36 |
| | Total | 9,999,900 | | $45,437,822 | |

.

Findings ¶¶ 35-38.

A second independent analysis of the value of the Restricted Shares was also obtained by the Litmans and the Dieners. The second appraiser's opinion actually resulted in a lower fair market value of the Restricted Shares than the BVS analysis. Using the conservative approach, the Litmans reported the fair market value of the Restricted Shares received at the higher value set forth relying on the BVS appraisal. *Id.* Findings ¶¶ 38-40.

The TMF Liquidating Trust reported the fair market value of the Restricted Shares acquired in the Transaction at a collective value of $45,437,822. The value resulted in total net long term gain to the Litmans of $22,718,911. Findings ¶¶ 41-42.

The gain from the Stock received in the Transaction, plus other gains recognized by the Litmans in 2000, resulted in the Litmans reporting total net long term gain the amount of

$49,816,356 on Line 12 of Schedule D of the 2000 Form 1040. The Litmans also reported a non-passive loss from the TMF Liquidating Trust in the amount of $3,572,234. The Litmans paid income taxes of $9,749,859 in connection with their 2000 Form 1040. Of the income tax paid, $4,543,782 resulted from the gain recognized on receipt of the Restricted Shares. Findings ¶ 43.

**C. Andrew Pells' Compensation**

During 2000, TMF Liquidating Trust reported a total non-passive loss of $7,144,467. TMF Liquidating Trust reported employee compensation, including cash and stock, of $6,844,136. This included $2,924,215.50 of wages reported to Andrew Pells on a Form W-2 and $3,919,920 of Miscellaneous Income reported to Mr. Pells on a Form 1099-Misc. The amounts reported on the Form W-2 issued to Mr. Pells were for cash payments to Mr. Pells. The Miscellaneous Income of $3,919,920 resulted from the March 1, 2000 assignment of 244,995 shares of one year restricted stock to Mr. Pells.[3] The shares transferred to Mr. Pells as compensation were valued at $16 per share as statutorily required under I.R.C. § 83.[4] In connection with the transfer of these shares to Mr. Pells, the TMF Liquidating Trust recognized and reported a capital gain of $1,940,360.[5] Findings ¶¶ 46-50.

---

[3] Section 7.15 of the 2000 Amendment permitted the TMF Liquidating Trust to transfer these shares to Mr. Pells.

[4] I.R.C. § 83(a) provides that if, in connection with the performance of services, property is transferred to any person, the transferees' gross income shall include "the excess of (1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) . . . over (2) the amount (if any) paid for the property." I.R.C. § 83(a). I.R.C. § 83(h) provides that the employer's deduction shall be computed in the same manner. I.R.C. § 83(h).

[5] The TMF Liquidating Trust had a basis in the shares transferred to Mr. Pells of $8.08 per share, as the shares were restricted from trading for one year. Since I.R.C. § 83 required the shares transferred to Mr. Pells to be valued at $16 per share (*i.e.*, assuming the restrictions did not exist), the capital gains recognized by the TMF Liquidating Trust upon the transfer of the shares to Mr. Pells was computed as follows: [$16 - 8.08] times 244, 995, or $1,940,360.

The cash and stock compensation paid to Mr. Pells was fair and reasonable and commensurate with the substantial services Mr. Pells provided to TMF, Inc. and its successor, TMF Liquidating Trust. TMF, Inc.'s primary business involved hotel reservations. TMF, Inc. was a consolidator of hotel accommodations, providing service through various websites and a toll free call center. TMF, Inc. contracted with hotels in advance for volume purchases at wholesale prices and sold those rooms to consumers, often at discounts from published rates. TMF, Inc. grew from a company of $5 million of sales in 1992 to a company having over $1.4 billion of sales in 2003. Findings ¶¶ 52-55.

Mr. Pells was a key employee of TMF, Inc. from its creation in 1991. He is not related to any of the owners of TMF, Inc., nor did he own an interest in TMF, Inc. Prior to his employment with TMF, Inc. Mr. Pells had over fifteen years experience in the travel industry, including owning and operating a significant wholesale travel agency. Mr. Pells possessed significant relationships in the hotel industry, which were extremely valuable to TMF, Inc. Mr. Pells was also a skilled negotiator and a strong deal closer. As the Senior Vice President of Hotel Product, Mr. Pells was responsible for many of the company's vendor relationships, and played a large part in building the hotel program and relationships with TMF, Inc.'s approximately 1,200 hotel partners, which was the backbone of the company's business. Findings ¶¶ 56-61.

