**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **DAVID S. LITMAN and MALIA A. LITMAN** | ) | |
| **Plaintiffs-Counterdefendants,** | ) | |
| **V.** | ) | **No. 05-956T** |
| | ) | **(Judge Mary Ellen Coster Williams)** |
| **THE UNITED STATES OF AMERICA** | ) | |
| **Defendant-Counterplaintiff.** | ) | |

**PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Pursuant to Rule 56(d)(1) of the United States Court of Federal Claims, Plaintiffs David S. Litman and Malia A. Litman set forth the following material facts (the "Findings") upon which Plaintiffs base their Motion for Summary Judgment:

**A. Jurisdictional Issues.**

1. This case is an action under 28 U.S.C. § 7422 for the refund of income taxes and penalties. Exhibit A ¶ 3; Exhibit B ¶ 3.

2. Jurisdiction is conferred on this Court by 28 U.S.C. § 1491. Exhibit A ¶ 4; Exhibit B ¶ 4.

3. On or about October 15, 2001, Plaintiffs timely filed their federal income tax return for the tax year ending December 31, 2000, with the Internal Revenue Service, Austin Service Center, at Austin, Texas (the "Austin Service Center"). Exhibit A ¶ 6; Exhibit B ¶ 6.

4. The Plaintiffs timely paid a total of $9,749,859 in federal income tax with respect to their tax year ending December 31, 2000, such amount being the amount shown on the return. Exhibit A ¶ 6; Exhibit B ¶ 6.

5. The names and address of the taxpayers shown on the federal income tax return are David S. and Malia A. Litman, 10710 Strait Lane, Dallas, Texas 75229. Exhibit A ¶ 6; Exhibit B ¶ 6.

6. On October 8, 2004, the Internal Revenue Service (the "IRS"), mailed a notice of deficiency for the tax year ended December 31, 2000 to Plaintiffs asserting a deficiency in the amount of $15,101,991.60 (based upon an income tax assessment of $12,584,993 and a penalty of $2,516,998.60). Exhibit A ¶ 6; Exhibit B ¶ 6.[1]

7. On January 4, 2005, Plaintiffs paid, under protest, the sum of $15,101,991.60 to the Internal Revenue Service, Wage & Investment Area, Five Director and Farmers Branch, Texas. Exhibit A ¶ 6; Exhibit B ¶ 6.

8. On February 18, 2005, Plaintiffs filed a Form 843, Claim for Refund and Request for Abatement (the "2000 Claim for Refund"), with the Austin Service Center. Exhibit A ¶ 6; Exhibit B ¶ 6.

9. The names and address of the taxpayers shown on the 2000 Claim for Refund are David S. and Malia A. Litman, 14275 Midway, Suite 450, Addison, Texas 75001. Exhibit A ¶ 6; Exhibit B ¶ 6.

10. The IRS has denied the 2000 Claim for Refund. Exhibit A ¶ 8; Exhibit B ¶ 8.

11. Plaintiffs, who are married, jointly file their federal income tax returns. Exhibit A ¶ 7; Exhibit B ¶ 7; Exhibit D.

**B. The Sale.**

12. In May of 1999, all of the assets of TMF, Inc., a Subchapter S corporation in which the Litmans (and trusts of which they are treated as grantors under I.R.C. § 671-678) owned a fifty percent interest, were sold to USA Networks ("the 1999 Contract"). Exhibit D ¶ 2.

---

[1] The notice of deficiency was not sent to the Litmans' last known address as required by § 6501(a).

13. TMF, Inc.'s primary business involved hotel reservations. Exhibit D ¶ 14.

14. TMF, Inc. was a consolidator of hotel accommodations, providing service through various websites and a toll free call center. Exhibit D ¶ 14.

15. TMF, Inc. contracted with hotels in advance for volume purchases at wholesale prices and sold those rooms to consumers, often at discounts from published rates. Exhibit D ¶ 14.

16. During 1999, TMF, Inc. was liquidated and its assets (including, without limitation, the sales proceeds and other rights under the 1999 Contract) and its liabilities were transferred to TMF Liquidating Trust, an entry in which the Litmans (including trusts as to which the Litmans are treated as grantors under I.R.C. §§ 671-678) held a fifty percent beneficial interest. Exhibit D ¶ 4.

