# EXHIBIT D

**TO**

**PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **DAVID S. LITMAN and MALIA A. LITMAN** | ) | |
| **Plaintiffs-Counterdefendants,** | ) | |
| **V.** | ) | **No. 05-956T** |
| | ) | **(Judge Mary Ellen Coster Williams)** |
| **THE UNITED STATES** | ) | |
| **Defendant-Counterplaintiff.** | ) | |

**<u>Affidavit of David S. Litman</u>**

STATE OF TEXAS §
§
COUNTY OF DALLAS §

Before me, the undersigned notary public, personally appeared David S. Litman, who, being duly sworn upon his oath, stated as follows:

1. My name is David S. Litman. I am over the age of 18 and I am fully competent to make this affidavit. The facts contained in this affidavit are true and correct and based upon my personal knowledge.

2. In May of 1999, all of the assets of TMF, Inc., a Subchapter S corporation in which my wife, Malia A. Litman ("Malia"), and I (as well as a trust of which we are treated as grantors) owned a fifty percent interest, were sold to USA Networks ("the 1999 Contract"). Relevant portions of the 1999 Contract are attached to this affidavit as **Exhibit A** and is incorporated by reference.

3. After the sale, I served as the Chief Executive Officer of Hotel Reservations Network, Inc. ("HRN"), the wholly owned subsidiary of USA Networks that ultimately acquired and operated the assets of TMF, Inc. Robert Diener served as the President of HRN. Mr. Diener, his wife, Michelle, and trusts of which they were treated as grantors owned the remaining fifty percent of TMF, Inc. HRN ultimately became the company known as "hotels.com."

4. During 1999, TMF, Inc. was liquidated and its assets (including, without limitation, the sales proceeds and other rights under the 1999 Contract) and its liabilities were transferred to a liquidating trust ("TMF Liquidating Trust"). The beneficiaries of the TMF Liquidating Trust were the same stockholders of TMF, Inc. and held beneficial ownership interests in the TMF Liquidating Trust in the same percentages as their stock ownership in TMF, Inc.

5. HRN was anticipating making an initial public offering of a portion of its common stock during February of 2000. Effective February 2, 2000, the 1999 Contract was amended ("the 2000 Amendment"). Relevant portions of the 2000 Amendment are attached to this affidavit as **Exhibit B** and is incorporated by reference. As a part of the 2000 Amendment ("the Transaction"), TMF Liquidating Trust exchanged certain earn-out rights under the 1999 Contract for the right to receive restricted equity interests in the common stock of HRN.

6. The shares of stock to be received by TMF Liquidating Trust from the Transaction were subject to onerous sale restrictions (the "Restricted Shares"). These sale restrictions included, among other things, (1) contractual holding periods (the majority of the Restricted Shares were subject to a four year restriction on sale), (2) SEC Rule 144 volume restrictions on the number of Restricted Shares that could be sold after holding periods expired, (3) the requirement that approval of HRN's parent company be obtained before any Restricted Shares could be sold, (4) the practical market restriction on sale due to the fact that TMF Liquidating Trust was owned by the CEO and President of HRN (any sale might be considered to be a lack of confidence in the company), and (5) the public float was initially only half the size of the Restricted Shares issued to TMF Liquidating Trust, so practically the Restricted Shares could not be sold without drastically lowering the market price. The contractual transfer restrictions are described in detail in the 2000 Amendment.

7. The 2000 Amendment resulted in the capital gains reflected on Line 12 of Schedule D of the U.S. Individual Income Tax Return, Form 1040, for calendar year 2000 filed by Malia and me ("our 2000 Form 1040"). A true and correct copy of our 2000 Form 1040 filed with the Internal Revenue Service is attached to this affidavit as **Exhibit C** and is incorporated by reference.

