normal business hours and upon reasonable request, to review all work papers and procedures used to prepare the Buyer's Determination and to have reasonable access to the Buyer's financial employees and accountants involved in the preparation thereof and shall have the right to perform reasonable procedures necessary to confirm the accuracy thereof. The Buyer's Determination shall become final and binding on the Sellers and the Buyer unless the Sellers give written notice of their disagreement, including a reasonably detailed description of the basis for such disagreement and the Sellers' determination (the "Sellers' Determination") of the relevant amounts of Adjusted EBT or Adjusted Gross Profit, as the case may be (a "Notice of Disagreement"), to the Buyer within thirty (30) days following receipt by the Sellers of the statement setting forth the Buyer's Determination. During a period of fifteen (15) days following the aforesaid thirty (30) day period, the Buyer and the Sellers shall attempt to resolve any differences which they may have with respect to any matter specified in any Notice of Disagreement. If at the end of such fifteen (15) day period, the Buyer and the Sellers shall have failed to reach written agreement with respect to all of such matters, the Buyer and the Sellers shall retain PricewaterhouseCoopers or if such firm declines to act in such capacity, any such other firm of independent nationally recognized accountants chosen and mutually accepted by both parties (the "Referee") to make a determination (the "Referee Determination") of the disputed Adjusted EBT or Adjusted Gross Profit, as the case may be. The Buyer and Sellers shall request the Referee to act promptly to prepare the Referee Determination, and in any event to render the Referee Determination within 30 days after the commencement of its engagement. The Buyer shall give the

Referee, during normal business hours and upon reasonable request, access to all work papers and procedures used to prepare the Buyer's Determination and to the Buyer's financial employees and accountants involved in the preparation thereof. The Referee shall deliver the Referee Determination to the Buyer and the Sellers. The final amount of the Adjusted EBT or Adjusted Gross Profit, as the case may be, for the relevant period shall be the average of the two closest determinations between the Buyer's Determination, the Sellers' Determination and the Referee Determination. In the event the difference between the Buyer's Determination and the Referee Determination equals the difference between the Referee Determination and the Sellers' Determination, the Referee Determination shall be binding.

7.9.2 <u>1999 Additional Purchase Price Payment</u>. Subject to Section 7.9.5 below, within fifteen (15) days following the final determination of the 1999 Adjusted EBT and Adjusted Gross Profit in accordance with paragraph 7.9.1 above, the Buyer shall pay to the Sellers, by wire transfer of immediately available funds, an amount equal to the greater of (i) the product of (x) the amount, if any, by which the 1999 Adjusted EBT exceeds 1998 Adjusted EBT times (y) 2.5, and (ii) if 1999 Adjusted Gross Profit is at least 50% greater than 1998 Adjusted Gross Profit, (x) the amount by which the 1999 Adjusted Gross Profit exceeds 1998 Adjusted Gross Profit times (y) 1.44.

7.9.3 <u>2000 Additional Purchase Price Payment</u>. Subject to Section 7.9.5 below, within fifteen (15) days of the final determination of the 2000 Adjusted EBT and Adjusted Gross Profit in accordance with paragraph 7.9.1 above, the Buyer shall pay to the Sellers, by wire transfer of immediately available funds, an

amount equal to the greater of (i) the product of (x) the amount, if any, by which the 2000 Adjusted EBT exceeds the greater of (A) 1999 Adjusted EBT and (B) 1998 Adjusted EBT times (y) 2, and (ii) if 2000 Adjusted Gross Profit is at least 35% greater than the greater of (A) 1999 Adjusted Gross Profit and (B) 1998 Adjusted Gross Profit, (x) the amount by which the 2000 Adjusted Gross Profit exceeds the greater of (A) 1999 Adjusted Gross Profit and (B) 1998 Adjusted Gross Profit times (y) 1.18.

7.9.4 <u>2001 Additional Purchase Price Payment</u>. Subject to Section 7.9.5 below, within fifteen (15) days of the final determination of the 2001 Adjusted EBT and Adjusted Gross Profit in accordance with 7.9.1 above, the Buyer shall pay to the Sellers, by wire transfer of immediately available funds, an amount equal to the greater of (i) the product of (x) the amount, if any, by which the 2001 Adjusted EBT exceeds the greater of (A) 2000 Adjusted EBT, (B) 1999 Adjusted EBT and (C) 1998 Adjusted EBT times (y) 1.5, and (ii) if 2001 Adjusted Gross Profit is at least 20% greater than the greater of (A) 2000 Adjusted Gross Profit, (B) 1999 Adjusted Gross Profit and (C) 1998 Adjusted Gross Profit, (x) the amount by which 2001 Adjusted Gross Profit exceeds the greater of (A) 2000 Adjusted Gross Profit, (B) 1999 Adjusted Gross Profit and (C) 1998 Adjusted Gross Profit times (y) .87.

7.9.5 <u>Certain Matters Effecting Additional Purchase Price Payment</u>. In the event the amount determined by the calculation in paragraph 7.9.2, 7.9.3 or 7.9.4 above results in a negative number, no amount shall be paid by the Buyer to the Sellers under such paragraph. The amounts due from Buyer to Sellers

under 7.9.2, 7.9.3, and 7.9.4 shall accrue interest from and after June 29, 2000, 2001 and 2002, respectively, at USAi's then applicable Cost of Funds.

7.10 Quarterly Deferred Payment.

7.10.1 Quarterly Deferred Payment.

(a) Not more than 30 days after the end of the fiscal quarter of the Business ended March 31, 1999, the Sellers shall prepare and deliver to the Buyer a statement of the Adjusted Gross Profit of the Business for such fiscal quarter.

(b) Not more than 30 days after the end of each of the fiscal quarters of the Business ended June 30, 1999, September 30, 1999 and December 31, 1999, the Buyer shall prepare and deliver to the Sellers a statement of the Adjusted Gross Profit of the Business for such fiscal quarter.

(c) Within 10 days after the determination of the Adjusted Gross Profit for each fiscal quarter pursuant to Section 7.9.1(a) and (b) above, if the Adjusted Gross Profit for such fiscal quarter as so determined exceeds 25% of the Target Adjusted Gross Profit for such quarter as reflected on Schedule 7.10 attached hereto (the "Target Adjusted Gross Profit"), the Buyer shall pay to the Sellers by wire transfer of immediately available funds, an amount equal to (x) $12.5 million times (y) the Deferred Payment Adjuster (as defined below) (the "Deferred Payment"). Notwithstanding the above, in the event the Deferred Payment with respect to any fiscal quarter is due in accordance with the provisions of Section 7.10.1(c) prior to the Closing, such Deferred Payment shall be made, without interest, by wire transfer of immediately available funds, at the Closing.

(d) The "Deferred Payment Adjuster" shall be a percentage (which in no event shall be greater than 100) equal to the (x) Target Percentage (as defined below) minus (y) the lesser of (i) 100% minus the Target Percentage and (ii) 25%. "Target Percentage" shall be the Adjusted Gross Profit of the Business for the relevant period divided by the Target Adjusted Gross Profit for such period.

