# EXHIBIT E

**TO**

**Affidavit of David S. Litman**

HOTEL RESERVATIONS NETWORK
www.180096hotel.com

May 7, 1999

Via Hand Delivery

Mr. Andy Pells
c/o Hotel Reservations Network
8140 Walnut Hill Lane
Suite 203
Dallas, TX 75231

Re: Payment Agreement

Dear Andy:

As you know, on April 13, 1999, TMF, Inc. d/b/a Hotel Reservations Network (the "*Company*") agreed to sell substantially all its assets (the "*Business*") to HRN, Inc or its successors. (the "*Buyer*"), an affiliate of USA Networks, Inc. (the "*Transaction*") pursuant to the terms of an Asset Purchase Agreement (the "*Purchase Agreement*"). This letter sets forth the terms and conditions of the severance agreement between you and the Company. Upon signing this letter but only effective upon the closing of the Transaction, you will have resigned from all positions with the Company effective as of the date of such closing (the "*Closing Date*") and you will become an employee of the Buyer.

1. Severance Payment. In consideration for your dedicated service to the Company prior to the Closing Date and your resignation from the Company effective as of the Closing Date, the Company hereby agrees to pay you severance in the aggregate amount of (i) $115,000, (ii) Five percent (5%) of the Net Sales Proceeds (as defined below) actually received by the shareholders of the Company at the time of the Closing (which 5% is estimated to be approximately $6,750,000 prior to tax withholding), (iii) and up to five percent (5%) of the remaining total Net Sales Proceeds actually received by the shareholders of the Company from the Buyer in connection with the Transaction, subject to and according to the Payment Schedule provided in § 2 below.

As used in this letter agreement, "*Net Sales Proceeds*" shall mean the cash or stock paid by the Buyer and actually received by the shareholders in the Transaction, less all costs and expenses incurred by the Company or the shareholders in consummating the Transaction or collecting such funds, including, but not limited to, any "built-in" gain or other tax to be incurred by the Company in such sale, all fees of any attorney, accountant, investment banker or other professional engaged by the Company to assist it in consummating the Transaction, and any severance payable to any employee of the Company other than yourself, Dave Litman, or Bob Diener. You understand that the Company and its shareholders reserve the right to resolve any disputes as to the interpretation of the Agreement with Buyer or resolve any claims thereunder without notice or approval from you.

2. Payment Schedule for Contingent Payments. Under the terms of the Purchase Agreement, the Company and its shareholders may receive, after the initial portion of the Net Sale Proceeds paid at the Closing Date (the "*Initial Payment*"), the following additional contingent payments (collectively referred to as the "Contingent Payments") based upon: (a) the achievement of the gross profit goals for the Business during the twelve (12) months ended December 31, 1999 (the "*1999 Deferred Payment*"); (b) the before tax earnings growth of the Business, as adjusted

pursuant to the terms of the Purchase Agreement, in each of the three (3) years ended March 31, 2000, 2001 and 2002 (each an "*Annual Deferred Payment*"); (c) a portion of the sale price of the Business or of the stock of the Business, in the event of an initial public offering of the stock of the Business (the "*Deferred Participation Payment*"); (d) in the event of no sale or public offering prior to the 5th anniversary of the Closing Date, a portion of the adjusted enterprise value of the Business on the fifth anniversary date of the Closing Date (the "*Deferred Enterprise Value Payment*"), and (e) the proceeds of an escrow fund after the reduction for claims under the Purchase Agreement ("Escrow Payment").

**(a) First Installment of Each Contingent Payment.** Provided that you are employed by the Buyer or its successor on the date any Contingent Payment is made by the Buyer to the Company or its shareholders, then you shall received as to that Contingent Payment, two and one-half percent (2.5%) of the Net Sales Proceeds received in that Contingent Payment within 7 business days after such payment by the Buyer. Provided, however, that even if you are not employed by the Buyer on such date, you shall still be entitled to the 2.5% payment if the reason your employment with Buyer ended is a Qualifying Terminating Event (as defined below).

