# EXHIBIT E

**TO**

**PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAVID S. LITMAN | ) | |
| and MALIA A. LITMAN | ) | |
| | ) | |
| Plaintiffs-Counterdefendants, | ) | |
| | ) | |
| V. | ) | No. 05-956T |
| | ) | |
| THE UNITED STATES | ) | Judge Mary Ellen Coster Williams |
| | ) | |
| Defendant-Counterplaintiff. | ) | |

**Affidavit of Mark L. Mitchell**

STATE OF WASHINGTON §
§
COUNTY OF KING §

Before me, the undersigned notary public, personally appeared Mark L. Mitchell, who, being duly sworn upon her oath, stated as follows:

1. My name is Mark L. Mitchell. I am over the age of 18, and I reside at 902 Alder Ave. NE, Bainbridge Island, Washington. I am fully competent to make this affidavit. The facts contained in this affidavit are true and correct and based upon my personal knowledge.

2. I have significant experience in providing valuation analyses. I hold a Masters of Business Administration degree in Finance from Southern Methodist University and two Bachelor of Science degrees, in Mathematical Sciences and Economics and Systems Analysis, also from Southern Methodist University. I am a member of the CFA Institute, and a senior member of the American Society of Appraisers. I have extensive experience in the valuation of business assets for gift and estate tax purposes, acquisition, divestiture, strategic planning, minority stockholder disputes, employee stock ownership plans, and fairness and solvency opinions. I was a principal of Business Valuation Services, Inc. ("BVS") from January 1, 1992 to October 31, 2000. I am currently Director of Valuation Services for Clothier & Head in Seattle, Washington. My current curriculum vitae is attached as **Exhibit A** to this affidavit and is incorporated by reference.

3. In 2001, BVS was retained to render a valuation analysis of the appropriate discount for lack of marketability applicable to determine the fair market value of 9,999,900 shares of Class A common stock in Hotel Reservations Network, Inc. ("HRN"), and common stock issued to TMF, Inc. and HRN Marketing Corp. (the "Shares"). Unlike publicly traded stock, the Shares were subject to substantial

restrictions on sale. The net effect of these restrictions is to reduce the fair market value of the shares below the price of similar, but freely traded, shares. The difference in value is referred to in the appraisal community as a "discount for lack of marketability." I prepared the appraisal report determining the discount for lack of marketability on behalf of BVS. A true and correct copy of my appraisal ("the Appraisal") is attached to this affidavit as **Exhibit B** and is incorporated by reference. The Appraisal contains my analytical process and conclusions of the discount for lack of marketability to be applied when valuing the Stock.

4. To develop our conclusion of value, we considered all factors, including the items listed in Revenue Rulings 59-60 and 77-287.

5. I was provided with copies of the relevant documents setting forth the restrictions on the Stock prior to my preparation of the appraisal report. Additional information regarding HRN was available in the public domain. I had sufficient information to accurately appraise the interests in the HRN stock.

6. To the best of my knowledge, Robert Diener, Michele Diener, David Litman, and Malia Litman are not related to anyone employed by, or with an ownership interest in, BVS. I did not have any personal or business relationship with the Dieners or the Litmans prior to my engagement to prepare the Appraisal.

Mark L. Mitchell
Mark L. Mitchell

SWORN TO AND SUBSCRIBED BEFORE ME this 10th day of November, 2005.

Nancy M. Moore
Notary Public, State of Washington

My Commission Expires:
Jan. 12, 2008

NANCY M MOORE
COMMISSION EXPIRES
NOTARY PUBLIC
1/12/2008
STATE OF WASHINGTON

# EXHIBIT A

**TO**

**Affidavit of Mark L. Mitchell**

# Mark L. Mitchell, CFA, ASA

**Director of Valuation Services**
**Clothier & Head, P.S.**

## Employment History

- **2003 - Present Clothier & Head, P.S., Seattle, Washington**

  *Director of Valuation Services.* Mr. Mitchell directs the firm's valuation practice in the areas of tax, mergers and acquisitions, financing and other management requirements, and dispute resolution. He has extensive experience in the valuation of business assets for gift and estate tax purposes, acquisition, divestiture, strategic planning, stockholder disputes, employee stock ownership plans, and fairness and solvency opinions. He frequently values debt instruments and other specialized securities including convertible bonds, preferred stock, options, and warrants.

  Mr. Mitchell has completed numerous assignments involving the valuation of intangible assets, including patents, software, license agreements, trademarks, and trade names. His experience extends to merger and acquisition advisory services in which he has assisted clients in initiating and structuring transactions to enhance shareholder value.

  Mr. Mitchell has significant experience in providing valuation consulting services in litigation support situations, including tax litigation. He has provided services in cases involving economic loss, business interruption/lost profits, bankruptcy/reorganization, and marital dissolution. As a result of these analyses, testimony was provided in deposition and courtroom settings.

  Mr. Mitchell has an extensive knowledge of financial markets, economics, securities analysis, and the tax and accounting aspects of valuation issues. He has served clients, which include the Internal Revenue Service and the Department of Justice, in a wide variety of industries, including banking and finance, retail, entertainment, lodging and hospitality, construction, healthcare, consumer products, oil and gas, electronics, media, distribution, light and heavy manufacturing, communications, business services, and computer hardware and software.

- **2000 - 2002 Williams Companies, Tulsa, Oklahoma**

  *Manager, Structured Finance.* Mr. Mitchell analyzed investment opportunities in the gas and power industries, including gas storage, electricity generation, gas pipelines, and emerging technologies. He also developed and implemented financing structures to optimize cost of capital and return on investment.

**Employment History (continued)**

- **1988 - 2000 Business Valuation Services, Inc., Dallas, Texas**

  *Principal.* Mr. Mitchell participated in all phases of project management and client development for the firm. He completed numerous assignments involving the valuation of businesses and business assets for tax, advisory, financial reporting, financing, strategy, and litigation purposes.

- **1987 - 1988 Arthur D. Little Valuation, Inc., Dallas, Texas**

  *Senior Consultant.* Mr. Mitchell performed valuations of closely held businesses for gift and estate tax purposes, employee stock ownership plans, and purchase price allocation studies. He also conducted valuation analyses of various intangible assets for tax related purposes, and managed client engagements in a number of different industries.

- **1986 - 1987 Electronic Data Systems, Dallas, Texas**

  *Financial Analyst.* Mr. Mitchell conducted analyses of corporate budgets and developed software programs to facilitate management reporting functions. He prepared monthly expense variance analyses for senior management.

