COPY



UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------x

DAVID S. AND MALIA A. LITMAN,

Plaintiffs,

v. No. 05-956T

USA,

Defendant.

-------------------------------x

ROBERT B. AND MICHELLE S. DIENER,

Plaintiffs,

v. No. 5-971T

USA,

Defendant.

-------------------------------x

CHRISTINE ZEIKEL

New York, New York

Tuesday, July 26, 2006

Reported by: Steven Neil Cohen, RPR

Job No. 186276

July 26, 2006

9:50 a.m.

Deposition of CHRISTINE ZEIKEL, taken by Defendants, pursuant to notice at the offices of Baker Botts, LLP, 30 Rockefeller Plaza, New York, New York, before Steven Neil Cohen, a Registered Professional Reporter and Notary Public of the State of New York.

APPEARANCES

BAKER BOTTS LLP
One Shell Plaza
910 Louisiana
Houston, Texas 77002-4995
Attorneys for Plaintiffs
BY: JOHN W. PORTER, ESQ.

U.S. DEPARTMENT OF JUSTICE
P.O. Box 26
Ben Franklin Station
Washington, DC 20044
Attorneys for Defendants
BY: CORY A. JOHNSON, ESQ.

LATHAM & WATKINS, LLP
555 Eleventh Street, N.W.
Suite 1000
Washington, D.C. 20004-1304
Attorneys for Hotels.com
BY: KARI M. LARSON, ESQ.

DELOITTE & TOUCHE USA LLP
Suite 500
555 Twelfth Street N.W.
Washington, D.C. 20004-1207
Attorneys for Christine Zeikel
BY: ERIC P. WITIW, ESQ.

IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the respective parties hereto, that the sealing and filing of the within deposition be waived; that such deposition may be signed and sworn to before any officer authorized to administer an oath; that all objections, except as to form are reserved to the time of trial.

Zeikel

CHRISTINE ZEIKEL,
called as a witness by the Plaintiffs,
having been duly sworn, testified as follows:
BY MR. PORTER:
Q. Could you state your name please?
A. Christine Zeikel.
Q. Ms. Zeikel, what is your business address?
A. 2 Hilton Court, Parsippany, New Jersey.
Q. Have you ever been deposed before?
A. Yes.
Q. With respect to valuation cases?
A. Yes.
Q. How many times?
A. Once.
Q. You understand that I am asking -- I and other lawyers here will be asking various questions and the court reporter will be taking those questions down and -- not only my questions but your answers -- and typing those out ultimately in booklet form?

Zeikel

A. Yes.

Q. The testimony you are giving here today is just as though -- is under oath just as if you were testifying in a court of law?

A. Yes.

Q. If there is a question that I ask that you don't understand or that you believe is not clear please ask me to restate it and I will be happy to try and do so.

A. Okay.

Q. If at any time you need a break let me know.

A. Okay.

Q. Would you give us -- where are you currently employed?

A. I am employed at Deloitte & Touche.

Q. What is your position?

A. I am a principal in the Financial Advisory Services practice.

Q. Is a principal akin to being a partner in the firm except you are not a

Zeikel

certified public accountant?

A. That's correct.

Q. What does the Financial Advisory Services group of Deloitte & Touche consist of?

A. Financial Advisory Services is actually Deloitte Financial Advisory Services LLP and we have several service lines.

Valuation is one which is the area that I focus on; corporate finance, restructuring, RSG, restructuring, and forensic dispute consulting.

Q. How long have you been a principal in the financial services group of Deloitte & Touche?

A. Principal, five years.

Q. How long have you been with Deloitte & Touche in the financial services group?

A. 18 years in the Financial Advisory Services group.

Q. Thank you very much.

Let's go back in, say, the last

Zeikel

five years, what has your practice consisted of?

A. I am sorry. Can you --

Q. Sure.

Let's start say in 2000 and move -- well, what does your practice currently consist of?

A. People-wise or --

Q. Services; what types of services do you provide?

A. Valuation services?

Q. Yes.

A. Primarily business valuation services associated -- anything with a balance sheet valuing assets, equity, including discount studies, control studies, pretty much overall business consulting-type services.

Q. Does that include valuing stock or equity interests that are restricted in some form or fashion from being publicly traded?

A. Yes, it does.

Q. Have you -- other than the

Zeikel

valuation of the HRN restricted shares that we are here to talk about today have you valued other shares of stock, that is, restricted stock, which has a publicly traded counterpart?

