Zeikel

A. I am not an American Society of Appraisers member however we do follow the general guidelines of ASA.

Q. It says, "This valuation report was prepared in conformity with the uniform standards of professional appraisal practice of the Appraisal Foundation and the principles of appraisal practice and code of ethics of the American Society of Appraisers."

Is that -- the uniform standards of professional appraisal practice, is that commonly referred to as USPAP?

A. Yes.

Q. Why do you follow USPAP in connection with the preparation of your appraisal reports in valuation matters?

A. Any of our staff that are members of the ASA need to follow USPAP and Kevin was.

Q. For those matters that you prepare without assistance from someone who is a member of the ASA do you still follow USPAP?

Zeikel

A. We do not necessarily unless the client wants us to.

Q. Turn to page 1 of the report which is IAC00322.

It says, "Obviously the purpose of this valuation is to determine for federal income tax purposes the appropriate discounts to be applied to certain restricted shares in Hotel Reservations Network, Inc."

Then the next paragraph goes on to say, "These shares were received on February 25, 2000 ("the valuation date") as part of an amended and restated asset purchase agreement in exchange for foregoing certain rights to receive additional purchase consideration."

Did Mr. DeGraw tell you that the shares were received on February 25, 2000?

A. I believe so.

Q. Let's turn to page 3 which is IAC324 and 325.

Actually 324 is page 3 and page 4 is 325.

Zeikel

This is a summary of the transfer restrictions that were imposed on the shares.

Do you recall in general many of the shares, in fact, most of the shares had four-year transfer restrictions?

A. That's correct.

Q. Some of the shares could be released after the first anniversary of the IPO, roughly 10 million shares, and after the second anniversary 489,990, same number after the third anniversary, and after the fourth anniversary you have got 1,959,960 that can be sold.

Then you have another 5.1 million shares that could not be sold for four years, correct?

A. That's correct.

Q. Have you in your valuation work ever seen restricted shares of publicly traded stock that had transfer restrictions as great as those imposed on the HRN restricted shares that you were valuing here?

Zeikel
A. I don't understand your question.
Q. Sure.
You have done a lot of valuation work in your career?
A. Yes.
Q. Have you ever been involved in a valuation project where the restrictions on transfer imposed on what would otherwise be publicly traded stock were as severe as the restrictions on transfer imposed on the shares you were valuing in Exhibit 84?
A. Yes.
Q. Would you agree these are severe restrictions?
MR. JOHNSON: Objection to the form.
THE WITNESS: Can you, I guess, explain what you mean by "severe?"
BY MR. PORTER:
Q. Why don't we -- we will cover that in a minute. I will ask that question again in just a minute.
Let's turn to page 9. You looked at -- one of the things you looked at was

Zeikel

the restricted stock studies?

A. Correct.

Q. Did those assist you in determining an appropriate lack of marketability discount for the HRN restricted shares?

A. Yes, they did.

Q. Based on your analysis is it fair to say that median discounts from the studies range anywhere from 20 to 45 percent?

MR. JOHNSON: Objection to the form. Leading.

THE WITNESS: That sentence on the bottom does indicate that.

BY MR. PORTER:

Q. Okay. I notice you cite to a number of restricted stock studies.

You don't include a study by Hertzel & Smith. Can you tell me why?

A. I don't know.

Q. Let's turn to page 20.

At page 20 you begin the discussion of the various factors of

Zeikel

impacting the marketability of the HRN restricted stock.

You say in the fourth paragraph under subsection D, "The primary factor behind a discount for lack of marketability is the impaired liquidity associated with the restricted securities."

Why is that?

A. I am sorry. Why is that sentence there?

Q. No. Why is the primary factor behind a discount for lack of marketability the impaired liquidity associated with restricted securities?

A. You cannot sell the stock immediately.

Q. Turn to page 21. Paragraph 4, one of the factors referred to is expected holding period for investment in the company.

