UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - x

DAVID S. AND MALIA A. LITMAN, :

Plaintiffs, :

COPY

v. : No. 05-956T

USA, :

Defendant. :

- - - - - - - - - - - - - - - - - x

ROBERT B. AND MICHELLE S. DIENER, :

Plaintiffs, :

v. : No. 05-971T

USA, :

Defendant. :

- - - - - - - - - - - - - - - - - x

HOTELS.COM, INC., AND :

SUBSIDIARIES (f/k/a HOTEL :

RESERVATIONS NETWORK, INC.), :

Plaintiffs, :

v. : No. 06-285T

USA, :

- - - - - - - - - - - - - - - - - x

Deposition of ERIC DeGRAW

New York, New York

Tuesday, June 13, 2006

9:00 a.m.

Job No.: 24-80324

Pages: 1 - 121

Reported by: Jeannette McCormick

Deposition of ERIC DeGRAW, held at the law offices of:

BAKER BOTTS, LLP
30 Rockefeller Plaza
New York, New York 10112-4498
(212) 408-2500

Pursuant to Notice, before Jeannette McCormick, Court Reporter and Notary Public in and for the States of New Jersey and New York.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS HOTELS.COM

KARI M. LARSON, ESQUIRE
KIM MARIE K. BOYLAN, ESQUIRE
LATHAM & WATKINS, LLP
555 Eleventh Street, Northwest
Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200

ON BEHALF OF THE PLAINTIFFS DIENER and LITMAN

JOHN W. PORTER, ESQUIRE
BAKER BOTTS, LLP
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002
Telephone: (713) 229-1597

A P P E A R A N C E S

(CONTINUED)

ON BEHALF OF THE DEFENDANT

CORY A. JOHNSON, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
P.O. Box 26
BEN FRANKLIN STATION
Washington, D.C. 20044
Telephone: (202) 307-3046

ON BEHALF OF THE WITNESS

EDWARD T. FERGUSON, ESQUIRE
IAC - INTERACTIVE CORP.
152 West 57th Street, 42nd floor
New York, New York 10019
Telephone: (212) 314-7300

C O N T E N T S


| EXAMINATION OF ERIC DeGRAW | PAGE |
|---|---|
| By Mr. Johnson | 9 |
| By Mr. Porter | 97 |


E X H I B I T S

(Retained by Counsel)


| DeGRAW DEPOSITION EXHIBIT | | PAGE |
|---|---|---|
| No. 80 | Draft HRN 2000 Tax Return | 34 |
| No. 81 | Deloitte & Touche Retention Letter, Bates Nos. DT 243 - 250 | 51 |
| No. 82 | e-mails, Bates No. DT 222 | 58 |
| No. 83 | 10/9/01 e-mail | 46 |
| No. 84 | Valuation Report, Bates Nos. IAC 317 - 355 | 69 |

E X H I B I T S

(CONTINUED)

(Retained by Counsel)

| DeGRAW DEPOSITION EXHIBIT | | PAGE |
|---|---|---|
| No. 85 | e-mails, Bates Nos. IAC 70 - 71 | 77 |
| No. 86 | Document, Bates Nos. IAC 866 - 869 | 79 |
| No. 87 | Draft HRN 2000 Tax Return, Bates Nos. HC 116 - 221 | 81 |
| No. 88 | Document, Bates Nos. IAC 54 - 58 | 82 |
| No. 89 | Draft HRN 2000 Tax Return, Bates Nos. HC 321 - 470 | 83 |

E X H I B I T S

(CONTINUED)

(Retained by Counsel)


| DeGRAW DEPOSITION EXHIBIT | | PAGE |
|---|---|---|
| No. 90 | Document, Bates Nos. IAC 59 - 60 | 92 |
| No. 91 | Document, Bates Nos. IAC 863 - 865 | 92 |
| No. 92 | Tax Sharing Agreement | 116 |


* Exhibits retained by Counsel (Mr. Johnson)

ERIC DeGRAW,
having been first duly sworn,
according to law, testified
as follows:

EXAMINATION

BY MR. JOHNSON:

Q. Good morning.
A. Good morning.
Q. Could you state your name for the record?
A. Eric DeGraw.
Q. Why do you currently live?
A. Rye, New York.
Q. And are you currently employed?
A. Yes.
Q. Where?
A. IAC.
Q. Have you ever had your deposition taken before, Mr. DeGraw?
A. No.
Q. I'm going to be asking you a series of questions today to which you need to give a verbal

response rather than a shake of the head as a yes or a no so the court reporter can mark down your response. She is going to type down and put everything on paper that is said today.

