would generally like them to be consistent.
Q. When you say they don't have to be consistent, what is your basis for saying that?
A. I don't think -- it's just I don't think there is a rule that says they have to be prepared consistently -- in the instructions I don't think it says that.
Q. The instructions on the form?
A. 8594, yes.
Q. Do you know if in this instance there was an understanding that they needed to be consistent?
A. I am not aware that there was.
Q. Are you aware that there was an understanding that they didn't have to be consistent?
A. No.
Q. You just don't know one way or the other?
A. I am not aware that it was discussed.
(Whereupon, Defendant's Deposition Exhibit No. DeGraw 83 was marked for Identification.)
BY MR. JOHNSON:
Q. Mr. DeGraw, I have marked as Exhibit 83 a

copy of an e-mail. Take your time and review it, if you would like, and I have a couple of questions for you.

Do you know who Brian Ledge is?

A. From reading this, I take it he was their general counsel or an in-house counsel or counsel for someone, but I don't specifically know.

Q. Who is Mel Robinson, do you know him?

A. Mel Robinson was the CFO at the time, I think.

Q. Of HRN?

A. Of HRN, yes.

Q. And the middle e-mail, the one from Mr. Robinson to -- is that to Bill Severans?

A. Correct.

Q. And what was his position at the time at USA?

A. Bill Severans?

Q. Yes.

A. He was controller.

Q. And it's cc'd to you, this e-mail on October 9th?

A. Yes.

Q. Do you recall receiving this?

A. Not specifically.

Q. Mr. Robinson has a note to you at the end of that e-mail requesting an update as to when you identify the appraisal firm to give a quick initial estimate of the tax value of the shares. Do you see that?

A. Yes.

Q. Did you make -- did you hire somebody to do an appraisal of the shares transferred to Mr. Diener or Mr. Litman?

A. Yes.

Q. And it's your understanding that was going to be used for tax purposes?

A. Yes.

Q. Now, this is dated October 9, 2001. Is it your recollection that HRN's tax return had already been filed by this point?

A. Which tax return?

Q. For HRN for the year 2000.

A. That would be -- I would think so, but I am not sure. I don't have -- I don't know for sure.

Q. Do you recall that you retained Deloitte & Touche to do an appraisal of the shares after the HRN tax return had already been filed?
A. Yes.
Q. Did you look at any other or contact any other firms besides Deloitte & Touche?
A. Yes.
Q. Which ones?
A. I don't specifically remember, two or three firms.
Q. Were they other large accounting firms like Deloitte & Touche?
A. No. They were actually large appraisal firms.
Q. You don't recall the names of any of them?
A. Not offhand.
Q. Are you the one who decided to retain Deloitte & Touche for this purpose?
A. I had to get approval, but yes.
Q. You recommended them?
A. I recommended them, yes.
Q. And the purpose of retaining Deloitte &

Touche, was this to determine to fair market value of the shares and then use that value in HRN's tax return for the year 2000?

A. Yes.

Q. And you are doing it now at this point because, obviously, it hadn't been done previously?

A. Yes.

Q. Do you know what value had been used in the tax returns for HRN in the year 2000 that had been filed just prior to your retaining Deloitte & Touche?

A. I think the value that was used was the value that was used for GAAP books, the same fair market value. I don't specifically remember the number.

Q. Is there a difference in your understanding between what is used for GAAP and what should be used for tax?

A. Generally, no.

Q. How about with regard to this issue, specifically the stock valuation?

A. In this issue, yes, there was a difference.

Q. So, it's your understanding that the GAAP

value had been used for the tax return as filed, but now a fair market value for tax purposes needed to be determined?

A. A fair market value needed to be determined, yes.

Q. For tax purposes?

A. For tax purposes.

Q. And that hadn't been done previously?

A. No.

Q. Do you know who decided to use the value that was used in HRN's tax return as filed for the year 2000?

A. For the year 2000? I don't know what value was used. Do I know who? No, I don't know who decided to use that. I don't recollect.

