Q. You don't recall a decision being made for those years to not use the Deloitte & Touche valuation?

A. No.

Q. Is it your recollection that the company was always comfortable with that valuation for those years as well?

A. Yes.

Q. You had no reason to throw it overboard for those years?

A. No, no change in facts.

Q. Do you know if IAC has any economic or financial interest in Hotels obtaining a tax refund for the year 2000?

A. If they would have any economic -- for 2000 -- not that I'm aware of. I don't know, to tell you the truth.

Q. Do you know if IAC has any exposure or liability if HRN or Hotels.com is found to owe additional taxes for the year 2000?

A. We do not have exposure. IAC does not have exposure.

Q. Why do you say that, is that based on something?

A. IAC spun off our travel entities and we have been indemnified for taxes related to those businesses. That is my understanding.

Q. What is your understanding of the connection currently, if any, between IAC and Hotels?

A. The only connections I'm aware of are that -- are that Barry Diller is chairman of both companies, but otherwise they are a separate public company.

Q. You mentioned there was this issue about original issue discount for the year 2000. Was the law firm Jones Day ever consulted about that, do you know?

A. Not that I recollect.

(Whereupon, Defendant's Deposition Exhibits Nos. DeGraw 90 and 91 were marked for Identification.)

BY MR. JOHNSON:

Q. Mr. DeGraw, I marked as Exhibit 90 a two-page document IAC59 through 60, and 91 is Bates 863 through 865. Do you recognize either of these?

A. This one?
Q. I'm sorry. This one too.
A. I don't specifically recognize them.
Q. That is not your handwriting on 91?
A. No.
Q. You don't have any knowledge as to who might have prepared these?
A. No.
Q. You mentioned that in '04, I think, that you learned that an amended return had not been filed?
A. Yes.
Q. Did you ask or find out why one hadn't been filed?
A. No.
Q. Did you do anything to find out why one hadn't been filed?
A. No.
Q. Did anybody ever tell you why one hadn't been filed?
A. No.
Q. After you received the Deloitte & Touche valuation, did you do anything -- well, let me back

up.

I think you told me that after you received the Deloitte & Touche valuation you realized that that valuation was different from the one that Mr. Diener and Mr. Litman had, right?

A. Yes.

Q. Did you do anything to try to come to an agreement with them as to a consistent valuation?

A. I don't specifically remember anything except that I do remember there being a conversation -- I am not sure who with -- that obviously it was in -- that valuations would be scrutinized if they weren't the same.

Q. Now, was that a conversation with Mr. Diener or Mr. Litman?

A. I wouldn't have had that conversation with them, no.

Q. Do you know if somebody did?

A. I don't.

Q. Well, what is the basis of saying of your answer about there being a conversation about this, the valuations being scrutinized?

A. I don't know specifically. It could have been with Viren. It could have been -- I just know it was discussed.

Q. Did you discuss it with Mr. Gandhi?

A. I don't specifically remember.

Q. Or with anybody else at HRN?

A. I don't. It's too long ago, I don't remember.

Q. I understand. Do you know if it was with somebody at HRN or whether it was just internally within USA?

A. My recollection is it was with someone at HRN.

Q. But you don't know who it was?

A. No.

Q. The report or the valuation that was obtained by Mr. Diener and Mr. Litman, I think you told me you had never seen a copy of that; is that right?

A. I think I got a copy of it from the 2004 -- during the 2004 audit.

Q. But that was the first time?

A. That's my recollection, yes.

Q. Do you know if they -- do you know one way or the other whether they obtained that report on behalf of themselves as the sellers of the TMF assets or whether they obtained that on behalf of HRN?

A. I would have to assume. So I don't know for sure.

Q. You don't know one way or the other?

A. I don't know one way or the other.

Q. When you learned of the valuation, what was your understanding as to whether it was obtained on behalf of the Dieners and Litmans, the sellers, or was it your understanding that this was a valuation that had been obtained by HRN?

A. When I learned of it, it was my understanding that it was on their behalf.

Q. By "their" you mean --

A. The sellers' behalf.

MR. JOHNSON: Thank you, Mr. DeGraw that's all I have. That was me.

MR. PORTER: Let's take a five-minute break.

(Recess from 11:40 to 11:45.)

EXAMINATION

BY MR. PORTER:

Q. Mr. DeGraw, I am John Porter. I represent Bob Diener and his wife Michelle, along with Dave and Malia Litman. I have just a few followup questions for you.

