# TRANSCRIPT OF PROCEEDINGS

DAVID S. and MALIA A. LITMAN,
Plaintiffs, NO. 05-956T
vs.
THE UNITED STATES OF AMERICA,
Defendant.

---

ROBERT B. and MICHELLE S. DIENER,
Plaintiffs, NO. 05-971T
vs.
THE UNITED STATES OF AMERICA,
Defendants.

---

HOTELS.COM, INC. and Subsidiaries f/k/a HOTEL RESERVATIONS NETWORK, INC.,
Plaintiffs, NO. 06-285T
vs.
THE UNITED STATES OF AMERICA,
Defendant.

---

Deposition of James Lucien Horan

Pages: 1 through 100

Place: Miami, Florida

Date: July 24, 2006

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

Case 1:05-cv-00956-TCW Document 45-10 Filed 02/26/2007 Page 2 of 155

UNITED STATES COURT OF FEDERAL CLAIMS

DAVID S. and MALIA A. LITMAN,
Plaintiffs, NO. 05-956T
vs.
THE UNITED STATES OF AMERICA,
Defendant.

---

ROBERT B. and MICHELLE S. DIENER,
Plaintiffs, NO. 05-971T
vs.
THE UNITED STATES OF AMERICA,
Defendants.

---

HOTELS.COM, INC. and Subsidiaries f/k/a HOTEL RESERVATIONS NETWORK, INC.,
Plaintiffs, NO. 06-285T
vs.
THE UNITED STATES OF AMERICA,
Defendant.

---

Deposition of:

JAMES LUCIEN HORAN,

taken at the instance of the Agency for the purposes of discovery and for use as evidence in the above-entitled cause, was taken before me, CLAUDETTE FROST, Court Reporter/Notary Public in and for the State of Florida at Large, at Mellon Financial Center, 1111 Brickell Avenue, 19th Floor Conference Room, Miami, Florida, on Monday, July 24, 2006 commencing at 9:00 a.m.

APPEARANCES:

On behalf of the Plaintiffs, Litman & Diener

JOHN W. PORTER, ESQUIRE
Baker Botts, LLP
One Shell Plaza
910 Louisiana
Houston, Texas 77002-4995
(713) 229-1597

On behalf of the Plaintiff, Hotels.Com, Inc.

KARI M. LARSON, ESQUIRE
Lathami & Watkins, LLP
555 Eleventh Street, N.W.
Suite 1000
Washington, D.C. 20004-1304
(202) 637-2200

On behalf of the Department of Justice

CORY A. JOHNSON, ESQUIRE
P.O. Box 26
Ben Franklin Station
Washington, D.C. 20044
(202) 307-3046

On behalf of the Witness

LAURA BESVINICK, ESQUIRE
Hogan & Harts on
Mellon Financial Center
1111 Brickell Avenue
19th Floor
Miami, Florida

I N D E X


| WITNESS: | PAGE |
|---|---|
| James Lucien Horan | |
| Direct Examination by Mr. Johnson | 4 |
| Cross-Examination by Ms. Larson | 70 |
| Cross-Examination by Mr. Porter | 79 |
| Redirect Examination by Mr. Johnson | 90 |
| Recross-Examination by Mr. Porter | 96 |

EXHIBITS FOR IDENTIFICATION

| EXHIBIT NO. | PAGE |
|---|---|
| Exhibit No. 158 | 56 |
| Exhibit No. 159 | 60 |
| Exhibit No. 160 | 83 |
| Exhibit No. 161 | 96 |

| | |
|---|---|
| CERTIFICATE OF REPORTER | 100 |
| ERRATA SHEET: | 99 |
| SIGNATURE PAGE | 98 |

P-R-O-C-E-E-D-I-N-G-S

(9:00 a.m.)

WHEREUPON:

JAMES LUCIEN HORAN

was called as a witness herein and, after having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. JOHNSON:

Q Good morning, Mr. Horan.

A Good morning, Cory.

Q Could you tell us your full name for the record and where you live?

A Sure. James Lucien Horan, H-O-R-A-N. I live in Miami, Florida.

Q And you're represented here today?

A I am.

Q Okay. Did you -- you used to work for KPMG, correct?

A That's correct.

Q Okay. Are you retired from KPMG?

A I am retired.

Q When did you leave KPMG?

A I retired September 30, 2002.

Q And how long had you been with KPMG?

A Since 1977, January of 1977. I guess that would make it twenty-five years.
Q Okay. Was that always in the Miami area?
A Yes.
Q Okay. Could you briefly describe for me your education after high school?
A I received a Bachelor of Science in Accounting from Fordham University in New York City.
Q Are you a CPA?
A I am.
Q During your years of practicing, did you have a specialty?
A I did.
Q What was it?
A International taxation.
Q During the years of the late 1990's, early 2000's, until you retired in 2002, you were in the Miami KPMG office?
A Correct.
Q And did you have a title at that point?
A Yes.
Q What was it?
A I was the managing partner of the South Florida business unit. I was also the partner in charge of tax.

