use your term, that you know, information is being gathered?

A Well, again, I'll go back and say this appears to be something that had already been filed. So I don't think I could tell them to file something now.

This would have been a position that again the officer or director or whoever was advising HRN would have advised them to. I honestly was not advising or had not advised HRN in any part of this transaction. I do think Mr. Diener was conflicted as an officer and also the seller. But I do not recall advising Mr. Diener to do anything other than to get together with the buyer and seller.

Q I understand it's five years ago. So you don't recall telling Mr. Diener that HRN should not file its tax return with the undiscounted stock valuation reflected in the Form 8594?

A I'll repeat. I could not advise Mr. Diener of what actions HRN should or should not -- they had their own advisors. I think they had, I believe it looked like it was Ernst and Young.

Q So you didn't advise Mr. Diener as to what HRN should do at all with regard to its tax return?

A No.

Q Okay.

MR. JOHNSON: Would you mark this as Exhibit 158?

(Whereupon, the above-referred to document was marked as Exhibit Number 158 for identification.)

BY MR. JOHNSON:

Q Mr. Horan, we've marked as Exhibit 158 a document that's Bate stamped KPMG 112 through 168.

You spoke earlier about some valuations you had seen and I wanted to ask you if this is one of them?

A Yes.

Q The cover letter to Mr. Diener is dated March 23, 2000. I didn't see in the production any cover letter to you.

Do you know about when you received this, or when you saw it?

A I can only say some time subsequent to his receipt.

Q And is that your writing on the top that says, 'Ray Nicholson'?

A That is, yes.

Q And is this the valuation you sent to Mr. Nicholson?

A Yes. Excuse me. If this cover letter and the attachment to it is -- were together, then it would be.

Q Did you ever speak with -- well, let me back up.

The report that's attached comes with a cover letter from Mr. Mitchell and the report appears to be drafted by Mr. Mitchell. Have you ever spoken with Mr. Mitchell?

A No.

Q Do you know who he is, other than what you see here?

A Just what I see there.

Q You told me that you sent this to Mr. Nicholson and that he responded to you. Do you recall the substance of any conversations you may have then had with Mr. Diener regarding this valuation?

A No.

Q How about with Mrs. Diener or Mr. Lidji?

A Substance of conversations; no, I don't.

Q How about with the Litmans?

A No, I never spoke with the Litmans until subsequent to this.

Q If you could turn to the last page, and

that's Bate stamped KPMG 168.
A Mm-hmm.
Q Do you recognize that?
A Yes.
Q Is this something you prepared?
A I did not prepare.
Q How do you recognize it? What do you recognize it as?
A I see that there's a user file again, that's addressed to Nicholas Boyd and that would have been the individual, the manager that was on this engagement prior to Madeline, so handled the very first transaction.
Q And Nicholas Boyd was in the tax department with you in Miami?
A Correct, yes. This means whoever had this had filed it under using his name, I believe.
Q Is this something that was prepared within KPMG; do you recall?
A I do not know.
Q Do you know --
A Excuse me. I can't say. I really can't. I would think not.
Q You said you recognized it. Why did you say that?

A Again, because of the reference to Nicholas Boyd, but I should back out and say -- back up my statement and say specifically if I recognize it, I will say no. I'm assuming that was part of the study, but specifically I can't tell you that I know for sure that this page was part of that study.

Q Did Nicholas Boyd or Mr. Nicholson do any calculations or prepare any sort of spreadsheet to -- or in connection with their review of the BVS report?

A I don't know if Mr. Nicholson ever did. I actually never met him. I've only spoken to him over the phone. So I don't really know what procedures he performed to become comfortable with the study.

Q Okay. How about Mr. Boyd, do you know if he did any calculations or prepared any spreadsheets?

A In relation to -- just to clarify. Nick Boyd certainly prepared many spreadsheets and many--

Q I'm sorry.

A Yeah, that's what I'm asking.

Q I'm talking about in connection with the valuation or KPMG's review.

A No.

Q Okay.

(Whereupon, the above-referred to document was marked as Exhibit Number 159 for identification.)

BY MR. JOHNSON:

Q Mr. Horan, we've marked as Exhibit 159 a document Bate stamped LD3586 through 3590. And you mentioned previously some -- a memo you had seen.

Do you recognize this document?

A Yes.

Q And what is it?

A This is the document I referred to earlier that summarizes really the items surrounding the 2000 TMF Liquidating Trust tax return, the issues that were existing at the time.

