HOTELS.COM DEPOSITION DESIGNATION
EXHIBIT 5

# TRANSCRIPT OF PROCEEDINGS

DAVID S. and MALIA A.
LITMAN,
Plaintiffs, NO. 05-956T
vs.
THE UNITED STATES OF AMERICA,
Defendant.

ROBERT B. and MICHELLE S.
DIENER,
Plaintiffs, NO. 05-971T
vs.
THE UNITED STATES OF AMERICA,
Defendants.

HOTELS.COM, INC. and Subsidiaries
f/k/a HOTEL RESERVATIONS NETWORK,
INC.,
Plaintiffs, NO. 06-285T
vs.
THE UNITED STATES OF AMERICA,
Defendant.

Deposition of David J. Bohlmann

Pages: 1 through 122

Place: Miami, Florida

Date: July 24, 2006

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

UNITED STATES COURT OF FEDERAL CLAIMS

DAVID S. and MALIA A. LITMAN,
Plaintiffs, NO. 05-956T
vs.
THE UNITED STATES OF AMERICA,
Defendant.

---

ROBERT B. and MICHELLE S. DIENER,
Plaintiffs, NO. 05-971T
vs.
THE UNITED STATES OF AMERICA,
Defendants.

---

HOTELS.COM, INC. and Subsidiaries f/k/a HOTEL RESERVATIONS NETWORK, INC.,
Plaintiffs, NO. 06-285T
vs.
THE UNITED STATES OF AMERICA,
Defendant.

---

Deposition of:

DAVID J. BOHLMANN,

taken at the instance of the Agency for the purposes of discovery and for use as evidence in the above-entitled cause, was taken before me, CLAUDETTE FROST, Court Reporter/Notary Public in and for the State of Florida at Large, at Mellon Financial Center, 1111 Brickell Avenue, 19th Floor Conference Room, Miami, Florida, on Monday, July 24, 2006 commencing at 1:00 p.m..

APPEARANCES:

On behalf of the Plaintiffs, Litman & Diener

JOHN W. PORTER, ESQUIRE
Baker Botts, LLP
One Shell Plaza
910 Louisiana
Houston, Texas 77002-4995
(713) 229-1597

On behalf of the Plaintiff, Hotels.Com, Inc.

KARI M. LARSON, ESQUIRE
Latham & Watkins, LLP
555 Eleventh Street, N.W.
Suite 1000
Washington, D.C. 20004-1304
(202) 637-2200

On behalf of the Department of Justice

CORY A. JOHNSON, ESQUIRE
P.O. Box 26
Ben Franklin Station
Washington, D.C. 20044
(202_ 307-3046

On behalf of the Witness

DAVID J. BOHLMANN, Pro Se
3529 St. Gaudens Road
Miami, Florida 33133
(305) 569-9339

# I N D E X


| WITNESS: | PAGE |
|---|---|
| David J. Bohlmann | |
| Direct Examination by Mr. Johnson | 4 |
| Cross-Examination by Ms. Larson | 87 |
| Cross-Examination by Mr. Porter | 97 |
| Redirect Examination by Mr. Johnson | 102 |
| Recross-Examination by Ms. Larson | 116 |
| Recross-Examination by Mr. Porter | 118 |


## EXHIBITS FOR IDENTIFICATION


| EXHIBIT NO. | PAGE |
|---|---|
| Exhibit No. 162 | 42 |
| Exhibit No. 163 | 52 |
| Exhibit No. 164 | 92 |
| Exhibit No. 165 | 103 |
| Exhibit No. 166 | 103 |
| Exhibit No. 167 | 103 |
| Exhibit No. 168 | 110 |
| Exhibit No. 169 | 112 |
| Exhibit No. 170 | 113 |
| Exhibit No. 171 | 114 |
| Exhibit No. 172 | 115 |

| | |
|---|---|
| CERTIFICATE OF REPORTER | 120 |
| ERRATA SHEET: | 122 |
| SIGNATURE PAGE | 123 |

P-R-O-C-E-E-D-I-N-G-S

(1:00 p.m.)

WHEREUPON:

DAVID J. BOHLMANN

was called as a witness herein and, after having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. JOHNSON:

Q Good afternoon, Mr. Bohlmann.

A Hi.

Q My name is Cory Johnson. I'm with the Department of Justice and I represent the United States in this case, who is the Defendant.

Could you state your full name and your address for the record?

A David J. Bohlmann, 3529 St. Gaudens Road, Miami, 33133.

Q And is that your residence?

A Yes, and my office.

Q You have a home office there?

