studies because you know the cash flow. And so the basic question is, what's the discount rate, and you go into your Excel program and there's your answer.

Q Do you recall if anybody was suggesting that you include in your report anything that was set forth in Exhibit 162?

A Nobody asked me to do anything. And if they did I would have turned the job down.

Q And I take it there was nothing in Exhibit 162 that you felt was relevant to your analysis?

A Not really. It's a different approach. I didn't agree with it. But it's a generally accepted approach. I just think they hadn't thought through the whole thing.

Q When you say 'it's a generally accepted approach,' you're talking about the approach of Mr. Mercer?

A Yeah.

Q Okay.

A It again applies only to privately held interests, not to public stock or potential public stock.

Q Could you turn to the page that's numbered 29 in that exhibit, and there's a section that's titled Quantitative Models.

A Yeah.
Q And you're welcome to look through it, but it talks about using an implied option.
A Mm-hmm.
Q And using the Black Shoals model.
A Okay, I'm familiar with the Black Shoals model with options. I have written reports on that subject.
Q What is -- you didn't use this approach in your report?
A I did not.
Q Is there a reason?
A Yes. Black Shoals, they won a Nobel prize, but it's applicable to short term investments, puts and calls. The entire original study was based on six months. When you're looking at something three, four, five years, Black Shoals doesn't work.
Q So you disagreed with the approach here that used the implied option analysis?
A Yeah. Why throw in complications?
Q Did you voice your disagreement with his approach to Mr. Diener or anybody else?
A No. They didn't ask me to.
Q Okay. The section prior to that, and it's

starting back on the page numbered 18, which is the first page, it talks about some empirical studies; do you see that section?

A Mm-hmm.

Q And it talks about an SEC study and a study by Hertzel and Smith. Are you familiar with either of those?

A Yes.

Q Okay. And you didn't use those in your approach; did you?

A No. Again, they don't apply.

Q And why -- and they also talk about the silver study. Are you familiar with that?

A Mm-hmm.

Q You have to say 'Yes' or 'No.'

A Yes.

Q And you didn't apply that either?

A No.

Q Why not, if there's a reason?

A Again, those studies are studies that will determine what the discount should be or what actual discount was experienced prior to IPO's. This is the general rule. And so you come up and say, 'Okay, you know, so and so bought these shares and they did an analysis. Okay, here's what you got.'

Again, why throw in complications? We knew what the price and the number of shares that could be sold in the future. We didn't need those kind of things.

Again, these stocks, these procedures, were originally presented by Pratt in Volume I, Volume II, Volume III and Volume IV of his books. And again, they are used as an indication of value for privately held interests, okay, where you didn't know when the stock was going to be sold. In this book, in this particular Hotel Reservation case, you knew when you can sell it. Why use these? There's no value.

Q Okay. You said you were familiar with the studies that were set forth in this Exhibit 162. Are you familiar with any studies or papers written about such studies done by a Dr. Makesh Bajaj?

A Yes, I've read several critiques of his work. Not all complimentary.

Q What critiques have you read?

A Shannon Pratt has put out I think a series, about two to three years ago, when the Bajaj study came out. Pratt had comments and other business valuation experts also had comments, and none of them particularly complimentary.

Q What, if you recall, was the gist of the critique regarding Dr. Bajaj's work?

A I can't remember. I read these articles every day. I get Business Valuation Review, which is a quarterly. I get the IBA quarterly studies. I have several lawyers that send me critiques from Law Journals, you know, when it comes to valuation. They just automatically send it. I read all these things. I can't keep track of them all. I've got a stack this high.

Q You said you were familiar with the critiques of Dr. Bajaj's work. Have you read any papers written by him?

A I read a synopsis of his original report that was included in one of the studies.

Q And do you recall generally what his work was about that you read the synopsis of?

A No, I can't remember.

Q Okay.

A The unfortunate part about that whole thing was the fact that they tried to paint him badly because he worked for the IRS. And I think it was a case of, you know, 'We're going to snub him because,' you know. So I don't think that the critique was all that fair to him either.

Q I'm going to show you this. This is a copy of Exhibit 115. Do you recognize this as a fax with a draft report attached that you sent --

A Yes.

Q -- in late February, 2000?

A Yes.

Q Okay. In the second paragraph you describe the deal as unusually complex, and I think you said earlier today that it was a very complicated transaction.

A Right, in the beginning yeah, because of the way it was set up. Yeah, it was complicated.

Q What about it made it complex?

