**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **DAVID S. LITMAN And MALIA A. LITMAN,**<br>**Plaintiffs-Counterdefendants,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br>**Defendant-Counterplaintiff** | **No. 05-956T** |
| **ROBERT B. DIENER And MICHELLE S. DIENER,**<br>**Plaintiffs-Counterdefendants,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br>**Defendant-Counterplaintiff** | **No. 05-971T** |
| **HOTELS.COM, INC. and Subsidiaries (f/k/a HOTEL RESERVATIONS NETWORK, INC.)**<br>**Plaintiffs,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br>**Defendant** | **No. 06-285T**<br>**(Judge Christine O.C. Miller)** |

**PLAINTIFF HOTELS.COM'S PRETRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

**February 26, 2007**

**Kim Marie K. Boylan**
**Latham & Watkins, LLP**
**555 11th Street, NW**
**Washington, DC 20004**
**(202) 637-2235**
**Attorney of Record for Plaintiffs Hotels.com and Subsidiaries**

**Kari M. Larson**
**Latham & Watkins, LLP**
**555 11th Street, NW**
**Washington, DC 20004**
**Of Counsel**

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS .......... i
TABLE OF AUTHORITIES .......... iii
INTRODUCTION .......... 1
LEGAL AND FACTUAL CONTENTIONS .......... 6
CONTENTIONS OF FACT .......... 6
I. THE ACQUISITION .......... 6
II. THE AMENDED AND RESTATED ASSET PURCHASE AGREEMENT .......... 7
A. The Parties Valued The Remaining Contingent Earn Out Rights And Agreed That Litman And Diener Would Receive Restricted HRN Stock Equal To The Value Of Those Rights .......... 8
B. The Litmans And Dieners Received Additional Contingent Purchase Price Simply Because An IPO Was Consummated .......... 10
C. Mandatory Consistent Tax Treatment .......... 12
III. THE 2000 IPO .......... 12
A. SEC Correspondence, The Registration Statement, And The Prospectus .......... 12
B. The IPO Process .......... 13
C. The Closing Of The IPO Was A Condition Precedent To The Litmans' And Dieners' Ownership Of The Stock .......... 14
D. HRN Became A Separate Company On March 1, 2000 .......... 15
E. Subsequent Official Descriptions Of The Transaction Comport With Hotels.com's Primary Position .......... 16
IV. THE AMENDMENT TO THE AMENDED AND RESTATED ASSET PURCHASE AGREEMENT .......... 17
V. 2000 TAX RETURN POSITIONS .......... 17
A. The Litmans' And Dieners' Returns .......... 17
1. The Valuation Date Mystery .......... 18
2. The Discount .......... 18
3. The Dual Purpose Of The Valuation .......... 19
4. KPMG's "Review" Of The Mitchell 2000 Valuation .......... 19
B. Hotels.com's Tax Returns .......... 20
C. The IRS Audits And Subsequent Litigation .......... 22

VI. THE TRIAL EXPERTS....................23
A. The Litmans' And Dieners' Expert....................23
B. The United States' Expert....................23
C. Hotels.com's Expert....................24
CONTENTIONS OF LAW....................25
ARGUMENT....................28
I. THE AMENDED AND RESTATED ASSET PURCHASE AGREEMENT IS DISPOSITIVE OF THE ISSUES BEFORE THIS COURT....................28
II. IN THE ALTERNATIVE, IF THE CONTRACT DOES NOT ESTABLISH ITS VALUE, THE STOCK MUST BE VALUED AS OF MARCH 1, 2000....................33
A. All Of The Trial Experts Agree On The Starting Point For Valuation....................33
1. March 1, 2000 Is The Proper Valuation Date....................33
2. The Value Of A Freely Tradable Share Of HRN Stock On March 1, 2000 Is Easily Determined....................35
3. Two Of The Three Trial Experts Agree That 20 Percent Is The Appropriate Level Of Discount....................35
B. In The Further Alternative, Valuation As Of February 25, 2000 Must Be Based On The Market Price Of HRN Stock....................36
C. In The Further Alternative, Valuation As Of February 24, 2000 Would Not Begin With The IPO Price....................36
1. Litman And Diener Directed The Date To Be Placed On The Stock Certificate....................37
2. A Stock Certificate Is Not Determinative Of Ownership....................38
III. WHATEVER OCCURRED DURING THE IRS AUDIT IS IRRELEVANT AND INADMISSIBLE....................39
CONCLUSION....................40

APPENDIX A, APB No. 16

# TABLE OF AUTHORITIES

Page(s)

## CASES

*150 Broadway New York Associates, L.P. v. Bodner*,
784 N.Y.S.2d 63 (N.Y. App. Div. 2004) ....................33, 34

*Commissioner v. Patino*,
186 F.2d 962 (4th Cir. 1950) ....................31

*Cook v. United States*,
46 Fed. Cl. 110 (2000) ....................40

*Fireplace Shop, Inc. v. Fireplace Shop of Lafayette, Inc.*,
400 So. 2d 702 (La. Ct. App. 1981) ....................38

*Gould, Inc. v. United States*,
935 F.2d 1271 (Fed. Cir. 1991) ....................33

*Greenberg's Express, Inc. v. Commissioner*,
62 T.C. 324 (1974) ....................39, 40

*Grill v. United States*,
157 Ct. Cl. 804 (1962) ....................22

*Hunt Construction Group, Inc. v. United States*,
281 F.3d 1369 (Fed. Cir. 2002) ....................29, 33

*In re Matco-Norca, Inc.*,
802 N.Y.S.2d 707 (N.Y. App. Div. 2005) ....................28, 30, 34

*International Paper Co. v. United States*,
36 Fed. Cl. 313 (1996) ....................40

*Jack Daniel Distillery v. United States*,
180 Ct. Cl. 308 (1967) ....................32, 39

*Jupiter Corp. v. United States*,
2 Cl. Ct. 58 (1983) ....................38

*Mazzola v. County of Suffolk*,
533 N.Y.S.2d 297 (N.Y. App. Div. 1988) ....................28, 34

*Migliore v. Manzo*,
813 N.Y.S.2d 762 (N.Y. App. Div. 2006) ....................28

*Moore-McCormack Lines, Inc. v. Commissioner*,
44 T.C. 745 (1965) .......... 31

*Philadelphia Park Amusement Co. v. United States*,
130 Ct. Cl. 166 (1954) .......... 31

*Ruth v. United States*,
823 F.2d 1091 (7th Cir. 1987) .......... 40

*Sara Lee Corp. v. United States*,
29 Fed. Cl. 330 (1993) .......... 40

*Southern Natural Gas Co. v. United States*,
188 Ct. Cl. 302, 358 (1969) .......... 31

*W.W.W. Associates, Inc. v. Giancontieri*,
566 N.E.2d 639 (N.Y. 1990) .......... 28

*Walter v. Commissioner*,
No. 8321-05, 2007 WL 14634 (T.C. Jan. 3, 2007) .......... 34

*Weinstein v. Hartford Chemical Corp.*,
393 N.Y.S.2d 74 (N.Y. App. Div. 1977) .......... 38

*Weisberger v. Goldstein*,
662 N.Y.S.2d 544 (N.Y. App. Div. 1997) .......... 28

*Wood v. United States*,
89 Ct. Cl. 442 (1939) .......... 32

**STATUTES AND REGULATIONS**

26 U.S.C. § 1501 .......... 16

26 U.S.C. § 1504 .......... 16

26 U.S.C. § 7422 .......... 25

28 U.S.C. § 1491 .......... 25

Treas. Reg. § 20.2031-1(b) .......... 32

## OTHER AUTHORITY

Federal Rule of Evidence 408....................................................................................40

Rev. Rul. 59-60, 1959-1 C.B. 237 ....................................................................................35, 39

Alan S. Gutterman & Bentley J. Anderson, *Managing the Initial Public Offering of Securities*, 59 C.P.S. (BNA 2007)....................................................................................14

**APB Opinion No. 16, Business Combinations* (August 1970) ....................................................32

*Statement of Financial Accounting Concepts No. 7* (February 2000) ..........................................32

*Statement of Financial Accounting Standards No. 135, Rescission of FASB Statement No. 75 and Technical Corrections* (1999)....................................................................................32

18A Am. Jur. 2d *Corporations* § 619 ....................................................................................38

*Webster's II New College Dictionary* (1995) ..........................................................................34

***** As a courtesy to the Court, the item marked with an asterisk is attached hereto in Appendix A. APB Opinion No. 16 is no longer in effect and is difficult to locate.

**N THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **DAVID S. LITMAN And MALIA A. LITMAN,**<br>**Plaintiffs-Counterdefendants,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br>**Defendant-Counterplaintiff** | ) | **No. 05-956T** |
| **ROBERT B. DIENER And MICHELLE S. DIENER,**<br>**Plaintiffs-Counterdefendants,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br>**Defendant-Counterplaintiff** | ) | **No. 05-971T** |
| **HOTELS.COM, INC. and Subsidiaries (f/k/a**<br>**HOTEL RESERVATIONS NETWORK, INC.)**<br>**Plaintiffs,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br>**Defendant** | ) | **No. 06-285T**<br>**(Judge Christine O.C. Miller)** |

**PLAINTIFF HOTELS.COM'S PRETRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

## INTRODUCTION

This dispute is about the amount of additional consideration paid in 2000 by HRN, Inc., Hotels.com's predecessor, to the Litmans and Dieners[1] in connection with the 1999 purchase of two companies Litman and Diener founded. The crux of the issue is whether the Litmans and

[1] References to "Litman" are to Mr. Litman and references to "Diener" are to Mr. Diener. References to the "Litmans" are to both Mr. and Mrs. Litman and references to the "Dieners" are to both Mr. and Mrs. Diener.

