assets which do not have discernible market prices. Goodwill and other unidentifiable intangible assets are difficult to value directly, and measuring assets acquired for stock is easier if the fair value of the stock issued is determinable. The excess of the value of stock issued over the sum of the fair values of the tangible and identifiable intangible assets acquired less liabilities assumed indicates the value of acquired unidentified intangible assets (usually called goodwill).

23. However, the fair value of stock issued is not always objectively determinable. A market price may not be available for a newly issued security or for securities of a closely held corporation. Even an available quoted market price may not always be a reliable indicator of fair value of consideration received because the number of shares issued is relatively large, the market for the security is thin, the stock price is volatile, or other uncertainties influence the quoted price. Further, the determinable value of one security may not necessarily indicate the fair value of another similar, but not identical, security because their differences affect the value—for example, the absence of registration or an agreement which restricts a holder's ability to sell a security may significantly affect its value.

24. Those who oppose applying the purchase method to some or most business combinations effected by stock also challenge the theoretical merits of the method. They contend that the goodwill acquired is stated only by coincidence at the value which would be determined by direct valuation. The weakness is attributed not to measurement difficulties (direct valuation of goodwill is assumed) but to the basis underlying an exchange of shares of stock. Bargaining in that type of transaction is normally based on the market prices of the equity securities. Market prices of the securities exchanged are more likely to be influenced by anticipated earning capacities of the companies than by evaluations of individual assets. The number of shares of stock issued in a business combination is thus influenced by values attributed to goodwill of the acquirer as well as goodwill of the acquired company. Since the terms are based on the market prices of both stocks exchanged, measuring the cost of an acquired company by the market price of the stock issued may result in recording acquired goodwill at more or less than its value determined directly.

25. A related argument is that the purchase method is improper accounting for a business combination in which a relatively large number of shares of stock is issued because it records the goodwill and fair values of only the acquired company. Critics of purchase accounting say that each group of stockholders of two publicly held and actively traded companies evaluates the other stock, and the exchange ratio for stock issued is often predicated on relative market values. The stockholders and management of each company evaluate the goodwill and fair values of the other. Purchase accounting is thus viewed as illogical because it records goodwill and values of only

one side of the transaction. Those who support this view prefer that assets and liabilities of both companies be combined at existing recorded amounts, but if one side is to be stated at fair values, they believe that both sides should be recorded at fair values.

26. Criticism of the purchase method is directed not only to the theoretical and practical problems of measuring goodwill in combinations effected primarily by stock but also to accounting after the combination for goodwill recorded by the purchase method. Present accounting for goodwill, which often has an indeterminate useful life, is cited as an example of lack of uniformity because selecting among alternative methods of accounting is discretionary.

**Pooling of Interests Method**

27. The more important arguments expressing the advantages and disadvantages of the pooling of interests method and some of the practical difficulties experienced in implementing it are summarized in paragraphs 28 to 41.

28. *Validity of the concept.* Those who support the pooling of interests method believe that a business combination effected by issuing common stock is different from a purchase in that no corporate assets are disbursed to stockholders and the net assets of the issuing corporation are enlarged by the net assets of the corporation whose stockholders accept common stock of the combined corporation. There is no newly invested capital nor have owners withdrawn assets from the group since the stock of a corporation is not one of its assets. Accordingly, the net assets of the constituents remain intact but combined; the stockholder groups remain intact but combined. Aggregate income is not changed since the total resources are not changed. Consequently, the historical costs and earnings of the separate corporations are appropriately combined. In a business combination effected by exchanging stock, groups of stockholders combine their resources, talents, and risks to form a new entity to carry on in combination the previous businesses and to continue their earnings streams. The sharing of risks by the constituent stockholder groups is an important element in a business combination effected by exchanging stock. By pooling equity interests, each group continues to maintain risk elements of its former investment and they mutually exchange risks and benefits.

29. A pooling of interests transaction is regarded as in substance an arrangement among stockholder groups. The fractional interests in the common enterprise are reallocated—risks are rearranged among the stockholder groups outside the corporate entity. A fundamental concept of entity accounting is that a corporation is separate and distinct from its stockholders. Elected managements represent the

stockholders in bargaining to effect a combination, but the groups of stockholders usually decide whether the proposed terms are acceptable by voting to approve or disapprove a combination. Stockholders sometimes disapprove a combination proposed by management, and tender offers sometimes succeed despite the opposition of management.

30. Each stockholder group in a pooling of interests gives up its interests in assets formerly held but receives an interest in a portion of the assets formerly held in addition to an interest in the assets of the other. The clearest example of this type of combination is one in which both groups surrender their stock and receive in exchange stock of a new corporation. The fact that one of the corporations usually issues its stock in exchange for that of the other does not alter the substance of the transaction.

