**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **DAVID S. LITMAN and MALIA A. LITMAN,** | ) | |
| **Plaintiffs-Counterdefendants,** | ) | |
| **V.** | ) | **No. 05-956T** |
| **THE UNITED STATES,** | ) | |
| **Defendant-Counterplaintiff.** | ) | |
| **ROBERT B. DIENER and MICHELLE S. DIENER,** | ) | |
| **Plaintiffs-Counterdefendants,** | ) | |
| **V.** | ) | **No. 05-971T** |
| **THE UNITED STATES,** | ) | |
| **Defendant-Counterplaintiff.** | ) | |
| **HOTELS.COM, INC. and Subsidiaries (f/k/a HOTEL RESERVATIONS NETWORK, INC.),** | ) | **No. 06-285T (Judge Christine O.C. Miller)** |
| **Plaintiffs,** | ) | |
| **THE UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS-COUNTERDEFENDANTS,**
**DAVID S. LITMAN, MALIA A. LITMAN,**
**ROBERT B. DIENER AND MICHELLE S. DIENER'S**
**MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Plaintiffs-Counterdefendants, David S. Litman and Malia A. Litman (the "Litmans") and Robert B. Diener and Michelle S. Diener (the "Dieners")[1] submit the following Memorandum of Contentions of Fact and Law in accordance with Appendix A ¶ 14(a) of the Rules of the Court of Federal Claims.

[1] Collectively, the Litmans and the Dieners are referred to herein as "Plaintiffs."

**A. Summary - The Litmans and Dieners Are Each Entitled to a Refund of $15 Million of Income Taxes and Penalty Paid Under Protest to the IRS.**

This case primarily involves the fair market value of almost ten million shares of restricted stock -- seventy percent of which could not be sold for four years -- in Hotel Reservations Network, Inc. ("HRN") (the "Restricted Shares"). HRN was a consolidator of hotel rooms who sold discounted hotel rooms through the internet (at "hoteldiscount.com") and a 1-800 phone number. The Restricted Shares were issued on February 24, 2000 to the TMF Liquidating Trust.[2] At the time the Restricted Shares were issued, HRN was about to embark on an initial public offering of 5.4 million shares of its stock (the "HRN IPO"). The shares sold to the public by HRN at $16 per share in the HRN IPO were freely tradable on the NASDAQ exchange. The HRN IPO occurred at the tail of the "internet bubble," when dot.com stocks (of which HRN was one) were highly volatile and grossly overvalued.

The Restricted Shares, however, were not a part of the HRN IPO. Rather, the Restricted Shares had onerous restrictions on their sale. The restrictions included, among other things, contractual prohibitions (mostly four years) against selling the shares, SEC Rule 144 volume sale restrictions, and the requirement that HRN's parent company (USA Networks, Inc.) consent to any sale. Practical impediments to the sale of the shares which negatively impacted the value of the Restricted Shares also existed. First, because the number of Restricted Shares was twice the number of the shares sold to the public in the HRN IPO, any attempt to sell a substantial number of shares (even if permitted) would flood the market, drastically reducing the market value. Second, any sale of a substantial number of the Restricted Shares would impair investor confidence in HRN because the TMF Liquidating Trust was owned by David Litman and Robert Diener, HRN's CEO and President. Each of these onerous restrictions on

[2] The TMF Liquidating Trust was a flow-through entity owned by the Plaintiffs.

sale had a negative impact on the value of the Restricted Shares when compared to the $16 per share price that USA Networks and HRN sold unrestricted shares to the public in the HRN IPO.

Plaintiffs recognized and paid millions of dollars of capital gains in 2000 based upon the value of the Restricted Shares received. To determine the value of the Restricted Shares, the Litmans and the Dieners obtained a contemporaneous appraisal of the shares by an appraisal firm often used by the IRS in valuation disputes, Business Valuation Service, Inc. ("BVS"). Mark Mitchell of BVS determined that the onerous 4 year transfer prohibitions imposed on approximately 7 million shares of this volatile internet stock warranted a lack of marketability discount of 79% from the $16 per share price that HRN sold the freely tradable shares to the public in the HRN IPO. BVS also determined that 1 to 3 year transfer restrictions imposed on the remaining 3 million shares warranted lack of marketability discounts ranging from 63.5% for the 3 year restricted shares to 49.5% for the 1 year restricted shares. BVS's valuation analysis has been relied upon consistently by the Plaintiffs in filing their tax returns, dealing with the IRS audit, and in this litigation.

While this is fundamentally a valuation case in which expert testimony is often helpful to the Court in resolving the fair market value question, the credibility of that testimony (and each party's position) must be examined in light of the valuation positions taken by each party during the years since the Restricted Shares were issued. The Litmans and the Dieners have consistently taken the position that the shares were issued on February 24, 2000 and that the fair market value of those shares should be based on the BVS appraisal. On the other hand, both the IRS and Hotels.com have taken inconsistent valuation positions, as demonstrated by the Valuation Timeline attached as Exhibit A and the Appraised Value Summary attached as Exhibit B. Hotels.com has also taken a new position regarding the proper valuation date.

Despite repeatedly acknowledging for the last six years that the Restricted Shares were issued before the February 25, 2000, HRN IPO, Hotels.com now asserts that TMF Liquidating Trust was not entitled to receive the shares until March 1, five days ***after*** HRN's stock began trading on the NASDAQ. Hotels.com's position is simply not credible.[3]

After an audit of the Plaintiffs' 2000 income tax returns, the IRS issued notices of deficiency to the Litmans and the Dieners alleging that each owed $12.5 million of additional tax and a $2.5 million penalty. Ignoring the substantial valuation impact of the mostly 4 year sale restrictions and ignoring what the IRS recognized as "well-settled law," the IRS's $30 million tax deficiency and penalty was based on the erroneous assumption that the stock received by the TMF Liquidating Trust was worth $16 per share -- the freely traded IPO price. At the time the notices of deficiency were issued, the IRS had not obtained any expert valuation of the shares.

After the IRS issued the notices of deficiency to the Plaintiffs, the IRS had the shares valued by Ruth Haney, an IRS economist, who initially determined the values of the Restricted Shares by applying lack of marketability discounts to the $16 per share IPO price on unrestricted shares ranging from 48.59% for the 7 million shares of 4 year restricted stock to 33.09% for the 1 year restricted stock. Despite the fact that the IRS knew the value of the shares was virtually half of the $16 per share IPO price for unrestricted HRN shares, the IRS did not concede any of the Plaintiffs' claim for a refund of the $30 million of tax and penalties they were forced to pay under protest based on the IRS's erroneous assertion of a $16 per share value. The IRS has now obtained a "trial" appraisal of the shares. The IRS's trial appraiser --

[3] Hotels.com apparently seeks to use the March 1 date because the HRN stock was trading at approximately $26 per share on that date. However, just a few weeks later, HRN stock dropped to approximately $14 per share -- $2 per share ***below*** the HRN IPO price.

Francis Burns -- has determined that the value of the Restricted Shares should be based on an approximate 20% lack of marketability discount to the $16 per share IPO price for unrestricted stock. Mr. Burns's valuation analysis lacks credibility, as he makes no real distinction between the value of shares restricted for trading for four years versus those restricted for one year.

Hotels.com (HRN changed its name to Hotels.com in 2002) intervened in this case because it capitalized the value of the Restricted Shares and has amortized that value over a 15 year period. Hotels.com has also used a number of different values for the Restricted Shares -- but with a common theme. Hotels.com's claimed value of the Restricted Shares has increased as the case has proceeded. Specifically, HRN took the position in connection with its tax returns from 2001 through 2004 and in its income tax audit for 2000 that the value of the Restricted Shares was a weighted average of $10.18 per share based upon an appraisal HRN obtained from Deloitte & Touché,[4] with discounts for lack of marketability applied to the $16 per share HRN IPO price for unrestricted stock ranging from 40% for the 7 million shares of 4 year restricted stock to 25% for the one year restricted stock.

