*05-956 T, 05-971 T, & 285 T*
*(Judge Christine O.C. Miller)*

---

*IN THE UNITED STATES COURT OF FEDERAL CLAIMS*

**DAVID S. LITMAN and MALIA A. LITMAN**
**ROBERT B. DEINER and MICHELLE S. DEINER**

**Plaintiffs-Counterdefendants**

v.

**THE UNITED STATES,**

**Defendant-Counterplaintiff**

**HOTELS.COM, INC. AND SUBSIDIARIES**
**(f/k/a HOTEL RESERVATIONS NETWORK, INC.)**

**Plaintiff**

**v.**

**THE UNITED STATES,**

**Defendant**

# *THE UNITED STATES' PRETRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW*

EILEEN J. O'CONNOR
Assistant Attorney General

DAVID GUSTAFSON
STEVEN I. FRAHM
CORY A. JOHNSON
Attorneys
Justice Department (Tax)
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Post Office
Washington, D.C. 20044
(202) 307-6506

---

Page

## TABLE ON CONTENTS

**The United States' Pretrial Memorandum Of Contentions of Fact and Law.** . . . . . 1

**Introduction.** . . . . . 2

**Statement of Facts.** . . . . . 2

I. **THE UNDERLYING TRANSACTIONS.** . . . . . 2

A. **The TMF Asset Sale and Agreements.** . . . . . 2

B. **HRN'S Initial Public Offering and Issuance of the HRN Restricted Stock.** . . . . . 4

II. **PLAINTIFFS' REPORTING OF THE TMF ASSET SALE.** . . . . . 6

A. **Plaintiffs Reporting of the Original Transaction in 1999.** . . . . . 6

B. **Plaintiffs' Failure to Properly Disclose and Report the Transfer of the HRN Restricted Stock in 2000.** . . . . . 7

1. **HRN's (Hotels.com) 2000 Return.** . . . . . 7

2. **The Litmans and Dieners 2000 Returns.** . . . . . 9

III. **THE LITMANS AND DIENERS DEDUCTIONS FOR PAYMENTS TO ANDREW PELLS.** . . . . . 10

IV. **RECEIPT OF THE NOTICE OF DEFICIENCY BY ROBERT AND MICHELLE DIENER.** . . . . . 11

V. **THE VALUE OF THE HRN STOCK.** . . . . . 13

A. **The United States' Valuation.** . . . . . 14

B. **The Litmans and Dieners' Valuation.** . . . . . 15

C. **Hotels.com's Valuation.** . . . . . 15

Page

**(Continuation):**


**ISSUES OF FACT AND LAW** . . . . . 16

**DISCUSSION OF LEGAL PRINCIPLES** . . . . . 18

I. **THE NOTICES OF DEFICIENCY TO PLAINTIFFS** . . . . . 18

II. **THE STOCK VALUATION** . . . . . 19

A. **February 24, 2000 Is the Appropriate Valuation Date** . . . . . 19

B. **The HRN Restricted Stock's Fair Market Value as of February 24, 2000** . . . . . 21

C. **There Was No Unambiguous Agreement Between Plaintiffs As to the Value of the HRN Restricted Stock** . . . . . 23

III. **PENALTIES** . . . . . 26

A. **The Litmans and Dieners** . . . . . 26

B. **Hotels.com** . . . . . 27

IV. **THE DIENERS' LIMITATIONS DEFENSE UNDER § 6501 TO THE ORIGINAL TAX ASSESSMENT** . . . . . 27

V. **THE LITMANS AND DIENERS' LIMITATIONS DEFENSE TO COUNT II OF THE UNITED STATES' COUNTERCLAIMS** . . . . . 29

VI. **THE LITMAN AND DIENERS' DEDUCTIONS AND CAPITAL GAINS RELATED TO THE BONUS PAID TO ANDREW PELLS** . . . . . 31

**Conclusion** . . . . . 33

**Page**

## TABLE OF AUTHORITIES

**Cases:**

*American Steel Foundries v. United States*, 153 Ct. C 1961 WL. 8687. . . . . . . . . . . . . . . 22

*Balkissoon v. Commissioner*, 995 F.2d 525 (4th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . 28

*Bankers Trust v. United States*, 518 F.2d 1210 (Ct. Cl. 1975). . . . . . . . . . . . . . . . . . . . . . 21

*CC& F Western Operations L.P. v. Commissioner*, 273 F.3d 402 (1st Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Campbell v. United States*, 661 F.2d 209 (Ct. Cl. 1981). . . . . . . . . . . . . . . . . . 21, 23, 24, 25

*Clodfelter v. Commissioner*, 527 F.2d 754 (9th Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . 28

*Colony v. Commissioner*, 357 U.S. 28 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Commissioner v. National Alfalfa Dehydrating and Milling Co.*, 417 U.S. 134 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Fayeghi v. Commissioner*, 211 F.3d 504 (9th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . 18

*Grapevine Imports, Ltd. v. United States*, 71 Fed. Cl. 324 (2006). . . . . . . . . . . . . . . . . . 30

*Estate of Greenwood v. Commissioner*, T.C. Memo 2003-98 (U.S. Tax Ct. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Hawk v. Commissioner,* T.C. Memo 1992-42. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Herbert J. Investment Corporation v. United States*, 360 F. Supp. 825 (E.D. Wis. 1973), *aff'd* 500 F.2d 44 (7th Cir. 1974).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Hospital Corporation of America v. Commissioner,* T.C. Memo 1996-559, 1996 WL. 740741. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Lane Bryant Inc. v. United States*, 35 F.3d 1570 (Fed. Cir. 1994). . . . . . . . . . . . . . . . . . 23

*Maggie Management Co. v. Commissioner*, 108 T.C. 430 (U.S. Tax Ct. 1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Page**

**Cases (Continuation):**

*McDonald v. Commissioner*, 764 F.2d 322 (5th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . 21

*Okerlund v. United States*, 53 Fed. Cl. 341 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Phinney v. Chambers*, 392 F.2d 680 (5th Cir. 1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Robinson v. United States*, 335 F.3d 1365 (Fed Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . 31

*Scheidt v. Commissioner*, 967 F.2d 1448 (10th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . 28

*St. Joseph Lease Capital Corp. v. Commissioner*, 235 F.3d 886 (4th Cir. 2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Roush*, 466 F.3d 380 (5th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Statutes**:

Internal Revenue Service Codes of 1986 (26 U.S.C.):

§ 83.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 31

§ 162.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

§ 1060.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 23

§ 1001.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

§ 6212.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 28

§ 6213.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

§ 6501. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12,17, 27, 29

§ 6601.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

§ 6503.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

§ 6662.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

§ 6664.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Page**

**Miscellaneous**:

Rev. Proc. 2001-18. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Rev. Rul. 77-287. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Treasury Regulations (26 C.F.R.):

§ 1.1060-1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

§ 1.6664-4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **DAVID S. LITMAN and MALIA A. LITMAN,** | ) | |
| **Plaintiffs-Counterdefendants** | ) | **No. 05-956 T** |
| **vs.** | ) | |
| **THE UNITED STATES,** | ) | |
| **Defendant-Counterplaintiffs.** | ) | |

| | | |
|---|---|---|
| **ROBERT B. DEINER and MICHELLE S. DEINER,** | ) | |
| **Plaintiffs-Counterdefendants** | ) | **No. 05-971 T** |
| **vs.** | ) | |
| **THE UNITED STATES,** | ) | |
| **Defendant-Counterplaintiff.** | ) | |

| | | |
|---|---|---|
| **HOTELS.COM, INC. AND SUBSIDIARIES (f/k/a HOTEL RESERVATIONS NETWORK, INC.** | ) | |
| **Plaintiff** | ) | |
| **v.** | ) | **No. 06-285 T** |
| **THE UNITED STATES,** | ) | **(Christine O. C. Miller)** |
| **Defendant** | ) | |

