kpmg

To TMF LIQUIDATING TRUST FILE

Date April 3, 2001

From Madeline Fernandez
cc Jim Horan

Ref 00NOTES TO FILES.doc

**VARIOUS TAX DISCUSSIONS RELATING TO TMF LIQUIDATING TRUST**

Following are short explanation relating to the 1999 and 2000 tax year which have an impact on the 2000 TMF Liquidating Trust tax return.

**Sale of TMF, Inc. – Installment Sale and Imputed Interest**

TMF, Inc., a Sub S Corp sold all of its assets to USA Network on May 11, 1999. The sale qualified as an installment sale. TMF was liquidated in 1999 and a liquidating trust was formed to which the sales proceeds and other obligations (principally to a former employee, Andy Pell) are paid to and from. The basics of the transaction called for a cash payment , part of which was placed into an interest bearing escrow account, notes that came due partially in the year of sale and partially in the tax year of 2000. The sale contract called for a contract price of $200,000,000 which was paid as follows: (1) $177,500,000 cash received in 1999, (2) $5,000,000 cash into escrow in 1999, (3) $5,000,000 cash into escrow in January 2000 and (4) $12,500,000 cash received in January 2000. In addition to the cash payments, earn out provisions were established over a future period of time, and should the newly formed entity have an public stock offering within the next five years, the sellers were entitled to 10 % of the stock.

Since the payments from the sale would extend past one year, the sale was treated as an installment sale on the 1999 return. Since the contingent payment dates and amounts were undeterminable at the date of sale the sale was treated as an installment sale over a 5 year period (the life of the contract). Accordingly the cost basis was allocated over this 5 year period. (see §15A.453(1)(c)(3)).

(For computation of 1999 installment sale – see TMF Liquidating Trust 1999 workpapers)

During the tax year of 1999 certain installments were paid to the sellers in November, that were less than 6 months from the date of sale. No interest was imputed under IRC secs. 483 or 1274. However, it was anticipated that any payments made subsequent to November (6

LD 003586

EXHIBIT 1

months) would be subject to the imputed interest rules since the contract was for a period longer than 12 months and payments would be made subsequent to 6 months. (sec 483). However in February of 2000, the new company had an IPO. In preparation of the IPO, the original sales contract which covered a payout period greater than 12mos (actually 5 years) was materially modified. A new agreement was entered into whereby the earn out provisions of the old contract were cancelled and in consideration the sellers received the rights to additional equity interests in the IPO. The last earn out calculation under the old agreement was paid to the sellers on March 31, 2000 (less than 12 months from the original sale date). Thereafter no further consideration was paid to the sellers under the old contract. The sellers received stock in the IPO as calculated under the terms of the new or modified agreement. The IPO occurred in February of 2000. The stock received while transferable is subject to certain restrictions, chiefly a four year holding period that is released proportionately on an annual basis over the four years. (see the contract for the release dates etc.).

Per §483(c) interest on deferred payment on the sale of property only applies when part of the sales price is due more than 6 months after the date of such sale under a contract where some or all of the payments are due more than 1 year after the date of such sale and under which there is a total unstated interest.. Due to the termination of the original contract and final fixed payment received within <u>less than 12 months</u> (payment received in January 2000) no imputed interest (i.e. no OID) is calculated for the 2000 payment. In addition the monies in escrow are not subject to imputed interest because the escrow amounts bears a <u>stated</u> 4.75% interest. Note that the escrow amounts are restricted and thus not treated as received or taxable until date paid out of the escrow. On the date paid from escrow the entire amount will be treated as capital gains.

We have concluded that while imputed interest was required pursuant to the original contract which was for a period greater than 12 months. No imputed interest is required under the new set of facts. The old agreement was terminated within that twelve month period and all payments required under the original contract where made in a period less than 12 months from the date of sale. It is possible that an IRS agent may raise this issue, however we feel that the correct return position is not to impute interest. Disclosure in the return is not required as the reporting is not contrary to the regulations or case law.

Furthermore the original installment sale contract had allocated basis equally over a five year period (length of the original contract). As that 5 year contract was terminated in the second year, the remaining basis should be allocated to the payments received in the year 2000. That is, the remaining cost on the sale of $6,242,850 (total cost less that claimed in 1999 which equals 4/5 of total cost) is taken in 2000 to offset proceeds received in 2000. Note that no cost is being allocated to monies remaining in escrow. Therefore when monies

election within the time allowed. Consequently he is including in income the value of the stock received in the year 2000 that is transferable without taking into account any of the holding period restrictions (pursuant to the rules of section 83(a) which is the strike price of $16 per share, the non discounted value. The corresponding deduction at the TMF liquidating trust will also be calculated at the non discounted value. In the year 2004 the amounts due pursuant to the earn out conversion will be paid to Andy Pell by the Liquidating Trust. The amount of income inclusion (ordinary income (i.e. compensation) and not capital gains) and corresponding deduction will be the fair market value of the stock at the time of payment and should not be based off of the $16 IPO strike price. This should be made clear to the parties involved as their work papers indicate that the $16 strike price will be the amount used for the inclusion.