At the time TMF, Inc. was formed, Robert Diener and David Litman recognized that Mr. Pells was going to be a key employee. On behalf of TMF, Inc., they agreed with Mr. Pells that he would be entitled to one percent of the value company (when that value was ultimately monetized) for each year he remained with TMF, Inc. up to a total of five percent as an incentive for him to stay with the company. There was no certainty that TMF, Inc. would succeed, and Mr. Pells gave up current income for an opportunity to be compensated later if the

company was successful. This compensation arrangement aligned Mr. Pells' interests with that of the company. Mr. Pells received and declined several other opportunities for employment during the 1991-2000 period. He remained a loyal and valuable employee of TMF, Inc. and was entitled to the agreed upon compensation. The agreement with Mr. Pells was similar to many agreements reached between start up companies and their key employees during this period, where the employee is willing to forgo some current salary for an equity stake in the company. Findings ¶¶ 62-66.

For a number of years, Mr. Pells worked for TMF, Inc at lower compensation than he might have received elsewhere and part of his motivation for doing so was the significant bonus he might receive upon the ultimate sale of the business. Arrangements like this are common in new business ventures. After the 1999 Contract was entered into, Mr. Pells was compensated in accordance with his agreement with TMF, Inc. After the 2000 Amendment, the TMF Liquidating Trust paid cash and assigned 244,955 shares of one year restricted stock to Mr. Pells in accordance with his agreement. As restrictions on the Restricted Shares lapsed during 2001, 2002, 2003, and 2004, Mr. Pells was assigned his portion of those shares in accordance with his compensation agreement. Mr. Pells' compensation was reasonable based upon his valuable services to TMF, Inc. and TMF Liquidating Trust and in light of the overall proceeds generated by TMF, Inc. and TMF Liquidating Trust in connection with the sale of TMF, Inc.'s assets in 1999. Findings ¶¶ 67-71.

### D. The IRS's Audit and Its Assertion of a Penalty

The 2000 Form 1040 was audited by the IRS, and a notice of deficiency was issued to the Litmans[6] dated October 8, 2004 ("the Notice of Deficiency"), asserting that the capital gain resulting from the Restricted Shares received in the Transaction was $79,999,200

[6] The notice of deficiency was not sent to the Litmans' last known address as required by § 6501(a).

rather than $22,718,911, as reported. The IRS asserted that the total capital gains reported on Line 12 of Schedule D for 2000 was $107,096,645, rather than $49,816,356, as reported. The Notice of Deficiency also asserted that the loss related to the compensation paid to Mr. Pells should be denied because the "amount deducted as employee compensation had not been substantiated as to amount or deductibility," even though the IRS's examining agent never raised the issue during the audit. Despite the fact that the Litmans relied upon two independent appraisals to determine the value of the Restricted Shares, the IRS asserted a deficiency in income taxes against the Litmans for the tax year 2000 in the amount of $12,584,993 and a penalty under I.R.C. § 6662(a) in the amount of $2,516,998.60. Findings ¶¶ 76-83.

The IRS's explanation for its assessment of a penalty under I.R.C. § 6662(a) is as follows:

> 3. <u>Accuracy-related Penalty IRC section 6662(a)</u>.
>
> Since all or part of the underpayment of tax for the taxable year(s) is attributable to one or more of (1) negligence or disregard of rules or regulations, (2) any substantial understatement of income tax, or (3) any substantial valuation overstatement, an addition to the tax is charged as provided by section 6662(a) of the Internal Revenue Code. The penalty is twenty (20) percent of the portion of the underpayment of tax attributable to each component of this penalty. In addition, interest is computed on this penalty from the due date of the return (including any extensions).

The IRS provided no further explanation for its imposition of penalties in the Notice of Deficiency. Findings ¶ 78.