17. TMF Liquidating Trust was a flow-through entity taxed as a grantor type trust. Accordingly, all income and loss of the TMF Liquidating Trust were taxable to its grantors. Exhibit D ¶ 4.

18. HRN was anticipating making an initial public offering of a portion of its common stock during February of 2000. Exhibit D ¶ 5.

19. Effective February 2, 2000, the 1999 Contract was amended ("the 2000 Amendment"). Exhibit D ¶ 5.

20. As a part of the 2000 Amendment ("the Transaction"), TMF Liquidating Trust exchanged certain earn-out rights under the 1999 Contract for the right to receive restricted equity interests in an anticipated initial public offering of common stock of HRN. Exhibit D ¶ 5. (Exhibit B).

21. The 9,999,900 shares of stock to be received by TMF Liquidating Trust from the Transaction ("the Shares") were subject to onerous sale restrictions. Exhibit D ¶ 6 (Exh. B).

22. These sale restrictions included, among other things, (1) contractual holding periods, (2) SEC Rule 144 volume restrictions on the number of shares that could be sold after holding periods expired, (3) the requirement that approval of HRN's parent company be obtained before any stock could be sold, (4) the practical market restriction on sale due to the fact that the TMF Liquidating Trust was owned by the CEO and President of HRN (and any sale might be considered to be a lack of confidence in the company), and (5) the public float was initially only half the size of the stock issued to the TMF Liquidating Trust, so practically it could not be sold without drastically lowering the market price. Exhibit D ¶ 6 (Exh. B).

23. These sale restrictions produced significant risk, particularly given the volatility of the NASDAQ and, more specifically, the volatility of dot.com and travel industry stocks during the relevant period. Exhibit D ¶ 8; Exhibit E.

**C. The Appraisals of the Shares Received and the Federal Income Tax Returns.**

24. The 2000 Amendment resulted in the Litman's recognizing capital gains equal to their proportionate share of the fair market value of the Restricted Shares received by TMF Liquidating Trust. Exhibit D ¶ 7.

25. In determining the fair market value of the Restricted Shares, the Litmans knew that the substantial sale restrictions caused the Restricted Shares to be worth less than the initial public offering price of the HRN stock, but we were not certain how much less. Because of this uncertainty, the Litmans sought professional appraisal help in determining the fair market value of the Restricted Shares. Exhibit D ¶ 3; Exhibit F ¶ 7.

26. Of the 9,999,900 Restricted Shares issued in February 2000, none were permitted to be sold for at least one year, and most could not be sold for four years. The market price of

HRN shares without the restrictions could rise and fall in the public market, and TMF Liquidating Trust could not take advantage of any of the increases during the restriction periods. Only after the expiration of four 4 years would all contractual restrictions on the Restricted Shares be removed. . Exhibit D ¶ 8; Exhibit F ¶ 7.

27. To determine the fair market value of the Restricted Shares, the Litmans, along with Robert and Michele Diener, sought the help of Business Valuation Services, Inc. (“BVS”), a very reputable independent appraisal and valuation firm. Exhibit D ¶ 9; Exhibit F ¶ 7.

28. BVS’s expert opinion is often relied upon by individuals, corporations and even the Internal Revenue Service with respect to complex valuation matters. Exhibit D ¶ 7; Exhibit E (Exh. A); Exhibit F ¶ 7; Judicial Notice.

29. BVS prepared an independent appraisal report expressing its opinion of the appropriate discount for lack of marketability to be applied in determining the fair market value of the Restricted Shares received by the TMF Liquidating Trust. Exhibit D ¶ 8; Exhibit E ¶ 2 (Exh. B); Exhibit F ¶ 8.

30. BVS was provided with accurate and sufficient information to prepare its analysis. Exhibit E ¶ 5 (Exh. B).

31. BVS was independent from the Litmans, and the appraisal was obtained in the ordinary course of business. Exhibit D ¶ 9; Exhibit E ¶ 6; Exhibit F ¶ 7.