8. In determining the fair market value of the Restricted Shares, we knew that the substantial sale restrictions caused the Restricted Shares to be worth less than the initial public offering price of the HRN stock, but we were not certain how much less. Because of this uncertainty, we sought professional appraisal help in determining the fair market value of the Restricted Shares. Of the approximately 10,000,000 Restricted Shares issued in February 2000, none were permitted to be sold until 1 year later. The market price of HRN shares without the restrictions could rise and fall in the public market, and TMF could not take advantage of any of the increases during that year nor could it limit its losses by selling shares. After that year, only about 20% of the Restricted Shares could contractually be sold (if the securities laws could be complied with and the market could absorb them). During that second year, again the prices of unrestricted HRN shares trading in the public market could rise or fall (as many technology stocks did during this period), and TMF would have no choice but to sit on the remaining 80% of the Restricted Shares without any ability to take advantage of increases in the market or limit losses by selling shares. Only after the expiration of 4 years would the contractual restrictions be removed.

9. We, along with Robert and Michele Diener, sought the help of Business Valuation Services, Inc. ("BVS"), a very reputable independent appraisal and valuation

firm, often relied upon by individuals, corporations and even the Internal Revenue Service with respect to complex valuation matters. BVS was provided with copies of the 1999 Contract and the 2000 Amendment prior to the preparation of its appraisal report, as well as the other information identified in its appraisal report. To the best of my knowledge, neither Malia nor I are related to anyone employed by, or with an ownership interest in, BVS.

10. BVS prepared an independent appraisal report expressing its opinion of the appropriate discount for lack of marketability to be applied in determining the fair market value of the Restricted Shares received by TMF Liquidating Trust. Malia and I relied on the BVS appraisal report in good faith to report the fair market value of the Restricted Shares received by TMF Liquidating Trust as a result of the Transaction on our 2000 Form 1040. We subtracted the discounts for lack of marketability determined by BVS from the $16 per share initial public offering price of the HRN stock to determine the fair market value of the Restricted Shares. A true and correct copy of the BVS appraisal that we relied upon in reporting the value of the Restricted Shares (dated February 24, 2000) is attached to the affidavit of Mark L. Mitchell signed on November 10, 2005, and is incorporated by reference.

11. Before reporting the value of the Restricted Shares consistently with the BVS appraisal analysis, Malia and I also reviewed a second independent, professional appraisal analysis of the fair market value of the Restricted Shares. The second appraiser's opinion resulted in a lower fair market value for the Restricted Shares than the BVS analysis. Although we felt this analysis was also reasonable due to the severe transfer restrictions imposed on the Restricted Shares, we took the more conservative approach and reported the fair market value of the Restricted Shares at the higher value, using the values determined in the BVS appraisal on our 2000 Form 1040.

12. During the course of the audit by the Internal Revenue Service of our 2000 Form 1040, Malia and I, through our attorneys, provided the Examining Agent with a copy of the BVS appraisal on June 9, 2004.

13. During 2000, TMF Liquidating Trust reported employee compensation, including cash and stock, of $6,844,136. This included $2,924,215.50 of wages reported to Andrew Pells on a Form W-2 and $3,919,920 of Miscellaneous Income reported to Mr. Pells on a Form 1099-Misc. The amounts reported on the Form W-2 issued to Mr. Pells were for cash payments to Mr. Pells. The Miscellaneous Income resulted from the March 1, 2000 assignment of 244,995 shares of one year restricted stock to Mr. Pells. TMF Liquidating Trust had a basis in these shares of $1,979,560 (244,995 x 8.08). Upon the transfer of these shares, TMF Liquidating Trust reported a gain of $1,940,360. A true and correct copy of TMF Liquidating Trust's 2000 Form 1041 filed with the Internal Revenue Service is attached to this affidavit as **Exhibit D** and is incorporated by reference.

14. The cash and stock compensation paid to Mr. Pells was fair and reasonable and commensurate with the substantial services Mr. Pells provided to TMF, Inc. and its successor, TMF Liquidating Trust. TMF, Inc.'s primary business involved

hotel reservations. TMF, Inc. was a consolidator of hotel accommodations, providing service through various websites and a toll free call center. TMF, Inc. contracted with hotels in advance for volume purchases at wholesale prices and sold those rooms to consumers, often at discounts from published rates. TMF, Inc. grew from a company of $5 million of sales in 1992 to a company having over $1.4 billion of sales in 2003.