7.10.2 Annual Deferred Payment Reconciliation.

(a) As soon as practicable, but in any event not more than 90 days after the end of the fiscal year ending December 31, 1999, Buyer shall prepare and deliver to the Sellers a statement setting forth the Adjusted Gross Profit of the Business for the year then ended (the "Annual Adjusted Gross Profit"), together with the unaudited financial statements of the Business for such period. The final Annual Adjusted Gross Profit shall be determined in accordance with the procedures set forth in Section 7.9 applicable to the determination of the final 1999 Adjusted Gross Profit.

(b) Within 15 days after the determination of the final Annual Adjusted Gross Profit,

(i) In the event the Total Deferred Payment (as defined below) is less than the Annualized Deferred Payment (as defined below), Buyer shall pay to Sellers, by wire transfer of immediately available funds, an amount equal to the Annualized Deferred Payment minus the Total Deferred Payment; or

(ii) In the event the Total Deferred Payment is greater than the Annualized Deferred Payment, Sellers shall pay to Buyer by wire

transfer of immediately available funds, an amount equal to the Total Deferred Payment minus the Annualized Deferred Payment.

(c) "Total Deferred Payment" means the sum of the Deferred Payments made by the Buyer each quarter pursuant to Section 7.10.1(c). "Annualized Deferred Payment" means an amount equal to (x) $50 million times (y) the Deferred Payment Adjuster.

7.11 Participation Payment.

7.11.1 2004 Payout and Participation Multiplier.

(a) Unless a payment has been made under Section 7.11.2 or 7.11.3, as soon as practicable, but in any event not more than ninety (90) days, after the end of the twelve-month period ending March 31, 2004, the Buyer shall deliver to the Sellers a statement setting forth the Adjusted EBT for the Buyer for the twelve-month periods ending March 31, 2001, 2002, 2003 and 2004 (the "2000 Adjusted EBT," "2001 Adjusted EBT," "2002 Adjusted EBT" and "2003 Adjusted EBT," respectively), and the EBT for the twelve-month period ending March 31, 2004 (the "2003 EBT") together with the unaudited financial statements for such periods. The final determination of the 2000, 2001, 2002 and 2003 Adjusted EBT and 2003 EBT shall be made in accordance with the procedures set forth in Section 7.9.1 with respect to the 2000 Adjusted EBT. Within 15 days of the final determination of the 2000, 2001, 2002 and 2003 Adjusted EBT and 2003 EBT in accordance with the provisions of Section 7.9.1 hereof, Buyer shall pay to the Sellers, by wire transfer of immediately available funds, an amount equal to the product of (x) (i) The Participation Multiplier (as defined below) times 2003 EBT minus (ii) Net Debt

Capital (as defined hereafter) times (y) 10% (the "2003 Payout"). "Net Debt Capital" means an amount equal to the enterprise value (including the net debt assumed), as reasonably determined in good faith by the Buyer and the Sellers, of any Acquired Business, other than, with respect to this Section 7.11.1 only, any Acquired Business acquired during the twelve-month period ending March 31, 2004, at the time of the consummation of such acquisition together with an amount equal to the interest on such amount from the time of such acquisition through the calculation date, at an annual rate of 12% compounded annually. In the event the Buyer and the Sellers are unable to determine the enterprise value of any Acquired Business, either party may, by written notice to the other party, require a nationally recognized investment bank mutually acceptable to the Buyer and the Sellers to be retained to determine the enterprise value of such Acquired Business. The fees and expenses of such investment bank shall be borne equally by the Buyer and the Sellers.

(b) The Participation Multiplier shall be as follows:

| Average Annual Adjusted EBT Growth (as defined below) | Participation Multiplier |
|---|---|
| 20% or less | 10 |
| Greater than 20%-30% | 11 |
| Greater than 30%-40% | 12 |
| Greater than 40%-50% | 13 |
| Greater than 50%-60% | 14 |
| Greater than 60% | 15 |

"Average Annual Adjusted EBT Growth" shall mean the average of the annual percentage growth (or reduction) in Adjusted EBT during the twelve-month periods ending March 31, 2002, 2003 and 2004.

7.11.2 Sale of the Business.

(a) If, prior to the payment of the 2004 Payout by the Buyer pursuant to Section 7.11.1 above and the consummation of the IPO of the Buyer referred to in Section 7.11.3, all or substantially all of the equity interests in the Buyer are sold, or the Buyer sells all or substantially all of its assets (including as a result of a merger, consolidation or reorganization) (each a "Sale of the Business"), the Sellers shall receive a portion of the consideration received in respect of the Sale of the Business (the "Sale Consideration") equal to (x) (i) the total value of the Sale Consideration as reasonably determined by the Buyer and the Sellers plus the aggregate value of all cash dividends paid by the Buyer to its shareholders following the Closing minus (ii) the Net Debt Capital (calculated including any Acquired Business acquired during the twelve-month period ending March 31, 2004) multiplied by (y) 10% (the "Sale of Business Payment"). The Sale of Business Payment shall be paid to the Sellers (i) at the same time and in the same form as the Sale Consideration received by the Buyer or its affiliates upon the Sale of the Business and (ii) shall be subject to the terms and conditions of the agreements entered into with respect to the Sale of the Business, including, without limitation, any escrow or indemnification obligations. In the event the Buyer and the Sellers are unable to determine the total value of the Sale Consideration, either party may, by written notice to the other party, require a nationally recognized investment bank mutually acceptable to the Buyer and

the Sellers to be retained to determine the total value of the Sale Consideration. The fees and expenses of such investment bank shall be borne equally by the Buyer and the Sellers.

(b) Notwithstanding the provisions of paragraph 7.11.2(a) above, the Sellers shall not be entitled to any payment in the event of a Sale of the Business to an affiliate of the Buyer.

(c) The Buyer and the Sellers acknowledge that the provisions of Section 7.11.2 shall not apply to transactions that do not constitute a Sale of the Business including a partial sale of equity interests in the Buyer or a partial asset sale (including as a result of a merger, consolidation or reorganization) of the Buyer (a "Non-Qualifying Sale"). In the event of a Non-Qualifying Sale (other than a Non-Qualifying Sale in the ordinary course of business), the Sellers and the Buyer shall negotiate in good faith to determine what, if any, arrangements should be made with respect to the Sellers' participation in such Non-Qualifying Sale in light of the circumstances of such Non-Qualifying Sale.

7.11.3 Participation in Event of IPO. If, prior to the payment of the 2004 payout by the Buyer pursuant to Section 7.11.1 or a payment in connection with the sale of the Business of the Buyer pursuant to Section 7.11.2 above, the Buyer consummates an initial public offering of shares of its common stock (an "IPO"), the Buyer shall issue to the Sellers a number of shares of common stock of the Buyer having an aggregate value (based on the price per share in the IPO) equal to the product of (x) (i) the total issued and outstanding shares of the Buyer immediately prior to the IPO times the IPO price minus (ii) the Net Debt

Capital multiplied by (y) 10%. Sellers hereby agree to enter into "lock up" indemnity or other customary agreements reasonably requested by the underwriters in connection with an IPO.