**(b) Final Installment of any Contingent Payments.** Provided you are employed by the Buyer or its successor on March 31, 2002, (unless the termination of such employment was pursuant to a Qualifying Terminating Event) you shall also receive an amount equal to additional two and one-half percent (2.5%) of the Net Sales Proceeds of any Contingent Payments, whether paid by Buyer before or after March 31, 2002. Such payment shall in no event be due to you prior to 7 days after such payment is paid by Buyer.

*Special Account.* As to any Contingent Payments paid by Buyer prior to March 31, 2002, the Company or shareholders shall establish a brokerage account (in the name of the Company or its shareholders) in which will be deposited the potential final installment of the Net Sales Proceeds of any Contingent Payment (being 2.5% of such Net Sales Proceeds) which may be payable hereunder after March 31, 2002, and shall invest such funds in money market or government obligations. Copies of account statements shall be forwarded to you not less than quarterly. In the event the final installment of the Contingent Payment shall become payable to you hereunder, you shall receive in addition the interest earned on such funds in such account. If the final installment is not payable, such funds and the interest thereon shall be retained by the Company or shareholders.

*Qualifying Terminating Event.* For the purpose of the continued employment condition provided above, any payments which arise after the date your employment with Buyer is terminated, are forfeited by you, regardless of the reason for such termination, including your resignation or termination with or without cause by Buyer or its successor. Provided, however, that if your employment terminates by reasons of a "Qualifying Terminating Event", then you shall receive all of the payments provided in (a) and (b) as and when received by the Company or its shareholders from the Buyer. The following are the only Qualifying Terminating Events: the termination of your employment by reason of your death or a termination of your employment (regardless of the reason) if such termination occurs after the last date on which neither Dave Litman nor Bob Diener are employed by the Buyer or a successor of the Buyer.

F. Adjustments. In the event of any adjustments of the Purchase Price after any payment dates and pursuant to the agreement with the Buyer (including as a result of any indemnification claims by the Buyer), or as a result of the determination of the amount of any built in gain, an amount previously paid hereunder would be, in view of such adjustment, determined to be higher than it should have been, the Company shall be entitled to make an adjustment to any

future payments or, upon written request of you, obtain a payment from you in the amount determined by such adjustment.

3. Sole Agreement. You hereby acknowledge the termination of any and all employment, consulting or severance agreements between you, the Company and any affiliates of the Company, other than as set forth in this letter agreement. Further, you hereby acknowledge your resignation from the Company and all affiliates of the Company as of the Closing Date and, in exchange for the Total Severance Payment to be provided to you by the Company under the terms of this letter agreement, you hereby release the Company, its affiliates and the owners, shareholders, employees, officers, directors and agents of all of them (collectively, the "*Released Parties*") from all claims and demands based on your employment with the Company or the termination thereof. You further hereby release each Released Party from any and all obligations that it or they might otherwise have had to you under any employment, consulting, severance or any other agreement between the Company or any affiliates of the Company and you, including, but not by way of limitation, any obligations of the Company or its affiliates to pay you accrued but unpaid compensation of any sort whatsoever, except as set forth in this letter agreement. You understand and agree that you are releasing the Released Parties from (a) any claims for wrongful discharge, (b) any claims arising under common law, (c) any claims for any bonus, (d) any claims for shares of stock of the Company, (e) any claims for options to purchase shares of stock of the Company, (f) any claims under any severance plan or policy of the Company, (g) any claims based upon any contract, whether oral or written and (h) any claims based upon any tort. You further understand and agree that you are releasing not only claims that you know about, but also claims about which you may not know about.