- **1984 - 1986 NorthPark National Bank, Dallas, Texas**

  *Lending Officer - Real Estate.* Mr. Mitchell managed and developed a portfolio of commercial and residential real estate loans. He analyzed commercial real estate projects concentrating on cash flow and valuation issues.

**Formal Education**

- Master of Business Administration, Finance - 1983
  Southern Methodist University, Dallas, Texas

- Bachelor of Science, Economics and Systems Analysis - 1982
  Bachelor of Science, Mathematical Sciences
  Southern Methodist University, Dallas, Texas

**Charters and Accreditations**

- Chartered Financial Analyst (CFA)

- Accredited Senior Appraiser (ASA)

## Professional Associations

- Member, CFA Institute
- Member, CFA Society of Seattle
- Member, American Society of Appraisers

## Publications

- "Capitalization and Discount Rates" – Published in *Financial Valuation: Businesses and Business Interests, 1999 Update*, Warren Gorham & Lamont, 1999.
- "Valuation of Asset Holding Companies" – Published in *Financial Valuation: Businesses and Business Interests, 1999 Update*, Warren Gorham & Lamont, 1999.
- "To Build or Not to Build: An Analysis of the Benefits of New Sports Facilities" - Published in *Real Estate Issues*, Volume 21, Number Three, December 1996.

## Lectures/Presentations

- "How to Analyze Financial Statements" – Washington State Bar Association (Formidable Factors: The Financial Aspects of Divorce) – Seattle, Washington – February 2005.
- "Financial Statement Analysis: Understand and Interpret Financial Results for Better Management, Investment and Credit Decisions" – CPE (Lorman Education Services) – Tacoma, Washington – November 2003.
- "Valuation for Venture Capital Financing" – Venture Financing Roundtable, VenLogic - Seattle, Washington - November 2003.
- "Real World Valuation for Start-up Enterprises" - Akin, Gump, Strauss, Hauer & Feld, L.L.P., Continuing Legal Education - Dallas, Texas - December 1999.
- "The Acquisition of a Sports Franchise" - Buying & Selling a Business Conference (CLE International) - Las Vegas, Nevada - November 1999.
- "Valuation of Intangible Assets" - Texas Association of Property Tax Professionals Consulting Course - Houston, Texas - November 1999.
- "Estate and Gift Tax Valuation Issues" - IRS Estate and Gift Tax Continuing Professional Education - Kansas City, Missouri - August 1998.
- "What's It Worth? Trends and Issues in Business Valuation" - IRS Estate and Gift Tax Continuing Professional Education - Houston, Texas - July 1998.
- "Some Comments from the Valuation Battlefield" - Texas Society of Certified Public Accountants - Dallas, Texas - May 1998.
- "Topical Issues and Tax Court Cases Relating to Gift and Estate Tax Valuations" - IRS Estate and Gift Tax Continuing Professional Education - Dallas, Texas - September 1997.

## Lectures/Presentations (continued)

- "Doctors, Money and the Dilemma of Selling Out" - Health Care Conference, Texas Society of Certified Public Accountants - Dallas, Texas - May 1997.
- "Estate of Cloutier and Valuation Discounts for Operating and Holding Companies" - Tulsa Chapter of the American Society of Appraisers - Tulsa, Oklahoma - November 1996.
- "Current Approaches and Issues to the Valuation of Business and Investment Interests" - IRS Estate and Gift Tax Continuing Professional Education; Dallas, Texas - May 1996.
- "Valuation: Common Battleground Issues and Anecdotal War Stories" - IRS Estate and Gift Tax Continuing Professional Education; Dallas, Texas - August 1995.
- "Intermediate Concepts in Valuation" - H.D. Vest Financial Services; Dallas, Texas - November 1994.
- "Valuation of Closely Held Business Interests" - IRS Estate and Gift Tax Continuing Professional Education; Dallas, Texas - February 1994.
- "Current Developments in the Valuation of Businesses, Including Real Estate Assets" - Real Estate Financial Executives Association; Dallas, Texas - October 1992.
- "Valuing the Closely Held Business" - H.D. Vest Financial Services; Dallas, Texas - May 1991.
- "Valuation Issues for Estate Planning" - Fidelity Union Life Conference; Dallas, Texas - March 1991.
- "Techniques for Valuing Closely Held Businesses" - National Association of Accountants; Dallas, Texas - September 1990.
- "The Small Business Owner" - H.D. Vest Financial Services; Dallas, Texas - September 1990; December 1990; February 1991.

## Expert Witness Testimony

- *Precision Replacement Parts Corp. v. Auto Glass Components, Inc.* (No. C04-0566L); United States District Court for the Western District of Washington at Seattle; deposition June 2005 regarding the loss in business value of a company operating as a wholesaler of automotive parts as a result of an alleged trademark infringement claim.
- *In re Manny Lincoln Neves and Daisy Neves, D&M Enterprises, Cedar Village Apartments, LLC, Fairway-Park Place, LLC and Avalon at Seven Hills, LLC,* (No. 03-15393-KAO); United States Bankruptcy Court, Western District of Washington at Seattle; testimony March 2005 regarding the value of a minority ownership interest in an LLC holding real property.
- *Brown & Cole, Inc., et al, v. Deloitte & Touche, et al*; Superior Court of Washington for King County; deposition October 2003 regarding the value of a portfolio of notes receivable.
- *Dallas Hockey Club, Inc. v. Comerica Bank-Texas,* (No. DV 9806889); District Court of Dallas County, Texas, 193rd Judicial District; depositions February 2001 and January 2003 regarding the economic loss suffered by the former owner of the Dallas Stars National Hockey League franchise in connection with the sale of the franchise.

**Expert Witness Testimony (continued)**

- *Ameritruck Distribution Corp., et al, v. Richard A. Beauchamp, et al*, Adversary No. 99-3302, United States Bankruptcy Court, Northern District of Georgia, Gainesville Division; deposition October 2000 regarding the economic loss suffered by a trucking company as a result of an alleged claim of fraud and breach of fiduciary duty relating to certain actions of the company's officers and a competitor.

- *Clade Enterprises, Inc., Clade Enterprises of North Dallas, Inc. and Leona Clade v. Ruth U. Fertel, Inc., Ruth's Chris Steak House, Inc., Ruth's Chris Steak House Franchise, Inc. and William L. Hyde* (No. 99-02227-C); District Court of Dallas County, Texas, 68th Judicial District; deposition August 2000 and testimony at trial October 2001 regarding the economic loss suffered by an operator of franchised steak restaurants as a result of an alleged claim of breach of contract relating to the opening of new restaurants pursuant to a franchise agreement.