A. Yes.

Q. How many times would you say you have valued such instruments?

A. At least ten. I would have to look at my records.

Q. From, let's say -- you have been with Deloitte Financial Advisory Services for 18 years?

A. Yes.

Q. Prior -- let's start when you came to Deloitte.

Did you come into the Financial Advisory Services group?

A. The practice had -- has had different names always doing the same type of work.

Q. Okay. I went to Texas A&M so my math isn't always good but 18 years ago would be 1988?

Zeikel

A. That's correct.

Q. In 1988 you came to Deloitte and what was your position then?

A. Consultant.

Q. As a consultant what types of work did you perform?

A. Business valuation, equity valuation, discount studies, premium studies.

Q. Is it the same type of work that you are performing today?

A. Yes, it is.

Q. Is it fair to say that since 1988 you have been involved with Deloitte & Touche in the valuation business as you have described it?

A. That's correct.

Q. Prior to 1998, what were you doing professionally?

A. 1988?

Q. Yes.

A. I worked for the U.S. Government in a project management role.

Q. What types of things did you do?

Zeikel

A. I worked in the capacity of a chemical engineer.

My undergrad degree is chemical engineering so it was more project management oriented.

Q. Why did you make the career switch?

A. I was getting my MBA and the Deloitte organization provided more opportunities to exploit my studies.

Q. Did you receive, and I recognize from your curriculum vitae attached to your report in this case, that you received an MBA in finance from New York University?

A. Yes.

Q. When was that?

A. Approximately 1991.

Q. In connection with that, obtaining that finance degree, did you have some specialized training in business valuation?

A. Sorry. In connection with the --

Q. Obtaining the finance degree did you have any type of courses in business

Zeikel

valuation?

A. The finance courses that I took were corporate finance, accounting, the typical finance MBA-type classes.

Q. Did those assist you in -- ultimately in your work in the business valuation field?

A. Yes, they did.

Q. Have you had any other specialized training in business valuation?

A. We are required to take a certain level of CP classes annually which are primarily focused on business valuation so I have done that on an annual basis.

Q. Approximately how many hours per year would you say you had in CPE in the business valuation area?

A. Approximately 40.

Q. I note that one of your professional designations is a chartered financial analyst.

A. Yes.

Q. Would you describe for us what that entails or what that is?

Zeikel

A. A chartered financial analyst requires you to go through three level exams focused on financial analysis, portfolio management, all types of finance-type issues, pretty much looking at anything from a business valuation to a personal finance portfolio-type analysis.

Q. Is there also a peer review segment of that, in other words, where your peers, for example, look at some work that you have done and determine whether or not you are qualified to become a chartered financial analyst?

A. No, there is not.

Q. Is there continuing education associated with maintaining your designation as a chartered financial analyst?

A. There is but it could be associated with the CPE that I take in my normal course of work.

Q. Is the chartered financial analyst a designation that is provided by a certain organization?

Zeikel

A. Yes, it is.

Q. Who is that?

A. AIMR, Association of Investment Management Research.

Q. How long have you been a chartered financial analyst?

A. I would say approximately ten years.

Q. Your professional affiliations also include the Association for Investment Management and Research.

Is that the organization I think you said that sponsors the chartered financial analyst designation?

A. Yes, it is.

Q. Were you affiliated with that association before you became a chartered financial analyst?

A. Yes. I would guess that I was.

Q. Can you tell me how?

A. It is -- since the CFA is a three-level class or three-level exam process you -- I am assuming or I am guessing that you would have the

Zeikel

opportunity to be part of the Association of Investment Management Research without attaining or without passing a third level of the exam.

Q. Would you say that the chartered financial analyst process is fairly rigorous?

A. Yes, it is.

Q. You are also affiliated with the New York Society of Security Analysts.

Could you tell us what that is?

A. That is a society primarily focused on CFAs providing continuing education as well as a forum to learn more about the security analyst type of industry focused on different industries, different service lines.

Q. Does that include issues involving pricing of securities?

A. Yes, in some capacities.

Q. I note that another designated affiliation you have is the Institute of Chartered Financial Analysts.

Is that a subset of the

Zeikel

association for investment management research?

A. Yes, it is.

Q. Is there any -- is that a special designation that you can obtain within the AIMR?

A. No. It is just another segment.

Q. How long have you been a member of the Institute of Chartered Financial Analysts?

A. Approximately ten years.

Q. How about the New York Society of Security Analysts, how long have you been a member of that organization?

A. Probably 10 to 15 years.

Q. Would you -- I hand you what has been marked in this case as Exhibit Number 84 which is a report that I believe you prepared with respect to the Hotel Reservations, Inc. stock, restricted stock.