Is the expected holding period something that in your opinion impacts the lack of marketability discount?

A. Yes.

Zeikel

Q. Would you agree that the longer an illiquid investment must be held then the less marketable that investment is?

A. The higher the discount, yes.

Q. You, in fact, say that, here, "The longer an investor must hold an illiquid investment, the less marketable is the investment. Although the holding period is unclear an investor in a publicly-traded company can sell when the investment's risk and return are no longer appropriate for the investor's portfolio or even if the investor requires liquidity. However, for restricted securities investors are concerned with potential scenarios in which they can cash out."

Could the owners of the HRN restricted shares that you were valuing cash those shares out, obtain liquidity before the restrictions associated with those shares expired?

A. I don't believe so.

Q. You go on to say, and this is the next paragraph, "The section 7.15 shares

Zeikel

are severely restricted until after the fourth anniversary of HRN's IPO."

What did you mean by "severely restricted?"

A. I don't remember.

Q. Were you attempting to convey a view that the restrictions were onerous?

A. I would assume that we are just conveying they couldn't sell them for four years.

Q. In your view would that be a severe restriction?

A. It is a restriction.

Q. If it is not a severe restriction why use the language?

A. I don't remember.

Q. Another is expect -- let me back up.

The expected holding period for an investment in the company was the four-year restriction which applied to most of the shares of restricted stock received.

Was it longer than the restrictions imposed on the stocks that

Zeikel

were examined in the restricted stock studies that you cited earlier in your report?

A. Kevin probably did that comparison. I would imagine that there is probably varied restrictions on the restricted stock studies subject to your question.

Q. Is it your understanding that at the time those restricted stock studies that you cite relate to, that the Rule 144 holding periods were two years?

A. I don't know. I would have to do that research.

Q. Expected dividend yield is item number 5 under the factors impacting the marketability discount.

You say that, "The company's ability and management intent to pay dividends are two key factors impacting the discount for lack of marketability."

Is it fair to say that if the company -- if a shareholder who owns restricted shares expects to see regular

Zeikel

dividends, that, all other things being equal, the discount for lack of marketability would be less than if the same shares were not expected to have dividends associated with them?

A. It would be one factor that somebody would consider. If you had dividends you may look at a lower discount.

Q. There were no dividends associated with the HRN restricted shares that were expected to be paid, were there?

A. I don't believe so.

Q. Let's turn to page 23, transfer restriction on shares.

The first sentence under that consideration, it says, "The transfer ability of the 5.1 million shares held by TMF and HRN is severely restricted until four years after the IPO date."

What did you mean by "severely restricted" in the context of the analysis that is on page 23?

A. I believe that refers to the fact that they cannot be sold until four years

Zeikel

after the IPO date.

Q. Then you go on to conclude in this section which deals with factors indicated in revenue ruling 77-287, the restricted stock studies and the specific characteristics of the shares, that there should be marketability discounts in various ranges associated with restricted shares; is that correct?

A. That's correct.

Q. And for the one-year restricted shares you conclude that a marketability discount of 15 to 20 percent should be applied?

A. That's correct.

Q. For the two year shares you determined that a 20 to 30 percent marketability discount should be applied; is that correct?

A. That's correct.

Q. For three years you conclude that a 30 to 35 percent lack of marketability discount should be applied?

A. That's correct.

Zeikel

Q. For the four year shares you conclude that a 35 to 40 percent lack of marketability discount should be applied, correct?

A. Correct.

Q. Now, that was your analysis using the restricted stock studies.

You also, as we discussed earlier, did a Black-Scholes option pricing model, correct?

A. Correct.

Q. That analysis begins on page 24. It says, "We used the Black-Scholes option pricing model ("Black-Scholes") as a second indication of the discounts on restricted stock. Black-Scholes is a commonly used method to determine the fair market value of call or put options."

It says, "The model can also be used to value the restricted stock of a company which also has publicly traded stock."