If I ask a question you don't understand, please let me know. I will try to rephrase it or reask it so you do understand it.

If you do answer the question, I will assume you understood it. Is that okay?

A. Yes.

Q. And occasionally throughout the day we will take breaks.

Can you tell me what, if anything, you did to prepare for the deposition today?

A. Nothing.

Q. Did you meet with anybody to discuss it?

A. I met yesterday with these attorneys right here.

Q. You are referring to Ms. Boylan and Ms. Larson?

A. Yes.

Q. Did you meet with Mr. Ferguson as well?

A. Yes.
Q. It was the four of you who met?
A. Yes.
Q. And what did you talk about?
A. Just generally how a deposition works.
Q. Did you discuss any of the events that are at issue in this case?
A. I don't know what the events are that are at issue. I mean we talked about the renovation of my house a little bit. They told me I would need to know my work history. I am not -- that's basically it.
Q. Did you look at any documents during the meeting?
A. No.
Q. Did you do anything else to prepare other than meet with the lawyers you just mentioned?
A. No.
Q. Can you tell me briefly your educational background from high school on?
A. I graduated from Stanford University in 1989. I started working in the tax department at Deloitte

& Touche thereafter in '89, '90. I worked at Deloitte & Touche until 1996. I then became the tax manager at Savoy Pictures in 1996, which became the company -- which became IAC eventually in 1998.

I moved to New York and became the tax director at what is now IAC.

Q. Can I stop you there and ask you what was the name of the company in 1998 that you joined as tax director?

A. The USA Networks, Inc. -- well, it was Home Shopping Network, Inc. and then it became, in 1998 it became USA Networks, Inc.

Q. When you joined, it was USA Networks?

A. Well, technically, yes, because Savoy Pictures -- I joined the company in 1996 called Savoy Pictures. They merged with Silver King and Home Shopping Network, and then Home Shopping Network acquired USA Networks. It was still the same company, but just name changes.

Q. Okay. I am sorry I interrupted you. You joined --

A. So. In 1998, I became the tax director of

USA Networks, Inc. In I think around 2002 my title changed to vice president of taxation, and I've been that same title ever since.

Q. And did USA Networks become IAC?

A. Correct.

Q. Was that simply a name change? Do you understand how that occurred?

A. Yes, it was just a name change.

Q. Can you describe for me your job in terms of your duties and responsibilities during the years 1998 through 2002 when you were the tax director for USA Networks?

A. I would just describe it as an overall responsibility for anything that had to do with taxation, very general.

Q. Who did you report to during that time period?

A. The CFO.

Q. And who was that?

A. Well, we had four CFOs I think during that period, there were a few of them. Michael Durney was one of them. Michael Silican was one of them.

Dara Khosrowshahi was one. I may be leaving one out, I am not sure.

Q. Now, did USA have subsidiary companies during this time period of 1998 through 2002?

A. Yes. Correct.

Q. And did you get involved in their tax issues as well?

A. Yes. Yes.

Q. That was part of your job was to oversee the tax issues of the subsidiaries?

A. Yes. Some subsidiaries had tax departments and some didn't. Just in general I was a part of the taxation of the subsidiaries also.

Q. And would the subsidiary companies, the person who was responsible for the tax issues of the subsidiary at the subsidiary report to you?