Q. Do you recall discussing that with anyone?

A. I may have. I don't recollect.

(Whereupon, Defendant's Deposition Exhibit No. DeGraw 81 was marked for Identification.)

BY MR. JOHNSON:

Q. Mr. DeGraw, we've marked as Exhibit 81 a

document Bates stamped DT-243 through 250. After you have had a chance to look at that, I would like to ask you if you can identify this for us.

Do you recognize that, Mr. DeGraw?

A. Yes.

Q. Is that your signature on the page 4?

A. Yes.

Q. On page 3, is that your handwriting and initials?

A. Yes.

Q. I take it you negotiated a reduction in Deloitte & Touche's fee?

A. Yes.

Q. On the first page, the second paragraph under the headlines "Services to Be Rendered," do you see that?

A. Yes.

Q. That begins, "We understand"?

A. Yes.

Q. The valuation was to be used for tax Form 8594 to be filed by HRN?

A. Yes.

Q. Was it your intention at this time to also share the valuation with Mr. Diener or Mr. Litman so they could review it?
A. Not that I recall.
Q. Did you ever receive a valuation report that Mr. Diener and Mr. Litman had obtained?
A. Not that I'm aware of.
Q. You never received a report prepared by a company called BVS?
A. In the middle of 2004, upon audit by the IRS, I think that the IRS agent sent us a copy of those, yes.
Q. Prior to the audit or prior to when you believe you received it in the middle of 2004, did you ever receive a copy?
A. Not that I'm aware of.
Q. Do you recall whether you were ever told prior to that that such a report had been prepared by BVS?
A. Yes, I was aware of that.
Q. When did you learn of that?
A. I don't specifically remember.

Q. Was it back in 2001, the fall of 2001, the time period we're talking about?

A. It would have been during this time period because that's why I needed to get an appraisal.

Q. When you say this time period, you are pointing to the Deloitte & Touche retention letter?

A. Right.

Q. So back in around the time of October 11, 2001, you recall being told about a BVS report?

A. Yes. Not a BVS report, a different valuation by the sellers, not specifically a BVS report.

Q. You just heard they had a valuation done and that was for tax purposes of the shares?

A. Yes.

Q. And do you recall what the valuation was that you learned of?

A. I wasn't ever specifically told. I do remember them saying it was much lower than the number we had originally used on the tax return.

Q. So the valuation you learned of was much lower than the GAAP number that had been used in the tax return?

A. Correct.

Q. Okay. How did you learn about this valuation from that was obtained by the Dieners and Litmans?

A. I don't specifically recall.

Q. Do you ever -- did you learn that they had a second one as well?

A. I do know that. I am not sure when I learned that, if it was during this audit that we just had. I gleaned a lot of information from that audit, so.

Q. So you don't recall?

A. I don't recall when, no.

Q. Did you ask to be provided a copy of the valuation that had been obtained by the Dieners and Litmans back in 2001?

A. Not that I recall.

Q. Do you know if anybody else at USA actually got a copy of it?

A. Not that I am aware of.

Q. Do you know if anybody at HRN other than Mr. Diener and Mr. Litman ever got a copy of the valuation?

A. I am not sure. I don't know.

Q. I think you said earlier that your learning of the Diener and Litman valuation is what caused you to go out and get this valuation from Deloitte & Touche; is that correct?
A. Correct.
Q. And why did that cause you to go out and retain Deloitte & Touche?
A. Because under the tax, generally for tax purposes, if buyer and seller file consistent 8594s, they won't challenge the fair market value. However, once I learned that they were filing with a different valuation, I couldn't rely on that. So I needed to get, in order to prepare a tax return that I was comfortable with, I needed to get my own valuation.
Q. So there was a difference between the value they used and the GAAP valuation HRN had used, so you went out to retain Deloitte & Touche?
A. Correct.
Q. Did you consider using the valuation that the Dieners and -- that Mr. Diener and Mr. Litman had used?