In 2003, or beginning in 2003, HRN's year 2000 tax return was audited. Are you aware of that?

A. Yes.

Q. Did you play a role in handling the audit of that return for either HRN or IAC, the parent company?

A. Yes.

Q. What role was that?

A. At some point in time, after the audit had been going on, there were two main issues left with the audit, and the folks, the tax people at Expedia had asked if I could help them with this piece of the audit, and so that's when I got involved.

Q. Now, during the 2003, 2004 time frame with

respect to the audit, was Expedia owned by IAC?
A. During 2003, Expedia was owned by IAC.
Q. Was Hotels.com at that time owned by Expedia?
A. Not directly owned, but -- no, not -- I don't think -- no, not directly owned.
Q. Was IAC considered Hotels.com's ultimate parent company?
A. During 2003?
Q. Yes.
A. I think so, yes.
Q. How about during 2004?
A. I think so, yes.
Q. How about the first half of 2005?
A. Until August, I would say that's correct, yes.
Q. What occurred in August of 2005?
A. Our travel assets, including the Hotels, was spun off to our shareholders.
Q. Now, during the audit of the HRN 2000 return, what was your specific role in dealing with the Internal Revenue Service?
A. My specific role was trying to understand and

close out the two remaining items that were open on this audit, during this audit.

Q. Did you have authority to speak on behalf of Hotels.com with respect to the issues involving -- involved in the 2000's return audit?

A. I am not sure I -- I'm not sure of that answer.

Q. Was there anyone at Hotels.com that was dealing directly with the Internal Revenue Service?

(Cell phone ringing.)

A. I'm sorry?

Q. Was there anyone with Hotels.com that was dealing directly with the Internal Revenue Service during the audit of HRN or Hotels.com's 2000 return?

A. During the time that I was having discussions with the auditor, I am not aware that anyone from Hotels was.

Q. Was the audited return being handled by the parent company?

A. I would describe it as being overseen by the parent company.

Q. Now, in terms of -- in terms of reporting

lines -- I am going back to 2000 -- how would subsidiary tax return issues come to your attention?

A. I'm not sure there was any specific process. We were just there. I mean, you know, I think it was expected that if there was an issue, we would be notified.

Q. Notified by the subsidiary company?

A. Correct.

Q. And would that typically be the CFO of the subsidiary company?

A. Typically, there isn't -- it's not -- there isn't -- typical is a hard word to use because some of the subsidiaries we owned had tax departments and some of the subsidiaries we owned didn't. So if there was a tax department, typically, they would contact me. And if there wasn't, then somebody else in the finance department would.

Q. And did you typically review subsidiaries' tax returns before they were filed with the Internal Revenue Service?

A. Not in detail.

Q. Did you review them at all?

A. I reviewed -- there was a review process, but it didn't entail specifically looking at the tax return page by page.

Q. Would you describe for me the return review process that USA Networks employed with respect to its subsidiaries' tax returns for the year 2000?

A. Yes. It was generally a meeting with Ernst & Young and anyone else who prepared the tax return, and there would be overall reconciliations that would be reviewed, items that -- that the accounting firm thought we should be aware of and that we would discuss, and then discussions would come out of that, but there wasn't, you know, a tax return page by page flip was not done.

Q. Is it fair to say that the focus was generally on large or significant items in the return?

A. I think, yes, that is fair to say that.

Q. Do you recall such a meeting with Ernst & Young to review HRN's 2000 federal income tax return?

A. I don't specifically recall a meeting, no.

Q. Would it have been unusual for there to not have been such a meeting?

A. With subsidiary tax returns, it wouldn't be unusual.

Q. Who typically attended these meetings on behalf of USA network?

A. It would be Ernst & Young and their preparers and myself and anyone involved at USA Network except the corporate office in the tax department.

Q. And so you gave a list a little earlier. Would Cenceria Edwards might be one of the people that would be in attendance there?

A. I don't think so.

Q. How about Les Evans?

A. I don't specifically remember who was there to tell you the truth.

Q. Michael Burk, would he attend these meetings?

A. I don't specifically remember, but I would assume he would.

Q. Why would you assume Mr. Burk would have attended?

A. Because I think he, if my memory serves me,

he helped in the compliance internally, by compliance getting the tax returns prepared and completed.

Q. So, is it fair to say that in addition to information coming from HRN, there would have also been information coming from USA Network in order for Ernst & Young to prepare HRN's 2000 federal income tax return?