Q A partner in charge of tax for the Miami business unit?
A South Florida business unit.
Q South Florida business unit, okay.
Did a Michelle Diener ever work with you at KPMG?
A Yes, she did.
Q When was that?
A Before she became a Diener. That escapes me. But Michelle did work in the tax department.
Q And she worked with you?
A Not really. I mean with me on engagements, no. I mean certainly in the department.
Q Okay. And she worked in the tax department which you were in charge of?
A Not at the time. I was -- did not have that title when she was there.
MS. BESVINICK: I just want to caution you to make sure you allow Mr. Johnson to finish his question before you answer it. It will be a clearer record.
MR. JOHNSON: I was about to say the same thing.
BY MR. JOHNSON:

Q Have you ever been deposed before?
A Yes.
Q How many times?
A Once.
Q Okay. Well, as you know, I'm going to ask you a series of questions, and as your counsel told you, it will be very helpful to all of us, especially the court reporter, if you pause before you answer to make sure I'm done so that we don't talk over each other.
Also, if I ask a question you don't understand, please let me know and I will rephrase it.
A Okay.
Q Okay. Otherwise, if you answer I will assume you understood the question. Is that okay?
A That's fine.
Q And if any time this morning you need to take a break or would like to take a break, please let us know and we will do so.
A Fine.
Q The other rule to remember is, in response to my questions you have to give a verbal answer rather than a nod or a shake, since it's being recorded this morning.

A Understood.

Q Okay. I understand that Michelle Diener worked in the tax department when you were there. Were you ever social friends with the Dieners?

A No.

Q What did you do, if anything, to prepare for the deposition today?

MS. BESVINICK: And I just want to caution the witness, you can explain to counsel who you met with or whether you looked at documents, but not the substance of any communications with me or anyone associated with the firm.

THE WITNESS: Okay. In preparation for the deposition I met with counsel. That's all. I did not do any other review of documents.

BY MR. JOHNSON:

Q Did you review documents when you met with your counsel?

A We looked at one or two documents I think, to clarify a point.

Q Do you remember what those documents were?

A Yes.

Q What were they?

A The tax return for the TMF Liquidating

Trust for the year, I believe it was 2000. And we looked at a memorandum that was prepared.

Q Was this an internal KPMG memo?

A An internal KPMG memo; that is correct.

Q And was this a memo concerning the TMF Trust?

A No. This was a memorandum that summarized a lot of the tax issues that were outstanding at the time of the return for the year 2000.

Q Okay.

MS. BESVINICK: Before we go further, I just want to make sure with respect to the privilege that Mr. -- that if there are privilege issues that anyone needs to raise, they'll be raised in response to specific questions, but that otherwise Mr. Horan is authorized to answer any questions.

MR. PORTER: That is correct.

MS. BESVINICK: Okay. I should have said that at the beginning, but I just wanted to be clear on the record.

BY MR. JOHNSON:

Q When is the last time you spoke to Mr. or Mrs. Diener?

A Soon after the subpoena for the documents

took place, when Bob called purely to thank me.

Q Thank you for what?

A Getting the documents together.

Q Okay. Did you talk about the case he was involved in?

A Not at all.

Q Prior to that, when was the last time you talked to either of them?

A Many months before, and I could not give you an accurate date, but many, many months before that.

Q Have you talked to either Mr. or Mrs. Diener at all about this case or about the tax returns filed in 2000, other than back in 2000 when it was going on?

A Sure. Again, those months I referred to that I spoke to Bob earlier, he had called me purely to ask me a question about location of some documents.

Q I'm sorry, were you finished?

A Yes.

Q Anything else that you talked about with him?

A He informed me that they were under audit and he was looking to see what documents we may or

may not have.

And then I spoke to John --

Q You mean John Porter?

A John Porter; yes, I did, soon thereafter, and indicated to you what documents we had.

Q Have you ever spoken to the Litmans?

A David, yes.

Q And when was the last time you spoke with him?

A Right at that same point in time. And again, I don't have the recollection, I don't recall the exact date, but as I said, many months before that. So whenever that would have been, again, I don't have the accurate date for that.

But yes, I spoke with David then.

Q And what did you speak with him about?

A The exact same question as to documents he asked for, you know, certain underlying documents that we may have or may not have in our files.

Q Did you provide documents to the Litmans or Dieners in response to these?

A No.

Q How about to Mr. Porter?

A No.

Q Was there -- did you not find any

documents?

A I did.

Q What did you do with those?

A Well, I had -- one, I'm not an employee of the firm; two, I have no ability to remove anything from the files, and I said to John I believe, John Porter, that if he wanted anything he'd have to work through counsel for KPMG.

Q Do you know if KPMG provided the Litmans, Dieners or Mr. Porter with any documents?

A Only what was subpoenaed, I believe.

Q Okay.

A I will qualify. In my communication to Mr. Porter when I told him that he would need to receive -- you know, request or work with KPMG counsel, I did indicate to him the essence of what was in those files.

Q And how did you describe the essence of those files?

A That there was a faxed copy of Form 8594, or forms I guess, from Mr. Diener, as well as a cover sheet on that fax indicating what they were, you know, the faxed documents.

And then I found a note regarding a valuation, but it was for a valuation prior to the

2000 return. It was a valuation that dealt with the original acquisition.

Q And what was it a valuation of?

A It was a valuation of built-in gains from the S corporation. That was not relevant. Now there were the valuations there of the valuation for the, what do you call it?

Q The stock?

A The stock of --

Q The earn-outs?

A The earn-outs.

Q Anything else you recall that was in the file?

A That was in the file, or that I communicated to John? I mean there's a lot of things in the files.

Q I understand.

A I'm just trying to narrow the point down.

Q You said --

A Those are the things -- sorry.