Q I also want to show you Exhibit 76. The first one we looked is dated April 3, 2001 and this one's dated April 6, 2001.

And I'll just tell you there are some slight differences. I don't want you to go through it and -- but do you recall which ones you saw, or did you see it all?

A I'm going to premise this by saying, you know, when you give me a date I don't know which -- I would have reviewed both.

Q So you recognize both of these as memos that Madeline Fernandez did with regard to TMF Trust for the year 2000 tax return?

A Correct.

Q Okay.

MS. BESVINICK: Counsel, what does the LD stand for?

MR. JOHNSON: Litman/Diener.

MS. BESVINICK: Okay.

MR. JOHNSON: They said these were produced by them.

MS. BESVINICK: Okay, thank you.

THE WITNESS: Can I ask for clarification?

BY MR. JOHNSON:

Q Possibly.

A You've given me two memoranda. You asked me if I'd seen -- they're in essence the same memoranda, but obviously there were some differences made in them. And you asked me if I had seen them before they were issued, before they were finalized. I don't know.

This really confuses me, because you have an exhibit coming from the Dieners and one coming from KPMG. So I cannot account why there's a

difference or why one went to the Dieners and one is in our file. I can only assume that it got cleaned up. But I cannot tell you then that I saw both.

Q Let me ask you some questions about Exhibit 76.

A Yes.

Q Which is the one produced by KPMG.

You'll see that the first section of the memorandum deals with the subject to installment sale and imputed interest.

A Correct.

Q In connection with the sale of TMF, Inc.'s assets.

A Correct.

Q Do you recall anything about that issue?

A Yes, I do.

Q What do you recall?

A Again, not reading this over again, but what I do recall is that, you know, with an installment sale there's obviously interest that needs to be calculated, and the fact that the -- and also the use of an installment sale requires a certain period of time to be in excess I believe of a year.

The contract was -- the second phase of

this, when the IPO came on board, it now required the payment of any outstanding notes, et cetera, and then the question came to be whether or not since it would be less than a year, whether or not you would have imputed interest or not.

And that's, you know, a quick recollection of this issue.

Q Okay. So is it correct --

A Six months, right, reading it now.

Q For any payments received a year after the original transaction, would it be appropriate that there be imputed interest on that payment?

A I would love to read this over to answer that question.

Q You don't recall how that was resolved in this?

A I believe, and again it's a belief, if it was in excess of a year you would have to have interest.

Q Okay.

A If it's less, you wouldn't.

Q The memorandum also deals with the issue of employee compensation to Andy Pells. Do you recall that being an issue?

A Oh, yes.

Q What do you recall about that?

A What I recall about Andy Pells, and I've not met Andy, was that he was a valued employee of TMF. He designed the ability to use the internet for the reservations, et cetera. And that part of his employment agreement was that he would share in proceeds from any disposition of TMF business. He then became an employee of HRN and continued the work of providing the technical aspects I guess of putting this on the internet, our reservation system on the internet.

And he was deemed to be valuable to the Trust as well, since if he did not perform well at TMF, he would diminish the worth and pay-outs I guess that were owed to TMF. So TMF continued to make payments to Andy. And he shared in the ultimate proceeds of the IPO.

Q And he received some stock; is that right?

A That's correct.

Q Do you recall there being a disagreement between the Trust or the Litmans and Dieners on one hand and the buyers, that being HRN or Hotels on the other, regarding whether there should be imputed interest calculated for any of the consideration in the sale?

A The only reference that I've even seen of HRN's difference was in that cover sheet that came in reference to the 8594.

Q And that was on --

A Point One of --

Q -- Exhibit 139?

A Let me look at that. We have multiple exhibits. Yes. I will read what he says. It says, 'HRN is considering payment and late payment interest as earn-out payment. TMF tax return of 2000 took the interest amount as ordinary. Do we want to revise and consider complete -- ordinary, complete payment ordinary?'

Q You referenced earlier that this is when you learned that there was a dispute or disagreement about imputed interest?

A That's correct.

Q What do you recall being the issue?

A Well, I never spoke to a person at HRN of this issue. And my only comment back to Mr. Diener on this point was, 'We would keep it as we filed it.'

So we -- it says, 'TMF took the interest amount as ordinary,' which is not capital gain, whatever piece of interest that fell outside of the

I guess imputed interest rule. I think we recalculated what portion of the proceeds would be interest and which wouldn't be.