A Yes.

Q Are you employed anywhere else at the moment?

A No.

Q Are you self-employed?

A Yes. I have a corporation.

Q And what's the name of the corporation?

A DJ Bohlmann, Inc.

Q And what is the business of that corporation?

A Appraisals. Consulting and appraisals. Basically appraisals. Business valuation really.

Q And how long has that corporation been in existence?

A '84/'84.

Q And has it been in the appraisal and consultant business since then?

A Yeah.

Q Are there any other employees, other than yourself?

A My wife. My wife is an appellate attorney currently not working. She quit when she was ahead. She went to Supreme Court.

Q And won?

A She wrote nineteen briefs and won nineteen.

Q Well, you're ahead when you can say that I guess.

A Yeah.

Q Have you ever had your deposition taken?
A For appraisal work, no.
Q Okay. Otherwise?
A Once, 1980, '79, something like that, on a completely different matter, in a civil suit.
Q Were you a party or just a witness?
A Witness.
Q Okay. Well, I'm going to be asking you a series of questions and the other attorneys may do so as well.
One of the rules to remember, for both of us, is try not to talk over each other for the benefit of the court reporter.
A Right.
Q And you'll need to give verbal responses so the microphones can pick it up and the court reporter can understand what your response is.
A Okay.
Q If you want to take a break at any time, let me know.
A I have a cold so I may require a break if I start coughing.
Q Okay. Well, that's fine. By the way, there's drinks over there if you want something.
A Yeah, I'll get some water.

Q Okay. And we appreciate your coming in this afternoon, Mr. Bohlmann. You agreed to come in for your deposition.

Are you being compensated in any way for your time here today?

A I expect to bill Baker Botts for my time.

Q Okay.

A I haven't done so yet.

Q Okay. Have you billed Baker Botts or the Litmans and Dieners within the last year or two?

A Earlier this year when I made copies of the entire file and sent it to Baker Botts. I did bill them for the cost and my time. 500 bucks or something like that.

Q And how much do you bill per hour?

A 250.

MR. JOHNSON: John, do you know if that's -- did you produce that file to us then?

MR. PORTER: Yes. You had requested in your initial document request all documents reviewed or relied on by Mr. Bohlmann in preparing his report, and we did. My recollection is that's in the production Bates labels LD00336 through 3460.

MR. JOHNSON: So everything you got you

sent on?

MR. PORTER: Yes.

BY MR. JOHNSON:

Q Were there any parts of the file relating to the valuation of the HRN stock that you didn't give to Mr. Porter?

A Yes, the prospectus. You know, I know you wanted to get copies, and I just gave you the cover. It was 140 pages. No sense copying the whole thing.

MR. PORTER: Cory, let me make sure that the record's clear. Within that Bates range was not Mr. Bohlmann's report itself. It was produced in another part of that production to you. But these are the documents that were responsive to that.

So if you add the report to the documents I just referenced, that is what we received.

MR. JOHNSON: Okay.

BY MR. JOHNSON:

Q Could you take a look at Exhibit 75? It should be in one of those binders. For some reason she didn't give us tabs. I think I might have put a sticky on it.

A Yeah, that's the cover page.

Q Okay. You referenced that when you gave

documents to Mr. Porter, you didn't copy the entire prospectus?

A That's right.

Q Is this what you copied?

A Yeah, just the cover page.

Q So is that -- the handwriting at the bottom, is that your handwriting?

A No, that's not -- yeah, that's mine.

Q It says 'balance of documents not copied'?

A Yeah. And the writing up here is also mine.

Q Okay. So did you -- in your file you had a copy of the entire prospectus?

A Yes.

Q Okay. The handwriting on the middle of that page of Exhibit 75, do you know when you wrote that?

A Probably when I was reviewing the document. There's a -- probably a stickem. It's in here some place. Yeah, a yellow stickem. So I had written that at the time I was reviewing, doing the work on the report.

Q So that would have been back in the year 2000?

A Yeah.

Q Okay.

A (Coughing.) That teaches me to go on vacation. I got a cold.

Q Mr. Bohlmann, could you describe for me briefly your work history after finishing your education?

A I was a computer assistant analyst at Abbott Laboratories, North Chicago, Illinois. I was there five years. Then I became a manager and consultant with Peat Marwick Mitchell. It's KPMG now. And basically doing a lot of analysis in related computer systems.

Then I was Controller of Anchor Coupling Company. That was a small manufacturer of hydraulic assemblies. Then I was Chief Financial Officer of HCA Food Corporation. In those days that was about $50 million sales. They're now probably 500.