A Well, that was based on the document provided by Mr. Lidji. I don't know what your number would be on these, but I'm sure you've seen this one.

Q So when you refer to the deal being complex, you were talking about the restrictions and how they operate?

A Yeah. And just pinning down the number of shares that were involved, you know, and the sales, and there was the liquidating trust and you know, the Pell shares, which we turned around to just leave out. And you know, it was just complicated as

hell.

Once I finally understood it, then it wasn't complicated any more. But Mr. Lidji was not the greatest writer in the world.

Oh, this is yours.

Q Mr. Bohlmann, we've marked as Exhibit 163 a document Bate stamped LD3470 through 3486.

(Whereupon, the above-referred to document was marked as Exhibit Number 163 for identification.)

BY MR. JOHNSON:

Q Is this your final report?

A Yeah.

Q In the cover letter you state that, 'In accordance with your request, I have made an appraisal as at February 25, 2000 of the fair market value of 9,999,900 shares.'

Do you recall, was it Mr. Diener who asked you to value it as of February 25, or did you pick that date, or how did that come about?

A I picked that date because it was the date of the IPO.

Q And were you ever told by anyone the date on which the shares were issued to the Trust?

A I think it was the day before. I'm not

sure.

Q Now on the page Bate stamped 3475 of your report --

A What's the page number on the report?

Q It probably would be best if you looked at the actual exhibit so we're on the same page.

A Okay. 3475. Okay.

Q You say there was -- at the beginning you say there was an initial public offering of 5.4 million shares.

Do you know whether or not there was any additional shares issued, an over-allotment issued by the underwriters?

A Probably was, but I don't know.

Q Okay. If there was, you didn't take that into account?

You need to say 'Yes' or 'No.'

A Yes or no. Yes, it was not taken into account.

Q Okay. Turning to Page 4, the first sentence of your -- on that page, 'Sale of the stock will require many years, and during that time period the market price of the stock will change.'

I guess it's fair to say that's the one thing we do know for certain, is that the stock

price will not stay the same?
A Yeah. Rockefeller said that very clearly.
Q And then you say that 'newspaper reports show that internet stocks are highly volatile.'
Did you do any research other than looking at newspaper reports as to the volatility of internet stocks?
A I didn't do any physical studies, but as I say, I read the Wall Street Journal every day.
Q Other than that, did you look at any studies or go back and look at any data compilations?
A No, except for that next sentence.
Q And which sentence are you referring to?
A '25 percent of the 1991 IPO's ended the year trading below their offer,' and a recent economic study which I also footnote.
Q Now you footnote that to Worth. Is that a magazine?
A Yes.
Q Okay. Did you read the magazine article or did you look at the academic study?
A I read the article.
Q Okay. Now the 5000 companies that the article evidently referenced that you talk about

here, do you know, were those all different kinds of companies?

A Probably.

Q Okay. It wasn't limited to internet companies?

A No.

Q And it wasn't limited to travel services related companies?

A No. It was general. Because internet didn't even exist in IPO's back in '98.

Q Okay.

A '88 I mean. I didn't get my first computer until '87.

Q The next paragraph, you say 'There are six public companies that are direct competitors of Hotel Reservations Network.'

On what basis do you believe that they were direct competitors?

A I went to the files and I printed it out. You've got copies of all the stuff I printed out. Indicating, you know, what the field is.

Q Did Mr. Diener tell you that 'These are our six competitors'? Did Mr. Lidji? Or did you determine this yourself?

A I found it myself.

Q Okay. Sabre Holding, what business was it in?

A That was formed by the airlines, originally American Airline created the Sabre Network and that was an on-line ticket, originally just tickets. And then they expanded to hotels and other things. It was a gigantic -- it was one of the first giant computer systems in the United States.

Q Now back in 2000, could the general public use the Sabre System?

A Oh, yeah. You couldn't -- you had to go to a travel agent.

Q So the general public had to go to a travel agent to use it?

A Yeah.

Q Okay.

A Well, business offices would all have special accounts.

Q Okay. Now going down to the paragraph that begins with 'Of the remaining four firms,' do you see that one?

A Yeah.

Q Okay. The last couple sentences you state, 'The company is currently profitable and

projects earnings growth over the next several years. The market therefore may treat the company stock in the traditional manner of evaluating profitability and normal growth, rather than as a high flying internet commerce security.'

What did you mean when you said that the market's going to treat the stock in the traditional manner?