Dieners should be held to an agreement that both Litman and Diener sought, heavily negotiated, and, together with their wives, personally signed. This agreement is dispositive of the issue before the Court.

The agreement at issue is an Amended and Restated Asset Purchase Agreement which resulted from the parties' renegotiation of the terms of the original Asset Purchase Agreement under which HRN purchased the two companies. Under the original Asset Purchase Agreement, the Litmans and Dieners were paid $246,000,000 and also had the possibility of receiving two forms of additional, contingent purchase price: (1) performance-based payments unlimited in amount for 2000, 2001, and 2002 under various earn out provisions; and (2) shares of restricted HRN stock valued at the IPO price if HRN were to complete successfully an initial public offering ("IPO").

The uncertainty attendant to HRN's unlimited additional purchase price obligations under the Asset Purchase Agreement's earn out provisions, a common desire to better align the interests of Litman and Diener with those of HRN, and the decision of HRN's parent company to attempt an IPO of HRN led to the Amended and Restated Asset Purchase Agreement. The parties carved out the 2000 earn out payment (which was ultimately paid in cash) and negotiated the value of the remaining 2001 and 2002 contingent purchase price payments. The parties agreed that the value of those rights was $81,600,000. The agreed value of $81,600,000 was to be paid "simultaneously with the initial close of the IPO" in the form of restricted stock if, and only if, HRN were to complete an IPO on or before March 31, 2000. In that case, a trust established and controlled by the Litmans and Dieners[2] would receive restricted HRN stock equal to the agreed $81,600,000 value of the remaining earn out rights. The Amended and

[2] This grantor trust is called the TMF Liquidating Trust (the "Trust").

Restated Asset Purchase Agreement also modified slightly the terms of the second form of contingent purchase price, the contingent restricted stock payment that would be made solely if an IPO were completed.

Importantly, the Litmans and Dieners proposed much of the stock restriction language that appeared in the Amended and Restated Asset Purchase Agreement. Thus, all such restrictions were taken into account when the parties negotiated how both forms of additional, contingent purchase price would be converted into shares of restricted stock.

HRN did complete its very successful IPO on March 1, 2000. As a result, the Litmans and Dieners were paid the agreed-upon additional purchase price of $81,600,000 in extinguishment of their remaining earn out rights. Under the formula negotiated by the parties, that amount was paid in the form of 5,100,000 shares of restricted HRN stock. In addition, the Litmans and Dieners received the second category of additional purchase price under the IPO provision: 4,899,900 shares of restricted HRN stock, valued at $78,398,400 pursuant to the terms of the Amended and Restated Asset Purchase Agreement. As a result, the total additional purchase price paid to the Litmans and Dieners under the Amended and Restated Asset Purchase Agreement was $159,998,400. Both Litman and Diener stated to the SEC, in writing, that this was the value of the additional purchase price they received from the sale of the two companies in the form of restricted stock.[3]

Because the payment of the stock was deferred contingent purchase price, it represented a payment of additional goodwill by HRN to the Litmans and Dieners. Hotels.com claimed additional amortization deductions on its 2000 Federal income tax return based on the agreed $159,998,400 value of what was paid to the Litmans and Dieners.

---

[3] In the SEC filings, the $159,998,400 of additional purchase price was rounded to $160 million.

The current dispute was created not by Hotels.com, but by the Litmans and Dieners when they violated the Amended and Restated Asset Purchase Agreement and took tax return positions that rejected that Agreement. They now claim that the total value they received was $45,437,822 and not the $159,998,400 they actually received. This unfounded claim is not merely inconsistent, it is in direct violation of Section 3.4(ii) of the Amended and Restated Asset Purchase Agreement, which explicitly prohibited such shenanigans:

> For all Tax purposes, the Buyer [HRN] and the Sellers [the Litmans and Dieners] agree (A) to report the transactions contemplated by this Agreement in a manner consistent with the terms of this Agreement and (B) that none of them will take any position inconsistent therewith in any Tax Return.

The Amended and Restated Asset Purchase Agreement is dispositive of the issue before the Court: the proper value of the total additional, contingent purchase price the Litmans and Dieners agreed to be paid in the form of restricted stock is the arm's length value negotiated by the parties, memorialized in the Agreement, and reported to the SEC and all of HRN's public shareholders – $159,998,400. In Hotels.com's view, this case requires no expert testimony.

By contrast, the Litmans and Dieners allege that the additional purchase price they sought, freely negotiated, agreed to, and reported to the SEC and the world can somehow have a radically different value for tax purposes, notwithstanding section 3.4(ii) of the Amended and Restated Asset Purchase Agreement quoted above. Moreover, their position would require the Court to ignore the condition precedent to the receipt of the stock – the closing of an IPO – and to conclude that they owned the stock before the IPO even occurred. Thus, the Litmans' and Dieners' position is completely unsupportable and should be rejected. The value of the additional, contingent purchase price paid by HRN was $159,998,400.

Hotels.com argues solely in the alternative that if the clear terms of the Amended and Restated Asset Purchase Agreement are not controlling, only then should the testimony of

valuation experts be relied upon to determine the fair market value of the restricted stock. What must then be determined is the proper valuation date, the discount to apply to account for the agreed upon restrictions on the stock, and the stock price against which to apply the discount. Each of the parties has retained a trial expert.

The proper valuation date is March 1, 2000 – the date on which the IPO closed. As discussed above, the Litmans and Dieners were entitled to receive the restricted stock if, and only if, an IPO were completed. Therefore, March 1, 2000 is the date the Litmans and Dieners acquired beneficial ownership of the stock under the express terms of the Amended and Restated Asset Purchase Agreement and the authorizing resolution of the HRN Board of Directors (which, as members of the Board, Litman and Diener personally approved). The Trust also acknowledged receipt of the restricted stock and released HRN from all of its obligations under the Amended and Restated Asset Purchase Agreement on March 1, 2000.

With respect to the proper level of discount, the discounts computed by the experts for two directly adverse parties, Hotels.com and the United States, are virtually identical, 20 percent and 20.3 percent, respectively. This is overwhelming evidence that an approximately 20 percent discount should be applied. The over 70 percent average discount determined by the Litmans' and Dieners' expert should be rejected.

Finally, the stock price against which to apply the discount is clear. All of the experts agree that the fair market value analysis must begin by using a willing-buyer/willing-seller paradigm – that is, the starting point for the valuation is the price on the valuation date at which a willing buyer would buy, and a willing seller would sell, a freely-tradable share of HRN stock. No guesswork is needed to determine the price at which a freely-tradable share of HRN stock could be sold on March 1, 2000. The HRN stock traded on the NASDAQ exchange and closed

at $26.25 per share. The weighted average price on that day was $25.8756. Thus, if the deferred purchase price agreed to under the terms of the Amended and Restated Asset Purchase Agreement were not respected, the proper application of long-standing valuation principles and case law would mandate the result put forth by Hotels.com in its alternative position, namely, that the value of the total additional purchase price was equal to the value of the freely tradable price of the HRN stock less a 20 percent discount.[4]

## LEGAL AND FACTUAL CONTENTIONS

The central issue in this case is the value of the additional, contingent purchase price paid by Hotels.com to the Litmans and Dieners in the form of restricted stock.

## CONTENTIONS OF FACT

### I. THE ACQUISITION

In 1999, Litman and Diener, the founders of Hotels.com's two predecessor companies, TMF, Inc. ("TMF") and HRN Marketing Corp. ("HRN Marketing"), sold substantially all the assets and liabilities of TMF and HRN Marketing to HRN, Inc. ("HRN"), a newly-created, wholly-owned subsidiary of USA Networks, Inc. ("USA")[5] pursuant to an Asset Purchase Agreement dated as of April 13, 1999. The Litmans and Dieners received up-front cash of $145,000,000. Under the Asset Purchase Agreement, they also were entitled to additional, contingent purchase price payments (1) under various earn out provisions and (2) if HRN were to complete an IPO. The performance-based earn out payments were to continue until 2002 and were not "capped" as to amount. As of December 31, 2000, not including the additional

---

[4] As discussed below, Hotels.com also asked its expert to value the stock, as a further alternative, as of February 25, 2000 and, as a still further alternative, as of February 24, 2000.

[5] USA had changed its name to USA Interactive in 2002 and to InterActiveCorp in June 2003, but for simplicity is referred to herein as USA.

purchase price at issue here, the purchase price received by the Litmans and Dieners totaled $246,000,000.

Litman and Diener, the CEO and President, respectively, of TMF and HRN Marketing, remained in these positions after the 1999 acquisition by HRN. The earn out provisions caused conflict between Litman, Diener and HRN/USA because the parties' interests were not fully aligned. Litman and Diener sought to have their earn out rights exchanged for HRN stock. The parties heavily negotiated the computation of the contingent purchase price payments under the various earn out formulas in the original Asset Purchase Agreement.

## II. THE AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

On November 5, 1999, the HRN Board of Directors authorized an initial public offering ("IPO") of its stock and appointed two of the directors, Victor Kaufman and Dara Khosrowshahi, to serve as the "Pricing Committee" which would negotiate and approve the IPO price and all other matters with respect to the IPO. On November 6, 1999, Litman and Diener became Board members of HRN.

The uncertainty attendant to HRN's otherwise unlimited additional purchase price obligation under the Asset Purchase Agreement's earn out provisions, a desire to better align the interests of Litman and Diener with those of HRN, and HRN's decision to attempt an IPO all led to the negotiation of the Amended and Restated Asset Purchase Agreement. The Board approved amending the original Asset Purchase Agreement on December 23, 1999. Litman and Diener, in their role as members of the HRN Board, approved this action.