31. *Consistency with other concepts.* Proponents of pooling of interests accounting point out that the pooling concept was developed within the boundaries of the historical-cost system and is compatible with it. Accounting by the pooling of interests method for business combinations arranged through the issuance of common stock is based on existing accounting concepts and is not an occasion for revising historical costs. Both constituents usually have elements of appreciation and of goodwill which are recognized and offset, at least to some extent, in setting a ratio of exchange of stock. The bargaining which occurs usually reflects the relative earning capacities (measured by historical-cost accounts) of the constituents and frequently recognizes the relative market values of the two stocks, which in turn reflect earning capacity, goodwill, or other values. Accounting recognizes the bargaining by means of the new number of shares outstanding distributed in accordance with the bargained ratio, which has a direct effect on earnings per share after the combination.

32. *Usefulness of the concept.* Those who favor the pooling of interests method of accounting believe that the economic substance of a combination is best reflected by reporting operations up to the date of the exchange of stock based on the same historical-cost information used to develop the separate operating results of each constituent. Also, informative comparison with periods prior to the business combination is facilitated by maintaining historical costs as the basis of reporting combined operations subsequent to the combination.

33. *Application of the concept.* It has been observed that criteria for distinguishing between a pooling and a purchase have eroded over the years and that present interpretations of criteria have led to abuse. However, most accountants who support the pooling concept believe that criteria can be redefined satisfactorily to eliminate abuses. It is their view that the pooling of interests method of accounting for

business combinations is justifiable on conceptual grounds and is a useful technique and therefore should be retained.

34. Some proponents of pooling of interests accounting support a restriction on the difference in size of combining interests because a significant sharing of risk cannot occur if one combining interest is minor or because a meaningful mutual exchange does not occur if the combination involves a relatively small number of shares. Most, however, believe that there is no conceptual basis for a size restriction and that establishing a size restriction would seriously impair pooling of interests accounting.

35. *Defects attributed to pooling of interests method.* Those who oppose the pooling of interests method of accounting doubt that the method is supported by a concept. In their view it has become essentially a method of accounting for an acquisition of a company without recognizing the current costs of the assets, including goodwill, underlying the transaction. The concept of a pooling of interests was described in general terms in the past—for example, as a continuity of equity interests or as a combination of two or more interests of comparable size. The descriptions tend to be contradictory. For example, accountants do not agree on whether or not relative size is part of the pooling of interests concept. Attempts to define the concept in terms of broad criteria for applying the method have also been unsuccessful.

36. Indeed, many opponents of the pooling of interests method of accounting believe that effective criteria cannot be found. The concept of a uniting or fusing of stockholder groups on which pooling of interests accounting is based implies a broad application of the method because every combination effected by issuing stock rather than by disbursing cash or incurring debt is potentially a pooling of interests unless the combination significantly changes the relative equity interests. However, so broad an application without effective criteria results in applying the pooling of interests method to numerous business combinations which are clearly in economic substance the acquisition of one company by another.

37. Some critics point out that the method was first applied to combining interests of comparable size and that pronouncements on business combinations have never sanctioned applying pooling of interests accounting to all or almost all business combinations effected by exchanging stock. All pronouncements have indicated that a large disparity in the size of the combining interests is evidence that one corporation is acquiring another.

38. Other criteria restricting application of pooling of interests accounting, such as those prohibiting future disposals of stock received and providing for continuity of

management, were added to the size restriction. Those criteria have, however, tended to strengthen the view that one corporation acquires another because they are unilateral, that is, they are applied only to the stockholders and management of the "acquired" company.

39. The most serious defect attributed to pooling of interests accounting by those who oppose it is that it does not accurately reflect the economic substance of the business combination transaction. They believe that the method ignores the bargaining which results in the combination by accounting only for the amounts previously shown in accounts of the combining companies. The acquiring corporation does not record assets and values which usually influence the final terms of the combination agreement with consequent effects on subsequent balance sheets and income statements. The combined earnings streams, which are said to continue after a pooling of interests, can continue unchanged only if the cost of the assets producing those earnings is identical for the acquiring corporation and the acquired company. That coincidence rarely occurs because the bargaining is based on current values and not past costs.

40. Pooling of interests accounting is also challenged because the amount of assets acquired less liabilities assumed is recorded without regard to the number of shares of stock issued. The result does not reflect the presumption that a corporation issues stock only for value received and, in general, the greater the number of shares issued, the larger the consideration to be recorded.

41. Traditional principles of accounting for acquisitions of assets encompass all business combinations because every combination is effected by distributing assets, incurring liabilities, issuing stock, or some blend of the three. Those who oppose the pooling of interests method believe that a departure from the traditional principles is justified only if evidence shows that financial statements prepared according to other principles better reflect the economic significance of a combination. In their opinion, the characteristics of a business combination do not justify departing from traditional principles of accounting to accommodate the pooling of interests method.