Hotels.com now takes the position that the value of the Restricted Shares should be $23.625 – 50% ***above*** the IPO price set by HRN's parent company. Hotels.com's position is based upon a "new" appraisal obtained in this litigation and its assertion -- first raised six years after the Restricted Shares were issued and contrary to its tax returns, its Claim for Refund, its Complaint, and all of the evidence in this case -- that the Restricted Shares were issued on

[4] As noted below, HRN originally filed its 2000 tax return using the HRN IPO price of $16 per share for unrestricted stock as the fair market value for the shares. HRN and USA Networks were aware that this $16 value was erroneous, as it failed to take the transfer restrictions into account. HRN and USA Networks promptly obtained the Deloitte valuation, and relied on it when reporting the value of the shares in subsequent years. HRN and USA Networks intended to amend HRN's 2000 tax return to reflect the Deloitte & Touché valuation, but for some unexplained reason the amendment was never filed.

March 1, 2000. Hotels.com's "litigation" position -- which values the Restricted Shares at more than twice the value it represented the shares to be at audit and in its tax returns and which applies the same lack of marketability discount to each of the shares regardless of the length of the restrictions -- is disingenuous, lacks credibility and is completely at odds with the facts of this case.

There are four additional issues involved in this case unrelated to Hotels.com. The first issue is whether the TMF Liquidating Trust was entitled to a deduction, under § 162(a)(1), for compensation paid to Andrew Pells, TMF's key employee. The second issue is whether the IRS erred in asserting a $2.5 million "accuracy-related" penalty under § 6662 when the evidence conclusively demonstrates that (1) no underpayment of tax occurred and (2) the Plaintiffs reasonably relied upon two independent appraisals from qualified and reputable appraisal firms in reporting the fair market value of the restricted HRN shares received. The third issue is whether the IRS's deficiency and penalty against the Dieners is barred because the IRS failed to send a Notice of Deficiency to the Dieners' last known address within the three year statute of limitations as required by § 6501(a). The fourth issue is whether the Defendant's alternative claim for an additional deficiency is barred by the three year statute of limitations under § 6501.

Because the evidence conclusively demonstrates that the compensation paid to Mr. Pells by TMF Liquidating Trust was fair, reasonable and commensurate with the valuable services he provided to TMF Liquidating Trust and its predecessor, the IRS erred in denying the compensation deduction. Because (1) no underpayment of tax occurred, and (2) the Plaintiffs reasonably relied upon a qualified and independent appraisal in reporting the value of the restricted shares received, the Plaintiffs are not liable for the $2.5 million penalty assessed by

the IRS under § 6662(a). Finally, because the United States' claims are barred by the statute of limitations, the Dieners are entitled to a refund of all amounts paid by them.

**B. Statement of Facts Plaintiffs Expect to Prove.**

**1. The Sale of TMF, Inc. to USA Networks.**

In May of 1999, all of the assets of TMF, Inc., a Subchapter S corporation in which the Plaintiffs owned a fifty percent interest, were sold to USA Networks ("the 1999 Contract"). During 1999, TMF, Inc. was liquidated and its assets (including, without limitation, the sales proceeds and other rights under the 1999 Contract) and its liabilities were transferred to the TMF Liquidating Trust in which the Litmans and Dieners (including trusts as to which the Plaintiffs are treated as grantors under I.R.C. §§ 671-678) each owned a fifty percent interest. The TMF Liquidating Trust was a flow-through entity taxed to its grantors under I.R.C. §§ 671-678. Part of the consideration paid to TMF Inc. was the right to receive an amount of stock approximately equal to ten percent of HRN's outstanding stock if HRN ever engaged in an initial public offering, and "earn out rights" if HRN reached certain performance milestones.

**2. The Internet Bubble and the HRN IPO.**

In late 1999 -- at the tail end of the "internet bubble" -- HRN's parent company began considering making an initial public offering of a portion of HRN's common stock. At this time, "dot.com" companies like HRN were trading at unheard of multiples, often hundreds of times a company's earnings (if the company was even profitable at all).[5] The NASDAQ -- the stock market on which HRN shares would trade -- was at an all time high. The dot.com

[5] Just a few weeks before the HRN IPO, numerous dot.com companies paid outlandish sums for advertisements during the 2000 Super Bowl, most never to be heard from again. *See, e.g.*, http://www.youtube. com/watch?v=CZJ5XDnN1OE (Computer.com); and http://www.youtube.com/watch?v=nXHrlm5Nk5w (Pets.com).

stock market was not only overvalued, but highly volatile, with stock prices wildly fluctuating up and down at historic rates. Companies considered comparable to HRN had volatilities with an average of approximately 100%. Comparable dot.com travel companies like Priceline.com., Expedia, and Cheaptickets, Inc. saw the value of their shares fluctuate wildly in the months before the HRN IPO. HRN itself even used a volatility estimate -- a measure of risk -- of 100% to calculate the value of warrants it issued to affiliates listed in its Prospectus. It was in this climate of extreme volatility and stock market risk that the HRN IPO occurred.

Before the IPO was to occur, USA Networks, Inc. requested Mr. Litman and Mr. Diener to exchange their earn out rights for restricted shares in HRN. The goal was to better align the interests of Mr. Litman and Mr. Diener with those of USA Networks, HRN's parent company who owned a majority of HRN's stock and who controlled HRN through the ownership of all of HRN's voting shares. To accomplish this goal, the 1999 Contract was amended ("the 2000 Amendment"). As a part of the 2000 Amendment ("the Transaction"), the TMF Liquidating Trust exchanged the earn-out rights under the 1999 Contract for the right to receive additional restricted equity interests in the common stock of HRN immediately prior to the HRN IPO.

**3. The Restricted Shares Were Issued to TMF Liquidating Trust Immediately Before USA Networks and HRN Sold the HRN IPO Shares to the Public at the $16 Per Share.**

The underwriter's agreement authorizing the issuance of the shares in the HRN IPO was signed on February 24, 2000. The HRN IPO price of $16 per share was set by USA Networks and its underwriters, Donaldson, Lufkin, Jenrette, who both owed fiduciary obligations to HRN and its other shareholders to maximize the return to the company in the

HRN IPO. Under the 2000 Amendment, HRN had the obligation to issue the shares to the TMF Liquidating Trust "simultaneously with the initial closing of the 2000 IPO."

The HRN IPO occurred on the morning of February 25, before the NASDAQ market opened and the shares could be freely traded by the persons who bought the shares in the HRN IPO. Consistent with these events and the 2000 Amendment, the stock certificates issued by HRN to the TMF Liquidating Trust were dated February 24, 2000. HRN also acknowledged that the Restricted Shares would be issued to the TMF Liquidating Trust before the HRN IPO, stating specifically that:

> **Immediately prior to the offering the Company will have 9,999,900 shares of Class A common stock** [the shares issued to TMF Liquidating Trust] and 38,999,100 shares of Class B common stock outstanding [the shares owned by USA Networks].

Prospectus, p. F-14 (emphasis added). HRN also treated the shares as "placed in service" for financial accounting purposes on February 25, 2000.

From the date of the HRN IPO until midway through discovery in this lawsuit, there was no debate that the Restricted Shares were issued prior to the HRN IPO or that the $16 per share HRN IPO price for unrestricted shares was the appropriate starting point to value the shares before applying a lack of marketability discount. HRN consistently treated the shares as issued prior to the HRN IPO in the documents it filed with the SEC, its tax returns, its Claim for Refund, and its Complaint in this case. Even the first draft of Hotels.com's expert's valuation report in this case used February 24, 2000 as the valuation date. It was not until June 16, 2006, when Hotels.com's lawyers in this case reviewed a draft of that appraisal, that Hotels.com first asserted that the valuation date for the Restricted Shares should be March 1, 2000.[6] Not only is this position disingenuous and completely at odds with the company's position for the previous

[6] Both the United States and Plaintiffs assert that the valuation date is February 24, 2000.

seven years, it is completely inconsistent with the facts. It is indisputable that the parties to the Transaction intended that the Restricted Shares be issued to TMF Liquidating Trust prior to the HRN IPO and the actions of the parties unequivocally reflected this intention. The date placed on the stock certificates issued to TMF Liquidating Trust -- February 24, 2000 -- makes clear the intention of the parties.