**THE UNITED STATES' PRETRIAL MEMORANDUM**
**OF CONTENTIONS OF FACT AND LAW**

**Introduction**

These three cases arise from the failure of plaintiffs David and Malia Litman and Robert and Michelle Diener, on the one hand, and plaintiff Hotels.com, on the other hand, to report, on their respective tax returns, one, consistent value for the approximately 10 million shares of restricted stock that Hotels.com's predecessor, HRN, Inc., issued to the Litmans and Dieners in February 2000. As a result of the different valuations – for the same shares of stock – the plaintiffs whipsawed the IRS. The Litmans and Dieners, who each reported one-half of the shares as income in 2000, valued the shares at an average of only $4.54 per share for purposes of paying capital gains taxes. Hotels.com (then HRN), however, reported the stock's value at $16 per share for purposes of taking a goodwill amortization deduction in 2000. This discrepancy created a tax gap of approximately $115 million.

In this consolidated proceeding, one value for the stock will be determined, and the transaction between the plaintiffs will be consistently and properly taxed. Based on a consistent fair market value for the stock, the parties and Court can compute the correct amount of capital gains realized by the Litmans and Dieners in 2000 and the correct amount of goodwill Hotels.com obtained in 2000, which it will then amortize in yearly deductions.

## STATEMENT OF FACTS

The United States expects the following facts to be proven at trial.

### I. THE UNDERLYING TRANSACTIONS

#### A. The TMF Asset Sale and Agreements

Pursuant to an Asset Purchase Agreement, dated April 13, 1999, the Litmans and Dieners sold all the assets of their internet-based hotel reservations company, TMF, Inc. (d/b/a Hotel

Reservations Network), to USA Networks, Inc. After the sale, USA Networks continued to operate the business through its wholly-owned subsidiary HRN, Inc., and Mr. Litman and Mr. Diener became the Chief Executive Officer and President of HRN.[1] In return for the assets of TMF, the Litmans and Dieners principally received cash, the right to certain contingent earn-out payments in the future and, if HRN conducted an initial public offering of its stock by a certain date, the right to receive an amount of stock equal to 10% of the stock outstanding prior to the IPO (the "section 7.11.3 shares").[2]

On February 2, 2000, the parties agreed to an Amended and Restated Asset Purchase Agreement. Under the amended agreement, Mr. Litman and Mr. Diener exchanged their right to the remaining contingent earn-out payments for the right to receive additional stock if HRN conducted the initial public offering that was then planned for late February 2000 (the "section 7.15 shares"). These shares would be in addition to the section 7.11.3 shares. In the amended agreement, Litman and Diener also agreed that certain transfer restrictions would be placed on all of the shares they were to receive.

The provisions (summarized above) in the Amended Asset Purchase Agreement concerning the issuance of stock to Litman and Diener are as follows:

---

[1] HRN changed its name to Hotels.com in 2002.

[2] TMF, Inc. was a subchapter S corporation owned equally by Mr. Litman and Mr. Diener. As a subchapter S corporation, the income of TMF was generally passed-through to them. After agreeing to sell all the assets of TMF, Litman and Diener formed TMF Liquidating Trust ("TMF Trust"), and TMF assigned to the Trust all of TMF's remaining assets and liabilities, including those under the Asset Purchase Agreement. Litman and Diener were co-trustees and had equal interests in the Trust, which was taxed as a grantor trust – *i.e.*, deductions and income again flowed through to them. See I.R.C. § 671 et. seq.

> 7.11.3 Participation in Event of IPO. If, prior to the payment of the 2004 payout by the Buyer pursuant to Section 7.11.1 or a payment in connection with the sale of the Business of the Buyer pursuant to Section 7.11.2 above, the Buyer consummates an initial public offering of shares of its common stock (an "IPO"), the Buyer shall issue to the Sellers a number of shares of common stock of the Buyer having an aggregate value (based on the price per share in the IPO) equal to the product of (x) (I) the total issued and outstanding shares of the Buyer immediately prior to the IPO (which shall include the shares issued under Section 7.15 simultaneously with the IPO) times the IPO price minus (ii) the Net Debt Capital multiplied by (y) 10%. ....
>
> 7.15 2000 Initial Public Offering. If the initial closing of the proposed initial public offering (the "2000 IPO") of the Class A Common Stock, par value $0.01 per share (the "Class A Common Stock"), of the Buyer occurs prior to March 31, 2000, the following provisions shall apply:
>
> 7.15.1 Simultaneously with the initial closing of the 2000 IPO:
>
> (i) In full satisfaction of the its obligations under Section 7.9.3 and 7.9.4, the Buyer shall issue to the Trust the number of shares (the "Section 7.15 Shares") of Class A Common Stock equal to the number that can be found by dividing (x) $81.6 million dollars by (y) the price at which each share of Class A Common Stock is initially sold to the public in the 2000 IPO (the "IPO Price"); Provided That, (I) if the IPO Price is less than $11.00 per share, the price used for purposes of this clause (y) shall be $11.00 and (ii) if the IPO Price is greater than $16.25 per share, the price used for purposes of this clause (y) shall be $16.25. ....[3]

**B. HRN'S Initial Public Offering and Issuance of the HRN Restricted Stock**

On February 24, 2000, HRN set the IPO price for its stock at $16 per share. On February 25, 2000, HRN conducted the IPO, and public trading of its stock began. A total of 6,210,000

---

[3] The $11.00 and $16.25 collar on the denominator in this formula placed an upper and lower bound on the number of section 7.15 shares that would be issued to Litman and Diener.

shares were sold in the IPO.[4]

Pursuant to the Amended Asset Purchase Agreement, the TMF Trust was entitled to a total of 9,999,900 shares of HRN stock (5,100,000 section 7.15 shares and 4,899,900 section 7.11.3 shares. Collectively, the "HRN restricted stock."). Although the shares were issued because an IPO occurred, these shares were not part of the IPO. The HRN restricted stock was issued separately to the TMF Trust, as of February 24, 2000. The stock certificates are dated February 24, 2000, and Hotels.com alleges in its Complaint that the shares were issued on February 24, 2000. (See Complaint, p. 110)

The shares issued to the TMF Trust were subject to contractual resale restrictions and SEC Rule 144. The contractual restrictions prevented it from selling or transferring the shares for the following periods of time:

| Period of Restriction | Number of Shares |
|---|---|
| One year | 1,959,960 |
| Two years | 489,990 |
| Three years | 489,960 |
| Four years | 7,059,960 |

A portion of the one-year restricted shares (244,995 shares) was given to Andrew Pells, a former employee of TMF as a bonus for his past years of service. This transfer was specifically allowed by the Amended Asset Purchase Agreement.

---

[4] The offering was initially set for 5,400,000 shares, but the underwriters had the option to purchase an additional 810,000 shares to cover overallotments, which they did.