§83(a) states that if in connection with the performance of services property is transferred to any person the excess of the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the time of transfer or at the time the property is not subject to a substantial risk of forfeiture (whichever occurs first) over any amounts paid shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to substantial risk of forfeiture, whichever is applicable. Since no money was paid by Andy and the shares were not subject to a substantial risk of forfeiture even though the shares have restrictions and are non transferable, the amount deducted relating to the shares are 244,995 shares times the IPO value of $16/share (i.e. fair market value in 2000) for a total of $3,919,920. Note that the additional 255,000 shares given to Andy have restrictions up to 3/1/04 thus will not be allowed as an expense until 2004 when the restrictions are lifted based on the FMV at that date as explained above.

The amount of the deduction at the Trust level will equal the amount of the inclusion of income by Andy Pell. As stated above that amount is $16 per share in 2000. The basis of the stock used to satisfy this obligation was specifically identified as coming from the stock with the one year restriction which has been discounted to 49.5% of the strike price of $16 (i.e. a total basis of $1,979,560). Two issues arise, what is the correct basis that should be used, the 49.5% discount, a blended discount rate of all of the stock received, or the blended rate of the pre IPO stock only? I would think that if the actual stock that was transferred had a legend on it with the one year restriction, a specific identification method could be used. We need to ascertain the facts. Regardless of the discount applied to the basis of the stock, the paying taxpayer will recognize capital gain to the extent there is difference between the basis and the amount of the obligation satisfied, i.e. $16 – basis.

are paid from escrow the entire amount will be a capital gain. (Per the balance sheet of TMF Liquidated Trust provided by client all $10,000,000 ($5M in 1999 + $5M in 2000) remain in escrow as of 12/31/00).

The new contract in 2000 for the sale of additional TMF, Inc. shares are treated as a new contract and treated as capital gains based on the total value of the shares at the time of sale. Note that due to the restriction to hold these shares for a fixed number of years (see contract details), an independent valuation analysis was done in order to determine the value of the TMF, Inc. shares at the time of issuance (see valuation report and summary workpapers provided by client). No cost is allocated to these shares and thus the entire valued amount is capital gains.

**Employee Compensation – Andy Pell**

When the sellers negotiated the sale of the assets of TMF they entered into a contract with an employee named Andy Pell. Andy Pell was critical to the success of the old and new entity. He is separately employed by the new entity HNR and has a separate employment contract with HNR. The sellers , in recognition of his prior services agreed to pay Andy 5% of the proceeds in the same manner and timing as they receive the proceeds. The payments are treated as compensation and the TMF liquidating trust has deducted the payments made to Andy as an ordinary business expense. When the earn out was relinquished and replaced with additional stock in the IPO, Andy's agreement was modified . He was paid 5% of the stock from the "10%pre IPO initial shares in the year 2000. He will be paid 5% of the "Earn out Exchange Shares" in the year 2004. The total shares to be given to Andy are 499,995 shares: 244,995 in 2000 and 255,000 in 2004.

100% of the stock received by the sellers (both the 10% pre IPO Stock and the Earn out Exchange Shares) was valued by an independent third party. The valuation was reviewed by the KPMG Valuation group in Atlanta purely for reasonableness and concurred that proper valuation methods were used. While KPMG concurred as to the methods used and reasonability of discounts , it did not perform the valuation and this should not be construed that the valuation is KPMG's. The discounted value of the stock received by the sellers , both the "10% pre IPO initial shares" as well as the "Earn out Exchange Shares" is included in their taxable incomes for the year 2000. The 5% payment made to Andy Pell in the year 2000 was made from the "10% pre IPO initial shares". 5% of the Exchange Shares is still pending to be paid to Andy Pell and will be paid by the sellers in the tax year 2004 when the holding period restrictions lapse. I do not know if these shares are subject to a substantial risk of forfeiture or not, however Andy Pell did not make a section 83(b)

The balance sheet of TMF Liquidating Trust shows the shares received in TMF, Inc at the discounted value received from the independent valuation. The 244,995 shares later given to Andy Pell were originally valued at $1,979,560 due to the restrictions (i.e. 49.50%). This amount is what is included on the trust balance sheet as the cost basis. However, per §83(a) rules above upon transfer of these shares to Andy the trust may take a deduction for the fair market value of $3,919,920. The difference of $1,940,360 will be treated as capital gains on the sale of stock in the 2000 taxable year.

**(KPMG was not provided with the contract to Andy, above information was provided by the client. Must verify if employment taxes were paid on this compensation paid to Andy Pell).**

Special Tracking Interest to Grantor Trusts

In 2000, Bob and Michelle sold a "special tracking interest" in TMF Liquidating Trust to Diener Family GS – Trust and Robert B. Diener GS-trust which are both defective grantor trusts (i.e. transfer of beneficial interest in the trust). This sale in not considered a sale for income tax purposes as it is seen as a transfer to oneself because the trusts are defective grantor trusts where income is taxed to the grantor. The purpose of the transfer is purely for estate tax purposes. Grantor trust returns are not needed as everything is reported by the grantor (Rob and Michelle Diener). In order to properly track to the transfer when preparing the K-1's for the trust put the social security number of the Diener's on the grantor trust's K-1 but keep the grantor trust name. The Diener's social security number is used because they report the K-1 income in their 1040 return. (information provided by Tracy Henderson, KPMG-Atlanta PFP Partner).