The IRS asserted an "accuracy-related" penalty against the Litmans under I.R.C. § 6662(a) even though the IRS (1) was fully aware that the Litmans had reasonably relied upon two independent appraisals from reputable appraisal firms and reported the transaction using a conservative approach based upon the higher value of the two appraisals, (2) was provided with a copy of the BVS Appraisal on June 9, 2004, before the notice of deficiency was issued, (3) the

IRS failed to obtain any independent appraisal of the Restricted Shares before issuing the notice of deficiency and before denying the Litmans' claim for refund, and (4) the IRS never sought any substantiation of Andrew Pells' compensation and raised no question about this compensation during the audit. Moreover, the IRS asserted a penalty despite the fact that (1) BVS is often employed by the IRS to provide the IRS with opinions regarding valuation issues, and (2) BVS's opinions are relied upon by the IRS in valuation disputes with other taxpayers. Findings ¶¶ 79-83.

## III. Settled Precedent, the IRS's Admissions, and the Appraisal Relied Upon by the Litmans Demonstrate that the Litmans are Entitled to Summary Judgment Because as a Matter of Law the Fair Market Value of the Stock was Less Than $16 Per Share.

Courts and valuation professionals have long recognized that stock subject to sale or transfer restrictions has a lower value than identical, but freely tradable restricted shares of the same stock. That is because, all other things being equal, an investor will require a reduction in price, also referred to as a "discount," because the restricted shares cannot be sold in the open market for a period of time and thus expose the holder to additional risk. The size of the discount depends upon a number of factors, including without limitation, the length of the period during which the stock is restricted, the size of the block of restricted stock compared to the company's market capitalization, and the risk inherent in and the volatility of the company's stock. *See, e.g.*, *Estate of Gilford v. Comm'r*, 88 T.C. 38 (1987). For example, in *McDonald v. Comm'r*, 764 F.3d 322 (5th Cir 1985), *aff'g*, 45 T.C.M. (CCH) 1276 (1983), the Fifth Circuit Court of Appeals noted as follows:

> [I]t has long been recognized that restrictions of the very kind here in issue [sale restrictions] affect the fair market value of the stock subject thereto. As the Tax Court said in *LeVant v. Commissioner*, 45 T.C. 185, 204 (1965), *rev'd on other grounds*, 376 F.2d 434, 441-42 (7th Cir. 1967), "[i]t has been held in several cases that the restriction on the sale of investment letter stock reduces the value

> of the stock below the fair market value of the stock without the restriction . . . ." *See also Victorson v. Commissioner*, 21 T.C.M. 1238, 1246 (CCH) (1962), *aff'd*, 326 F.2d 264 (2d Cir. 1964); *Goldwasser v. Commissioner*, 47 B.T.A. 445, 457 (1942), *aff'd mem. per curiam*, 142 F.2d 556 (2d Cir.), *cert. denied*, 323 U.S. 765, 65 S.Ct. 119, 89 L.Ed. 612 (1944); *Bolles v. Commissioner*, 69 T.C. 342, 354 (1977) ("The value of stock which may be sold only to persons who take for investment is significantly decreased by such restriction."); *Husted v. Commissioner, . . .*"

*Id.* at 329-30. *See also* Shannon P. Pratt, et al., Valuing a Business, 395-407 (4th ed. 2003).

The IRS's National Office recognized this discount almost thirty years ago when it promulgated Revenue Ruling 77-287, in which the IRS described the valuation impact as follows:

> The market experience of freely tradable securities of the same class as the restricted securities is also significant in determining the amount of discount. Whether the shares are privately held or publicly traded affects the worth of the shares to the holder. Securities traded on a public market generally are worth more to investors than those that are not traded on a public market.

Rev. Rul 77-287, 1977-2 C.B. 319, § 6.04. The Ruling also states that "***the longer the buyer of the shares must wait to liquidate the shares, the greater the discount***." *Id*. at § 6.02 (emphasis added).