32. BVS is often employed by the IRS to provide the IRS with opinions regarding valuation issues. Exhibit D; Exhibit E (Exh. A); Judicial Notice.

33. BVS’s opinions are relied upon by the IRS in valuation disputes with other taxpayers. Exhibit D; Exhibit E (Exh. A); Judicial Notice.

34. The BVS valuation analysis considered, among other things, the relevant sale restrictions on the Shares, as well as the factors listed in Revenue Rulings 59-60 and 77-287. Exhibit E ¶ 4 (Exh. B, p. 1).

35. Giving consideration to relevant sale restrictions, BVS determined that the appropriate lack of marketability discount to be applied to the anticipated IPO price of the HRN stock to determine the fair market value of the Restricted Shares was:

| Contractual Restriction Period | Discount |
|---|---|
| One year | 49.5% |
| Two years | 61.5% |
| Three years | 63.5% |
| Four years | 79.0% |

Exhibit E ¶ 3 (Exh. B, p. 2).

36. The BVS appraisal was signed by Mark L. Mitchell, a principal with BVS at the time. Mr. Mitchell's qualifications at the time he prepared the BVS appraisal, were, in part, as follows:

> [Mark L. Mitchell] has extensive experience in the valuation of business assets for gift and estate tax purposes, acquisition, divestiture, strategic planning, minority stockholder disputes, ESOPs and fairness and solvency opinions. He frequently values debt instruments and other specialized securities, including convertible bonds, preferred stock, options and warrants.
>
> Mr. Mitchell holds a Master of Business Administration degree in Finance from Southern Methodist University and two Bachelor of Science degrees, in Mathematical Sciences and Economics and Systems Analysis, also from Southern Methodist University. He is a member of the Association for Investment Management and Research, a member of the Dallas Association of Investment Analysts and a Senior Member of the American Society of Appraisers.

Exhibit E (Exh. B, p.42).

37. Applying these lack of marketability discounts to the $16 per share initial public offering price of the HRN stock, the following values were derived for the Restricted Shares:

| Contractual Restriction Period | IPO Price | Numbered of Shares Received | BVS Discount | Value | Per Share Value |
|---|---|---|---|---|---|
| One year | $16 | 1,959,960 | 49.5% | $15,836,477 | $8.08 |
| Two years | $16 | 489,990 | 61.5% | 3,018,338 | $6.16 |
| Three years | $16 | 489,990 | 63.5% | 2,861,542 | $5.84 |
| Four years | $16 | 7,059,960 | 79.0% | 23,721,465 | $3.36 |
| | Total | 9,999,900 | | $45,437,822 | |

.

Exhibit D ¶ 10; Exhibit E ¶ 3 (Exh. B, p. 2).

38. Before reporting the value of the Restricted Shares consistently with the BVS appraisal analysis, the Litmans also reviewed a second independent appraisal analysis of the value of the Restricted Shares. Exhibit D ¶ 11; Exhibit F ¶ 9.

39. The second appraiser's opinion actually resulted in a lower fair market value of the Restricted Shares than the BVS analysis. Exhibit D ¶ 11; Exhibit F ¶ 9.

40. Using the conservative approach, TMF Liquidating Trust and the Litmans reported the fair market value of the Restricted Shares at the higher value set forth using the BVS appraisal. Exhibit D ¶ 11; Exhibit F ¶ 9.

41. TMF Liquidating Trust reported the fair market value of the Restricted Shares acquired in the Transaction at a collective value of $45,437,822. Exhibit A ¶ 20; Exhibit B ¶ 20; Exhibit D ¶ 11; Exhibit F ¶ 9.

42. The Litmans' proportionate share of the net long term capital gains resulting from the Transaction was $22,718,911, which the Litmans reported on Line 12 of Schedule D of their U.S. Individual Income Tax Return, Form 1040, for calendar year 2000 ("the 2000 Form 1040"). Exhibit A ¶ 20; Exhibit B ¶ 20; Exhibit D (Exh. C).