15. Mr. Pells was an employee of TMF, Inc. from its creation in 1991. He is not related to any of the owners of TMF, Inc. Prior to his employment with TMF, Inc., Mr. Pells had over fifteen years experience in the travel industry, including owning and operating a significant wholesale travel agency. He had also worked with Robert Diener and me in another venture for five years before TMF, Inc. was formed. Mr. Pells possessed significant relationships in the hotel industry, which were extremely valuable to TMF, Inc. Mr. Pells was also a skilled negotiator and a strong deal closer. Mr. Pells was a key employee of TMF, Inc. As the Senior Vice President of Hotel Product, Mr. Pells was responsible for many of the TMF, Inc.'s vendor relationships, and played a large part in building the hotel program and relationships with TMF, Inc.'s approximately 1,200 hotel partners, which was the backbone of the company's business.

16. We realized that Mr. Pells was going to be a key employee. So at the time TMF, Inc. was formed, Robert Diener and I, acting on behalf of TMF, Inc., agreed with Mr. Pells that he would be entitled to one percent of the value of the company (when that value was ultimately monetized) for each year he remained with TMF, Inc. up to a total of five percent as an incentive for him to remain with the company. There was no certainty that TMF, Inc. would succeed, and Mr. Pells gave up current income for an opportunity to be compensated later if TMF, Inc. was successful. This compensation arrangement aligned his interests with ours. Mr. Pells received and declined several other opportunities for employment during the 1991-2000 period. He remained a loyal and valuable employee of TMF, Inc. and was entitled to the agreed upon compensation. The agreement with Mr. Pells was not reduced to writing when the agreement was reached, but there was no question that Mr. Pells and TMF, Inc. did reach an agreement.

17. After the 1999 Contract was entered into, Mr. Pells was compensated in accordance with the agreement between Mr. Pells and TMF, Inc. Although Mr. Pells and TMF, Inc. had never felt the need to reduce the agreement to writing, TMF, Inc.'s counsel advised us to do so at the time of the 1999 sale. One of the reasons for finally reducing the agreement to writing was to include a non-competition agreement with Mr. Pells, similar to the non-competition agreement being required of myself and Mr. Diener. Accordingly, a letter was prepared that confirmed the agreement regarding Mr. Pell's 5% interest, outlined his non-competition agreement, and detailed how the funds would be paid to him. A copy of that agreement letter is attached as **Exhibit E**. Because the payment would be triggered by the sale of the business, whereupon Mr. Pell's employment with TMF, Inc. would terminate, the payment is denominated as a severance payment. Like Mr. Diener and myself, Mr. Pells went to work for HRN after it acquired the business of TMF, Inc. TMF, Inc. deducted Mr. Pells' compensation on its 1999 Federal Income Tax Return. The IRS never questioned this deduction for Mr. Pells' compensation. After the 2000 Amendment was entered into, TMF Liquidating Trust paid cash and assigned 244,955 shares of one year restricted stock to Mr. Pells in accordance

with his agreement. As restrictions on the Restricted Shares lapsed during 2001, 2002, 2003, and 2004, Mr. Pells was assigned his portion of those shares in accordance with his compensation agreement. It is my understanding that Mr. Pells treated his receipt of this compensation as ordinary income on his federal income tax return.

18. For a number of years, Mr. Pells worked for TMF, Inc. at lower compensation than he may have received elsewhere and part of his motivation for doing so was the significant bonus he might receive upon the ultimate sale of the business. Arrangements like this are common in new business ventures. Mr. Pells' compensation was reasonable based upon his valuable services to TMF, Inc. and TMF Liquidating Trust and in light of the overall proceeds generated by TMF, Inc. and TMF Liquidating Trust in connection with the sale of TMF, Inc.'s assets in 1999.

19. During the Internal Revenue Service's audit of TMF Liquidating Trust's 2000 Form 1041, the IRS never requested any information regarding the payments to Mr. Pells and never asked us to substantiate the amount or the deductibility of the payments. In its notice of deficiency, the IRS stated that it was disallowing a portion of the loss claimed from the TMF Liquidating Trust because the "amount deducted as employee compensation has not been substantiated as to amount or deductibility." I was shocked and surprised by this allegation, as not once did the IRS request any information during its audit regarding the compensation deduction.

David S. Litman

SWORN TO AND SUBSCRIBED BEFORE ME this 11th day of November, 2005.

Carol Doremus
Notary Public, State of Texas

CAROL DOREMUS
MY COMMISSION EXPIRES
December 5, 2008