7.11.4 Termination of Participation Payment. Upon the payment or distribution to the Sellers under any of Sections 7.11.1, 7.11.2 or 7.11.3, the other provisions of this Section 7.11 shall immediately terminate and no further payment or obligation shall be due the Sellers thereunder; provided that the payment provided in 7.11.1 cannot be made earlier than provided in that section without the written consent of the Sellers.

7.11.5 Calculation Schedule. Attached as Schedule 7.11.5 is a spreadsheet outlining examples of the calculations of the Additional Purchase Price, Quarterly Deferred Payment and Participation Payment.

7.12 USAi Guaranty. USAi hereby irrevocably, unconditionally and completely guarantees the full and timely payment and performance of all the Buyer's obligations under this Agreement, subject to the provisions and limitations set forth herein. The obligations and liabilities under this guaranty constitute primary obligations and liabilities of USAi and shall not be affected by the absence of any action to enforce obligations of, or proceedings first against, the Buyer or the inability of the Buyer to pay due to bankruptcy or otherwise.

7.13 Buyer's Allocation of Affiliate Overhead; Affiliate Transactions.

(a) The Buyer hereby agrees that no corporate overhead expenses of any affiliate of the Buyer not directly related to the Business, shall be included in the calculation of Adjusted EBT or Adjusted Gross Profit of the Business

for the purposes of determining the Adjusted EBT and Adjusted Gross Profit of the Business pursuant to Sections 7.9, 7.10 and 7.11. Notwithstanding the foregoing, expenses incurred by affiliates of the Buyer directly related to the Business (i.e. employee benefits and insurance premiums) shall be allocated to the Business for the purposes of determining the Adjusted EBT and Adjusted Gross Profit of the Business pursuant to Sections 7.9, 7.10 and 7.11.

(b) The Buyer hereby agrees that the cost and expenses related to the purchase of any goods or services from any affiliate of the Buyer (an "Affiliate Transaction") shall not, without the consent of the Sellers, be included in the calculation of Adjusted EBT or Adjusted Gross Profit of the Business for the purposes of determining the Adjusted EBT and Adjusted Gross Profit of the Business pursuant to Sections 7.9, 7.10 and 7.11 unless such Affiliate Transaction is with respect to goods and services historically used by the Business and on arms length market terms and conditions which, in the case of advertising services, is currently 5% of the revenues generated by such advertising.

7.14 Obligations Regarding Acquired Businesses. (a) The Buyer shall not acquire any person, asset or business engaged primarily in a business other than the Company Business (as defined in Section 10.1) without the prior consent of the Sellers; provided, however, that the Buyer may purchase a person, asset or business engaged primarily in a business other than the Company Business without the prior consent of the Sellers, if the Buyer agrees at the time of such acquisition that such Acquired Business will not be included in the calculation of Adjusted EBT and Adjusted Gross Profit of the Business for the purposes of determining the Adjusted

EBT and Adjusted Gross Profit of the Business pursuant to Sections 7.9, 7.10 and 7.11. The Buyer may acquire any person, asset or business in the Company Business without the consent of the Sellers.

(b) Notwithstanding anything in this agreement to the contrary, the Sellers and the Shareholders agree that the Buyer and its affiliates shall have no obligation whatsoever to purchase any person, asset or business, whether or not such person, asset or business is, directly or indirectly, related to the Company Business, and the Buyer and its affiliates shall have no obligation whatsoever to contribute any person, asset or business, owned or purchased by any affiliate of the Buyer, to the Buyer, including, without limitation, a person, asset or business, directly or indirectly, related to the Company Business. Nothing in this Agreement shall, in any way, prohibit, restrict, limit or effect in any way the ability of any affiliate of the Buyer to make any acquisition of any person, asset or business.

8. <u>Conditions Precedent to the Obligation of the Buyer to Close</u>. The obligation of the Buyer to enter into and complete the Closing is subject, at its option, to the fulfillment on or prior to the Closing Date of the following conditions, any one or more of which may be waived by it:

8.1 <u>Representations and Covenants</u>. The representations and warranties of the Sellers contained in this Agreement shall be true on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date. Furthermore, the representations and warranties of the Sellers contained in this Agreement shall be true and correct (without regard to any Material Adverse Effect or materiality qualifier) except for all such violations which taken together would not

constitute a Sellers Material Adverse Effect. The Sellers shall have performed and complied with all covenants and agreements required by this Agreement to be performed or complied with by the Sellers on or prior to the Closing Date. The Sellers shall have delivered to the Buyer a certificate, dated the Closing Date and signed by the Sellers, to the foregoing effect and stating that all conditions to the Buyer's obligations hereunder have been satisfied.

8.2 Governmental Permits and Approvals. Any and all permits and approvals from any governmental or regulatory body required for the lawful consummation of the Closing shall have been obtained.

8.3 Third Party Consents. All consents, permits and approvals from parties to any contracts or other agreements with the Sellers (other than contracts and agreements with hotels referred to in Section 5.9(iv)) which may be required in connection with the performance by the Sellers of its obligations under this Agreement or the continuance of such contracts or other agreements after the Closing and all consents and approvals required with respect to the contracts and agreements with hotels which are indicated on Schedule 5.9(iv) as requiring consent or approval shall have been obtained.

8.4 Opinion of Counsel to the Sellers. The Buyer shall have received the favorable opinion of Sayles & Lidji, counsel to the Sellers, dated the Closing Date, addressed to the Buyer, in a form reasonably satisfactory to the Buyer.

8.5 Litigation. No action, suit or proceeding shall have been instituted before any court or governmental body or instituted or threatened by any governmental agency or body to restrain or prevent the carrying out of the

transactions contemplated hereby, or which has or may have, in the opinion of the Buyer, a materially adverse effect on the assets, properties, business or condition, financial or otherwise, of the Sellers.

8.6 Escrow Agreement. Simultaneously with the Closing, the Buyer and the Sellers shall enter into an Escrow Agreement in the form of Exhibit C.

8.7 Hart-Scott-Rodino. Any person required in connection with the transactions contemplated under this Agreement to file a notification and report form in compliance with the HSR Act shall have filed such form and the waiting period specified in the HSR Act, including any extensions thereof, shall have expired.

8.8 Landlord Estoppel Certificate. The Buyer shall have received, at the Sellers' expense, a current estoppel certificate from the landlord under each Lease stating (i) that such Lease is in full force and effect and has not been amended, modified or supplemented other than as set forth on Schedule 5.10; (ii) that all rent and other sums and charges payable under such Lease are current, and setting forth the date through which such payments have been made; (iii) the amount of any tenant security or other similar deposit held by or on behalf of such landlord under such Lease; (iv) that no notice of default on the part of the Sellers, as the case may be, or termination notice has been served under such Lease which remains outstanding; and (v) that, to the knowledge of such landlord, no uncured default or termination event or condition exists under such Lease, and that no event has occurred or condition exists which, with the giving of notice or the lapse of time or both, would constitute such a default or termination event or condition; and (vi) that the consummation of the transactions contemplated in this Agreement will not constitute a default under

such Lease or grounds for the termination thereof or for the exercise of any other right or remedy adverse to the interests of the tenant thereunder.