4. Assignment. This letter agreement may not be assigned or transferred by you, in whole or in part, without the prior written consent of the Company, and any assignment in violation of this Section shall be void. The Company shall have the right to assign this letter agreement and any of its rights hereunder to an affiliate or a liquidating trust created to administer the orderly distribution of the Company's remaining assets and liabilities, or as a part of a sale or transfer of the assets of the Liquidating Trust or any substantial portion thereof.

5. Interpretation; Severability of Invalid Provisions. All rights and restrictions contained hereunder may be exercised and shall be applicable and binding only to the extent that they do not violate any applicable laws and are intended to be limited to the extent necessary to render this letter agreement legal, valid and enforceable. If any term of this letter agreement shall be held to be illegal, invalid or unenforceable by a court of competent jurisdiction, the remaining terms shall remain in full force and effect. The existence of any claim by you against the Company, whether predicated on this letter agreement or otherwise, shall not constitute a defense to enforcement by the Company of any or all such provisions or covenants.

6. Agreement Binding. This letter agreement shall inure to the benefit of the Company and its successors, assignees and designees and shall be binding upon you and your heirs, executors, administrators and personal representatives.

7. Nonwaiver. No failure on the part of either you or the Company to exercise, and no delay by either you or the Company in exercising any right, power, or remedy under this letter agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy by either you or the Company preclude any other or further exercise thereof or the exercise by such party of any other right, power or remedy. No express waiver or assent by either you or the Company of any breach of or default in any term or condition of this letter agreement by

the other party shall constitute a waiver of or an assent to any succeeding breach of or default in the same or any other term or condition hereof.

8. Amendments and Modifications. This letter agreement may be amended or modified only by a writing signed by you and the Company.

9. Governing Law. The validity and effect of this letter agreement shall be construed under, governed by and enforced in accordance with the laws of the State of Texas, without regard to the choice of law provisions, statutes, regulations or principles of this or any other jurisdiction.

10. No Conflicting Agreement. You represent and warrant that you are not party to any agreement, contract or understanding which would prohibit you from entering into this letter agreement or performing fully your obligations hereunder.

11. Arbitration.

A. Any and all disputes arising out of or in connection with the negotiation, execution, interpretation, performance or non-performance of this letter agreement, shall be referred to and solely and finally resolved by arbitration. The place of arbitration shall be Dallas, Texas or such other location as the parties may agree in writing. The arbitration tribunal shall consist of three arbitrators. The parties shall each nominate one arbitrator and the third arbitrator shall be appointed, all in accordance with the Rules (as defined below). The parties hereby renounce all recourse to litigation and agree (i) that no reference shall be made to any court on a point of law and (ii) that the award of the arbitration tribunal shall be final and subject no judicial review. The arbitration tribunal shall conduct the proceedings in accordance with the arbitration rules of the American Arbitration Association (the "*Rules*), which Rules are deemed to be incorporated by reference to this clause. The arbitration tribunal shall decide the issues submitted to them in accordance with (A) the language and commercial purposes of this letter agreement, and (B) what is just and equitable under the circumstances, provided that all substantive questions of law shall be determined under the laws of the State of Texas.

B. The parties agree to facilitate the arbitration by: (i) making available to one another and to the arbitration tribunal for examination, inspection and extraction all documents, books, records and personnel under their control determined by the arbitration tribunal to be relevant to the dispute; (ii) conducting arbitration hearings to the greatest extent possible on successive days; and (iii) observing strictly the time periods established by the Rules, or by the arbitration tribunal, for submission of evidence or briefs.

C. Judgment on the award of the arbitration tribunal may be entered in any court having jurisdiction over the party against which enforcement of the award is being sought. All deposits and other costs (other than fees of counsel) incurred in conducting the arbitration shall be borne equally by the parties or as otherwise determined by the tribunal. Each party shall be solely responsible for its own attorney's fees incurred in connection with the arbitration.

12. **Confidentiality.** You agree to keep the terms of this agreement and the terms and conditions of the Transaction confidential and to disclose such information to no party other than your accountants and attorneys who have a need to know such information.