- *In the Matter of the Marriage of Vickie L. Whitman and Scott A. Whitman* (No. 199-51626-99); District Court of Collin County, Texas, 199th Judicial District; deposition June 2000 and testimony at trial June 2000 regarding the value of a minority ownership interest in a company that designed, manufactured and installed plant floor automation systems used primarily in the aerospace industry.

- *Knight Furniture Company, Inc. v. Commissioner of Internal Revenue* (Docket No. 15369-99, T.C. Memo. 2001-19); United States Tax Court, Judge Cohen presiding; prepared a written direct report; testified at trial June 2000 regarding the value of minority ownership interests in a company that owned and operated retail furniture stores.

- *Estate of Marcia Hoffman v. Commissioner of Internal Revenue* (Docket No. 8632-98, T.C. Memo. 2001-109); United States Tax Court, Judge Ruwe presiding; prepared a written direct report; testified at trial March 2000 regarding the value of minority ownership interests in a real estate development company, a company engaged in homebuilding, a general partnership interest and promissory notes held by related entities.

- *Trinity Industries Leasing Company and Trinity Industries, Inc. v. American Energy, Inc., The Sterling Companies, Inc., f/k/a N.C. Propane Gas Co., Inc., Ferrellgas, L.P., Ferrellgas, Inc., Hugh Hinton, Sr., Hugh Hinton, Jr., Don Rich, Chet Hinton and Ann T. Hinton* (No. 97-06498); District Court of Dallas County, Texas, 191st Judicial District; deposition December 1999 and testimony at trial January 2000 regarding the value of certain tangible and intangible assets of a company that operated as a wholesaler of propane gas.

- *In the Matter of the Marriage of Howard Walsh and Karen Walsh* (No. 231-241799-96); District Court of Tarrant County, Texas, 231st Judicial District; deposition March 1999 regarding the value of an oil and gas operating company.

- *J.B.N. Morris, Individually and on behalf of Del Frisco's International, Inc. v. Del Frisco's International, Inc., Dale F. Wamstad, Brass Balls, Inc., and Charles J. Weeks* (No. 95-12800-F); District Court of Dallas County, Texas, 116th Judicial District; deposition January 1999 regarding the value of certain intangible assets related to restaurant operations.

- *BMW of North America, Inc. v. United States of America* (Civil Action No. 96-4360 (JCL)); United States District Court for the District of New Jersey; deposition September 1998 regarding the value of the fringe benefit associated with the use of company owned vehicles by certain employees of BMW of North America, Inc.

- *Buffalo Rock Company, Inc. v. United States of America* (Civil Action No. CV-97-P-0672-S); United States District Court for the Northern District of Alabama, Birmingham Division; deposition September 1998 and testimony at trial February 1999 regarding the value of non-compete agreements related to the acquisition of soft drink bottling and distribution operations.

## Expert Witness Testimony (continued)

- *Jerome B. Ruenheck and Karen L. Ruenheck, Debtors. Jerome B. Ruenheck and Karen L. Ruenheck v. United States of America, Department of Treasury, Internal Revenue Service* (Case No. 97-04063-6J1); United States Bankruptcy Court for the Middle District of Florida, Orlando Division; deposition August 1998 and testimony at trial August 1998 regarding the value of minority ownership interests in companies that operated franchised fast food restaurants.

- *The Rupp and Bowman Company, Debtor. Jeffrey H. Mims, Chapter 7 Trustee for The Rupp and Bowman Company v. Immuno Concepts, Inc., a Texas Corporation and Immuno Concepts, Inc., a Michigan Corporation* (Case No. 394-33815-SAF-11); United States Bankruptcy Court for the Northern District of Texas, Dallas Division; deposition October 1997 regarding the value of a distributor of medical equipment and laboratory supplies.

- *Comerica Bank - Texas, Successor to Northpark National Bank of Dallas v. Delwax Corporation dba Natural Dry of Dallas dba Natural Dry of Chicago and Fred O. Delin* (Docket No. 92-15232); District Court of Dallas County, Texas, 95th Judicial District; deposition June 1997 and testimony at trial August 1997 regarding the economic loss suffered by a hand dryer sales and service company as the result of an alleged claim of liability against Comerica Bank - Texas.

- *2618, Inc. dba Caligula XXI, v. Commissioner of Internal Revenue* (Docket No. 311-93, T.C. Memo. 1998-227); United States Tax Court, Judge Swift presiding; prepared a written direct report; testified at trial January 1997 regarding the value of a 100% ownership interest in a sexually-oriented business/nightclub.

- *Charles B. and Teresa A. Thompson, Et Al. v. Commissioner of Internal Revenue* (Docket Nos. 5219-95, 5220-95, 16787-95, 16945-95, 16946-95, T.C. Memo. 1997-287); United States Tax Court, Judge Vasquez presiding; prepared a written direct report; testified at trial March 1996 regarding the value of non-compete agreements related to the acquisition of a wholesale distributor of professional beauty supply products.

- *Estate of Joseph R. Cloutier, Joseph A. Cloutier, Fiduciary, v. Commissioner of Internal Revenue* (Docket No. 8905-94, T.C. Memo. 1996-49); United States Tax Court, Judge Laro presiding; prepared a written direct report; testified at trial November 1995 regarding appropriate marketability discount for a 100% ownership interest in a company whose principal asset was an NBC television affiliate in Fort Wayne, Indiana.

- *In the Matter of the Marriage of Regina Ann Cranmer and Scott Lanier Cranmer and in the Interest of Jennifer Michelle Cranmer, a Child* (No. 233-198893-93); deposition March 1995 in Arlington, Texas; testified regarding the value of a company that distributed aerospace components.

- *ITT Commercial Finance Corp. and Brokerage Services of America, Inc. v. Wal-Mart Stores, Inc. d/b/a Sam's Club* (Nos. 3:93-CV-2297-H and 3:93-CV-2480-H); United States District Court for the Northern District of Texas, Dallas Division; deposition January 1995 and testimony at trial October 1995 regarding the economic loss suffered by a distributor of computer products as the result of an alleged breach of contract by the Defendant.

- *Brenfrey Properties, Inc. and Nancy Garrett, Independent Executrix of the Estate of Larry V. Garrett v. J-Four Incorporated, Jim Milner and Joey Milner* (No. 17-135474-91); District Court of Tarrant County, Texas, 17th Judicial District; deposition January 1995; testified regarding the value of a minority ownership interest in a company that operated franchised video rental stores.