Do you recognize that document?

A. Yes, I do.

Q. Would you turn with me to page. 30?

Zeikel

That is a copy of your curriculum vitae which was attached to the report.

Are there any professional designations or professional affiliations that you have obtained since this report was prepared?

A. No.

Q. Do you recall that in 2001 you were asked by Eric DeGraw of USA Networks to prepare a valuation of certain shares of restricted stock of Hotel Reservations Network?

A. Yes.

Q. Was the purpose of that analysis to allow HRN to determine the fair market value of those shares for tax reporting purposes?

A. Yes.

Q. Did Mr. DeGraw explain to you why he thought it was necessary for HRN to obtain its own valuation analysis with respect to the fair market value of the HRN shares?

A. I don't remember.

Zeikel

Q. Let me show you what has been marked in this case as Exhibit Number 81.
It is a letter dated October 11, 2001.
If you will turn to the fourth page it appears to be signed by Deloitte & Touche.
Is that your handwriting on behalf of Deloitte & Touche?
A. Yes, it is.
Q. Going back to the first page, and do you recognize this to be the engagement letter with USA Networks in connection with the valuation work that you were doing?
A. Yes.
Q. Going back to the first page, it states -- and this is services to be rendered -- it says, "The purpose of the appraisal is to establish the appropriate discount applicable to certain restricted shares. The objective of our analysis is to estimate the fair market value of certain restricted common shares (restricted shares) as of the date of the

Zeikel

IPO."

It further says, "We understand these restricted shares were issued to certain shareholders."

Was it your understanding from Mr. DeGraw that what he wanted you to do was determine the fair market value of those restricted shares that had been issued to certain shareholders as of the date of the initial public offering?

A. Yes.

Q. Was it your understanding then that the initial public offering date was February 25 of 2000? That is the date that the valuation occurred?

A. Yes.

Q. Did he tell you why he wanted the values determined as of the date of the IPO?

A. I don't remember. I don't believe so.

Q. Do you recall who else at either USA Network or Hotel Reservations Network that you communicated with with respect to

Zeikel

your valuation work?
A. I don't.
Q. Was your principal contact Mr. DeGraw?
A. Yes.
Q. At the time you were doing the valuation work were you aware that USA Network was the controlling shareholder of Hotel Reservations Network?
A. I don't remember.
Q. I will show you what has been marked as Exhibit Number 82.
This is an e-mail string. The first appears to be at the bottom from Mr. DeGraw to you; is that correct?
A. That's correct.
Q. With a carbon copy to Mark Goldstein.
Who is Mr. Goldstein?
A. I believe Mark is a principal in our Los Angeles office.
Q. Also in the valuation that -- the Financial Advisory Services group?
A. No.

Zeikel

Q. What group is he in?

A. I believe tax.

Q. Why was it necessary to communicate with Mr. Goldstein in the tax group with respect to this valuation assignment?

A. Mark had some sort of relationship with Eric and the company.

Q. Were you aware at this time that Deloitte & Touche was in the bidding process with respect to USA Networks' tax compliance work?

A. I don't remember. I don't believe so.

Q. Do you know specifically what Mr. Goldstein's relationship was with Mr. DeGraw?

A. No.

Q. The e-mail that Mr. DeGraw is sending to you, it says, this is October 12 of 2001, "The consensus is that we are price sensitive on this particular valuation. I have gotten feedback indicating that we would like to keep the

Zeikel

fees below $15,000 thus I am looking at the proposals in this range."

My question about that is did Mr. DeGraw share with you who else he was seeking proposals from with respect to this valuation work?

A. Not that I remember.

Q. You then forwarded that same day Mr. DeGraw's e-mail to Kevin Fitzsimmons, correct?

A. Correct.

Q. Fitzgibbon.

Who is Mr. Fitzgibbon?

A. Kevin was a manager in our practice.

Q. Was he working under you in connection with this particular valuation assignment?

A. Yes, he was.

Q. Your e-mail to him says, and I am going down to the second line, "The restriction is for a four-year period. The stock is Hotel Reservations Network."

Then you go on to say, "I would

Zeikel

do a put option analysis tax court quick summary, summary on restricted stock studies and the client indicated that the seller took a huge discount for their tax purposes."

The first suggestion you have is a put option analysis.

Why would you suggest a put option analysis with respect to the valuation of these restricted shares?