Is that a correct statement that is -- that the Black-Scholes model can also

Zeikel

be used to value the restricted stock of a company which also has publicly traded stock?

A. Sorry. You are on the first paragraph?

Q. Yes.

A. That is what we did, yes.

Q. It is your view that the Black-Scholes model is proper to use to value the restricted stock of a company which also has publicly traded stock?

A. It doesn't necessarily have to have publicly traded stock.

Q. It could be a private company too?

A. Right.

Q. Then you go on to say, "Essentially the value of a put option calculated using Black-Scholes can be used as a proxy for the marketability discount. The value of the put represents the cost of insuring that the shares can be sold at the end of the option period at today's option price. The put value expressed as a

Zeikel

percentage of the current share price is the indicated marketability discount."

Is that an accurate statement?

A. That is.

Q. Have you used this put option analysis in other valuation projects to determine an appropriate lack of marketability discount?

A. Yes, we have.

Q. Is that true even though the shares are in fact restricted from being sold?

Bad question.

Is that true even though the shares that -- is that true even though you are prohibited from purchasing an option on the shares?

A. Yes, otherwise the option would have a price, public price.

Q. That is easily determinable?

A. Right.

Q. The third paragraph on page 24 says, "All of the section 7.15 shares have a four-year restriction period while the

Zeikel

remaining 7.11.3 shares have a tiered structure whereby the shares are released over a three-year period."

This is the language I want to talk to you about.

"The key variables in the model are shown in table Roman Numeral VII-A for the one, two, three-year restriction periods. For this exercise the strike price is set equal to the share price of HRN as of the IPO date which is the date that hypothetical put option could have been purchased."

Why did you use the share price of HRN as of the IPO date? You used 16.50.

A. That is the indication of the stock price.

Q. Was that the IPO price in your understanding?

A. That is my understanding of the IPO price.

Q. It goes on to say in the next full paragraph below table V-9, "Volatility is the measure of standard deviation of the

Zeikel
annualized changes in the share price for non-dividend paying stocks. We have determined the volatility of HRN shares based on the daily and weekly changes in comparable share prices for between 12 and 36 months prior to the IPO date."
Obviously as of the IPO date HRN wasn't publicly trade, correct?
A. That's correct.
Q. You had to determine volatility, and in this case what you did was used comparable -- did you use comparable companies?
A. That's correct.
Q. Why use comparable companies?
A. It would be the best proxy for HRN stock volatility.
Q. Is that a reasonable method in your opinion by which an appraiser can determine the volatility or the expected volatility of the HRN shares?
A. Yes, it is.
Q. Would you agree that, all things being equal, the higher the expected

Zeikel

volatility of a stock the higher the lack of marketability discount would be?

A. Yes.

Q. Why?

A. Well, the higher the volatility, the higher the put price, the option price.

Q. Is that because there is a greater anticipated risk associated with holding the stock over the period from which it is restricted from being traded?

MS. LARSON: Objection, leading.

BY MR. PORTER:

Q. You can answer.

A. I am sorry. I --

MR. PORTER: Could you read that question back please?

(Record read)

THE WITNESS: There is basically more volatility so therefore there is more risk in holding the stock.

BY MR. PORTER:

Q. So the answer to that question would be, yes?

A. Yes.

Zeikel

Q. Then you go on to say, at the bottom paragraph that carries over to the next page, you based your analysis on volatility factors ranging from 70 to 90 percent, correct?

A. That's correct.

Q. Then the sentence that carries over to the last page says, "The value of the put option as a percentage of the share price can be used as a proxy for the marketability discount resulting from the transfer restrictions," correct?

A. Correct.

Q. Then you say, "Therefore, the discounts from the Section 7.13.1 shares from the IPO date range from 24 to 46 percent depending on the time period to exercise."

Was that your analysis or your conclusion based on your analysis?