A. No.

Q. Who would report to you from the subsidiary, if anybody?

A. Nobody.

Q. The other thing to remember today is if you could make sure that I am finished with my question

before you start answering --
A. Sure.
Q. You know, a deposition is sort of a unnatural way to talk, but the court reporter has to get all this down, and it makes it difficult for her if you and I are talking over each other.
What was your degree from Stanford in?
A. Economics.
Q. And was that a B.A. or B.S. ?
A. B.A.
Q. Do you have any other formal education?
A. I'm a CPA.
Q. When did you become a CPA?
A. I would say probably '91 or '92.
Q. Anything else, any other formal education or training?
A. No.
Q. You said in 2002 you became vice president of taxation for IAC. The change from tax director to vice president, was that a promotion or a name change or how would you describe that?
A. Technically, it's a promotion, but my

responsibilities didn't change.
Q. During the years 2002 to date, who have you reported to?
A. I reported to the CFO until about two years ago when we hired an SVP of taxation, and then I reported to the SVP of taxation.
Q. Who was the CFO you reported to?
A. During that period it would have been Dara Khosrowshahi.
Q. And when was this change made from you reporting to the CFO to the senior vice president of tax?
A. When we hired the senior vice president of tax, which was about two years ago.
Q. So sometime in 2004?
A. Yes.
Q. And who is the -- who was hired as the senior vice president of tax in 2004?
A. His name is Greg Morrow.
Q. Is he still there?
A. Yes.
Q. As senior vice president -- going back to the

1998 through 2002 time period when you were tax director of USA, you told me you reported to the CFO. Can you tell me who worked for you or reported to you during that time period?

A. We had a person by the name of Les Evans who was the director of reporting. We had a person named Michael Burk who assisted in reporting. He also did compliance. We had a person named Cenceria Edwards.

Q. Could you spell Cenceria?

A. Sure. C-E-N-C-E-R-I-A. And we had -- there is one I'm leaving out. There is one other manager I can't think of off the top of my head.

Q. These people all assisted you with handling tax issues of the company?

A. Yes.

Q. For the years 1999 and 2000 for those tax years, did you have authority to sign the tax returns of USA?

A. Yes.

Q. Do you know if you did for 1999?

A. I don't recall.

Q. How about for 2000?
A. I don't specifically recall.
Q. Was it your job in 1999 and 2000 to a review the tax returns and approve them before filing?
A. Yes.
Q. And do you recall if you did so for those years?
A. Yes.
Q. Do you understand that this case involves, in part, the purchase by USA of a company called TMF, Inc. that was doing business under the names Hotels Reservation Network in 1999?
A. Yes.
Q. Were you involved at all in the purchase of TMF, Inc. in 1999?
A. Yes.
Q. Could you tell me what your involvement was?
A. I would have been responsible for monitoring the tax due diligence during the acquisition.
Q. Could you tell me what you mean by tax due diligence?
A. We hire an accounting firm to come in and

look at the tax returns and report to us any exposures that they're aware of that we would want to know of upon acquiring the company.

Q. You are looking at tax exposures, possible exposures of TMF?

A. Correct.

Q. Did you do anything else in connection with the purchase in 1999?

A. No.

Q. Do you recall the result of your tax due diligence?

A. Well, we got a tax due diligence report. I don't recall anything that stands out.

Q. Do you know who you hired to do that?

A. Ernst & Young.

Q. Do you recall how the purchased company was incorporated with -- within USA, was it held as a separate subsidiary?

A. Yes.

Q. And that was called HRN?

A. I think the entity that was set up to do the acquisition was called HRN.

Q. For the year 1999, do you know or recall whether HRN filed a separate tax return or whether it was consolidated within USA's tax return?

A. It should have been consolidated in USA Networks's tax return.

Q. You say it should have been. Does that mean that you don't specifically recall?

A. I don't specifically recall.

Q. But it's your recollection that it should have been?

A. That's my recollection.

Q. The purchase of TMF, Inc., do you recall that was an asset purchase?

A. Yes.

Q. Are you familiar with a form called Form 8594 that the IRS has for asset purchases?

A. Yes.

Q. Do you know if one of those was filed by USA or HRN for the year 1999?

A. I don't specifically know.

Q. Have you seen one lately?

A. I have seen an 8594.

Q. Have you seen one for the year 1999 that was filed on behalf of USA or HRN?
A. I don't -- I have documents. I don't know if I specifically have seen the 8594 or if I have it.
Q. Given your understanding that the purchase of TMF was an asset acquisition, is it your understanding also that one of these forms should have been filed for 1999?
A. That would be my understanding.
Q. Do you have any recollection of reviewing such a form for 1999 for USA or HRN?
A. I don't have a recollection of actually reviewing the form.
Q. Do you have a recollection of one being prepared or discussing the preparation of one for 1999?
A. Yes.
Q. And what was your involvement, what do you recall?
A. The only thing I recall is my involvement was just to make sure that it got filed, that one was prepared and got filed.