A. No.
Q. Why not?
A. I felt it was prudent to get my own valuation.
Q. And did you know what valuation they used?
A. I didn't specifically know the number, no.
Q. Did you generally have an idea of what sort of discount or valuation they used?
A. No. I just knew that it was a low number. That is what I specifically remember being told or hearing or --
Q. So by low number, do you mean that the --
A. The discount would have been high.
Q. Okay. So the per share value would have been low?
A. Correct.
Q. And is it fair to say that the lowness of that number is what caused you to go out and retain Deloitte & Touche?
A. No.
Q. Did you think the number that they used was too low?

A. I didn't -- I, me myself, don't know if it was low or high. I am not a valuation person. I just know I had a different number. Once I get a different number, I need to, in order to prepare a tax return, get comfortable with a fair market value to prepare the tax return.

Q. Is it fair to say that you don't have the expertise or training to value the stock or critique or criticize the valuations done by the Dieners and Litmans or Deloitte & Touche?

A. Yes.

MS. BOYLAN: Is this a good time to take a break?

(Recess from 10:26 to 10:33.)

(Whereupon, Defendant's Deposition Exhibit No. DeGraw 82 was marked for Identification.)

BY MR. JOHNSON:

Q. Mr. DeGraw, we have marked as Exhibit 82 a document Bates stamped DT222. The second e-mail noted there is that an e-mail you sent to Ms. Zeikel?

A. I think so, yes.
Q. And she was a Deloitte & Touche person?
A. Yes.
Q. And she was the one who was going to assist in valuating those shares?
A. Yes.
Q. You say in your e-mail that you would like to keep the price below 15,000 for the valuation, correct?
A. Yes.
Q. You also say at the bottom that you are sure that we will need these types of services in the future. Do you see that?
A. Yes.
Q. Do you mean valuation services?
A. Yes.
Q. Were you intending to, when you said that, were you intending to provide an incentive for her to keep the fees below 15,000?
A. Yes.
Q. Sort of a carrot?
A. Yes.

Q. Was USA using Deloitte & Touche for anything prior to this valuation job?

A. Deloitte & Touche I think was -- we were putting our compliance work out for bid I think about this time, and Deloitte & Touche was one of the accounting firms that were bidding to get our compliance work. I am not sure if it had actually been accepted at this point or not. I don't know for sure, but I would assume there was other work that they had done for us here and there through the company.

Q. Was Ernst & Young your primary outside accountants at that time?

A. Ernst & Young were our primary outside accountants, however, we needed to make a change on the tax side. We were -- because they were our GAAP auditor, we were switching to a different firm for tax.

Q. And this was the bid process that you were going through at about this time?

A. I think it was about at this time, yes.

Q. Do you know if Ms. Zeikel was aware that was

out for bid and Deloitte & Touche was --
A. I don't know that she was aware of that.
Q. What was the result of that bidding process regarding USA's tax work?
A. Deloitte got the engagement to do our compliance work.
Q. Could you tell us what you mean by the compliance work?
A. Preparing tax returns.
Q. And they were not doing that prior to this?
A. Correct.
Q. Do you know when that was awarded to Deloitte & Touche?
A. Not offhand. I don't know the specific date.
Q. Did that also include doing compliance tax work for HRN?
A. I think that HRN had already hired Deloitte separately from our hiring them, prior to us hiring Deloitte --
Q. And do you know --
A. -- or it might have been after, but it was a separate process. That, I recall.

Q. What was the volume of business or billings for this compliance work that was out for bid? Do you have a general recollection of what, you know, what the size of the contract was or --

A. It was roughly, probably about a million dollars, between 600,000 and a million dollars, maybe to a million two.

Q. And that's the business that Deloitte & Touche was awarded?

A. Correct.

Q. In your e-mail you say that we are price sensitive on this particular valuation. Do you recall why you said that?

A. I think because I tell that to everybody that I am hiring to do work for me.

Q. So nothing other than the usual desire to pay as little as possible?

A. I think so, yes.

Q. If you could look at the e-mail above that, the one that indicates it's from Ms. Zeikel to Kevin Fitzgibbon, do you understand Mr. Fitzgibbon was working with Ms. Zeikel on this valuation project?