A. Yes.

Q. Now, do you recall who the tax partner for Ernst & Young was with respect to HRN's 2000 federal income tax return?

A. From Ernst & Young?

Q. Yes.

A. Specific to Hotels?

Q. Yes.

A. I don't.

Q. Who was USA Network's tax partner in charge of the tax compliance during 2000 at Ernst & Young?

A. Gary Pompan.

Q. And would, typically, the same partner be in charge of the subsidiary returns?

A. I don't think that is typical, no.

Q. Now, one of the questions counsel asked you just a few minutes ago related to the bidding process whereby USA Network was putting out tax compliance work for bid, and I believe your testimony was that the compliance work was worth, roughly, I think you said anywhere from 600,000 to one million to two --

A. One point two million.

Q. Would that be per year?

A. That would be per year.

Q. Could you turn to Exhibit 61, please. It's the cover letter from Ernst & Young dated September 19, 2001.

A. Okay.

Q. Are you with me?

A. Yes.

Q. The second paragraph of this letter states that, "In accordance with our discussion, Form 8495 asset acquisition statement is attached to Form 1120 was prepared on the assumption that the seller HRN Marketing Corporation agrees to the allocation as

reflected on the form. Please let us know immediately if the seller's expectation is contrary to ours."

Did you learn soon after September 19, 2001 that the seller had a different view with respect to the value of the restricted shares that they received?

A. I can't recall exactly when I learned. I am not sure if it was soon after or not.

Q. Was it fair to say that it was prior to your seeking out appraisal firms to determine the fair market value of the shares?

A. Correct.

Q. Now, could you look at Exhibit number 63. Exhibit 63 is an e-mail dated September 24, 2001 from Mr. Diener to Viren Gandhi, which also copies Robinson and Litman, and in that e-mail he advises Mr. Gandhi and Mr. Robinson that TMF is not in agreement with the amounts on the 8594 tax return for the year 2000.

Do you recall seeing this e-mail or having this e-mail forwarded to you by either Mr. Gandhi or

Mr. Robinson?

A. I do not.

Q. Do you recall where you would have heard or who told you that TMF, Mr. Litman, Mr. Diener were not in agreement with the amounts reflected on the 8594 in the draft E&Y return?

A. I'm not sure. I don't recall where I heard that from.

Q. Could you turn to Exhibit number 82, please, the October 12 e-mail from you to Christine Zeikel. I'm looking at the third sentence. It says, "I have gotten feedback indicating that they would like to keep the fees below 15,000."

Who did you get that feedback from?

A. I don't specifically know.

Q. Someone above you?

A. I don't know. I don't recall.

Q. Did you discuss the fact that Mr. Diener and Mr. Litman had a disagreement with respect to the value of the restricted shares that they had received with one of your superiors at USA Network or IAC?

A. Did I discuss -- yes.
Q. Who?
A. Dara Khosrowshahi.
Q. Anyone else?
A. That is the only person I can recall.
Q. What do you recall those discussions being?
A. I think I recall them just an explanation of that, what it meant and why -- that filing inconsistent 8594s meant that the numbers would be scrutinized and we would need our own valuation.
Q. And so this discussion occurred before you sought out the Deloitte & Touche valuation, correct?
A. I think so.
Q. Did Mr. Khosrowshahi have an opinion as to what the value of the shares or have an opinion as to how the value of the shares should be reflected in HRN's tax return?
A. Not that I recall.
Q. Did he give you any guidance with respect to what you should do with respect to this disagreement?
A. Not that I recall.

Q. Did you have any further discussions with him with respect to the differences in opinion with respect to the value of the shares?

A. I'm sure I kept him updated, but I don't have any specific recollection.

Q. After you obtained the Deloitte & Touche determination of the value of the shares, did you discuss that determination with him?

A. The value?

Q. Yes.

A. I think so. I don't specifically recall.

Q. Did Mr. Khosrowshahi authorize using the Deloitte & Touche determined value in HRN's tax returns for 2000, 2001, 2002, 2003?

A. I can't -- I don't have any recollection that he did.

Q. Who made the decision to use the Deloitte & Touche determined value in HRN's tax returns for 2000, 2001, 2002 and 2003?