Q You said -- I think we were talking about your description to Mr. Porter of the essence of the documents, and I just wanted to ask if there was anything else you haven't told me about yet.

A No, I don't believe there was.

Q The valuation of the earn-outs that you recall, do you know who did that valuation?

A Yes.

Q Who was that?

A BVS.

Q And do you know when that was done?

A That was done at the same time that the transaction was taking place, I guess in February, I believe, of 2000. I believe that's the date.

Q Okay.

A February or March.

Q When you refer to the transaction, are you referring to the amendment of the Asset Purchase Agreement in February, 2000?

A I'm talking about the sale of the earn-out provisions in exchange for stock.

Q Okay. The valuation of the earn-outs, what sort of document was this in?

A A rather lengthy document.

Q Over a dozen pages?

A Well in excess of a dozen pages.

Q Okay. I'd like to -- I'm sorry, did you have something to add?

A I did, but it's actually, you know, going through to my head.

I also indicated to John Porter that the valuation had been reviewed, this was the earlier valuation, had been reviewed by a Ray Nicholson of KPMG Valuation Services.

Q And was he in the Miami --

A No, he was out of Atlanta, Georgia.

Q And he reviewed the BVS report?

A That's correct, the BVS report. Reviewed it for reasonableness that was prepared in accordance with standards of the industry, the valuation industry.

Q And when did Mr. Nicholson review this?

A Okay, I'm speaking now of the first valuation for the built-in gains, so that would have been in '99, I guess it was.

The other valuation which dealt with the earn-out provisions, Mr. Nicholson also looked at that. And I believe I indicated that to Mr. Porter.

Q So Mr. Nicholson also reviewed the valuation that was done in early 2000?

A Correct.

Q And what -- I think you said Mr. Nicholson was with KPMG's Valuation Group?

A Yes, in Atlanta, Georgia.

Q What did he do at the time that he

reviewed the 2000 report? What was his job with
KPMG?

A Okay, I don't know what he did, per se, or didn't do or whatever, but what I sent it to him for would have been since I am not a valuation expert, I sent it to him just to validate whether or not this was prepared in a reasonable way, that the methodologies used were accurate, that it met the standards of the industry. And he concurred that it did.

Q Did you view him as having any expertise in valuation matters?

A Yes, I did.

Q And why do you say that?

A Well one, he wouldn't be in that group if he didn't; two, this was standard procedures. I don't know how long he's been in that group, but anything that's done that requires an expertise has to be reviewed by someone who has that expertise before it can be relied upon, if it's prepared outside of the firm.

Q Did Mr. Nicholson give you a written response at all after he reviewed it, or was it just oral?

A Which?

Q I'm referring to the review of the valuation from 2000.

A Oral.

Q Do you recall what he said? Let me back up.

Did he give his oral response to you or somebody else?

A To me.

Q Do you recall what he said?

A The essence of or his words? I don't remember his words, but the essence of it would be that it was appropriate, that you know, I could rely on it. But his words, I don't recall.

Q Do you recall generally whether, even though he said it was appropriate, he thought it was too low, too high, or any other feelings he had about it?

A No, I don't recall.

Q Prior to sending him the 2000 valuation to look at, am I correct that you had sent him the one from 1999 as well?

A Correct.

Q Other than those two, had you sent him in connection with any other matters for any other clients, valuations?

A No.

Q So these two instances were the first time you sent him valuations to get his review of them?

A Correct.

Q Did you send any to him after these two instances?

A No.

Q I'd like to look back a bit and get a little bit more background.

Were you -- during your years that you were at KPMG, were you retained by the Dieners personally for any matters?

A No.

Q Did you -- did KPMG -- let me back up.

Do you know if KPMG, whether it was you or somebody else within KPMG, was retained by the Dieners for personal --

A No.

Q How about the Litmans? Do you know if KPMG was retained by them at all?

A I have no knowledge of that.

Q How about TMF, Inc.? When I say TMF, Inc., do you know what I'm referring to?

A Yes, I do.

Q Okay. And what's your understanding of

what that is?

A TMF, Inc. was the company, the S corporation, that originated the operations that became known as Hotels.com.

Q And that was owned by the Dieners and Litmans?

A Correct.

Q Was KPMG retained -- ever retained to perform work for TMF, Inc.?

A The only time and the first time that KPMG was retained was in this matter of the sale of the business of TMF.

Q Mr. Horan, I'd like to show you what's previously been marked as Exhibit 59, and we have them all in these binders, so if I could pass that over to you.

And obviously that's a tax return for 1999 for TMF, Inc. and you're welcome to page through any portions you'd like. It's a long document, obviously.

What I wanted to ask you in connection with my previous question about KPMG being retained by TMF, Inc., this indicates that KPMG prepared this tax return; do you see that?

A I see that.

Q Okay. Do you recognize the signature there that's in the line there, the preparer's signature?

A No.

Q Do you know if you assisted in any way in the preparation of this tax return?

A I would have.

Q You would have?

A Mm-hmm.

Q So you think you were involved with this?

A I would have been, yes.

Q Okay. Do you know who else was involved in preparing this from KPMG?

A Yes. I believe Nicholas Boyd was his name.

Q And you don't recognize that as Mr. Boyd's signature there?

A It could be, but I couldn't -- you know, if you show that signature to me absent a return, I wouldn't know whose it was.

Q KPMG had also been retained by TMF Trust during the time you were there, correct?