And I take it that HRN was treating the entire payment as part of the -- you know, the note is a little confusing actually. 'HRN is considering payment and late payment interest.'

Oh, okay, well late payment interest, yes, we said clearly could not be other than interest. You know, it was beyond the -- it was not part of the payment for principal. It really was interest from a late payment.

Q The notation at 1-D it states, 'Is the increase class 4, 5.'

Did you understand the increase to refer to the receipt of the restricted stock and whether that should be allocated to Class 4 or 5?

MS. BESVINICK: The question is, do you remember what this refers to?

THE WITNESS: Yes. No, I don't know what it refers to.

BY MR. JOHNSON:

Q You mentioned that you sent down a valuation report from BVS to Mr. Nicholson.

A Yes.

Q Did you ever send down a report to him from a David Bohlmann?

A I don't recognize the name David Bohlmann.

Q You've never -- were never asked for KPMG to look at a report by a Mr. Bohlmann?

A I don't know that. Who is Mr. Bohlmann? Oh, you can't answer.

I don't recall who, or I don't know a David Bohlmann.

Q Did you ever -- did anybody ever tell you, the Litmans or the Dieners or Mr. Lidji, that there had been a second valuation done in addition to the one done by BVS?

A No.

Q You said earlier that -- well, we talked earlier about your discussions with the Dieners and Mr. Lidji in September of 2001 regarding the valuations and how that should be reported for tax purposes and trying to get both sides to agree.

And I think you said -- well, you said you advised them that they should try to get agreement and that the point of this was to ultimately put it on the -- report it in the tax return.

A Agreement, but substantiated with documentation.

Q Okay. And then I think you said that after that you didn't hear anything else about this; is that right?

A For the longest of time, and again I couldn't tell you what date, but just that the matter was an ongoing matter.

Q Did Mr. Diener or Mrs. Diener or Mr. Lidji ever get back to you and say, you know, 'We can't come to an agreement'?

A Just that it was an ongoing matter, which would lead me to believe that they haven't come to an agreement.

Q Did anybody ever come back to you or anybody else at KPMG to ask that you assist in preparing a Form 8594 for the year 2000?

A No.

Q Do you know if one was ever filed for the Trust for the year 2000?

A I don't believe there was one filed.

Q When you advised the Dieners that they should work with the buyers, HRN, to try to come to an agreement with documentation regarding the valuation, did you also tell them that 'Once that's done let me know and we'll complete a Form 8594"?

A I don't believe I told them that.

Q Why not?

A I would have -- had they completed one and agreed to one, I think at that juncture I would have suggested, or not suggested, I would have advised that we now file that together.

So I mean in some ways it's understood that that's what the situation would be, the procedure would have been.

Q So it was understood that the procedure --

A 'You're dead in the water right now. I mean you guys can't agree. Once you agree then we can take action or do what we have to do to get to -- to reflect both amounts, you know, both sides of the transaction.'

Q Just so we're clear. So the understood procedure was, once agreement is reached, we should then complete the forms with consistent amounts and file them?

A That's correct. We would have to reflect through an amended return. Not just the form. If there's differences between the form and the -- which would reflect the difference in the gain, you would have to reflect that in an amended return, absolutely.

Q And you discussed this procedure going

forward with the Dieners?

A I don't know if I did or didn't. That would be the normal outcome, I would think, of once you agree upon the valuation on both sides.

Q Okay. That's all I have, Mr. Horan. Thank you.

A You're welcome. Thank you.

MS. LARSON: Do you want to go ahead?

MR. PORTER: Go ahead.

MS. LARSON: You don't want to, do you?

MR. PORTER: I want to hear what you ask first.

MS. BESVINICK: I'm sorry, can you clarify who you represent?

MS. LARSON: For the record, my name is Kari Larson. I'm with Latham & Watkins and I represent Hotels.com.

MS. BESVINICK: Are they a party in this?

MS. LARSON: Yes.

MR. JOHNSON: They're consolidated cases.

CROSS-EXAMINATION

BY MS. LARSON:

Q Mr. Horan, first, could you turn back to Exhibit 139, and could you turn to the last page of the exhibit, KPMG 242?

A Yes.
Q Are you familiar with this page of the document?
A Yes.
Q And did you create this page of the document?
A No.
Q Do you know who did?
A Yes.
Q Who?
A Michelle Diener sent it to me.
Q Do you recall discussing anything about this page with Michelle Diener?
A I would have -- well, do I recall discussing -- what I recall discussing with her is just how to read this form, how to read the spreadsheet.
Q And do you recall discussing anything related to the left most column under 'per contract date' beginning with 3/1/01?
MS. BESVINICK: I'm sorry, what was the question?
BY MS. LARSON:
Q Let me rephrase this.
What was your understanding of what those

dates represented?