And then I went to GAC Corporation.

Q I'm sorry, what corporation?

A GAC Corporation. Used to be called General Acceptance Corporation, a loan company, a major loan company, that was in a very active acquisition program. And so I was involved in acquisitions for about six years, seven years there. And at that time we bought the Consolidated Water

Company, which is a public company. I was an officer and director in that company for about two years while we were integrating into our own operation that I -- then GAC went down the hill. Actually, the went into bankruptcy. And I went to Ryder Systems, the big truck leasing company. And I was there, again in acquisitions. And when they fired Jim Ryder, I worked directly for Jim, so I went too.

At that point I said I'll never work for anybody again.

Q And when was this, what year?

A About 1980.

Q So then what did you do in 1980?

A I hooked up with my partner in the acquisition -- in the appraisal business, but it was slow to get started. And so I formed a couple of small manufacturing companies. And kept them for about five or six years, and sold at a very nice profit.

The appraisal business became much more possible, and so then I've been an appraiser since then.

Q When did -- did you start doing appraisal work full-time at some point?

A Yeah, about '85.
Q And was that -- when I say full-time, was that --
A My primary source of income, yes.
Q Okay. And did you have a partner at that point?
A Yes, I did.
Q And who is that?
A His name was Walter Strathman.
Q And was it just the two of you?
A Yes.
Q And was he an appraiser as well?
A Yes.
Q Did you undertake any education or training in order to get into the appraisal business back in the 1980's?
A Yes. I had to take courses, which I did, like five or six of them. And then you had to have a sample report, which had to be reviewed. You had to take an exam, which I passed. And my report was approved. And I'm designated as a certified business appraiser by the Institute of Business Appraisal. And they are larger than the business valuation section of ASA. There are more appraisers in there. It's a very professional organization.

Q I'm sorry. It's the Institute of Business?

A Appraisers.

Q Appraisers. And is that a private organization?

A It's a non-profit.

Q And you said you became certified as a certified business appraiser?

A Yes.

Q And when did that happen?

A About '85.

Q Okay. And are you still a certified business appraiser?

A Yes.

Q And have been since '85?

A Yeah.

Q You said you had to take an exam. Who administered that exam?

A The Institute of Business Appraisers. It took about five hours.

Q How many certified business appraisers are there that have been certified by the Institute of Business Appraisers?

A I don't know for sure. Probably about 2000, maybe 3000. The group is larger because

there's a lot of people coming in and they have to get the education and take the exam and this kind of stuff. So I know for sure there's at least 2000 CBA's.

Q And is there anything you have to do every year or at some period to remain a CBA?

A Yes. You have to have continuing education. You have to have twenty hours every two years, which I take courses. There's a complete description of the requirements for all of these certifications in Shannon Pratt's books.

Q Now as a certified business appraiser, do you have any special expertise?

A I primarily concentrate on estate planning matters. I do not take divorces. I would say 95 percent of my work is estate planning in one form or another.

Q And was that true back in the 2000/2001 time period?

A Yeah.

Q And what sort of work do you do in connection with estate planning?

A Well, in most cases consist of family run partnerships or liquidating trusts in this particular case, LLC's, which are now current,

that's the current in thing. And the basic thing is that the rich people put their assets in and then gift it to the kids. And of course, that's where the appraisal comes in.

Number one, what's the value of the assets they put in, and number two, what's the value of the gifts they give? And that's my basic field.

And I said before, I have never been in court and I have never been deposed before.

Q In terms of assets or things that might be valued or appraised, do you have a specialty or not?

A No. You can see on that one document I gave you that -- the various fields that I have done. Manufacturing '54. Investment real estate and investment securities, those basically are family run partnerships, specializing in one or the other. And that's 147 on here. I'll bet that's more like 225 or 30 by now.

Q Now in talking about the Institute of Business Appraisers, you also mentioned another organization. What was that?

A ASA, American Society of Appraisers, and they have multiple fields of expertise and they have a business valuation specialty, which is very similar to the requirements from IBA also.

Q And you're not a member of ASA?

A No. Why pay double fees?

Q Does the Institute of Business Appraisers publish any standards or principals or guides that are supposed to be used in your work?

A Yes. They follow the same requirements that are -- I can't remember the name of the group. There is an ethical standard, business standard and things you must do and must not do. And IBA and ASA and those CPA groups, they all have these professional standards which you must follow. If you don't, you're out.

Q And IBA has these principals?

A Yes.

Q Okay. Do you have any other certifications or designations or licenses other than the CBA?