A IPO's in dot com companies all lost money. That was just -- it was before the balloon popped. Whereas, this company was making money. Okay? They went out with an PE of 140. Okay? But in the long run, if they make their money gradually, growing and they make more profits, more profit per share, the market is going to say, 'Hey, this is not a high flyer. This is an operating company.'

And so the PE is going to come down from 140 down to a reasonable level. And that's basically what I'm saying here is, if they can grow, their stock price is not going to go up, it's going to come down.

Q I'm sorry, were you projecting that the stock price would come down?

A I was indicating that it might.

Q It might.

A Yeah, don't forget, this report was February, 2000. The market hit its peak in January, 2000 and went down -- well, the NASDAQ went down 70 percent in the next two years.

Q The next paragraph, you state in the first sentence, 'The reservations industry is mature in the electronic commerce area.'

What did you mean by that?

A Well, this company had originally been in business for years and they were doing it by fax. People would fax in, 'I need a hotel room,' and so on and so on, and then they would fax the confirmation back. And then they gradually, the whole industry switched to the internet. But at that time they were still doing a few faxes, you know.

So basically, they knew what they were doing. This industry knew what they were doing. They would go out, they'd contract for rooms, and they had their customers which they would sell the rooms to, and make a profit in the process.

So you know, it wasn't new, wild, exciting. It was a business.

Q So is it your understanding that the -- well, you understood that they were using the

internet?

A Yeah.

Q Was it your belief that the use of the internet by the general public for purposes of obtaining hotel reservations was a mature business at that point?

A Yeah. I used them.

Q And what do you mean by -- when you say 'it's mature,' what do you mean?

A It doesn't have flaws. It works. You can call them up or you can go on the internet and say, 'I want a reservation, San Jose, California, at a decent hotel. What's the prices?' And bingo, you've got the reservation.

Q When you use the word 'mature' here in this context, did you mean that it was not a growth industry?

A Yeah. It was not a growth -- not a high growth industry. If you're familiar with the economic concept of new industries.

Q Did you attempt to estimate the growth in that industry in connection with this report?

A No.

Q Do you think that the growth rate for that industry would have been relevant for your report?

A No. I read the various summaries of the companies in this industry, and none of them were indicating that the world's going to -- gigantic explosion. They were all just, 'Hey, things are going to go along.'

Q When you said you read some reports by the companies in the industry, are you referring to the six you have listed?

A Yeah. They're all included in the stuff I gave you, all the print-outs from the internet.

Q Later on in that paragraph you said, 'Company management projects that rapid growth in internet reservations is over and that industry revenue growth will decline over the next several years.'

What company management are you referring to?

A Bob Diener.

Q Anybody else?

A No.

Q So it's your recollection that he told you that rapid growth in the internet reservations industry is over?

A Yeah.

Q Did you believe him when he said that?

A Mm-hmm. Yes.

Q And the next sentence says that 'Industry revenue growth will decline over the next several years.'

Did Mr. Diener tell you that as well?

A Yes.

Q Okay. And did you believe him when he told you that?

A Yes. He was the CEO.

Q It's now been five or six years since this time period when Mr. Diener would have told you these things. Do you think he was proven correct or incorrect, or definitely haven't you looked to see?

A I haven't looked. I haven't followed the company.

Q Well, how about the industry generally, which is what the sentences address, and that's the internet reservations industry? Do you know --

A I haven't followed it.

Q So you don't know if its grown or not?

A No.

Q Now earlier you referenced that the company went out at the IPO time period with a PE of I think you said around 140 or something.

A Yeah.

Q And then I think you said that you expected that to decline.

A Yes.

Q And it's just a piece of math to say that there is only two ways that that can happen; one, the earnings grow, or two, the price declines. Is that fair to say?

A If the earnings grow --

Q Well, let me ask you this.

For a price range ratio to decline, what has to happen?

A If it declines it's because the public is paying less for the stock.

Q So then the stock price has come down?

A Assuming, level -- say earnings, if the PE drops the price is dropping.

Q Okay.

A If you have a growth there and the price is still -- the PE declines, the price is still going to have to come down.

Q Okay. In the second paragraph on the page Bate stamped 3477 you state, 'The above discussion indicates a strong probability that the market price of the company's stock over the next two to three years will decline from the IPO price of $16.00.'