### A. The Parties Valued The Remaining Contingent Earn Out Rights And Agreed That Litman And Diener Would Receive Restricted HRN Stock Equal To The Value Of Those Rights

At the time the parties agreed to amend the original Asset Purchase Agreement, Litman and Diener were still entitled to contingent deferred cash purchase price payments computed under the earn out provisions for the periods ending March 31, 2000, 2001, and 2002. The parties carved out the 2000 earn out payment and agreed that it would be paid in cash under the terms of the original Asset Purchase Agreement. In connection with the Amended and Restated Asset Purchase Agreement, Litman and Diener, on the one hand, and USA and HRN, on the other, heavily negotiated the value of the additional purchase price attributable to the remaining earn out payments for 2001 and 2002. The parties agreed that these rights were worth $81,600,000. In addition, they negotiated how the agreed amount would be paid and when it would be paid. The parties agreed that it would be paid in the form of restricted stock "[s]imultaneously with the initial closing of the 2000 IPO." In fact, Litman and Diener, who are both lawyers, and their outside counsel, Brian Lidji, proposed the terms of many of the stock restrictions that are set forth in the Amended and Restated Asset Purchase Agreement.

In sum, the parties agreed to a payment by HRN to the Litmans and Dieners of $81,600,000 in additional purchase price in "full satisfaction" of the remaining earn out rights if an IPO, in fact, were completed. The Amended and Restated Asset Purchase Agreement specifically sets forth the $81,600,000 value and provides the formula by which the number of shares of restricted HRN stock that would be paid in "full satisfaction" of this amount would be computed. These shares are defined in the Amended and Restated Asset Purchase Agreement as the "Section 7.15 Shares."

Under the Section 7.15 formula, if the IPO price ultimately were below $11 per share, then $11 would be used as the denominator in the computation of the number of Section 7.15

Shares to be paid. If the IPO price ultimately were set above $16.25 per share, then the denominator would be $16.25. If the IPO price were between $11 and $16.25, as was the case here, the $81,600,000 of agreed, additional purchase price would be divided by the IPO price. The Shares were to be issued to a Trust controlled by the Litmans and Dieners (the "TMF Liquidating Trust"). Because the Amended and Restated Asset Purchase Agreement was executed as of February 2, 2000, and the IPO price had not been set at that time, the Litmans and Dieners did not know at the time they executed the Amended and Restated Asset Purchase Agreement how many Shares they would receive in exchange for the agreed $81,600,000 of additional purchase price. However, they did know that regardless of how many Shares they received, those Shares would be worth $81,600,000.

Because the IPO price was ultimately set at $16 per share, pursuant to Section 7.15.1(i) of the Amended and Restated Asset Purchase Agreement, the number of Section 7.15 Shares the Litmans and Dieners received in full satisfaction of the $81,600,000 agreed amount of additional purchase price was 5,100,000.[6] If the IPO price had been set at $11 per share, the Litmans and Dieners would have received more Section 7.15 Shares so that the number of Shares equaled the agreed $81,600,000 value. If the IPO price had been set at $16.25, then they would have received fewer Section 7.15 Shares, but, again, the total value of those Shares still would have been the agreed $81,600,000.

[6] $81,600,000/$16 = 5,100,000 shares.

A condition precedent to this entire exchange, however, was the conclusion of an IPO on or before March 31, 2000.[7] In that event, the Section 7.15 Shares were to be issued "[s]imultaneously with the initial closing of the 2000 IPO." Any other date of issuance would not only have been contrary to the express terms of the Amended and Restated Asset Purchase Agreement, but would also have been an unauthorized corporate action. The HRN Board of Directors authorizing resolution provides that the Section 7.15 and Section 7.11.3 Shares would be "validly issued" only "upon issuance in accordance with the Amended Asset Purchase Agreement . . . ." Litman and Diener, in their role as members of the Board, approved this resolution.

The initial closing of the 2000 IPO occurred on March 1, 2000. The expiration dates of the restrictions on the stock received in the exchange, like the Litmans' and Dieners' entitlement to the stock itself, were triggered off of the IPO's initial closing date. The restrictions expired over four-years on the anniversary of the IPO's initial closing. Litman's, Diener's, and Lidji's internal analyses of the restrictions also use the March 1st closing date. Also on March 1, 2000, Litman, Diener, and the Trust acknowledged receipt of the Section 7.15 Shares and released HRN from all of its obligations under Section 7.15 of the Amended and Restated Asset Purchase Agreement. Therefore, March 1, 2000 is the date the Litmans and Dieners were entitled to the Section 7.15 Shares.

**B. The Litmans And Dieners Received Additional Contingent Purchase Price Simply Because An IPO Was Consummated**

In addition to the Section 7.15 Shares, under Section 7.11.3 of the Amended and Restated Asset Purchase Agreement the Litmans and Dieners were also entitled to additional deferred

---

[7] Although not relevant to Hotels.com's primary legal argument, the date on which the Litmans and Dieners were legally entitled to the shares at issue is significant in the context of Hotels.com's alternative arguments.

purchase price, again payable in shares of restricted HRN stock, in the event HRN consummated an IPO. The Litmans' and Dieners' entitlement to additional purchase price in the event of an IPO also existed under the original Asset Purchase Agreement.

The original Asset Purchase Agreement required HRN to issue, "if, . . ., the Buyer consummates an initial public offering of its common stock (an 'IPO')"

> a number of shares of common stock of [HRN] having an aggregate value (based on the price per share in the IPO) equal to the product of (x)(i) the total issued and outstanding shares of [HRN] immediately prior to the IPO times the IPO price minus (ii) the Net Debt Capital multiplied by (y) 10%.

The Amended and Restated Asset Purchase Agreement revised this formula slightly to take into account the new fact that if there were an IPO, the Litmans and Dieners would also receive the Section 7.15 Shares in exchange for extinguishing their remaining earn out rights. Section 7.11.3 of the Amended and Restated Asset Purchase Agreement provided that the Litmans and Dieners would be entitled to additional shares of restricted stock (the "Section 7.11.3 Shares") if HRN "consummates an initial public offering of shares of its common stock," computed as follows:

> a number of shares of common stock of [HRN] having an aggregate value (based on the price per share in the IPO) equal to the product of (x)(i) the total issued and outstanding shares of [HRN] immediately prior to the IPO (*which shall include the shares issued under Section 7.15 simultaneous with the IPO*) times the IPO price minus (ii) the Net Debt Capital multiplied by (y) 10%. [emphasis added]

Thus, the only change to the original provision was to include, for purposes of computing the 10 percent, the number of Shares that would be issued under Section 7.15.

Because an IPO was consummated on March 1, 2000, the Litmans and Dieners received an additional 4,899,900 Shares of restricted HRN stock under Section 7.11.3. Under the unambiguous terms of Section 7.11.3 of the Amended and Restated Asset Purchase Agreement, the "aggregate value (based on the price per share in the IPO)" of these Shares, taking into

account all of the restrictions to which they were subject, was $78,398,400."[8] As stated above, the initial closing of the 2000 IPO occurred on March 1, 2000. On March 1, 2000, Litman, Diener, and the Trust acknowledged receipt of the Section 7.11.3 Shares and released HRN from all of its obligations under Section 7.11.3 of the Amended and Restated Asset Purchase Agreement.[9]

### C. Mandatory Consistent Tax Treatment

Under the Amended and Restated Asset Purchase Agreement, the above-described provisions also govern the reporting of the transaction for tax purposes. Specifically, Section 3.4(ii) of the Amended and Restated Asset Purchase Agreement provides that "[f]or Tax purposes, the Buyer [Hotels.com] and the Sellers [Litman and Diener] agree (A) to report the transactions contemplated by this Agreement in a manner consistent with the terms of this Agreement, and (B) that none of them will take any position inconsistent therewith in any Tax Return." Hotels.com reported the transaction at issue in a manner consistent with the Amended and Restated Asset Purchase Agreement. By claiming that the additional purchase price they received was $45 million rather than the agreed $159,998,400 they actually received, the Litmans and Dieners did not. Rather, they violated the express terms of the Amended and Restated Asset Purchase Agreement.

## III. THE 2000 IPO

### A. SEC Correspondence, The Registration Statement, And The Prospectus

The documentation of the 2000 IPO is completely consistent with Hotels.com's primary position in this case, namely, that the Amended and Restated Asset Purchase Agreement is

---

8 The IPO price was $16 per share. Thus, 4,899,900 shares x $16 = $78,400,000.

9 The Amended and Restated Asset Purchase Agreement defines the Section 7.11.3 Shares together with the Section 7.15 Shares collectively as the "2000 IPO Shares."

controlling. In connection with finalizing the IPO's governing document, the Form S-1 (Registration Statement (which includes the Prospectus)), the SEC raised several issues with respect to the description of the additional purchase price to be paid to the Litmans and Dieners if the IPO were completed. Ultimately, the SEC required that the transaction be described consistently with the terms of the Amended and Restated Asset Purchase Agreement. HRN complied with this requirement.

The final Prospectus is dated February 25, 2000. It stated that "under the amended and restated asset purchase agreement, we [HRN] will issue to TMF Liquidating Trust, as the party designated by TMF, Inc. and HRN Marketing Corp., 9,999,900[10] shares of class A common stock immediately prior to the closing of this offering," and that the issuance of those Shares will result in HRN having "approximately $160 million" of additional goodwill.