## OPINION

### Applicability of Accounting Methods

42. The Board finds merit in both the purchase and pooling of interests methods of accounting for business combinations and accepts neither method to the exclusion of the other. The arguments in favor of the purchase method of accounting are more

persuasive if cash or other assets are distributed or liabilities are incurred to effect a combination, but arguments in favor of the pooling of interests method of accounting are more persuasive if voting common stock is issued to effect a combination of common stock interests. Therefore, the Board concludes that some business combinations should be accounted for by the purchase method and other combinations should be accounted for by the pooling of interests method.

43. The Board also concludes that the two methods are not alternatives in accounting for the same business combination. A single method should be applied to an entire combination; the practice now known as part-purchase, part-pooling is not acceptable. The acquisition after the effective date of this Opinion of some or all of the stock held by minority stockholders of a subsidiary—whether acquired by the parent, the subsidiary itself, or another affiliate—should be accounted for by the purchase method rather than by the pooling of interests method.

44. The Board believes that accounting for business combinations will be improved significantly by specifying the circumstances in which each method should be applied and the procedures which should be followed in applying each method. The distinctive conditions which require pooling of interests accounting are described in paragraphs 45 to 48, and combinations involving all of those conditions should be accounted for as described in paragraphs 50 to 65. All other business combinations should be treated as the acquisition of one company by another and accounted for by the purchase method as described in paragraphs 66 to 96.

**Conditions for Pooling of Interests Method**

45. The pooling of interests method of accounting is intended to present as a single interest two or more common stockholder interests which were previously independent and the combined rights and risks represented by those interests. That method shows that stockholder groups neither withdraw nor invest assets but in effect exchange voting common stock in a ratio that determines their respective interests in the combined corporation. Some business combinations have those features. A business combination which meets *all* of the conditions specified and explained in paragraphs 46 to 48 should be accounted for by the pooling of interests method. The conditions are classified by (1) attributes of the combining companies, (2) manner of combining interests, and (3) absence of planned transactions.

46. *Combining companies.* Certain attributes of combining companies indicate that independent ownership interests are combined in their entirety to continue previously separate operations. Combining virtually all of existing common stock interests avoids combining only selected assets, operations, or ownership interests,

any of which is more akin to disposing of and acquiring interests than to sharing risks and rights. It also avoids combining interests that are already related by substantial intercorporate investments.

The two conditions in this paragraph define essential attributes of combining companies.

a. Each of the combining companies is autonomous and has not been a subsidiary or division of another corporation within two years before the plan of combination is initiated.

A plan of combination is initiated on the earlier of (1) the date that the major terms of a plan, including the ratio of exchange of stock, are announced publicly or otherwise formally made known to the stockholders of any one of the combining companies or (2) the date that stockholders of a combining company are notified in writing of an exchange offer. Therefore, a plan of combination is often initiated even though consummation is subject to the approval of stockholders and others.

A new company incorporated within the preceding two years meets this condition unless the company is successor to a part of a company or to a company that is otherwise not autonomous for this condition. A wholly owned subsidiary company which distributes voting common stock of its parent corporation to effect the combination is also considered an autonomous company provided the parent corporation would have met all conditions in paragraphs 46 to 48 had the parent corporation issued its stock directly to effect the combination.

Divestiture of assets to comply with an order of a governmental authority or judicial body results in an exception to the terms of this condition. Either a subsidiary divested under an order or a new company which acquires assets disposed of under an order is therefore autonomous for this condition.

b. Each of the combining companies is independent of the other combining companies.

This condition means that at the dates the plan of combination is initiated and consummated the combining companies hold as intercorporate investments no more than 10 percent in total of the outstanding voting common stock of any combining company.[4] For the percentage computation, intercorporate investments exclude voting common stock that is acquired after the date the plan of combination is initiated

[4]An exception for common stock held on October 31, 1970 is explained in paragraph 99.

in exchange for the voting common stock issued to effect the combination. Investments of 10 percent or less are explained in paragraph 47-b.

47. *Combining of interests.* The combining of existing voting common stock interests by the exchange of stock is the essence of a business combination accounted for by the pooling of interests method. The separate stockholder interests lose their identities and all share mutually in the combined risks and rights. Exchanges of common stock that alter relative voting rights, that result in preferential claims to distributions of profits or assets for some common stockholder groups, or that leave significant minority interests in combining companies are incompatible with the idea of mutual sharing. Similarly, acquisitions of common stock for assets or debt, reacquisitions of outstanding stock for the purpose of exchanging it in a business combination, and other transactions that reduce the common stock interests are contrary to the idea of combining existing stockholder interests. The seven conditions in this paragraph relate to the exchange to effect the combination.

a. The combination is effected in a single transaction or is completed in accordance with a specific plan within one year after the plan is initiated.