### 4. Plaintiffs Accurately Reported the Fair Market Value of the Restricted Shares.

The TMF Liquidating Trust, and thus the Plaintiffs, recognized capital gains on the receipt of the Restricted Shares based upon the fair market value of those shares when received. The Restricted Shares were subject to onerous sale restrictions imposed by USA Networks, federal law, and the market in general. While the shares issued in the HRN IPO were freely tradable on the NASDAQ market, none of the 9,999,900 Restricted Shares issued on February 24, 2000, could be immediately sold. Over seven million of the Restricted Shares could not be sold for four years. The sale restrictions included, among other things, (1) contractual holding periods, (2) SEC Rule 144 volume restrictions on the number of Restricted Shares that could be sold after holding periods expired, (3) the requirement that approval of HRN's parent company be obtained before any Restricted Shares could be sold, (4) the practical market restriction on sale due to the fact that the TMF Liquidating Trust was owned by the CEO and President of HRN and would be subject to additional securities law restrictions, and (5) the public float was initially only half the size of the Restricted Shares issued to the TMF Liquidating Trust, so practically it could not be sold without drastically lowering the market price. These sale restrictions produced significant risk, particularly given the volatility of the NASDAQ and, more specifically, the volatility of dot.com and travel industry stocks during the relevant period. The market price of HRN shares without the

restrictions could rise and fall in the public market, and TMF Liquidating Trust could not take advantage of any of the increases during the restriction periods. Only after the expiration of four years would all contractual prohibitions on the sale of Restricted Shares be removed.

To determine the fair market value of the Restricted Shares, the Plaintiffs sought the help of Business Valuation Service, Inc., a very reputable, independent appraisal and valuation firm. BVS's expert opinion is often relied upon by individuals, corporations and even the Internal Revenue Service with respect to complex valuation matters.[7] Mark Mitchell of BVS prepared an appraisal report expressing its opinion of the appropriate discount for lack of marketability to be applied in determining the fair market value of the Restricted Shares received by the TMF Liquidating Trust. The BVS valuation analysis considered, among other things, the relevant sale restrictions imposed on the Restricted Shares, the expected volatility of the dot.com shares during the one to four year restriction period, and the other factors listed in Revenue Rulings 59-60 and 77-287.

Giving consideration to relevant sale restrictions, BVS determined the appropriate lack of marketability discounts to be applied to the anticipated IPO price of unrestricted HRN stock for each tranche of the Restricted Shares. Applying BVS's lack of marketability discounts to the $16 per share initial public offering price of the unrestricted HRN stock, the following fair market values were derived for the Restricted Shares:

[7] *See, e.g., Estate of Mellinger v. Comm'r,* 112 T.C. 26 (1999), *acq.,* 1999-2 C.B. XVI; *Estate of Jung v. Comm'r,* 101 T.C. 412 (1993); *Estate of Hendrickson v. Comm'r,* 78 T.C.M. (CCH) 322 (1999); *Estate of Mitchell v. Comm'r,* 74 T.C.M. (CCH) 872 (1997); *Estate of Gray v. Comm'r,* 66 T.C.M. (CCH) 254 (1993).

| Transfer Restriction | IPO Price | Numbered of Restricted Shares Received | BVS Discount | Value | Per Share Value |
|---|---|---|---|---|---|
| Four years | $16 | 7,059,960 | 79.0% | $23,721,465 | $3.36 |
| Three years | $16 | 489,990 | 63.5% | 2,861,542 | 5.84 |
| Two years | $16 | 489,990 | 61.5% | 3,018,338 | 6.16 |
| One year | $16 | 1,959,960 | 49.5% | 15,836,477 | 8.08 |
| | Total | 9,999,900 | | $45,437,822 | $4.54 |

A second independent analysis of the value of the Restricted Shares was also obtained by the Plaintiffs. The second appraiser's opinion actually resulted in a lower fair market value of the Restricted Shares than the BVS analysis. The Plaintiffs also sought the advice of KPMG's valuation group before filing their return. KPMG reviewed the BVS appraisal and determined that both the valuation methodology and conclusion were reasonable. Using the conservative approach, the Plaintiffs reported the fair market value of the Restricted Shares at the higher value determined by BVS. The Plaintiffs relied on the advice of their professional advisors and BVS in making this determination. The Plaintiffs collectively paid income taxes of approximately $20 million in 2000. From 2001 – 2004, the Plaintiffs sold the Restricted Shares as soon as they could because of concerns about the volatility of the stock. Unlike most internet stocks during that period, the value of the HRN shares increased during 2001 – 2004. As the shares were sold, the Plaintiffs recognized capital gains equal to the difference between the selling price and their tax basis in the shares (based on the BVS appraisal).

The issuance of the Restricted Shares also had a tax impact on HRN. Because the Restricted Shares were part of the consideration given to TMF Liquidating Trust in the Transaction, HRN could capitalize the value of the Restricted Shares and amortize the value over a fifteen year period. In its 2000 income tax return, HRN initially reported the value of the

Restricted Shares based upon the $16 per share HRN IPO price of unrestricted shares. HRN and USA Networks recognized that $16 per share was not the correct value because it did not reflect the valuation impact of the onerous transfer restrictions imposed on the Restricted Shares. HRN and USA Networks thus commissioned an appraisal of the Restricted Shares by Deloitte & Touché. Deloitte & Touché applied a valuation analysis similar to that used by BVS. The primary difference between the BVS analysis and the Deloitte & Touché analysis was the estimate of expected volatility of the HRN shares. Because Deloitte & Touché used a lower estimated volatility (an estimate lower than HRN used to value stock warrants it had issued at the time of the IPO), the lack of marketability discount determined by Deloitte & Touché was lower than the discount determined by BVS. Using the Deloitte & Touché analysis, USA Networks and HRN determined the fair market value of the Restricted Shares as follows:

| Transfer Restriction | IPO Price | Numbered of Restricted Shares Received | Deloitte & Touché Discount | Value | Per Share Value |
|---|---|---|---|---|---|
| Four years | $16 | 7,059,960 | 40% | $67,775,616 | $9.60 |
| Three years | $16 | 489,990 | 35% | 5,095,896 | 10.40 |
| Two years | $16 | 489,990 | 30% | 5,847,888 | 11.20 |
| One year | $16 | 1,959,960 | 25% | 23,519,520 | 12.00 |
| | Total | 9,999,900 | | $101,878,920 | $10.18 |

During the audit of its 2000 federal income tax return and in its federal income tax returns for 2001, 2002, and 2003, HRN asserted that the fair market value of the Restricted Shares should be based upon the values determined using the Deloitte & Touché appraisal.

After the IRS issued its notices of deficiency to Plaintiffs, the IRS obtained a valuation of the Restricted Shares from Ruth Haney, an IRS valuation analyst. Ms. Haney applied the same valuation analysis as did BVS and Deloitte & Touché in determining the

appropriate lack of marketability discount, and applied that lack of marketability discount to the $16 per share IPO price of unrestricted HRN shares to determine the fair market value of the Restricted Shares. Ms. Haney determined the fair market value of the Restricted Shares to be as follows:

| Transfer Restriction | IPO Price | Numbered of Restricted Shares Received | IRS Ruth Haney Discount | Value | Per Share Value |
|---|---|---|---|---|---|
| Four years | $16 | 7,059,960 | 48.59% | $57,728,703 | $8.18 |
| Three years | $16 | 489,990 | 46.97% | 4,157,439 | 8.48 |
| Two years | $16 | 489,990 | 42.71% | 4,491,219 | 9.17 |
| One year | $16 | 1,959,960 | 33.09% | 20,731,673 | 10.58 |
| | Total | 9,999,900 | | $87,109,035 | $8.71 |

After discussions with Deloitte & Touché, Ms. Haney subsequently increased her determined value by approximately $1 per share.