## II. PLAINTIFFS' REPORTING OF THE TMF ASSET SALE

### A. Plaintiffs' Reporting of the Original Transaction in 1999

Although tax year 1999 is not at issue in these cases, a brief summary of the parties' returns in that year is useful.

As an asset sale, the original transaction in 1999 was governed by § 1060 of the Code. Pursuant to § 1060(b), TMF, Inc. and USA Networks, Inc. were each required to file an IRS Form 8594 with their 1999 returns. 26 U.S.C. § 1060(b). In this form, each party to an asset sale must disclose the aggregate consideration paid, and the allocation of that consideration among the various classes of assets transferred. Treas. Reg. § 1.1060-1(e). TMF and USA purportedly agreed to a consistent allocation of the purchase price among the asset classes for 1999 based on an agreed closing date balance sheet. This was required by the Amended Asset Purchase Agreement:

> 3.4 Purchase Price Allocation
>
> (i) The Purchase Price and Assumed Liabilities shall be allocated among the Purchased Assets (A) in accordance with the values reflected for such Purchased Assets on the Closing Date Balance Sheet (as adjusted by any disputes resolved by the parties and by the Arbitrator's WC Determination, if any), (B) $1 million to the covenants against competition described in Section 10.1 and (C) the balance to intangible assets and goodwill.
>
> (ii) For all Tax purposes, the Buyer and the Sellers agree (A) to report the transactions contemplated by this Agreement in a manner consistent with the terms of this Agreement, and (B) that none of them will take any position inconsistent therewith in any Tax Return.

TMF, Inc. filed an IRS Form 8594 with its return in 1999.[5]

### B. Plaintiffs' Failure to Properly Disclose and Report the Transfer of the HRN Restricted Stock in 2000

#### 1. HRN's (Hotels.com) 2000 Return

For the year 2000, HRN was required to file a supplemental Form 8594 in order to disclose the additional consideration – the HRN restricted stock – given for the assets of TMF in that year. Treas. Reg. § 1.1060-1(e)(1)(ii)(B). At the time HRN prepared and filed its 2000 return, Mr. Litman and Mr. Diener were the CEO and President of HRN, respectively. Because they were also co-trustees of the TMF Trust, they were on "both sides" of the transaction at the time this additional tax reporting was required in 2000.

The 2000 HRN return was originally prepared with a draft Form 8594 that reported the value of the restricted stock at $159,998,400, or $16 per share, the February 25, 2000, IPO price for unrestricted shares. All of this additional consideration was allocated to goodwill. Under § 197 of the Code, this goodwill would be amortized by HRN over fifteen years through yearly deductions.[6]

---

[5] Under § 1060(a), if the parties agree in writing as to the allocation of the consideration, or the fair market value of any of the assets, they are bound by that agreement. The IRS is not bound by any such agreement. A Form 8594 discloses the parties' valuations and allocations to the IRS so that it can take steps to enforce consistent allocations and values, if necessary. If only money is exchanged for the assets (as was the case here for tax year 1999), issues should arise only with regard to allocation. If property with an uncertain value is exchanged for the assets, however, issues with regard to the amount of consideration paid can arise (as is the case here for tax year 2000).

[6] The allocation of the stock value to goodwill is not in dispute in this case. The issue is the appropriate value for the stock, and, therefore, the total amount of goodwill and yearly amortization deductions.

Upon seeing HRN's draft Form 8594, with the $160 million valuation, Diener consulted his and the TMF Trust's accountant, Jim Horan of KPMG. By this time, the TMF Trust had already filed its tax return using a $45 million valuation for the stock that had been obtained by Litman and Diener (discussed below). Diener then instructed HRN's Senior Director of Finance to remove the $160 million valuation from the form and, in its place, insert a notation stating that the value is "to be determined." The Form 8594 actually filed with HRN's 2000 tax return has "White-Out" obscuring the figures intended to disclose the additional consideration (the value of the HRN restricted stock), and, in their place, a handwritten statement that "Information is being gathered. Will be supplied at a later date."

Although HRN didn't disclose on the altered Form 8594 the valuation it was using for the additional consideration paid to the TMF Trust, HRN did, nevertheless, use the $160 million valuation for purposes of taking a goodwill amortization deduction. This amount, and the corresponding yearly deduction, are listed in the amortization schedules attached to HRN's 2000 return, but there is no indication that it is based on issuance of restricted stock as additional consideration for the assets purchased from TMF in 1999.

Shortly after filing its (incomplete) 2000 return, HRN retained Deloitte & Touche to value the HRN restricted stock. In a report dated October 18, 2001, Deloitte determined that the appropriate average lack of marketability discount for the HRN restricted stock, as of February 25, 2000, was 36%. The Director of Taxation for USA Networks Inc. (HRN's parent) at that time and the Chief Financial Officer of HRN at that time both believed that the Deloitte valuation was reasonable and appropriate. Relying on Deloitte' valuation, HRN reported the fair market value of the HRN restricted stock at a discount from the IPO price in its subsequent returns.

HRN reported the fair market value as $101 million, or about $10.15 per share, for purposes of its goodwill amortization deductions for tax years 2001, 2002, 2003 and 2004.

Draft amended returns for 2000 were prepared also using the $101 million Deloitte valuation. In fact, HRN's board of directors discussed filing an amended return and changing the HRN restricted stock valuation in the 2000 return from $160 million to $101 million. The board also discussed the fact that Diener and Litman were intending to report the value at only $45 million in their personal returns, and that this discrepancy in valuation could trigger an audit of HRN's and Litman's and Diener's tax returns. No amended tax return, or completed Form 8594, was ever filed by HRN for the year 2000.[7] Thus, HRN's tax returns for the year 2000, and for the years 2001-2004, used inconsistent values for the HRN restricted stock.

**2. The Litmans' and Dieners' 2000 Returns**

The TMF Trust also was required to file a Form 8594 with its 2000 tax return. (The HRN restricted stock was issued to Litman and Diener as co-trustees of the TMF Trust in 2000). No such form was filed.

Litman and Diener were aware of the requirement. The Dieners discussed with KPMG the Trust's obligation to file a Form 8594, and Mrs. Diener (an accountant, formerly with KPMG) prepared a draft form for 2000. And, as discussed above, Litman and Diener knew of HRN's proposed Form 8594 for 2000, with its $160 million valuation for the HRN restricted stock.

The Litmans and Dieners did, nevertheless, obtain a valuation of the HRN restricted

[7] Certain former HRN employees have testified that they thought an amended return had been filed.

stock. Relying on this valuation, the Trust reported a gain of $45,437,822 in its 2000 tax return. This gain was erroneously described in the return, however, as resulting from the "Sale of TMF, Inc. stock." There is no indication in the return that this income is actually additional consideration, in the form of HRN restricted stock, received from HRN for the sale of TMF's assets in 1999 (for which a supplemental Form 8594 would be required).

Because the income of the Trust flowed-through to them, the Litmans and Dieners each reported one-half of this $45 million as capital gain in their respective individual 2000 returns. The Litmans and Dieners also did not disclose in their returns that these amounts actually resulted from additional consideration received in exchange for the assets of TMF, Inc.

In sum, the facts show that Hotels.com and the Litmans and Dieners knew of their respective obligations to file a completed From 8594 regarding the transfer of the HRN restricted stock in 2000, in order to disclose the valuation given to it, but either negligently or intentionally did not do so. Moreover, each side of the transaction assigned a different value to the same shares of stock – values that were beneficial in terms of reducing their respective tax obligations.