The IRS's examining agent even acknowledged this discount in her Revenue Agent's Report in this case, stating as follows:

> ***It is well settled that restrictions on the public sale of stock reduce the stock's fair market value***; *Estate of Piper v. Commissioner*, 72 T.C. 1062, 1087, 1979 WL 3788 (1979); *Bolles v. Commissioner*, 69 T.C. 342 (1977); *Hirsch v. Commissioner*, 51 T.C. 121 (1968); *Husted v. Commissioner*, 47 T.C. 664 (1967). Revenue Ruling 77-287, 1977-2 C.B. 319 was issued to provide guidance to taxpayers, Internal Revenue Service personnel, and others concerned with the valuation, for Federal tax purposes, of securities that cannot be immediately resold because they are restricted from resale pursuant to Federal securities laws.

> ***Since the HRN stock was unregistered and subject to resale restrictions of SEC Rule 144, this restriction limited their sale in the public marketplace and would generally justify a discount.*** However, since the statute of limitation is imminent and the taxpayer has decline [sic] to extent [sic] the statute, time does not permit a valuation to be prepared by the Service or for the parties to further attempt to come to an agreement on the FMV of the restricted stock. As a result, the portion of the gain from the receipt of HRN restricted stock is computed based on the FMV asserted by HRN, or $16 per share.

Findings ¶ 78 (emphasis added).

The Restricted Shares received by the TMF Liquidating Trust are subject to (1) contractual holding periods ranging from one to four years (most of the stock was four year restricted), (2) SEC Rule 144 volume restrictions on the number of Restricted Shares that could be sold after holding periods expired, (3) the requirement that approval of HRN's parent company be obtained before any stock could be sold, (4) the practical market restriction on sale due to the fact that the TMF Liquidating Trust was owned by the CEO and President of HRN (any sale might be considered to be a lack of confidence in the company), and (5) blockage restrictions due to the size of the block of stock compared to the number of freely traded Restricted Shares. BVS appraised the Restricted Shares using commonly relied upon valuation techniques and the methodology promulgated by the IRS in Rev. Rul. 77-287. The BVS appraisal conclusively demonstrates that in determining the fair market value of the Restricted Shares of restricted stock received by the TMF Liquidating Trust, the transfer restrictions justify discounts (when compared to the IPO price) ranging from 49.5% to 79%. Applying the valuation discounts determined by BVS, the fair market value of the Restricted Shares received by the TMF Liquidating Trust was $45,437,822. Findings ¶¶ 35-38.

To date, the IRS has not produced any evidence demonstrating that the value should be different from that determined by BVS. The IRS's use of the freely traded IPO price

in the notice of deficiency is not entitled to a presumption of correctness as it is contrary to settled case law and the IRS's own position. *Cook v. United States*, 46 Fed. Cl. 100, 114 (2000). As a matter of law, the Litmans are entitled to summary judgment providing that the fair market value of the Restricted Shares received by the TMF Liquidating Trust was $45,437,822 or, alternatively less than $16 per share. In either case, the Litmans are entitled to a refund of income taxes paid.

The Litmans assume that Defendant will request additional time to provide the Court with an expert opinion of the value of the Restricted Shares and the discount to be applied. If the Court grants this request, the Litmans respectfully request the Court to enter an order providing, at a minimum, that the Litmans are entitled, pending the final resolution of this case, to a refund of income tax and interest thereon in an amount equal to the difference in tax that would have been paid based upon the IRS expert's determination of value and the amount of tax paid by the Litmans.

**IV. The IRS Had No Basis for Denying TMF Liquidating Trust's Deduction for Andrew Pells' Compensation.**

Under § 162(a)(1), TMF Liquidating Trust could deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered." I.R.C. § 162(a)(1). To be deductible, payments must both be reasonable and purely for services rendered. Treas. Reg. § 1.162-7(a). Likewise, bonus payments are deductible as compensation if, when added to the salary, they do not exceed reasonable compensation for services actually rendered. Treas. Reg. § 1.162-9. Unlike many cases in the reasonable compensation area, this case does not involve the reasonableness of compensation

paid to an employee/owner. *See, e.g., Northlich, Stolley, Inc. v. United States*, 177 Ct. Cl. 435, 368 F.2d 272 (1966).