43. The gain from the Restricted Shares received in the Transaction, plus other gains recognized by the Litmans in 2000, resulted in the Litmans reporting total net long term gain the

amount of $49,816,356 on Line 12 of Schedule D of the 2000 Form 1040. Exhibit A ¶ 20; Exhibit B ¶ 20.

44. The Litmans in good faith relied on the BVS valuation analysis to report their proportionate share of the capital gains resulting from the Transaction. Exhibit D ¶¶ 4-12; Exhibit E; Exhibit F ¶¶ 3-9.

45. The fair market value of the Restricted Shares received by TMF Liquidating Trust in the Transaction was 45,437,822. Exhibit E ¶ 3 (Exh. B, p.2).

**D. Andrew Pell's Compensation Deduction.**

46. During 2000, TMF Liquidating Trust reported employee compensation, including cash and stock, of $6,844,136. Exhibit D ¶ 13.

47. This included $2,924,215.50 of wages reported to Andrew Pells on a Form W-2 and $3,919,920 of Miscellaneous Income reported to Mr. Pells on a Form 1099-Misc. Exhibit D ¶ 13.

48. The amounts reported on the Form W-2 issued to Mr. Pells were for cash payments to Mr. Pells. The Miscellaneous Income of $3,919,920 resulted from the March 1, 2000 assignment of 244,995 shares of one year restricted stock to Mr. Pells. The shares transferred to Mr. Pells as compensation were valued at $16 per share as statutorily required under I.R.C. §83. Exhibit D ¶ 13.

49. In connection with the transfer of these shares to Mr. Pells, the TMF Liquidating Trust recognized and reported a capital gain of $1,940,360. Exhibit D ¶ 13.

50. TMF Liquidating Trust reported a total non-passive loss of $7,144,467 on its 2000 Form 1041. Exhibit D (Exh. D).

51. A portion of this non-passive loss ($6,844,136) related to the compensation paid to Andrew Pells. Exhibit D ¶ 13 (Exh. D).

52. The cash and stock compensation paid to Mr. Pells was fair and reasonable and commensurate with the substantial services Mr. Pells provided to TMF, Inc. and its successor, TMF Liquidating Trust. Exhibit D ¶¶ 14-18.

53. TMF, Inc. was a consolidator of hotel accommodations, providing service through various websites and a toll free call center. Exhibit D ¶ 14.

54. TMF, Inc. contracted with hotels in advance for volume purchases at wholesale prices and sold those rooms to consumers, often at discounts from published rates. Exhibit D ¶ 14.

55. TMF, Inc. grew from a company of $5 million of sales in 1992 to a company having over $1.4 billion of sales in 2003. Exhibit D ¶ 14.

56. Mr. Pells was the key employee of TMF, Inc. from its creation in 1991. Exhibit D ¶¶ 15-16.

57. Mr. Pells is not related to any of the owners of TMF, Inc., nor did he own an interest in TMF, Inc. Exhibit D ¶ 15.

58. Prior to his employment with TMF, Inc. Mr. Pells had over fifteen years experience in the travel industry, including owning and operating a significant wholesale travel agency. Exhibit D ¶ 15.

59. Mr. Pells possessed significant relationships in the hotel industry, which were extremely valuable to TMF, Inc. Exhibit D ¶ 15.

60. Mr. Pells was also a skilled negotiator and a strong deal closer. Exhibit D ¶ 15.

61. As the Senior Vice President of Hotel Product, Mr. Pells was responsible for many of the company’s vendor relationships, and played a large part in building the hotel

program and relationships with TMF, Inc.'s approximately 1,200 hotel partners, which was the backbone of the company's business. Exhibit D ¶ 15.

62. At the time TMF, Inc. was formed, Robert Diener and David Litman recognized that Mr. Pells was going to be a key employee. Exhibit D ¶ 16.

63. On behalf of TMF, Inc., they agreed with Mr. Pells that he would be entitled to one percent of the value company (when that value was ultimately monetized) for each year he remained with TMF, Inc. up to a total of five percent as an incentive for him to stay with the company. Exhibit D ¶ 16.

64. There was no certainty that TMF, Inc. would succeed, and Mr. Pells gave up current income for an opportunity to be compensated later if the company was successful. This compensation arrangement aligned Mr. Pells' interests with that of the company. Exhibit D ¶ 16.