8.9 Assignment of Lease. The Buyer shall have received an assignment of each Lease, in a form reasonably satisfactory to the Buyer.

8.10 Tax Returns. Buyer shall have received any and all real property transfer tax returns and other similar filings required by law in connection with this Agreement, all duly and properly executed and acknowledged. Sellers shall also execute such affidavits in connection with such filings as shall have been required by law or reasonably requested by Buyer.

8.11 FIRPTA Affidavit. Buyer shall have received an affidavit of an officer of each Seller sworn to under penalty of perjury, setting forth such Seller's name, address and Federal tax identification number and stating that such Seller is not a "foreign person" within the meaning of section 1445 of the Code.

9. Conditions Precedent to the Obligation of the Sellers to Close. The obligation of the Sellers to enter into and complete the Closing is subject, at the option of the Sellers, to the fulfillment of the following conditions, any one or more of which may be waived:

9.1 Representations. The representations and warranties of the Buyer contained in this Agreement shall be true on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date. The Buyer shall have performed and complied with all covenants and agreements required by this Agreement to be performed or complied with it on or prior to the Closing Date. The Buyer shall have delivered to the Sellers a certificate, dated the Closing Date and

signed by an officer of the Buyer, to the foregoing effect and stating that all conditions to the Sellers' obligations hereunder have been satisfied.

9.2 Opinion of Counsel to the Buyer. The Sellers shall have received the favorable opinion of Paul, Weiss, Rifkind, Wharton & Garrison, counsel to the Buyer, dated the Closing Date, addressed to the Sellers, in a form reasonably satisfactory to the Sellers.

9.3 Litigation. No action, suit or proceeding shall have been instituted before any court or governmental or regulatory body or instituted or threatened by any governmental or regulatory body to restrain or prevent the carrying out of the transactions contemplated hereby.

9.4 Hart-Scott-Rodino. Any person required in connection with the transactions contemplated under this Agreement to file a notification and report form in compliance with the HSR Act shall have filed such form and the waiting period specified in the HSR Act, including any extensions thereof, shall have expired.

10. Covenants of Robert Diener and David Litman.

10.1 Covenants Against Competition. Each Shareholder acknowledges that (i) the principal business of the Sellers is the direct marketing and selling of hotel rooms to consumers through telephonic orders and internet access (the "Company Business"); (ii) he is one of the limited number of persons who has developed such business; (iii) the business of the Sellers is national and international in scope; (iv) his work for the Sellers has brought him and his work for the Buyer will continue to bring him into close contact with many confidential affairs not readily available to the public; and (v) the Buyer would not purchase the Purchased Assets

but for the agreements and covenants of the Shareholder contained in this Section 10. Accordingly, as a material inducement to the Buyer to enter into this Agreement and consummate the transactions referred to herein, each Shareholder covenants and agrees, with respect to himself, that:

(a) Non-Compete. During the term of the Shareholder's employment with the Buyer as successor in interest to the business of the Sellers or with any affiliate of the Buyer, and for a period of five years following the termination (whether for cause or otherwise) of the Shareholder's employment with the Buyer or any of its affiliates (the "Restricted Period"), the Shareholder shall not in the United States of America or in any foreign country, directly or indirectly, (i) engage in the Company Business for the Shareholder's own account; (ii) engage in any business that constitutes part of the Buyer's, or any affiliate of the Buyer for which the Shareholder has significant management responsibility, business at the time of the termination of such Shareholder's employment with the Buyer; (iii) enter the employ of, or render any services to, any person engaged in such activities; or (iv) become interested in any such person as an individual, partner, shareholder, officer, director, principal, agent, employee, trustee, consultant or in any other relationship or capacity; provided, however, the Shareholder may own, directly or indirectly, solely as an investment, securities of any person which are traded on any national securities exchange if the Shareholder (a) is not an officer, director, consultant, employee or a controlling person of, or a member of a group which controls, such person or (b) does not, directly or indirectly, own 5% or more of any class of securities of such person.

(b) Confidential Information. During and after the Restricted Period, the Shareholder shall keep secret and retain in strictest confidence, and shall not use for the benefit of himself or others except in connection with the business and affairs of the Buyer and its affiliates, all confidential matters relating to the Company Business and to the Buyer and its affiliates, including without limitation, trade know-how, secrets, customer lists, subscription lists, subscription lists, details of author or consultant contracts, pricing policies, operational methods, marketing plans or strategies, produce development techniques or plans, business acquisition plans, new personnel acquisition plans, methods of manufacture, technical processes, designs and design projects, inventions and research projects and other business affairs relating to the Company Business and to the Buyer and its affiliates learned by the Shareholder heretofore or hereafter, and shall not disclose them to anyone outside of the Buyer and its affiliates, either during or after employment by the Buyer or any of its affiliates, except as required in the course of performing duties hereunder or with the Buyer's express written consent.

(c) Property of the Buyer. All memoranda, notes, lists, records and other documents (and all copies thereof) made or compiled by the Shareholder or made available to the Shareholder concerning the Company Business or the Buyer or any of its affiliates shall be the Buyer's property and shall be delivered to the Buyer promptly upon the termination of the Shareholder's employment with the Buyer or any of its affiliates or at any other time on request.

(d) Employees of the Buyer. During the Restricted Period, the Shareholder shall not, directly or indirectly, hire, solicit or encourage to leave the

employment of the Buyer or any of its affiliates, any employee of the Buyer or any of its affiliates or hire any such employee who has left the employment of the Buyer or any of its affiliates within one year of the termination of such employee's employment with the Buyer or any of its affiliates.

10.2 Rights and Remedies Upon Breach. If the Shareholder breaches, or threatens to commit a breach of, any of the provisions of Section 10.1 (the "Restrictive Covenants"), the Buyer shall have the following rights and remedies, each of which rights and remedies shall be independent of the other and severally enforceable, and all of which rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available to the Buyer under law or in equity:

(a) Specific Performance. The right and remedy to have the Restrictive Covenants specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to the Buyer and that money damages will not provide adequate remedy to the Buyer.

(b) Accounting. The right and remedy to require the Shareholder to account for and pay over to the Buyer all compensation, profits, monies, accruals, increments or other benefits (collectively, "Benefits") derived or received by the Shareholder as the result of any transactions constituting a breach of any of the Restrictive Covenants, and the Shareholder shall account for and pay over such Benefits to the Buyer.

10.3 Severability of Covenants. If any court determines that any of the Restrictive Covenants, or any part thereof, is invalid or unenforceable, the

remainder of the Restrictive Covenants shall not thereby be affected and shall be given full effect, without regard to the invalid portions.

10.4 Blue-Pencilling. If any court determines that any of the Restrictive Covenants, or any part thereof, is unenforceable because of the duration of such provision or the area covered thereby, such court shall have the power to reduce the duration or area of such provision and, in its reduced form, such provision shall then be enforceable and shall be enforced.