13. **Covenants Against Competition.** You acknowledges that (i) the principal business of the Company is the direct marketing and selling of hotel rooms and other travel-related products and services to consumers through telephonic orders and Internet access or other

business activities of the Buyer or its affiliates in which you are involved while an employee of the Buyer (the "Company Business"). As a material inducement to the Company to enter into this Agreement and consummate the transactions referred to herein you agree:

(a) Non-Compete. During the term of your employment with the Buyer as successor in interest to the business of the Company or with any affiliate of the Buyer, and for a period of 3 years following the termination (whether for cause or otherwise) of that employment you shall not in the United States of America or in any foreign country, directly or indirectly, (i) engage in the Company Business for your own account; (ii) enter the employ of, or render any services to, any person engaged in such activities; or (iii) become interested in any such person as an individual, partner, shareholder, officer, director, principal, agent, employee, trustee, consultant or in any other relationship or capacity; provided, however, the your may own, directly or indirectly, solely as an investment, securities of any person which are traded on any national securities exchange if you (a) are not an officer, director, consultant, employee or a controlling person of, or a member of a group which controls, such person or (b) you do not, directly or indirectly, own 5% or more of any class of securities of such person.

(b) Confidential Information. During and after the Restricted Period, you shall keep secret and retain in strictest confidence, and shall not use for the benefit of yourself or others except in connection with the business and affairs of the Buyer and its affiliates, all confidential matters relating to the Company Business and to the Buyer and its affiliates, including without limitation, trade know-how, secrets, customer lists, subscription lists, subscription lists, details of author or consultant contracts, pricing policies, operational methods, marketing plans or strategies, produce development techniques or plans, business acquisition plans, new personnel acquisition plans, methods of manufacture, technical processes, designs and design projects, inventions and research projects and other business affairs relating to the Company Business and to the Buyer and its affiliates learned by you hereafter, and shall not disclose them to anyone outside of the Buyer and its affiliates, either during or after employment by the Buyer or any of its affiliates, except as required in the course of performing duties for the Buyer or with the Buyer's express written consent..

Please confirm our agreement by countersigning and returning one copy of this letter to me.

Very truly yours,

David Eitman

ACCEPTED AND AGREED TO
this 7th day of May, 1999:

# HOTEL RESERVATIONS NETWORK

Robert Diener
President
8140 Walnut Hill Lane Suite 203
Dallas Texas 75231

Telephone 1-214-361-7311
Fax 1-214-361-2248

August 24, 1999

Mr. Andy Pells
c/o Hotel Reservations Network
8140 Walnut Hill Lane Suite 203
Dallas, TX 75231

Re: Correction to Severance Agreement

Dear Andy:

I am writing, as we discussed, to clarify your Severance Agreement with TMF, Inc., dated May 7, 1999. When we met on May 7, Dave and I reviewed the Severance Agreement's terms with you, and we told you that the first year's quarterly payments(which can total up to $2,500,000) would be payable in all events after paid by USAI to TMF. However, the letter agreement, which we handed to you and you signed, mistakenly treated those payments as contingent, with half of the payments also being deferred. We apologize that the agreement did not reflect what we told you it would, and we are writing to correct that error regarding the first year's quarterly payments. Accordingly, please consider this letter as a clarifying amendment to our May 7, 1999, Severance Agreement. We confirm that your 5% share of the 1999 quarterly gross profit payments received by TMF will be payable to you in all events as follows: (1) your entire share of quarterly gross profit payments TMF receives in 1999 will be paid to you by December 31, 1999, and (2) your entire share of quarterly payments TMF receives in 2000 will be paid to you shortly after receipt.

Please sign and date this letter where indicated below to confirm this clarification to the severance Agreement.

Very truly yours,

Robert Diener

Confirmed this 27 day of August, 1999.