- *Estate of Joseph Cidulka, Deceased, James S. Bozik, Administrator, v. Commissioner of Internal Revenue* (Docket Nos. 22456-91 and 564-93, T.C. Memo. 1996-149); United States Tax Court, Judge Scott presiding; prepared a written direct report; testified at trial December 1994 regarding the value of a majority ownership interest in an outdoor advertising company.

## Expert Witness Testimony (continued)

- *In re: Arbitration between Jeffrey M. Weiser and Paul E. Jornayvaz and American Central Gas Companies, Inc.* (No. 71-116-00142-93); Tulsa, Oklahoma; deposition February 1994 and testimony at arbitration hearing March 1994 regarding the value of minority ownership interests in a natural gas gathering and marketing company.

- *In re: Yesterday Once More, Inc. and David S. Warnell, Debtors* (No. 91-03743-H5-11); United States Bankruptcy Court for the Southern District of Texas, Houston Division; testimony at trial February 1994 regarding the value of a nightclub/dance hall.

- *[Various Limited Partners] v. Alpha Pay Phones, Ltd. and Alpha Pay Phones II, Ltd.*, District Court, Denver, Colorado; testimony at trial November 1992 regarding the value of partnerships that owned and operated pay telephones.

- *In the Matter of the Marriage of Fran Elizabeth Pace and John Edward Pace and in the Interest of Michael Robert Pace, Charles Aaron Pace, and Amy Beth Pace v. Pace III, Inc.* (No. 219-52122-91); District Court of Collin County, Texas, 219th Judicial District; deposition October 1992 and October 1993; testified regarding the value of ownership interests in companies that operated franchised automobile repair shops.

- *In the Matter of the Marriage of Cleo Loretta Rathjen and John Theodore Rathjen, Jr.* (No. 296-50409-90); District Court of Collin County, Texas, 296th Judicial District; deposition May 1992 and testimony at trial October 1992 regarding the value of a chiropractic practice.

- *Estate of Mildred Herschede Jung, Deceased, Ruth J. Conway, Executrix, v. Commissioner of Internal Revenue* (Docket No. 20221-88, 101 T.C. No. 8); United States Tax Court, Judge Chabot presiding; prepared a written direct report and written rebuttal report; testified at trial December 1990 regarding the value of a 20.74% ownership interest in a company involved in the manufacture of healthcare and textile products.

# EXHIBIT B

**TO**

**Affidavit of Mark L. Mitchell**

# VALUATION ANALYSIS
## AS OF FEBRUARY 24, 2000

## RESTRICTED STOCK
## HOTEL RESERVATIONS NETWORK, INC.

PREPARED BY
BUSINESS VALUATION SERVICES, INC.

FEBRUARY 24, 2000

CBIZ BVS
BUSINESS VALUATION SERVICES
A Century Business Services Company

Valuation and Litigation Advisory Services
3030 LBJ Freeway
Suite 1650
Dallas, Texas 75234.7779
Phone: 972.620.0400
Fax: 972.620.8650

February 24, 2000

Mr. Robert Diener
Hotel Reservations Network, Inc.
12000 Biscayne Blvd., Ste. 216
Miami, FL 33181

Dear Mr. Diener:

Pursuant to your authorization, Business Valuation Services, Inc. has been retained to render a valuation analysis of the common stock of Hotel Reservations Network, Inc. Our analysis was limited to a determination of an appropriate marketability discount applicable to the common stock of Hotel Reservations Network, Inc., as of February 24, 2000, giving consideration to relevant resale restrictions. We understand that the valuation will be used for tax purposes in connection with an initial public offering of Hotel Reservations Network, Inc.'s common stock. No other purpose for our analysis is intended or should be inferred.

For purposes of this report, fair market value is defined as the price at which property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

Our analysis was conducted in accordance with generally accepted valuation standards and included such tests and procedures as we considered necessary under the circumstances. To develop our conclusion of value, we considered all factors listed in Revenue Rulings 59-60 and 77-287. These factors included:

1) The nature of the business and its history from inception;

2) The economic outlook in general and the condition and outlook of the specific industry;

3) The book value of the stock and the financial condition of the business;

CB17 BVS
BUSINESS VALUATION SERVICES



4) The earning capacity of the company;

5) The dividend paying capacity of the company;

6) Whether or not the enterprise has goodwill or other intangible value;

7) Prior sales of the stock and the size of the block to be valued;

8) The market price of the stock of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over-the-counter;

9) Resale provisions pursuant to the terms found in any restriction agreements associated with the securities; and

10) The market experience of freely tradable securities of the same class as the restricted securities.

The procedures performed during this valuation analysis included, but were not limited to, the following:

1) A review of the Form S-1 Registration Statement and Amendment No.1 to the Form S-1 for Hotel Reservations Network, Inc.;

2) A review of relevant industry information and current regional and national economic information; and

3) A review of published information regarding the quantification of marketability discounts in the determination of the fair market value of various assets.

We relied on information received regarding the operations of Hotel Reservations Network, Inc. as a fair reflection and made limited investigation as to the accuracy and completeness of such information. Our analysis was based in part on this information as well as on other data we developed.

CB17 BVS
BUSINESS VALUATION SERVICES



Based on the methodology employed in our analysis, it is our opinion that the marketability discount to be applied to the market price of the Hotel Reservations Network, Inc. stock to reflect the fair market value of the stock giving consideration to relevant resale restrictions, as of February 24, 2000, is reasonably stated as:

| Restriction Period | Discount |
|---|---|
| One year | 49.5% |
| Two years | 61.5% |
| Three years | 63.5% |
| Four years | 79.0% |

We are independent of Hotel Reservations Network, Inc. and have no current or prospective interest in the subject assets. Our fee for this appraisal service was in no way influenced by the results of our analysis.

The Statement of Limiting Conditions and the Appraisal Certification are integral parts of this report.