A. That is a typical analysis that we would do to quantify a marketability restriction type of discount.

Q. Would that be a Black-Scholes type analysis?

A. Yes.

Q. Have you used that many times in your valuation practice?

A. Yes.

Q. Why does, in your view, do a -- is what you are saying is that the Black-Scholes analysis captures the appropriate discount for lack of marketability?

Zeikel

MR. JOHNSON: Objection to the form. Leading.

BY MR. PORTER:

Q. Let me ask it this way.

Does the Black-Scholes analysis in your view capture the appropriate discount for lack of marketability?

A. Studies have indicated that a Black-Scholes model is a good indication to determine or estimate a discount.

Q. Can you tell me why?

A. You are basically coming up with the price somebody would pay to buy that option so the inverse would be the discount associated with that ability or that inability to sell it.

Q. In the appraisal industry is it your view that -- or could you state whether or not the Black-Scholes option method that you described is something that appraisers commonly rely on to determine a lack of marketability discount for restricted shares?

A. Black-Scholes model is one of the

Zeikel

models.

There are a fair number of restricted stock studies that are also used to estimate the discounts that would be appropriate.

Q. The e-mail goes on to say, "USA would like as high a value (lowest discount) as possible but their initial thought was that 40 percent would not be unreasonable."

Did Mr. DeGraw tell you that he thought that a 40 percent discount for lack of marketability with respect to these particular restricted shares would not be unreasonable?

A. No, he did not.

Q. Where did you get that understanding?

A. All our studies are very objective and independent, however, based on my previous experience and just general restricted stock studies that are out in the marketplace I would imagine that my conversation with him probably indicated

Zeikel

that a 40 percent, 30 to 40 percent type of discount would be probably in the range and it could deviate but that is a standard starting point.

Q. This says, "But their initial thought was that 40 percent would not be unreasonable."

Did he then convey to you that he thought, when you conveyed to him this 30 to 40 percent number, that he thought that was not unreasonable?

A. I don't remember the exact conversation.

Q. Did Mr. DeGraw tell you that they would like as high a value or low -- as low a discount as possible?

A. I don't remember.

Q. Take a look at Exhibit Number 85. This is a string of e-mails.

The first -- the first e-mail at the bottom of the string, bottom of page IAC000870 sent on Wednesday, October 17 of 2001 to Mr. DeGraw from Mr. Fitzgibbon, you are carbon copied on that; is that correct?

Zeikel

A. Yes.

Q. Mr. Fitzgibbon says to Mr. DeGraw, "We were able to speak with Mary Riedy to get our remaining questions answered and complete our analysis."

Was Ms. Riedy involved in helping you and Mr. Fitzgibbon understand the restrictions that had been placed on the HRN restricted shares?

A. I don't have a recollection of Ms. Riedy.

Q. Okay.

It goes on to say that, "We have determined separate discounts for two blocks of shares as the 7.11.3 block, 4.9 million shares, as the provisions which allow for shares to be sold prior to the end of the four-year period," and then it says, "The 7.15 of 5.1 million shares is subject to the full four-year restrict period and therefore requires a higher discount."

Then it provides -- the second page of the e-mail provides ranges of

Zeikel

discounts which are for the 4.9 million share block, 30 to 35 percent, and for the 5.1 million block, 40 to 45 percent.

Did Mr. DeGraw ask you for an estimate of the discounts that might be applied before you completed your work?

A. It is not untypical for us to provide preliminary estimates prior to a final report being issued.

Q. Were there any oral discussions of the range of discounts that were going to be applied before this e-mail was sent?

A. I don't know.

Q. Let's turn back to Exhibit Number 84 which is the report.

If you would turn with me to the page Bates labeled IAC000319 which is the opinion letter, is that what this document is, actually this two-page 319320, is that your ultimate opinion letter that is attached to the report?

A. Yes.

Q. Is it fair to say that Deloitte & Touche's conclusion, the ultimate

Zeikel

conclusion, was that a discount of 33 percent is appropriate for the section 7.11.3 shares and a discount of 40 percent is appropriate for the section 7.15 shares?

A. That's correct.

Q. That would be a lack of marketability discount, correct?

A. That's correct.

Q. The next page, 320, says, "Our valuation was conducted in accordance with generally accepted valuation standards as promulgated by the American Society of Appraisers."

What is the American Society of Appraisers?

A. It is -- it is a society that I wouldn't say governs but a number of valuation practitioners belong to and provides some guidance in terms of how to value companies' procedures and processes and restrictions as well.

Q. As a chartered financial analyst do you follow the guidelines of the American Society of Appraisers?