A. Yes.

Q. Then you determined -- is it fair to say you determined ultimately that the four-year restricted stock, the 5.1 million

Zeikel

shares, the four-year restricted stock should have a lack of marketability discount based on your analysis of 40 percent?

A. That's correct.

Q. Did you provide Exhibit 84 to -- did you send this to Mr. DeGraw?

A. This report?

Q. Yes.

A. Yes.

Q. Did you have any discussions with Mr. DeGraw with respect to your ultimate valuation conclusions after you sent the report to him?

A. I don't remember.

Q. Do you recall Mr. DeGraw expressing to you that he thought that your discounts were appropriate?

A. No.

Q. Do you recall Mr. DeGraw expressing any dissatisfaction with either the valuation analysis or the conclusions with respect to the valuation that you reached?

Zeikel

A. No, I don't.

Q. In preparation for your deposition today did you meet with any lawyers representing Hotels dot com?

A. I met with Kari a couple weeks ago.

Q. A couple of weeks ago. What did you all discuss?

A. Basically the report and what we did.

Q. Did -- were you ever contacted in connection with potentially serving as an expert witness in this case for Hotels dot com?

A. No.

Q. Did any of the lawyers from Hotels dot com tell you why they did not want to use your services as an expert in this case with respect to the value of the restricted shares?

A. No.

MR. PORTER: I will pass the witness.

MR. JOHNSON: Do you want to take

Zeikel

a few minutes?

(Recess)

BY MR. JOHNSON:

Q. Ms. Zeikel, my name is Cory Johnson and I am with the Department of Justice representing the United States in these consolidated cases.

I want to ask you a few follow-up questions.

A. Okay.

Q. Could you turn to Exhibit 81 which I believe you were shown earlier? That is the engagement letter.

A. Yes.

Q. I think you looked at this sentence earlier, about the middle of the page, or a little below the middle it says, "We understand the results of our valuation will be used for federal income tax purposes, specifically for tax form 8594."

Do you see that?

A. Yes, I do.

Q. Do you know what tax form 8594 is?

Zeikel

A. I do not.

Q. Do you recall that Mr. DeGraw asked that this valuation project be done quickly?

A. I see from the court paper files and the date of the discussion that there was some time sensitivity.

Q. Do you recall why that was?

A. I do not.

Q. The report is dated October 18, I think.

A. Yes.

Q. And the engagement letter is October 11.

Is it fair to say that the work on this was done in about a week's time?

A. That's correct.

Q. I understand that you don't know what a form 8594 is.

Do you remember Mr. DeGraw or anybody else telling you that the purpose of this valuation was to use it in connection with such a form?

A. They would have had to since we

Zeikel

put it in the engagement letter.

We typically look at whether it is for tax or accounting and the same type of valuation methodologies would apply.

Q. Do you recall that HRN and USA wanted the valuation so they could file an amended tax return?

A. I was not aware of that.

Q. In response to one of Mr. Porter's questions you said that you, in your professional experience, you had seen restrictions on stock as severe as the ones in this case, do you recall that?

A. Yes.

Q. Can you tell me about those instances that you recall where there were restrictions that were as severe as the ones you saw in this case?

A. Generally speaking, most any type of marketability study that we do involves a restricted stock, some sort of inability to sell a stock, and many times we see companies that are privately held that you cannot sell the stock indefinitely so that

Zeikel

is the most unmarketable type of security.

Q. The restrictions aren't limited to four years but they are forever or indefinite?

A. Indefinite or indeterminable.

Q. Indeterminable. There is no set time period when they are going to lapse?

A. Exactly.

Q. On how many instances have you dealt with restricted stock like that?

A. Numerous with private companies.

Q. In connection with preparing the report did you have a chance to look at any other valuations that had been done by other parties regarding the HRN stock?

A. No.

Q. You didn't see a report by BVS?

A. No, I did not.

Q. Or one by David Bohlmann?

A. No.

Q. You knew that the sellers had had a valuation done?

A. I don't know. I don't remember.

Q. If you could look at Exhibit 82,

Zeikel

that is your -- the top one is your e-mail, right?