Q. And did you instruct or direct somebody to prepare one?

A. I don't specifically recall who prepared it or I don't specifically remember who that would have been.

Q. You said you recall being attentive to the issue of one being filed or prepared. What is that based on, what's your recollection based on?

A. I just generally remember that there's a time-line to get the form filed, and I just remember running up against that, the time-line, and having to deal with it in that sense to make sure it got filed timely.

Q. And this was for 1999?

A. I think so, yes.

Q. Do you recall that there were any discussions with the sellers of TMF, Inc. regarding the contents or the preparation of a Form 8594 for the year 1999?

A. I don't remember any specific conversations with them.

Q. Do you recall generally any such discussions?

A. No. I just know that both parties have to

file one, the buyer and seller both have to file one.

Q. Would it have been your practice to talk with the other side, the sellers, to discuss the preparation of the form?

A. I don't think we had a general practice. I think it's just transaction by transaction.

Q. And you don't recall?

A. I don't -- sorry.

Q. You don't recall doing this with regard to 1999 for this transaction?

A. I do not.

Q. Of the people you mentioned earlier who worked with you or for you and during the year 1999 and 2000, is there any one of those that would have been responsible for preparing the Form 8594 regarding this purchase of TMF's assets for the year 1999?

A. I would think not.

Q. It could have been any one of those people you mentioned?

A. No. We outsourced our tax compliance to

Ernst & Young. So most of the preparation of the tax return would have taken place through Ernst & Young and at Hotels.com or HRN.

Q. So E&Y, Ernst & Young, prepared the tax return for USA for tax year 1999?

A. Yes.

Q. Do you recall that there was an IPO initial public offering of stock of HRN in February of 2000?

A. Yes.

Q. Did you have any involvement in that?

A. No.

Q. You didn't contribute to any documents that were sent on to the investment bankers or provide information to them?

A. I would -- my only involvement would have been reviewing any tax sections or anything that mentioned a tax.

Q. You didn't have any involvement in setting the IPO price?

A. No.

Q. You didn't have any involvement in providing forecasts or projections of growth for HRN?

A. No.
Q. Did you purchase any stock in the IPO?
A. Of HRN?
Q. Yes.
A. I think through the friends and family I was given a small amount, yes.
Q. Do you recall how much?
A. I don't specifically recall, but maybe a couple hundred shares or a thousand shares.
Q. Why did you decide to purchase those shares?
A. I don't specifically remember. I guess -- I don't specifically remember.
Q. Do you still have those shares?
A. No.
Q. When did you dispose of them and how?
A. I disposed of them shortly after the IPO.
Q. Within a month or less?
A. I would say so. I think so. That is my recollection.
Q. And did you sell them for a profit?
A. Yes.
Q. Prior to the IPO, are you aware of whether

there were any considerations of a secondary offering, another offering to occur at some point in the future?

A. Not that I'm aware of.

Q. Do you have any -- let me back up.

At the time of the IPO, did you have any opinion as to whether the 16 dollar offering price was too high or too low or just right?

A. No.

Q. What was your belief as to the growth prospects, if you had any such belief, at the time of the IPO for HRN?

A. I don't really think I had any knowledge of the growth aspects or prospects.

Q. Are you aware that the agreement between the sellers of TMF, Inc. and the buyer USA was amended at or around the time of the IPO?

A. Yes.

Q. And do you have an understanding of what that amendment did or what was amended?

A. I think so.

Q. Could you tell me what's your understanding

of what occurred?
A. My understanding is that the original purchase contract contemplated an earnout, and then upon there being an IPO, the contract was adjusted to put in place or give the sellers more stock in the IPO in place of a cash earnout that would have been earned.
Q. Did you have any involvement in that amendment or the process leading to the amendment?
A. No, not that I'm aware of. Not that I recall.
Q. Did you have any involvement or knowledge of trying to forecast what those earnouts might be that were exchanged for the stock in the amendment?
A. No.
Q. Do you have any knowledge as to how it was determined -- let me back up.
Were you involved at all in determining how many shares of stock the sellers would receive in exchange for the earnout rights?
A. No.
Q. Do you have an understanding of how that was

determined or what formula was used?