A. Okay. Yes.
Q. She indicates that the work needs to be or the valuation needs to be finished by Thursday. Do you see that?
A. Yes.
Q. Do you recall that there was this time limit or deadline set?
A. I don't specifically remember why.
Q. Do you recall that there was -- that you asked Deloitte for a quick turn-around?
A. Yes, but I generally do that.
Q. Do you recall if you did it in this case for any specific reason?
A. No.
Q. Did you want to file an amended return as soon as possible?
A. I don't recollect.
Q. But you knew that the point of this was to obtain a valuation and then file an amended return?
A. Correct.
Q. If you look further down in Ms. Zeikel's e-mail, she states to Mr. Fitzgibbon, "USA would

like as high a value (lowest DISC) as possible, but their initial thought was that 40 percent would not be unreasonable."

Did you tell Ms. Zeikel that USA would like as high a value or lowest discount as possible?

A. The only specific thing I remember telling her on this conversation was that I was -- we knew that the IRS was going to challenge this number and that we wanted a number that we could be very comfortable with on the tax return. It was known that this number was going to be scrutinized by the IRS.

Q. Why do you say that?

A. Because we had -- we learned that the sellers used a different number.

Q. Do you recall telling her anything that would have given her the impression that USA would like as high a value or as low a discount as possible?

A. I don't remember telling her that, but I would think that we would want a number that we're comfortable with that is as high as we could get on the tax return, that is -- but I specifically don't

remember telling her that. The only other thing I remember telling her was that we had, you know, that I had talked with other valuation companies about it -- about doing the work.

Q. Had you talked with these other valuation companies about the actual valuation or discount?

A. Not specifically, no.

Q. Generally, do you recall?

A. I mean I gave them the same information that I gave to Ms. Zeikel, which I assume would have been the amended agreement.

Q. Did any of these other appraisers or accountants you talked to about a valuation provide a response to you about what their opinion was as to the valuation or discount?

A. I don't specifically remember numbers, but I do remember them telling me there were general ranges for discounts that they were familiar with, not anything specific.

Q. Do you recall what those general ranges were?

A. No, I don't.

Q. Do you recall who told you these general

ranges?

A. No. It was the valuation firms that I was working or that I was interviewing for this work.

Q. So, are these sort of off-the-cuff comments by them on the telephone when you are talking about possibly retaining them?

A. Correct.

Q. Do you have any reason to doubt that this e-mail accurately reflects Ms. Zeikel's impression that USA would like as high a value or lowest discount as possible?

A. I really don't know. I don't -- I'm not aware of what -- like I said, I specifically remember telling her that the reason we were doing this is to -- because the number will be challenged by the IRS, and we would need a number that we would be comfortable with.

Q. She goes on there to say that their additional thought was that 40 percent would not be unreasonable. Do you recall saying anything to her to convey your feeling that a 40 percent discount wouldn't be unreasonable?

A. I don't recollect that because I would have no idea what discount would be reasonable.

Q. Did anybody else from USA talk with Ms. Zeikel or Mr. Fitzgibbons about this valuation?

A. I don't know.

Q. Did you ever talk with Mr. Fitzgibbon?

A. I don't think so.

Q. But you did obviously talk to Ms. Zeikel?

A. Correct.

Q. Are you the one who sent her information or materials or documents to use?

A. I don't know if it was me specifically, but I would have -- I know materials were sent to her.

Q. Do you recall what you sent to her?

A. Not specifically.

Q. She also says in the e-mail that, "I got the feeling that seller used something like 80 percent."

Do you recall if you told her what sellers had used as the discount?

A. I don't recall telling her that because I do not think I knew the number.

Q. I would like to show you what was previously

marked as Exhibit 54, which is a document titled Draft Valuation Report.

Do you recall if Deloitte & Touche provided you drafts of their report prior to a final report?

A. I don't specifically recall. I do know that I got a valuation report, but the time frame was so short in preparing this, I am just not sure if I got a draft.

Q. This is dated or the letter on page 2 is dated October 18, which is just a week or less after you retained them. Do you recall -- you mentioned a short time frame. Do you recall if the valuation was done in a week or so?