A. I don't have any specific recollection of that either.

Q. This was an important matter for the parent

company, wasn't it?
A. I don't understand the question.
Q. Well, typically, you didn't get involved in subsidiary tax return issues, did you?
A. I typically did if there was a problem or an issue.
Q. And so this was a problem that you wound up getting involved in, correct?
A. Yes.
Q. And the problem, I think, as you've articulated, is making sure you had a proper fair market value for the restricted shares to include in the HRN tax returns, correct?
A. Correct.
Q. And you solved that problem by seeking out an appraisal from Deloitte & Touche with respect to the value of those shares, correct?
A. Correct.
Q. Did you seek approval from anyone at IAC to use the Deloitte & Touche determined value in HRN's tax returns?
A. Not that I can recall.

Q. Was it your decision to use the Deloitte & Touche determined value of the restricted shares in HRN's tax returns for 2000, 2001, 2002 and 2003?

A. I just don't have a recollection of what the process was that ultimately and how it was concluded.

Q. Who else would have made that decision?

A. I don't know.

Q. Who did you provide the Deloitte & Touche appraisal to?

A. The only -- I only remember sending it to the tax preparers, so that would have been Ernst & Young.

Q. And did you, after you -- after you sent the Deloitte & Touche appraisal to the tax return preparers, did you ask them to prepare the Form 8594 for year 2000 for HRN consistent with the values determined in the Deloitte & Touche appraisal?

A. I think that was just the assumed course of action, yes.

Q. And for subsequent years, did you ask the tax return preparers for HRN to prepare the good will

amortization consistent with the value determined by Deloitte & Touche?

A. There wouldn't have been a specific request because it just -- it just rolls over from year to year. So once you establish an asset and start amortizing it, it rolls until you change it. So there wasn't any -- it was -- it just carried forward.

Q. Could you look at Exhibit number 87, please, and specifically at HC00133.

A. 0013?

Q. 133. Do you recall -- I am looking specifically at items 1 and 2 under paragraph A. Do you recall that this amended Form 8594 reflects the fair market value of the restricted shares as determined by using the Deloitte & Touche appraisal?

A. Can you ask the question again?

Q. Certainly. Does this amended Form 8594 reflect the fair market value of the restricted shares issued to the sellers TMF liquidating as determined by using the Deloitte & Touche appraisal?

A. Well, if I add the 52 and the 48, it seems to

be close to the number I'm familiar with, yes.

Q. Is the number you are familiar with something in the range of 101 million dollars?

A. Correct.

Q. And that is using the Deloitte & Touche determined discounts for lack of marketability and applying those discounts to the 16 dollar per share initial offering price?

A. That's my understanding, yes.

Q. Would you look at Exhibit number 85, please, and also Exhibit number 86? Did Deloitte, prior to its issuance of an appraisal report, provide you with a range of discounts for determining the value of the restricted shares?

A. I don't specifically remember that they did or didn't.

Q. If you would look at Exhibit 85, the bottom e-mail which is from Mr. Fitzgibbon at Deloitte to you, it says that, "We've determined separate discounts for the two blocks of shares of the 7.11.3 block of 4.9 million shares" -- sold prior to the four-year period, and it goes on to talk about the

5.1 million shares. It says, "Our ranges are as follows. And it says 7.11.3 block of 4.9 million shares, 30 to 35 percent discount; 7.15 block of 5.1 million shares, and then Mr. Fitzgibbon goes on to say, "We would like to discuss with you our range estimates on Thursday, if possible."

Do you recall discussing these range discounts with Mr. Fitzgibbon or Ms. Zeikel?

A. I don't specifically remember that conversation.

Q. Do you have any recollection of telling them you thought that their range of discounts was too high?

A. No.

Q. Now, the final discount used in the report was 40 percent for the 5.1 million shares. Do you know why Deloitte used the 40 percent discount in their final report as to either 45 percent or something between 40 and 45 percent?

A. No.

Q. Did you discuss with them whether or not they should use the 45 percent discount or something

between 40 and 45 percent for the 5.1 million block of shares?

A. The only discussion I had with them was that -- I wanted a number that was going to be scrutinized by the IRS and we could be comfortable with. That is -- otherwise, that's the only conversation I had.

Q. And do you recall telling Susan Weiss just that -- Susan Weiss of the Internal Revenue Service -- that you were very comfortable with the Deloitte determined discounts?

A. I do.

Q. Would you look at page or Exhibit 86 and this is IAC000869?

A. 869?

Q. It's the amendment work papers, it starts out at the top book "Valuation of shares"?

A. Okay.

Q. This says, "The book value of the shares in first block was 16 dollars per share."

Earlier, you were talking about GAAP reporting. Is this the book value of -- when this