A Yes.

Q Okay. How about -- you understand that the sale of TMF, Inc. to USA Networks happened in

1999?

A Correct.

Q Okay.

A The assets.

Q The asset sales, right. Okay.

For purposes of today when we refer to the company that purchased the assets after the sale in 1999, and I'll refer to it as HRN or Hotels maybe; is that okay?

A That's fine.

Q And then for the company that was using the assets and operating that company before the sale in 1999, we'll refer to as TMF?

A Correct.

Q Okay. Do you know if KPMG was ever retained by HRN or Hotels after the sale in 1999 to perform any services for HRN?

A No, there was not.

Q Do you know a Brian Lidji?

A Brian Lidji is the counsel for TMF.

Q And did you speak with him back in the 2000 time frame in connection with the transaction?

A Yes.

Q Okay. Have you spoken to him since then?

A No.

Q So the last time you spoke with him was 2000, 2001 maybe?

A 2001.

Q Okay. Now you told me you were involved in the preparing of Exhibit 59, which is the 1999 tax return for TMF, Inc.

Could you turn to the page that's Bate stamped, and that's the numbers in the lower right-hand corner, LD1010, and I take it you recognize that as an IRS Form 8594?

A I do.

Q You mentioned that form earlier today.

A I did.

Q Okay. Just so we're all on the same page, can you tell me what your understanding of the purpose of this form is, and in particular in connection with this tax return?

A The purpose of this form, and this is a form that was prepared by the seller, is to allocate the purchase price between various classes of assets and that in fact the buyer and seller have agreed to this allocation.

Q And do you know in this instance with regard to this form that the seller, TMF, Inc., and USA, the buyer, agreed to this allocation?

A Do I know that to be a fact? I don't know that to be a fact.

Q Do you recall whether the forms filed by the buyer and seller were consistent to this case for 1999?

A I don't recall that.

Q This was obviously filed some time in 2000. It dealt with the 1999 tax year.

A Mm-hmm.

Q Do you recall, did you have and review the Asset Purchase Agreement from 1999 when you --

A I did.

Q -- when you helped prepare this return?

A Correct.

Q Okay.

MS. BESVINICK: Wait for him to finish the question.

BY MR. JOHNSON:

Q What was your practice in this time frame with regard to the preparation of tax returns? Would you prepare them and send them to the client for review and approval?

A Is that in respect to this return or overall?

Q I just wanted to ask about your practice

at the time, and this time frame, the year 2000, was it your practice in connection with any tax returns you helped prepare to send them to the client after preparation for their review and approval?

A That would be customary.

Q Okay. And do you recall that you did that in this instance with regard to Exhibit 59?

A I can't say specifically that. You said with respect to this exhibit.

Q Well --

A I'm sorry, I was looking at the 1010. Yes, I would have.

Q Okay.

A Do I remember as opposed to would have. You know, straight up to you, I can't recall, don't recall the -- and I really have to think back in my head, the circumstances or moments surrounding the sending off of that return and any subsequent dialogue about it. I just don't have the memory of it.

Q Okay. But you believe it would have been consistent with your practice at the time?

A That would be my customary, yes.

Q Okay. And do you recall who you were dealing with with regard to tax returns and

preparation back in the 2000 time frame with regard to TMF, Inc.?

A As a client, which is TMF, we had spoken to Bob Diener, Michelle Diener, Brian Lidji.

Q You mentioned the earn-outs earlier in relation to the Asset Purchase Agreement. What do you recall those earn-outs being? What's your recollection of what they were?

A Well, you had, if I recall, three pieces to this transaction. You had the existing earn-out up to the date of the transaction. You had future earn-out from the date of the transaction to the date they had contracted for an earn-out. Correct? And the third piece was the sale of warrants that they had. They owned stock warrants, if the company were to be part of an IPO. So those three pieces were part of that transaction.

Q And you mentioned earlier that there was a -- well, do you recall if there was an exchange of some of those earn-outs for the stock in 2000?

A Correct.

Q What's your understanding of what that exchange was? What was exchanged for what?

A I told you the three pieces. They received stock in the new IPO company in exchange

for three separate assets. The earn-out up through the date of the acquisition or the IPO, the earn-out from the subsequent to that date, that was originally contracted for, and thirdly, the stock warrants, they had conversion rights from the original transaction to acquire any stock. I believe it was ten percent. I don't recall exactly.

Q Okay.

A Any future IPO offering.

Q If you'd look again, I'm sorry, back at Exhibit 59, and again at LD1010 through LD1012, you told me your understanding of the purpose of this form. I wanted to ask you a particular about your understanding of the purpose of the third page, Part III of the form.

What's your understanding of the purpose of this part of this type of form?

A Well, other than what it says in the Part III Supplement Statement, I think I would want to look at some authorities about this again.

Q Do you understand that this part is to be used if a previous form needs to be added to or amended or if there is additional consideration paid?

A What the Supplement Statement says,

instructions it would say, if you're amending an original statement, so if the original statement was incorrect, or previously filed a Supplemental Statement because of an increase or decrease in consideration. And that's all it says.

Q Mr. Horan, can I ask you to turn to Exhibit 65? And you're welcome to page through that. That's a three page document. It was produced by KPMG in response to the subpoena in this case.

Have you had a chance to look at it?

A Yes.

Q Do you recognize this as a bill or invoice from KPMG to the Dieners?