A The date the restrictions would lapse.

Q And where did you obtain that understanding?

A From the terms of the agreement, the contract.

Q Did you discuss that provision within the contract with the Dieners?

A I don't recall.

Q Did any conversations inform your understanding about the date the restrictions lapsed?

A Can you rephrase that, please?

Q Was your understanding regarding the dates on which the restrictions were to lapse informed by any conversations with anyone at the time?

For example, did you discuss the restrictions lapsing with Brian Lidji, with the Dieners, with anyone else?

A I would -- well, first of all, I would have discussed it with the person preparing the return within KPMG. As far as the Dieners and Brian Lidji and the like, I have no recollection.

Q Okay.

A When you say -- again, can you clarify

what you mean by discuss?

Q Did you have a conversation about when the restrictions on the stock were to lift, the actual date?

A No. I think it was evident in the contract.

Q Okay. And at the point you received Exhibit 139, was it your understanding that the Dieners had already obtained a valuation of the shares, of the restricted shares?

A Yes. The valuation by BVS.

Q And did you play any part in the process whereby they came to have the shares valued?

A No.

Q Do you know how the Dieners selected BVS to perform the valuation?

A No idea.

Q You mentioned earlier in response to a question by Mr. Johnson that it was your belief or view that Mr. Diener was conflicted related to the issue of the 8594 Form.

A Yes.

Q Did you inform Mr. Diener of that view?

A I believe I did.

Q And do you recall what he said in

response?

A No.

Q Apart from simply telling him you believe he was conflicted on it, did you say anything else in the context of that communication?

A Just that he needed to get counsel together.

Q Do you recall any later discussions related to the conflict issue?

A No.

Q And again in response to a question from Mr. Johnson related to the disagreement between the buyer and the seller on the 8594 Forms, you said until the parties agree, quote, 'You're dead in the water.'

When you said, 'You're dead in the water' --

A No.

MS. BESVINICK: Let her finish the question.

BY MS. LARSON:

Q What did you mean when you said, 'You're dead in the water'?

A I didn't say 'You are dead in the water.' You can't move, you can't continue to take contrary

positions in this transaction and still file something else. It was in response to a question by Mr. Johnson about filing another 8594. You can't file another 85 -- or file any 8594 until you agree.

Q So --

A So this -- no one person was dead in the water. The ability to act was stymied, was frustrated. That's what's meant by dead in the water. It was frustrated. No action could be taken until you resolved that issue.

Q Could you turn to Exhibit 63 in the binders?

MS. BESVINICK: What's HC, by the way?

MS. LARSON: Hotels.com.

MS. BESVINICK: Thank you. That means this was produced by them.

THE WITNESS: Okay, I've read it now.

BY MS. LARSON:

Q Have you seen this document before?

A No, I have not.

Q I'd like to draw your attention to the last sentence in the first paragraph.

A Yes.

Q And it says, 'We are therefore filing the HRN return since it must be filed today with, quote,

'to be determined,' end quote, on Form 8594 per the advice of KPMG.'

And the question is, is this sentence consistent with your recollection of the advice you gave to the Dieners related to the Form 8594?

A Not entirely, no.

Q And in what way is it inconsistent?

A I think the -- again, if I recall, this is the 24th of September and I would have thought the return would have been filed on the 15th of September. So it's a little inconsistent there to me.

But I would have said to Bob, again, certainly not in his capacity as an officer and director of Hotel HRN, but to be determined as a plausible sentence to say, basically indicating that you have not completed whatever work you need to complete. But I don't think I would have -- and I'm saying would have, because now being that -- I don't have the exact words what I recall, but again, I did not advise him what to do in his capacity as an officer of HRN.

If you asked -- again, you know, I'm trying to answer your question specifically. So that's how it would have differed.

Q Apart from his role as an officer with HRN, is it fair to say you advised him that in general putting the words 'to be determined' on Form 8594 is not implausible?

(Phone ringing.)

(Off the record.)

BY MS. LARSON:

Q Do you need me to repeat the question?

A Yes, please.

Q Would it be fair to say that -- well, strike that.

Did you advise him at this -- during this time period anything related to the plausibility or implausibility of using the phrase 'to be determined' on a Form 8594?