A No.

Q Could you describe for me briefly your education after high school?

A I have an under-graduate degree in Economics with minors in Philosophy, French and Chemistry. And then I have an MBA from the University of Chicago with a concentration in finance.

Q Did you take any courses in valuations at the University of Chicago?

A No. Back then valuations wasn't even heard of. I graduated with a Master's Degree in '59.

Q Were you retained by Mr. Diener to value some stock in HRN or Hotels Reservations Network?

A Yes.

Q Okay. And do you recall when that was?

A It's in the file.

Q Do you recall it was generally the year 2000?

A Actually, I think it started in '99.

Q Okay. I was just looking for a general date.

A In 2000.

Q Okay.

A I have an engagement letter in here some place.

Q And that was some restricted stock, correct?

A Yes. It was the stock that was going to be in play under the IPO and the extra stock that was granted, 9,999,900.

Q Ten million shares, roughly. The roughly

ten million shares, is that what you were going to value?

A Yes.

Q Okay. And were those restricted shares?

A Yes, they were.

Q Okay. But the company was also doing an IPO of unrestricted shares?

A Yes.

Q Okay. Prior to this engagement regarding the HRN shares, restricted shares, had you ever valued or appraised restricted stock of a publicly traded company?

A Yes. I looked through the reports that I have written since '95. I did it way back into ancient history. In '95 I did restricted stock of a finance company listed on the -- just over the counter, but it was reasonably traded. And this particular group owned over 50 percent of the stock.

In '97 --

Q Can I stop you there and ask you what the name of the finance company was?

A It's confidential really. I can't tell you the name of clients. The company was PMC.

Q PMC?

A PMC. They're still existing.

Q Okay. Any others?
A In '97 I did a bank, stock in a bank. It was about 30 block for an estate, again restricted.
Q And what was the name of the bank?
A What?
Q What was the name of the bank?
A I didn't write it down. It was a bank here in South Florida that was on the pink sheets.
Q What do you mean by 'the pink sheets'?
A You know, they don't trade enough to get into NASDAQ or anything like that.
Q Okay.
A And in '97 I did a fiber optic company, which was a very bad situation. They had come to the United States. These were Dutch investors. They had come to the United States and started buying up these companies that were laying fiber optic cables. They bought over 50 of them. And they give them half cash and half convertible notes, subordinated convertible notes. And then they got in trouble and they pushed them all down from convertible notes to preferred stock. And at that point they asked me to value that preferred stock.
Q Was it restricted in any way?
A It was restricted completely.

Q In what way?

A By contract.

Q What were the restrictions? What couldn't you do?

A You just couldn't flat sell it. The notes were not restricted. The original subordinated notes were registered. Okay, but then the preferred wasn't. And then six months later they converted all those preferred stocks to common and the people lost everything, literally. And it was a deliberate ploy. It was a horrible situation. They got one cent out of every $100.00 worth of notes.

Anything since then I've done -- I just completed a report last week for NYX, New York Stock Exchange, for one of the seat holders, you know. Are you familiar with that?

Q The New York Stock Exchange went public?

A Yes. One of the seat holders took his shares and shoved them into a family run partnership. And it's one of 1600, so I'm not revealing any information.

Q But that was after the --

A Yeah, that was after 2000.

Q After 2000, okay. Well, let me stop you there before we go on.

Prior to being engaged by Mr. Diener, had you ever been designated or identified as an expert for purposes of a trial or a legal proceeding?

A No.

Q Have you since then?

A No. I didn't want to get involved in litigation support. You make a lot of money, but it's not worth the headaches.

Q Do you know how it came about that you were engaged by Mr. Diener?

A Yes. I had done a great deal of work over the years with Greenberg Traurig. They are a national law firm. Their office is right close here. They've got 1000 attorneys. I did a lot of work for their wealth management department.

And a gentleman by the name of Jerry Hesch, Jerry is an adjunct professor at the University of Miami and he still teaches, but he is Greenberg Traurig's local estate planning tax genius. He doesn't have any clients of his own. He just gets called in from all over the country to, you know, help plan things. And I get all the goodies. The ones that are really tough they give me. The simple ones, you know, simple family partnerships, I don't see those but they usually go

to the CPA firm, you know, that's handling it. But I get all the headaches.

And Jerry recommended me to Diener.

Q Now in your valuation work, have you ever been retained by the Internal Revenue Service?

A Yes.

Q Had you been retained by them prior to being retained by Mr. Diener?

A Yes.

Q What have you done for the IRS?