A Yes.
Q What did you base that statement on?
A Well, it was just a PE of 140 is ridiculous. Over 150 I'd say, I know it was 140. And at that point it was pretty clear that the boom was over. The bubble didn't pop for about six months after that, but it was coming. I personally believed it, so that I liquidated a lot of my stock. I went into CD's. The best investment I ever made. And I'm just an average investor. I'm not any fancy guy.
Q You said you based it on this statement on the PE of 150 being too high.
A Yes.
Q Anything else that you based that statement on?
A Just an understanding, general understanding of the market conditions and so forth. At that time the economy had been growing for a solid eight years. The longest single growth period in the history of the United States. And you knew it had to end. The question is when.
Q Do you know whether HRN was able to sell all the stock in the IPO?
A I have no idea.

Q Do you know how many people, or how much was requested, how much interested buyers requested, how many shares?

A No, I have no idea.

Q You don't know if there was an over-subscription or under-subscription of shares?

A I do not know.

Q Okay. Did you -- you say there's a strong probability that the market price will decline.

Did you try to quantify that?

A In the sense that in the development of the discount rate I include that in the concepts.

Q Did you assign a probability to the outcome of the stock declining?

A Not per se, no. Because what you do is, you can't predict the future. So the stock could go up, the stock could go down. So what you do is, you predict the risk. And that's what I did. I said, you know, 'The risk should be at 35 percent discount rate.'

And so what I was looking at is, if the stock goes down, if you have a reasonable discount rate, you're covered. If the stock goes up, you're a millionaire, ahead. But if the stock goes down with a reasonable discount rate, you're covered and

you don't lose.

Q And this risk of the stock going up or going down, that would be reflected in the IPO price as well?

A Not necessarily, no.

Q Why not?

A Again, I don't know how the underwriters think. I just see what they do. And their risk level is just long enough to get rid of their over-subscribed shares. Then they don't give a damn. So they're not looking five years out or three years out. They get the stock out there, they sell their goodies, and then they're through with you. So they don't look long term.

Q You say in the last sentence there that 'The only reasonable position to take in evaluating the future stock price of the company is to accept the $16.00 per share as an informed judgment of the underwriters, but hedge against price changes with a discount rate that reflects the risks involved.'

A Right.

Q So in your report and calculations, you've assumed that the stock is sold in the future at various points of time by the Litmans and Dieners at $16.00 per share?

A Yeah. It's the best estimate that you have available at the time I wrote the report.

Q So you're assuming that they sell it for $16.00 in a year for those shares that are sellable within a year, and then also $16.00 four years from now when they can sell those shares?

A Yes.

Q Okay.

A But the discount rate I used takes care of the fluctuations that would occur.

Q And you're not adjusting that $16.00 sale price for any inflation?

A No.

Q So in terms of the selling price, you're assuming no inflation?

A I guess you could say that.

Q Okay.

A Except I would build the inflation concept again into the discount rate.

Q And in fact in the discount rate, what you call a built-out discount rate, you include an expected inflation rate and add that into the discount rate?

A Yes.

Q In the next sentence you begin -- or the

next section you begin talking about the discount rate you're using and you call it the built-up discount rate.

Is that a term you created or is that a standard industry term?

A That's a standard industry term. You can find it in every book. It was built up -- it was created by Shannon Pratt, and it is standard for the entire valuation industry.

Q So Mr. Pratt talks about this in his books?

A Two chapters.

Q Do you know if he applies it to restricted stock and for the purpose of valuing restricted stock of publicly traded companies?

A He uses words appropriate. In other words, basically he builds up the discount rate in his books to be used by people in the valuation industry. His approach was to establish what is the proper discount rate, considering the size of a company and you know, blah, blah, blah. And once you've got a discount rate you can use it for a million purposes.

Q But my question was, do you know if in his books or his writings, he says that this built-up

discount rate method can be used to value restricted stock of a publicly traded company in order to estimate the marketability discount or liquidity discount that should be applied to that stock?

A He does not specifically do that.

Q Okay.

A When he goes into the marketability discount, he starts using those silver reports and this kind of stuff, but again, as they apply to privately held companies, which is not in this case. It doesn't exist in this case. It's a very interesting book, 780 pages long. That's Volume IV.

Q Now you start with the risk free rate in building up the built-up discount rate, and then you add an expected inflation rate of 1.38 percent; is that correct?

A Right. Yeah.

Q Okay. So does that mean your calculations here assume inflation at the rate of 1.38 percent?

A Yeah.

Q That's annual?

A Yeah.

Q And how did you come up with the 1.38?

A You take the yield on long term bonds, okay, and the yield on the T-bill, and you subtract

one from the other. And that is what they call imputed expected inflation rate, it's what the market says, the bond market says is the probable rate of inflation as affected by the 30 year bond and the T-bills. And it's usually a little bit lower than actual inflation, but not always. It's a measure of potential future inflation.