**B. The IPO Process**

In February 2000, Litman and Diener participated in what are known as "road shows" to educate prospective investors regarding the prospects of HRN and the merits of the anticipated IPO. The interest in the HRN IPO was very strong and it was oversubscribed.

The IPO price eventually set by the Pricing Committee of HRN's Board of Directors was $16 per share. Neither Litman nor Diener was on this committee. Consistent with standard practice, the ability to purchase HRN shares at the IPO price was offered only to select investors and "friends and family."

After the IPO price is set but before an IPO actually starts to trade publicly, underwriters seeking to trade in a stock make bids and offers based on their knowledge of the market and the anticipated demand for the shares. These "pre-open bid and offer prices" are the best indication

---

[10] The sum of the Section 7.15 and 7.11.3 Shares is 9,999,900.

of the freely-tradable value of shares prior to the commencement of actual securities exchange trading. The pre-open bid and offer prices on the HRN stock started at $23 and $27, respectively. The HRN stock began to trade publicly on February 25, 2000, and the initial closing of the IPO occurred on March 1, 2000. The closing price of the HRN stock was $26 on February 25th and $26.25 on March 1st. The weighted average price of the stock was $25.1030 and $25.8756 on February 25th and March 1st, respectively. While not relevant to Hotels.com's primary legal position, the freely tradable value of the HRN Stock is relevant to Hotels.com's alternative positions.

Generally, five business days after the Registration Statement for the IPO becomes effective, a "closing" occurs where documents necessary to complete the transaction are executed.[11] The initial closing of the HRN IPO occurred on March 1, 2000. Because the IPO was oversubscribed, there was an additional allocation of shares. This subsequent closing for the IPO occurred on March 2, 2000.

**C. The Closing Of The IPO Was A Condition Precedent To The Litmans' And Dieners' Ownership Of The Stock**

The date on which the Litmans and Dieners obtained beneficial ownership of the stock at issue also is not relevant under Hotels.com's primary legal position. However, if the Court were to conclude that the Amended and Restated Asset Purchase Agreement were not controlling, and would therefore be forced to engage in a valuation exercise, then the date the Litmans and Dieners obtained beneficial ownership of the stock is critical. The underwriters of the IPO did not receive their stock until the IPO actually closed on March 1, 2000. Litman, Diener, and the Trust released HRN of its obligations and acknowledged receipt of the Section 7.15 and 7.11.3

---

[11] If the documents are executed earlier, they are held in escrow until the actual closing date. For a description of the IPO process, see Alan S. Gutterman & Bentley J. Anderson, *Managing the Initial Public Offering of Securities*, 59 C.P.S. (BNA).

Shares on March 1, 2000. The Amended and Restated Asset Purchase Agreement imposed a condition precedent to the receipt of both the Section 7.15 and Section 7.11.3 Shares – the completion or consummation of the IPO on or before March 31, 2000. In that event, the Section 7.15 Shares would be issued "simultaneously with the initial close of the IPO" and the Section 7.11.3 Shares would be issued only if HRN "consummate[d] an initial public offering of its common stock." As noted above, the HRN IPO closed on March 1, 2000. The Board, including Litman and Diener, resolved that the Section 7.15 and 7.11.3 Shares "upon issuance in accordance with the Amended Asset Purchase Agreement, will be validly issued . . . ." Thus, the Litmans and Dieners did not own the Shares prior to the March 1, 2000 closing date of the IPO.

**D. HRN Became A Separate Company On March 1, 2000**

The stock certificate received by the Trust for the Section 7.15 and 7.11.3 Shares is dated February 24, 2000. The Litmans and Dieners are expected to assert that the date on the stock certificate establishes their rights to the stock. Again, this position is only relevant in the context of Hotels.com's alternative position. As discussed below, this assertion is incorrect as a matter of law.

As a factual matter Litman, in his role as a trustee of the Trust, and Lidji directed the transfer agent to issue the stock as of that date. If the Litmans and Dieners are correct that their stock was *validly* issued as of February 24, 2000 (which is inconsistent with the express terms of the Amended and Restated Asset Purchase Agreement), that stock would have represented 20.4 percent of the total shares outstanding[12] and, as a result, HRN would have been deconsolidated from USA on that date. This did not occur. Rather, HRN became deconsolidated from USA on

---

12 (9,999,900 shares)/(9,999,900 + 38,999,100 shares held by USA) = 20.4 percent

March 1, 2000 because, as of that date, USA no longer owned 80 percent of the vote and value of HRN. HRN's short taxable year began on March 1, 2000 and ended on December 31, 2000.[13]

**E. Subsequent Official Descriptions Of The Transaction Comport With Hotels.com's Primary Position**

The description of the transaction in HRN's 2000 Annual Report also was consistent with the terms of the Amended and Restated Asset Purchase Agreement and Hotels.com's primary position in this case. In the HRN Annual Report, which both Litman and Diener signed, they admitted:

> On May 10, 1999, the Company acquired substantially all of the assets and assumed substantially all of the liabilities of TMF, Inc. and HRN Marketing Corp., which operated the Hotel Reservations Network service. The total purchase price paid through December 31, 2000 is $406 million, which is comprised primarily of $145 million paid on May 11, 1999; $5 million related to a promissory note which was paid on January 31, 2000; $50 million related to contingent payments based on the operating performance for the year ended December 31, 1999; *$78.4 million related to 4,899,900 shares of class A common stock issued to the sellers of the predecessor business which represented 10% of the aggregate value of the Company immediately prior to the initial public offering in accordance with the asset purchase agreement*; $46 million based on operating performance for the twelve-month period ended March 31, 2000; *and $81.6 million related to 5,100,000 shares of class A common stock issued to the sellers of [TMF and HRN Marketing] in exchange for their release of the Company's obligation for contingent payments based on operating performance for the twelve month periods ended March 31, 2001 and 2002.* [emphasis added].

Virtually identical language was contained in the Form 10-Q filed with the SEC for the first quarter of 2000, which was signed by Litman. Thus, Litman and Diener reported to the SEC that the value of the additional purchase price they received in exchange for the extinguishment of their remaining earn out rights was $81.6 million, that the value of the Shares they received

---

13 Under Sections 1501 and 1504 of the Internal Revenue Code, a corporation can be included in a consolidated return only if its parent company owns at least 80 percent of the total voting power and 80 percent of the total value of the subsidiary's stock. 26 U.S.C. §§ 1501, 1504.

simply because an IPO was consummated was $78.4 million and, therefore, the total value of their restricted stock was $160 million.

## IV. THE AMENDMENT TO THE AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

In 2002, HRN changed its name to Hotels.com. In 2003, Hotels.com went private and was once again a subsidiary of USA. USA, which owned both Hotels.com and one of its primary competitors – Expedia, Inc. – reorganized the consolidated company and made Expedia Hotels.com's direct parent company. Litman and Diener chose to leave Hotels.com rather than continue working within the new corporate structure.

When Litman and Diener decided to leave the company, they also renegotiated the Amended and Restated Asset Purchase Agreement. The Amendment lifted all of the remaining restrictions on the 2000 IPO Shares early.

## V. 2000 TAX RETURN POSITIONS

The Litmans and Dieners filed their individual tax returns after the HRN return was filed and took positions they knew were contrary to (1) the position already taken by HRN in its 2000 return; (2) all of the provisions the Litmans and Dieners had agreed to in the Amended and Restated Asset Purchase Agreement, and in the Board resolution they had approved; and (3) their own statements made in SEC filings. Unlike the Litmans and Dieners, Hotels.com adhered to its agreement and reported the additional purchase price paid using the $159,998,400 value that had been agreed to by all of the parties.

### A. The Litmans' And Dieners' Returns

The Litmans and Dieners will undoubtedly allege that their tax reporting was based on the tax reporting of the Trust (which they also controlled). Rather than use the negotiated and agreed-upon value of the deferred purchase price of $159,886,400, the Trust appears to have

reported the value of the stock as $45,437,822, based, in part, on an appraisal performed by Mark Mitchell. The Trust reported the value of the stock as additional capital gain from the sale of TMF, Inc. and HRN Marketing.

**1. The Valuation Date Mystery**

Mitchell, the appraiser whom the Trust, the Litmans, and the Dieners relied upon for purposes of their tax return positions, used a valuation date of February 24, 2000 in the report he prepared in 2000. However, in their depositions, neither Mitchell, Litman, nor Diener were able to explain why that valuation date was selected or by whom. Even stranger, a draft of Mitchell's 2000 report summary faxed to Litman and Diener on February 25, 2000, used February 25th as the valuation date. This document was produced to Hotels.com after the close of discovery.

Mitchell is also serving as the trial expert for the Litmans and Dieners. In his trial report, Mitchell uses a valuation date of February 24, 2000. However, a second appraiser hired by Litman and Diener, David Bohlmann, used February 25th as the valuation date in his report.

**2. The Discount**

In his final 2000 report, Mitchell determined that the restrictions on the Section 7.15 and 7.11.3 Shares should result in an average marketability discount of approximately 70 percent, to be applied to the "market price of the Hotel Reservations Network, Inc. stock to reflect the fair market value of the stock giving consideration to relevant resale restrictions." This was consistent with his February 25, 2000 draft. Also consistent with the draft, his final 2000 report defined fair market value as "the price at which property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts." Contrary to his February 25, 2000 draft report, Mitchell omitted any total value for the stock in

his final 2000 report. Litman and Diener made the decision to apply the 70 percent discount to the $16 IPO price of the stock.