Altering the terms of exchange of stock constitutes initiation of a new plan of combination unless earlier exchanges of stock are adjusted to the new terms.[5]

A business combination completed in more than one year from the date the plan is initiated meets this condition if the delay is beyond the control of the combining companies because proceedings of a governmental authority or litigation prevents completing the combination.

b. A corporation offers and issues only common stock with rights identical to those of the majority of its outstanding voting common stock[6] in exchange for substantially all of the voting common stock interest of another company at the date the plan of combination is consummated.

The plan to issue voting common stock in exchange for voting common stock may include, within limits, provisions to distribute cash or other consideration for frac-

[5]However, an adjustment after the effective date of this Opinion in the terms of exchange in a plan of combination initiated before and consummated after the effective date always constitutes initiation of a new plan. The one year specified in this condition is measured, therefore, from the date of adjustment of terms and all other conditions are evaluated for the new plan. (Paragraph 97 describes the application of this Opinion to a plan of combination initiated before the effective date of this Opinion and consummated later in accordance with the terms of exchange prevailing on the effective date.)

[6]A class of stock that has voting control of a corporation is the majority class.

tional shares, for shares held by dissenting stockholders, and the like but may not include a pro rata distribution of cash or other consideration.

Substantially all of the voting common stock means 90 percent or more for this condition. That is, after the date the plan of combination is initiated, one of the combining companies (issuing corporation) issues voting common stock in exchange for at least 90 percent of the voting common stock of another combining company that is outstanding at the date the combination is consummated. The number of shares exchanged therefore excludes those shares of the combining company (1) acquired before and held by the issuing corporation and its subsidiaries at the date the plan of combination is initiated, regardless of the form of consideration,[7] (2) acquired by the issuing corporation and its subsidiaries after the date the plan of combination is initiated other than by issuing its own voting common stock, and (3) outstanding after the date the combination is consummated.

*An investment in stock of the issuing corporation* held by a combining company may prevent a combination from meeting this condition even though the investment of the combining company is not more than 10 percent of the outstanding stock of the issuing corporation (paragraph 46-b). An investment in stock of the issuing corporation by another combining company is the same in a mutual exchange as an investment by the issuing corporation in stock of the other combining company—the choice of issuing corporation is essentially a matter of convenience. An investment in stock of the issuing corporation must be expressed as an equivalent number of shares of the investor combining company because the measure of percent of shares exchanged is in terms of shares of stock of the investor company. An investment in 10 percent or less of the outstanding voting common stock of the issuing corporation affects the measure of percent of shares exchanged in the combination as follows:

> The number of shares of voting common stock of the issuing corporation held by the investor combining company at the date the plan is initiated plus shares it acquired after that date are restated as an equivalent number of shares of voting common stock of the investor combining company based on the ratio of exchange of stock in the combination.
>
> The equivalent number of shares is deducted from the number of shares of voting common stock of the investor combining company exchanged for voting common stock of the issuing corporation as part of the plan of combination.
>
> The reduced number of shares is considered the number exchanged and is compared with 90 percent of the outstanding voting common stock of the

[7] An exception for common stock held on October 31, 1970 is explained in paragraph 99.

investor combining company at the date the plan is consummated to determine whether the terms of condition 47-b are met.

Since the number of shares of voting common stock exchanged is reduced for an intercorporate investment in voting common stock of the issuing corporation, the terms of condition 47-b may not be met even though 90 percent or more of the outstanding common stock of a combining company is exchanged to effect a combination.

*A combination of more than two companies* is evaluated essentially the same as a combination of two companies. The percent of voting common stock exchanged is measured separately for each combining company, and condition 47-b is met if 90 percent or more of the voting common stock of each of the several combining companies is exchanged for voting common stock of the issuing corporation. The number of shares exchanged for stock of the issuing corporation includes only shares exchanged by stockholders other than the several combining companies themselves. Thus, intercorporate investments in combining companies are included in the number of shares of stock outstanding but are excluded from the number of shares of stock exchanged to effect the combination.

*A new corporation formed to issue its stock* to effect the combination of two or more companies meets condition 47-b if (1) the number of shares of each company exchanged to effect the combination is not less than 90 percent of its voting common stock outstanding at the date the combination is consummated and (2) condition 47-b would have been met had any one of the combining companies issued its stock to effect the combination on essentially the same basis.

*Condition 47-b relates to issuing common stock for the common stock interests in another company.* Hence, a corporation issuing stock to effect the combination may assume the debt securities of the other company or may exchange substantially identical securities or voting common stock for other outstanding equity and debt securities of the other combining company. An issuing corporation may also distribute cash to holders of debt and equity securities that either are callable or redeemable and may retire those securities. However, the issuing corporation may exchange only voting common stock for outstanding equity and debt securities of the other combining company that have been issued in exchange for voting common stock of that company during a period beginning two years preceding the date the combination is initiated.