**5. The United States and Hotels.com Hire "Trial" Appraisers -- Both of Whom Value the Restricted Shares Higher Than Their Prior Experts.**

After the case was docketed in the Claims Court, Hotels.com hired a new expert to determine the value of the Restricted Shares. Not surprisingly, Hotels.com's "new" expert determined a value for the shares substantially higher than the value determined by Deloitte and used by Hotels.com in its tax reporting position. Hotels.com hired Mukesh Bajaj, an economist whose expert testimony has been criticized by courts in several reported decisions.[8] Based on instructions from Hotels.com's counsel, Bajaj used the March 1, 2000 trading price of $26.25 as the starting point before applying a lack of marketability discount of only 20% -- incredibly

[8] *See, e.g.*, *Estate of Dailey v. Comm'r*, 84 T.C.M. (CCH) 633 (2002) (Bajaj testified for the IRS, and the Court noted in rejecting his opinion that Bajaj's testimony was contradictory, unsupported by the data, and inapplicable to the facts); *Succession of McCord v. Comm'r*, 461 F.3d 614, 628 (5th Cir. 2006) ("[G]iven the Majority's non-erroneous rejection of the Commissioner's expert[s]'s [Dr. Bajaj's] values . . . .").

using the same discount whether the shares are restricted for one year or four. He determined that the value of the Restricted Shares was $23.625 per share, 50% higher than the initial public offering price.

The IRS also switched experts after the case was docketed in the Claims Court. The IRS hired Francis Burns who, like BVS, used the IPO price as the starting point for determining the value of the Restricted Shares. Mr. Burns initially determined that the per share value was $11.10. *See* Ex. 50. He later amended his opinion and determined that the value was $12.75 per share. Ex. 51. Burns applied only a 20.5% lack of marketability discount.

**6. Summary of Expert Valuations.**

A summary of the valuations obtained by the parties and the dates on which they were obtained is as follows:

| **Pre-Litigation Appraisals** | | | | |
|---|---|---|---|---|
| **Appraiser** | **Value Per Share** | | | |
| **Number of Shares** | 7,059,960 | 489,990 | 489,990 | 1,959,960 |
| **Transfer Restriction** | 4 Year | 3 Year | 2 Year | 1 Year |
| Mitchell/BVS (Plaintiffs) [02/25/00] | $3.36 | $5.84 | $6.16 | $8.08 |
| Bohlmann (Plaintiffs) [07/21/00] | $3.20 | $3.20 | $3.20 | $3.20 |
| KPMG (Plaintiffs) [04/03/01] | Concluded BVS values reasonable | | | |
| Deloitte (Hotels.com) [10/18/01] | $9.60 | $10.40 | $11.20 | $12.00 |
| Ruth Haney (IRS) [01/05/05] | $8.18 | $8.48 | $9.17 | $10.58 |
| Ruth Haney (IRS) [04/28/05] | $9.65 | $9.95 | $10.54 | $12.69 |

| **Post-Litigation Appraisals** | | | | |
|---|---|---|---|---|
| **Appraiser** | **Value Per Share** | | | |
| **Transfer Restriction** | 4 Year | 3 Year | 2 Year | 1 Year |
| Mukesh Bajaj (Hotels.com) [06/21/06] | $23.625 | $23.625 | $23.625 | $23.625 |
| Francis Burns (IRS) [06/21/06] | $10.688 | $10.688 | $10.814 | $12.704 |
| Francis Burns – Amended (IRS) [07/25/06] | $12.608 | $12.608 | $12.656 | $13.296 |

### 7. The Mitchell/BVS Determination of the Fair Market Value of the Restricted Shares is Both Contemporaneous and Credible -- Bajaj and Burns's Analyses Are Not.

Plaintiffs initially hired Mark Mitchell and BVS to appraise the Restricted Shares in 2000 and continue to rely on Mr. Mitchell's analysis at trial. The methodology and assumptions used by BVS/Mitchell are reasonable. ***Although criticized by Hotels.com's and the IRS's "trial experts," the option pricing method used by Mitchell to determine his lack of marketability discount was also used by Deloitte and Ruth Haney to determine the value of the Restricted Shares.*** The volatility assumption of 100% used by Mr. Mitchell was the same volatility assumption used by HRN in related stock warrant valuation calculations provided to the SEC. The Mitchell appraisal demonstrates that in determining the value of the Restricted Shares, the onerous and mostly 4 year transfer restrictions justify lack of marketability discounts (when compared to the HRN IPO price for unrestricted shares) ranging from 49.5% for 1 year restricted stock to 79% for 4 year restricted stock.

The fundamental problems with the Bajaj and Burns's analyses is detailed in Mitchell's Reports. Burns erroneously relies on the cost of a "collar" to determine the applicable lack of marketability discount. As Burns acknowledges, however, the Restricted Shares could not be legally or practically collared. Both the contractual restrictions imposed on

the Restricted Shares and the practical constraints due to the fact that the size of the block of the Restricted Shares was almost twice the total amount of shares publicly trading made a "collar" of the shares impossible. Burns has never been involved in a collar transaction of this nature and failed to contact any investment bankers to see whether such a transaction was even feasible. Burns's ivory tower theoretical approach lacks credibility.

Bajaj's analysis also suffers from a number of fatal flaws. Despite the fact that HRN issued the shares on February 24, 2000, Bajaj used the $26 per share March 1 trading price as the starting point for determining the value of the shares rather than the $16 per share HRN IPO price for unrestricted shares. He then applied a small lack of marketability discount of 10 - 20%, despite the fact that the most of the shares could not be traded at all for four years. The studies relied upon by Bajaj demonstrate that the longer the restrictions exist and the more volatile the stock, the greater the lack of marketability discount. None of the studies involve four year restricted stock; nor do the studies relied upon by Bajaj address the value of stock that cannot be traded at all during the restriction period. Although Bajaj generally recognizes that increased restrictions on sale result in greater lack of marketability discounts, his analysis fails to take into account the fact that most of the Restricted Shares are both contractually and statutorily restricted from being sold for four years. Unlike the private placement data relied upon by Bajaj (which do not contain restrictions on private sales and only restrict sales in the public market), the Restricted Shares cannot be sold either in a private sale or in the public market.

Moreover, Bajaj makes no distinction between the value of the Restricted Shares with one year contractual sales restrictions from those with four year restrictions. Bajaj's position is patently absurd. No rational person would suggest that one year restricted shares

carry the same value as four year restricted shares. Yet that is exactly what Bajaj does in his report. This ridiculous position illustrates what Bajaj's report is -- pure advocacy -- not the work of an unbiased expert. For that reason alone, the Court should reject his analysis in its entirety.

Both Bajaj and Burns examined "quartiles" of discounts observed in these studies to determine the lack of marketability discount. While the individual transactions reflected in the studies in fact reflect discounts in the range determined by BVS/Mitchell, Bajaj and Burns use of "quartiles" dilutes the effect of these individual transactions. Bajaj's reliance on the mean and median discounts in any of these quartiles would render a lack of marketability discount of only between 15% and 29.5% in each case regardless of the specific facts associated with the stock being valued. Burns's analysis suffers from the same fatal flaw, as his use of averages within each quartile from the Management Planning study would produce discounts ranging from only 21.8% to 34.7% and the Johnson study from 13% to 23%. The use of these quartiles artificially dilutes the real valuation impact of the onerous restrictions placed on the shares.

**8. The Compensation Paid to Andrew Pells was Reasonable and For His Service as an Employee.**

At the time TMF, Inc. was formed, Robert Diener and David Litman recognized that Andrew Pells was going to be a key employee. On behalf of TMF, Inc., they agreed with Mr. Pells that he would be entitled to one percent of the value company (when that value was ultimately monetized) for each year he remained with TMF, Inc. up to a total of five percent as an incentive for him to stay with the company. There was no certainty that TMF, Inc. would succeed, and Mr. Pells gave up current income for an opportunity to be compensated later if the company was successful. This compensation arrangement aligned Mr. Pells' interests with that

of the company. Mr. Pells remained a loyal and valuable employee of TMF, Inc. and was entitled to the agreed upon compensation. The agreement with Mr. Pells was similar to many agreements reached between start up companies and their key employees during this period, where the employee is willing to forgo some current salary for an equity stake in the company. The compensation paid to Mr. Pells was reasonable and compensation for his services as an employee of TMF, Inc.

**9. A Notice of Deficiency Was Not Sent to the Dieners' Last Known Address as Required by I.R.C. § 6501(a).**

In the fall of 2004, the Dieners moved. On September 30, 2004, the Dieners mailed a change of address form (Form 8822) to the Commissioner of the Internal Revenue Service ("the Commissioner") in the Atlanta Service Center by certified mail, return receipt requested. The address on the change of address form is 8 Indian Creek Island Road, Indian Creek Village, FL 33154.