## III. THE LITMANS' AND DIENERS' DEDUCTIONS FOR PAYMENTS TO ANDREW PELLS

The Litmans and Dieners claim that a $6.8 million payment made to Andrew Pells by the TMF Trust in 2000 is deductible under § 162 of the Code. The payment to Pells consisted, in part, of 244,995 shares of the one-year HRN restricted stock, and the remainder was in cash. Because the value of the HRN stock is disputed, the proper amount of the deduction for the payment to Pells is at issue in this case. The United States does not dispute whether the payment meets the standards of § 162.

Pells reported the shares as having a value of $3,919,920, and paid tax on their receipt in

2000. Pursuant to § 83(b), he included the shares in his income based on their fair market value, without regard to the restrictions, which was determined to be $16 per share, the IPO price. *See* 26 U.S.C. § 83(b). The TMF Trust then claimed this same amount ($3,919,920) as part of its deduction for the payments to Pells.

The TMF Trust also reported capital gains on the transfer of the stock to Pells in the amount of $1,940,361, which is the difference between $3,919,920 and $1,979,559, the TMF Trust's claimed tax basis for the 244,995 shares of stock. This tax basis was determined using the Litmans and Dieners' valuation for the one-year restricted stock ($8.08), taking into account the restrictions.

Computation of the proper deduction and capital gains related to the payment of stock to Pells will depend on the determination of the fair market value of the HRN stock, with and without restrictions. This, of course, is the principal issue in the case. The United States does not believe any other facts will need to be determined at trial.

## IV. RECEIPT OF THE NOTICE OF DEFICIENCY BY ROBERT AND MICHELLE DIENER

Because the Dieners claim that the IRS did not send their notice of deficiency to their "last known address," and that this alleged "mistake" makes the assessment of taxes against them untimely, the facts concerning the issuance of the notice of deficiency, and its *actual receipt* by the Dieners, will be presented at trial. The Litmans made a similar limitations claim in their Complaint, but have now abandoned it.[8]

[8] The Litmans and Dieners' combined pretrial memorandum sets forth the claim only on behalf of the Dieners. Counsel for the Litmans also confirmed separately that the Litmans have abandoned any statute of limitations claim under § 6501(a) based on a claim that their notice was (continued...)

The IRS sent a notice of deficiency to the Dieners by certified mail on October 8, 2004, approximately one week before the expiration of the three-year limitations period under § 6501(a) on October 15, 2004. The Dieners actually received the notice soon thereafter when, in response to the notice of certified mail left in their mailbox, Mrs. Diener retrieved the notice of deficiency from the post office. The Dieners also separately learned of the notice of deficiency from their attorney, John Porter, on October 12, 2004, when he received a copy.

The notice of deficiency sent to the Dieners was addressed to them at Champlain Towers North, 8877 Collins Avenue, PH A, Surfside, FL 33154-3524. This was the address on their most recently filed tax return (2003), and the address at which the IRS agent had corresponded with them during the audit of their 2000 tax return in 2004. Indeed, the Dieners owned this condominium in October 2004, when the notice of deficiency was sent to them, and still owned it as of June 2006, when they were deposed in this case.

Just days before, however, on September 30, 2004, after the audit had been completed, and *in anticipation* of the notice of deficiency being sent to them, the Dieners had sent a change of address form to the IRS Atlanta Service Center. They requested that their mailing address be changed to 8 Indian Creek Island Road, Indian Creek Village, Florida, another property they owned. The IRS Atlanta service center received the change of address form on October 4, 2004. The Dieners did not inform the IRS office (Dallas) or agent (Susan Weiss) handling their audit of this "change of address."[9]

---

[8](...continued)
allegedly not sent to their "last known address."

[9] The submission of this change of address form was done in concert with the Litmans.
(continued...)

Before sending the notice of deficiency to the Dieners, Jean Wharton, of the Dallas IRS office, researched a number of reference sources, including IRS records, Ms. Weiss' audit files and United States Postal Service records, to confirm the appropriate address for the Dieners. Having confirmed that she had the appropriate address, Ms. Wharton sent the notice of deficiency to the Dieners at their Surfside residence on October 8, 2004.

Subsequently, on October 15, 2004, within just several days of receipt, the Diener's "change of address" was processed by IRS and their records were updated. Of course, this was after the notice of deficiency had been sent. Nevertheless, the Dieners received the notice of deficiency at their Surfside residence.

## V. THE VALUE OF THE HRN STOCK

Each party in this case intends to present expert testimony as to the value of the HRN restricted stock. For purposes of determining Hotels.com's taxes, only the aggregate value of all 9,999,900 shares is relevant. For determining the Litmans and Dieners taxes, however, the Court will need to determine the fair market value of each of the four subsets of the stock, which have different lengths of transfer restrictions. (The aggregate value relevant to Hotels.com will be the

---

[9](...continued)
The Litmans also sent a change of address form on September 30, 2004, knowing that a notice deficiency was being prepared for them as well. They sent their change of address request to the IRS Service Center in Austin, Texas. They were not moving from their home in Dallas, however. The Litmans' "new address" was only an office. The Litmans also did not inform the IRS agent in Dallas of their "change of address." Like the Dieners, the Litmans actually received the notice of certified mail from the IRS. Mrs. Litman, however, realizing that it was from the IRS, intentionally did not retrieve the notice from the post office. As noted above, the Litmans have abandoned their limitations claim based on an alleged mistaken address on the deficiency notice.

sum of the value of these four subsets.)[10]

### A. The United States' Valuation

Mr. Francis Burns, an expert from CRA International, valued the HRN restricted stock for the United States. He employed two separate methodologies to estimate the stock's value. First, he researched the published empirical studies that have calculated lack of marketability discounts by comparing actual transactions in unrestricted shares to transactions in shares of the same companies that have some form of restriction on their marketability. By analyzing the relationships that emerge from this empirical data, and applying them to the HRN restricted shares, Mr. Burns estimates that a 6% to 22% discount from the $16 IPO price would be appropriate for determining the value of the HRN restricted stock

As a second method of determining the applicable discount, Mr. Burns creates a hypothetical equity option collar transaction in order to estimate the theoretical economic cost of restoring the liquidity that the HRN restricted stock lacks. This quantitative approach can be specifically tailored to the circumstances of the HRN stock, including by explicitly taking into account the duration of the transfer restrictions. Under this method, Mr. Burns concludes that the four subsets of HRN restricted stock should be discounted from the IPO price by 17% to 22 %, with a weighted average discount for all the HRN restricted stock of 20%. This leads to an average per share value for the HRN restricted stock of $12.75 as of February 24, 2000, the stock issuance date.

---

[10] The Litmans and Dieners sold the stock in subsequent years, when the restrictions expired. The fair market value of the shares in 2000 will be relevant to the basis used for calculating gains in those subsequent years.

**B. The Litmans and Dieners' Valuation**

The Litmans and Dieners' valuation expert in this case is the same one they relied upon in 2001, when they filed their tax returns. Unfortunately, Mr. Mitchell relies upon the same flawed methodology and assumptions that he used previously. Both the United States' and Hotels.com's experts will explain at trial the problems with Mr. Mitchell's approach. The result of Mr. Mitchell's flawed analysis is an enormous discount from the $16 IPO price for the HRN restricted stock. He values the stock at an average of only $4.54 per share.