The test of deductibility is whether the compensation payments are reasonable under all the circumstances and whether they are purely for services. Treas. Reg. § 1.162-7. Courts have considered a number of factors in deciding whether the amount of compensation paid to an employee is reasonable, such as: (a) the employee's qualifications; (b) the nature, extent and scope of the employee's work; (c) the size and complexity of the business; (d) the comparison of salaries paid with gross and net income; (e) general economic conditions; (f) comparison of salaries to distributions to shareholders and retained earnings; (g) the prevailing rates of compensation for comparable positions in comparable companies; (h) the employer's salary policy to all employees; (i) the employer's financial conditions; (j) compensation paid in prior years; and (k) whether the employee and employer dealt at arm's-length. *See, e.g., Elliott's, Inc. v. Comm'r*, 716 F.2d 1241 (9th Cir. 1983), *aff'd*, 782 F.2d 1051 (1986); *Mayson Mfg. Co. v. Comm'r*, 178 F.2d 115, 119 (6th Cir. 1949). No one factor determines whether the compensation is reasonable. As demonstrated below, Mr. Pells' compensation arrangement satisfied the deductibility test.

- **Qualifications** - Mr. Pells was highly qualified for his position as Senior Vice President of Hotel Product of TMF, Inc. Prior to his employment with TMF, Inc., Mr. Pells had over 15 years experience in the travel industry, including owning and operating a significant wholesale travel agency. He possessed significant relationships in the hotel industry. Findings ¶¶ 58-59.

- **Scope of Work** – As a Senior Vice President of Hotel Product, Mr. Pells was the key employee of TMF, Inc. He was responsible for many of the company's vendor

relationships, and played a large part in building the hotel program and relationships with TMF, Inc.'s approximately 1,200 hotel partners. Findings ¶¶ 61-62.

- **<u>Size and Complexity of Business</u> –** TMF, Inc. was a leading on-line consolidator of hotel accommodations, providing service through various websites and a toll-free call center. TMF, Inc. contracted with hotels in advance for volume purchases at wholesale prices and sold those rooms to consumers. In 2000, the company employed 180 people in its call center in Dallas. HRN, who acquired TMF, Inc.'s assets, ultimately became known at "hotels.com." Findings ¶¶ 13-15, 73.

- **<u>Comparison of Salaries to Shareholder Distributions/Employer's Financial Condition</u>** - Mr. Pells received total compensation of $6,844,136 during 2000. This consisted of cash of $2,924,215.50 and 244,995 shares of stock with a fair market value of $1,979,560 ($8.08 per share).[7] Given that TMF, Inc. realized and reported a gain of $45,437,822 on the receipt of the Restricted Shares in 2000, Mr. Pells' compensation was reasonable compared to the benefits received by the shareholders of the company. Findings ¶¶ 24-37, 46-48.

- **<u>Prevailing Rates in Comparable Companies/Prior Years Compensation</u>** - The agreement with Mr. Pells, whereby he was willing to forego some current salary for future compensation when the company performed well, was comparable to the compensation structure employed by numerous start-up companies. Findings ¶¶ 64-68.

- **<u>Arm's Length Nature</u>** - Andrew Pells was unrelated to the owners of TMF, Inc., and he owned no stock in TMF, Inc. or TMF Liquidating Trust. He was, however, a valued employee and made significant contributions to the business. Findings ¶¶ 57-68.

---

[7] As noted, I.R.C. § 83 required the compensation to be valued at $16 per share despite the significant transfer restrictions, resulting in Mr. Pells reporting the shares in his gross income (and TMF Liquidating Trust deducting the compensation expense) at $3,919,920. Mr. Pells recognized these amounts as ordinary income.

In *Custom Chrome, Inc. v. Comm'r*, 76 T.C.M. (CCH) 386 (1998), *rev'd on other grounds*, 217 F.3d 1117 (2000), the Tax Court allowed a deduction under I.R.C. § 162 based upon a compensation arrangement similar to Mr. Pells' agreement with TMF, Inc. In that case, the Court addressed the question of whether amounts paid to key employees as compensation for services rendered in prior years were deductible as business expenses. The amounts paid were based on long-standing agreements between the employees and the shareholder/officer that once the shareholder's stock was sold, additional compensation for past services would be paid to them. The IRS argued that the payments were not deductible, and related to covenants not to compete entered into between the company and the employees. Holding that the entire balance of the payments was deductible compensation, the Tax Court found that

> The evidence, although not extensive, is credible and persuasive and establishes that the $1.199 million was paid to Panzica, Battistella, and Navarra as consideration for services rendered in prior years and not for covenants not to compete. The $1.199 million was paid in 1990, not deferred until later years after the employees terminated their employment with petitioner and was based on a longstanding understanding between Cruze, on the one hand, and Panzica, Battistella, and Navarra, on the other, that Panzica, Battistella, and Navarra would be compensated with additional compensation for services rendered if Cruze's stock in petitioner was sold.