65. Mr. Pells received and declined several other opportunities for employment during the 1991-2000 period. Exhibit D ¶ 16.

66. He remained a loyal and valuable employee of TMF, Inc. and was entitled to the agreed upon compensation. Exhibit D ¶ 16.

67. For a number of years, Mr. Pells worked for TMF, Inc at lower compensation than he might have received elsewhere and part of his motivation for doing so was the significant bonus he might receive upon the ultimate sale of the business. Exhibit D ¶ 18.

68. Arrangements like this are common in new business ventures. After the 1999 Contract was entered into, Mr. Pells was compensated in accordance with his agreement with TMF, Inc. Exhibit D ¶ 18.

69. After the 2000 Amendment, the TMF Liquidating Trust paid cash and assigned 244,955 shares of one year restricted stock to Mr. Pells in accordance with his agreement. Exhibit D ¶ 17.

70. As restrictions on the Restricted Shares lapsed during 2001, 2002, 2003, and 2004, Mr. Pells was assigned his portion of those shares in accordance with his compensation agreement. Exhibit D ¶ 17.

71. Mr. Pells' compensation was reasonable based upon his valuable services to TMF, Inc. and TMF Liquidating Trust and in light of the overall proceeds generated by TMF, Inc. and TMF Liquidating Trust in connection with the sale of TMF, Inc.'s assets in 1999. Exhibit D ¶¶ 10, 13-18; Exhibit E (Exh. B, p.2).

72. TMF, Inc. grew from a company of $5 million of sales in 1992 to a company having over $1.4 billion of sales in 2003. Exhibit D ¶ 14.

73. TMF, Inc.'s successor, HRN, ultimately became known as "hotels.com." Exhibit D ¶ 3.

74. The 244,995 shares transferred to Mr. Pells were valued at $16 per share because I.R.C. § 83 required that property transferred in connection with the performance of services be valued without regard to any restriction other than a restriction which by its terms will not lapse. I.R.C. § 83.

75. The Litmans proportionate share of TMF Liquidating Trust's non-passive loss was $3,572,234, which they reported on their 2000 Form 1040. Exhibit D (Exh. C).

**E. The IRS's Audit and Its Assertion of a Penalty.**

76. In its Notice of Deficiency, the IRS asserted that the total capital gains reported on Line 12 of Schedule D for 2000 was $107,096,645, rather than $49,816,356, as reported. Exhibit A ¶ 24; Exhibit B ¶ 24.

77. The IRS's increase in the capital gains resulting from TMF Liquidating Inc.'s receipt of the Restricted Shares received in the Transaction was based on the assumption that the per share value of the Restricted Shares was $16, the freely traded initial public offering price of HRN stock. Exhibit A ¶ 27; Exhibit B ¶ 27.

78. Before the IRS issued its Notice of Deficiency, the IRS's Examining Agent recognized that the fair market value of the Restricted Shares was less than the HRN stock initial public offering price of $16 per share. In her Revenue Agent's Report prepared, the IRS's Examining Agent acknowledged the valuation impact of the sale restrictions on the Restricted Shares as follows:

> ***It is well settled that restrictions on the public sale of stock reduce the stock's fair market value***; *Estate of Piper v. Commissioner*, 72 T.C. 1062, 1087, 1979 WL 3788 (1979); *Bolles v. Commissioner*, 69 T.C. 342 (1977); *Hirsch v. Commissioner*, 51 T.C. 121 (1968); *Husted v. Commissioner,* 47 T.C. 664 (1967). Revenue Ruling 77-287, 1977-2 C.B. 319 was issued to provide guidance to taxpayers, Internal Revenue Service personnel, and others concerned with the valuation, for Federal tax purposes, of securities that cannot be immediately resold because they are restricted from resale pursuant to Federal securities laws.
>
> ***Since the HRN stock was unregistered and subject to resale restrictions of SEC Rule 144, this restriction limited their sale in the public marketplace and would generally justify a discount.*** However, since the statute of limitation is imminent and the taxpayer has decline [sic] to extent [sic] the statute, time does not permit a valuation to be prepared by the Service or for the parties to further attempt to come to an agreement on the FMV of the restricted stock. As a result, the portion of the gain from the receipt of HRN restricted stock is computed based on the FMV asserted by HRN, or $16 per share.