10.5 Enforceability in Jurisdictions. The Buyer and the Shareholders intend to and hereby confer jurisdiction to enforce the Restrictive Covenants upon the courts of any jurisdiction within the geographical scope of such Covenants. If the courts of any one or more of such jurisdictions hold the Restrictive Covenants wholly unenforceable by reason of the breadth of such scope or otherwise, it is the intention of the Buyer and the Shareholders that such determination not bar or in any way affect the Buyer's right to the relief provided above in the courts of any other jurisdiction within the geographical scope of such Covenants, as to breaches of such Covenants in such other respective jurisdictions, such Covenants as they relate to each jurisdiction being, for this purpose, severable into diverse and independent covenants.

10.6 Shareholder Guaranty. The Shareholders, and their respective spouses (Malia Litman with respect to Litman and Michelle Diener with respect to Diener), jointly and severally, hereby irrevocably, unconditionally and completely guarantee the full and timely payment and performance of all of the Sellers' obligations under this Agreement, subject to the provisions and limitations set forth herein; provided, however, each Shareholder's, and such Shareholder's Spouse's,

liability under this Section 10.6 or Section 12 shall not exceed 50% of the Purchase Price. Each of the Zachary Charles Litman Exempt GS-Trust, Katherine Elizabeth Litman Exempt GS-Trust, the Anne Marie Litman Exempt GS-Trust, the Alison Diener Exempt GS-Trust and the Brianna Diener Exempt GS-Trust (collectively, the "Trusts"), jointly and severally, hereby irrevocably, unconditionally and completely guarantee the full and timely payment and performance of all of the Sellers' obligations under this Agreement, subject to the provisions and limitations set forth herein; provided, however, each such Trust's liability under this Section 10.6 or Section 12 shall not exceed the percentage of the Purchase Price distributed to such Trust, including upon liquidation, by the Sellers. The obligations and liabilities under this guaranty constitute primary obligations and liabilities of the Shareholders and the Trusts and shall not be affected by the absence of any action to enforce obligations of, or proceedings first against, the Sellers or the inability of the Sellers to pay because of the Sellers' bankruptcy or otherwise.

11. <u>Survival of Representations and Warranties of the Sellers</u>. Notwithstanding any right of the Buyer fully to investigate the affairs of the Sellers and notwithstanding any knowledge of facts determined or determinable by the Buyer pursuant to such investigation or right of investigation, the Buyer has the right to rely fully upon the representations, warranties, covenants and agreements of the Sellers contained in this Agreement or in any document delivered to the Buyer by the Sellers or any of its representatives, in connection with the transactions contemplated by this Agreement. All such representations, warranties, covenants and agreements shall survive the execution and delivery hereof and the Closing hereunder. Except for

those representations and warranties in Sections 5.1, 5.2 and 5.7 (all of which representations and warranties shall survive without limitation), all representations and warranties shall terminate and expire with respect to any theretofore unasserted (i) General Claim (as herein defined), on the second anniversary of the Closing Date, (ii) any Tax Claim (as herein defined), 30 days after assessment of the liability to which any such Tax Claim may relate is barred by all applicable statutes of limitations (taking into account any applicable waivers or extensions) and (iii) any Safety and Environmental Claim (as herein defined), on the fifth anniversary of the Closing Date and (iv) any ERISA Claim (as herein defined) on the date upon which the liability to which any such ERISA Claim may relate is barred by applicable statutes. As used in this Agreement, the following terms have the following meanings:

(i) "ERISA Claim" means any claim based upon, arising out of or otherwise in respect of any inaccuracy in or any breach of representation or warranty of the Sellers contained in Section 5.18.

(ii) "General Claim" means any claim arising out of or based on otherwise in respect of any inaccuracy in or any breach of any representation, warranty, covenant or agreement of the Sellers contained in this Agreement that is not a Tax Claim.

(iii) "Safety and Environmental Claim" means any claim based upon, arising out of or otherwise in respect of any inaccuracy in or any breach of any representation or warranty of the Sellers contained in this Agreement related to Safety and Environmental Laws.

(iv) "Tax Claim" means any claim arising out of or otherwise in respect of any inaccuracy in or any breach of any representation, warranty, covenant or agreement of the Sellers contained in this Agreement related to Taxes.

12. Indemnification.

12.1 Obligation of the Sellers and Diener and Litman to Indemnify. Subject to the limitations contained in Section 12.5, the Sellers and the Shareholders, jointly and severally, agree to indemnify, defend and hold harmless the Buyer (and any of its officers, directors, employees, affiliates, successors and assigns) from and against any losses, liabilities, damages, judgments, assessments, fines, costs, expenses or deficiencies (including interest, penalties, fees, expenses and disbursements of attorneys, experts, personnel and consultants incurred by the indemnified party) ("Losses") based upon, arising out of or due to or otherwise in respect of:

(i) any inaccuracy in or any breach of any representation or warranty of the Sellers or the Shareholders contained in this Agreement or in any document or other writing delivered pursuant hereto;

(ii) any breach of any covenant or agreement of the Sellers or the Shareholders contained in this Agreement; and

(iii) any liability or obligation not assumed by the Buyer pursuant to Sections 2.1 and 2.2, including, without limitation, any liability to which it may become subject as a result of the fact that the transactions contemplated by this Agreement are being effected, at the request of the Sellers, without compliance with

the provisions of any Bulk Sales Act or any similar statute as enacted in any jurisdiction, domestic or foreign.

12.2 Obligation of Buyer to Indemnify. The Buyer shall indemnify, defend and hold harmless the Sellers from and against any Losses arising out of or due to (i) any inaccuracy in or any breach of any representation, warranty, covenant or agreement of the Buyer contained in this Agreement or in any document or other writing delivered pursuant hereto; and (ii) any liability or obligation assumed by the Buyer pursuant to Section 2.1.

12.3 Notice to Indemnifying Party.

(a) Notice of Asserted Liability. The party making a claim under this Article 13 is referred to as the "Indemnitee," and the party against whom such claims are asserted under this Article 12 is referred to as the "Indemnifying Party." All claims by any Indemnitee under this Article 12 shall be asserted and resolved as follows: Promptly after receipt by the Indemnitee of notice of any claim or circumstances which, with the lapse of time, would or might give rise to a claim or the commencement (or threatened commencement) of a claim for indemnification under this Article 12, including any action, proceeding or investigation (an "Asserted Liability") that may result in a Loss, the Indemnitee shall give notice thereof (the "Claims Notice") to the Indemnifying Party; provided, that, the failure to give notice shall not effect the Indemnifying Party's obligations hereunder except to the extent it is materially prejudiced thereby. The Claims Notice shall describe the Asserted Liability in reasonable detail, and shall indicate the amount (estimated, if necessary,

and to the extent feasible) of the Loss that has been or may be suffered by the Indemnitee.