Andy Pells

**TMF Liquidating Trust**
**(Successor to TMF, Inc.)**

February 21, 2000

**VIA HAND DELIVERY**
Mr. Andy Pells
c/o Hotel Reservations Network
8140 Walnut Hill Lane
Suite 203
Dallas, TX 75231

Re: Amendment to Payment Agreement dated May 7, 1999, as corrected on August 24, 1999, letter (the "*Payment Agreement*"). Capitalized terms used in this letter and not otherwise defined herein shall have the meanings assigned to them in the Payment Agreement.

Dear Andy:

As you know, on February 2, 2000, Bob and I, as trustees of TMF Liquidating Trust (the successor to TMF, Inc., the "*Trust*"), entered into an amended and restated asset purchase agreement with HRN, Inc. (the "*Buyer*") pursuant to which the contingent cash payments provided in the original Purchase Agreement due for the twelve month periods ending March 31, 2001 and 2002 , were extinguished in exchange for the delivery of shares of the class A common stock of the Buyer immediately prior to the closing of its initial public offering (the "*IPO*"). This change is conditional on the IPO being completed prior to March 31, 2000. The number of shares to be so issued (the "*Exchange Shares*") will be determined by dividing $81.6 million by the IPO price in the Buyer's offering (6,800,000 shares, assuming an IPO price of $12.00 per share), except that no more than 7,418,182 shares and no less than 5,021,538 shares will be so issued.

As under the original asset purchase agreement, the amended and restated agreement also obligates the Buyer to issue to the Trust a number of shares of class A common stock equal to 10% of the Buyer's outstanding common stock immediately prior to the completion of the IPO. As a result, the Buyer is obligated to issue what is currently estimated to be an additional 4,899,900 shares of the Buyer's class A common stock to the Trust (the "*Participation Shares*").

The Exchange Shares and the Participation Shares (together totaling approximately 11,699,900 shares) are to be issued to the Trust subject to a four-year restriction on transferability, except for certain limited exceptions. The entire restated and amended agreement has been filed with the Securities & Exchange Commission as an exhibit to the Buyer's registration statement on Form S-1, No. 333-90601, relating to Buyer's IPO.

Under your Payment Agreement, you are currently entitled to receive 5% of the estimated 11,699,900 shares, or an estimated total of 584,995 shares, payable one-half to you immediately after receipt by the Trust and the balance on March 31, 2002, so long as you are employed by the Buyer at that time (unless the termination of such employment was pursuant to a Qualifying Termination Event). This letter, in the following paragraphs, amends the terms of your Payment Agreement by (a) replacing any references therein to the timing of your receipt of your portion of the Deferred Participation Payment in the form of the Participation Shares and (b) replacing any reference therein

Mr. Andy Pells
February 21, 2000
Page 2

to the payment of the Annual Deferred Payments for the twelve months ending March 31, 2001 and 2002 by providing you with an option to receive your portion of the Exchange Shares in either stock or cash as described below.

This letter amendment, upon being signed by you, amends your Payment Agreement as follows:

***Participation Shares.*** Your portion of the Participation Shares (244,995 shares or 5% of the estimated 4,899,900 shares), shall be delivered to you immediately after the Trust receives its Participation Shares; provided, however, that your Participation Shares will be subject to being forfeited by you (and will bear a legend to that effect) and upon such forfeiture shall be returned to the Trust, if you terminate your employment with the Buyer or its successor for any reason prior to the one year anniversary of the IPO, unless your employment is terminated by reason of your death or you resign because you become Permanently Disabled (as defined below). You hereby represent and warrant to the Trust that you shall not be taxed until you receive of your portion of the Participation Shares, which shall occur upon the expiration of the one year period during which your Participation Shares are subject to being returned by you to the Trust as described above. Your Participation Shares will not be subject to any restrictions on transferability after the one year anniversary of the IPO, but must be sold in accordance with Rule 144 of the Securities Exchange Act of 1934; and