Respectfully submitted,

**BUSINESS VALUATION SERVICES, INC.**

By:

Mark L. Mitchell

Mark L. Mitchell, CFA, ASA
Principal

**VALUATION ANALYSIS**
**AS OF FEBRUARY 24, 2000**

**HOTEL RESERVATIONS NETWORK, INC.**

**TABLE OF CONTENTS**


| Section | Topic | Page |
|---|---|---|
| I | ENGAGEMENT OVERVIEW | |
| | Description of the Assignment | 1 |
| | Scope | 1 |
| | Procedures | 2 |
| II | HISTORY AND NATURE OF THE BUSINESS | |
| | Operations | 3 |
| | Financial Review | 8 |
| III | VALUATION ANALYSIS | |
| | Introduction | 10 |
| | SEC Regulation of Primary and Secondary Transactions | 10 |
| | Discount Analysis | 18 |
| IV | VALUATION CONCLUSION | |
| | Introduction | 36 |
| | Synthesis and Conclusion | 36 |
| | Procedures | 37 |
| V | STATEMENT OF LIMITING CONDITIONS | 39 |
| VI | APPRAISAL CERTIFICATION | 41 |
| VII | QUALIFICATIONS OF PRINCIPAL APPRAISER | 42 |

# I. ENGAGEMENT OVERVIEW

# I. ENGAGEMENT OVERVIEW

## DESCRIPTION OF THE ASSIGNMENT

Business Valuation Services, Inc. has conducted a valuation analysis of the common stock (the "stock") of Hotel Reservations Network, Inc. ("HRN" or the "Company"). Our analysis was limited to a determination of an appropriate marketability discount applicable to the stock, as of February 24, 2000 (the "valuation date"), giving consideration to relevant resale restrictions. We understand that the valuation will be used for tax purposes in connection with an initial public offering of HRN's common stock. No other purpose for our analysis is intended or should be inferred.

For purposes of this report, fair market value is defined as the price at which property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts.

## SCOPE

This report provides a detailed discussion of the valuation analysis we performed and is divided into four major sections. This first section outlines the description, scope and procedures of our analysis. The second section provides a discussion of the Company's history and the nature of its business and its historical operating results as of the valuation date. The third section presents a discussion of valuation theory and the specific methodology used with respect to the valuation of the stock. Finally, a summary of the conclusion reached in our analysis is presented in the fourth section.

## PROCEDURES

This valuation analysis was conducted in accordance with generally accepted valuation procedures. These procedures included such substantive valuation tests as we considered necessary and appropriate under the circumstances. We relied on information provided to us regarding the subject assets and made limited investigation as to the accuracy and completeness of such information. Our analysis was based in part on this information as well as on other data we developed. A full discussion of the methodologies employed appears in the following sections of this report.

## II. HISTORY AND NATURE OF THE BUSINESS

## II. HISTORY AND NATURE OF THE BUSINESS

### OPERATIONS

**Introduction**

According to HRN's Form S-1 Registration Statement ("S-1"), dated January 18, 2000, the Company is a leading online consolidator of hotel accommodations, providing service through various websites and a toll-free call center. HRN contracts with hotels in advance for volume purchases at wholesale prices and sells these rooms to consumers, often at significant discounts to published rates. In addition, the Company's hotel supply relationships often allow HRN to offer its customers hotel accommodation alternatives for otherwise unavailable dates.

The Company has developed supply relationships with approximately 1,200 hotels. Due to HRN's proven ability to sell rooms in volume, the Company is able to secure room inventory during both peak and off-peak time periods and often is permitted to return unsold rooms without a penalty within a specified period of time. The Company offers accommodations in 40 major metropolitan markets. In each market, HRN seeks to offer a range of hotel options at a variety of prices.

Through the Company's fully automated websites, customers can quickly and easily compare price, availability and amenity options, view photos of accommodations and maps of the relevant area and securely book room reservations with or without any assistance from HRN's operators. HRN established its first proprietary website in 1997. Internet bookings accounted for an increasing percentage of total room bookings in the periods immediately prior to the valuation date. Internet generated bookings accounted for 21%, 44% and 78% of total bookings in 1997, 1998 and the nine months ended September 30, 1999, respectively.

The Company has negotiated marketing agreements with many of the leading travel-related websites included Preview Travel, Microsoft's Expedia, Sabre's Travelocity, Pegasus System's TravelWeb, Cheap Tickets, Yupi.com, GetThere.com and over 1,500 other affiliate websites. Through these agreements, HRN's websites are prominently featured on and linked to these affiliated websites on a co-branded or private label basis. HRN is also featured prominently on most of the leading Internet search engines and online communities, including Ticketmaster Online-City Search, Excite and Infoseek. For 1998, 16% of the Company's Internet generated bookings were made through the Company's online affiliations. For the nine months ended September 30, 1999, 49% of HRN's Internet generated bookings were made through its online affiliations and no single affiliate accounted for more than 10% of revenue.

HRN also works with a network of thousands of agencies to ensure awareness of its accommodations and booking options. Travel agencies typically book rooms through a central reservation system, such as Sabre or Galileo, at "rack" rates (the regular non-discounted published rate), corporate rates (typically 10-15% lower than the rack rate) or other discount rates. However, the lowest rates offered by some hotels are often not displayed. In addition, many available rooms do not appear on a central reservation system if the hotel is predicting maximum capacity. HRN offers agents one-stop shopping to check rates, confirm availability, obtain inventory and promptly receive commission payments. In 1998, 8% of HRN's bookings were generated through travel agencies and for the nine months ended September 30, 1999, 3% of bookings were generated through travel agencies.

HRN currently employs 180 people in its call center in Dallas, Texas. The Company's toll-free call center handles inbound calls from its toll-free number (1-800-96-hotel) and hundreds of travel clubs and affinity groups. On average, HRN's call center receives approximately 6,000 calls per day and provides customer service for toll-free number customers, Internet customers, and a number of affiliated travel and membership clubs. As of the valuation date, HRN's call center operated 24 hours a day, seven days a week.

**Development of Business**

TMF, Inc. was incorporated in Texas in 1991, and HRN Marketing Corp. was incorporated in Florida in 1998. In the spring of 1998, TMF, Inc. and HRN Marketing Corp. engaged an advisor to explore a variety of strategic alternatives. USA Networks, Inc. ("USAi"), HRN's parent company, was approached during this process. Negotiations for a possible transaction began in August 1998. In connection with these negotiations, HRN was formed in Delaware on March 25, 1999 as a direct, wholly owned subsidiary of USAi.

On April 13, 1999, the Company entered into a definitive agreement with USAi, TMF, Inc., HRN Marketing Corp. and Messrs. David Litman and Robert Diener to acquire substantially all the assets and liabilities of TMF, Inc. and HRN Marketing Corp. This transaction was completed on May 10, 1999. As a result, TMF, Inc. and HRN Marketing Corp. are, collectively, HRN's predecessor business. Along with their spouses and trusts for the benefit of some members of their families, Messrs. Litman and Diener were the sole stockholders of TMF, Inc. and HRN Marketing Corp. Since the acquisition, Messrs. Litman and Diener have continued on as the Company's Chief Executive Officer and President, respectively.