A. Yes.

Q. You will need to say yes or no for the court reporter.

A. Yes. Sorry.

Q. Thanks.

In your e-mail you state, "I got the feeling that the seller used something like 80 percent."

Do you see that towards the end?

A. Yes, I do.

Q. Is it your understanding that you were told that by Mr. DeGraw or given that impression by Mr. DeGraw?

A. Probably an impression by Mr. DeGraw.

Q. I take it if in fact the sellers did use a discount of 80 percent for the stock you would disagree with that based on the discount you concluded?

A. That's correct.

Q. Do you know what method the sellers used?

Zeikel

A. No, I don't.

Q. In using the Black-Scholes methodology, the put option analysis, is the volatility factor the most important variable in that equation or analysis?

A. My feeling is that it is probably the time period rather than the volatility but they both do have an impact.

Q. Why do you say the time period is an important factor?

A. My professional judgment would be that if you did a sensitivity analysis it would -- the greater impact would be based on the time of expiration rather than the volatility.

Q. Do you recall any discussions about what starting price or base price against which to apply the discount is determined?

A. I do not.

Q. You don't recall discussing whether you should -- the IPO price should be used or some other price should be used?

A. No, I don't.

Zeikel

Q. I take it you concluded that the IPO price should be used?

A. Yes.

Q. Could you look with us at Exhibit 84? That is your report.

I will ask you about page 5 which is a description of the travel industry.

A. Yes.

Q. Specifically the online travel industry that HRN was in. Do you see that?

A. Yes.

Q. What is your recollection of what the status of the industry in which HRN was at the time?

A. Sorry. Can you explain your question? Status in what sense?

Q. What was your understanding of what business HRN was in?

A. Online travel services.

Q. Would you characterize that business generally as a growth -- growing business at that time?

A. Yes, I would.

Q. HRN was growing at that time as

Case 1:05-cv-00956-CCM Document 45-4 Filed 02/26/2007 Page 28 of 30


Zeikel

well, wasn't it?

A. Yes.

Q. Did HRN or USA provide you with information about their expected growth or forecasted growth in connection with preparing your report?

A. I don't remember. I believe we have historical financial information. I don't think we had a forecast of financial information.

Q. Do you recall what that historical information showed regarding their growth?

A. I think it is quoted in the report that they had a significant growth over the last year.

Q. Is it fair to say the information in the report is what you got from USA or HRN?

A. That's correct.

Q. I think somewhere in the report you cite a study by Jupiter -- a Jupiter Communications study.

Do you recall that?

Zeikel

A. I don't recall the study.

Q. Have you heard of that company, Jupiter study before?

A. I don't remember.

Q. Are you familiar with a term "a mature industry" or "mature business?"

A. Yes.

Q. What is your understanding of that term?

A. A mature industry is usually a developed industry, very predictable, and, like I say, moderate growth.

Q. Would you characterize the online travel reservation industry in which HRN was in a mature industry at this point in time, that is the year 2000, 2001?

A. No. I would not.

Q. If you could turn to page 8 of your report, and I am looking at the bottom where you have four bullet points?

A. Yes.

Q. The third one states, "The buyer's right to receive continuous disclosure of information about the issuer

Zeikel

from the seller."

You are citing that as a factor that might affect the discount; is that correct?

A. That's correct.

Q. Can you explain to me how that affects the discount?

A. If the information is not freely disclosed then the person holding the restricted stock would have higher known factors and therefore would lead to a higher discount.

Q. If the buyer does not have a right to receive continuous disclosure of information it is your understanding that would justify a larger discount?

A. That's correct.

Q. Do you know if that is sometimes referred to as monitoring costs? Have you ever heard that term?

A. I have not heard that term.

Q. If you would turn to page 24, the first paragraph? We looked at that earlier.