A. No.

Q. Is it your understanding that the sellers also received earnout payments prior to the IPO?

A. I think that's correct, yes.

Q. Are you aware of any conflicts that occurred between the sellers and USA regarding the calculations of those earnouts?

A. I am not.

Q. Did you have any involvement in determining what those earnout payments should be?

A. No.

Q. The stock that the sellers were to receive under the amendment to the asset purchase agreement, was it your understanding that they had restrictions associated with them?

A. That is my understanding, yes.

Q. What's your understanding of what those restrictions were?

A. My recollection is there were time restrictions.

Q. Is that time periods during which the sellers

couldn't sell the stock?
A. Correct.
Q. Do you know who the sellers were?
A. Yes.
Q. Is that Mr. Diener and Mr. Litman?
A. Correct.
Q. It is your understanding they were essentially the owners of TMF, Inc.?
A. Yes.
Q. Did you have any involvement in determining the restrictions on the stock to be given to Mr. Diener or Mr. Litman or the process that led up to that?
A. No.
Q. Is it your understanding that Mr. Diener and Mr. Litman then received stock in 2000 pursuant to the amended agreement?
A. Yes.
Q. Do you know how many shares that was?
A. Not offhand, no.
Q. You understood that these shares were given as additional consideration for the assets of TMF,

Inc.?

A. Yes, in lieu of earnout payments.

Q. Would then a -- another Form 8594 need to be filed for the year 2000 to reflect the transfer of these shares?

A. That would be my understanding, yes.

Q. I take it you were the tax director for USA in 2000, 2001?

A. Correct.

Q. So you were involved in supervising the preparation of the tax return for the year 2000?

A. For -- I supervised the IAC tax return for the year 2000, yes.

Q. Was it called IAC at that point or USA?

A. 2000? I would say it was USA Networks.

Q. Can you tell me what you did in connection with the preparation and filing of USA's tax return for the year 2000?

A. Well, I would have -- the return was prepared both internally and externally by Ernst & Young, along with that reconciliations of book to tax differences equity would have been prepared, and I

would have basically reviewed those reconciliations and had a meeting with Ernst & Young where they would fill me in on any items that I should be aware of, generally discuss the tax return. That's probably about it.

Q. Who at Ernst & Young was involved with regard to the year 2000 of USA?

A. The preparation would have been by someone by the name of Bo Yee Fung. That was the person who was in charge of compliance at Ernst & Young.

Q. Anybody else involved that you recall in the preparation of that?

A. In 2000? We would have had each of our subsidiaries also do preparation. Home Shopping Network did a lot of work for us in preparing the tax return. That is another one of our subsidiaries.

Q. Home Shopping Network, were they consolidated within the USA --

A. Yes.

Q. -- tax return?

A. Yes.

Q. So the only one at Ernst & Young that you recall being involved was Mr. Fung?

A. There was a senior manager that he reported to, but I can't recall her name.

Q. Now, you told me for the year 1999 you thought HRN was consolidated with USA in their tax return. Is it your recollection that HRN was not consolidated within USA's tax return for the year 2000?

A. For a portion of 2000, correct.

Q. And is that the latter -- the latter part of 2000 it was not consolidated?

A. Correct.

Q. So HRN would file a separate tax return for the latter portion?

A. Correct.

Q. Mr. DeGraw, could you take a look at what has been previously marked as Exhibit 61, and that is a September 19, 2001 letter from Mr. Fung to Mr. Gandhi which it indicates that you were copied. Do you recall did you receive this letter?

A. I don't specifically recall.

Q. Do you have any reason to doubt that you received it?

A. No.

Q. Now, this letter indicates that he's sending to Mr. Gandhi the tax return for HRN. Do you see that?

A. Yes.

Q. And do you recall if you received that at or about this time, a tax return or draft tax return for HRN?

A. I don't know if I would have received one or if I did.

Q. Would that have been your practice for a subsidiary of USA like HRN that E&Y would have sent you the draft return that they had prepared?

A. Probably not.

Q. Why do you say that?

A. Because it's not my practice to review specific detail and down to that level of the tax returns of the consolidated group. I would normally focus on the IAC top company and the consolidation at that level.

(Discussion off the record.)