A. I just recall that it was done -- we asked them to do it very quickly.

Q. Do you recall providing any feedback or comments to Deloitte & Touche regarding their work prior to them finalizing a report?

A. Not specifically, I don't recall giving them any feedback.

Q. Generally, do you recall doing that?

A. No. I just remember I would have read this

to make sure that the facts were correct.
Q. Do you recall ever going back to them and saying this fact is wrong or that fact is wrong?
A. No, I don't recall doing that.
(Whereupon, Defendant's Deposition Exhibit No. DeGraw 84 was marked for Identification.)
BY MR. JOHNSON:
Q. Mr. DeGraw, we marked as Exhibit 84 a document titled Valuation Report, and this is Bates stamped IAC317 through 355. Do you recognize this?
A. Yes.
Q. Is this the valuation report that Deloitte & Touche prepared?
A. Yes.
Q. Do you recall whether -- again, the letter is dated October 18, 2001. Do you recall or did you receive it on or about that date?
A. I am not sure.
Q. Is that the time -- does that time frame sound about right to you?
A. I would think so.

Q. Okay. The first paragraph after the indented paragraph that begins, "This valuation was conducted," do you see that?

A. Yes.

Q. It states that it was conducted for financial reporting and federal tax purposes. Was the report used for financial reporting purposes?

A. Well, inevitably, it gets used for financial reporting because we have, if there is a basis difference under FAS 109, we have to report that, so.

Q. Do you know --

A. Anything that is different on your tax return from your financial statements automatically gets picked up as deferred asset or liability, so I am not sure why they worded it that way, but just from any knowledge of tax accounting.

Q. Do you know if there was this basis difference that was reported?

A. I don't know that.

Q. Now, what did you do after you received this report?

A. I don't understand the question.
Q. Well, you hired Deloitte & Touche to value the stock for tax purposes, correct?
A. Yes.
Q. To be used in HRN's tax return for the year 2000?
A. Correct.
Q. They came back and gave you a report, correct?
A. Correct.
Q. With their opinion as to the appropriate discount?
A. Correct.
Q. What did you then do with that information?
A. I would assume that I gave it to the tax preparers to use to amend the tax return. I don't specifically remember, but that's the whole reason for doing the valuation.
Q. The reason was to give it to E&Y?
A. Yes.
Q. Do you know if you gave it to anybody at -- gave a copy of this report to anybody at HRN

including Mr. Diener and Mr. Litman?
A. I do not know.
Q. Do you know if you discussed the conclusions of Deloitte & Touche with anybody at HRN?
A. I don't remember.
Q. You don't recall discussing it with Mr. Diener or Mr. Litman?
A. I don't.
Q. Do you recall any discussions internally or with Deloitte & Touche regarding the date at which the shares should be valued?
A. No.
Q. Any discussions regarding whether the IPO date or some other date should be used?
A. I don't recall a discussion about that, no.
Q. What is your understanding of what Deloitte & Touche concluded?
A. I don't have an understanding. I don't have any recollection of ever thinking about it.
Q. Did you read the report?
A. Yes.
Q. Do you recall that it came to the conclusion

that certain marketability discounts should be applied?
A. Yes.
Q. Do you recall any discussion or consideration as to what those discounts should be applied to, whether it should be the IPO price of 16 dollars or some other price?
A. No.
Q. Do you know, was there a decision reached as to what the discount should be applied to?
A. Not by me.
Q. Do you know if somebody else did?
A. Not that I'm aware of.
Q. After Deloitte & Touche provided its report and conclusions to you, was a decision made to use their conclusions for the purpose of HRN's tax return for the year 2000?
A. Yes.
Q. Who made that decision?
A. I would assume it was me.
Q. Would anybody else's approval have been necessary?