A Yes. Is it to the Dieners? Yes, it is to the Dieners.

Q And is this a bill that you would have reviewed before it was sent out?

A Yes.

Q And the first page is dated November 29, 2001 and then there's a second page which appears to be a more detailed description of the activities in the billings; is that correct?

A That's correct.

Q And is it your understanding that that

second page backs up, so to speak, the billings on the first page?

A That's correct.

Q The third page is dated February 7, 2002. We didn't get the back-up detail for that.

A I'm sorry, the third page?

Q The third page of the exhibit.

A One two -- that's Exhibit KPMG 250?

Q Yes.

A Okay.

Q Now that's dated February 7, 2002.

A Correct.

Q So even those these are stapled together, that's a different bill?

A That is correct.

Q For a different time period?

A That is correct.

Q That third page, KPMG 250, the invoice indicates that it's for service rendered by you.

A Yes.

Q And so is this a bill that you would have reviewed and sent out as well?

A Yes.

Q The first bullet point in that February 7, 2002 bill states that there is research with respect

to IRS audit issue on the covenants not to compete.
Do you recall what covenants not to compete those were?

A Not specifically, no.

Q Did they relate to Mr. Litman and Mr. Diener?

A I don't -- really do not recall.

Q Do you recall there being an IRS audit with regard to a covenant not to compete issue?

A I don't recall the circumstances surrounding this, and this audit was not being conducted by or handled by KPMG. We had no involvement with the audit in relation to talking to an agent or --

Q Who was handling it?

A I believe the local accountants, which was Lisa Florentino and David Vinck.

Q Okay. The second bullet point indicates review of valuation report. Do you know what valuation report that was that you reviewed and billed for in February, 2002?

A Going from this billing, it would have to be the first valuation.

Q The valuation done in 1999?

A The one for the audit. This is when the

company's under audit. Maybe you can specify to me, which audit are we speaking of?

MS. BESVINICK: I just want to caution the witness. I want you to respond fully, completely and truthfully to counsel's questions, but if you don't understand a question, tell him you don't understand the question and he'll clarify it.

THE WITNESS: Could you clarify for me? Thank you very much.

MR. JOHNSON: I will clarify questions, but unfortunately I can't answer questions.

MS. BESVINICK: That's why he keeps looking at you when you ask him questions. He can't answer them. Seriously now, if you have a problem with a question, counsel will be happy to clarify it.

THE WITNESS: The problem I have with the question is, that I'm reading from an invoice that I believe dealt with an audit, an IRS audit for the year of the original sale and not for the year in which I believe you're looking at.

BY MR. JOHNSON:

Q The year of the original sale was 1999?

A Correct.

Q Okay. Now, going back to the first two pages of the exhibits, and that's the November 29, 2001 bill and back-up detail, was it the general practice of KPMG to issue bills like this monthly?

A Yes.

Q And did you -- how did you keep your time and bill in this time frame?

A How did I keep it?

Q How would you record your time and decide how to bill?

A Tell my secretary and she entered it in a log for me.

Q The first bullet point in this first page of Exhibit 65 states that there were various discussions and tax advice to Brian Lidji and Michelle Diener with respect to Form 8594 acquisition statement as a result of the sale of TMF, Inc.

Were these discussions concerning the need to file such a form for the year 2000 tax year?

A The need to file -- I'm sorry, I was reading this. The Form 8594?

Q Yes.

A Yes.

Q And the second page of the bill, the entry for you for September 24, 2001 states there were 'calls, - Michelle Diener, - Bob Diener, RE: Form 8594.'

What's your understanding of what that entry there means?

A My understanding of this would be in reference to the fax that Mr. Diener sent to me with various 8594 forms.

Q So is it fair to say that on September 24th and September 25th you were talking with the Dieners as well as Brian Lidji about draft Form 8594's and the contents of any such form and whether such a form should be filed?

A The draft forms, they were prepared by someone other than ourselves/myself, and I don't know who prepared those forms.

We discussed the essence of that fax which had three forms to it.

Q Okay. But is it fair to say that that was the gist of your discussions with the Dieners and Mr. Lidji on September 24th and 25th, and that is, you know, the contents of the draft Form 8594, whoever prepared it, and whether such a form should be filed?

MR. PORTER: Objection, vague.

BY MR. JOHNSON:

Q You can answer. He's making objections for the record, but you can answer.

A Well, you know, clearly there was differences within each of those forms. One represented the amounts that were reflected in the tax return of TMF for the year 2000, which was filed in April. One reflected amounts, I have to assume came from the buyer. And the third was a statement, if I recall correctly, saying we haven't agreed, can't file it or should wait. That's what I recall.

Q But part of the discussion was what figures to put in the Form 8594 that would be filed on behalf of the seller for the year 2000; is that correct?

A No, I don't believe so. I believe that what I indicated was the buyer and the seller have to agree on this allocation, that this is something counsel needs to insert himself in and you need to agree on these.

Also, the documentation, I mean you just don't choose numbers out of the air. You need to have the documentation. TMF had documentation for its allocation of the purchase price.