A That's plausible. I don't mean to be facetious. But again, I want to reiterate to you that I could only speak to Bob in respect to TMF.

Now whether this was an action that he would choose, I would say clearly the valuation that was reflected no discount, I would have told him I can't agree with that at all.

TMF had already filed its return in April without the 8594. Whether that was correct or incorrect, I'm not saying right now.

But to tell him not to -- or to go ahead and file the 8594 on behalf of HRN or sign that return, with the third option, again I can't tell you with absolute certainty whether or not I would have, you know, condoned that as a choice. I realize he says that I advised there, or that KPMG advised 'to be determined.' I cannot tell you that with absolute certainty.

Q In light of your recognition of the conflict in which Mr. Diener was in, would you say it was more likely than not one way or the other what you advised him related to whether it was permissible or plausible or implausible to use the phrase 'to be determined' on that 8594?

MS. BESVINICK: Objection. I don't understand that question at all.

MR. PORTER: Same objection. Vague and calls for speculation.

BY MS. LARSON:

Q Did you not understand the question?

A You're asking me to guess about something, and I would say I can't guess. I mean I can't. I'm trying to answer you factually.

MS. LARSON: I'm going to pass the witness.

MR. PORTER: Mr. Horan, do you want to take a break right now?

THE WITNESS: I do have a question for my counsel.

MS. BESVINICK: Why don't we take a break?

(Off the record.)

MR. PORTER: Are you ready, Mr. Horan?

THE WITNESS: I am, John.

CROSS-EXAMINATION

BY MR. PORTER:

Q I'm John Porter. I represent Robert and Michelle Diener and David and Malia Litman. I just have a few questions for you.

Early in your discussion with Mr. Johnson he asked -- you spoke of a valuation that you had reviewed of earn-outs. Do you recall that, one prepared by BVS?

A Yes.

Q Would you look at Exhibit Number 158?

A 158?

Q Yes. Is that the valuation you're referring to?

A Yes.

Q In this case, basically what that is is a

valuation of the stock that was received by the TMF Liquidating Trust and not the earn-out rights. Does that refresh your recollection that what you were actually referring to was a valuation of the stock received by TMF Liquidating Trust and not the earn-out rights themselves that were exchanged?

A Correct.

MR. JOHNSON: Objection, leading.

THE WITNESS: Well, that's correct. It is -- this was the restricted stock that was received.

BY MR. PORTER:

Q Do you ever recall seeing someone do a valuation of the estimated present value of the earn-out rights that the TMF Liquidating Trust might have received under the terms of the original contract had it not been amended?

A Repeat please?

Q Sure.

Do you ever recall having received -- or having reviewed a valuation of the estimated earn-out rights that might have been received under the original Asset Purchase Agreement between TMF, Inc. and USA Networks?

A I don't recall, John.

Q Could you look at Exhibit Number 76, please?

MS. BESVINICK: We don't have Exhibit 76.

MR. PORTER: You don't?

MS. BESVINICK: 76?

MR. PORTER: Yeah.

MS. BESVINICK: No. This goes to 69.

BY MR. PORTER:

Q Do you have 76 in front of you?

A I do.

Q Mr. Horan, the portion of Exhibit 76 which is labeled at the bottom KPMG 00243 through 247 is the five page memorandum from Madeline Fernandez dated April 6, 2001 that I believe you were discussing with Mr. Johnson?

A Correct. Not April 3rd, which was another exhibit of the same memorandum.

Q Does this document come from the files of KPMG?

A Yes.

Q And is this document retained in the files of KPMG?

A Yes.

Q Was this memorandum prepared at or near April 6, 2001?

A Yes.

Q And is it a regular part of KPMG's practice to prepare a memorandum of this nature to document its observations and conclusions with respect to the tax return work that KPMG has been performing?

A Yes.

Q Let me ask you to turn to Page 3, and I am at the bottom paragraph that begins with the language, '100 percent of the stock received by the sellers.' It's says, '100 percent of the stock received by the sellers (both the 10 percent pre-IPO stock and the earn-out exchange shares) was valued by an independent third party.'

It goes on to say, 'The valuation was reviewed by the KPMG valuation group in Atlanta purely for reasonable and concurred that proper valuation methods were used.'

Did you convey to Bob and Michelle Diener the conclusions of the KPMG valuation group in Atlanta with respect to their review of the valuation?

A Yes.

Q The next sentence goes on to say, 'While KPMG concurred as to the methods used and the