A We did the same unit twice over a period of about three years, Walter and I, my partner and I. A complicated arrangement. But at that point after doing it twice, we just said, 'You know, the IRS never pays us. They give us a tremendous amount of grief. It's just not worth the trouble.' And we just told the local office, you know, 'Go get somebody else.'

Q You said you did the same unit twice. What did you mean by that?

A It was a situation where -- is it Fuddruckers? Have you ever heard of Fuddruckers Restaurants, the hamburger joint, adult hamburger joint? One of the partners in the first Fuddruckers in Miami was convicted of a felony, serious felony,

drug money. And his ownership interest belonged to the IRS. They got in, you know, in forfeiture and they said, 'What can we sell this for?' And we came back the first time and said, 'Basically, you can't. Give it away.' Okay, and they said that wasn't acceptable.

So then we went back two years later. There was a new senior agent here down in Miami, and we told him basically the same thing. Because what they did is, they opened a chain of these here in Florida, set up a management company, and all profits went in as management fees. So the unit never made a penny and it never has. And the IRS has got a piece of paper that owns 40 percent of that unit which is worthless.

Q Other than valuing this Fuddruckers unit, have you done any other work for the IRS?

A No. At that point we got a little disgusted with the IRS.

Q The three instances in '95, '97 and also '97 where you say you valued restricted stock, did you write a written report?

A In each case, yes.

Q Do you know if you still have those?

A Yes.

Q Now, did Mr. Diener contact you?
A Yes.
Q And what did he say he wanted you to do?
A He said he'd like to talk to me about valuing the stock for income tax purposes and I said, 'Fine,' and I went up and talked to him. And we struck a deal.
Q Had you ever met him or talked to him before that?
A No.
Q How many times would you say you've been retained by Greenberg Traurig or have been retained in a matter in which they were also retained?
A When you say 'they,' are you talking about various people at Greenberg Traurig?
Q I'm asking about how many times would you say you've been retained by Greenberg Traurig, or maybe perhaps you were retained by their client when they were also advising the client?
A 30 to 40 times.
Q And were all of those with Mr. Hesch?
A No, no, no. He just basically -- he was my tout.
Q Okay.
A And I worked with a half a dozen partners.

Their wealth management group is very large and very successful.

Q Mr. Bohlmann, could you take a look at Exhibit 68 in the binder in front of you?

A Must be this one?

Q Yeah.

A Yeah. That's a memo from Bob to me.

Q Okay. You recognize that as a memo you received?

A Yes.

Q Okay.

A It came from my file.

Q And do you recall when you received this?

A Not off-hand.

Q I take it you brought your file with you?

A Yes, I did.

Q Is there anything in your file that might tell you?

A No. You know, a period in the file, it would be during the period I was working on the case, but I would not know when exactly it arrived.

Q Do you know what this concerns?

A Yeah. Yeah, this is just giving me some of the details, supporting some of the questions.

Mr. Lidji, I think you've already talked

to him, right? He sent a very complicated memo to me which was complicated and not particularly understandable, and I was looking to Bob for some answers and finally back and forth with Mr. Lidji, we finally got it straightened out.

Q Okay. And this memo to you states in the first sentence, 'There are three pages to valuate all described on clipped pages.'

Do you recall, did you receive some clipped pages with this memo?

A No, I don't remember that.

Q The third item listed there that references contingent payments, do you recall that you were asked to value some contingent payments?

A Yes. That was the difference -- that was when the five million additional shares were contractually obligated. Instead of waiting for those to happen, they renegotiated the deal and just stuck them all into the initial package, which took it up to the 9,999,000 shares.

Q Were you asked to value those contingent payments, or estimate what those contingent payments would have been?

A No. I took that as a given. I guess it was contractually obligated.

Q Did you value any earn-out payments that the Litmans or Dieners may have been entitled to under the contract?

A No.

Q Do you recall how much you charged for your work in total?

A I think the bill's in here some place. I can't remember off-hand.

No, I guess it isn't in here. Well, I went by the engagement letter, whatever the engagement letter said.

At one time I wrote a memo saying it was going to be more expensive, but then the information from Mr. Lidji started to make sense and I was able to cut it down. I think it was $6,000.00.

Q You think that's what the fee was?

A I got 2,500 as a retainer and I got the balance at the end. I'd have to go back to my bookkeeping records to prove that though.

Q Okay. Well, when you talked with Mr. Diener about this engagement, did he tell you that they had retained another --

A No.

Q -- person to value it as well?

A I did not know that at the time.