Q The next component is what you call the implied equity premium.

A Okay.

Q Can you describe that for me, what that is?

A Okay. That's Mr. Grabowski and Mr. King.

They did a study of all of the common stock in the University of Chicago database, and end of the year Ibeston annual statement studies. Grabowski and King broke theirs down into 25 steps. Ibeston breaks it down to ten. Okay. And once they broke it into 25 steps and they establish a 7000 or 8000 data points and imply the law of linear calculation to it, which is actually a beautiful thing. Ibeston is designed for big companies, mid-cap, large-cap stocks, where they have -- worry day and night about what's my cost of issue bond series or you know, cost for preferred stock or something.

I do almost all my work in much smaller companies. Okay? Well, this company is what you would call a small-cap stock. So what that chart does is, you simply take the log of the size of the company and apply this formula and you get an implied equity payment of 10.3.

So you go to the next page, you look at Ibetson's typical approach, using their technique. You would come up with an actually higher one, 12.7.

I believe very strongly that the Grabowski and King system is much better. By the way, Grabowski and King is now being published -- was originally being published by Ibetson. Okay? It has now been bought by Standards and Poors and you can download their reports, 200 pages, for 200 bucks off the internet, and it's of tremendous value for use in valuation study.

Q So using the Grabowski and King approach, what were they -- what are you measuring, what are you doing there?

A The equity premium. In other words, you're looking first -- when you build up capital -- first the bond. Then you say stock has to carry a greater risk. So you figure an equity premium is the bigger the company, the less the risk.

I used to say General Motors, maybe better from now on say General Electric. They have a hell of a lot better following capacity or anything else, and therefore, their risk is going to be a lot less than Joe Schmo, the midget's car shop, okay.

So this line shows that with 7000 data points, which is an outstanding statistical piece of work. And so you look at the size of the company and say, 'Okay, here it is.'

Q So you're using their research to determine the --

A Equity premium.

Q -- equity premium that should be applied here and that's based on the company's size?

A Yes.

Q Is it based on any other factor other than company size?

A Not really.

Q Okay. So this equity premium, that would be needed for all the stock of HRN?

A Yes.

Q Okay. So whether it's restricted or unrestricted, that needs to be there in the stock because of its size?

A Right. When you put a cap, market cap on

any company, they don't care whether it's restricted or not. They just take the total number of shares issued and authorized and multiply by the price, and that's the market cap.

Q Okay. So if you say -- say you pick a day, the closing price for a particular day for HRN, and let's say it's $16.00 just by coincidence, that price would have captured within it the equity premium necessary for that size company?

A Yeah. Yes.

Q Okay. And your calculation of the equity premium number doesn't vary by length of restriction or --

A Not at all.

Q Okay, it's not dependent or even connected with that at all?

A Not at all.

Q So for -- I take it with this approach of Grabowski and King in which you use here, you can take any stock of different sizes and take their freely traded market price and within that price is going to be reflected the implied equity premium?

A Yeah.

Q Okay. So it's already in there in the market price?

A Yeah.

Q Okay. And so the built-up discount rate you come to is 17 percent?

A Right.

Q Okay. On the next page you discuss adding additional amounts to the discount rate, correct?

A Yeah.

Q Okay. And you list some of the things that you call significant risk factors. And one of them is international current rates. Do you see that?

A Yes.

Q Okay. Do you know how much business they did that involved foreign currencies?

A Percentage-wise, I don't know. But I know they were doing international business.

Q Did Mr. Diener or somebody else tell you that they had a significant risk exposure based on international currency rates?

A No. I'm just saying it's a potential.

Q Okay.

A I was very familiar with that particular problem because my daughter was in the accounting department of Royal Caribbean and she was screaming almost all the time about the effect of those damn

international exchange rates.

Q And then further down on the page you state in the second to last paragraph, 'To cover these risks, the discount rate developed above must be increased by 15 to 20 percent. This produces a discount rate between 32 and 37 percent.'

And I take it those final two numbers are arrived at by adding the 15 to 20 to the 17 on the previous page?

A Yeah.

Q Okay. How did you come up with the figures of 15 to 20 percent to add to the built-up discount rate?

A That's, you know, just an overall analytical concept, looking at these risks.

Q And did you just sort of -- was that a gut feel or did you calculate it somehow?

A It's basically a gut feel based on understanding the risks. Because in every report I've ever written, all 500, I look at the risks and I have to say to myself, 'How risky is this company? How risky is it going to be?'