**3. The Dual Purpose Of The Valuation**

Mitchell's 2000 valuation not only served as the basis for the Litmans' and Dieners' decision to report capital gains far lower than the agreed-upon value of the consideration they received, but it also served as the basis for the value of "tracking interests" in the Trust. As discussed above, the Litmans and Dieners chose to have the stock at issue held by the Trust. Although the stock was subject to the same restrictions in the hands of the Trust as it would have been if held by Litman and Diener directly, those restrictions did not stop Litman and Diener from accomplishing their estate planning goals.

"Tracking interests" in the TMF Liquidating Trust were created, which allowed Litman and Diener to sell beneficial interests in the Trust itself. These tracking interests were initially held by Litman and Diener in equal shares. The 2000 Mitchell valuation used by the Litmans and Dieners to value the stock for purposes of reporting their capital gains was also used to establish the value the Litmans' children and Mrs. Litman would have to pay to Mr. Litman to acquire some of his tracking interests and the value Mrs. Diener and the Dieners' children would have to pay to their father to acquire their tracking interests. The lower the valuation, the less the Litman and Diener family members had to pay for the tracking interests.

**4. KPMG's "Review" Of The Mitchell 2000 Valuation**

The Litmans and Dieners are expected to argue that KPMG reviewed and concurred with the Mitchell valuation of the 2000 IPO Shares. Hotels.com believes any testimony concerning such "review" is inadmissible hearsay.[14] Nevertheless, should any evidence of such review be

---

[14] Under the Court's Order, motions *in limine* are not due until April 5, 2007.

admitted, it is important to understand the nature of KPMG's purported "review" and "concurrence." Diener's contact at KPMG, James Horan, apparently faxed to an airport Hilton a draft version of the 2000 Mitchell valuation. The recipient of the fax was a Mr. Nicholson, whom Horan did not know and had never met, but who is allegedly a member of KPMG's valuation practice. Nicholson was apparently attending a conference at the airport hotel. While Nicholson was still at the conference, likely the day after he received the fax, he allegedly told Horan that he thought the valuation was "reasonable." Horan had no idea how much time Nicholson spent reviewing the valuation or what, if anything, he did to evaluate it. Mr. Nicholson did not provide Horan with any written analysis or documentation.

**B. Hotels.com's Tax Returns**

USA retained Ernst & Young ("EY") to prepare HRN's 2000 return for the short year beginning March 1, 2000 and ending on December 31, 2000.[15] EY prepared the return, reporting amortization deductions based on the $158,998,400 total additional purchase price negotiated under the Amended and Restated Asset Purchase Agreement. The amortization deductions were based on a spreadsheet prepared by an HRN employee which shows that the claimed amortization period began on February 25, 2000. EY also prepared a Form 8594 Asset Acquisition Statement, which is required when an asset acquisition is completed. This Form, as prepared by EY, was consistent with the Amended and Restated Asset Purchase Agreement and Litman's and Diener's statements to the SEC.

Because HRN was no longer part of USA's consolidated group as of March 1, 2000, HRN's separate tax return had to be signed by someone from HRN. Diener, who was the person

[15] Only the 2000 taxable years of the parties are before the Court of Federal Claims. However, because the value of the stock represents additional goodwill that Hotels.com is entitled to amortize and deduct over a number of years, this issue impacts Hotels.com's subsequent tax years as well.

at HRN ultimately responsible for HRN's tax matters, directed HRN's Vice President of Finance, Viren Gandhi, to sign the return. However, before the return was filed, Diener directed Gandhi to "white out" the information on the Form 8594 that set forth the value of the additional, contingent purchase price paid to the Litmans and Dieners. No one informed USA of this action at the time. In fact, Hotels.com's records did not contain a copy of the 2000 HRN tax return with the Form 8594 whited out. Hotels.com did not learn of the actions directed by Diener until counsel for the United States questioned the copy of the return attached to Hotels.com's Complaint and provided Hotels.com with a copy of the whited out form. Although Diener's order to white out certain information on the Form 8594 was complied with, the HRN return, as filed with the IRS, nevertheless reported amortization deductions based on the $159,998,400 of additional purchase price paid and the beginning amortization date of February 25, 2000.[16]

Around the time that the HRN return was filed, USA learned that Litman and Diener were not reporting the agreed-to value in their tax returns. Because the parties were not reporting the same value, USA knew that the IRS would focus on this issue. USA retained Deloitte & Touche ("DT") to prepare a quick valuation. DT was asked to complete its analysis in less than a week. DT determined that a weighted average discount of approximately 33 percent was reasonable. DT used February 25, 2000 as the valuation date. In computing the discount, DT assumed that the share price "as of February 25, 2000 was $16.50." In fact, the closing share price on that date was $26 and the weighted-average price was $25.1030. DT did

---

[16] This date is incorrect. It should have been March 1, 2000, the first day of HRN's short tax year for 2000. But, in any event, the employee who prepared the schedule did not use February 24, 2000 as the date HRN paid the additional deferred purchase price.

not determine a total value for the Shares at issue or state the share price to which its computed discount should be applied. Hotels.com is not relying on the DT valuation in this litigation.[17]

### C. The IRS Audits And Subsequent Litigation

The IRS did, indeed, audit the Litmans', Dieners', and Hotels.com's 2000 tax returns. The Litmans and Dieners refused to extend their statutes of limitation on assessment. As a result, the IRS issued Notices of Deficiency to the Litmans and Dieners in October 2004. Those Notices of Deficiency reflect a total value of consideration received by the Litmans and Dieners of $159,998,400. The Litmans and Dieners paid the deficiencies asserted by the IRS and filed claims for refund. Neither the Litmans nor the Dieners requested that the IRS deny their refund claims. The Litmans and Dieners filed suit in this Court on August 30, 2005 and September 7, 2005, respectively, and the Court consolidated their cases.

Hotels.com extended its statute of limitations on assessment until December 31, 2006. On February 10, 2006, the IRS issued a Notice of Deficiency to Hotels.com reflecting the total $45,437,822 value used by the Litmans and Dieners. Hotels.com paid the deficiency on March 9, 2006, filed a claim for refund on March 16, 2006, and, by letter of the same date requested that the IRS deny its claim for refund under the provisions of Internal Revenue News Release IR1600. The IRS issued its denial on March 30, 2006. On April 10, 2006, Hotels.com filed suit

---

[17] Certain later year HRN returns adjusted HRN's claimed amortization deductions downward. The position taken on these returns is not determinative of value. A tax return position, while an admission, may not be resorted to for determining market value unless there is an absence of other evidence to the contrary. *Grill v. United States*, 157 Ct. Cl. 804, 812-13 (1962). It is clear beyond cavil that in this case there is determinative valuation evidence to the contrary. Moreover, Hotels.com has filed protective amended returns reflecting its originally claimed basis in the additional goodwill as dictated by the terms of the Amended and Restated Asset Purchase Agreement. In addition, because Diener was ultimately in charge of taxes at HRN during 2000 and he directed the actions of the HRN employee who signed the 2000 HRN return, the position taken on the 2000 tax return (*i.e.*, the value of the additional purchase price paid was $159,998,400) is an admission against him.

in this Court. By Order dated April 27, 2006, Hotels.com's case was consolidated with the Litmans' and Dieners'.

## VI. THE TRIAL EXPERTS

As indicated above, the testimony of trial experts is only relevant to Hotels.com's alternative position.

### A. The Litmans' And Dieners' Expert

Mitchell remains the Litmans' and Dieners' expert in this litigation. In his trial report, Mitchell either selected or was told to use February 24, 2000 as the valuation date. As in his 2000 Report, he states that a willing-buyer/willing-seller analysis is appropriate. However, unlike his 2000 Report, his trial report provides dollar values for the stock. In his deposition, Mitchell stated that he computed a value for the stock at the request of Mr. Porter, counsel for the Litmans and Dieners. In his trial report, Mitchell subtracts his computed discount from the $16 per share IPO price, but provides no support for why, in his view, this was the appropriate starting point or why that price satisfies his own definition of the arm's length price for freely tradable HRN shares. Mitchell did not consider any of the HRN IPO's pre-opening stock activity. Mitchell's average per share discount remains at approximately 70 percent, resulting in an average per share price of $4.53, or $45,437,823 in the aggregate.

### B. The United States' Expert

The United States retained Francis X. Burns as its expert. Burns used February 24, 2000 as the valuation date at the instruction of his counsel and did not make an independent determination of the appropriate valuation date. He also used the $16 per share IPO price as a starting point, and his report, like Mitchell's, provides no support for why he chose this price. Burns did not consider any of the HRN IPO's pre-opening stock activity.

Burns determined a discount of approximately 20.3 percent and, therefore, valued the 2000 IPO Shares at $12.75 per share, or an aggregate of $127,498,725.[18] In his deposition, however, Burns agreed that if the valuation date were after the HRN stock started to trade, he believed that the market price of the stock would likely be the starting point to which he would apply a discount.

### C. Hotels.com's Expert

Hotels.com retained Dr. Mukesh Bajaj as its expert. Dr. Bajaj has testified both for taxpayers and the government and his opinions and studies have been relied upon in numerous cases.

Dr. Bajaj valued the 2000 IPO Shares as of three different dates – March 1, 2000, February 25, 2000, and February 24, 2000. The date used does not materially impact Dr. Bajaj's conclusion that the fair market value of the Section 7.15 and Section 7.11.3 Shares, including all restrictions, is in excess of the $16 per share IPO price if the analysis is done using accepted valuation techniques and theories correctly applied.