The Commissioner mailed the Notice of Deficiency to the Dieners at 8877 Collins Avenue PH A, Surfside, FL 33154 on October 8, 2004. Pursuant to Section 6501(a), the date of expiration of the three-year period of limitation for assessment of any income tax deficiency against the Dieners was October 15, 2004. The Commissioner did not send the Notice of Deficiency to the Dieners' last known address within three years of the filing of the 2000 Return, as required by I.R.C. § 6212. Defendant has not, prior to or subsequent to the October 15, 2004, date of expiration of the period of limitation for assessment, sent a notice of deficiency of income tax to the Dieners at their last known address.

**C. Issues of Fact and Law.**

In order to resolve this case as it relates to Plaintiffs, the Court must determine the following issues of fact and law:

(1) Whether the United States (and, to the extent they contradict the Plaintiffs' positions, Hotels.com) bears the burden of proof in this case under I.R.C. § 7491;

(2) Whether February 24, 2000, is the proper valuation date for the Restricted Shares;

(3) Whether Hotels.com has judicially admitted that February 24, 2000, is the proper valuation date for the Restricted Shares;

(4) Whether Hotels.com is estopped by the doctrine of variance to assert a valuation date of other than February 24, 2000, for the Restricted Shares;

(5) The fair market value of the Restricted Shares on February 24, 2000 for federal income tax purposes;

(6) Whether the compensation paid to Andy Pells by TMF Liquidating Trust was reasonable and compensation for his services as an employee of TMF Liquidating Trust and its predecessor;

(7) Whether accuracy-related penalties under I.R.C. § 6662(a) should be applied to Plaintiffs. To address this issue the Court must address two sub-issues:

   (a) Whether there was an underpayment of tax by Plaintiffs;

   (b) Whether Plaintiffs acted in good faith and in reasonable reliance on the advice of professional advisors and appraisers in reporting the fair market value of the Restricted Shares on TMF Liquidating Trust's 2000 Form 1041 and on their 2000 Form 1040's;

(8) Whether Defendant's assessment of tax against the Dieners are barred by

the statute of limitations because the IRS did not send a Notice of Deficiency to the Dieners' last known address as required under I.R.C. § 6501(a); and

(9) Whether Defendant's alternative claims for an additional deficiency is barred by the three year statute of limitations under I.R.C. § 6501(a). To address this issue, the Court must address whether the six year statute of limitations under I.R.C. § 6501(e)(1)(A) is applicable to Defendant's alternative claims.

## D. Discussion of Legal Principles.

### 1. The United States Bears the Burden of Proof Under I.R.C. § 7491.

Consolidation of these cases cannot deprive the Litmans and the Dieners of their right under I.R.C. § 7491 to have the burden of proof in this case shift to Defendant. Section 7491 provides as follows:

> (a) BURDEN SHIFTS WHERE TAXPAYER PRODUCES CREDIBLE EVIDENCE.–
>
> (1) GENERAL RULE.–If, in any court proceeding, a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B, the Secretary shall have the burden of proof with respect to such issue.
>
> (2) LIMITATIONS.– Paragraph (1) shall apply with respect to an issue only if --
>
> (A) the taxpayer has complied with the requirements under this title to substantiate any item;
>
> (B) the taxpayer ***has maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews***; and
>
> (C) in the case of a partnership, corporation, or trust, the taxpayer is described in section 7430(c)(4)(A)(ii).
>
> Subparagraph (C) shall not apply to any qualified revocable trust (as defined in section 645(b)(1)) with respect to liability for tax

> for any taxable year ending after the date of the decedent's death and before the applicable date (as defined in section 645(b)(2)).
>
> (3) COORDINATION.– Paragraph (1) shall not apply to any issue if any other provision of this title provides for a specific burden of proof with respect to such issue.

I.R.C. § 7491 (emphasis added). Plaintiffs believe that there is no material dispute that they have satisfied the prerequisites of § 7491, as the Examining Agent made only one request for information during their audit, which request was fully complied with. Thus, Plaintiffs request that the Court shift the burden of proof to the Defendant and, to the extent they take positions contrary to Plaintiffs, Hotels.com, on all factual determinations in this case, including the fair market value of the Restricted Shares. *See Okerlund v. United States,* 53 Fed. Cl. 341, 355-57 (2002) (Court held that burden of proof shifted to Defendant under I.R.C. § 7491 in case involving the determination of the fair market value of closely held stock), *aff'd*, 365 F.3d 1044 (Fed. Cir. 2004). Consolidation cannot effectively deprive the Litmans and the Dieners of their statutory right to seek a shift of burden of proof to Defendant on any factual issues. Hotels.com has no similar right under § 7491 because it is a corporation.

**2. February 24, 2000, is the Proper Valuation Date for the Restricted Shares and Hotels.com Cannot Now Argue that a Different Date Applies.**

As discussed above, Hotels.com now asserts that the proper valuation date for the Restricted Shares is March 1, 2000, and not February 24 or 25 (immediately before shares began trading) as Hotels.com admitted throughout the IRS audit and in its filings with the IRS and the SEC. Hotels.com's litigation position, contrived by its counsel to gain settlement leverage, lacks credibility and is belied by the conduct of Hotels.com and its parent company. As detailed above, the facts in this case are clear -- the Restricted Shares were issued before the

IPO, not after it closed. Moreover, Hotels.com's claims regarding the valuation date are legally barred by its own judicial admissions in this case. For example, its Complaint states that:

> On February 25, 2000, HRN, Inc. underwent an initial public offering (an "IPO"). The IPO price of the HRN, Inc. common stock was $16 per share.
>
> ***Contemporaneous with the February 2000 IPO,*** HRN, Inc. paid to the Sellers 9,999,900 shares of HRN, Inc. common stock pursuant to the Amendment (the "IPO Shares").

Hotels.com Complaint ¶¶ 8-9. Likewise, Hotels.com's 2000 Claim for Refund unambiguously acknowledges that:

> Pursuant to the Amended Purchase Agreement, **on February 24, 2000, Hotels.com issued the sellers 5,1000,000 shares of class A common stock.**
>
> * * *
>
> **On February 24, 2000, Hotels.com issued the sellers 4,899,900 shares of class A common stock** ("Section 7.13.1 Shares").

(Emphasis added.) Again, consistent with Hotels.com's assertion in its Claim for Refund, the Restricted Share certificates bear a February 24, 2000 issuance date.

Accordingly, Hotels.com has judicially admitted that the correct valuation date for the Restricted Shares was February 24, 2000 by incorporating by reference its Claim for Refund into its Complaint in this case. *See* RCFC 10(c) ("exhibit to a pleading is a part thereof for all purposes"); *Filtration Dev. Co., LLC v. United States*, 60 Fed. Cl. 371, 381 (Fed. Cl. 2004) ("pleadings are judicial admissions and a party may invoke the language of the opponent's pleading to render the facts contained therein indisputable") *quoting E.C. McAfee A/C Bristol Metal Indus. of Canada, Ltd. v. United States*, 832 F.2d 152, 154 n. (Fed. Cir. 1987).

The variance doctrine also prohibits Hotels.com from, as it seeks to do here,

raising factual issues that were not raised in its Claim for Refund and contradicting factual assertions contained in its Claim for Refund. *See, e.g., Union Pacific R.R. Co. v. United States*, 389 F.2d 437 (Ct. Cl. 1968); *Boddie-Noell Enters., Inc. v. United States*, 36 Fed. Cl. 722 (1996), *aff'd*, 132 F.3d 54 (1997). This Court lacks jurisdiction to hear any basis for refund not made clear in a timely-filed Claim for Refund. *Id.* The Claim for Refund "must set forth in detail each ground upon which the credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." Treas. Reg. § 301.6402-2(b) (1982); *see also Mobil Corp. v. United States*, 52 Fed. Cl. 327, 331 (2002). The taxpayer cannot substantially vary at trial from the factual bases raised in the claim for refund. *Lockheed Martin Corp. v. United States*, 210 F.3d 1366, 1371 (2000).