Although the United States believes that Mr. Mitchell's discount is much too large, it and the Litmans and Dieners, and Mr. Burns and Mr. Mitchell, are in agreement that the starting price against which a discount should be applied is the $16 per share IPO price, and that the stock must be valued as of February 24, 2000, the date it was issued.[11]

**C. Hotels.com's Valuation**

Hotels.com retained Dr. Mukesh Bajaj for purposes of this case. Like Mr. Burns, Dr. Bajaj relies upon empirical studies of actual transactions in restricted and unrestricted stock to try to determine an appropriate discount for the HRN restricted stock. Also like Mr. Burns, Dr. Bajaj concludes that a discount of approximately 20% is warranted.

Following Hotels.com's instructions, however, Dr. Bajaj initially valued the HRN restricted stock on March 1, instead of February 24, 2000. For reasons discussed below, March 1 is not the correct valuation date. Hotels.com subsequently had Dr. Bajaj submit a supplemental

---

[11] In 2001, the Litmans and Dieners also consulted David Bohlman regarding the value of the HRN restricted stock. His analysis is so flawed, however, that the Litmans and Dieners themselves didn't rely upon it. The Litmans and Dieners also claim that their accountant at KPMG told them that he was told by someone else at KPMG that Mr. Mitchell's valuation was reasonable. This is obviously hearsay, and inadmissible.

report, after expert reports were due, and after he was deposed in this case, in which he discloses an opinion that, assuming February 24 is the correct valuation date, the $16 IPO price set on that day is, nevertheless, not the right starting price against which to apply a discount.[12] Having rejected the IPO price as a starting point, Dr. Bajaj asserts that the HRN restricted stock, as of February 24th, had a value of about $20 per share, even though the price for unrestricted HRN stock in the IPO on February 25th was $16 per share.[13]

As is apparent from the above summaries, there are partial points of agreement among the three experts. The United States' and Hotels.com's experts agree that an average discount of about 20% is appropriate for the HRN restricted stock. The United States' and the Litmans' and Dieners' experts agree that the HRN IPO price of $16 is the appropriate starting point, against which to apply a discount, for valuing the restricted stock as of February 24, 2000.

## ISSUES OF FACT AND LAW

The Court will need to resolve the following issues of fact and law to decide plaintiffs' refund claims, and the United States' counterclaims.

1. Whether February 24, 2000, the stock issuance date, is the appropriate valuation date for the HRN restricted stock, or whether, instead, one of the alternative dates urged by Hotels.com is the appropriate valuation date.

---

[12] This contradicts his initial draft report in which he stated that the $16 IPO price was the correct starting price for a discount analysis as of February 24, 2000.

[13] Hotels.com did not retain Deloitte & Touche to provide expert testimony in this case. As noted above, in 2001, Deloitte valued the stock at about $10 per share, and Hotels.com used that valuation for tax years 2001 - 2004.

2. The total fair market value of all the HRN restricted stock as of the valuation date, and the fair market value of each of the four subsets of the stock subject to the one, two, three and four-year transfer restrictions.

3. The fair market value of the HRN stock, without the restrictions, transferred by the TMF Trust to Andrew Pells.

4. Whether plaintiffs are liable for penalties under § 6662 of the Code, which is, in turn, dependent upon whether there was a disregard of applicable rules, a substantial understatement of tax, or a substantial valuation misstatement, and whether plaintiffs acted with reasonable cause and in good faith with regard to any underpayment of tax.

5. Whether the assessment of tax and penalties against the Dieners was timely under § 6501(a).

6. Whether the claim for additional taxes, penalties and interest in Count II of each of the United States' counterclaims against the Litmans and Dieners is timely under § 6501(e)(1). (These counterclaims against the Litmans and Dieners were added in the event the Court determines that the fair market value of the HRN restricted stock is greater than $16 per share, the value reported by Hotels.com for 2000, and used for purposes of the notices of deficiency issued to the Litmans and Dieners.)

Resolution of the above issues of fact and law will permit the parties and the Court to determine if any of the plaintiffs are entitled to a refund, and if so, compute the amount. One issue not listed above, but which is merely computational, is the United States counterclaim for

underpayment interest owed by the Litmans and Dieners under § 6601 of the Code. (See Count I of the counterclaims against the Litmans and Dieners.) The interest has been assessed, but the Litmans and Dieners have not paid it.

## DISCUSSION OF LEGAL PRINCIPLES

### I. THE NOTICES OF DEFICIENCY TO PLAINTIFFS

Because the plaintiffs have, on various occasions, questioned, or attempted to use as "evidence," the assumed values for the HRN restricted stock used by the IRS in the notices of deficiency, an explanation of those deficiency notices is necessary. In brief, after the IRS (fortuitously) discovered that plaintiffs had reported different values for the same 10 million shares of stock, and concluded that plaintiffs would not agree to a consistent value, the IRS determined that it had to issue notices of deficiency to seek the consistent and proper taxation of the transfer of the HRN restricted stock. In order to protect the United States' interests, and because of the uncertainty as to the fair market value that would ultimately be determined, the IRS used an assumed $16 per share value (Hotels.com's reported value for 2000) for determining the taxes due in the notices to Litman and Diener, and an assumed $4.54 per share value (Litman and Diener's valuation) for determining the taxes due in the notice issued to Hotels.com. The courts have specifically upheld this procedure as necessary when two or more parties whipsaw the IRS by reporting different values for the same property. *See, e.g., Fayeghi v. Commissioner,* 211 F.3d 504 (9th Cir. 2000); and *Maggie Management Co. v. Commissioner,* 108 T.C. 430 (U.S. Tax Ct. 1997). Now, in this consolidated proceeding, a consistent fair market value for the stock will be determined.

## II. THE STOCK VALUATION

### A. February 24, 2000 Is the Appropriate Valuation Date

The threshold issue for valuing the HRN restricted stock is determining the appropriate valuation date. All plaintiffs – representing both sides of the transaction at issue – agree that the HRN restricted stock was issued to the TMF Trust on February 24, 2000. The stock certificates produced by the Litmans and Dieners in discovery reflect an issuance date of February 24, 2000, and Hotels.com states in its Complaint that the stock was issued on February 24, 2000, and confirms this in its pretrial memorandum. This date, on which TMF Trust became the record owner of the stock is, therefore, the appropriate valuation date. *See e.g., United States v. Roush*, 466 F.3d 380, 385 (5th Cir. 2006).

Despite agreeing that the stock was issued on February 24th, Hotels.com now argues in its pretrial memorandum that the stock should, nevertheless, be valued as of March 1, 2000, the date of the IPO "closing" between HRN and its underwriters.[14] Hotels.com bases this new argument on its reading of sections 7.11.3 and 7.15 of the Amended Asset Purchase Agreement (quoted above). These provisions, however, are not consistent and clear as to the date on which shares will be issued to Litman and Diener. To be sure, an IPO was necessary for Litman and Diener to have any rights to receive the shares, but the agreement's provisions, taken together, are not unambiguous as to the date of issuance for those shares.[15]

---

[14] This argument is inconsistent with its Complaint and claim for refund. In both, it states that it seeks a refund based on a valuation of the HRN restricted stock "as of the date of issuance," which it states was February 24, 2000. (See Hotels.com's Complaint, ¶ 31 and Exhibit 6, pp. 110 - 11).