*Id.* at 392.

In this case, the summary judgment evidence conclusively demonstrates that Mr. Pells' compensation was reasonable and based upon his valuable services to TMF, Inc. and TMF Liquidating Trust. As a matter of law, TMF Liquidating Trust was entitled to a deduction of such compensation under § 162(a)(1) and the IRS erred in disallowing the Litmans' loss relating to such compensation.

**V. The Litmans Are Entitled to a Refund of the IRS's $2.5 Million Accuracy-Related Penalty as a Matter of Law Because (1) No Underpayment of Taxes Occurred, and**

**(2) They Reasonably Relied Upon Two Qualified Independent Appraisals When Reporting the Fair Market Value of the Restricted Shares.**

**A. Overview of Section 6662(a) Penalties**

The IRS has asserted that the Litmans are liable for penalties under § 6662(a) because "all or part of the underpayment of tax for the taxable year(s) is attributable to one or more of (1) negligence or disregard of rules or regulations, (2) any substantial understatement of income tax, or (3) any substantial valuation overstatement." If applicable, § 6662(a) provides for an addition to tax in an amount equal to in 20 percent of the portion of the underpayment of tax to which § 6662 applies. I.R.C. § 6662(a). If, as demonstrated above, no underpayment of tax occurred, then the IRS's assessment of a penalty under § 6662 was improper.

Section 6662(b) sets out the conduct which gives rise to the 20 percent penalty, and provides in pertinent part, as follows:

> (b) PORTION OF UNDERPAYMENT TO WHICH SECTION APPLIES.--This section shall apply to the portion of any underpayment which is attributable to 1 or more of the following:
>
> (1) Negligence or disregard of rules or regulations.
>
> (2) Any substantial understatement of income tax.
>
> (3) Any substantial valuation misstatement under chapter 1.

I.R.C. § 6662(b).

Section 6664 provides an exception to § 6662 penalties.[8] Section 6664 provides that "[n]o penalty shall be imposed under section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the

[8] The regulations pertaining to § 6664, titled "Reasonable cause and good faith exception to section 6662 penalties," state that "[n]o penalty may be imposed under section 6662" where a showing of reasonable cause and good faith is made. Treas. Reg. § 1.6664-4(a); s*ee also Jacobson v. Comm'r*, 78 T.C.M. (CCH) 930, 934 (1999) ("The accuracy-related penalty under section 6662(h) [for gross understatement] does not apply to any portion of underpayment if the taxpayer shows that there was reasonable cause for such portion and that the taxpayer acted in good faith.").

taxpayer acted in good faith with respect to such portion." I.R.C. § 6664(c)(1). Thus, the IRS's assertion of a penalty -- even if we assume that the IRS's erroneous tax deficiency was correctly issued -- cannot stand if the Court determines that the Litmans had reasonable cause and acted in good faith in determining the reported value of the Restricted Shares. I.R.C. § 6664(c)(1).

Courts have repeatedly held that reliance on professional advice constitutes good cause under § 6664(c) when: (1) the advisor has sufficient expertise to justify reliance; (2) the taxpayer provides the professional advisor with sufficient and accurate information; and (3) the taxpayer actually relies in good faith on the advisor's judgment. *See, e.g.*, *Sklar, Greenstein & Scheer v. Comm'r*, 113 T.C. 135, 144-45 (1999); *Sather v. Comm'r*, 78 T.C.M. (CCH) 456 (1999), *rev'd on other grounds*, 251 F.3d 1168 (8th Cir. 2001). In particular, courts have repeatedly found that reliance on a professional appraiser meets the reasonable reliance standard. *See, e.g.*, *Estate of Simplot v. Comm'r*, 112 T.C. 130, 182 (1999), *rev'd on other grounds*, 249 F.3d 1191 (9th Cir. 2001) (holding that taxpayer's reliance on professional appraisal met reasonable reliance standard); *Crocker v. Comm'r*, 75 T.C.M. (CCH) 2414 (1998) (holding that taxpayer's reliance on licensed real estate appraisers met reasonable reliance standard); *Schauerhamer v. Comm'r*, 73 T.C.M. (CCH) 2955 (1997) (holding that taxpayer's reliance on competent tax professionals and a property appraisal company was sufficient to meet the reasonable reliance standard). For example, in *Estate of Simplot*, the taxpayer relied on a professional appraisal from Morgan Stanley & Co. to value shares of stock in J.R. Simplot Co. *Estate of Simplot*, 112 T.C. at 182-83. The Tax Court held in *Estate of Simplot* that the taxpayer's reliance on Morgan Stanley, a long time advisor to the family company, was reasonable and that § 6662 penalties should not be applied. *Id.*