Exhibit C (emphasis added).

79. However, the IRS did not obtain any independent determination of the fair market value of the Restricted Shares before issuing the Notice of Deficiency. Exhibit C.

80. The IRS's Examining Agent was provided with a copy of the BVS Appraisal on June 9, 2004, four months before the Notice of Deficiency was issued. Exhibit D ¶ 12.

81. Despite the fact that the examining agent never sought any substantiation of Andrew Pells' compensation and raised no question about his compensation during the audit, the IRS's Notice of Deficiency also asserted that the loss related to the compensation paid to Mr. Pells should be denied because the "amount deducted as employee compensation had not been substantiated as to amount or deductibility." Exhibit A (Exh. A); Exhibit D ¶ 19.

82. Despite the fact that the Litmans relied upon the BVS appraisal to determine the value of the Shares, the IRS asserted a penalty under I.R.C. § 6662(a) in the amount of $2,516,998.60. Exhibit A ¶ 25; Exhibit B ¶ 25; Exhibit D ¶ 19.

**F. Ultimate Findings of Fact.**

83. The fair market value of the Restricted Shares received by TMF Liquidating Trust as a result of the Transaction was $45,437,822. Exhibit E ¶ 3 (Exh. B, p.2); Exhibit D ¶ 10.

84. The Litman properly reported their proportionate share of the gain from the Transaction in their 2000 Form 1040. Exhibit E.

85. TMF Liquidating Trust is entitled to a deduction on its 2000 Form 1041 of $6,844,136 for cash and stock paid as compensation to Andrew Pells as such amount was fair and reasonable compensation. Exhibit D.

86. The Litmans reasonably relied upon independent expert advice in reporting their proportionate share of the gain from the Transaction in their 2000 Form 1040. Exhibit D; Exhibit E.

87. The Litmans owed no additional income tax or penalty for 2000. Exhibit D; Exhibit E.

88. The Litmans are entitled to a refund of the income tax and penalty of $15,101,991,60 that they paid on January 4, 2005, plus interest until paid. Exhibit D; Exhibit E.

Respectfully submitted,

BAKER BOTTS L.L.P.

Dated: November 14, 2005

By: s/ John W. Porter
John W. Porter
Attorney of Record

BAKER BOTTS, L.L.P.
3000 One Shell Plaza
910 Louisiana
Houston, Texas 77002
(713) 229-1597
(713) 229-1522 (FAX)

Stephanie Loomis-Price (Of Counsel)
J. Graham Kenney (Of Counsel)

ATTORNEYS FOR PLAINTIFFS-
COUNTERDEFENDANTS
DAVID S. LITMAN and
MALIA A. LITMAN

**Exhibits to Plaintiffs' Proposed Findings of Uncontroverted Facts**

**Exhibit A** - Plaintiffs' Complaint

**Exhibit B** - Defendant's Answer

**Exhibit C** - Revenue Agent's Report, Form 4549-A

**Exhibit D** - Affidavit of David S. Litman

| | | |
|---|---|---|
| Exhibit A to Affidavit | - | Asset Purchase Agreement |
| Exhibit B to Affidavit | - | Amended and Restated Asset Purchase Agreement |
| Exhibit C to Affidavit | - | United States Income Tax Return, Form 1040 for David S. and Malia A. Litman |
| Exhibit D to Affidavit | - | United States Income Tax Return, Form 1041 for TMF Liquidating Trust |
| Exhibit E to Affidavit | - | Andrew Pells' Contract |

**Exhibit E** - Affidavit of Mark L. Mitchell

| | | |
|---|---|---|
| Exhibit A to Affidavit | - | Curriculum Vitae of Mark L. Mitchell |
| Exhibit B to Affidavit | - | Valuation Analysis as of February 24, 2000 of Restricted Stock of Hotel Reservations Netowrk, Inc. |

**Exhibit F** - Affidavit of Malia A. Litman