(b) Opportunity to Defend. The Indemnifying Party may elect to compromise or defend, at its own expense and by its own counsel, any Asserted Liability arising from any third party claim. If the Indemnifying Party elects to compromise or defend such Asserted Liability, it shall within 30 days (or sooner, if the nature of the Asserted Liability so requires) notify the Indemnitee of its intent to do so, and the Indemnitee shall cooperate, at the expense of the Indemnifying Party, in the compromise of, or defense against, such Asserted Liability. If the Indemnifying Party elects not to compromise or defend the Asserted Liability, fails to notify the Indemnitee of its election as herein provided or contests its obligation to indemnify under this Agreement, the Indemnitee may pay, compromise or defend such Asserted Liability. Notwithstanding the foregoing, neither the Indemnifying Party nor the Indemnitee may settle or compromise any Asserted Liability over the objection of the other; provided, however, consent to settlement or compromise shall not be unreasonably be withheld. In any event, the Indemnitee and the Indemnifying Party may participate, at their own expense, in the defense of such Asserted Liability. If the Indemnifying Party chooses to defend any Asserted Liability, the Indemnitee shall make available to the Indemnifying Party any books, records or other documents within its control that are necessary or appropriate for such defense.

12.4 Escrow Fund. The obligation of the Sellers and the Shareholders under Section 12.1 shall be satisfied first from the Escrow Fund and, if the Escrow Fund is inadequate to provide indemnification to the Buyer as provided in

the Escrow Agreement, then from the Sellers and the Shareholders as provided in Section 12.1.

12.5 Limitation on Indemnification. Anything in this Agreement to the contrary notwithstanding, no indemnification payment shall be made to the Buyer pursuant to this Section 12.1(i) of Agreement, except those based upon, arising out of or otherwise in respect of Sections 5.5, 5.18 and Article 10, or in respect of Taxes, whether from the Escrow Fund or otherwise, until the amounts which the Buyer would otherwise be entitled to receive as indemnification under this Agreement aggregate at least $200,000 (the "Basket Amount"), at which time the Buyer shall be entitled to receive the amount of any such payments in excess of the Basket Amount. Indemnification in respect of Taxes shall include the amount of such Tax, interest, penalties, fees and disbursements of attorneys, experts, personnel and consultants incurred by the indemnified party but shall not include any other consequential damages. Anything in this Agreement to the contrary notwithstanding, the liability of the Sellers shall in no event exceed the Purchase Price received by the Sellers pursuant to this Agreement (including any amount distributed or which may later be distributed to the Sellers pursuant to the Escrow Agreement). Anything in this Agreement to the contrary notwithstanding, the liability of each Shareholder, other than such Shareholder's liability pursuant to Article 10, shall in no event exceed 50% of the Purchase Price.

12.6 Set-Off Rights. Each of the Sellers and the Shareholders agrees that the Buyer shall have the right, but not the obligation, to set-off against any of its payment obligations hereunder or under the Purchase Note, the full amount of any

Losses required to be paid by such Sellers pursuant to Section 12.1 if such Losses are not otherwise paid within thirty (30) days after the Buyer has requested payment. If Buyer elects to exercise its set-off rights hereunder against any payment obligation under this Agreement or the Purchase Note, it will give to the Sellers written notice of such election which includes the amount to be set off and, upon giving such notice, the amount of the obligations under this Agreement or the Purchase Note, as the case may be, shall automatically be reduced by the amount set forth in such Notice. In the event there is a final determination by a court of competent jurisdiction that the Buyer was not entitled to indemnification under this Article 12 with respect to the set-off amount, the Buyer shall promptly thereafter pay to the Sellers all such amounts which are so determined to have been incorrectly set-off plus interest thereon at a rate per annum equal to USAi Cost of Funds in effect during the period from such set-off to such repayment, which interest shall be calculated on the basis of a 365-day year and shall accrued from the date the Buyer exercises its right of set-off hereunder to the date of such repayment. For purposes of this Section 12.6, a determination shall be final if any and all appeals therefrom shall have been resolved or if thirty days shall have passed from the rendering of such determination (or of any determination on appeal therefrom) and no party shall have commenced any such appeal therefrom.

13. Termination of Agreement.

13.1 Termination. This Agreement may be terminated prior to the Closing as follows:

(i) at the election of the Sellers, if the Buyer has breached any material representation, warranty, covenant or agreement contained in this Agreement

and such breach is either not capable of being cured prior to September 30, 1999 or, if such breach is capable of being cured, is not so cured within a reasonable amount of time;

(ii) at the election of the Buyer, if the Sellers have breached any material representation, warranty, covenant or agreement contained in this Agreement and such breach is either not capable of being cured prior to September 30, 1999 or, if such breach is capable of being cured, is not so cured within a reasonable amount of time;

(iii) at the election of the Sellers or the Buyer, if any legal proceeding is commenced or threatened by any governmental agency or other person directed against the consummation of the Closing or any other transaction contemplated under this Agreement and either the Sellers or the Buyer, as the case may be, reasonably and in good faith deems it impractical or inadvisable to proceed in view of such legal proceeding or threat thereof;

(iv) at any time on or prior to the Closing Date, by mutual written consent of the Sellers and the Buyer;

(v) at the election of the Buyer if the Closing has not occurred by September 30, 1999 (other than a failure of the Closing to occur due to a breach of this Agreement by the Buyer); or

(vi) at the election of the Sellers if the Closing has not occurred by September 30, 1999 (other than a failure of the Closing to occur due to a breach of this Agreement by the Sellers); or

13.2 Survival After Termination. If this Agreement terminates pursuant to Section 13.1 and the transactions contemplated hereunder are not consummated, this Agreement shall be null and void and have no further force or effect, except that any such termination shall be without prejudice to the rights of any party on account of the nonsatisfaction of the conditions set forth in Articles 8 and 9 resulting from the intentional or willful breach or violation of the representations, warranties, covenants or agreements of another party under this Agreement. Notwithstanding anything in this Agreement to the contrary, the provisions of Article 14 shall survive any termination of this Agreement.

14. Miscellaneous.

14.1 Certain Definitions. As used in this Agreement, the following terms have the following meanings unless the context otherwise requires:

(i) "Acquired Business" is any person or business acquired by the Buyer after the Closing through a purchase of assets or stock, or a contribution to the capital of the Buyer, other than the Purchased Assets and other assets or Investments purchased in the ordinary course of business of the Buyer.

(ii) "Acquired EBT" is (a) the amount of EBT of the Acquired Business for the twelve-month period ending on the last day of the month immediately prior to the date of the acquisition of such Acquired Business by the Buyer divided by 52 times (b) the number of weeks (rounded to the nearest whole) during the relevant period for which EBT is being calculated that the Acquired Business was owned by the Buyer.

(iii) "Acquired Gross Profit" is the Gross Profit attributable to, or contributed by, any Acquired Business during the relevant period.

(iv) "Adjusted EBT" means EBT adjusted (a) to exclude Acquired EBT (as defined above) for the period, (b) to exclude expenses related to the transaction contemplated by the Agreement, any expenses incurred by the Buyer relating to disputes under this Agreement and any amortization of goodwill, (c) to exclude an amount equal to Base Cost of Capital and (d) to include an amount equal to the Imputed Interest. Notwithstanding the foregoing, for the purposes of determining the Adjusted EBT for the year ended March 31, 2004 in Section 7.11 only, all EBT attributable to, or contributed by, any Acquired Business acquired during such period shall be excluded and the calculation of Base Cost of Capital shall not include any Acquired Business acquired during such period.