***Exchange Shares.*** Your portion of the Exchange Shares (340,000 shares or 5% of 6,800,000 shares, which assumes an IPO price of $12.00 per share), shall be delivered to you on the fourth anniversary of the IPO unless you provide the Trust with written notice of your desire to receive on such four year anniversary date a cash payment, in lieu of all or a portion of such stock. The cash portion of your Exchange Shares, if any, shall be , in an amount equal to the number of Exchange Shares you would have received on that date in lieu of cash times the IPO price, as adjusted for any stock splits or stock dividends. Your right, however, to elect to receive the cash payment described above in lieu of any portion of the Exchange Shares shall be of no further force or effect if, at any time during such four year period your employment with the Buyer or its successor is terminated either (x) for Cause (as defined below) or (y) as a result of your resignation for any reason other than because you become Permanently Disabled. For the purpose of this letter, "Permanently Disabled" means a disability that renders you incapable of performing your work functions As used herein, a termination of your employment for "*Cause*" shall mean only your pleading guilty or being found guilty of a felony offense.

As with the Participation Shares, however, the shares are not registered and any sale of the Exchange Shares must be in accordance with applicable securities laws, including Rule 144 of the Securities Exchange Act of 1934.

Except as provided above, the Payment Agreement is neither amended or modified and the forgoing amendment shall not be effective unless the Buyer's IPO described in the preliminary prospectus dated February 7, 2000, a copy of which is enclosed, is consummated prior to March 31, 2000, or such date is extended by written agreement between the Trust and the Buyer. From and

after the date of the effectiveness of the amendment described above, all references to the Payment Agreement shall be deemed to be references to the Payment Agreement as amended hereby.

The amendment described above shall be effective upon the execution of counterparts of this letter by you and me. By signing this letter, you hereby represent to the Trust that you have consulted and reviewed the terms of this letter with your advisors and, as a result of such consultation and review, have determined to accept the arrangement described in this letter.

If this letter is acceptable, please countersign and return one copy of this letter to me.

Very truly yours,

David Litman
Co-Trustee of the TMF Liquidating Trust

ACCEPTED AND AGREED TO
this _____ day of February, 2000:

______________________
Andy Pelis

LETTER OF REPRESENTATIONS

HRN, Inc.
c/o USA Networks, Inc.
152 West 57th Street
42nd Floor
New York, New York 10019
Attention: General Counsel

February 24, 2000

To whom it may concern:

Reference herein is made to the Amended and Restated Asset Purchase Agreement (the "*Asset Purchase Agreement*") dated as of April 13, 1999, as amended (as further amended on February 2, 2000) among HRN, Inc., a Delaware corporation, USA Networks, Inc., a Delaware corporation, TMF, INC., a Texas corporation, HRN Marketing Corp., a Florida corporation, TMF Liquidating Trust, a Texas trust, Robert Diener and David Litman. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement.

In consideration of the issuance of 244,995 shares of class A common stock of the Buyer, par value $0.01 per share (the "*Subject Shares*"), the undersigned hereby:

1. Acknowledges that the undersigned or the undersigned's representative has had access to the same kind of information concerning the Buyer that is required by Schedule A of the Securities Act, to the extent that the Buyer possesses such information;

2. Represents and warrants that the undersigned has such knowledge and experience in financial and business matters that the undersigned is capable of utilizing the information that is available to the undersigned concerning the Buyer to evaluate the risks of investment in the Buyer;

3. Represents and warrants that it qualifies as an "accredited investor" under Rule 501(a)(7) under the Securities Act.

4. Acknowledges that the undersigned has been advised that the Subject Shares have not been registered under the Securities Act and, accordingly, that the undersigned may not be able to sell or otherwise dispose of the Subject Shares when the undersigned wishes to do so;

5. Represents and warrants that the Subject Shares are being purchased by the undersigned for the undersigned's own sole benefit and account for investment and not with a view to, or for resale in connection with, a public offering or distribution thereof;

6. Agrees that the Subject Shares will not be resold (a) without registration thereof under the Securities Act (unless an exemption from such registration is available) or (b) in violation of any law;

7. Consents that the certificate or certificates representing the Subject Shares may be impressed with a legend indicating that the Subject Shares are not registered under the Securities Act and reciting that transfer thereof is restricted; and

8. Consents that stop transfer instructions in respect of the Subject Shares may be issued to any transfer agent, transfer clerk or other agent at any time acting for the Buyer..