As a component of the consideration for the transaction, HRN was required to issue to TMF, Inc. and HRN Marketing Corp., for no additional consideration, the number of shares of the Company's class A common stock equal to approximately 10% of the aggregate value of the Company's equity immediately prior to the closing of its initial public offering. Subsequent to the initial public offering, the Company's common stock will consist of 16,209,900 shares of Class A common stock (one vote per share) and 38,999,100 shares of Class B common stock (15 votes per share, convertible at any time at the option of the holder into shares of class A common stock on a share-for-share basis). USAi owns all the Class B common stock.

Included in the Class A shares is a block of 5,100,000 shares issued to TMF, Inc. and HRN Marketing Corp. in exchange for the release of future cash payments (amending the 10% requirement noted above). Messrs. Litman and Diener (or related entities) will each own 4,999,950 shares of Class A common stock subsequent to the offering. The stock owned by Messrs. Litman and Diener, totaling 9,999,900 shares (equal to approximately 18.1% of the total of 55,209,000 shares outstanding) is the subject of our analysis.

It is our understanding that the contractual restrictions governing the subject stock are as of follows: (1) the block of 5,100,000 shares will not be available for sale until four years after the date of the initial public offering; (2) for the remaining 4,899,900 shares, 40% (or 1,959,960 shares) will be available for sale one year after the date of the initial public offering (all sales pursuant to Rule 144 restrictions – see discussion below); an additional 10% (or 489,990 shares) will be available for sale two years after the date of the initial public offering; an additional 10% will be available for sale three years after the date of the initial public offering; and the remaining 40% will be available for sale four years after the date of the initial public offering. In addition, the subject shares carry registration rights after the fourth anniversary of the initial public offering at no expense to the holder of the shares.[1]

## Operating Environment

As noted in its S-1, the U.S. travel industry is large and growing. The Travel Industry Association of America estimates that consumers in the U.S. spent in excess of $515 billion on business and leisure travel in 1998, making travel one of the nation's largest industries. Lodging accounts for a significant share of these travel expenditures.

---

[1] The registration rights primarily impact the shares carrying contractual restrictions of four years, a total of approximately seven million shares. The size of the block is significant relative to total shares outstanding and relative to the anticipated float subsequent to the initial public offering. While the prospect of registration would reduce the expected holding period after four years, issues related to the affiliate status of the holder of the shares and the ability to effectively register and sell all of the shares impact our discount analysis.

According to Smith Travel Research, the U.S. lodging industry generated $93 billion in revenues in 1998.

Online sales of travel services have become an important part of the overall travel industry and have expanded dramatically in recent years due to the increased acceptance of the Internet by both travel service providers and consumers. According to a May 1999 study by Jupiter Communications, the U.S. online travel market has more than doubled from $911 million in 1997 to $2.2 billion in 1998. Jupiter Communications projects that online travel bookings will increase from $4.2 billion in 1999 to $16.6 billion in 2003, representing a compound annual growth rate of 41%. For travel service providers, the Internet is an efficient distribution channel and offers a medium to reach more travelers and increase occupancy. The Internet also enables dynamic, real-time updating of pricing and availability and targeted marketing of last minute "specials" to maximize occupancy and yields.

Hotel reservations are particularly well-suited to the Internet and the services of third-party consolidators. Historically, hotels have relied on travel agencies and internal sales departments as their primary distribution channel. These traditional channels have not enabled hotels to maximize capacity and generally have offered limited assistance to the traveler. In addition, the central reservation system that hotels and travel agents rely upon often does not have access to discounted rates or to rooms during otherwise unavailable dates. Alternative booking methods, such as calling individual hotels or using publications like guidebooks or yellow pages, are both cumbersome and time consuming.

According to a May 1999 study by Jupiter Communications, online hotel bookings totaled $282 million in 1998. In addition, Jupiter Communications projects that online hotel bookings will increase from $630 million in 1999 to $4.2 billion in 2003, representing a compound annual growth rate of 60%.

## FINANCIAL REVIEW

### Operating Results

The following table presents the consolidated statements of operations for HRN for the periods indicated:

**CONSOLIDATED STATEMENT OF OPERATIONS**
**(In thousands)**

| | Year Ended December 31, 1998 | Year Ended December 31, 1999 |
|---|---|---|
| Revenues | $66,472 | $161,814 |
| Expenses: | | |
| Cost of sales | 45,818 | 116,328 |
| Selling, general and administrative | 10,020 | 21,363 |
| Depreciation and amortization | 20,031 | 13,356 |
| Total operating expenses | 75,869 | 151,047 |
| Income (loss) from operations | (9,397) | 10,767 |
| Other expense (income): | | |
| Interest | 674 | 0 |
| Other | 74 | 1,936 |
| Pretax income | $(8,649) | $12,703 |

HRN bills a customer's credit card in full when a reservation is booked and pays the hotel after a guest has departed. The Company records prepaid bookings as deferred revenue until check-out, at which time revenue is recognized. Accordingly, prepaid bookings represent payments received for revenue to be recognized in the future. Because the Company's customers pay HRN when a reservation is booked and does not pay a hotel until after a guest has departed, the Company is able to operate with limited or even negative working capital.

According to information presented in the S-1, revenues for the nine months ended September 30, 1999 increased by $67.6 million, or 165.7%, to $108.4 million compared to $40.8 million for the nine months ended September 30, 1998. The increase resulted from

expansion of affiliate marketing programs, an increase in the number of hotels for existing cities and expansion into new cities. Internet generated sales for the nine months ended September 30, 1999 increased by $68.3 million, or 416.5%, to $84.7 million compared to $16.4 million for the nine months ended September 30, 1998.

The Company intends to continue to expand its business by establishing strategic marketing affiliations with additional Internet portals, search engines, content providers, communities and other travel-related websites to capitalize on their brand recognition and significant customer traffic levels. In addition, the Company expects to expand its hotel supply arrangements in existing markets, enter new markets, initiate new affiliations with travel agencies and enhance its products and services to include other travel related services.

As of December 31, 1999, the Company reported total assets of $202.489 million, with $200.307 million reflecting goodwill (per unaudited financial statements provided by the Company). Net property, plant and equipment totaled $1.988 million, while current assets were equal to $13.027 million, including a cash balance of $11.302 million. Current liabilities were equal to $53.637 million. The book value of shareholders' equity was $148.85 million as of December 31, 1999, reflecting a per share value of approximately $3.82 based on 54.399 million shares outstanding subsequent to the initial public offering, adjusted for the net proceeds of the offering (see discussion below of market for HRN's stock).