(Whereupon, Defendant's Deposition Exhibit No. DeGraw 80 was marked for Identification.)

BY MR. JOHNSON:

Q. Mr. DeGraw, we marked as Exhibit 80 what appears to be a copy of the HRN tax return, at least a draft of it for the year 2000.

Do you recognize the signature there on the first page at the bottom?

A. I can't tell you whose it is.

Q. Is that Mr. Fung's signature?

A. I think so.

Q. You will notice that it's dated September 19th, the same date as the letter which we just looked at Exhibit 61.

Do you recall if you received Exhibit 80 along with Exhibit 61?

A. I don't recall if I received it.

Q. Do you recall ever seeing a draft tax return for HRN for the year 2000 back in the 2001 time frame?

A. I don't recall seeing one, specifically seeing one.

Q. Do you have a general recollection of ever receiving or seeing a draft tax return for HRN?

A. No.

Q. Do you recall ever discussing with Mr. Fung preparation of a tax return for HRN for the year 2000?

A. Yes.

Q. Could you turn to the page that is Bates stamped HC 72 and 73. Do you see the numbers there? I guess HC 74 as well. Do you agree that that's a draft Form 8594?

A. Yes.

Q. Do you recall seeing this in 2001?

A. I recall seeing an 8594.

Q. You are not sure if it's this one?

A. No.

Q. And that's an 8594 for HRN for the year 2000?

A. Correct.

Q. Okay. Do you recall seeing more than one?

A. No.

Q. Do you recall -- do you not recall how many you saw or do you recall specifically only seeing one?

A. I only recall seeing one.

Q. The one that you saw, how did it come about that you saw it?

A. I don't remember.

Q. Did somebody send it to you?

A. I don't remember. I would assume so, but I don't remember.

Q. You don't remember preparing one?

A. I wouldn't have prepared it, but I would have -- I do remember seeing one.

Q. Okay. You don't recall whether it was sent by Mr. Fung or somebody else?

A. I don't.

Q. The Form 8594 for HRN for the year 2000 that you do recall seeing, do you recall the contents of it?

A. No.

Q. Even generally?

A. No.

Q. Do you recall that it was an attempt to reflect the payment of the or the transfer of the stock to Mr. Diener and Mr. Litman in the year 2000?
A. I don't recall, but I would assume. I don't recall specifically.
Q. Do you recall discussing that Form 8594 with anybody?
A. No.
Q. Did you do anything as a result of receiving it?
A. No.
Q. Do you recall discussing the contents of such a form? Let me back up.
Do you recall discussing the contents of that form with anybody?
A. No.
Q. Exhibit 80 appears to have been prepared by Ernst & Young. Do you see that at the bottom?
A. Yes.
Q. Do you know whose decision it was to retain Ernst & Young to prepare HRN's tax returns for the year 2000?

A. Ernst & Young prepared -- was engaged by USA Networks to prepare the tax returns of IAC and its subsidiaries.

Q. So, would it be fair to say that IAC decided that Ernst & Young would prepare HRN's return?

A. Yes.

Q. For HRN for the time period in 2000 when it was going to file a separate return, did you have an understanding of who the appropriate person at HRN would be to sign that return?

A. I don't know who would have signed it.

Q. Do you know who the officers of the company were at that time?

A. Not specifically, no.

Q. Do you recall Mr. Diener and Mr. Litman were with HRN at that time?

A. Yes.

Q. Do you know in what capacity or role?

A. Not specifically, but in an executive role.

Q. They were among the officers?

A. I don't specifically know that, but.

Q. You told me you recall talking with Mr. Fung

regarding the HRN tax return for the year 2000. What do you recall discussing with him?
A. My specific recollection was that Ernst & Young was having a lot of difficulty getting information from HRN to finalize and prepare the return. So, basically, it was Ernst & Young asking for me to help them push to get information so that they could timely prepare the tax return.
Q. Do you recall what information was needed that they were having difficulty getting?
A. Basic trial balance -- just basic information to prepare the tax return.
Q. Any other type of information?
A. Nothing specifically.
Q. Do you recall discussing anything else with Mr. Fung about the 2000 tax returns for HRN?
A. No.
Q. You told me earlier that it was your understanding that a Form 8594 should be filed for the year 2000 to reflect the issuance of a stock to Mr. Diener and Mr. Litman, correct?
A. Correct.