A. I'm -- I don't have any recollection, but normally I would discuss it with the CFO.

Q. But a decision was made to use the conclusions in this report?

A. Yes.

Q. And why did you decide to use the Deloitte & Touche valuation for the purposes of HRN's tax return?

A. Because they're valuation experts.

Q. Did you have anybody else review their conclusions of the report, to double-check it?

A. Not that I remember.

Q. But you received their conclusions and report and thought they were reasonable?

A. Correct.

Q. When you decided to use the Deloitte & Touche valuation for the purposes of HRN's tax return, did you consult with anybody at HRN about that?

A. I don't have any specific recollection.

Q. Do you recall telling anybody at HRN, Mr. Robinson or Mr. Diener or Mr. Litman or Mr. Gandhi that we've got the Deloitte & Touche

valuation, and that's what we're going to use, and we're going to prepare amended returns based on that?

A. I know that they were aware that we were preparing amended returns. I don't know what the specific conversations were.

Q. Why do you say that they knew?

A. I specifically know that they -- we had conversations, and they were aware that we were preparing amended returns.

Q. And the amended returns were based, at least in part, on the valuation you now had for the stock?

A. Correct.

Q. And who did you discuss that with, the fact that amended returns were being prepared at HRN?

A. I don't have specific recollection, but generally the person I spoke with there was Viren.

Q. Viren Gandhi?

A. Yes.

Q. Is he the only one you recall discussing this issue with?

A. I don't recall discussing this issue with

him, but he's the person I discussed tax things with.

Q. You said that you knew that Mr. Diener and Mr. Litman had a valuation that was different than what HRN originally used in the tax return it filed for the year 2000. I take it, after receiving the Deloitte & Touche report, you knew that their conclusion was also different than the valuation that the Dieners and Litmans had?

A. I would -- I was just told that it was -- I just knew that it was a low number. I was told it was a low number, but I didn't know how much it was different by, but I assumed it was different.

Q. Different than Deloitte & Touche's number as well?

A. Different, yes.

Q. Did you ever tell anybody at HRN that Mr. Diener and Mr. Litman should not be involved anymore in the preparation or filing of HRN's tax returns?

A. No.

Q. Are you aware of any instruction by anybody

that they should be recused from that process?

A. No.

Q. Do you know if they were involved at all in reviewing or looking at any draft amended returns for the year 2000?

A. I don't.

Q. Mr. Gandhi never told you that he was running these by Mr. Diener and Mr. Litman?

A. Not that I recall.

Q. Or that he was discussing the Deloitte & Touche valuation with them?

A. Not that I can recall.

Q. Do you know if Deloitte & Touche came in under $15,000 for the report?

A. I don't specifically know. It would be a first.

(Whereupon, Defendant's Deposition Exhibit No. DeGraw 85 was marked for Identification.)

BY MR. JOHNSON:

Q. Mr. DeGraw, we have marked as Exhibit 85 a document Bates stamped IAC70 and 71. The bottom

e-mail appears to be from you to Mr. Fitzgibbon. Do you recall you received this e-mail?

A. Not specifically.

Q. Do you have any reason to doubt you received it?

A. No.

Q. Do you remember receiving e-mails from Deloitte & Touche regarding the valuation?

A. Yes.

Q. Who is Mary Reed?

A. I don't know.

Q. Does this refresh your recollection at all of having discussions with Deloitte & Touche about the valuation prior to them finalizing the report?

A. I'm not sure what was discussed, but it appears there were discussions.

Q. The e-mail above that I take it you are sending to Mr. Severans or you are forwarding on to Mr. Severans the e-mail you received from Deloitte & Touche?

A. Correct.

Q. And he was the controller at USA?

A. Yes.
Q. And then he responded to you with a spreadsheet?
A. It appears that way.
Q. Calculating the tax impact?
A. Yes.
Q. And is it your understanding that the tax impact of the valuation --
A. For financial statement purposes, that would be my assumption.
Q. What do you mean by financial statement purposes?
A. If you have a difference in tax amortization than book amortization, you would have a book tax difference that you would have to reflect in your financial statements.
Q. Was he not involved in the preparation of tax returns?
A. No.
(Whereupon, Defendant's Deposition Exhibit No. DeGraw 86 was marked for Identification.)