Q What documentation are you referring to?
A The Business Valuation Services' appraisal.
Q Now you said earlier in your answer that the parties needed to agree on the contents of these forms.
A Correct.
Q When you said they had to agree, what did they have to agree on in your understanding?
A The form for the buyer and the seller in essence should reflect the same information.
Q The same numbers?
A The same purchase price and the same allocation. So there's two pieces to this.
Q And what's your basis for saying that they had to agree or the forms had to be consistent?
A I believe that's what the Code Section and Regulations refer to.
Q And do you know -- do you recall if there was anything in the Asset Purchase Agreement between the parties that provided that they would agree on this purchase price and its allocation?
A Yes.
Q There was something in there?
A In the contract, the buy and sell

contract, yes. It clearly stated that the buyer and the seller must agree.

Q And you had that agreement to look at and review to come to that conclusion?

A Yes.

Q And did you convey that to Mr. Diener or Mrs. Diener?

A I believe I did. Now, I can't recall exact words, but I believe that's the essence. And what I am speaking of here today is the essence of the conversations.

Q Well, if that was your conclusion as a tax expert and they were looking to you for tax advice, is it fair to say that you would have given them your best advice?

A Yes.

Q Could you look at Exhibit 64. You mentioned earlier I think a fax that you received.

A Yes.

Q Is this a copy of the fax?

A Yes, it is.

Q And you got this from Bob Diener?

A That's correct.

Q And did you get this some time in September, 2001?

A I believe that would be the date.

Q Okay. And that -- this fax and its attachments are the things you were discussing that we looked at --

A That's correct.

Q -- for which you billed in the previous exhibit?

A That's correct. Excuse me for interrupting you.

MS. BESVINICK: Yeah, I just want to tell the witness that you should look through this because I note this is not the KPMG copy. So it's a different Bates number, so I just want to make sure that when you say this is what you looked at, that it's in fact what you looked at.

WITNESS: Excuse me. Thank you.

Well, this I certainly looked at.

MS. BESVINICK: I don't know if you have the KPMG.

MR. JOHNSON: We have a couple versions. They're a little different.

MS. LARSON: Exhibit 66 is the KPMG?

THE WITNESS: If I recall, I wrote something -- yes, here we go. Yes, I remember.

MS. BESVINICK: Do you want to look at Exhibit 66?

MR. JOHNSON: There's three of them actually. 66 and 64. They're a little different; that's why there's three.

MS. BESVINICK: And that's why when you asked him, 'Is this what you looked at,' I didn't want it to be misleading.

THE WITNESS: And what was 67? No.

MS. BESVINICK: The other was 64.

THE WITNESS: 64, 66 and what else?

MR. JOHNSON: Well, why don't we just stick with two at the moment.

THE WITNESS: Well, I recall having written a note on something.

MR. JOHNSON: Well, if you want to look at a third, we can. That's Exhibit 139, and why don't I give this to you.

THE WITNESS: That's what I remember.

MR. JOHNSON: Can I have that back a second?

MS. BESVINICK: Of course.

MR. JOHNSON: It's a little different. There's two of them there, that's why.

BY MR. JOHNSON:

Q Are you looking at Exhibit 66, Mr. Horan?

MS. BESVINICK: We have in front of us Exhibit 66 and Exhibit 139.

BY MR. JOHNSON:

Q Let me ask you about Exhibit 66, that first page. Do you recognize that handwriting?

A I believe that to be the handwriting of Madeline Fernandez.

Q And she worked at KPMG with you?

A That's correct.

Q And she worked on these matters related to TMF?

A That's correct.

Q Okay. And in fact she is the one who wrote those? Did she write the memo that you referenced earlier?

A That's correct.

Q Okay. And was she also involved in these discussions about the Form 8594, to your recollection?

A Involved with the -- and this is -- I'm asking for clarification. Involved with myself or with the client or with the buyer?

Q Did you discuss with her these issues related to Form 8594?

A Yes, most certainly.

Q Okay. And did she talk with Mr. Litman or Mr. Diener, do you know?

A No, I don't believe she would have. I don't believe she did.

Q Okay. But you were discussing these matters with her?

A Yes. And she again -- I can say that for certainty, yes.

Q I understand that this handwriting's not yours on Exhibit 66, but I wanted to ask you a question about it.

The last entry there says, 'Brian' --

A Lidji.

Q That's Brian Lidji as you understand it?

A Yes.

Q Okay. And then under that it says, 'Contract says TMF and HRN will be consistent.'

A Yes.

Q Do you recall, did Mr. Lidji tell you that the contract said that TMF and HRN had to be consistent with regard to the Form 8594?

A I don't believe I can answer you on that. I'm going back five years.

Q I understand.

A So please appreciate that.

Q I do.

A To a conversation. And I try to distinguish between what would have been, could have been and what I recall.

These are Madeline's notes, they're not my notes.

Q I understand it's a long time ago. I just want to know if you recall him saying that.

A I can't say that with certainty.

Q Okay. And I think you also have in front of you Exhibit 139, and you were looking for a copy that you had written some notes on, I guess. Is this -- you said you have your notes on this exhibit?

A I see that I faxed this to Brian Lidji and to Tom Avent.

Q Okay. So that's your handwriting?

A That's my handwriting.

Q And who is Tom Avent?

A Tom Avent is a tax partner in the office of KPMG in Atlanta and heads up the mergers and acquisitions group.

Q And why did you fax this to him?

A Since he really is in charge of the Sub C

practice, I would have sought his advice.

Q Do you recall any advice or any response that you received from him with regard to this matter?

A I do not.

Q Do you see your notes anywhere else?

A Yes.

Q There appears to be some handwriting on the third page.

A That is my writing.

Q And just for the record, could you read what you've written there?