Q Did you later learn that they had?
A Yes, I did.
Q Okay. Did you ever learn why they consulted the two of you?
A That's their prerogative. They can do whatever they want.
Q Did they ever tell you why they had also contacted somebody else?
A No. This is not unusual. You know, when you've got a lot of money riding, they often get two appraisers.
Q Could you go back to Exhibit 75.
A Right here, okay.
Q I think you told me that that handwriting in the middle was written back in 2000.
A Yeah.
Q The first line says 'Hotel Revs' for reservations?
A Mm-hmm.
Q The second line, what does that say?
A 'Market price by underwriters.'
Q Okay. What did you mean by writing that there?
A That's, you know, the initial value would be the IPO value is what I'm talking about.

Q And what do you mean by initial value?
A You know, what the IPO goes out at.
Q And how would that figure into your work or analysis?
A That's the basis for your whole analysis.
Q So you were assuming that the IPO price was the market price?
A Yeah.
Q Okay. The next line down, next two lines, what do they say?
A 'Assume a sophisticated analysis in IPO price.'
Q Is it correct that you didn't try to determine whether the IPO price was appropriate, too high or too low?
A Have you ever dealt with New York underwriters?
Q I can't answer questions today. I'm sorry, Mr. Bohlmann.
A Let me put it this way. You do what they tell you. You have a big meeting. And they talk about this and say what the price is going to be. And then they bring in the pro. God walks in the door and he says 'The price is $16.00.' And that's it. But they don't come up with that like this.

They have huge staffs and they know exactly what they're doing. These are sophisticated people. And I've sat through these meetings two or three times.

Mr. Goodfriend, have you ever heard of him? He's with Solomon Brothers.

Q So you were comfortable at the $16.00 price --

A Absolutely.

Q -- and didn't try to go behind it to see if it was appropriate?

A There's no way you could, because they won't give you the information.

Q Okay. The next entry there on the exhibit, could you tell me what that says?

A 'DCF.' That means discounted cash flow is the way of the future.

Q And what did you mean by writing that there?

A In today's business environment, the value of any assets is the value of the discounted cash flow, period. There are other techniques, but the true value is established by the present value of the assets cash flow. And I have four or five books by prestigious people that all say the same thing.

Q Exhibit 75 is the first page of a

prospectus. You told me you have the entire prospectus?

A Yes.

Q Okay. Did you read that?

A Oh, yeah, cover to cover.

Q Okay. And did that disclose the investment risks for the Hotel stock?

A Mm-hmm.

Q And it described the operating or the business environment it was going to face?

A Yes.

Q Okay. And it described their business and their plans for the business?

A Yes.

Q Okay. And the market risks that they could face?

A Mm-hmm. Yes.

Q And was it your understanding that all of that was considered and used by the underwriters to come up with the $16.00 price?

A Probably. It was probably included in their thinking.

Q What else would they be including in their thinking in determining that the $16.00 should be the IPO price, in your understanding?

32

A In my understanding, they look at all -- they look at economics. They look at what the company's doing, where they're going to go, and you know, before the IPO they do have a dog and pony show that goes out and they have to go around to these broker firms and make presentations. So this is the big boys. They know what they're doing.

I remember Bob told me one time, Bob Diener told me one time, he said he was at one of these meetings and one of the brokers said, 'If you're an IPO and a dot com company, how come you're making money?' Which in those days never happened.

And Bob said his answer was, 'That's the way we do things.'

Q Now, the -- could you describe for me your understanding of, putting aside the IPO price, how a stock price is determined generally?

A Didn't ask. People make orders and people offer to buy and offer to sell and it's handled by the exchanges.

Q A buyer's willingness to purchase the stock would be dependent on his or her expectation as to the cash flow that might come from that stock?

A I would presume so, yes.

Q And that could include dividends?

A Yes.

Q And an increase in the stock price?

A Yeah.

Q Those are the two general ways you get a cash flow from stock?

A That's not really. A general buyer of the market individual, they don't do that kind of analysis. The fund managers, you know, that buy large blocks, they do a very detailed analysis before they make their decision and they look at a lot of things, not just the potential cash flow. They basically try to establish is the cash flow justified and possible?

The price in today's market is in the short run, run by emotions; in the long run, run by professionals that analyze things. And it's based on the economic growth of the country.

Q If you have two different stocks, both with the same expected cash flow from them, all other things being equal, the one that's riskier will be worth less; is that fair to say?

A Riskier would be worth less. Yes, that's fair to say. It depends. The value of cash flow is the expected cash flow at some point in the future, discounted at an appropriate discount rate. And the

rest is just ____

Q Okay. Other than the prospectus, what else did you review to do your report regarding the HRN restricted stock?