And you know, when you've done it 500 times, well, 400 times at this time, you know, you get a pretty good feel for it.

Q Did you -- I understand you didn't do any calculations to come to the 15 to 20 percent. Did you look at any sources to check it?
A Yeah, look at the next page.
Q Okay. What on the next page are you referring to?
A The Cambridge Associates studies of returns on private equity funds.
Q And what are the private equity funds that Cambridge Associates looked at?
A Venture capital funds, 239 of them.
Q Okay. And what was your understanding of what type of venture capital funds they were looking at in their study, the Cambridge Associates study?
A They were looking at reports from all of those companies and you know, simply doing analysis of what was reported to Cambridge Associates by the various funds.
Q And the funds were reporting their returns on their investments?
A Yeah.
Q So the figures you're listing there on that page that's numbered 7, those are the returns--
A Right.
Q -- to the venture capital funds?

A Right.

Q And do you know what kind of ventures these funds had been invested in?

A Dot coms, a lot of them were, but they also invested in a lot of other things, all kinds of start-up companies. Microsoft started with venture capital money.

Q So it's a wide variety of instances?

A Yes. Now, at this time in the early '90's, in the mid-'90's, a lot of it was dot com stuff.

Q Do you know if the ventures -- well, let me back up.

Back to the page that was numbered 6, you added to the built-up discount rate the 15 to 20 percent figures for a range, but above that you talk about additional risk factors for companies normally justifying in addition to the discount rate of 3 to 15 percent.

A Yeah.

Q Why did you exceed that normal range of discount in this case?

A Basically for the three items. Number one, the potential bear market which I really felt was coming, and acted on it as a matter of fact.

Internet stocks I had already knew were going to go down the tubes. And the float, it was very low. And the float, you know, affects the price of the stock a lot. I mean, for example, Hotel Reservation, if they went out one year, that would change the price substantially, if they went out and put it actually on the market.

Q You said you knew the bear market was coming. Do you think the people who subscribed to the HRN stock or purchased the stock in the IPO also saw what you saw?

A No, I don't.

Q You think you uniquely saw the bear market coming?

A No. Mr. Greenspan said in front of Congress, 'Exuberance, excessive exuberance,' okay, which was a pretty good indication that he felt something was coming.

Q So there were other people around Wall Street who knew?

A A lot of other people, a lot of very important people.

Q Okay.

A The Wall Street Journal and Business Week are very good economic consultants.

Q So you have no reason to believe that the people who subscribe to the HRN stock IPO or purchased it in the IPO didn't have access to these same dire forecasts that you did?

A I wouldn't call them dire, but I would just say that speculative investors ignore reality. And when the dot com thing was going, they were speculators.

Q But I thought you told me earlier you don't know who purchased the HRN stock in the IPO; is that right?

A Probably a broad line of people.

Q Okay. So you don't know whether they speculated or not, in fact?

A No.

Q Okay. You pointed to the study done by Cambridge Associates on venture capital funds as -- and the return of those funds in fact achieved to confirm your use of the 15 to 20 percent discount?

A Yes.

Q What about -- what is it about the returns actually achieved by venture capital funds makes you think that that's a good benchmark for determining the discount rate to be added to the built-up discount rate in this case?

A Okay. Venture capital funds are risk takers. They go out and put a lot of money into companies on the hope that they're going to be able to take them public and make a killing. Anywhere from a half to three-quarters of their investments go down the tubes total. But when they get a winner, they get a big winner.

So they take the risk because in the long run over a substantial period of time, they make out very well. But they are definitely risk takers.

Mark Hilderbrand who I talk about here, vice president, happens to be my wife's nephew, and he's been in that field for years. And a very realistic guy, I'll tell you.

Q And Mr. Hilderbrand is one of the people you said that support your report?

A Yes.

Q Am I correct that you didn't investigate each one of these venture funds that's in the report to determine what kind of companies or ventures or securities they were investing in?

A Of course not.

Q You were looking at the --

A The overall --

Q The statistics that Cambridge Associates

put together?

A Right.

Q So you don't know whether the ventures were investing in restricted stock or unrestricted stock or --

A I have no idea.

Q Okay.

A Probably a little of both, you know. Actually generally, their investments are pre-IPO's anyway. So they're really restricted.

Q In the next section titled Hypothetical Sale of the Stock, I guess we talked about this earlier, but you say, 'The expected price of each sale is $16.00 per share.'

A Yes.

Q Why didn't you -- well, strike that, back up.