Given that the Litmans and Dieners were not entitled to receive the Section 7.15 Shares until the "initial closing" of the IPO, which occurred on March 1, 2000, or the Section 7.11.3 Shares until the IPO was "consummated," *i.e.*, March 1, 2000, Dr. Bajaj was instructed to use March 1, 2000 as his primary valuation date.[19] Dr. Bajaj concluded that a maximum discount of 20 percent should be applied to account for the various restrictions to which the Section 7.15 and Section 7.11.3 Shares were subject. On March 1, no guesswork or judgment is involved in

---

[18] Burns originally determined that the value was $11.10 per share. However, he filed an addendum to his report to correct a mathematical error. In the addendum, the corrected valuation is $12.75.

[19] Again, any valuation analysis is solely in connection with Hotels.com's alternative legal arguments.

determining the value of freely tradable shares of HRN. Starting with the $26.25 closing price for HRN stock on March 1, 2000, Dr. Bajaj determined that the fair market value of the Section 7.15 and Section 7.11.3 Shares was $21 per share, or $209,997,900 in the aggregate.

Because February 25, 2000 had been used as a valuation date by others, Dr. Bajaj was instructed to value the Shares as of that date as well. Again, no judgment or guesswork was required to determine the willing buyer-willing seller starting point because that share price was set by the market. Using the $26 per share closing price of HRN stock on February 25, 2000 and applying Dr. Bajaj's 20 percent discount would result in a per share value of $20.80, or $207,997,920 in the aggregate.

Even if a February 24, 2000 valuation date were used, Dr. Bajaj would still apply a 20 percent discount. However, unlike Mitchell or Burns, his analysis did not begin with the $16 per share IPO price. In Dr. Bajaj's opinion, that price is not the fair market value of freely tradable HRN shares because it is not the price at which a willing buyer would buy *and a willing seller would sell* freely tradable shares mere hours before the stock actually began trading on the NASDAQ. In Dr. Bajaj's opinion, the "pre-open bid and offer prices" on the HRN stock provide the best evidence of the market price of the HRN stock as of February 24, 2000. Those prices started at $23 and $27, respectively, well above the $16 per share IPO price.

Thus, if valued as of February 24, 2000, beginning with the $23 pre-open bid price and applying a 20 percent discount, the minimum justifiable value for the Section 7.15 and Section 7.11.3 Shares was $18.40 per share, or $183,998,160 in the aggregate.

## CONTENTIONS OF LAW

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491 and 26 U.S.C. § 7422.

2. All conditions precedent to the jurisdiction of the Court have been satisfied.

3. The Amended and Restated Asset Purchase Agreement establishes the value of the additional, deferred purchase price paid by HRN to the Litmans and Dieners.

4. The value of the 5,100,000 Section 7.15 Shares is equal to the value of the contingent earn out rights for which they were exchanged. The parties agreed that the contingent earn out rights, and therefore the value of the Section 7.15 Shares, taking into account all restrictions to which such Shares were subject, was $81,600,000. As a matter of law, the value of the Section 7.15 Shares is $81,600,000.

5. The parties agreed that the value of the 4,899,900 Section 7.11.3 Shares was to be computed based on the IPO Price. The IPO Price was $16 per share. Thus, they agreed that the value of those Shares, taking into account all restrictions, was $78,398,400. As a matter of law, the value of the Section 7.15 Shares is $78,398,400.

6. As a matter of law, Hotels.com paid additional deferred purchase price to the Litmans and Dieners in the total amount of $159,998,400, which represents additional goodwill that Hotels.com is entitled to amortize.

7. In the alternative, if the Amended and Restated Asset Purchase Agreement is not found to be controlling as to the issue before this Court, the restricted HRN stock must be valued as of the date the Litmans and Dieners obtained beneficial ownership of the stock using accepted valuation techniques properly applied.

8. The date on the stock certificate is not controlling as to when the Litmans and Dieners obtained beneficial ownership of the restricted HRN stock.

9. The completion of an IPO was a condition precedent to the Litmans' and Dieners' entitlement to receive the restricted HRN stock. Thus, as a matter of law, the Litmans and

Dieners obtained beneficial ownership of the restricted HRN stock on March 1, 2000, the date of the IPO's closing.

10. The fair market value of the restricted HRN stock is the amount a willing buyer would pay and a willing seller would accept for an unrestricted share of HRN common stock, less a discount to reflect the restrictions. The market price of the HRN stock on March 1, 2000 as reflected on the NASDAQ exchange is the appropriate starting point for purposes of determining the value of the restricted HRN stock received by the Litmans and Dieners. The discount computed by Hotels.com's expert and the United States' expert is reasonable. Thus, the value of the HRN restricted stock received by the Litmans and Dieners would be computed by applying a 20 percent discount to the March 1, 2000 market price of the freely tradable HRN stock.

11. In the further alternative, if the Amended and Restated Asset Purchase Agreement were not found to be controlling as to the issue before this Court, and if the Court were to conclude that the restricted HRN stock must be valued as of February 25, 2000, the market price of the HRN stock on February 25, 2000 as reflected on the NASDAQ would be the appropriate starting point for purposes of determining the value of the restricted HRN stock received by the Litmans and Dieners. The discount computed by Hotels.com's expert and the United States' expert is reasonable. Thus, the value of the HRN restricted stock received by the Litmans and Dieners would be computed by applying a 20 percent discount to the February 25, 2000 market price of the freely tradable HRN stock.

12. In the further alternative, if the date on the stock certificate were found to be controlling, the "pre-open bid and offer prices" would be the best indication of the fair market value of freely tradable shares of HRN stock as of that date. The discount computed by Hotels.com's expert and the United States' expert is reasonable. Thus, the minimum value of the HRN restricted stock

received by the Litmans and Dieners would be computed by applying a 20 percent discount to the pre-open bid price of $23 per share.

## ARGUMENT

### I. THE AMENDED AND RESTATED ASSET PURCHASE AGREEMENT IS DISPOSITIVE OF THE ISSUES BEFORE THIS COURT

Because the Amended and Restated Asset Purchase Agreement is clear and unambiguous, it controls in this case. The Agreement provides that, in the event an IPO were completed on or before March 31, 2000, the Litmans and Dieners would receive additional proceeds from the sale of TMF and HRN Marketing of $159,998,400. An IPO was, in fact, completed in that time period and the value of the additional purchase price is therefore incontrovertible.[20]

Under Section 14.6 of the Amended and Restated Asset Purchase Agreement, New York law controls the Agreement's interpretation. Under New York law, "'[i]t is the primary rule of construction of contracts that when the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and the parties' reasonable expectations.'" *In re Matco-Norca, Inc.*, 802 N.Y.S.2d 707, 708-09 (N.Y. App. Div. 2005) (quoting *Weisberger v. Goldstein*, 662 N.Y.S.2d 544 545 (N.Y. App. Div. 1997), and citing *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990); *Mazzola v. County of Suffolk*, 533 N.Y.S.2d 297, 297 (N.Y. App. Div. 1988)). This is especially true where, as here, the parties are sophisticated and represented by counsel. *See, e.g., Migliore v. Manzo*, 813 N.Y.S.2d 762, 764 (N.Y. App. Div. 2006) (in contract reformation action, sophisticated, counseled businessmen held to the terms of

---

[20] There is no doubt that the stock issued to the Litmans and Dieners constituted additional, deferred purchase price paid by HRN for the purchase of TMF, Inc. and HRN Marketing. The Trust, the Litmans and Dieners, and HRN all reported it as such on their respective tax returns.

an unambiguous contract). These same rules are followed in this Court. *See, e.g., Hunt Constr. Group, Inc. v. United States*, 281 F.3d 1369 (Fed. Cir. 2002), *aff'g* 48 Fed. Cl. 456 (2001).

Litman and Diener are lawyers, as is Mrs. Litman. The Litmans and Dieners also were represented by Lidji in the negotiations. The Amended and Restated Asset Purchase Agreement was heavily negotiated and many of the terms were proposed by Litman, Diener, and Lidji. In particular, they proposed the terms of many of the restrictions placed on the HRN stock the Litmans and Dieners received as additional purchase price. Accordingly, the parties should be bound to their agreement.

Both of the provisions governing the value of the contingent, additional purchase price are clear and unambiguous. With respect to the Section 7.15 Shares, Section 7.15 of the Agreement stated the $81,600,000 negotiated value of the future remaining earn out rights that HRN was obligated to pay if an IPO were to close on or before March 31, 2000. Section 7.15 of the Agreement also set forth the form of the payment. It provided that the $81,600,000 would be paid in the form of restricted HRN stock and that the number of Shares would be computed by dividing $81,600,000 by a price that would be determined under the formula set forth therein. Thus, under the clear language of the Amended and Restated Asset Purchase Agreement, the agreed value of the Section 7.15 Shares was $81,600,000. While *the number* of Shares the Litmans and Dieners would receive could vary based on what the IPO price turned out to be, *the value* of those Shares was set in stone.

A simple example illustrates this point. The denominator actually used was the $16 per share IPO price, resulting in 5,100,000 Shares. If, however, the IPO price had been $12 per share, the Litmans and Dieners would have received 6,800,000 Shares; the number of shares computed by dividing $81,600,000 by $12. Although *the number* of Shares would have differed

from the 5,100,000 Shares they actually received, *the total value* of the Shares ($81,600,000) would have been the same regardless of the denominator used.[21]

The contract is equally clear with respect to the second block of stock received by the Litmans and Dieners under Section 7.11.3 simply because an IPO was consummated. Section 7.11.3 provided that the "aggregate value of [those] shares" was "based on the price per share in the IPO." In other words, this formula determined the number of shares of common stock to which the Litmans and Dieners were entitled when, and if, an IPO were "consummated" and established that the agreed, aggregate value of those shares was to be "based on the price per share in the IPO." Thus, the Litmans and Dieners were entitled to 4,899,900 Shares of restricted HRN stock, the aggregate value of which, "based on the price per share in the IPO," was $78,398,400.[22]

Under the clear language of the contract, the total value of the 9,999,900 Shares issued by HRN pursuant to Sections 7.15 and 7.11.3 of the Amended and Restated Asset Purchase Agreement was $159,998,400. No other value is possible under the terms of the Agreement and, accordingly, it must control. *In re Matco-Norca, Inc.*, 802 N.Y.S.2d at 709.