As a result, Hotels.com cannot now assert that March 1, 2000, was the proper date to value the shares at issue in this case or that the value of the shares is something higher than $16 per share, because it did not raise those factual issues in its Claim for Refund. *See Mobil*, 52 Fed. Cl. at 333. Hotels.com's valuation date argument substantially varies from the factual bases of its claim for refund and this Court has no jurisdiction to hear such a claim. *See Lockheed Martin Corp.*, 210 F.3d at 1371. Hotels.com's new position is not simply a clarification or an incremental change – it is a fundamental change in its position that if Hotels.com's "new" expert is to be believed – would have a dramatic potential impact on the tax or refunds due as a result of this case.

**3. Plaintiffs' Expert Provides the Only Consistent and Reasonable Determination of the Fair Market Value of Restricted Shares.**

**a. Determining the Fair Market Value of Restricted Stock.**

Courts and valuation professionals have long recognized that stock subject to sale or transfer restrictions has a lower value than identical, but freely tradable restricted shares

of the same stock. That is because, all other things being equal, an investor will require a reduction in price, also referred to as a "discount," because the restricted shares cannot be sold in the open market for a period of time and thus expose the holder to additional risk. The size of the discount depends upon a number of factors, including without limitation, the length of the period during which the stock is restricted, the size of the block of restricted stock compared to the company's market capitalization, and the risk inherent in and the volatility of the company's stock. *See, e.g.*, *Estate of Gilford v. Comm'r*, 88 T.C. 38 (1987). For example, in *McDonald v. Comm'r*, 764 F.2d 322 (5th Cir 1985), *aff'g*, 45 T.C.M. (CCH) 1276 (1983), the Fifth Circuit Court of Appeals noted as follows:

> [I]t has long been recognized that restrictions of the very kind here in issue [sale restrictions] affect the fair market value of the stock subject thereto. As the Tax Court said in *LeVant v. Commissioner*, 45 T.C. 185, 204 (1965), *rev'd on other grounds*, 376 F.2d 434, 441-42 (7th Cir. 1967), "[i]t has been held in several cases that the restriction on the sale of investment letter stock reduces the value of the stock below the fair market value of the stock without the restriction . . . ." *See also Victorson v. Commissioner*, 21 T.C.M. 1238, 1246 (CCH) (1962), *aff'd*, 326 F.2d 264 (2d Cir. 1964); *Goldwasser v. Commissioner*, 47 B.T.A. 445, 457 (1942), *aff'd mem. per curiam*, 142 F.2d 556 (2d Cir.), *cert. denied*, 323 U.S. 765, 65 S.Ct. 119, 89 L.Ed. 612 (1944); *Bolles v. Commissioner*, 69 T.C. 342, 354 (1977) ("The value of stock which may be sold only to persons who take for investment is significantly decreased by such restriction."); *Husted v. Commissioner*, . . ."

*Id.* at 329-30. *See also* Shannon P. Pratt, et al., Valuing a Business 395-407 (4th ed. 2003).

The IRS's National Office recognized this discount almost thirty years ago when it promulgated Revenue Ruling 77-287, in which the IRS described the valuation impact as follows:

> The market experience of freely tradable securities of the same class as the restricted securities is also significant in determining the amount of discount. Whether the shares are privately held or

> publicly traded affects the worth of the shares to the holder. Securities traded on a public market generally are worth more to investors than those that are not traded on a public market.

Rev. Rul. 77-287, 1977-2 C.B. 319, § 6.04. The Ruling also states that "***the longer the buyer of the shares must wait to liquidate the shares, the greater the discount***." *Id*. at § 6.02 (emphasis added).

The IRS's examining agent even acknowledged this discount in her Revenue Agent's Report in this case, stating as follows:

> ***It is well settled that restrictions on the public sale of stock reduce the stock's fair market value***; *Estate of Piper v. Commissioner*, 72 T.C. 1062, 1087, 1979 WL 3788 (1979); *Bolles v. Commissioner*, 69 T.C. 342 (1977); *Hirsch v. Commissioner*, 51 T.C. 121 (1968); *Husted v. Commissioner*, 47 T.C. 664 (1967). Revenue Ruling 77-287, 1977-2 C.B. 319 was issued to provide guidance to taxpayers, Internal Revenue Service personnel, and others concerned with the valuation, for Federal tax purposes, of securities that cannot be immediately resold because they are restricted from resale pursuant to Federal securities laws.
>
> ***Since the HRN stock was unregistered and subject to resale restrictions of SEC Rule 144, this restriction limited their sale in the public marketplace and would generally justify a discount.***

(Emphasis added.)

**4. The 2000 Amendment Does Not Set a Value For the Restricted Shares for Federal Tax Purposes.**

After joining the case, Hotels.com took two positions that it had never espoused during the five plus years since the Restricted Shares were issued to the Plaintiffs. Specifically, Hotels.com now asserts under the 2000 Amendment, the parties agreed to report the value of the Restricted Shares based upon the $16 per share IPO price. Not only did neither HRN nor its parent company ever raise this position, both Eric DeGraw (USA Networks' Senior Vice President in Charge of Tax) and Mel Robinson (HRN's Chief Financial Officer) will testify that

they were completely unaware that such an alleged agreement had been entered into. HRN's and its parent company's conduct in obtaining the Deloitte appraisal and reporting the value of the shares based upon the Deloitte appraisal belies Hotels.com's litigation position that such an agreement existed. Moreover, the clear reading of the 2000 Amendment demonstrates that no such agreement was entered into. Paragraph 3.4 of the 2000 Amendment, the only paragraph addressing tax valuation issues, provides only that:

> (ii) For all Tax purposes, the Buyer and the Settlers agree (A) to report the transactions contemplated by this Agreement in a manner consistent with the terms of this Agreement, and (B) that none of them will take any position inconsistent therewith in any Tax Return.

2000 Amendment, ¶ 3.4. This provision does not set a value for the Restricted Shares, and nothing elsewhere in the 2000 Amendment addresses the reporting of the value of the Restricted Shares.

**5. Plaintiffs are Entitled to a Deduction for the Compensation Paid to Andy Pells.**

During 2000, TMF Liquidating Trust reported employee compensation, including cash and stock, of $6,844,136 paid to Andy Pells, a key employee of TMF. The shares transferred to Mr. Pells as compensation were valued at $16 per share as statutorily required under I.R.C. § 83.[9] In connection with the transfer of these shares to Mr. Pells, the TMF Liquidating Trust recognized and reported a capital gain of $1,940,360.

Under § 162(a)(1), TMF Liquidating Trust could deduct all "the ordinary and necessary expenses paid or incurred [during the taxable year] in carrying on any trade or

[9] Section 83(a) provides that if, in connection with the performance of services, property is transferred to any person, the transferees' gross income shall include "the excess of -- (1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) . . . over (2) the amount (if any) paid for such property." I.R.C. § 83(a). Section 83(h) provides that the employer's deduction shall be computed in the same manner. I.R.C. § 83(h).

business, including a reasonable allowance for salaries or other compensation for personal services actually rendered." Treas. Reg. § 1.162-7(a) (1960). To be deductible, payments must both be reasonable and purely for services rendered. *Id.* The cash and stock compensation paid to Mr. Pells was fair and reasonable and commensurate with the substantial services Mr. Pells provided to TMF, Inc. and its successor, TMF Liquidating Trust. TMF, Inc., was a consolidator of hotel accommodations, providing hotel reservation services through various websites and a toll free call center. TMF, Inc. contracted with hotels in advance for volume purchases at wholesale prices and sold those rooms to consumers, often at discounts from published rates. TMF, Inc. grew from a company of $5 million of sales in 1992 to a company having over $1.4 billion of sales in 2003. As the Senior Vice President of Hotel Product, Mr. Pells was responsible for many of the company's vendor relationships, and played a large part in building the hotel program and relationships with TMF, Inc.'s approximately 1,200 hotel partners, which was the backbone of the company's business.