[15] The IPO prospectus is also unclear and confusing on this point. In one section it states

(continued...)

What is clear is that the stock was issued to the TMF Trust, by HRN and its stock registrar and transfer agent, Chase Mellon Shareholder Services, L.L.C., as of February 24, 2000, and that this issuance date has not been challenged over the past seven years, and is *admitted by all plaintiffs in this case*. The fact that the language of the Amended Asset Purchase Agreement could be read to permit, or even require, the issuance of the stock on another day (such as the day of the "closing," or the day of the IPO) is, therefore, irrelevant. Similarly, Hotels.com's argument (based of its current construction of the terms of the agreement) that TMF Trust could not have obtained a "beneficial ownership" in the stock until the "closing" is also beside the point. The actual transaction between the parties in 2000 resulted in TMF Trust being issued, and becoming the owner of, the HRN restricted shares on February 24, 2000. Hotels.com cannot now change this fact because there may be a different reading of the Amended Asset Purchase Agreement that would be more beneficial to it for tax purposes. *See, e.g. Commissioner v. National Alfalfa Dehydrating and Milling Co.,* 417 U.S. 134, 149 (1974) ("This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, and may not enjoy the benefit of some other route he might have chosen to follow but did not." ) ( internal citations omitted).[16]

---

[15](...continued)
that the 9,999,900 HRN restricted shares will be "outstanding" before the offering on February 25th, and, in another section, its states that the shares will be issued "immediately prior to the closing of this offering," which was March 1st.

[16] Even if the "closing" on March 1st were some sort of condition to TMF Trust's right to the HRN restricted stock, in addition to the occurrence of the IPO, that fact is not inconsistent with the issuance of the HRN restricted stock to TMF Trust as of February 24, 2000, or with (continued...)

**B. The HRN Restricted Stock's Fair Market Value as of February 24, 2000**

Fair market value is generally defined as "the price at which the property (in question) would change hands between a wiling buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts." *Campbell v. United States*, 661 F.2d 209, 221 (Ct. Cl. 1981). With regard to stock that is subject to transfer restrictions, like the HRN restricted stock here, it is generally accepted that its fair market value is less than (or valued at a discount from) the price of similar stock without any transfer restrictions. *See, e.g. Campbell, supra; McDonald v. Commissioner*, 764 F.2d 322 (5th Cir. 1985); and Rev. Rul. 77-287.

Here, the price for unrestricted stock of HRN as of February 24, 2000, is the $16 per share IPO price that was set on that date. The subsequent trading prices of the stock, after the IPO on February 25th, were, of course, unknown and unknowable as of February 24th. They should not, therefore, be considered – the valuation of a stock "must be made as of the relevant dates without regard to events occurring subsequent to the crucial dates." *Okerlund v. United States*, 53 Fed.Cl. 341, 355 (2002). Accordingly, the $16 IPO price for unrestricted HRN stock should be used as the starting point for the discount analysis determining the value of the HRN

---

[16](...continued)
valuing the stock as of that date. The number of shares to be issued to TMF Trust was fixed on February 24th, when the IPO price was set. And, the closing between the underwriters and HRN was a formality after HRN's registration statement was declared effective by the SEC, the IPO was conducted on February 25, and the stock began trading. A transfer (or issuance of stock), with the benefits and burdens of ownership, can be effective for tax purposes even though there may be an outstanding subsequent condition or contingency, the occurrence of which is a foregone conclusion. *See Herbert J. Investment Corporation v. United States*, 360 F.Supp. 825 (E.D. Wis. 1973), *aff'd* 500 F.2d 44 (7th Cir. 1974).

restricted stock.[17]

Hotels.com argues that the starting point for the valuing the stock as of February 24th should not be $16. Instead, according to Hotels.com, the Court should look beyond February 24th to purported "pre-open bid and offer prices" for HRN stock made on the morning of February 25th, before the IPO later that day, and before actual trading began. These pre-open bids and offers were allegedly $23 and $27 per share.[18] While it is generally true that market prices are the best evidence of the value of traded stocks, the "pre-open" bids and offers cited by Hotels.com are not the type of market prices used by the courts. Courts look to actual market prices of stocks, "freely traded in an open, organized market..." *Bankers Trust v. United States*, 518 F.2d 1210, 1219 (Ct. Cl. 1975). For example, if the Court needed to determine the value of IBM stock on any given day, it could justifiably rely on the NYSE price for IBM stock. Here, in contrast, the purported "pre-open" bids and offers cited by Hotels.com are not from a similarly open and organized market, and do not provide a better indicator of value than the IPO price actually determined on February 24th as the price for the stock.

Additionally, courts have recognized that, under certain circumstances, even if "market" prices are available, they may not be appropriate indicators of fair market value. Such circumstances include two that are present here with regard to the purported pre-open bids and offers: a "thin" market and a newly issued stock. *See e.g., American Steel Foundries v. United*

---

[17] The Litmans and Dieners agree that the fair market value for HRN unrestricted stock as of February 24, 2000, was $16 per share, and that this price should be used as the starting point for determining the value of the restricted stock.

[18] These pre-open bids and offers are hypothetical only. No actual transactions take place.

*States*, 153 Ct. Cl. 234, 1961 WL 8687, p. 15 - 16 (1961). As the *American Steel* court stated:

> The prices relied upon as the basis of defendant's valuation are the prices paid on the first trades in a green security, newly issued on the Exchange and relatively unknown to the investing public. The reliability of prices in such trades as a basic guide to value of corporate properties is substantially less than would be prices in current trading in a security well known to the investing public and having an established market

*American Steel*, 1961 WL 8687, p. 16.

The turbulent market for HRN's stock immediately after the IPO demonstrates that this cautionary principle is applicable here. After initially rapidly increasing in the days after the IPO (the "post-IPO bump"), HRN's stock price soon declined and, in fact, hovered around $16 per share for several weeks before then starting a steady rise a few months after the IPO. For purposes of valuing the HRN stock as of February 24th, therefore, the Court should use the IPO price set on that day as the value of the unrestricted stock, and then apply the discounts it finds appropriate in order to determine the fair market value of the four subsets of restricted stock.

### C. There Was No Unambiguous Agreement Between Plaintiffs As to the Value of the HRN Restricted Stock

Under § 1060(a) of the Code, if the parties to an asset sale agree in writing as to the fair market value of assets transferred, that agreement is binding as between the parties. The IRS, however, is not bound by the agreement if it concludes that the agreed fair market value is "not appropriate." 26 U.S.C. § 1060(a). The *Danielson* rule also provides that parties who agree to the value or allocation of consideration in an agreement concerning the transfer of assets can be held to that agreement, and its tax consequences, by the IRS. *See e.g., Lane Bryant Inc. v. United States*, 35 F.3d 1570 (Fed. Cir. 1994); *Campbell v. United States*, 661 F.2d 209, 216 (Ct. Cl. 1981). Both of these rules are applicable, however, only if there actually is an agreement as to

the fair market value of, or allocation of the value among, the assets transferred. *See, e.g. Campbell*, 661 F.2d at 216 - 18; and *Hospital Corporation of America v. Commissioner,* T.C. Memo 1996-559, 1996 WL 740741, pp. 13 - 17 (U.S. Tax Ct. 1996). Here, there is no express agreement as to the value of the 9,999,900 shares of HRN restricted stock.[19]

Indeed, the actions of the Litmans and Dieners and Hotels.com from the time the stock was issued until mid-way through this case, suggest that there was no agreement between them as to the fair market value of the HRN restricted stock. When the difference of opinions as to value came to light in 2001, neither side claimed that there had been an agreement, or sought to enforce one. In particular, Hotels.com (who now claims there was an agreement at $16 per share) obtained a fair market valuation of the stock from Deloitte, and used that value (of $10 per share) in its tax returns for 2001 through 2004, not the alleged agreed $16 per share value, which would have been even more beneficial to it. Because the evidence produced in these cases does not demonstrate that there was an agreement, the United States is not seeking to enforce an agreed value, but seeks one, consistent fair market value for the stock.