Treas. Reg. § 1.6664-4(b)(1) also provides that, where an appraisal is involved, the methodology and assumptions underlying the appraisal, the relationship of the appraiser to

the taxpayer, the appraisal price and the relationship between the appraised price and any purchase price of the item appraised, and the circumstances under which the appraisal was obtained can be relevant to determining whether the taxpayer was reasonable in his reliance on the appraisal. Treas. Reg. § 1.6664-4(b)(1).

**B. Because the Litmans' Position Was Taken In Good Faith And With Reasonable Cause, the IRS's Assessment of Section 6662(a) Penalties is in Error**

The Litmans obtained two appraisals from professional appraisers and used the appraisal with the higher value. BVS, the expert[9] who prepared the appraisal upon which the Litmans placed primary reliance, is a nationally known, highly regarded professional appraisal firm that often has been used by the IRS in valuation matters. *See, e.g.*, *Estate of Mellinger v. Comm'r*, 112 T.C. 26 (1999), *acq.* 1999 WL 33541675; *Estate of Jung v. Comm'r*, 101 T.C. 412 (1993); *Estate of Hendrickson v. Comm'r*, 78 T.C.M. (CCH) 322 (1999); *Estate of Mitchell v. Comm'r*, 74 T.C.M. (CCH) 872 (1997), *vacated on other grounds*, 250 F.3d 697, *non-acq.*, 2005 WL 1318362 (2005); *Estate of Gray v. Comm'r*, 66 T.C.M. (CCH) 254 (1999). Any claim by

[9] The BVS appraisal was signed by Mark L. Mitchell, a principal with BVS at the time. Mr. Mitchell's qualifications, as set forth in the BVS appraisal, were, in part, as follows:

> [Mark L. Mitchell] has extensive experience in the valuation of business assets for gift and estate tax purposes, acquisition, divestiture, strategic planning, minority stockholder disputes, ESOPs and fairness and solvency opinions. He frequently values debt instruments and other specialized securities, including convertible bonds, preferred stock, options and warrants.
>
> Mr. Mitchell holds a Master of Business Administration degree in Finance from Southern Methodist University and two Bachelor of Science degrees, in Mathematical Sciences and Economics and Systems Analysis, also from Southern Methodist University. He is a member of the Association for Investment Management and Research, a member of the Dallas Association of Investment Analysts and a Senior Member of the American Society of Appraisers.

Findings ¶ 36.

the IRS that BVS lacks sufficient expertise to justify the Litmans' reliance on a BVS appraisal would be specious and should be summarily rejected.

The affidavits submitted with this motion conclusively demonstrate that (1) BVS was provided with accurate and sufficient information to prepare its appraisal,[10] and (2) the Litmans relied on the BVS appraisal in good faith to report the value of the Restricted Shares in computing the capital gain reflected in their 2000 Form 1040. Thus, the evidence submitted conclusively demonstrates that the Litmans have satisfied § 6664(c), and the IRS erred in assessing penalties under § 6662.

While Treas. Reg. § 1.6664-4(b)(1) provides several factors to be considered when determining whether reliance on an appraisal is reasonable and in good faith, here only the methodology and assumptions underlying the BVS appraisal are potentially open to discussion. It is indisputable that BVS was independent from the Litmans and that the appraisal was obtained in the ordinary course of business. There is no "purchase price" with which to compare the value determined by the appraisal, because while registered shares of HRN were publicly traded, the Litmans did not own registered shares.