(v) "Adjusted Gross Profit" means Gross Profit for a period of time, adjusted to exclude any Acquired Gross Profit.

(vi) "affiliate," with respect to any person, means and includes any person controlling, controlled by or under common control with such person.

(vii) "Base Cost of Capital" shall be an amount equal to 12% per annum applied to the enterprise value (including debt (less cash) assumed), as reasonably determined by the Buyer and the Sellers, of any Acquired Business, compounded annually from the date such Acquired Business was acquired by the Buyer. As an example if an Acquired Business is purchased for $1 million and the Buyer assumes $500,000 of the Acquired Business' debt, the enterprise value of such

Acquired Business shall be $1.5 million. In the event the Buyer and Sellers are unable to determine the enterprise value of any Acquired Business, a nationally recognized investment bank mutually acceptable to the Buyer and the Sellers shall be retained to determine the enterprise value of such Acquired Business.

(viii) "Business" means the business of the Sellers as conducted prior to the Closing and the business of the Buyer as conducted after the Closing.

(ix) "Business Day," means any day which is not a federal, state or local holiday and on which the banks generally are open in New York, New York for the conduct of business.

(x) "Code" shall mean the Internal Revenue code of 1986, as amended, and the applicable Treasury regulations promulgated thereunder.

(xi) "contracts and other agreements" means and includes all contracts, agreements, indentures, bonds, leases, mortgages, franchises, licenses, commitments or binding arrangements, express or implied.

(xii) "document or other papers" means and includes any document, agreement, instrument, certificate, notice, consent, affidavit, letter, telegram, telex, statement, schedule (including any Schedule to this Agreement), exhibit (including any Exhibit to this Agreement) or any other paper whatsoever.

(xiii) "EBT" means for the relevant period, as to the Business, the net income of such business before deduction for federal, state or local Income Taxes, all determined in accordance with GAAP consistently applied; provided,

however, that the 2003 EBT in Section 7.11 shall not include the EBT attributable to, or contributed by, any Acquired Business acquired during such period.

(xiv) "Environment" means navigable waters, waters of the contiguous zone, ocean waters, natural resources, surface waters, ground water, drinking water supply, land surface, subsurface strata, ambient air, both inside and outside of buildings and structures, man-made buildings and structures, and plant and animal life on earth.

(xv) "Environmental Claims" means any notification, whether direct or indirect, formal or informal, written or oral, pursuant to Safety and Environmental Laws or principles of common law relating to pollution, protection of the Environment or health and safety, that any of the current or past operations of the Sellers, or any by-product thereof, or any of the property currently or formerly owned, leased or operated by the Sellers, or the operations or property of any predecessor of the Sellers, is or may be implicated in or subject to any claim, order, hearing, notice, agreement or evaluation by any governmental body or any other person.

(xvi) "GAAP" means generally accepted accounting principles of the U.S. consistently applied.

(xvii) "Gross Profit" means for the relevant period total revenue (other than interest and dividend income, net income resulting from the sale of marketable securities and other non-operating activity generated income) calculated in accordance with Schedule 14.1 reduced by the Cost of Sales calculated in

accordance with Schedule 14.1 related to such revenue, all in accordance with GAAP consistently applied.

(xviii) "Hazardous Substance" means any toxic waste, pollutant, contaminant, hazardous substance, toxic substance, hazardous waste, special waste, industrial substance or waste, petroleum or petroleum-derived substance or waste, radioactive substance or waste, or any constituent of any such substance or waste, or any other substance regulated under or defined by any Safety and Environmental Law.

(xix) "Income Taxes" means any federal, state, local, or foreign Tax (including any interest, penalties, or additions to Tax attributable to such Tax) (i) based upon, measured by, or calculated with respect to, net income or net receipts, proceeds, or profits (including, but not limited to, any capital gains Taxes, minimum Taxes, and any Taxes on items of Tax preference, but not including sales, use, real or personal property transfer, or similar Taxes), or (ii) based upon, measured by, or calculated with respect to multiple bases (including, but not limited to, corporate franchise or occupation Taxes) if one or more of the bases on which such Tax may be based, measured by, or calculated with respect to is described in (i) above.

(xx) "Imputed Interest" means an amount equal to the interest rate USAi earns on its short term cash deposits, as adjusted quarterly, applied to the amount of any cash dividends, distributions or advances by the Buyer, compounded annually from the date of such cash dividend or distribution.

(xxi) "Investment" means any loan or advance to any person, any purchase or other acquisition of any capital stock or other ownership or profit

interest, warrant, right, option, obligation or other securities of such person, any capital contribution to such person or any other investment in such person.

(xxii) "knowledge" means, with respect to the Buyer or Sellers, the actual knowledge of any officer, director or shareholder of such person.

(xxiii) "lien or other encumbrance" means and includes any lien, pledge, mortgage, security interest, claim, lease, charge, option, right of first refusal, easement or any other encumbrance whatsoever.

(xxiv) "Net Working Capital" means the current assets of the Sellers acquired by Buyer at Closing minus the current liabilities of the Sellers assumed by Buyer at Closing, all determined in accordance with GAAP consistently applied. Schedule 14.1 sets forth the Net Working Capital of the Sellers as of December 31, 1998.

(xxv) "person" means any individual, corporation, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization or other entity.

(xxvi) "property" means real, personal or mixed property.

(xxvii) "Safety and Environmental Laws" means all Laws and Orders relating to pollution, protection of the Environment, public or worker health and safety, or the emission, discharge, release or threatened release of Hazardous Substances into the Environment or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances including the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., the Resource Conservation and Recovery

Act, 42 U.S.C. § 6901 et seq., the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq., the Clean Air Act, 42 U.S.C. § 7401 et seq., the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. § 121 et seq., the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq., the Asbestos Hazard Emergency Response Act, 15 U.S.C. § 2601 et seq., the Safe Drinking Water Act, 42 U.S.C. § 300f et seq., the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq., and analogous state acts.

(xxviii) "Tax Return" means all returns, declarations, reports, forms, estimates, information returns, and statements required to be filed in respect of any Taxes or to be supplied to a taxing authority in connection with any Taxes.

(xxix) "Taxes" means all taxes of any kind, charges, fees customs, duties, imposts, levies, or other assessments, including, without limitation, all net income, gross receipts, ad valorem, value added, transfer, gains, franchise, profits, inventory, net worth, capital stock, asset, sales, use, license, estimated, withholding, payroll, transaction, capital, employment, social security, workers compensation, unemployment, excise, severance, stamp, occupancy, and property taxes, together with any interest, penalties, additions to tax, or additional amounts imposed by any taxing authority (domestic or foreign) and shall include any transferee liability in respect of Taxes.

(xxx) "USAi Cost of Funds" means the interest rate charged USAi pursuant to its senior credit facility in existence at such time.

14.2 Publicity. No publicity release or announcement concerning this Agreement or the transactions contemplated hereby shall be issued without advance approval of the form and substance thereof by the Sellers and the Buyer.