Yours sincerely,

Andy Pells

-end-

**TMF Liquidating Trust**
5521 Greenville Avenue
PMB 540 Suite 104
Dallas, TX 75206-2925

Via Telecopy (212) 373-2825 and Federal Express

March 7, 2000

Hotel Reservations Network, Inc.
c/o Paul, Weiss, Rifkind, Wharton & Garrison
Attn: Mary Reidy
1285 Avenue of the Americas
New York, New York 10019

Re: TMF Liquidating Trust ("Trust") and Andy Pells ("Pells") stock certificates of Hotel Reservations Network, Inc. ("HRN")

Ladies & Gentlemen:

We write you in connection with the representation letters signed by the Trust and Andy Pells addressed to you and dated February 24, 2000, relating to the shares of HRN class A common stock, par value $0.01 per share (the "Common Stock"), to which the undersigned are entitled. As you know, the Trust has transferred 244,995 shares of Common Stock (the "Pells Shares") to Pells in accordance with Section 7.15.2(i) of the Agreement (as defined below.) The Trust has previously written HRN and its transfer agent by letter dated February 24, 2000, regarding the referenced stock certificates. Reference is made to the Amended and Restated Purchase Agreement dated February 2, 2000 (the "Agreement") among HRN, the Trust and others. Capitalized terms used but not otherwise defined in this letter shall have the meanings ascribed to them in the Agreement.

1. Pells agrees that the restrictions applicable to the Section 7.11.3 Shares contained in the Agreement shall apply to the Pells Shares, provided that such shares shall be free of all such contractual restrictions on March 1, 2001.

2. The Trust agrees and confirms that all of the Pells Shares shall be treated as among the 40% of the Section 7.11.3 Shares referred to in Section 7.15.2(ii) of the Agreement, and the Trust acknowledges and agrees that, after the first anniversary of the IPO (and prior to taking into account the additional permissible transfers after the second and third anniversaries of the IPO), the Trust and its Permitted Transferees may Transfer under Section 7.15.2(ii) of the Agreement, in the aggregate, up to 1,714,965 Section 7.11.3 Shares other than the Pells Shares.

3. In the Letters of Representations to HRN by the Trust and by Pells, each dated as of February 24, 2000 (the "Representations Letters"), HRN acknowledges and agrees that the consent to the issuance of stop transfer instructions contained in paragraph 8 of the Representations Letters shall apply only to stop transfer instructions issued relating to, in connection with, in accordance with or in order to enforce the terms and conditions of, the Representations Letters, the Agreement or this letter.

4. HRN's agreement to the terms and provisions of this letter shall be evidenced by the delivery of a certificate or certificates to the Trust.

Hotel Reservations Network, Inc.
March 7, 2000
Page 2

In addition, regarding the stock certificate representing the Pells Shares, please deliver that certificate as follows:

Solomon Smith Barney, Inc.
f/b/o Andrew Pells and Jodie Pells
Account #108-08297-1-4-809
333 West 34th Street
Third Floor
New York, New York

The contact person at Solomon Smith Barney, Inc. to coordinate the delivery of the Trust's certificates and Mr. Pells' certificate is John Hacker, whose telephone number is (212) 615-8950.

-Please accept a telecopy of this letter. Following the delivery by telecopy, we will delivery original signed copies of this letter to you via Federal Express.

TMF Liquidating Trust
By David Litman, Trustee

Andy Pells