## Market for HRN's Stock

The Company's common stock will trade under the Nasdaq National Market Symbol "ROOM". A total of 6.21 million shares of common stock are being issued with estimated net proceeds to the Company of $99.36 million. The expected offering price per share is $16.00.

## III. VALUATION ANALYSIS

## III. VALUATION ANALYSIS

### INTRODUCTION

In the following sections of the report, we address the relevant restrictions that impact the valuation of the HRN stock. Included in our discussion is a review of the relevant regulations promulgated by the Securities and Exchange Commission ("SEC") with respect to the sale of securities such as the HRN stock.

### SEC REGULATION OF PRIMARY AND SECONDARY TRANSACTIONS

#### Introduction

Congress passed the Securities Act of 1933 (the "1933 Act") to regulate the issuance of securities by a corporation, general or limited partnership, unincorporated association or individual. Congress passed the Securities Act of 1934 to regulate trading in securities already outstanding. The SEC administers both acts. The primary concern of the SEC is to ensure that investors are provided with material information to protect them from fraud and misrepresentation in the public offering, trading, voting and tendering of securities.

The sale of securities from an issuing business entity to the public is considered a primary market transaction, while the resale of a previously issued security between two investors is considered a secondary market transaction. In a primary market transaction, the sale of a security brings in cash, while a secondary market transaction does not. The distinction between primary and secondary transactions is an important element in the subject analysis as discussed in the following sections of our report.

## Requirements for the Registration of Securities

### Introduction

Unless a security or transaction qualifies for an exemption, Section 5 of the 1933 Act requires securities offered to the public through mail or any facility of interstate commerce to be registered with the SEC by means of a registration statement and an accompanying prospectus. Depending on the size of the offering, the direct cost of registration can be considerable. Direct costs consist of filing fees, investment banking fees, legal fees and printing and mailing expenses. For a $25 million public issue, the total direct cost for a debt offering may well exceed $500,000.[2]

There are also several indirect costs, which can be significant compared to the amount of the financing and often exceed direct costs in the case of equity issues. Indirect costs consist of the following:

1) the underwriting discount (or spread, which is the difference between price paid by underwriters to the issuer and the price at which underwriters sell the security to investors);

2) underpricing of the securities being issued (as measured from the price at which underwriters sell the security to investors relative to the after-market price immediately after the issuance);

3) the cost of the over-allotment option (underwriters are provided an over-allotment option to purchase additional securities at their contractual price to cover greater than anticipated demand for the security);

4) negative market reaction concerning the price of other publicly traded securities of the company, if any; and

5) the indirect cost of management time and involvement.

---

[2] "Shaking up America's Capital Markets." *The Economist*, April 21, 1990: 89.

The registration statement filed by an issuer must provide information about the securities being offered, the business of the issuer, the industry in which the issuer participates and the regulatory environment. Financial statements are also required. A registration statement becomes effective 20 business days subsequent to the date it is filed unless the SEC seeks additional information. The SEC does not judge the merits of the securities being offered; it only concerns itself with adequate disclosure. The accompanying prospectus is a written disclosure statement that contains much of the same information as the registration statement. The prospectus is distributed to potential investors as a marketing tool.

The issuer is restricted from undertaking certain marketing-related actions during the registration process. In general, during the pre-filing period, which begins on the issuer's contemplation of a public issue, the issuer is forbidden from engaging in public relations activities that may condition the market for the upcoming issue. Subsequent to filing the registration statement but prior to the registration becoming effective, the issuer may condition the market by: 1) making oral offers to sell the securities through face-to-face meetings and telephone conversations; 2) distributing the preliminary prospectus (on file with the SEC, which may not contain the offering price); 3) distributing a summary prospectus (containing a summary of the information in the preliminary prospectus); and 4) placing tombstone advertisements in newspapers.

Unapproved writings that are considered offers to sell are prohibited during the period between the filing date and the effective date. During the period between the effective date of the registration statement and the consummation or withdrawal of the offer (the "post-effective period"), the issuer may solicit potential investors; however, prior to sale confirmation, a final prospectus must be delivered to investors.

The 1933 Act offers several exemptions from the registration process to ameliorate the cost of compliance. For example, the following securities are exempt from registration requirements:

1) Securities issued by any government in the United States (e.g., municipal bonds issued by city governments);

2) Short-term notes and drafts that have a maturity date not exceeding nine months from the date of issuance (e.g., commercial paper issued by corporations);

3) Securities issued by nonprofit issuers, such as religious institutions, charitable institutions and colleges or universities;

4) Securities of financial institutions (e.g., banks and savings associations) that are regulated by the appropriate banking authorities;

5) Securities issued by common carriers (e.g., railroads and trucking companies) that are regulated by the Interstate Commerce Commission;

6) Insurance and annuity contracts issued by insurance companies;

7) Stock dividends and stock splits; and

8) Securities issued in a corporate reorganization where one security is exchanged for another security.

**Nonissuer Exemption**

Non-issuers, such as average investors, do not have to file a registration statement prior to reselling securities they have purchased. The 1933 Act exempts from registration securities transactions not made by an issuer, underwriter or dealer. For example, an investor who owns 1,000 shares of Microsoft can resell the shares to another investor without having to register with the SEC.

**Intrastate Offering Exemption**

Local businesses can raise money from local investors without needing to register with the SEC. There is no limit on the amount of capital that can be raised pursuant to the intrastate offering exemption; however, the following three requirements must be met to qualify for this exemption:

1) The issuer must be a resident of the state for which the exemption is claimed and the corporation must be a resident of the state in which it is incorporated;

2) The issuer must be doing business in the state, which implies at least 80% of the assets must be located in the state, at least 80% of the gross revenues must be derived from the state and 80% of the proceeds must be utilized in the state; and

3) The offerees and the purchasers of the securities must be residents of that state and the resident purchasers cannot sell the securities to nonresidents for a period of nine months subsequent to the purchase.

**Small Offering Exemption**

Securities offerings that do not exceed certain threshold dollar amounts are exempt from registration requirements.[3] According to Rule 504, the sale of securities not exceeding $1 million during a 12-month period is exempt from registration. These securities may be sold to any number of accredited and unaccredited investors, but general selling efforts to the public are not permitted.[4] Securities not exceeding $5 million during a 12-month period are exempted from registration requirements by Rule 505. Sales may be made to an unlimited number of accredited investors, but to no more than 35 unaccredited investors. General selling efforts to the public are not permitted.