Q. What was your understanding as to how the value of that stock should be reflected or recorded in that form for HRN in the year 2000?

A. My understanding would have been fair market value.

Q. And then your understanding that fair market value, should that have reflected the impact, if any, of the restrictions on the sale of the stock by Mr. Diener and Mr. Litman?

A. I don't know. That depends.

Q. What does it depend upon?

A. If a buyer and seller agree to a price, then that is the fair market value, generally, under tax rules.

Q. So that's the definition of fair market value?

A. There is no definition for fair market value in the tax code, but the IRS generally respects when a buyer and seller agree to fair market value.

Q. Do you recall whether there was an agreement between the parties regarding the fair market value of this stock?

A. Not that I recall. There was an overall agreement.

Q. What overall agreement?

A. The agreement that was established in 1999 and amended in 2000.

Q. Did you ever learn that Mr. Diener or Mr. Litman had any objections to the HRN tax return for the year 2000 as originally prepared by Ernst & Young?

A. I didn't have any knowledge of those two having any objections, no.

Q. You don't recall ever learning that Mr. Diener or Mr. Litman objected to the contents of a Form 8594 for HRN for the year 2000 as originally prepared by Ernst & Young?

A. No.

Q. Do you recall learning of objections by anybody else regarding the -- that draft return?

A. Not that I recall.

Q. You don't recall learning of objections by anybody regarding the contents of a draft Form 8594 for the year 2000?

A. No.

Q. I would like to show you what has been marked as Exhibit 62 previously. That is a copy of the HRN tax return for the year 2000.

I notice you are looking at the Exhibit 80 which was a return for 2000 as well, a draft return. You notice this one is Exhibit 62 is signed -- appears to be signed by somebody on behalf of HRN. Do you recognize that signature?

A. No.

Q. Have you ever seen Exhibit 62 before?

A. I don't think so. I don't know. Not that I can recollect.

Q. Would you take a look at -- well, I will find it for you. Exhibit 62 has a Form 8594 in it as well. These pages aren't Bates stamped in this exhibit. And, again, it's a three-page form.

Have you had a chance to look at it?

A. Yes.

Q. The second page of the Form 8594 in Exhibit 62 has some handwriting on it which appears to say that, "Information is being gathered. Will be

supplied at a later date."
Do you recognize that handwriting?
A. No.
Q. Have you ever seen this before?
A. I think -- I think I recently saw this and it was shown to me by these attorneys.
Q. By the attorneys for Hotels.com?
A. Yes.
Q. So recently within the last month or so?
A. Yes.
Q. Had you seen it at any time before that?
A. No.
Q. Did you ever learn back in the year 2001 that the Form 8594 for HRN had been filed in this form?
A. No.
Q. By this form, I mean as included in Exhibit 62?
A. No.
Q. No one ever told you -- you never learned that the information on this form had been whited out?
A. No.

Q. Did you ever talk with Mr. Diener about a Form 8594 and its contents?
A. Not that I recollect.
Q. How about Mr. Litman, did you ever talk with him about that?
A. Not that I recollect.
Q. Have you ever spoken with either of them?
A. I know that I have spoken with them.
Q. Do you recall the contents of any discussions with either of them?
A. Most of them were -- the few times that I may have spoken to them, it was generally at a social function for USA Networks.
Q. Do you recall, have you ever spoken with them about the contents of HRN's tax returns or their personal returns?
A. No.
Q. You never discussed tax issues at all with either of them?
A. No.
Q. Do you recall giving any instructions or directions to anybody at Ernst & Young about the

contents of HRN's tax return and any included Form 8594 for the year 2000?

A. No.

Q. Do you recall giving any instructions regarding the contents of the return or included Form 8594 for HRN for the year 2000 to anybody at HRN?

A. No.

Q. You told me it was your understanding that HRN would need to file a Form 8594 for the year 2000 based on the stock issuance.

Was it also your understanding that the sellers would need to file such a form as well?

A. That would be my understanding, yes.

Q. Was it your understanding that the values reflected in those two forms needed to be consistent?

A. They don't have to be. That is my understanding.

Q. What do you mean by that?

A. The 8594s are prepared separately. So, technically, they don't have to be consistent. You