BY MR. JOHNSON:
Q. Mr. DeGraw, we marked as Exhibit 86 a document Bates stamped IAC866 through 869. Have you ever seen Exhibit 86 before?
A. I am not sure. Not that I recall.
Q. Do you have an understanding of what it is?
A. Yes.
Q. What is it?
A. I think it is a spreadsheet that shows the difference between the original tax basis good will and the new tax basis good will.
Q. And this is the -- this is in connection with the tax return of HRN?
A. Yes.
Q. And is this a recalculation of the good will of HRN based on the Deloitte & Touche valuation?
A. I don't know. I can't tell from this spreadsheet.
Q. The previous exhibit we looked at, Exhibit 85, seems to indicate there was, you know, a spreadsheet sent, and there is an attachment there at the second page you see at the bottom?

A. Um-mm.

Q. Do you know if Exhibit 86 is that attachment or spreadsheet?

A. I don't know.

Q. Do you have any idea who might have prepared Exhibit 86?

A. I don't.

(Whereupon, Defendant's Deposition Exhibit No. DeGraw 87 was marked for Identification.)

BY MR. JOHNSON:

Q. I would like you to look at what we have marked as Exhibit 87, and this is a draft tax return for HRN for the year 2000, Bates numbers HC116 through 221.

Earlier, Mr. DeGraw, you had mentioned that the point of getting the valuation was to prepare an amended return for HRN?

A. Correct.

Q. Do you recall seeing this Exhibit 87?

A. I recall seeing an amended tax return.

Q. After Deloitte & Touche did its report --

A. Yes.
Q. -- incorporating the results of that report?
A. Yes.
Q. And you don't recall if this is the one you saw?
A. No, not specifically.
(Whereupon, Defendant's Deposition Exhibit No. DeGraw 88 was marked for Identification.)
BY MR. JOHNSON:
Q. Let me show you what has been marked as Exhibit 88, and the second page of that exhibit -- I am sorry -- this exhibit is Bates stamped IAC 54 through 158. The second page is a letter to Mr. Gandhi from Mr. Fung on which you were copied. Do you see that?
A. Yes.
Q. Do you recall that you received this tax return?
A. No. I would tell you that, oftentimes, they will just send me the transmittal letters so that I can see they have been sent. That doesn't

necessarily mean I got the tax return.

Q. In that instance where you didn't receive the tax return, would you ever follow up with Mr. Gandhi or Mr. Fung to find out what was in the tax return?

A. It's possible. I don't specifically recollect.

Q. You don't recall doing it in this instance?

A. No.

(Whereupon, Defendant's Deposition Exhibit No. DeGraw 89 was marked for Identification.)

BY MR. JOHNSON:

Q. Could you take a look at what we have marked as Exhibit 89. That's an another draft HRN tax return Bates stamped HC 321 through 470. Again, this is for the year 2000. Is that correct?

A. Yes.

Q. And this one appears to have been drafted by Deloitte & Touche. Do you see that?

A. Yes.

Q. Was there a switch in accounting firms made or why -- do you know why this one was prepared by

Deloitte & Touche?

A. There was a switch, yes.

Q. Is this the bidding process you told me about earlier in the switch in the compliance?

A. No.

Q. Why was the switch done?

A. I think that both Hotels and Ernst & Young were unhappy with each other, and my recollection is Hotels went out and hired Deloitte to prepare the tax return.

Q. So, it's your recollection that Hotels or HRN went out to hire Deloitte & Touche?

A. Yes.

Q. And did that require anybody at USA or IAC's approval?

A. I don't think it specifically required it. I was aware of it, but I don't think that it required approval by IAC or USA Networks.

Q. You reference that Hotels and E&Y were unhappy with each other. Do you know why or what the basis of that was?

A. My recollection is is that Ernst & Young --

well, Hotels wasn't happy with the size of the bills they were getting from Ernst & Young and weren't paying them, and Ernst & Young wasn't happy with the information-gathering, the information to prepare the tax return, and it was causing them to run up much larger bills to prepare the tax return because it was so much work to collect the information. So my recollection is is that there was an outstanding bill and they basically both didn't want to have anything to do with each other anymore.