A 'This is what would be our client's position,' and then I have some numerical writing, '147 less 91, 56 mil. 205 less 91, 114, divided it by two, 57.'

Q Sitting here now, do you know what those numbers represented?

A I would much prefer to sit down and look at that.

Q I understand it was a long time ago. You don't recall what those represented?

A Well, if you turn to the second document, I think it's a little clearer. The numbers are in their entirety.

Q Okay.

A And yes, I can tell you what the -- you know, there are difference. I was trying to reconcile the differences between the form that's shown as Exhibit 1 in here and what was shown as 2.

Q Getting to the numbering on the pages, were you referring to the 1 with a circle around it?

A Yes.

Q Okay. If you can turn back --

A The number 1 circled, yes.

Q Right. Getting back to the first page of the exhibit, you have the number 1 with a circle around it and next to that it says, 'proposed 8594"; do you see that?

A Yes.

Q Okay. And you understand that to correspond to the form that's included that's Bate stamped KPMG 237 and 238?

A Yes.

Q Okay. So this is -- it was your understanding at the time that this was a proposed Form 8594 being sent to you by Mr. Diener for the TMF Liquidating Trust?

A Yes.

Q Okay. And your handwritten note on the

second page of the form, Bate stamped KPMG 238, as you stated says, 'This would be our client's position.' So TMF Trust was KPMG's client at the time?

A Correct.

Q And Mr. Diener and Mrs. Diener were asking for your in-put or advice on filing this form; is that fair to say?

MR. PORTER: Objection, vague.

THE WITNESS: I don't know if they were asking whether they should file this statement or not. There were clear differences. And again, I don't know who produced these. But there were differences. And this is the first time that I see that there's a difference between the parties and how they viewed this transaction.

BY MR. JOHNSON:

Q The issue being discussed with the Dieners though was filing one of these forms for the year 2000?

A I think the issue that was being discussed was the conundrum that existed at this point.

Q And what was that conundrum?

A Again, the filing of -- first, TMF

Liquidating Trust had already filed its return. So now you're over at HRN who prepared these. I assume they prepared them. I don't know if they did that or not, but I assume they did. They're trying to prepare a return that would reflect amounts different, both in the amount of purchase price as well as allocation. No, they both allocated to the same class of assets, just that the purchase price was different.

Q So the allocation was not the issue. It was all going to class 4 or 5 for good will, right?

A Intangibles, yeah.

Q Okay. So the issue was not the allocation. The issue was the amount?

A Correct.

Q Okay. And this issue arose because of the issuance of the restricted stock in exchange for the earn-outs, correct?

A Correct.

Q Okay. And it was that exchange that led to the need to reflect this consideration in a new Form 8594?

A Well, repeat that, please, that led to the consideration?

Q The exchange in 2000 of earn-outs for the

restricted stock is what led to the need to file a Form 8594, because such a form needed to be filed to reflect the issuance of the stock; is that your understanding?

A That's what I knew they were doing. Whether or not a new form had to be filed or not, I'm not sure.

Q The Dieners were sending you a draft form --

A Yes.

Q -- to be filed?

A Well, to be filed by whom? By HRN, I know that. And as I said, the return for the Liquidating Trust had been -- well, hopefully had been submitted, but it was prepared back in April with no 8594.

Q You recall that specifically, that there was no form in it?

A I recall that.

Q Why do you recall that?

A I recalled that at a later date when this came up, because I even have a note in here asking did we file a new 8594. That is my handwriting.

Q Okay. And that's your handwriting on the page Bate stamped KPMG 240?

A That's correct.
Q Okay. And why did you raise that question, 'Did we file a new 8594"?
A Because I'm now in receipt of these forms.
Q Did you -- and I take it you found out that one had not been filed --
A That's correct.
Q -- with the TMF Trust return?
A Correct.
Q Did you come to a conclusion as to whether one should have been filed?
A I did not.
Q Why not?
A I don't know why not. You know, the question, did I look specifically -- can you ask me the question again?
Q Sure.
You said you didn't come to a conclusion that such a form should have been filed. Is that correct or do you want to clarify that?
A I'll clarify that.
I did not come to any conclusion.
Q Did you come to a conclusion as to whether such a form should be filed in the future for -- to amend the Trust return for the year 2000?

A I did not.
Q Okay. Did you give any advice to the Dieners at all or to Mr. Lidji about whether such a form should be filed?
A I don't recall if I did or did not. What I do recall -- well, was purely that they need -- you need to agree on these values together, buyer and seller have to.
Q And the purpose of agreeing is so that those agreed amounts can be reflected in the tax returns; isn't that --
A That's correct.
Q Okay. So the ultimate purpose of coming to agreement on the amounts is that so that then those agreed amounts can be reflected in the tax returns?
A Correct.
Q Okay.
(Phone ringing.)
(Off the record.)
BY MR. JOHNSON:
Q Mr. Horan, when you told -- was it Mr. Diener and Mrs. Diener who you told that there needed to be agreement on the valuation amount?
A It would have been, yes, Bob and Michelle.

Q And you said earlier that the ultimate point of this was then to report that amount in the tax returns, right?

A The two tax returns of the buyer and seller should reflect the same amounts.

Q Okay. With regard to the seller, based on your understanding of the transaction at the time, who would report that agreed amount? Would it be TMF Trust, TMF, Inc., the Litmans and Dieners, or do you have a recollection of how that shaped out?