A Well, I looked at the market. You know, in the files that I gave you are all of the other public companies. You know, I got Yahoo reports, 30, 40 pages of them. I read the Wall Street Journal every day and the Business Week every week, and I try and keep up with current economic thinking. So that all goes into what I do. And I looked at all of the documents related to the company. I mean there's a great deal of information in the prospectus. (Coughing.)

Q Do you want to take a break?

A Keep going for a minute. We've been going 40 minutes. I can live.

Q Okay. Well, if you want to take a break just let us know.

A Okay.

Q I wanted to talk specifically about this report though and what you looked at specifically from the report. You told me you looked at the prospectus.

Was there any other information concerning

the company itself, HRN, that you looked at?

A Yes, they gave me financials, current financials. Again, that's in the information I gave you and I reviewed those. I spent a lot of time with Bob at his office up in North Miami and with Brian -- not Brian. Basically with Bob Diener, but who's the other guy?

Q Did you speak with Mr. Litman?

A Yeah. Yeah, I talked to him.

Q Did you read any of the registration statements that the company had filed with the SEC?

A No.

Q Okay. Other than the prospectus and the -- and some financial statements, what other information, if any, did you look at regarding the company?

A I looked at financial statements, which tell you a lot. And I looked at what the industry was doing, you know, and it's included in my report. You know, I read a great deal about them.

Q Okay. Did you look at any academic work that had been published regarding valuation of restricted stock or just stock generally?

A Not in this specific case here, but in the past; yes, I have. And I have the SEC Regulations,

which I have a copy in my desk at all times.

Q Which regulations?

A The total regulation of the SEC, which includes 144, what you're talking about, because I had to use that.

Q Had you looked at any studies that had been done about historical values of restricted stock?

A Yes, I did.

Q What studies?

A The problem is, there's been so many. Some are before 2000, some have been after. So I couldn't pinpoint it right now. I have read a lot of them.

Q I noted in the report that you didn't reference any kind of studies like that. Is it fair to say that you didn't review those specifically in connection with this report?

A No, not off-hand. I talked to a lot of people about it.

Q Was your answer that no, you don't think you did look at those studies?

A I didn't go back and look at them, no.

Q Okay. The times that you had -- the three times I guess that you had valued restricted stock

prior to this engagement --

A That's only since '95. I had done some prior to that, but I haven't researched that, I haven't gone back.

Q Okay, I'm sorry.

The previous times that you had valued restricted stock, what was the time periods of those restrictions; do you recall?

A The first ones, of course, was when the SEC 144 was two years. Okay, and then it switched to the one year restriction. And so the first time I did some of these were basically a family run partnership where somebody had sold out and put the stock in. And they were definitely restricted under that.

I remember looking back at some of the case law on the restricted stock and blockage kind of stuff. I have a book on that, but I haven't brought it up to date.

Q Were any of the previous occasions that you valued restricted stock involve situations were a stock was restricted for up to four years?

A Yeah. Well, the PMC, the trading volume wasn't enough, and if I believe, the restrictions went on about ten years on that one.

Q Was that because of Rule 144?
A Yeah, 144 and you know, the number of shares that you could put out per quarter, and they had too many shares to be able to put it out because the value of PMC was too low. And that was approved by the IRS. At least they never came back at me.
Q Do you know if the IRS ever saw the report?
A I'm sure they did.
Q Do you know if they did?
A What?
Q Do you know if they did?
A No. I mean the report was filed with the tax return.
Q So that report was filed with the tax return?
A Yeah.
Q Okay. And that's the PMC stock?
A Yeah.
Q Okay.
A In this kind of procedure the reports are always attached to the gift tax return.
Q Do you recall when you completed your report in this case?
A I put the basic date of July 21st. That's

when I got to the point where the logic was clear, I established a value in my mind. Then because this was such a complicated transaction, I had sent copies to Lidji and, you know, the guys to look at. And they found some minor errors, changes in wording, but it didn't change value at all. But the final thing really wasn't sent out until October, I think.

Q So the changes --

A They were wording changes, basically. You know what lawyers love to do with people's writing.

Q So it's your recollection that the changes that Mr. Lidji proposed didn't affect your valuation?

A Not at all.

Q Okay. How about with regard to Mr. Diener? Did he give you any feedback on any draft reports that you sent to him?

A No, I don't think Bob gave me anything. They all came from Lidji.

Q Okay. How about Mr. Litman? Did he give you any feedback?