Where in your analysis, if anywhere, do you take account of the possibility that the stock might increase in price?

A It's part of the game, you know. It might increase, it might not.

Q But how does that possibility figure into your analysis as to the value?

A Okay. The chances are that 50 percent of

the public companies that go public, their stock is going to decline from the IPO within one or two years. Okay? The other 50 do well, you know.

So my point is, you have to look at the risk, okay, you have to cover yourself from the risk. If you don't, you could lose everything. But if you do and you have a stock that goes up, then you're in great shape. But you know, odds are 50/50, you know. Are you going to invest $100 million with the hope that it's going to go up? I wouldn't. I sure in hell wouldn't.

Q But as you said, it's possible that the stock could go up?

A Yes.

Q Okay. My question was, how, if at all, did you factor that possibility into your valuation?

A Only in the sense that you'd have to take a conservative approach, okay. You look at the risks and say to yourself, 'I want to cover myself.' And it's just like when you go out and play roulette, okay, you play odds and even, you break even and you lose in the long run. You play for one number and you get 35 times. The odds are very high against that.

Okay, so it's a matter of gambling, and

that's what speculation is, and this was a speculative stock. So if it went up, fine, but you can't count on it.

Q Well, I'm just trying to figure -- we went through the components of your discount rate.

A Yes.

Q Do any of those components include within them an accounting of the possibility of the price going up, or in that discount rate are you simply trying to quantify the possibility of this price going down?

A Yes. No, there's no -- nothing is specific on the path that it was going to go up, you know.

Q I'm sorry? There's nothing specific --

A Nothing specific built into the discount rate to cover the hopeful eventuality that it's going to go way the hell up, you know.

Q So the discount rate doesn't include within it any factor to take into account the possibility of the stock price going up?

A No.

Q I'm sorry, when you're saying 'No,' are you agreeing with my statement?

A Yes.

Q Okay. Thanks.

Now, when you had done this report of July 21, 2000 -- well, let me strike that.

The next page you go through various sales scenarios.

A Yes.

Q Okay. Did you get any information from Mr. Diener or anybody else as to how they expected to dispose of the stock in terms of timing?

A No, but I talked to Mr. Lidji about it.

Q Okay.

A And he, you know, pointed out the contractual obligation for the shelf registration.

Q Was it -- did you assume in here that they would be disposing their stock as soon as the restrictions lifted?

A Let's put it this way, any prudent investor is going to diversify his portfolio.

Q Was that your assumption here?

A Yes. In other words -- and that's been proven, you know, theoretically and all over the place. You don't sit on one stock, especially with that much money. You diversify. If you keep it all you're crazy, you know. Like people at Enron.

Q In fact, the stock went up over the years,

didn't it?

A I haven't kept track.

Q Okay. As of -- I think you wrote the report on July 21, 2000, or at least that's the date of your letter, and the stock had been publicly trading for a few months by then. Do you recall that?

A Yes.

Q Okay. Do you recall if, you know, prior to sending out the report on July 21, 2000 you looked to see how the stock had actually performed?

A I think I looked at it, but it didn't make any difference to me.

Q Okay.

A Because I was thinking long term, not a month to two months to three months, you know.

Q Okay.

A It went up and then it went down. I believe it fell below 16 at one point in two or three months.

Q So --

A I can't remember.

Q I'm sorry.

So the performance of the stock after the IPO but before you finalized your report in July,

2000 was not relevant to what you were doing?

A Completely. In other words, the basic principal of valuation is you only work on the information available at the time, the date of your valuation. You cannot look in the future.

Q On the page of your report that's numbered 8, you say that you're assuming a 5 percent discount or cost. What does that represent?

A Brokers' fees, you know, basic costs.

Q And how did you come up with the 5 percent figure?

A I talked to my broker at Merrill Lynch and talked to investment advisors, which I didn't bother to footnote them. And they were saying that, you know, in private placements there was always a 5 percent fee for -- somebody gets money, you know. And so I accepted that. You know, Merrill Lynch does, when they buy big blocks, and one of the other persons I talked with was a Ph.D. economist who was in private investment practices and he said the same thing, about 5 percent is a good fee for making a private placement. The private placement that you do -- if I've got $50 million worth of stock, you go to Merrill Lynch, you go to Solomon Brothers, and say, 'Find me a buyer for it.' So they go to an

insurance company or a mutual fund or something like that or a venture capital fund and say, 'Here's your price,' and they get 5 percent just for making the contact. They make a lot of money in sometimes twenty minutes.