This result is consistent with the long-established rule in this Court and others that "[a] contemporaneous agreement between parties 'with adverse interests' bargaining at arm's length 'over the worth of property' . . . is far superior to experts' widely varying judgments made many years later which are based on a host of factors that are concededly extremely difficult to

---

21 The value per share may be relevant to the Litmans' and Dieners' tax considerations, but from Hotels.com's standpoint, the value ascribed to each individual Section 7.15 Share is not relevant because the entire payment constitutes additional purchase price and, therefore, amortizable goodwill.

22 4,899,9000 shares x $16 = $78,398,480.

evaluate."[23] *Southern Natural Gas Co. v. United States*, 188 Ct. Cl. 302, 358 (1969). Thus, where stock is exchanged for property pursuant to an arm's-length transaction, courts presume that the value of such stock equals the value of the property received in exchange. *See id.* at 351-59 (holding that the parties' agreement to grant one share of stock for each $90 of services and materials established the fair market value of the stock, even though security analysts testified for the government that the public market value of the shares at the time of the transaction was as low as $5, and emphasizing that the parties were "experienced," "informed" parties who did not act "blindly or recklessly"); *see also Moore-McCormack Lines, Inc. v. Commissioner*, 44 T.C. 745, 757 (1965) (citing *Philadelphia Park Amusement Co. v. United States*, 130 Ct. Cl. 166 (1954)). "It is entirely proper for parties to a contract to make their own estimates of values; and if they are dealing at arms *[sic]* length and there is no reason to question the bona fides of the transaction, their valuations may be accepted as correct." *Commissioner v. Patino*, 186 F.2d 962, 967 (4th Cir. 1950). The Litmans, Dieners, HRN and USA were all experienced parties who did not act "blindly or recklessly" in making an arm's length determination of value. All parties should therefore be held to their bargain.

It also is important to note that the fair market value of HRN's payment to the Litmans and Dieners was reported to the world as $160 million in the final Prospectus for the IPO, HRN's 2000 Form 10-K, and HRN's first quarter 2000 Form 10-Q. Litman signed both the Form 10-K and the Form 10-Q and Diener signed the Form 10-K. Although the Litmans and Dieners will inevitably argue that the value reported therein was simply a "GAAP"[24] accounting number, nothing in those filings indicates that is the case. Moreover, the definition of fair market value

---

[23] Although Mitchell prepared a report close in time to the transaction, and the conclusions therein are similar to those in his trial report, for the reasons discussed below, his "widely" different judgment as to the proper valuation should be rejected.

[24] GAAP refers to generally accepted accounting principles.

for GAAP purposes is the same as the definition for tax purposes (and the definition set forth in all three of the expert trial reports). For example, *APB Opinion No. 16, Business Combinations* (August 1970)[25] requires business purchase transactions to be reported at "fair value." *Statement of Financial Accounting Concepts No. 7* (February 2000) defines the "fair value" of an asset or liability as "[t]he amount at which the asset (or liability) could be bought (or incurred) or sold (or settled) in a current transaction between willing parties, that is, other than in a forced or liquidation sale." *Id.* at 8.

For tax purposes, fair market value has been defined as the price at which a willing buyer will purchase property from a willing seller, when neither party is acting under compulsion and both parties are reasonably informed of all relevant facts. *See, e.g., Jack Daniel Distillery v. United States*, 180 Ct. Cl. 308, 315-16 (1967) (citing *Wood v. United States*, 89 Ct. Cl. 442 (1939)); Treas. Reg. § 20.2031-1(b) (same definition for estate tax purposes). Thus, while the treatment of an item for book and tax may differ in some circumstances, that is not the case here.

The Litmans' and Dieners' tax return position also would render meaningless Section 3.4(ii) of the Amended and Restated Asset Purchase Agreement, which requires that: "[f]or Tax purposes, the Buyer [Hotels.com] and the Sellers [Litman and Diener] agree (A) to report the transactions contemplated by this Agreement in a manner consistent with the terms of this Agreement, and (B) that none of them will take any position inconsistent therewith in any Tax Return." The Litmans' and Dieners' position simply cannot be squared with this provision. "It is a cardinal rule of contract construction that a court should 'avoid an interpretation that would leave contractual clauses meaningless.' Stated otherwise, '[c]ourts "are obliged to interpret a

---

[25] *Statement of Financial Accounting Standards No. 135, Rescission of FASB Statement No. 75 and Technical Corrections*, at 6 (1999) (amending *APB Opinion No. 16, Business Combinations*, by replacing "net realizable values" with "fair values").

contract so as to give meaning to all of its terms.”’” *150 Broadway N.Y. Assocs., L.P. v. Bodner*, 784 N.Y.S.2d 63, 66 (N.Y. App. Div. 2004) (citations omitted) (alteration in original); *see also Hunt*, 281 F.3d at 1372 (citing *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)). The Litmans’ and Dieners’ position flouts the plain meaning of the Amended and Restated Asset Purchase Agreement and must be rejected.

## II. IN THE ALTERNATIVE, IF THE CONTRACT DOES NOT ESTABLISH ITS VALUE, THE STOCK MUST BE VALUED AS OF MARCH 1, 2000

In the alternative, if the Court were to determine that the value of the contingent, deferred purchase price paid to the Litmans and Dieners is not controlled by the Amended and Restated Asset Purchase Agreement, then the Court would look to expert testimony to establish the value. In this case, Dr. Bajaj’s valuation of the restricted stock is correct.

### A. All Of The Trial Experts Agree On The Starting Point For Valuation

All three trial experts agree that the proper starting point for a valuation is the fair market value of freely tradable HRN shares; that is, the price at which a willing buyer would buy and a willing seller would sell freely tradable shares on the valuation date. As a result, under Hotels.com’s alternative position, the first issue that needs to be decided is the proper valuation date.

#### 1. March 1, 2000 Is The Proper Valuation Date

The Amended and Restated Asset Purchase Agreement provides an express condition precedent to the receipt of Shares at issue – the closing of an IPO. Documents, as well as trial testimony, will establish that the “initial close” of the IPO occurred on March 1, 2000.

Because the Section 7.15 Shares were to be issued “[s]imultaneously with the initial closing of the 2000 IPO,” under the clear provisions of the Amended and Restated Asset

Purchase Agreement, the Litmans and Dieners did not and could not beneficially own the Section 7.15 Shares until March 1, 2000.

The Section 7.11.3 Shares were to be issued only if HRN "consummates an initial public offering." Although the term "consummates" is not defined in the Amended and Restated Asset Purchase Agreement, it is a cardinal rule of contract interpretation that words must be given their plain and unambiguous meaning. *See, e.g., In re Matco-Norca, Inc.*, 802 N.Y.S.2d at 709; *150 Broadway N.Y. Assocs.*, 784 N.Y.S.2d at 66. Here, "close" and "consummates" have the same meaning. Indeed, Webster's Dictionary defines "close" as "to consummate." *Webster's II New College Dictionary* 211 (1995). Thus, the plain meaning of the word "consummates" leads to the same result for the Section 7.11.3 Shares. *See Mazzola*, 533 N.Y.S.2d at 297 ("[I]t is common practice for the courts of this State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract."); *see also Walter v. Commissioner*, No. 8321-05, 2007 WL 14634 (T.C. Jan. 3, 2007) (holding that courts should look to the terms of the stock option agreement to determine the conditions for exercising and valuing stock options, because these contractual provisions defined and established when the exercise is complete, so as to constitute a transfer of a beneficial interest to petitioner). The Section 7.11.3 Shares were not beneficially owned by the Litmans and Dieners until the IPO was "consummated" on March 1, 2000.

Such result is also dictated by the HRN Board of Directors resolution whereby the Section 7.15 and Section 7.11.3 Shares were "validly issued" only "upon issuance in accordance with the Amended Asset Purchase Agreement . . . ."[26]

---

[26] The resolution authorized delivery of the Shares to the Trust "immediately prior to the closing." Similar language was used in the Prospectus. It is Hotels.com's position that the phrase "immediately prior to the closing" does not mean that the stock was to be issued prior to March 1. Such a reading would not be possible given that the issuance was only valid if made in accordance with the Amended and Restated Asset Purchase Agreement which, as discussed

### 2. The Value Of A Freely Tradable Share Of HRN Stock On March 1, 2000 Is Easily Determined

On March 1, 2000, HRN stock was actually trading on the NASDAQ exchange. Therefore, the best evidence of the value of a freely tradable share of HRN stock is established by the market. *See, e.g.*, Rev. Rul. 59-60, 1959-1 C.B. 237, 238 ("Valuation of securities is, in essence, a prophesy as to the future and must be based on facts available at the required date of appraisal. As a generalization, the prices of stock which are traded in volume in a free and active market by informed persons best reflect the consensus of the investing public as to what the future holds for the corporations and industries represented."). Accordingly, the publicly traded price of the HRN stock on March 1, 2000 is the proper starting point for applying any discount to account for the restrictions on the stock at issue.