Courts have considered a number of factors in deciding whether the amount of compensation paid to an employee is reasonable, such as: (a) the employee's qualifications; (b) the nature, extent and scope of the employee's work; (c) the size and complexity of the business; (d) the comparison of salaries paid with gross and net income; (e) general economic conditions; (f) comparison of salaries to distributions to shareholders and retained earnings; (g) the prevailing rates of compensation for comparable positions in comparable companies; (h) the employer's salary policy to all employees; (i) the employer's financial conditions; (j) compensation paid in prior years; and (k) whether the employee and employer dealt at arm's-length. *See, e.g., Elliotts, Inc. v. Comm'r*, 716 F.2d 1241, 1243-45 (9th Cir. 1983); *Mayson Mfg. Co. v. Comm'r*, 178 F.2d 115, 119 (6th Cir. 1949). No one factor determines whether the

compensation is reasonable. As demonstrated below, Mr. Pells' compensation arrangement satisfied the deductibility test.

**Qualifications** - Mr. Pells was highly qualified for his position as Senior Vice President of Hotel Product of TMF, Inc. Prior to his employment with TMF, Inc., Mr. Pells had over 15 years experience in the travel industry. He possessed significant relationships in the hotel industry.

**Scope of Work** – As a Senior Vice President of Hotel Product, Mr. Pells was the key employee of TMF, Inc. He was responsible for many of the company's vendor relationships, and played a large part in building the hotel program and relationships with TMF, Inc.'s approximately 1,200 hotel partners.

**Size and Complexity of Business** – TMF, Inc. was a leading on-line consolidator of hotel accommodations, providing service through various websites and a toll-free call center. TMF, Inc. contracted with hotels in advance for volume purchases at wholesale prices and sold those rooms to consumers. In 2000, the company employed 180 people in its call center in Dallas. HRN, who acquired TMF, Inc.'s assets, ultimately became known at "hotels.com."

**Comparison of Salaries to Shareholder Distributions/Employer's Financial Condition** - Mr. Pells received total compensation of $6,844,136 during 2000. This consisted of cash of $2,924,215.50 and 244,995 shares of stock with a fair market value of $1,979,560 ($8.08 per share).[10] Given that TMF, Inc. realized and reported a gain of $45,437,822 on the receipt of the Restricted Shares in 2000, Mr. Pells' compensation was reasonable compared to the benefits received by the shareholders of the company.

---

[10] As noted, I.R.C. § 83 required the compensation to be valued at $16 per share despite the significant transfer restrictions, resulting in Mr. Pells reporting the shares in his gross income (and TMF Liquidating Trust deducting the compensation expense) at $3,919,920. Mr. Pells recognized these amounts as ordinary income.

**<u>Prevailing Rates in Comparable Companies/Prior Years Compensation</u>** - The agreement with Mr. Pells, whereby he was willing to forego some current salary for future compensation when the company performed well, was comparable to the compensation structure employed by numerous start-up companies.

**<u>Arm's Length Nature</u>** - Andrew Pells was unrelated to the owners of TMF, Inc., and he owned no stock in TMF, Inc. or TMF Liquidating Trust. He was, however, a valued employee and made significant contributions to the business.

In *Custom Chrome, Inc. v. Comm'r*, 76 T.C.M. (CCH) 386 (1998), *aff'd in part and rev'd in part on other grounds*, 217 F.3d 1117 (2000), the Tax Court allowed a deduction under I.R.C. § 162 based upon a compensation arrangement similar to Mr. Pells' agreement with TMF, Inc. In that case, the Court addressed the question of whether amounts paid to key employees based on long-standing agreements between the employees and the shareholder/officer that once the shareholder's stock was sold, additional compensation for past services would be paid to them. The IRS argued that the payments were not deductible, and related to covenants not to compete entered into between the company and the employees. Holding that the entire balance of the payments was deductible compensation, the Tax Court found that

> The evidence, although not extensive, is credible and persuasive and establishes that the $1.199 million was paid to Panzica, Battistella, and Navarra as consideration for services rendered in prior years and not for covenants not to compete. The $1.199 million was paid in 1990, not deferred until later years after the employees terminated their employment with petitioner and was based on a long standing understanding between Cruze, on the one hand, and Panzica, Battistella, and Navarra on the other, that Panzica, Battistella, and Navarra would be compensated with additional compensation for services rendered if Cruze's stock in petitioner were sold.

*Id.* at 392.

In this case, the uncontroverted evidence demonstrates that Mr. Pells' compensation was reasonable and based upon his valuable services to TMF, Inc. and TMF Liquidating Trust. TMF Liquidating Trust was entitled to a deduction of such compensation under § 162(b)(1).

**6. Plaintiffs Are Not Subject to Penalties Under § 6662.**

The IRS has asserted that the Plaintiffs are liable for $5 million in penalties under § 6662(a) because all or part of the underpayment of tax for the taxable year(s) is attributable to one or more of (1) negligence or disregard of rules or regulations, (2) any substantial understatement of income tax, or (3) any substantial valuation overstatement. I.R.C. § 6662(b). If applicable, § 6662(a) provides for an addition to tax in an amount equal to 20 percent of the portion of the underpayment of tax to which § 6662 applies. If, as demonstrated above, no underpayment of tax occurred, then the IRS's assessment of a penalty under § 6662 was improper.

Section 6664 provides an exception to § 6662 penalties. Section 6664 provides that "[n]o penalty shall be imposed under section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." I.R.C. § 6664(c)(1). Thus, the IRS's assertion of a penalty -- even if we assume that the IRS's erroneous tax deficiency was correctly issued -- cannot stand if the Court determines that the Plaintiffs had reasonable cause and acted in good faith in determining the reported value of the Restricted Shares. I.R.C. § 6664(c)(1).

Reliance on professional advice constitutes good cause under § 6664(c) when: (1) the advisor has sufficient expertise to justify reliance; (2) the taxpayer provides the

professional advisor with sufficient and accurate information; and (3) the taxpayer actually relies in good faith on the advisor's judgment. *See, e.g., Sklar, Greenstein & Scheer P.C. v. Comm'r*, 113 T.C. 135, 144-45 (1999). Reliance on a professional appraiser also meets the reasonable reliance standard. *See, e.g., Estate of Simplot v. Comm'r*, 112 T.C. 130, 182 (1999), *rev'd on other grounds*, 249 F.3d 1191 (2001).

The Plaintiffs obtained two appraisals from professional appraisers and used the appraisal with the higher value. The Plaintiffs also had the BVS appraisal reviewed by KPMG. BVS, the expert who prepared the appraisal upon which the Plaintiffs placed primary reliance, is a nationally known, highly regarded professional appraisal firm that often has been used by the IRS in valuation matters. *See, e.g., Estate of Mellinger v. Comm'r*, 112 T.C. 26 (1999), *acq.*, 1999-2 C.B. XVI; *Estate of Jung v. Comm'r*, 101 T.C. 412 (1993); *Estate of Hendrickson v. Comm'r*, 78 T.C.M. (CCH) 322 (1999); *Estate of Mitchell v. Comm'r*, 74 T.C.M. (CCH) 872 (1997); *Estate of Gray v. Comm'r*, 66 T.C.M. (CCH) 254 (1993).

**7. The United States' Claims Against the Dieners Are Barred by the Statute of Limitations.**

**a. The Statutory Framework.**

Section 6501(a) provides that the amount of any deficiency in income tax shall be assessed within three years after the income tax return is filed. I.R.C. § 6501(a). However, Section 6503(a)(1) provides that the running of the three-year period of limitations shall be suspended "after the mailing of a notice under section 6212(a)." I.R.C. § 6503(a)(1). Section 6212(a) authorizes the Secretary, upon determining that there is a deficiency in income tax, to send a notice of deficiency "to the taxpayer by certified mail or registered mail." I.R.C. § 6212(a). With regard to notices of deficiency in income tax, Section 6212(b)(1) provides that "notice of a deficiency in respect of [income tax], if mailed to the taxpayer at his

last known address, shall be sufficient for purposes of this . . . chapter. . . ." I.R.C. § 6212(b)(1). The taxpayer's last known address is generally the address on his most recently filed tax return, "unless the taxpayer provided 'clear and concise' notice to the IRS of an address change." *Ward v. Comm'r*, 907 F.2d 517, 521 (5th Cir. 1990). In the event that the Secretary or his delegate fails to mail a notice of deficiency to a taxpayer as provided in Sections 6503(a) and 6212(a) and (b)(1) prior to the expiration of the statute of limitations period for assessment, the Commissioner is prohibited from assessing and, therefore, collecting, any deficiency for the return for which the statute of limitations expired. See I.R.C. § 6501(a).