Pointing to the formulas in sections 7.11.3 and 7.15 of the Amended Asset Purchase Agreement, however, Hotels.com attempts to back-into an implied agreement between the parties regarding the fair market value of the restricted stock. The differing formulas in these sections, however, only determine the number of shares to be issued to Litman and Diener, and do not set forth an express agreement as to the fair market value of the shares. To be sure, they both use the IPO price as one of the factors in their respective formulas, and the formula in section 7.15 uses

---

[19] This is in contrast to the transfers made in 1999, when according to the deposition testimony in this case, there was an agreement as to the allocation of the cash consideration paid in that year in a closing date balance sheet.

what appears to be HRN's estimate of the value of the contingent earn-out rights exchanged for the stock as the numerator in its formula. Neither formula, however, in determining the number of shares to be issued, also rises to the level of an express agreement about the fair market of those shares that the courts require. *See e.g., Campbell*, 661 F.2d at 217 ("It is difficult to see, for example, how a bare bones recital as to the amount and form of consideration to be paid can double as an agreement intending to establish the fair market value for that consideration."); and *Hospital Corporation of America, supra*, pp. 15 - 18. Moreover, Hotels.com's argument simply does not make economic sense. It is based on the assumption that the parties agreed to value each share of restricted stock at the IPO price. The shares were subject to transfer restrictions of different lengths, however, ranging from one to four years.

Hotels.com's argument that HRN's estimate ($81.6 million) of the value of the earn-out rights, given in exchange for the section 7.15 shares, is dispositive of the value of those shares also fails. In this case, as the court in *Campbell* noted, the "barter-equation" theory does not really answer the valuation question: "that approach is so fraught with assumptions as to render meaningless the very idea that there was an agreement on value between the parties." *Campbell,* 661 F.2d at 218. Here, the most glaring problem is the assumption that the earn-out rights did, in fact, have a fair market value of $81.6 million on February 24th. Certainly, the parties agreed to use that figure in the formula, but there is, again, no express agreement about value, and no expert in this case will offer an opinion as to the value of the earn-out rights. Moreover, this theory about section 7.15 does not help determine at all the value of the shares issued under section 7.11.3. At most, an estimate of the value of the rights given in exchange for the stock may be one piece of evidence as to the restricted stock's value. This indirect route to valuing the

stock is not dispositive here, however, and the Court should itself directly determine, based on its own examination of the facts and evaluation of the expert testimony, the fair market value of the HRN restricted shares.

## III. PENALTIES

The IRS assessed penalties against the plaintiffs pursuant to § 6662 of the Code, which provides for penalties of 20% of the unpaid tax when a taxpayer (a) is negligent or disregards rules or regulations; (b) substantially (by 10%) understates his or her tax; or (c) overstates by 200% the value of any property reported on a return. 26 U.S.C. § 6662. Section 6664(c) provides that, if the taxpayer had "reasonable cause" for an underpayment, and acted in "good faith," no penalty should be assessed. 26 U.S.C. § 6664(c).

### A. The Litmans and Dieners

With regard to the Litmans and Dieners, a penalty may be appropriate because of both their disregard of applicable rules and regulations, and their substantial understatement of tax. The applicability of the understatement penalty is obviously dependent on the ultimate determination of the correct value for the HRN stock. Based on its valuation of the stock, however, the United States believes that both the Litmans and Dieners substantially understated their tax.

The Litmans and Dieners also disregarded the requirement to file a Form 8594 for the year 2000. Their receipt of the HRN restricted stock, and the valuation they placed on it, is not disclosed in their personal returns and is not properly disclosed in the TMF Trust return. *See* Treas. Reg. § 1.6664-4(d) ("The determination of whether a taxpayer acted with reasonable cause and in good faith with respect to an underpayment that is related to an item reflected on the return

of a pass-through entity is made on the basis of all pertinent fact and circumstances, including the taxpayers own actions as well as the actions of the pass-through entity.")

Finally, the mere fact that Litman and Diener obtained a valuation for the stock does not mean that the reasonable cause and good faith defense is automatically applicable. All the surrounding facts and circumstances, including the obvious flaws in the valuation and their other actions must be considered. *See* Treas. Reg. § 1.6664-4.

**B. Hotels.com**

Penalties also may be appropriate for Hotels.com. Hotels.com initially filed an incomplete Form 8594 with its return for 2000. After obtaining a valuation for the HRN restricted stock from Deloitte & Touche, Hotels.com did not then amend its return, and file a completed Form 8594. In fact, there is evidence suggesting that it was concerned that disclosure of the different values that it and the Litmans and Dieners were using for the stock would trigger an examination of those valuations by the IRS. Whether Hotels.com substantially understated its tax or substantially overstated the value of HRN stock, and is subject to penalties for those reasons, is dependent on the value for the stock ultimately determined in this case. 26 U.S.C. § 6662(d) and (e).

**IV. THE DIENERS' LIMITATIONS DEFENSE UNDER <u>§ 6501 TO THE ORIGINAL TAX ASSESSMENT</u>**

The IRS generally must assess additional taxes determined to be due within three years of a return being filed. 26 U.S.C. § 6501(a). If a notice of deficiency is mailed to the taxpayer, the running of this limitations period is suspended for 150 days (or longer, if a Tax Court case is filed). 26 U.S.C. §§ 6503(a) and 6213(a). If the amount of gross income that is omitted from a return is greater than 25% of the income stated in the original return, the IRS has six years to

assess the tax or begin a proceeding in court to collect the tax. 26 U.S.C. § 6501(e).

The Dieners filed their 2000 tax return on October 15, 2001. On October 8, 2004, within the 3-year statute, the IRS mailed notices of deficiency to the Dieners at the address listed on their most recently filed tax returns, and at which the IRS had corresponded with them during the just-completed audit. The Dieners received this notice of deficiency. They then paid the additional taxes in January 2005, and the IRS assessed the taxes (that had just been paid) in February 2005, within the (extended) three-year limitations period.

The Diener's nevertheless claim that the assessments were untimely under § 6501(a), because the notices of deficiency were not sent to their "last known address," and were, therefore, somehow "void," and did not suspend the running of the limitations period. Courts that have specifically addressed similar limitations defenses – based on alleged mistaken addresses in notices – have rejected it. Where a taxpayer actually receives the notice of deficiency, any alleged "misaddressed mailing is of no consequence," and the limitations period is suspended from the date of mailing, as the Code provides. *St. Joseph Lease Captital Corp. v. Commissioner*, 235 F.3d 886, 891 (4th Cir. 2000); *see also, Balkissoon v. Commissioner*, 995 F.2d 525 (4th Cir. 1993); *Scheidt v. Commissioner*, 967 F.2d 1448 (10th Cir. 1992); *Clodfelter v. Commissioner*, 527 F.2d 754 (9th Cir. 1975); and *Estate of Greenwood v. Commissioner*, T.C. Memo 2003-98 (U.S. Tax Ct. 2003).