There also can be no dispute that the methodology and assumptions used by BVS were reasonable. BVS followed the methodology for valuing restricted stock outlined by the IRS in Rev. Rul. 77-287, which provides that the restricted stock studies examined by BVS serve as guideposts for determining the discount to be applied when valuing the Restricted Shares. Rev. Rul 77-287, 1977-2 C.B. 319. These published studies, performed by valuation experts and economists through the years, demonstrate the discounts observed when comparing the price of restricted stock privately sold with its publicly traded counterpart. This methodology has also

---

[10] BVS was provided with the 1999 Contract and the 2000 Amendment. The Restricted Shares were publicly traded; thus, sufficient information was publicly available for BVS to accurately determine the fair market value of the Restricted Shares.

been approved in numerous court cases. *See, e.g., Estate of Gilford v. Comm'r*, 88 T.C. 38, 60 (1987) (approving appraiser's methodology, which followed Rev. Rul. 77-287 and resulted in a substantial discount from publicly traded value for SEC Rule 144 restricted stock); *Campbell v. United States*, 228 Ct. Cl. 661, 661 F.2d 209 (1981); *Adair v. Comm'r*, 54 T.C.M. (CCH) 705 (1987); *Estate of Sullivan v. Comm'r*, 45 T.C.M. (CCH) 1199 (1983); *Estate of Piper v. Comm'r*, 72 T.C. 1062 (1979).

As noted above, even the IRS recognizes that "[i]t is well settled that restrictions on the public sale of stock reduce the stock's fair market value . . . and would generally justify a discount." Findings ¶ 78. It is thus inexplicable that the IRS would penalize the Litmans for following the well-established principle that the fair market value of restricted stock is lower than that of unrestricted stock, while the IRS ignores that principle and values the Restricted Shares at their publicly traded, unrestricted value. The IRS's acknowledgment that the $16 per share price on which it based its $12.5 deficiency and its $2.5 million penalty was erroneous, and its failure to obtain any independent valuation of the Restricted Shares before it issued the notice of deficiency, demonstrates the irony of the IRS's position. As a matter of public policy, the IRS should not be allowed to assert a multi-million dollar deficiency and penalty against taxpayers who relied on a qualified appraisal from a firm often used by the IRS when the IRS itself has made no effort to value the Restricted Shares and acknowledges that the value it asserted is erroneous.

The IRS's arbitrary assessment of penalties against the Litmans has no basis in law or the facts of this case. As a matter of law, the Litmans' good faith reliance on the two qualified and independent appraisals to determine the value of the Restricted Shares in their 2000 income tax return precludes the IRS's assertion of penalties in this case. The Litmans are

entitled to summary judgment that the IRS erroneously asserted a penalty under § 6662, and a refund of the $2.5 million penalty paid.

## VI. Conclusion.

For the reasons set forth above, the Litmans respectfully request the Court to: grant this Motion for Summary Judgment and enter an order providing that (1) the fair market value of the Restricted Shares received by the TMF Liquidating Trust was $45,437,822 or, alternatively, less than $16 per share, and that the Litmans are entitled to a refund of income tax paid for calendar year 2000, plus interest from January 4, 2005 until paid; (2) TMF Liquidating Trust was entitled to a deduction, under § 162(a)(1), for the $6,844,136 of compensation paid to Andrew Pells during 2000, (3) the penalty assessed by the IRS under § 6662(a) was erroneous as a matter of law, and (4) that the Litmans are entitled to a refund of federal income taxes and penalties paid, plus interest from January 4, 2005 until paid.

Respectfully submitted,

Dated: November 14, 2005

By: s/ John W. Porter

John W. Porter
Attorney of Record

Stephanie Loomis-Price (Of Counsel)
J. Graham Kenney (Of Counsel)

BAKER BOTTS L.L.P.
3000 One Shell Plaza
910 Louisiana
Houston, Texas 77002-4995
(713) 229-1597
(713) 229-2797 (Fax)

ATTORNEYS FOR PLAINTIFFS-COUNTERDEFENDANTS
DAVID S. LITMAN AND MALIA A. LITMAN