14.3 Notices. Any notice or other communication required or which may be given hereunder shall be in writing and shall be delivered personally, sent by facsimile transmission or sent by certified, registered or express mail, postage prepaid. Any such notice shall be deemed given when so delivered personally, or sent by facsimile transmission or, if mailed, five days after the date of deposit in the United States mails, as follows:

(i) if to the Buyer or USAi, to it:

c/o USA Networks, Inc.
152 West 57th Street
42nd Floor
New York, New York 10019
Attention: General Counsel
Facsimile: (212) 314-7329

with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, New York 10019-6064
Attention: Robert B. Schumer, Esq.
Facsimile: (212) 757-3990

(ii) if to the Sellers, to it:

c/o Hotel Reservations Network
8140 Walnut Hill Lane
Suite 203
Dallas, Texas 75231
Attention: David Litman
Facsimile: (214) 265-0975

with a copy to:

Sayles & Lidji
1201 Elm Street
44th Floor
Dallas, Texas 75270
Attention: Brian M. Lidji, Esq.
Facsimile: (214) 939-8787

(iii) if to the Shareholders, to it:

David Litman
5001 Swiss Avenue
Dallas, Texas 75214
Facsimile: (214) 826-1917

and

Robert Diener
8877 Collins Avenue
PHA
Surfside, Florida 33154
Facsimile: (305) 868-4922

with a copy to:

Sayles & Lidji
1201 Elm Street
44th Floor
Dallas, Texas 75270
Attention: Brian M. Lidji, Esq.
Facsimile: (214) 939-8787

14.4 Entire Agreement. This Agreement (including the Exhibits and Schedules hereto) contains the entire agreement among the parties with respect to the purchase of the Purchased Assets and related transactions and supersedes all prior agreements, written or oral, with respect thereto.

14.5 Waivers and Amendments. This Agreement may be amended, modified, superseded canceled, renewed or extended, and the terms and conditions

hereof may be waived only by a written instrument signed by the parties or, in the case of a waiver, the party waiving compliance. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power or privilege hereunder, nor any single or partial exercise of any right, power or privilege hereunder, preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder. The rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies which any party may otherwise have at law or in equity. The rights and remedies of any party arising out of or otherwise in respect of any inaccuracy in or breach of any representation, warranty, covenant or agreement contained in this Agreement shall in no way be limited by the fact that the act, omission, occurrence or other state of facts upon which any claim of any such inaccuracy or breach is based may also be the subject matter of any other representation, warranty, covenant or agreement contained in this Agreement (or in any other agreement between the parties) as to which there is no inaccuracy or breach.

14.6 Governing Law. This Agreement shall be governed and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed entirely within such State.

14.7 Consent to Jurisdiction and Service of Process. Any claim arising out of or relating to this Agreement, the Purchase Note or the Escrow Agreement or the transactions contemplated hereby and thereby may be instituted in any Federal Court of the Southern District of New York or any state court located in

New York County, State of New York, and each party agrees not to assert, by way of motion, as a defense or otherwise, in any such claim, any claim it is not subject personally to the jurisdiction of such Court, that the claim is brought in an inconvenient forum, that the venue of the claim is improper or that this Agreement, the Purchase Note or the Escrow Agreement or the subject matter hereof or thereof may not be enforced in or by such Court. Each party further irrevocably submits to the jurisdiction of such Court in any such claim. Any and all service of process and any other notice of any such claim shall be effective against the party if given personally or by registered or certified mail, return receipt requested, or by any other means of mail that requires a signed receipt, postage prepaid, mailed to such party as herein provided. Nothing herein contained shall be deemed to affect the right of any party to serve process in any matter permitted by law or to commence legal proceedings or otherwise proceed against any other party in any other jurisdiction.

14.8 No Assignment. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns and permitted transferees of the parties hereto. This Agreement is not assignable except by operation of law; provided that Sellers may assign all or part of the Promissory Note, Additional Purchase Payment, Deferred Payment or Participation Payment to the Shareholders in connection with the partial or complete liquidation of the Sellers. The Shareholders may then assign without limit or reservation any of his or its rights (but not his or its obligations) to any family member or trust, whether charitable or for the benefit of any family member; provided, such family member or trust agrees in writing to be bound by the obligations of the Shareholders hereunder, including without limitation,

the indemnification obligations pursuant to Article 12 and the guaranty obligations pursuant to Section 10.6. Except as provided in Article 12, no other person other than the parties hereto and their successors and permitted assigns is intended to be a beneficiary of this Agreement.

14.9 Usage. All pronouns and any variations thereof refer to the masculine, feminine or neuter, singular or plural, as the identity of the person or persons may require. All terms defined in this Agreement in their singular or plural forms have correlative meanings when used herein in their singular or plural forms, respectively. Unless otherwise expressly provided, the words "include," "includes" and "including" do not limit the preceding words or terms and shall be deemed to be followed by the words "without limitation."

14.10 Counterparts. This Agreement may be executed by the parties hereto in separate counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

14.11 Exhibits and Schedules. The Exhibits and Schedules to this Agreement are hereby made a part of this Agreement as if set forth in full herein.

14.12 Headings. The headings in this Agreement are intended solely for convenience of reference and shall be given no effect in the interpretation of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

HRN, INC.

By [signature]
Name: Thomas Kuhn
Title: President

USA NETWORKS, INC.

By [signature]
Name: Thomas Kuhn
Title: Senior Vice President and General Counsel

TMF, INC.

By ______________________
Name:
Title:

HRN MARKETING CORP.

By ______________________
Name:
Title:

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

HRN, INC.

By ______________________________
Name:
Title:

USA NETWORKS, INC.

By ______________________________
Name:
Title:

TMF, INC.

By ______________________________
Name: David Litman
Title: Chief Executive Officer

HRN MARKETING CORP.

By ______________________________
Name: David Litman
Title: Vice-President

David Litman

Malia Litman

Robert Diener

Michelle Diener

The Zachary Charles Litman Exempt
G-S Trust

By ______________________
Name: Frank D. Connery
Title: Trustee

The Katherine Elizabeth Litman Exempt
G-S Trust

By ______________________
Name: Frank D. Connery
Title: Trustee

The Anna Marie Litman Exempt
G-S Trust

By ______________________
Name: Frank D. Connery
Title: Trustee

David Litman

Malia Litman

Robert Diener

Michelle Diener

The Zachary Charles Litman Exempt
G-S Trust

By Frank D. Connery
Name: Frank D. Connery
Title: Trustee

The Katherine Elizabeth Litman Exempt
G-S Trust

By Frank D. Connery
Name: Frank D. Connery
Title: Trustee

The Anna Marie Litman Exempt
G-S Trust

By Frank D. Connery
Name: Frank D. Connery
Title: Trustee

Doc#:D33:196565.8

The Allison Diener Exempt G-S Trust

By ________________________
Name: David Litman
Title: Trustee

The Brianna Diener Exempt G-S Trust

By ________________________
Name: David Litman
Title: Trustee