3 The small offering exemption and the private placement exemption (discussed below) are contained in SEC Regulation D, 17 C.F.R. 230. When these exemptions are used, the issuer must file a notice (Form D) with the SEC within 15 days of the first sale of securities.

4 An accredited investor is defined as: 1) any natural person (including spouse) who has a net worth of at least $1 million; 2) any natural person who has an annual income of at least $200,000 for the previous two years and reasonably expects to make $200,000 in the current year; 3) any corporation, partnership or trust with total assets in excess of $5 million; 4) insiders of the issuers, such as executive officers and directors of corporate issuers and general partners of partnership issuers; and 5) certain institutional investors, such as registered investment companies, pension plans, colleges and universities and the like.

**Private Placement Exemption**

An issue of securities that does not involve a public offering is exempt from filing a registration statement. This exemption allows issuers to raise capital from an unlimited number of accredited investors without the registration requirement. There is no dollar limit. No more than 35 unaccredited investors may purchase securities pursuant to this exemption; however, those unaccredited investors must have a certain sophistication through their own experience and education or through representatives (accountants, lawyers and business managers). General selling efforts, such as advertising to the public, are not permitted.

**Restricted Securities**

**Restrictions Pursuant to Rule 144 of the Securities Act of 1933**

Securities issued pursuant to the small offering exemption or private placement exemption are considered restricted securities. The resale of these securities is restricted pursuant to Rule 144. The SEC's Rule 144 allows for the sale of restricted securities in limited quantities without full registration (i.e., the registration is considered completed on the transfer of ownership). Rule 144 also applies to the sale of securities by affiliates (generally, officers, directors or anyone else owning 10% or more of the outstanding company securities).

Under Rule 144, restricted securities may be sold to the public without full registration if the following conditions are met:

1) The securities have been owned and fully paid for at least one year, or upon the death of the owner;

2) The current financial information must be made available to the buyer (companies that file 10-K and 10-Q reports with the SEC satisfy this requirement);

3) The seller must file Form 144, "Notice of Proposed Sale of Securities," with the SEC no later than the first day of the sale (the filing is effective for 90 days);

4) The sale of the securities may not be advertised and no additional commissions can be paid; and

5) If the securities were owned for between one and two years, the volume of securities sold is limited to the greater of 1% of all outstanding shares, or the average weekly trading volume for the preceding four weeks. If the shares have been owned for two years or more, no restrictions apply to a person who is not an affiliate of the issuer. Affiliates are always subject to volume restrictions.

It should be noted that neither the filing of the Form 144 notice nor the failure of the SEC to comment thereon is deemed to preclude the SEC from taking any action it deems necessary or appropriate with respect to the sale of the securities referred to in such notice. Rule 144 is regarded as a safe harbor in that it is an indication of an effort to comply with the applicable regulation and provides some protection if opposition to the sale of the securities is raised. In general, it is our understanding that in the majority of cases, there is no opposition to the sale of restricted securities.

**Rule 144A**

To establish a more liquid and efficient secondary market in unregistered securities, the SEC adopted Rule 144A in 1990. This rule permits qualified institutional buyers ("QIBs") to buy unregistered securities without being subject to the holding period restrictions pursuant to Rule 144. As defined in Rule 144A, QIBs are financial institutions, corporations and partnerships that own and invest on a discretionary basis at least $100 million in securities. This definition is broad enough to include life insurance companies, pension funds, investment companies, foreign and domestic commercial banks, master and collective bank trusts and savings and loan associations. Besides meeting the securities test, banks and savings and loans must have a net worth of at least $25 million. Broker-dealers must own only $10 million in securities to qualify as a QIB.

The SEC had two basic goals in adopting Rule 144A. One was to increase liquidity in the private placement market and thus lower the differences between the cost of capital between the public and private placement market. The other goal was to make the private placement market more attractive to foreign issuers who may not be willing to subject themselves to extensive disclosure requirements as part of the registration process.

Besides confining transactions to QIBs, Rule 144A requires the following three conditions:

1) To ensure that a minimum amount of information is available, an issuer must provide buyers with copies of recent financial statements;

2) When issued, privately placed securities cannot be of the same class as any of the issuer's securities already traded on a U.S. stock exchange or the NASDAQ system; and

3) The seller of securities must take reasonable steps to inform buyers that a sale is occurring pursuant to Rule 144A.

**Regulation S**

Regulation S clarifies conditions under which the offer and sale of securities made outside the United States will not be subject to the SEC's registration requirements and establishes "safe harbors," which means that offerings made in compliance with the regulation's conditions are automatically deemed to be "outside the United States." The two most important such conditions are the following: 1) no directed selling effort can be made in the United States in connection with an offering; and 2) offers and sales must be made in an offshore transaction where the purchaser is outside the United States, or where offers and sales are facilitated through a non-U.S. securities exchange.[5,6]

---

[5] Directed selling effort means any activity undertaken for the purpose of, or that could be reasonably expected to have, an effect of conditioning the market in the United States for any of the securities being offered in reliance on Regulation S. A concurrent private placement in the United States is not considered a directed selling effort.

## DISCOUNT ANALYSIS

### Introduction

The different approaches to quantifying discounts for lack of marketability fall into one of two general categories. The approaches that fall into the first category attempt to estimate the typical marketability discount by studying historical market data; however, these methods do not necessarily provide an objective methodology to determine the appropriate amount of the discount for lack of marketability for a specific security, although rough approximations can be inferred. The second approach seeks to provide an objective methodology to determine the appropriate size of such a discount applicable in that specific circumstance. It provides economic reasons for such a discount and formally incorporates transaction specific information in the analysis.

### Empirical Studies

#### Introduction

With respect to the first approach, the SEC conducted one of the most widely cited restricted stock studies. In the study, the SEC reported data on more than 300 transactions from 1966 through 1969. The SEC study indicated an average discount of approximately 26%, with the magnitude dependent to a great extent on the size and profitability of the specific firm. The data indicated that firms with greater sales volumes experienced smaller discounts, on average. For instance, firms with less than $5 million in sales at the time of the study reported an average discount of approximately 35%, while firms with more than $20 million in sales reported an average discount of only about 18%. Also, firms reporting higher earnings levels experienced lower discounts. Firms with earnings

[6] An offer is considered an offshore transaction if the offer is not made to a person in the United States and, at the time the buy order is originated, the buyer is reasonably believed to be outside the United States. An offer to a discretionary account held for a non-U.S. person by a dealer or other professional fiduciary in the United States is not considered an offer to a person in the United States.