Q. Did the problems between Ernst & Young and Hotels have anything at all to do with the stock valuation issue on the year 2000 return?

A. Not that I am -- not that I specifically remember.

Q. Anything generally you remember about that being an issue between them?

A. I don't remember there being an issue on the stock valuation. I remember that there was a back and forth about OID being reported on the tax return, and whether it was appropriate or not to report the original issue discount on the tax

return.

Q. And that's what you mean by OID is original issue discount?

A. Correct.

Q. And the OID issue that related to the purchase of TMF, that is the payments for that?

A. Yes, the payments were over that. So there is an interest -- there can be an interest element to the purchase price.

Q. And there was a difference about whether there should be an interest element between Hotels and E&Y?

A. I just remember it coming up and being discussed. I don't remember any specifics, but.

Q. Do you know if that was ever resolved one way or the other?

A. I am not sure. I don't recollect exactly how it was resolved.

Q. Did you have an opinion or did anybody give you advice as to what the proper resolution of that was?

A. I remember being in discussions with Deloitte

about it, who was preparing this tax return, but I'm not -- I don't have any specific recollections.

Q. Do you remember what Hotels's position was on that issue?

A. Not specifically.

Q. Were they arguing that OID was not appropriate?

A. I don't specifically remember.

Q. We've looked at Exhibits 87, 88, 89, draft HRN tax returns. Do you know if -- and these are draft amended returns for the year 2000. Do you recall if an amended return was ever filed for the year 2000?

A. Well, I thought one was, but I learned during the 2004 audit from the IRS that one was not filed.

Q. So, prior to the audit of 2004, you thought one had been filed?

A. Yes.

Q. What was your basis for thinking that?

A. Because I delivered them an amended tax return and asked them to file it.

Q. When you say them, who do you mean?

A. HRN.
Q. Do you know who at --
A. No, I don't know who. Like I said, I generally spoke with Viren, but.
Q. You say you delivered them an amended tax return. Do you have a recollection of sending it?
A. I didn't specifically do it, but I was aware that one was delivered. I would assume Ernst & Young sent -- either Ernst & Young or Deloitte sent the return to them.
Q. What I'm trying to ask, I guess, is are you assuming one was sent to them or do you have a specific recollection of sending them one yourself or E&Y or somebody else sending them a return?
A. I have a specific recollection that a return was sent to them.
Q. Did you ever -- did anybody at HRN ever tell you that an amended return had been filed?
A. I can't specifically tell you that I remember that, that they specifically told me it had been put in the mail and filed.
Q. Would you take a look at Exhibits 88 and 89,

specifically in number 88 take a look at page 71 Bates stamped 71, and then in 89 the Bates stamp HC350.

Those are both copies of the second page of Form 8594 that are included in these two draft returns, correct?

A. Correct.

Q. And 88 is, at least indicates that it was, signed in March of '02, and then 89 it appears it was signed in August of '02, correct?

A. Yes.

Q. Now, the second page of these two forms 8594 have different values there listed. Do you see that?

A. Yes.

Q. And this is where the valuation for the stock was to be reflected, correct?

A. Yes.

Q. The later one has an increase in the value. Do you see that?

A. Yes.

Q. Do you know why that is?

A. I do not.

Q. Do you recall that there was ever a decision made to not use the Deloitte & Touche valuation in an amended return?

A. Not that I'm aware of.

Q. It was your understanding at all times that the amended return was to be filed with the Deloitte & Touche valuation?

A. Yes.

Q. You told me earlier that you thought that a return had been filed?

A. Yes.

Q. And was it your belief that that return was filed with the Deloitte & Touche valuation?

A. Yes.

Q. Now, for subsequent years for HRN, 2001, 2002, 2003, 2004, was it your understanding or is it your understanding that the Deloitte & Touche valuation was also used for purposes of those returns for HRN?

A. I am fairly certain that is what the auditor told me during the IRS audit, yes.