A TMF, Inc. had been liquidated. So that was not in existence at the time. What was in existence was the Liquidated Trust. And it was a Form 1041 that was filed. In that form, that 1041, which I think you have as an exhibit, we reflected the amounts that coincided with the -- reflected in the appraisal, in the valuation report.

Q So it was the Trust that would report the --

A That's correct.

Q -- value of the restricted shares?

A Right. And then the K-1's would flow out to the individuals and whoever were the beneficiaries of the Trust.

Q So if a supplemental or amended Form 8594

needed to be filed for 2000, would that be filed by the Trust?

A Yes, if it needed to be.

Q Could you turn to Exhibit 60?

MS. BESVINICK: Would you like Exhibit 139 back?

MR. JOHNSON: Sure.

THE WITNESS: 60?

MR. JOHNSON: Yes.

BY MR. JOHNSON:

Q Do you recognize that as the TMF Liquidating Trust tax return for the year 2000?

A Yes.

Q And do you recognize -- is that Madeline Fernandez' signature?

A Yes, it is.

Q And did you participate in the preparation of this?

A Yes.

Q And do you recall if you reviewed it before it went out to Mr. Diener?

A Yes.

Q Could you turn to the last page of the return? See that Schedule D? Have you found that?

A This is Statement 3, Page 91, Schedule

Detail of Long Term Capital Gains and Losses?

Q Yes.

A Yes.

Q The entry there that says 'Sale of TMF, Inc. stock,' do you see that?

A Yes.

Q And over -- you go to the right of that, there's a gross sale price of 45 million --

A Yes.

Q -- 437,822?

A Correct.

Q Okay. Is this entry intended to reflect the valuation of the restricted stock; do you know?

A I would think so. This is what was acquired. They show the date acquired of 9/11/1991. Is that correct?

Q I'm wondering if that entry there that says 'sale of TMF, Inc. stock' is mis-described?

A It could be. Because what was sold here were warrants, the stock warrants in HRN. They received in the original -- now you know what, let's -- we're going to be guessing here, but you know, if that date, 1991, is that the date that they formed the original TMF?

MS. BESVINICK: He can't answer your

question.

THE WITNESS: Excuse me.

MS. BESVINICK: If you know the answer, you know the answer. If you don't know the answer, then the answer is 'I don't know.'

THE WITNESS: I don't know.

BY MR. JOHNSON:

Q The sale of TMF, Inc. was an asset sale?

A Correct.

Q And the 2000 exchange was an exchange of earn-out rights for the stock, correct?

A Yes.

Q Okay.

A But you know, when it was liquidated, when you liquidate a company, it's deemed to be a sale of the stock. So it's very possible that that's what that is.

Q Okay.

A Which would reflect the proceeds they received in the assets, and then a liquidation of the company.

Q Okay. When you were discussing with the Dieners and Mr. Lidji the fact that the Form 85 -- or the valuations needed to agree back in 2001, did you also discuss the issue of whether they didn't

agree on valuations, that this would be a red flag so to speak to the IRS and would lead to a possible audit?

A I can't recall that. I don't recall that.

Q Do you think that's probably true, nevertheless, that different valuations like this for this same asset could be a red flag and trigger an audit?

MR. PORTER: Object to form. Calls for speculation.

THE WITNESS: I could only speculate, as John says.

BY MR. JOHNSON:

Q Do you know if KPMG prepared the -- let me strike that.

How did you -- how was it left when you had these discussions with Mr. Diener and Mrs. Diener and Mr. Lidji about this issue of the valuation in the Form 8594? How was it left with them?

A It was left that they would contact the buyer and negotiate, and actually I've heard nothing since.

Q So you advised them they should come to agreement on the valuation?

A Correct.

Q Okay. Why don't you take a look again at Exhibit 139?

A Mm-hmm.

Q And look at the page that's Bate stamped KPMG 241. And again, you're free to look at the whole thing, and as we pointed out, these pages are numbered with circled numbers that seem to correspond to the front page.

What's your understanding of what this page is?

A My understanding of this page is kind of a putting the IRS on notice that the parties have not -- again, this is for the HRN return, and you know, I was not advising HRN, not speaking with HRN.

Q You understand this page we're looking at Bate stamped 241 to be the Form 8594 for HRN?

A That's what -- yeah, let's see what it says, '3, what HRN did file.' So it seems like it's an after the fact statement.

Q You weren't -- as you said, you weren't advising HRN, you hadn't been retained by them?

A Not at all.

Q You were advising Mr. Diener --

A Correct.

Q -- in his personal capacity or as Trustee --

A TMF, as Trustee of TMF, right. But again, this copy, cover sheet, indicates to me an action that had already transpired, which is what HRN did or had done.

Q You recall that Mr. Diener advised you that there was this disagreement regarding the valuation; HRN had a different value?

A Correct.

Q Okay. And do you recall whether the value HRN used was simply the IPO value of the stock, or had they discounted the value of the stock at all?

A What my recollection is and they put forth was that there was no discount applied to the consideration given in the transaction, although the consideration given in the transaction had multiple restrictions on it.

Q Did you discuss with Mr. Diener -- let me back up. Strike that.

Did you advise Mr. Diener that HRN should not file its 2000 return with that undiscounted valuation included, but instead should file a Form 8594 with those figures removed and with a notation like we see on Page 241, you're alerting the IRS, to