A No.

Q So the only one who gave you any feedback on your reports or draft reports was Mr. Lidji?

A Mm-hmm. Yes.

Q And the feedback you got from him didn't impact your valuation?

A Not at all.

Q Okay.

A Just made the report read a little bit better.

Q Now after you completed the report, what did you do with it?

A I sent copies.

Q You sent it to whom?

A One copy bound to Lidji, one unbound to Diener, two copies, one unbound, and I kept a file copy for me, which I bind and stick in a file.

Q Did you then talk with Mr. Diener or Mr. Litman or Mr. Lidji about your conclusions?

A No. I gave them the report.

Q Did you give them any opinions orally that weren't in the report?

A No.

Q So is it fair to say that all your opinions regarding this valuation issue are in the report?

A Yes. I did ask Lidji to send me a copy, after I found out that there was the other report,

just for more my education than anything else.

Q And did you see the other report before you finalized your report?

A No. When I finalized the report I didn't even know the other one existed.

Q And do you recall if that other report was done by BVS?

A Yeah. They sent me -- they didn't send me the whole report. They just sent me some extracts.

Q Was it just a couple pages?

A Five or six, something like that. It's in the file.

Q And what did you think of that?

A I write better reports.

Q What did you think of BVS' valuation conclusion?

A I never got their conclusion. That was not included in what they sent me.

Q Okay. What was included with what they sent you from BVS?

A Just the logic section, the discount analysis, empirical studies, quantity of models.

Q Do you mind if I take a look at that?

A You have a copy of it.

MR. JOHNSON: Can we take a break? Maybe

I can get a copy of this.

(Off the record.)

BY MR. JOHNSON:

Q We've marked as Exhibit 162 the document you brought with you today.

(Whereupon, the above-referred to document was marked as Exhibit Number 162 for identification.)

BY MR. JOHNSON:

Q Can you identify what that is?

A Apparently it's the Business Valuation Services, part of their report.

Q And was this something that was sent to you?

A Yeah, after I found out about it. Pages 18 to 30, not the complete report.

Q And did you get any portions of the BVS report, other than what's here in Exhibit 162?

A I don't think so. No. No.

Q And do you know, what was your understanding of the purpose of this document, which is Exhibit 162, being sent to you?

A Because I asked for it. I just wanted to see what the other people were thinking.

Q Okay.

A Part of your education is to see what other people do.

Q Did you look through it and read it?

A Yeah.

Q Did you think it was relevant to your work?

A I disagreed with a couple of the minor approaches, yeah.

Q What did you disagree with?

A He used the quantitative marketability discount approach, which is written by Chris Mercer. It's a book. I have a copy of it. I have used it occasionally, but it has -- but since the book came out, it's been accepted in some courts and other courts have rejected it.

Q And how did you describe that approach, what was it?

A The approach in the book has been used in court cases for the IRS. In initial earlier periods the courts accepted the approach, but since, some of the court proceedings have found against it.

Q Okay. I was trying to go back a little further.

Did you describe it as a quantitative marketability approach?

A Yeah, it's called a quantitative marketability discount method.

Q And what is that method in your understanding?

A Well, it's a whole book. It takes into consideration all of the things that a potential hypothetical investor would look at in determining the marketability discount appropriate in privately held businesses. And the first four or five chapters are excellent analysis of the thinking of investors. The actual application, I have some trouble with it.

Q What is the method and how is it applied? Does it use an option, a put option?

A No, no, no. What it does is it takes all these factors, and he built a computer program that produces these tables, and the basic factors are dividends, dividend growth, the discount rate, the holding period, and puts them all together into a chart and you can pick out the area that you're looking at.

Q And this book that you reference that has this method in it was written by Chris Mercer?

A Chris Mercer, yes.

Q Do you recall the title?

A Quantitative Marketability Discount.

Q Okay.

A It's a well received book. He's a very informed business valuation expert.

Q You said you disagreed with some of the approaches set forth in Exhibit 162.

Do you recall what else you disagreed with?

A Basically this was such a very simple concept. In other words, the quantitative market discount method is basically designed to look at companies where they're privately held and you can't say when you're going to sell the stock, when it could be available for sale.

In this particular case, there were specific restrictions. You could only sell this much, this much, this much, and then you had the right of either following 144 or getting the shelf registration. And so it really amounts to you knew what the cash flow was going to be. Okay? So the only other question is, what's the discount rate? You apply the two mathematically and you come up with the answer.

So it's a very, very simple report. It's not complicated at all. You don't have to go into