Q And in your analysis you're assuming that they dispose of the stock through a private placement?

A Yeah.

Q And to do so they would pay 5 percent of whatever block of stock they're selling?

A Yeah.

Q And you're valuing the stock -- or you're assuming that that private placement is sold at $16.00 per share?

A Yeah, $16.00 a share less the discounted cash flow, you know, but selling at 16 at that point in time, yes.

Q Okay.

A And then I discount it back for the time you have to wait.

Can we take a break?

Q Sure.

(Off the record.)

BY MR. JOHNSON:

Q Mr. Bohlmann, did you send a draft of your report to a Mr. Mincey?

A I may have. I don't know. He was the attorney in Dallas, right? I might have. I don't remember doing it though.

Q Okay. Do you recall getting any feedback from him?

A If you hand me the file, but I don't think so.

Q Okay. You don't recall the substance of any discussions you might have had with Mr. Mincey?

A No. I worked basically with Lidji. We were on the phone over and over again, because I couldn't understand what he was doing.

Q When you say you 'couldn't understand what he was doing,' are you talking about the restrictions?

A Yeah.

MR. JOHNSON: Until we get those documents, I guess I'll pass the witness for now, if somebody wants to hop in.

CROSS-EXAMINATION

BY MS. LARSON:

Q As you know, my name is Kari Larson. I represent Hotels.com and I'm with Latham & Watkins.

I just have a few very brief questions. Can you turn back to Exhibit 162?

A Which one?

Q 162.

A Where is that?

Q It's a loose exhibit.

A Okay, yes.

Q And I wasn't sure when you answered a question if I heard you correctly. I thought at one point you said after you found out about these pages 18 through 30, which is Exhibit 162, they said, 'Do not complete the report.'

Is that accurate?

A 'Do not complete the report'?

Q Yeah.

A No. I said I didn't get the complete report.

Q Oh, you didn't get the complete report.

A And this is just what I got.

Q Oh, okay. Okay, I just didn't understand what you had said then.

And then in response to some questions from Mr. Johnson related to management predictions of HRN future performance, you mentioned that Bob Diener had informed your understanding; is that

correct?

A Bob Diener had what?

Q Informed your understanding. And you know, maybe the best way to do this is to go to Exhibit 115.

Actually, you know what? Let's go ahead and go to Exhibit 163. That's easier. And if you could turn to Page 4, which is LD3476, and the final paragraph where there's a discussion of company management projects.

A Yes.

Q And I think you indicated that Bob Diener had informed you related to company management projections; is that correct?

A Yes.

Q Do you have any notes related to those conversations with Mr. Diener?

A No.

Q Could you turn to Exhibit 107, which is an exhibit in the binders?

A Okay, 107.

Q And do you recognize this document?

A Yes.

Q What do you recognize it to be?

A It's from me to Jim Mincey.

Q And --

A Oh, asked me to send you -- yeah, okay.

Q What did you just say?

A It said, 'Bob Diener had asked me to send you draft copy of the tax' -- yeah.

Q Do you know why Mr. Diener asked you to send the draft copy to Mr. Mincey?

A I have no idea.

Q In the second sentence of the text is says, 'This is not final and details will change depending on the IPO price and comments from Bob Diener and Brian Lidji.'

A Where are you?

Q On that first page. Go ahead and read the paragraph that appears on the first page.

A 'This is not final. Details will change depending on the IPO price.' Yeah, okay.

Q What details would change depending on the IPO price?

A Well, all the numbers would change. If it came out at $14.00, every number would change. That's the advantage of having Excel. You just put one number in and poof.

Q Beyond the numbers, would anything change about the appraisal report if the IPO price had

changed?

A Not really. I mean they knew approximately where the range was going to be. You know, if it had come out at $50.00 a share, everything would have changed, you know. But they knew it was going to be $14.00, $15.00, $16.00, somewhere in that range.

Q What do you mean by, 'if it had come out at 50 everything would have changed'?

A The numbers would have gotten so huge, you know, that I would have to rethink my approach.

Q You also indicated in this paragraph that details will change depending on comments from Bob Diener and Brian Lidji.

Beyond the numbers changing, what did -- what, if anything, changed with respect to comments from Bob Diener or Brian Lidji?

A Oh, there was a couple of wording changes, you know, where I wasn't quite accurate according to his legal standing, you know, or I hadn't described something absolutely perfectly. You know, so just wording changes.

Q Stylistic changes?

A Yeah. I mean there was no substantive change of any kind.