### 3. Two Of The Three Trial Experts Agree That 20 Percent Is The Appropriate Level Of Discount

Remarkably, the experts for two directly adverse parties, Hotels.com and the United States, are in complete agreement as to the appropriate level of discount – approximately 20 percent. Although they arrived at this result in somewhat different ways, Dr. Bajaj, Hotels.com's expert, concluded that a maximum discount of 20 percent is appropriate, and the United States expert, Burns, concluded 20.3 percent. Given that Hotels.com is adverse to the United States in this matter, the virtual uniformity in conclusion indicates that a discount of approximately 20 percent is correct. By contrast, the Litmans' and Dieners' expert's conclusion that the discount should be approximately 70 percent is "out in left field" and should be rejected.

---

above, establishes March 1, 2000 as the date on which the Litmans and Dieners were entitled to the stock. The "immediately prior" language simply means that the issuance to the Litmans and Dieners would occur a moment in time before the final documents effectuating the closing of the IPO were executed.

**B. In The Further Alternative, Valuation As Of February 25, 2000 Must Be Based On The Market Price Of HRN Stock**

As a further alternative, Hotels.com asked Dr. Bajaj to value the Shares as of February 25, 2000 as well, even though Hotels.com does not believe this is the proper valuation date. Hotels.com took this step because (1) Mitchell, the Litmans' and Dieners' expert used this date in one of his drafts, (2) Bohlmann, the Litmans' and Dieners' other expert used this date, (3) DT used February 25th for purposes of its valuation,[27] and (4) Hotels.com claimed amortization deductions associated with the additional goodwill as of February 25, 2000.

On February 25, HRN stock also traded on the NASDAQ and, therefore, the best evidence of the value of a freely tradable share of HRN stock is established by the market. The discount to be applied would not differ if the valuation date is changed.

**C. In The Further Alternative, Valuation As Of February 24, 2000 Would Not Begin With The IPO Price**

Hotels.com expects the Litmans and Dieners will argue that because the date on the stock certificate they were issued is February 24, 2000, that date is controlling. This is not the case. As discussed above, the Litmans and Dieners did not acquire beneficial ownership of the stock until the initial closing of the IPO or until it was consummated on March 1, 2000. Because the IPO did not close on February 24, 2000 and was not consummated on that date, Hotels.com does not believe that February 24, 2000 is supportable as a valuation date. The HRN IPO could not possibly have been closed or consummated before the stock even began trading publicly. Indeed, the Litmans' and Dieners' position would lead to the absurd conclusion that they would still own the Section 7.15 and 7.11.3 Shares even if the IPO had been cancelled at the last moment.

---

[27] As stated above, Hotels.com is not relying on the DT valuation in this litigation. See also footnote 17, above.

**1. Litman And Diener Directed The Date To Be Placed On The Stock Certificate**

Litman, in his role as a trustee of the Trust, and Lidji (the Litmans' and Dieners' counsel), directed the transfer agent to issue the stock as of February 24, 2000. For all of the reasons discussed above, the Litmans and Dieners did not beneficially own the stock on that date.

Hotels.com anticipates that the Litmans and Dieners may point to Section 7.11.3 of the Amended and Restated Asset Purchase Agreement to support their position that they owned the Stock on February 24, 2000. That section states that the number of Shares the Litmans and Dieners will receive under Section 7.11.3 simply because HRN consummates an IPO is based on the number of shares of HRN outstanding immediately prior to the IPO and that for purposes of this computation, the Section 7.15 Shares are to be included in the number of outstanding shares:

> a number of shares of common stock of [HRN] having an aggregate value (based on the price per share in the IPO) equal to the product of (x)(i) the total issued and outstanding shares of [HRN] immediately prior to the IPO (*which shall include the shares issued under Section 7.15 simultaneous with the IPO*) times the IPO price minus (ii) the Net Debt Capital multiplied by (y) 10%. [emphasis added]

This section makes clear that the treatment of the Section 7.15 Shares as outstanding immediately prior to the IPO is *for computational purposes only*. It does not change the date upon which the Litmans and Dieners *were entitled* to the Shares. Indeed, in computing the 4,899,900 Shares the Litmans and Dieners received under Section 7.11.3, the stock offered to the public in the IPO was also included. This stock, like the Section 7.15 Shares was not *actually* outstanding on that date, it was just *treated* as outstanding on that date for computational purposes.

Moreover, the Prospectus, dated February 25, 2000, stated that HRN "will issue" 9,999,900 Shares to the Trust. By using the future tense in its description, HRN told the world

that as of February 25, 2000 the Litmans and Dieners did not yet own the Section 7.15 and 7.11.3 Shares.[28] The date Litman and Lidji directed to be placed on the stock certificate is contrary to the express terms of the Amended and Restated Asset Purchase and the authorizing Board resolution. As a result, it does not control.

### 2. A Stock Certificate Is Not Determinative Of Ownership

A stock certificate is not determinative of ownership. "A person claiming to be a stockholder or member in a corporation has the burden of proving such claim." 18A Am. Jur. 2d, *Corporations* § 619 (citing *Weinstein v. Hartford Chem. Corp.*, 393 N.Y.S.2d 74 (N.Y. App. Div. 1977)). "Although a stock certificate is prima facie evidence of corporate ownership, it is to be distinguished from actual ownership, which may be determined from all the facts and circumstances of a case." *Fireplace Shop, Inc. v. Fireplace Shop of Lafayette, Inc.*, 400 So. 2d 702, 703 (La. Ct. App. 1981) (cited in 18A Am. Jur. 2d *Corporations* § 619). This Court has stated that a "stock certificate is merely 'a muniment of title' …. The issuance of the certificate is not a prerequisite to the acquisition of ownership." *Jupiter Corp. v. United States*, 2 Cl. Ct. 58, 64 (1983) (citations omitted). The *Jupiter* court also held, however, that "*absent evidence to the contrary*, the issuance of the stock certificates must be considered the event which creates an ownership interest in the corporation." *Id.* at 65 (emphasis added). Here, as discussed above, there is overwhelming evidence to the contrary. Thus, February 24, 2000 is simply not supportable as a valuation date.

Nevertheless, out of an abundance of caution, Hotels.com asked its expert Dr. Bajaj to value the Shares as of this date as well. As discussed above, in his view, the $16 per share IPO

---

[28] To the extent the Litmans and Dieners point to the "immediately prior to the closing" language of the Board resolution and Prospectus in support of their position, see footnote 26, above.

price is not the appropriate starting point. Rather, the pre-bid offer and ask prices on the HRN stock most clearly reflect the price at which a willing buyer would buy and willing seller, being reasonably informed of all relevant facts, would sell an unrestricted share of HRN stock right before the HRN stock was to start trading on the NASDAQ. One must consider the fact that a seller could almost certainly sell the stock for a large profit in a matter of hours. Mitchell's and Burns' $16 starting price ignores this key fact, is counter to common sense and, therefore, their starting price should be rejected. *See, e.g.*, *Jack Daniel Distillery*, 180 Ct. Cl. at 315-16 (analysis assumes reasonable knowledge of all relevant facts); Rev. Rul. 59-60, 1959-1 at 238 ("A sound valuation will be based upon all the relevant facts, but the elements of common sense, informed judgment and reasonableness must enter into the process of weighing those facts and determining their aggregate significance."). Thus, the minimum value of the Section 7.15 and 7.11.3 Shares should be computed applying a 20 percent discount to the pre-open bid price of $23 per share.

## III. WHATEVER OCCURRED DURING THE IRS AUDIT IS IRRELEVANT AND INADMISSIBLE

Hotels.com anticipates that the Litmans and Dieners will attempt to introduce evidence related to the administrative negotiations that took place before the issuance of the Notices of Deficiency to Hotels.com, including the valuations performed by the IRS. None of this evidence is admissible.[29] First, it is well-settled that courts do not look behind the Notice of Deficiency. *See, e.g.*, *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327 (1974). This is because Courts review *de novo* the determination or assessment. Thus, what happened administratively is simply not relevant. The *Greenberg's Express* principle applies equally to looking at the

---

[29] Although motions *in limine* are not due until April 5, 2007, Hotels.com briefly addresses this issue here because, in accordance with Appendix A of this Court's Rules, Hotels.com anticipates the Litmans and Dieners will make these arguments in their pretrial briefs.

procedures and evidence used in making an assessment. *See Ruth v. United States,* 823 F.2d 1091, 1094 (7th Cir. 1987). The Court of Federal Claims has adopted this view as well. *See, e.g., Cook v. United States,* 46 Fed. Cl. 110, 113 (2000) ("In tax refund suits, factual issues are tried *de novo* in this court, with no weight given to subsidiary factual findings made by the Service in its internal administrative proceedings." (citing *Int'l Paper Co. v. United States,* 36 Fed. Cl. 313, 322 (1996); *Sara Lee Corp. v. United States,* 29 Fed. Cl. 330, 334 (1993)). Moreover, such evidence is inadmissible under Federal Rule of Evidence 408. Fed. R. Evid. 408 ("Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible."). Finally, the positions taken by the IRS and Hotels.com at the administrative level are not the parties' litigating positions. This is precisely why *Greenberg's Express* and its progeny and the Federal Rules of Evidence operate as they do.

## CONCLUSION

For all of the reasons discussed above, Hotels.com asks the Court to rule in its favor.

February 26, 2007

Respectfully submitted,

s/ Kim Marie K Boylan
Kim Marie K. Boylan
Latham & Watkins, LLP
555 11th Street, NW
Washington, DC 20004
(202) 637-2235
Attorney of Record

Kari M. Larson
Latham & Watkins, LLP
555 11th Street, NW
Washington, DC 20004
Of Counsel