**b. A Notice of Deficiency Not Mailed to the Taxpayer's Last Known Address is Invalid.**

Defendant failed, prior to the expiration of the statute of limitations for assessment on October 15, 2004, to mail a notice of deficiency to the Dieners' last known address. Neither the United States Court of Federal Claims nor the United States Court of Appeals for the Federal Circuit has addressed the invalidity of a Notice of Deficiency mailed to an address other than a taxpayer's last known address within the statutory period. However, various other courts have considered the issue and concluded that a notice of deficiency not sent to the taxpayer at the taxpayer's last known address is invalid. *See, e.g.*, *Ward*, 907 F.2d at 521 ("To be valid, a petition must be filed from a valid statutory notice."); *Mulder v. Comm'r*, 855 F.2d 208, 211 (5th Cir. 1988) ("If the notice is not valid, . . . the Commissioner's action is barred by limitations, § 6501(a)."); *King v. Comm'r*, 857 F.2d 676, 679 (9th Cir. 1988) ("A notice of deficiency is valid, even if it is not received by the taxpayer, if it is mailed to the taxpayer's 'last known address'."); *Mulvania v. Comm'r*, 769 F.2d 1376, 1379 (9th Cir. 1985) ("[A]n erroneously addressed and undelivered registered notice of deficiency is not valid under either § 6212(a) or 6212(b)(1) even if the Commissioner also sends a copy of the notice by

regular mail to the taxpayer's attorney."); *D'Andrea v. Comm'r*, 263 F.2d 904, 906 (D.C. Cir. 1959) ("But if it was not sent 'to the last known address,' then the notice which starts the running of the 90-day period was never given, and the dismissal for lack of jurisdiction should have been based on that fact."); *Fernandez v. Comm'r*, 54 T.C.M. (CCH) 1036 (1987) (finding notice of deficiency was not mailed in accordance with I.R.C. § 6212(b)(1) where notice was not mailed to taxpayer's last known address); *Keeton v. Comm'r*, 74 T.C. 377, 385 (1980) (finding that sending a copy of deficiency notice to taxpayer's attorney by ordinary mail fell "far short of satisfying the statutory requirement of section 6212(b)"); *Reddock v. Comm'r*, 72 T.C. 21, 26 (1979) (holding that first notice of deficiency sent to incorrect address was invalid, and second notice sent after statute of limitations had run was also invalid), *acq.*, 1979-2 C.B. 1.

For purposes of mailing a notice of deficiency, "the taxpayer's 'last known address' is the address to which, in light of all surrounding facts and circumstances, the Commissioner reasonably believed the taxpayer wished the notice of deficiency to be sent." *Ward*, 907 F.2d. at 521; *see also Mulder*, 855 F.2d at 210-12. In *Ward*, the taxpayer mailed a letter to the IRS changing his address on November 6. The IRS received the letter on November 10 and input the change of address. Although the Court recognized that no computer search would reveal the new address for up to forty-five days, the Court held that the notice of deficiency, mailed on November 20, was invalid due to the fact that it had not been mailed to the taxpayer's last known address. *Ward*, 907 F.2d at 518-19. The Court held that the taxpayer's letter informing the IRS of his change of address constituted "clear and concise notice" of the change of address and reasoned that even though the responsible IRS agent was unaware of the fact, he "could have discovered that an address change was pending" as early as

November 12, as the letters "PN" would appear on the history portion of the taxpayer's file. *Id.* at 522, 518.

As was the case in *Ward*, the Dieners mailed clear and concise notice of their change of address to the IRS on September 30, 2004, fifteen days before the statute of limitations was to run. The IRS received the notice four days later, on October 4, 2004, and issued the Notice of Deficiency a week early, on October 8, 2004. Defendant's failure in this case to mail a Notice of Deficiency to the address that the Dieners clearly and concisely indicated in the change of address form that they wished any notice of deficiency to be sent to renders the Notice of Deficiency invalid, with the result that the statute of limitations for assessment expired on October 15, 2004.

Likewise, in *D'Andrea*, an original notice of deficiency was mailed to the address indicated in a taxpayer's most recently filed tax return. In the interim, however, the taxpayer had sent a letter to the IRS directing that all communications on the matter be sent to the taxpayer's attorney. When the IRS issued its notice of deficiency, it misread the taxpayer's letter and sent the notice directly to the taxpayer in contravention of his direction otherwise. Despite the fact that the taxpayer's attorney received a copy of the notice of deficiency, the Tax Court held that the IRS had not complied with the provisions of I.R.C. § 6212. *D'Andrea*, 263 F.2d at 906-09.

**c. Defendant Failed to Exercise Reasonable Diligence.**

As the Fifth Circuit in *Ward* held, "the taxpayer's 'last known address' is the address to which, in light of all surrounding facts and circumstances, the Commissioner reasonably believed the taxpayer wished the notice of deficiency to be sent." *Ward*, 907 F.2d at 521. In determining what the Commissioner reasonably believed, the Court "must focus on

information that would be available to the IRS at the time it issued the [notice of] deficiency if it had used reasonable diligence." *Id.* The Dieners mailed their change of address form to the Commissioner fifteen days before the statute of limitations was due to run, and the Commissioner received the change form four days later. Defendant's failure to mail a Notice of Deficiency to the Dieners as directed in the change of address form submitted by the Dieners on September 30, 2004, was in direct contravention of the provisions of I.R.C. §§ 6212(a) and (b)(1). As a result, the statute of limitations for assessment in I.R.C. § 6501(a) expired on October 15, 2004, three years from the date that the Dieners' income tax return was filed. Under these circumstances, Defendant did not use reasonable diligence when it failed to mail the Notice of Deficiency to the Dieners at their last known address.

**8. Defendant's Additional Claims in Its Amended Counterclaims Are Barred by the Three Year Statute of Limitations.**

Defendant erroneously argues that amounts in excess of those assessed by the IRS in its Notices of Deficiency may be asserted in Defendant's Amended Counterclaims under the six year statute of limitations provided by I.R.C. § 6501(e)(1)(A). Section 6501(e)(1)(A) provides:

> (A) If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph--
>
> (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; and
>
> (ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from

> gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature and amount of such item.

I.R.C. § 6501(e)(1)(A).

Plaintiffs are not subject to the I.R.C. § 6501(e)(1)(A) six year limitations period for three reasons. First, Plaintiffs did not under report the amount of income tax due by 25 percent or any other amount. Second, Plaintiffs did not "omit" any item of income -- the income attributable to the issuance of the Restricted Shares was reported on Plaintiffs' Forms 1040. *See Colony v. Comm'r*, 357 U.S. 28 (1958) (Congress intended [predecessor to I.R.C. § 6501(e)(1)(A)] to apply "where a taxpayer omitted some income receipt or accrual in his computation of gross income, and not more generally to errors in that computation arising from other causes".). Finally, Plaintiffs adequately disclosed the income resulting from the issuance of the Restricted Shares on their Forms 1040 and the TMF Liquidating Trust Form 1041.

Accordingly, the statute of limitations for assessment of tax related to the issuance of the Restricted Shares expired on October 15, 2004, three years after the returns were filed. Defendant cannot now assess additional tax in this case. Therefore, Defendant cannot assert any tax not asserted in its Notices of Deficiency (assuming, *arguendo*, that the Notices of Deficiency are valid at all).

**E. Objections to Witnesses.**

Plaintiffs reserve the right to object to the qualification of any witness as an expert at the time designated by the Court for filing of Motions in Limine.

Respectfully submitted,

Dated: February 26, 2007

By: s/ John W. Porter
John W. Porter
Attorney of Record

Stephanie Loomis-Price (Of Counsel)
J. Graham Kenney (Of Counsel)

BAKER BOTTS l.l.p.
3000 One Shell Plaza
910 Louisiana
Houston, Texas 77002-4995
(713) 229-1597
(713) 229-2797 (Fax)

COUNSEL FOR PLAINTIFFS-COUNTERDEFENDANTS DAVID S. LITMAN, MALIA A. LITMAN, ROBERT B. DIENER AND MICHELLE S. DIENER