Nevertheless, in support of their defense, the Dieners, like the taxpayers in the above cases, attempt to convert the "safe-harbor" provision for the IRS in § 6212(b) into something it is not. That section provides that a deficiency notice sent to a "last known address" is sufficient for various purposes, even if the taxpayer never actually receives the notice. *See*, 26 U.S.C. 6212(a);

and *Scheidt*, 967 F.2d at 1450 fn. 1. That safe-harbor does not also mean, however, that a deficiency notice actually received by a taxpayer (though perhaps not at his or her preferred address) is automatically void. The assessment here, therefore, was timely.

Additionally, the IRS is given a reasonable amount of time to process a request for a change of address before it becomes a "last known address." *See, e.g., Hawk v. Commissioner,* T.C. Memo 1992-42 and Rev. Proc. 2001-18 (change of address will be considered properly processed after 45 days). The Diener's request was received only four days before their notice of deficiency was sent. It is not reasonable to require the IRS Atlanta Service Center (which had no reason to know of the anticipated deficiency notice to the Dieners) to process that request, and notify all IRS employees, including those in Dallas who were preparing the deficiency notice, within such a short period of time. The deficiency notice was sent, therefore, to the Dieners' "last known address" as of October 4, 2004, even assuming that that is a requirement, in addition to the taxpayer actually receiving the notice

## V. THE LITMANS' AND DIENERS' LIMITATIONS DEFENSE TO COUNT II OF THE UNITED STATES' COUNTERCLAIMS

Although neither the Litmans or Dieners pled it as affirmative defense, as required by RCFC 8(c), they now argue that Count II of the United States' counterclaims against each of them for additional taxes, penalties and interest are untimely because the six-year limitations period of § 6501(e) is not applicable. The United States filed these counterclaims in response to Hotels.com's argument, raised late in this case, that the value of the HRN restricted stock was greater than $16 per share. Because the IRS had assessed taxes against the Litmans and Dieners based on an assumed maximum value of $16 per share (the value used by Hotels.com in its 2000

tax return), the counterclaims were necessary in the event the Court determines that the restricted shares did, in fact, have a fair market value greater than that.[20]

Section 6501(e)(1)(A) provides that if "a taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time within 6 years after the return was filed." 26 U.S.C. § 6501(e)(1)(A). Here, if the fair market value of the HRN restricted stock is ultimately determined to be greater than $16 per share, both the Litmans and Dieners will have understated their gross income by far more than 25 percent.

Citing *Colony v. Commissioner*, 357 U.S. 28 (1958), the Litmans and Dieners argue that § 6501(e)(1)(A) is not applicable here. The United States disagrees. *Colony* is inapposite for several reasons, including the fact that the statute has been amended since *Colony* was decided. Additionally, *Colony* involved trade or business income, not personal capital gain, and the Litmans and Dieners did not adequately disclose the receipt of the HRN restricted stock in their tax returns, or in the TMF Trust's return. *See e.g., Grapevine Imports, Ltd. v. United States*, 71 Fed. Cl. 324 (2006); *CC& F Western Operations L.P. v. Commissioner*, 273 F.3d 402 (1st Cir. 2001) ("Whether Colony's main holding carries over to section 6501(e)(1) is at least doubtful."); and *Phinney v. Chambers*, 392 F.2d 680 (5th Cir. 1968).

Because this limitations issue will be faced only if the Court finds that the HRN restricted stock had a value greater than $16 per share, and the United States' protective counterclaims are

---

[20] The Court granted the United States' motion to file the counterclaims in its Order of August 11, 2006.

therefore necessary to properly tax the transaction, the United States believes that full briefing on this issue should wait until it is known whether that contingency occurs. The United States believes it is likely the court will not need to decide this issue.

## VI. THE LITMANS' AND DIENERS' DEDUCTIONS AND CAPITAL GAINS RELATED TO THE BONUS PAID TO ANDREW PELLS

The deduction for, and the capital gains realized on, the transfer of 244,995 shares of HRN restricted stock to Andrew Pells in 2000 flowed-through from the TMF Trust to the Litmans and Dieners. The proper taxation of this transfer is governed by §§ 83 and 1001 of the Code

Section 83(h) of the Code provides that "there shall be allowed a deduction under section 162... an amount equal to the amount included under subsection (a), (b) or (d)(2) in the gross income of the person who performed such services." 26 U.S.C. § 83(h). Section 83(b) allows the person who performed the services to include the property received in his or her income at its fair market value, without regard to any applicable restrictions. Pursuant to § 83(b), Pells reported the HRN one-year restricted stock as income in 2000 in the amount of $3,919,920, which is the value of the 244,995 shares at $16 per share, the IPO price (*i.e.*, without taking into account any discount attributable to the restrictions). The TMF Trust then took a deduction for the transfer of stock to Pells in the same amount, $3,919,920.

As this Court is aware, in *Robinson v. United States*, 335 F.3d 1365 (Fed Cir. 2003), the United States Court of Appeals for the Federal Circuit held that the transferor of property is entitled to a deduction under § 83(h) in the amount that was "legally required to be included" in the recipient's income, "without regard to the amount that was actually included on his return...."

*Robinson*, 335 F.3d at 1373. Accordingly, if this Court determines that the HRN stock transferred to Pells had a value, without regard to its restrictions, in an amount other than $16 per share, the deduction permitted to TMF Trust would be in that amount, rather than the $16 per share reported by Pells.[21]

The TMF Trust also realized capital gains on the transfer of the stock to Pells. The computation of this gain is dependent on both the Court's determination of the fair market value of the stock with restrictions, which will be the tax basis for the stock, and of the value of the stock without restrictions, which will be the amount realized on the transfer. The parties will be able to compute these amounts after the values of the HRN stock are determined at trial.

[21] If the Court determines that the fair market value of the stock without restrictions as of February 24, 2000, is something other than $16 per share, there will then be a discrepancy between Pells' reported income and TMF Trust's deduction. While the initial whipsaw problem created by Hotels.com's and the Litmans and Dieners' different valuations is solved by consolidation of their refund cases here, Hotels.com's new argument – made late in this case – that the fair market value of the stock, without restrictions, is greater than the $16 per share IPO price creates the possibility of another whipsaw involving Pells, who is not a party to this case.

## **Conclusion**

Based on the above facts and law, and any additional facts presented at trial, the United States requests that the Court determine the issues described above. Based on the Court's decisions, the United States anticipates that the parties will then be able to compute the amount of any refunds and the amount due the United States under its counterclaims.

Respecfully Submitted,

*s/ Cory A. Johnson*
Cory A. Johnson
Attorney of Record
U.S. Department of Justice
Tax Division
Court of Federal Claims Section
P.O. Box 26
Ben Franklin Station
Washington D.C. 20044
202-307-3046

Eileen J. O'Connor
Assistant Attorney General
Steven I. Frahm
Assistant Chief, Court of Federal Claims Section

*s/ Steven I. Frahm*
Of Counsel

Attorney for The United States

Dated: April 2, 2007