# In the United States Court of Federal Claims

Nos. 05-956T, -971T & 06-285T
(Filed August 22, 2007)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| **DAVID S. and MALIA A. LITMAN,** | Tax; tax refund; valuation of restricted stock options; judicial estoppel; judicial admission; liability for penalties. |
| Plaintiffs-Counterdefendants, | |
| v. | |
| **THE UNITED STATES,** | |
| Defendant. | |

_____

**ROBERT B. and MICHELLE S. DIENER,**

      Plaintiffs-Counterdefendants,

      v.

**THE UNITED STATES,**

          Defendant.

_____

**HOTELS.COM, INC., and Subsidiaries (f/k/a HOTEL RESERVATIONS NETWORK, INC.),**

      Plaintiffs,

      v.

**THE UNITED STATES,**

          Defendant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

John W. Porter, Houston, TX, for plaintiffs-counterdefendants Litmans and Dieners. Stephanie Loomis-Price and J. Graham Kenney, Baker Botts, LLP, of counsel.

Kim Marie K. Boylan, Washington, DC, for plaintiffs Hotels.com.  Kari M. Larson and Jennifer S. Crone, Latham & Watkins, LLP, of counsel.

Cory A. Johnson, Washington, DC, with whom was Acting Assistant Attorney General Richard T. Morrison, for defendant.  Steven I. Fraham, Tax Division, of counsel.

## MEMORANDUM AND OPINION

**MILLER**, Judge.

This case, before the court after trial, arises from the failure of individual and corporate taxpayers to report one consistent value for  almost 10 million shares of restricted stock issued in February 2000 to plaintiffs-counterdefendants David S. Litman and Malia A. Litman (collectively, the "Litmans") and Robert B. Diener and Michelle S. Diener (collectively, the "Dieners"). 1/  Messrs. Litman and Diener are the founders of Hotels.com,

---

1/ Although the court has considered the testimony of every witness, discussion of each is not necessary in order to render a comprehensive decision.  The Litmans and the Dieners presented one expert witness, Mark L. Mitchell, CFA, ASA, Director of Valuation Services for Clothier & Head, P.S., an accounting firm.  Mr. Mitchell holds an M.B.A. from Southern Methodist University in Dallas, TX, and was qualified to give an opinion regarding the fair market value of the subject Hotel Reservations Network, Inc. ("HRN") restricted stock.  The following fact witness testified for the Litmans and the Dieners: (1) David S. Litman, CEO and a founder of the two predecessor companies of Hotels.com, Inc. & Subsidiaries (f/k/a Hotel Reservations Network, Inc.) ("Hotels.com"); (2) Robert B. Diener, President and a founder of Hotels.com's two predecessor companies; (3) John R. Bozalis, Jr., a Vice President at Donaldson Lufkin Jenerette, S.C. ("DLJ"), from 1997 to spring 2000, who focused on initial public offerings ("IPOs") and merger and acquisition advisory work; (4) Malia A. Litman, Esq., the wife of Mr. Litman; (5) Susan F. Weiss, an agent for the Internal Revenue Service (the "IRS"), who was assigned to audit the Litmans, the Dieners, and Hotels.com; (6) Brian Lidji, Esq., who represented Messrs. Litman and Diener in the sale of Hotel Reservations Network and the negotiations that resulted in the Amended and Restated Asset Purchase Agreement (the "ARAPA"); he also occasionally represented HRN; (7) Melville W. Robinson, Chief Financial Officer at HRN beginning in September 2000; and (8) Michelle S. Diener, the wife of Mr. Diener, who performed accounting services for

Inc. & Subsidiaries's two predecessor companies, TMF, Inc. ("TMF") and HRN Marketing Corp. ("HRN Marketing").

_____

1/ (Cont'd from page 2.)

HRN until approximately 1999. The Litmans and the Dieners offered deposition testimony of the following individuals: (1) Eric DeGraw, Tax Director at InterActiveCorp since 1998; and (2) James L. Horan, who was Managing Partner in charge of tax and the Managing Partner of the South Florida Business Unit at KPMG, LLP ("KPMG"), from the late 1990s until his retirement in September 2002. Hotels.com and defendant counter-designated testimony that they introduced.

Hotels.com offered one expert witness, Dr. Mukesh Bajaj, a Senior Managing Director of Finance and Damages Practice at LECG, LLC, an international consulting firm, who holds a Ph.D. in Business Administration from the University of California at Berkeley. Dr. Bajaj gave his expert opinion for Hotels.com regarding the fair market value of the HRN restricted stock. The following fact witnesses testified for Hotels.com: (1) Viren B. Ghandi, CPA, Senior Director of Finance at Hotels.com; (2) Dara Khosrowshahi, Vice President of Strategic Planning for USA Networks, Inc. ("USA Networks") from 1998 until January 2002 when he became Chief Financial Officer of InterActiveCorp (f/k/a USA Networks, Inc.) ("IAC"); in December 2004 he became Chief Executive Officer of IAC Travel; and, most recently, in 2005 he became Chief Executive Officer of a new publicly traded company, Expedia, Inc., the parent company of Hotels.com; and (3) Thomas J. Kuhn, Esq., who was Chief Legal Officer at IAC during the acquisition of the company that became known as HRN. Hotels.com offered deposition testimony of Christine Zeikel, CFA, a principal in the Financial Advisory Service practice at Deloitte & Touche LLP, an investment bank, who handled a valuation for USA Networks in 2001 of the restricted shares of HRN stock. The Litmans, the Dieners, and defendant counter-designated portions of this deposition.

Testifying for defendant was one expert witness, Francis X. Burns, ASA, a Vice President of CRA International, a publicly traded consulting firm focusing on economic analysis, valuation work, and strategy consulting. Mr. Burns was defendant's expert regarding the fair market value of the HRN restricted stock. The following fact witnesses testified for defendant: Jean M. Wharton, a "90-day reviewer" with the IRS in 2004 in the Exam Division, Technical Services in Dallas, TX. Transcript of Proceedings <u>Litman v. United States</u>, Nos. 05-956T, -971T, & 06-285T, at 150 (Fed. Cl. Apr. 30-May 9, 2007) ("Tr."). Ms. Wharton prepared the Statutory Notice of Deficiency that was issued to the Dieners.

In 1999 TMF and HRN Marketing sold substantially all of their assets to HRN, Inc. ("HRN"), "a newly-created, wholly-owned subsidiary of USA Networks, Inc." ("USA Networks"). Hotels.com's Br. filed Feb. 26, 2007, at 6 (footnote omitted). In 2002 USA Networks changed its name to USA Interactive. In June 2003 USA Interactive again changed its name to InterActiveCorp. HRN changed its name to Hotels.com, Inc. & Subsidiaries ("Hotels.com") in 2002.

As founders of the predecessor companies, when HRN completed its initial public offering (the "IPO"), Messrs. Litman and Diener received 9,999,900 restricted shares of HRN stock through TMF Liquidating Trust, an entity that the Litmans and the Dieners created to liquidate their former companies. On their 2000 personal income tax returns, the Litmans and the Dieners reported that the 9,999,900 restricted shares of HRN stock had an average weighted value of $4.54 per share. In contrast, on its 2000 tax return HRN reported that the approximately 10 million shares of restricted stock had a value of $16.00 per share. This figure was HRN's predicate for taking a goodwill amortization deduction. Defendant complains that the Litmans, the Dieners, and Hotels.com have "whipsawed the IRS," creating "a tax gap of approximately $115 million." Def.'s Br. filed Apr. 2, 2007, at 2. Defendant is seeking over $5.7 million in assessments and penalties from the Litmans and the Dieners. Defendant has reserved filing of a counterclaim for interest and penalties against Hotels.com pending the ultimate valuation of the stock.

## BACKGROUND AND FACTS

Friends since Cornell Law School, Messrs. Litman and Diener have been business partners since the early 1980s. In the early 1990s the men saw an opportunity to enter the hotel market. In 1991 Messrs. Litman and Diener founded TMF, a Texas corporation, and HRN Marketing, a Florida corporation, and began doing business as Hotel Reservations Network. These men were impressive in their dedication and vision, although they, like USA Networks, Hotels.com's predecessor entity, entered legal agreements that did not achieve their anticipated objectives relating to the tax consequences of their transactions.

Originally, Hotel Reservations Network's business model was simple: it took telephone calls from customers and found ways of getting them discounts on hotel rooms. As Mr. Diener, President of Hotel Reservations Network, explained: "For example, maybe there would be a AAA discount rate, or someone was retiring, you could get them a[n] AARP rate. And so we booked hotels . . . for a commission from the hotels." Transcript of Proceedings, Litman v. United States, Nos. 05-956T, -971T, & 06-285T, at 311 (Fed. Cl. Apr. 30-May 9, 2007) ("Tr."). Eventually, this model proved unworkable because Hotel Reservations Network collected only about 60% of its commissions. As a result, Messrs. Litman and Diener decided to change their business model to what eventually came to be

known as the "merchant model." Id. at 54. In late 1992 Hotel Reservations Network began contracting with individual hotels for a low net rate on a group of hotel rooms and then selling those rooms to customers at a higher price. After sales to customers, Hotel Reservations Network would pay the hotels for rooms, thus avoiding the expenditure of time and money collecting commissions from the hotels. While the merchant model had been used previously, distinguishing Hotel Reservations Network from its competitors was the decision to use the model in a variety of different cities, starting in New York, NY; Washington, DC; and Boston, MA.

In 1994 Hotel Reservations Network began developing a website, integrating the Internet into its business model. The website that was launched in 1995 was simple compared to the websites with which Internet users are familiar today. To book a room, a customer would send an e-mail request to Hotel Reservations Network and wait for a response. According to Mr. Litman, CEO of Hotel Reservations Network, the process was "clunky" because the "typical response time was between four and 12 hours . . . ." Id. at 52. Mr. Diener elaborated that "[s]omeone would request a booking; it may take a couple of days before we would actually respond. It may go back and forth, sometimes [it was] a week before we . . . confirmed the actual hotel . . . ." Id. at 312. Messrs. Litman and Diener, however, saw potential in the Internet. "[W]e recognized that, hey, this is an interesting method of business. It's getting us customers that we would not otherwise have gotten." Id. at 52-53 (testimony of Mr. Litman). By early 1998 Hotel Reservations Network's website became "interactive," and, selling from an inventory of hotel rooms, it was able to confirm hotel reservations immediately. Id. at 53, 312.

Between 1992 and 1998, the company grew significantly, as reported earlier in a Confidential Information Memorandum dated June 1998 prepared by Donaldson, Lufkin & Jenrette, S.C. ("DLJ"). "Revenues increased by 113% to $9.0 million in the first quarter of 1998 from $4.2 million in the first quarter of 1997, primarily due to dramatically higher revenues generated from the Company's websites." HX 308 at 29. One of the factors expanding Hotel Reservations Network's business was recruiting affiliates to sell hotel rooms for the company's account. Typically, the affiliate contracts lasted one to three years. "[W]e became kind of a back end booking engine for other websites and other travel providers." Tr. at 56 (testimony of Mr. Litman). These affiliates included Cheap Tickets, Travelocity, airline reservation websites, the New York Convention and Visitors Bureau. By 1998 affiliate contracts with other providers of hotel rooms represented approximately two-thirds of Hotel Reservations Network's business.

Critical to the success of Hotel Reservations Network was the company's ability to obtain, first, a profitable margin from the hotels and, second, a sufficient allotment of hotel rooms. The margin is the difference between the price that hotels charged Hotel

Reservations Network as a net rate and the price at which the company was able to sell the hotel rooms to the public.  The ability of Hotel Reservations Network to secure a profitable margin depended on the hotels giving Hotel Reservations Network a net rate that was below the price that the hotels were offering to the public.  Hotel Reservations Network's success also depended on its ability to get an allotment of hotel rooms – a group of rooms for "[Hotel Reservations Network's] exclusive use and sale, that [it] could sell in an automated way . . . ."  Tr. at 57 (testimony of Mr. Litman).  Hotel Reservations Network had to make sure that it had enough hotel rooms in its allotment to sell interactively on its website. Therefore, contracts were negotiated with individual hotel providers to ensure that Hotel Reservations Network received sufficient margins and allotments.  Primarily, Mr. Diener and Andrew Pells, Senior Vice President of Hotel Reservations Network, and one of its key employees during the company's early years, worked to create "harmonious" relationships with hotel providers.  Id. at 58 (testimony of Mr. Litman).  The hotel contracts typically last a year, as Mr. Litman said, "[A]ll we sold was hotels.  We were the butcher, . . . we were just one shop.  So we had to have contracts with the hotels."  Id.

In 1998 Messrs. Litman and Diener received their first offer to sell Hotel Reservations Network to a public company.  While they ultimately rejected the offer, it prompted Messrs. Litman and Diener to approach DLJ to represent them in the sale of their company.  DLJ coordinated the sale of Hotel Reservations Network.

Dara Khosrowshahi, who today is the CEO of Expedia, Inc., the parent company of Hotels.com, was the lead negotiator in the acquisition of Hotel Reservations Network.  In 1998 Mr. Khosrowshahi was USA Networks's Vice President of Strategic Planning.  In that role he was responsible for the "strategy of [USA Networks] in mergers and acquisitions." Id. at 758.  Mr. Khosrowshahi set the stage for USA Networks's interest in Hotel Reservations Network:

> We owned Ticketmaster at the time, and Ticketmaster was a company which . . . transacted half their business over the phones and half their business in [a] retail outlet. . . .
>
> [Ticketmaster] started a website ticketmaster.com, and in – and it was a lark, but in a year or two, 5 percent of their transactions went on the web. And when you looked at where the transactions came from, they came from the phone.  So almost all the transactions were moving from the phone onto the internet.

So we looked around and said, what other businesses look like Ticketmaster where you're making advance reservations for seats. You've got a product that you don't have to touch and feel. . . .

And then we saw this company Hotel Reservations Network, which was a hotel consolidator that had a phone business that was developing an internet channel really quickly.

So we saw the same dynamics as we saw in Ticketmaster[], and we thought that it could be something that was really, really interesting. . . .

Id. at 760-61. While Mr. Khosrowshahi recommended the acquisition of Hotel Reservations Network, any decision to bid on Hotel Reservations Network or acquire the company ultimately was subject to the approval of Barry Diller, CEO and Chairman of USA Networks, and Victor A. Kaufman, Vice Chairman of USA Networks.

The sale of Hotel Reservations Network in 1999 to USA Networks was structured so that HRN, a wholly-owned subsidiary of USA Networks, bought "substantially all of the assets, properties, rights and business of" TMF and HRN Marketing, d/b/a Hotel Reservations Network, as reflected in the April 13, 1999 Asset Purchase Agreement (the "Asset Purchase Agreement"). The original agreement entitled Messrs. Litman and Diener, as the shareholders of TMF and HRN Marketing, to $150 million and potentially additional purchase payments, depending on the company's performance in the future with Messrs. Litman and Diener retained at the helm. Asset Purchase Agreement § 3.

The Asset Purchase Agreement was primarily negotiated between Messrs. Litman and Diener, acting for themselves, and Mr. Khosrowshahi, for USA Networks. Brian Lidji was the attorney representing the Litmans and the Dieners, while Paul, Weiss, Rifkind, Wharton & Garrison, LLP, represented USA Networks. Thomas J. Kuhn, Senior Vice President and General Counsel of USA Networks from approximately 1997 through 2000, was responsible for overseeing the transaction "as it related to both the acquisition of HRN and the subsequent public offering." Tr. at 885. Mr. Kuhn described himself as involved in "every detail" of the negotiations and acquisition of Hotel Reservations Network. Id. at 890.

According to Mr. Khosrowshahi, one of the important terms of the sale of Hotel Reservations Network from USA Networks's perspective, was a "deal structure which would permit [USA Networks] to amortize the purchase price for tax purposes." HX 304; see Tr. at 768-69 ("[T]his deal was a bit unusual in that we were able to structure it in a way that would allow us to take the purchase price and amortize the purchase price for tax purposes over some period of time. . . . so the amortization really was cash that we would avoid paying

7

in taxes over a number of years, and the net present value of that was very, very significant. . . . I think over $50 million value . . . ."). The structure allowed USA Networks to pay more cash up front.

The Asset Purchase Agreement, which encapsulated the final agreement between the parties as to the sale of Hotel Reservations Network, defined Purchase Price, as follows:

> 3.1 Purchase Price. The aggregate purchase price for the Purchased Assets (the "Purchase Price") shall be an amount equal to (I) $150 million (as adjusted pursuant to Section 3.3 below); (ii) the Quarterly Deferred Payments, if any, provided in Section 7.10; (iii) the Additional Purchase Payment, if any, provided in Section 7.9; (iv) the Participation Payment, if any, provided in Section 7.11 and (v) the aggregate amount of the Assumed Liabilities on the Closing Date.

Asset Purchase Agreement § 3.1.

Under the terms of the Asset Purchase Agreement, Messrs. Litman and Diener could earn Additional Purchase Payments, Quarterly Deferred Payments, 2/ and Participation Payments, depending on how HRN performed in the future. Section 7.9 of the Asset Purchase Agreement set forth the methodology for determining the Additional Purchase Price to be paid to the Litmans and the Dieners:

> 7.9.2 1999 Additional Purchase Price Payment. . . . [F]ollowing the final determination of the 1999 Adjusted EBT and Adjusted Gross Profit in accordance with paragraph 7.9.1 above, the Buyer [HRN] shall pay to the Sellers [TMF, Inc. and HRN Marketing Corp.], by wire transfer of

---

2/ Subject to limitations, the Asset Purchase Agreement provided also for Quarterly Deferred Payments to be made

> if the Adjusted Gross Profit for such fiscal quarter as so determined exceeds 25% of the target Adjusted Gross Profit for such quarter as reflected on Schedule 7.10 attached hereto (the "Target Adjusted Gross Profit"), the Buyer shall pay to the Sellers by wire transfer of immediately available funds, an amount equal to (x) $12.5 million times (y) the Deferred Payment Adjuster (as defined below) (the "Deferred Payment").

Asset Purchase Agreement § 7.10.1(c).

immediately available funds, an amount equal to the greater of (I) the product of (x) the amount, if any, by which the 1999 Adjusted EBT exceeds 1998 Adjusted EBT times (y) 2.5, and (ii) if 1999 Adjusted Gross Profit is at least 50% greater than 1998 Adjusted Gross Profit, (x) the amount by which the 1999 Adjusted Gross Profit exceeds 1998 Adjusted Gross Profit times (y) 1.44.

Asset Purchase Agreement § 7.9.2.  The Asset Purchase Agreement used similar formulas for calculating the Additional Purchase Price Payments for 2000 and 2001 that the Litmans and the Dieners were entitled to as part of the sale. 3/

Pursuant to Section 7.11.1 the Asset Purchase Agreement provided for Messrs. Litman and Diener to receive Participation Payments using the following formula:

_____

3/ The following was set forth as the formula for calculating the 2000 Additional Purchase Price Payment:

[A]n amount equal to the greater of (I) the product of (x) the amount, if any, by which the 2000 Adjusted EBT exceeds the greater of (A) 1999 Adjusted EBT and (B) 1998 Adjusted EBT times (y) 2, and (ii) if 2000 Adjusted Gross Profit is at least 35% greater of (A) 1999 Adjusted Gross Profit and (B) 1998 Adjusted Gross Profit, (x) the amount by which the 2000 Adjusted Gross Profit exceeds the greater of (A) 1999 Adjusted Gross Profit and (B) 1998 Adjusted Gross Profit times (y) 1.18.

Asset Purchase Agreement § 7.9.3.   The formula for calculating the 2001 Additional Purchase Price Payment was also similar:

[A]n amount equal to the greater of (I) the product of (x) the amount, if any, by which the 2001 Adjusted EBT exceeds the greater of (A) 2000 Adjusted EBT, (B) 1999 Adjusted EBT and (C) 1998 Adjusted EBT times (y) 1.5, and (ii) if 2001 Adjusted Gross Profit is at least 20% greater than the greater of (A) 2000 Adjusted Gross Profit, (B) 1999 Adjusted Gross Profit and (C) 1998 Adjusted Gross Profit, (x) the amount by which the 2001 Adjusted Gross Profit exceeds the greater of (A) 2000 Adjusted Gross Profit, (B) 1999 Adjusted Gross Profit and (C) 1998 Adjusted Gross Profit times (y) .87.

Asset Purchase Agreement § 7.9.4.

9

(a) Unless a payment has been made under Section 7.11.2 [Sale of the Business] or 7.11.3 [Participation in Event of IPO], as soon as practicable, . . . Buyer shall pay to the Sellers, by wire transfer of immediately available funds, an amount equal to the product of (x) (I) The Participation Multiplier . . . times 2003 EBT minus (ii) Net Debt Capital . . . times (y) 10% (the "2003 Payout").

Asset Purchase Agreement § 7.11.1(a). Section 7.11.3 entitled Messrs. Litman and Diener participation in the event of an IPO. Section 7.11.3, states, in full:

7.11.3 <u>Participating in Event of IPO</u>. If, prior to the payment of the 2004 payout by the Buyer pursuant to Section 7.11.1 or a payment in connection with the sale of the Business of the Buyer pursuant to Section 7.11.2 above, the Buyer consummates an initial public offering of shares of its common stock (an "<u>IPO</u>"), the Buyer shall issue to the Sellers a number of shares of common stock of the Buyer having an aggregate value (based on the price per share in the IPO) equal to the product of (x) (I) the total issued and outstanding shares of the Buyer immediately prior to the IPO times the IPO price minus (ii) the Net Debt Capital multiplied by (y) 10%. Sellers hereby agree to enter into "lock up" indemnity or other customary agreements reasonably requested by the underwriters in connection with an IPO.

Asset Purchase Agreement § 7.11.3.

These provisions for additional consideration flowing to Messrs. Litman and Diener were referred to generally by the parties at trial as earn-out rights. Mr. Diener related his understanding of these provisions, in plain language:

[T]he offer was . . . for $150 million in cash, and I believe $5 million of that was going to be put in escrow, and then there were contingencies in the agreement and if we met certain hurdles, then there would be additional consideration and earn-outs, as well as percentage participation if there were to be at some point an IPO.

. . . .

. . . [T]here were three years of earn-outs. . . . [I]n the first year, we had to exceed our earnings of the prior year, and to the extent we exceeded the earnings of the prior year, then we received a multiple of those incremental earnings. And then every year, it got tougher; so they really gave us tough hurdles to jump over.

10

Tr. at 319.  In addition to the contingency payments, Messrs. Litman and Diener had "a residual interest in the company[,] which was 10 percent of the company."  Id. at 774; see Asset Purchase Agreement, Section 7.11.1.  Mr. Khosrowshahi explained that

> to the extent that there was a liquidity event of the company, to the extent that the company was sold, or the company was taken public, they would receive whatever consideration that [USA Networks] . . . would receive as part of that liquidity event.

> If there was no liquidity event for some period of time, I think it was five years, there was a buy out structure so that in 2004 they would be bought out of this residual interest, based on the performance of the company at that time.

Tr. at 774-75.

Following the sale of their company, Messrs. Litman and Diener continued as employees of HRN and served on the new company's Board of Directors, although they did not control it.  Mr. Litman was CEO of HRN and Mr. Diener, President. "I really did the same tasks I did before; however, they were quite a few new tasks, . . .[F]or example, there had to be an accounting system set up. . . [T]hey had various meetings with us where we would have to go through our budgets, go through our strategic directions."  Id. at 323 (testimony of Mr. Diener).  After working as independent entrepreneurs for fifteen years, Messrs. Litman and Diener soon chafed under the parent company's control.  The men particularly were frustrated by the parent's demands on their time; the control the parent company had over HRN, including hiring; strategic decision-making; and reporting requirements.  Messrs. Litman and Diener felt stymied by the slower decisionmaking process, which required all financial and tax decisions to be reviewed by USA Networks's legal and tax departments.

The Asset Purchase Agreement further exacerbated the day-to-day tension between Messrs. Litman and Diener and the parent company USA Networks.  As Mr. Diener noted, "[USA Networks] would obviously have an incentive for us not to reach [the incremental earning goals], and we would have an incentive to reach them."  Id. at 322.  And Mr. Khosrowshahi conceded that the earn-out caused problems between the two sides:

> Because of the earn-out payments, the earn-out was paid as a multiple of EBITDA cash flow.

> So what it translated into was if [Messrs. Litman and Diener] spent

11

> . . . an extra million dollars let's say in marketing during a year, they would get paid two times, so $2 or $2.5 million less in an earn-out.

> . . . [I]f we wanted [Messrs. Litman and Diener] to do something, they'd say, well I'm going to get less in my earn-out if I invest in the company. And we were all trying to grow the company.

Id. at 784.

On November 5, 1999, the Board of Directors of HRN authorized the IPO of HRN stock. The authorization came only seven months after the sale of Hotel Reservations Network, to Messrs. Litman and Diener's chagrin. According to Mr. Khosrowshahi, the decision to go public was based, at least in part, on the fast-paced industry in which HRN was involved and how quickly the landscape of the Internet travel industry was changing.

> [A]t the time these internet companies – the other internet companies were spending millions and millions of dollars on marketing to build their brand name in order to hopefully bring business in, [Messrs. Litman and Diener] built what we call the affiliate business.

> And with the affiliate business you had other travel companies spending the millions of dollars to bring in customers, and because [Messrs. Litman and Diener] had negotiated such good deals with hotels, . . . they powered the hotels behind these other internet companies, they were able to pay commissions to these internet companies to source the traffic, and make a bunch of money on the back end as well.

> This affiliate business started getting very competitive because other people saw what HRN was doing and tried to copy it. . . .

> And we thought that a key for the company was to lock in big affiliates for a long term basis. One of the biggest, for example, was Travelocity, which is now a big competitor of ours. And the way that we were able to lock them up was to give them equity in the company, to give them options in the company.

Id. at 780-81. Mr. Khosrowshahi noted also that the availability of stock would also allow the company to use stock for acquisitions in the future, if that option ever became necessary.

As part of the IPO process, Messrs. Litman and Diener entered into discussion with USA Networks to exchange their earn-out rights from the Asset Purchase Agreement for additional shares of stock in HRN. Mr. Diener related, "We were having so many conflicts with the company that being a public company, continuing to have these conflicts was just not a good idea. . . . [I]f there was a way to align our interests where we were both going in the same direction, it would be a good thing." Id. at 325-26. Mr. Litman's reasoning was broader: "It was very difficult to take the company public when we had these earn-outs that would detract . . . cash from the company, and then we . . . had different incentives than the public shareholders." Id. at 75-76.

From USA Networks's perspective, its executives became concerned about Messrs. Litman and Diener's outstanding rights to potential earn-out payments because the underwriters of the IPO raised concerns about the "accounting consequence of these fairly large sums going out of the company . . . three or four years out." Id. at 898 (testimony of Mr. Kuhn). As a result, Mr. Kuhn explained, "[I]t was decided, in consultation with the underwriters, that a cleaner way of presenting this IPO would be to have [the earn-out rights] converted to equity, and then the public stockholders and the founders would have had essentially the same economic interest, which is to see the stock price increase as the company performed." Id. at 899.

On February 2, 2000, HRN; USA Networks; TMF Liquidating Trust; TMF; HRN Marketing; and Messrs. Litman and Diener entered into the Amended and Restated Asset Purchase Agreement (the "ARAPA"). The ARAPA converted the earn-out provisions to which Messrs. Litman and Diener had been entitled under the Asset Purchase Agreement for HRN restricted stock (the "Section 7.15 Shares"). The ARAPA also provided that, in the event that HRN "consummate[d] an initial public offering," Messrs. Litman and Diener would be entitled to an additional block of shares based on a formula that considered the number of outstanding shares and the net debt capital of HRN. ARAPA § 7.11.3 (the "Section 7.11.3 Shares"); JX 4 at 21. Section 7.11.3 of the ARAPA provides:

> 7.11.3 PARTICIPATION IN EVENT OF IPO. If, prior to the payment of the 2004 payout by the Buyer pursuant to Section 7.11.1 or a payment in connection with the sale of the Business of the Buyer pursuant to Section 7.11.2 above, the Buyer consummates an initial public offering of shares of its common stock (an "IPO"), the Buyer shall issue to the Sellers a number of shares of common stock of the Buyer having an aggregate value (based on the price per share in the IPO) equal to the product of (x) (I) the total issued and outstanding shares of the Buyer immediately prior to the IPO (which shall include the shares issued under Section 7.15 simultaneous with the IPO) times the IPO price minus (ii) the Net Debt Capital multiplied by (y) 10%. Sellers

hereby agree to enter into "lock up" indemnity or other customary agreements reasonably requested by the underwriters in connection with an IPO. Simultaneously with the issuance of the of the shares to be issued to the Sellers pursuant to this Section 7.11.3, the Sellers shall execute and deliver to the Buyer a Representations Letter (substantially in the form attached hereto as Exhibit E) with respect to such shares.

Id.; JX 4 at 21.

Section 7.15 provides, in relevant part:

7.15 2000 INITIAL PUBLIC OFFERING.  If the initial closing of the proposed initial public offering (the "2000 IPO") of the Class A Common Stock, par value $0.01 per share (the "CLASS A COMMON STOCK"), of the Buyer occurs prior to March 31, 2000, the following provisions shall apply:

7.15.1 Simultaneously with the initial closing of the 2000 IPO:

(I) In full satisfaction of its obligations under Section 7.9.3 and 7.9.4, the Buyer shall issue to the Trust the number of shares (the "SECTION 7.15 SHARES") of Class A Common Stock equal to the number that can be found by dividing (x) $81.6 million . . . by (y) the price at which each share of Class A Common Stock is initially sold to the public in the 2000 IPO (the "IPO PRICE"); PROVIDED THAT, (I) if the IPO Price is less than $11.00 per share, the price used for purposes of this clause (y) shall be $11.00 and (ii) if the IPO Price is greater than $16.25 per share, the price used for purposes of this clause (y) shall be $16.25.  The issuance of the Section 7.15 shares shall result in a share-for-share reduction in the number of Class B Common Stock, par value $0.01 per share (the "CLASS B COMMON STOCK"), of the Buyer to be issued to USA in the recapitalization of the Buyer that will occur immediately prior to the completion of the 2000 IPO;

Id. § 7.15; JX 4 at 22-23 (the "Section 7.15 Shares").

Section 7.15.2 4/ imposed the following restrictions on the sale of HRN stock:

---

4/ The ARAPA incorrectly numbers Section 7.15.2 as Section 7.5.2.

17.[1]5.2  Without the advance written consent of Buyer (to be given or withheld in its sole discretion and, approved by its board of directors), the Trust shall not directly or indirectly sell, assign, transfer, gift, exchange or otherwise dispose of, or grant a lien, encumbrance, pledge or other security interest in (each, a "TRANSFER") any of the 2000 IPO Shares until after the fourth anniversary of the initial closing of the 2000 IPO, subject to the following exceptions:

(vi) The Trust may Transfer (I) after the first anniversary of the initial closing of the 2000 IPO, all or any portion of the 2000 IPO Shares to (x) a Shareholder, an immediate family member of a Shareholder, which shall include only the spouse (except for a spouse with whom such Shareholder has entered into any divorce or separation agreement), or a child of such Shareholder (collectively, the "FAMILY"), or (y) a trust, all of the beneficial interests in which shall be held by such Shareholder or one or more members of such Shareholder's Family, and (ii) up to 5% of the number of Section 7.11.3 Shares and 5% of the number of Section 7.15 shares originally issued to the Trust to a former executive of the Sellers consistent with the terms of a letter agreement dated May 7, 1999, from TMF, Inc. to that former executive (a copy of which the Trust has delivered to the Buyer) in each case provided that such transferee delivers a written instrument, reasonably acceptable to the Buyer, agreeing to be bound by the terms of this Agreement to the same extent as the transferor.  All persons and entities to whom the Trust may Transfer Class A Stock under this Section 7.15.2(a) are hereinafter referred to as "PERMITTED TRANSFEREES."

(vii) The Trust (and its Permitted Transferees) may Transfer in the aggregate a number of Section 7.11.3 Shares not to exceed the following percentages of the number of Section 7.11.3 Shares originally issued to the Trust (adjusted for any stock splits, stock dividends, or similar recapitalization), after the dates indicated:

| | |
|---|---|
| After first anniversary of the 2000 IPO | 40% |
| After second anniversary of the 2000 IPO | An additional 10% |
| After third anniversary of the 2000 IPO | An additional 10% |
| After fourth anniversary of the 2000 IPO | All remaining |

Id. § 7.15.2; JX 4 at 23-24.

Insofar as the parties agreed on the tax consequences of the ARAPA, Section 3.4(ii) carried forward the agreement to agree from the Asset Purchase Agreement:

> (ii) For all Tax purposes, the Buyer and the Sellers agree (A) to report the transactions contemplated by the Agreement in a manner consistent with the terms of this Agreement, and (B) that none of them will take any position inconsistent therewith in any Tax Return.

Id. § 3.4(ii); JX 4 at 5.

The concept of using a formula to determine the number of shares that Messrs. Litman and Diener would receive in the exchange originated with USA Networks. Although they requested a fixed number of shares, Messrs. Litman and Diener ultimately agreed to the formula. According to Mr. Litman, who recounted the terms of the arrangement, Mr. Khosrowshahi proposed the formula with $81.6 million as the numerator. By e-mail dated January 23, 2000, from Mr. Khosrowshahi to Messrs. Litman and Diener, USA Networks proposed a formula with $81.6 million as the numerator and the following justification:

> Following, please find my calcs based on the high projections, the low projections, and an average of the two. The spread is not insurmountable and the result will be somewhat self-correcting: if you exceed the projections by a wide margin, then the equity will be worth much more, so the amount that you lose in the earnout will be exceeded by the earnout you gain in equity, etc. Same goes if you miss projections – the stock will get killed.

JX 3 at 1. Mr. Khosrowshahi explained that the proposal was based on two sets of projections:

> There was a high and a low set of projections, which would result in various earn-out payments. And what I was proposing here was that I would go to [Victor Kaufman and the other executives at USA Networks] . . . with an average number, something in between the high and the low.

> And the average will refer to again taking the value of how much the earn-out payments would be and taking that value and using that as a basis for the value of the equity that [Messrs. Litman and Diener] would get in the IPO. So you would take the cash that they would earn, and you would say, well, we'll give you this much stock.

Tr. at 783.

16

On May 10, 1999, before the ARAPA was executed or HRN became a public company, Messrs. Litman and Diener assigned their rights under the Asset Purchase Agreement to an entity called TMF Liquidating Trust for the purpose of estate planning and dissolution of TMF. After Messrs. Litman and Diener entered into the ARAPA, on February 21, 2000, the TMF Liquidating Trust Agreement was amended, which allowed Messrs. Litman and Diener the ability to assign a portion of their beneficial interests in TMF Liquidating Trust to immediate family members. TMF Liquidating Trust, with Messrs. Litman and Diener as trustees, held the rights to acquire "a large number of shares of Class A common stock of HRN." HX 114A at 1.

On February 22, 2000, Messrs. Litman and Diener entered into contracts entitled Agreement for Sale of "Special Tracking Interest" with each of their respective families. The contracts sold HRN Tracking Interests – beneficial interests in TMF Liquidating Trust with respect to the restricted HRN stock – to their respective family members. The Agreement for Sale of "Special Tracking Interest" provides: "[The] shares of Class A common stock of HRN which are subject to certain 4-year contractual transfer restrictions . . . have a total fair market value under the Appraisal [provided by Business Valuation Services] of $3,000,000." Id., art. 1.1; HX 114B, art. 1.1 (same). Consequently, the purchase price for the HRN Tracking Interest, which was sold to the Diener Family GS-Trust, was set at $3 million. HX 114A, art. 1.2. The HRN Tracking Interests were sold to the trusts of Mr. Litman's three children for a combined price of $3 million. Mr. Diener testified that the beneficial interests in TMF Liquidating Trust were sold at a fixed-dollar amount, signifying that TMF Liquidating Trust sold shares worth a specific dollar amount. If the value of the shares held by TMF Liquidating Trust changed "the percentage of the beneficial interest that would be transferred [would change], but the fixed dollar amount would not change." Tr. at 348.

For the purpose of the preliminary prospectus documents and what is known in the industry as a "road show," the stock price of HRN was set between $11.00 and $13.00 per share. John R. Bozalis, Jr., a cautious, conservative witness, who served as a Vice President for DLJ from 1997 through 2000 and was involved in HRN's IPO. After setting the preliminary price of the stock, the lead underwriter and seller's agent, DLJ, and the management team from HRN, including Messrs. Litman and Diener, launched the "road show." Id. at 611 (testimony of Mr. Bozalis). During the road show, which lasted from February 7, 2000, through February 24, 2000, the lead underwriter and management team from HRN attended meetings with investors, mostly institutional investors, throughout the United States. At the meetings the investors were presented the "story" of HRN and the IPO. Id. Both before and after the road show, institutional salesmen followed up with the investors in order to gauge their reaction to the IPO and encouraged investors to place an order for HRN stock.

At the time of HRN's public offering, IPOs were priced with the intent that there will be a big "pop" on the first day of trading. Id. at 794 (testimony of Mr. Khosrowshahi). HRN was no exception. As explained by Mr. Kuhn, when DLJ presented the plan on how an offering such as HRN should be brought to the public, one of the strategies of the IPO was to "step up over time . . . the value attributed to the business as you go through the offering process." Id. at 901. The suggestion, according to Mr. Kuhn, was that the first set of filings with the Securities Exchange Commission (the "SEC") include a range for the IPO price. "The idea would be then in the second filing, when you file your amended registration statement, to step that [price] up a little bit . . . to build some good buzz in the market." Id. at 901-02. Mr. Kuhn testified that from the outset the plan, as contemplated by DLJ, was gradually to increase the IPO price. After the road show, when the full book of orders was in place, and the company is pricing the IPO, "assuming it's successful and over subscribed, you again try to step it up a little bit more . . . so the process of going through the SEC, because that's a public fact, required some communication with the market about value expectation." Id. at 902.

According to Mr. Bozalis, the underwriters would perform various analyses to establish the initial IPO price, including: (1) looking at comparable companies that were publicly traded, both in terms of "how those shares were valued based on their current trading price," Id. at 608, and how the growth rates of the companies compared; and (2) "performing discount cash flow analysis on the . . . contemplated . . . future earning stream and discounting that back to present day at an agreed-upon discount rate." Id. at 608-09.

During the second week of the road show and especially during the last two business days before the final pricing of an IPO is when "the vast majority of the orders actually come in and become final." Id. at 612 (testimony of Mr. Bozalis). In Mr. Bozalis's view, the HRN IPO was "nicely oversubscribed, but not wildly oversubscribed as some other dot-com companies experienced at the time." Id. at 613.

On February 24, 2000, the final IPO price was set at $16.00 per share. The Pricing Committee, composed of Mr. Kaufman and Mr. Khosrowshahi, set the price for the 5,400,000 shares of Class A Common Stock that were offered to the public and an additional 810,000 shares of Class A Common Stock that were issued to cover an over-allotment that was granted to the underwriters of the public offering. The public offering price was set at $16.00 per share, with $1.12 per share going to underwriting fees and $14.88 per share in proceeds to HRN, yielding total proceeds of $80,352,000 for the new company. See Prospectus for the 5,400,000 Shares of Class A Common Stock of HRN, dated Feb. 25, 2000, at cover; JX 7 at 1.

Ultimately, it was the Equity Capital Markets Group within DLJ that was responsible for setting the $16.00 price per share.  Mr. Bozalis testified that USA Networks would not have a significant role in the pricing of the stock: "[T]hey would either have accepted it or not. . . . Or they might have postured and negotiated . . . . And then we would have had to make a determination of whether or not we were willing to go [up]." Tr. at 616.  The price was derived by a process which Mr. Bozalis compared to an "art," rather than a "science." Id. at 615.  The Capital Markets Group within DLJ would look at its list of orders, or the book of orders, and "make [an] assessment over the hundreds of names on your list that [DLJ has] collected." Id.  For example, "Entity X over here, if they've normally put [in] an order for 100,000 shares, does that mean that they really want to own 100,000.  Or do they want to [own] 50- or 25-." Id.  The offering price distilled to a judgment call made by DLJ.  Given the mechanics of this process, the court does not credit Messrs. Litman's and Diener's assumptions that USA Networks had given assurances or otherwise had committed to a lower price.  Their distress at the $16.00 per share IPO price was genuine and reported by other witnesses, but it was misplaced.

On March 1, 2000, the IPO of the 6,210,000 shares of Class A Common Stock of HRN closed.  This public offering did not include the 5,100,00 shares of HRN Class A Common Stock, which was issued to TMF Liquidating Trust in exchange for extinguishing HRN's obligation to make contingent cash payments for the twelve-month periods ending March 31, 2001 and 2002.  Nor did the IPO include the 4,899,900 shares of Class A Common Stock "equal to 10% of [HRN's] outstanding common stock immediately prior to the completion [of HRN's] offering." JX 7 at 54.  As a result of the ARAPA, the Litmans and the Dieners through TMF Liquidating Trust received 9,999,900 shares of HRN Class A Common Stock subject to contractual restrictions.

Mr. Khosrowshahi testified that the "IPO was very successful, and as we went on the road show, there was a lot of investor interest in the company.  And, frankly, at the beginning we weren't sure if there would be because this was a very unusual company, it was highly profitable, but it was also termed an internet company by some." Tr. at 793-74.  The stock ended up "popping" once the company went public on February 25, 2000.  Id. at 795 (testimony of Mr. Khosrowshahi).

On February 24, 2000, Mr. Litman wrote to Chase  Mellon Shareholder Services, the transfer agent handling his issuance of the Class A Common Stock of HRN, directing the transfer agent to deliver the two certificates for TMF Liquidating Trust to Salomon Smith Barney, Inc.  On March 14, 2000, Chase Mellon Shareholder Services confirmed the receipt of stock certificate number HRN 0006 for 4,654,905 shares of HRN Class A Common Stock dated February 24, 2000; stock certificate number HRN 0007 for 5,100,000 shares of HRN

Class A Common Stock dated February 24, 2000; and stock certificate number HRN 0008 for 244,995 shares of HRN Class A Common Stock dated February 24, 2000.

Messrs. Litman and Diener knew that they were required to pay federal income taxes on the shares of HRN stock that they were receiving pursuant to the ARAPA. "[W]e were in a situation where we would be receiving restricted shares and no cash, but we'd have to pay tax on it." Id. at 98 (testimony of Mr. Litman). Retained by Messrs. Litman and Diener, on February 24, 2000, Mark L. Mitchell, CFA, ASA, a principal with Business Valuation Services, Inc. ("BVS"), determined the "appropriate marketability discount applicable to the common stock of [HRN,] as of February 24, 2000, giving consideration to relevant resale restrictions," (the "BVS Valuation"). L/DX 58 at 2. The BVS Valuation opined that

> the marketability discount to be applied to the market price of the [HRN] stock to reflect the fair market value of the stock giving consideration to relevant resale restrictions, as of February 24, 2000, is reasonably stated as:

| Restriction Period | Discount |
| --- | --- |
| One year | 49.5% |
| Two years | 61.5% |
| Three years | 63.5% |
| Four years | 79.0% |

Id. at 4.

Mr. Mitchell and BVS had been recommended to the Litmans and the Dieners by their attorney in Dallas, Jim Mincey. According to Mr. Diener, "[BVS] had a great reputation. [Mr. Mincey] told us that they do a lot of work for the [IRS]. . . . We used [BVS] for a previous valuation, so we had some experience with them. They were somewhat familiar with the company, and we were very comfortable [with them.]" Tr. at 346-47. Messrs. Litman and Diener used the BVS Valuation in reporting the value of their shares for income tax purposes and estate-planning purposes.

KPMG, LLP ("KPMG"), prepared TMF Liquidating Trust's 2000 tax return, which listed a long-term gain of $45,437,822 for the sale of TMF stock. The IRS received the tax return on May 27, 2001. Mr. Diener testified that the gross sales price and the long-term gain for the sale of TMF and HRN Marketing were calculated using Mr. Mitchell's appraisal:

> We took the $16 IPO price and we looked at each tranche, because every tranche had a different discount, so we took the BVS appraisal and we took the amount of shares that were given to us that had a one-year restriction and we

applied the discount for the one-year restriction . . . . We did the same for the two-year, the three-year, [and] the four year.

Id. at 350-51.

KPMG was selected to prepare TMF Liquidating Trust's 2000 tax return during the period when Messrs. Litman and Diener were in the process of selling Hotel Reservations Network. James Lucien Horan, CPA, managing partner for the South Florida Business Unit and the partner in charge of tax for the South Florida Business Unit at KPMG, was the Dieners' primary contact at KPMG. After consulting with Mrs. Diener, an accountant with a masters in tax and former accountant at KPMG, Mr. Horan was selected to handle TMF Liquidating Trust's 2000 federal tax return. Mr. Diener viewed Mr. Horan as "the reputed expert in corporate[] . . . mergers and complex corporate transactions." Id. at 352.

In preparation for the filing of TMF Liquidating Trust's 2000 tax return, KPMG reviewed the BVS Valuation. On April 3, 2001, Madeline Fernandez of KPMG wrote a memorandum to the TMF Liquidating Trust file entitled "Various Tax Discussions Relating to TMF Liquidating Trust." The memorandum noted the following about KPMG's review of the BVS Valuation:

> 100% of the stock received by the sellers (both the 10% pre IPO Stock and the Earn out Exchange Shares) was valued by an independent third party. The valuation was reviewed by the KPMG Valuation group in Atlanta purely for reasonableness and concurred that proper valuation methods were used. while KPMG concurred as to the methods used and reasonability of discounts, it did not perform the valuation and this should not be construed that the valuation is KPMG's.

L/DX 89 at 4.

Mr. Horan testified by deposition on July 24, 2006, that the review of the BVS Valuation was conducted by Ray Nicholson of KPMG Valuation Services:

> I am not a valuation expert, I sent [the BVS Valuation] to [Mr. Nicholson] just to validate whether or not this was prepared in a reasonable way, that the methodologies used were accurate, that it met the standards of the industry. And he concurred that it did.
>
> . . . .

21

> . . . [T]his was standard procedure[].  I don't know how long he's been
> in [the Valuation group], but anything that's done that requires an expertise has
> to be reviewed by someone who has that expertise before it can be relied upon,
> if it's prepared outside of the firm.

Horan Dep. at 16.  Mr. Horan related that Mr. Nicholson telephoned him and informed him
orally that the BVS Valuation was appropriate and that Mr. Horan could rely on it.  Before
signing and filing TMF Liquidating Trust's 2000 tax return on May 22, 2001, Mr. Diener
reviewed it.  On May 27, 2001, the IRS received TMF Liquidating Trust's tax return.  Under
the terms of the trust instrument, all income is taxable to the grantor as set forth under 26
U.S.C. §§ 671-678 (2000).

The IRS received the Litmans' individual tax return on October 18, 2001.  The
Litmans' individual tax return was prepared by Lisa Florentino of Vink, Pier & Teague, PC.
The Litmans reported a capital gain in the amount $49,810,323.  The Litmans arrived at this
value by applying the BVS Valuation discounts for each restriction period to the $16.00 IPO
price.  On January 6, 2005, the IRS sent, via certified mail, a Notice of Deficiency addressed
to the Litmans at 10710 Strain Lane, Dallas, TX 75229-5427.  The Notice of Deficiency
asserted that the Litmans underpaid their taxes by $12,584,993 and owed $2,516,998.60 in
penalties pursuant to I.R.C. § 6662(a).  The IRS attributed the tax adjustment to the Litmans'
failure to "correctly report the fair market value of the HRN stocks received upon the sale
of the assets and liabilities of TMF Incorporation and HRN Marketing Corporation.
Accordingly, we have adjusted the net gain reported from the receipt of the stocks . . . ."  JX
26 at 10.

Similarly, the IRS received the Dieners' self-prepared individual income tax return
for 2000 on October 18, 2001.  They reported a capital gain of $50,504,297.  The Dieners
arrived at this value by applying the BVS Valuation discounts for each restriction period to
the $16.00 IPO price.  On October 8, 2004, the IRS mailed the Dieners a Notice of
Deficiency to their home address at Champlain Towers North, 8877 Collins Avenue, PH A,
Surfside, FL 33154-3524.  The IRS attributed the tax adjustment to the Dieners' failure to
"correctly report the fair market value of the HRN stocks received upon the sale of the assets
and liabilities of TMF Incorporation and HRN Marketing Corporation.  Accordingly, we
have adjusted the net gain reported from the receipt of the stocks . . . ."  JX 27 at 10.

On October 1, 2001, the IRS received HRN's 2000 corporate income tax return.  The
tax return was signed by Viren B. Ghandi, Senior Director of Finance at HRN, and  prepared
by Ernst & Young, LLP ("Ernst & Young").  HRN's 2000 tax return reported $159,998,400
in goodwill associated with the 9,999,900 shares of HRN stock transferred to TMF
Liquidating Trust.  HRN amortized the goodwill for the 2000 tax year at a value $9,543,434.

In connection with its preparation of HRN's 2000 tax return, Ernst & Young prepared a Form 8594, Asset Acquisition Statement, for the 9,999,900 shares of HRN stock. The Form 8594 reported an increase in goodwill in the amount of $205,982,713. The reason provided for the increase in goodwill, as drafted by Ernst & Young, was as follows:

> 1. $78,398,400 in additional common stock issued to original sellers when HRN, Inc. entered into an IPO at the end of February 2000.
> 2. $81,600,000 in additional common stock issued to predecessor business for release of contingent payment obligations based on performance at the end of February 2000.
> 3. Payment of $45,984,313 to original sellers based on operating performance for 12 months ended 3/2000.

JX 23 at 5. Ernst & Young calculated the value of the goodwill of the additional common stock issued to the original sellers – Messrs. Litman and Diener through TMF Liquidating Trust – as $159,998,400 ($78,398,400 + $81,600,000) for the 9,999,900 shares, or $16.00 per share. The reasons for the increase in goodwill as stated by Ernst & Young on Form 8594 were never submitted to the IRS. Part III of Form 8594 was erased using white-out. In place of the information supplied by Ernst & Young, Mr. Ghandi wrote: "Information is being gathered. Will be supplied at a later date." JX 16 at 27; see Tr. at 783 (testimony of Mr. Ghandi). Despite these changes to the tax return before filing, the $159,998,400 value for goodwill purposes was reported elsewhere in the tax return.

Mr. Ghandi testified plausibly that he wrote the notation on Form 8594 at the instruction of someone at Ernst & Young or HRN:

> Q How did it come to pass that you provided this information on that page of the form?
> A Whatever I've written down must have been based upon instructions either from E&Y or somebody else at HRN. Certainly I'm not a tax expert. So I didn't even know what to write or whether there should be something written there. I'd say it was based upon instructions from somebody
> Q Do you recall specifically who those instructions came from?
> A I don't recall who exactly it came from[.]

Tr. at 738.

On September 19, 2001, Ernst & Young had forwarded to Mr. Ghandi's attention the federal income tax return for HRN for the short year which ended on December 31, 2000. The cover letter accompanying the tax return stated, in pertinent part:

> In accordance with our discussion, Form 8594, Asset Acquisition Statement, as attached to Form 1120, was prepared on the assumption that the seller, HRN Marketing Corporation, agrees to the allocation as reflected on the form. Please let us know immediately if the seller expectation is contrary to ours.

L/DX 37.

Melville W. Robinson III, Chief Financial Officer and Strategic Officer of HRN, was carbon-copied on the letter.  Mr. Robinson, a well-spoken executive who obviously was fond of Messrs. Litman and Diener, testified that normal procedure was for either Mr. Ghandi or Mr. Robinson to provide Mr. Diener with a copy of the draft tax return.  "[A]lmost immediately" upon sending the draft return to Mr. Diener, Mr. Robinson became aware that Messrs. Litman and Diener disagreed with the valuation.  Tr. at 496 (testimony of Mr. Robinson).

On Monday, September 24, 2001, Mr. Diener e-mailed Mr. Ghandi, carbon-copying Messrs. Litman and Robinson.  The e-mail stated, as follows:

> This is to confirm that TMF [i]s not in agreement with the amounts on the 8594 of the HRN tax return for 2000.  TMF has received a valuation and has filed a return that has a significant valuation discount on stock issued to TMF based on significant restrictions and limitations contractually and otherwise on the stock.  We are therefore filing the HRN return since it must be filed today with "To be determined" on the Form 8594 per the advise of KPMG.

JX 22.  Mr. Diener testified that he did not direct Mr. Ghandi to white-out any portion of the Form 8594.  Instead, Mr. Diener maintained, and the court deemed him credible on point, that he discussed the issue of the inconsistent valuations of the HRN stock with Mr. Robinson soon after the problem was brought to his attention and provided USA Networks and financial advisors at HRN a copy of the BVS Valuation.

After learning of the inconsistent values, Mr. Robinson testified that he met with the audit committee of HRN's Board of Directors, comprised of the outside directors of the board. Mr. Robinson also met with Mr. DeGraw, Tax Director for IAC (formerly USA Networks), and William Severance, Comptroller of USA Networks.  The result of these discussions, as related by Mr. Robinson, was that "the company needed to have an appraisal of the stock done . . . to establish our own position for tax purposes.  I ended up taking the recommendation of Eric DeGraw that Deloitte and Touche be used for that, since there was

24

an issue about whether E&Y's advice was proper." Tr. at 498. 5/  Although not detrimental to explicating this episode in the chronology, Mr. DeGraw's deposition testimony overall did not serve Hotels.com's interests in this litigation.  Untainted by prior document review, he left the opaque tracks of the customary uninformed discovery deponent, but he was equally ineffective for Hotels.com when the deposition was entered as his testimony at trial.

On October 18, 2001, Deloitte & Touche forwarded Mr. DeGraw the Deloitte & Touche Valuation Report: Discount Study – Consideration Shares in Hotel Reservations Network, Inc. (the "Deloitte & Touche Valuation Report"), which valued the 9,999,900 shares of HRN stock as of February 25, 2000.  It calculated the following discounts:

| Date of Exercise | Percent of shares | Applicable Discount |
|---|---|---|
| After first anniversary of IPO | 40% | 25% |
| After second anniversary of IPO | 10% | 30% |
| After third anniversary of IPO | 10% | 35% |
| After fourth anniversary of IPO | 40% | 40% |
|  |  |  |
| *Weighted average discount* |  | 33% |

L/DX 51 at 25.  The 2000 tax return was never amended to reflect a lower value based on the Deloitte & Touche Valuation Report.  Each of the 2001, 2002, and 2003 tax returns, however, took positions with regard to the 9,999,900 shares of stock based on the Deloitte & Touche Valuation Report.

On February 10, 2006, the IRS sent, by certified mail, to Hotels.com a Notice of Deficiency for the tax year ending on December 31, 2000.  The IRS determined that Hotels.com owed an additional $2,776,456 in increased tax and assessed an additional $491,338 in penalties.  In its Explanation of Adjustments, the IRS provided the following rationale for the increase in taxes owed for the 2000 tax year:

---

5/ Mr. Robinson noted that Messrs. Litman and Diener were not involved in the process of obtaining the Deloitte & Touche appraisal.  "I certainly told them that the process – that the valuation process was commencing, but that was the extent of their involvement." Tr. at 501.

The value of goodwill attributable to the issuance of restricted stock has been decreased to reflect the value of the restricted stock issued for the purchase of TMF, Inc. and HRN Marketing Corporation, and amortization for the goodwill has been reduced accordingly.

In addition to the above goodwill, the amortization of goodwill for an asset that was incorrectly computed due to an error of placed-in-service date, and the amortization of goodwill for an asset omitted from the return have been allowed.

JX 28 at 8.  Hotels.com has also filed a Protective Refund Claim for the tax years ending December 31, 2001, and December 31, 2002, in order "to protect Hotels.com's right to a refund pending the final outcome of Hotels.com, Inc. and Subsidiaries[(f/k/a Hotel Reservations Network, Inc. v. United States, U.S. Court of Federal Claims Docket No. 06-285T] as to the proper amount of amortization deductions to which Hotels.com is entitled." JX 30 at 1; JX 29 at 1 (similar).

## PROCEDURAL HISTORY

The Litmans filed their complaint in the United States Court of Federal Claims on August 30, 2005, alleging that they are entitled to a refund of the $12,584, 993.00 in income tax and the $2,516,998.60 in penalties assessed and paid, plus any allowable interest.  See Compl. at 23, David S. and Malia S. Litman v. United States, No. 05-956T (Fed. Cl. Aug. 30, 2005), assigned to Judge Mary Ellen Coster Williams.  Defendant filed its answer on November 1, 2005, which included a counterclaim against the Litmans seeking interest on penalties in the amount of $2,877,415.86 plus costs.

On September 7, 2005, the Dieners filed their complaint in the Court of Federal Claims, alleging that they are entitled to a refund of the $12,664,612 in income tax and the $2,532,922 in penalties assessed and paid, plus allowable interest.  See Compl. at 23, Robert B. and Michelle S. Diener v. United States, No. 05-971T (Fed. Cl. Sept. 7, 2005), assigned to the undersigned.  Defendant filed its answer on November 7, 2005, which included a counterclaim in the amount of $2,895,619.82, plus costs.  On November 10, 2005, defendant filed an unopposed Notice of Directly Related Case in both Nos. 05-956T & 05-971T.  On November 17, 2005, with the consent of the undersigned, Judge Williams entered an order granting defendant's motion in Litman, No 05-956T.  Although RCFC 40.1(b) and RCFC 40.2(a)(2) provide that the later-filed case be handled with its predecessor, Litman No. 05-956T, was transferred to the undersigned and consolidated with Diener, No. 05-971T, by order entered on November 22, 2005.

Before the cases were consolidated, on November 14, 2005, the Litmans had moved for summary judgment.  The Dieners also moved for summary judgment on November 21, 2005.  Defendant on November 29, 2005, filed a motion to strike plaintiffs' motions for summary judgment in both cases.  After the cases were consolidated, in response to the court's order entered November 22, 2005, the Dieners gave notice to the court "that they have no objection to the [summary judgment] motions being heard together or, alternatively, that the Motion for Summary Judgment submitted by the Litmans on November 14, 2005 shall control on all common issues of fact and law addressed by that Motion with regard to the Dieners' case."  Notice filed Dec. 2, 2005, ¶ 6.  On December 13, 2005, the Litmans and the Dieners filed Plaintiffs' Response to the United States' Motion to Strike Plaintiffs' Motion for Summary Judgment.  On December 27, 2005, defendant filed The United States' Reply Brief in Support of its Motion To Strike or Continue Plaintiffs' Motion for Summary Judgment.  On January 17, 2006, the court entered an order deferring any ruling on the Litmans' and Dieners' motion for summary judgment until discovery was completed.

On April 10, 2006, Hotels.com (f/k/a Hotel Reservations Network, Inc.) filed their complaint in the Court of Federal Claims.  See Compl., Hotels.com, Inc. and Subsidiaries (f/k/a Hotel Reservations Network, Inc.) v. United States, No. 06-285T (Fed. Cl. Apr. 10, 2006).  The complaint alleged that Hotels.com was entitled to "the recovery of income taxes, penalties and interest paid, together with interest provided by law, for the taxable period beginning March 1, 2000 through December 31, 2000," in the amount of $2,776,456.00 in taxes, $491,338.00 in penalties, and $1,054,991.00 in interest or "such other amount as may be legally refundable, plus interest as provided by law."  Id. at 1, 6.  Defendant filed its answer on April 26, 2006, asking the court to dismiss Hotels.com's complaint with prejudice.

Concurrently with the filing of its complaint, Hotels.com filed Plaintiffs' Motion for Consolidation and Notice of Directly Related Case on April 10, 2006. Responses to Hotels.com's Motion for Consolidation were filed by all parties on April 12, 2006.  On April 18, 2006, Hotels.com's Reply to the Litmans' and Dieners' Objections to Hotels.com's Motion for Consolidation and Request for Oral Argument was filed.  By order entered on April 19, 2006, argument was scheduled for April 27, 2006.  After argument the court entered an order granting the United States' Motion for Leave To File a Reply Brief in Support of Consolidation, which had been filed on April 19, 2006, and entered a separate order granting plaintiffs' motion for consolidation of No. 06-285T with Nos. 05-956T and 05-971T pursuant to RCFC 40.2(a) because the most recent case  "[involves] a common equation of law and fact. . . ."  Order at ¶ 1, Hotels.com, No. 06-285T (Fed. Cl. Apr. 27, 2006).

Before Hotels.com's case was consolidated with those of the Litmans and the Dieners, on March 7, 2006, the Litmans and the Dieners moved pursuant to RCFC 40 for an order

setting their case for trial "as soon as reasonably practical after the close of discovery." Litmans/Dieners' Br. filed Mar. 7, 2006, at 1.  On March 20, 2007, the court denied the Litmans and Dieners' motion for an order setting trial and granted The United States' Motion To Extend the Discovery Schedule, filed on March 15, 2006.  Order entered Mar. 20, 2006, ¶¶ 1-2.  On November 16, 2006, the court set trial to commence on April 30, 2007.  On January 3, 2007, the court ordered the summary judgment motions filed by the Litmans and the Dieners withdrawn *nunc pro tunc* to November 16, 2006, rendering defendant's motion to strike moot.  Order entered Jan. 3, 2007, ¶¶ 1-2.  Trial was held in Dallas, TX, from April 30, 2007, through May 9, 2007.  The parties submitted post-trial briefs on the "applicability of the variance doctrine to . . . Hotels.com's claims and the applicability of the doctrine of judicial admission to Hotels.com's allegations and discovery responses concerning the date of issuance of the restricted stock and the valuation thereof as of that date."  Order entered May 16, 2007, ¶ 3; see Def.'s Br. filed May 31, 2007; Litmans' Br. filed June 11, 2007; Hotels.com's Br. filed  June 11, 2007; Def.'s Br. filed June 22, 2007.

## DISCUSSION

I.  Standard of review

   1.  Standard of review for a tax refund suit

   The Litmans, the Dieners, and Hotels.com are seeking a refund of taxes assessed and paid for the tax year ending on December 31, 2000.   "In a refund suit the question of overpayment involves two elements: (1) has there been an overpayment and (2) if so, how much."  Fisher v. United States, 80 F.3d 1576, 1580 (Fed. Cir. 1996).  The court tries factual issues *de novo* in tax refund suits, no weight is given to the factual findings made by the IRS during its administrative proceedings.  George E. Warren Corp. v. United States, 135 Ct. Cl. 305, 314 (1956) ("The tax laws contemplate a trial de novo . . . ."); see also Sara Lee Corp. v. United States 29 Fed. Cl. 330, 334 (1993).  "[T]he burden is upon the taxpayer to establish the amount of a deduction claimed."  United States v. General Dynamics Corp., 481 U.S. 239, 245 (1987); see also Helvering v. Taylor, 293 U.S. 507, 514 (1935); Lewis v. Reynolds, 284 U.S. 281, 283, modified by 284 U.S. 599 (1932) ("The action to recover on a claim for refund is in the nature of an action for money had and received and it is incumbent upon the claimant to show that the United States has money which belongs to him.").  "[I]n a refund suit the assessment made by the Service is presumed to be correct and this places an obligation on the taxpayer to come forward with evidence to rebut the presumption."  Cook v. United States, 46 Fed. Cl. 110, 113-14 (2000) (citing United States v. Janis, 428 U.S. 433, 440-41 (1975) and Helvering, 293 U.S. at 291.).  Therefore, the taxpayer bears the burden in tax refund suit, "of proving both the excessiveness of the assessment and the correct amount

of any refund to which he is entitled." Carson v. United States, 560 F.2d 693, 696 (5th Cir. 1977).

II.  The value of the HRN restricted stock

       1.  The Litmans and the Dieners

              1) Valuation date

       The Litmans and the Dieners maintain that the 9,999,900 shares of restricted HRN stock should be valued for tax purposes as of the issuance date, February 24, 2000, the date that appears on the stock certificates.  The Litmans and the Dieners, as well as defendant, argue that this date, the date of issuance, should control for valuation purposes.  The individual taxpayers and defendant disagree with Hotels.com's alternative litigation positions that the stock should be valued as of March 1, 2000, or alternatively, February 25, 2000.

       The Litmans and the Dieners invoke judicial estoppel to bar Hotels.com from asserting a date other than February 24, 2000, as the date of issuance.  The Litmans and the Dieners point to Hotels.com's 2000 claim for refund, which was attached to its complaint and incorporated by reference, as an admission by Hotels.com that the date of issuance was February 24, 2000.  In post-trial briefing, the Litmans and the Dieners cited Hotels.com's protective claim for refund filed with the IRS on May 12, 2006, as another assertion by Hotels.com that the restricted shares of HRN stock were issued on February 24, 2000.  The Litmans and the Dieners also argue that the variance doctrine prevents Hotels.com from asserting a stock issuance date other than February 24, 2000.  Litmans/Dieners' Br. filed June 11, 2007, at 5. 6/

_____

       6/  The variance doctrine prohibits a taxpayer from presenting claims in a tax-refund suit that "substantially vary" from the claims submitted to the IRS.  Lockheed Martin Corp. v. United States, 210 F.3d 1366, 1371 (Fed. Cir. 2000); see also Western Co. v. United States, 323 F.3d 1024, 1034 (Fed. Cir. 2003).  An order entered on June 11, 2007, after conclusion of trial, directed the parties to "address[] the applicability of the variance doctrine to plaintiffs[] Hotels.com's claims and the applicability of the doctrine of judicial admission to Hotels.com's allegations and discovery responses concerning the date of issuance of the restricted stock and the valuation thereof as of that date." Order entered May 16, 2007, ¶¶ 3-5.  Defendant has confirmed that the Government does not raise the variance doctrine as a bar to Hotels.com's alternative valuation dates and valuations.

2) <u>Valuation of HRN restricted shares</u>

The Litmans and the Dieners ask the court to value each of the four "tranches" of HRN stock at discounts ranging from 49.5% to 79.5% based on the severity and length of the restrictions imposed on each tranche of HRN stock.  They ascribe the following values to each:

| Block | Shares | Restriction Period | Discount | Discounted Value Per Share |
|-------|--------|--------------------|----------|-----------------------------|
| One | 1,959,960 | One year | 49.5% | $8.08 |
| Two | 489,990 | Two years | 61.5% | $6.16 |
| Three | 489,990 | Three years | 63.5% | $5.84 |
| Four | 7,059,960 | Four years | 79.0% | $3.36 |

L/DX 60 at 2 (cover letter).

Mr. Mitchell, who prepared the BVS Valuation Report used by the Litmans and the Dieners for tax purposes in 2001 and served as their expert at trial, considered ten factors in developing these marketability discounts:

_____

<u>6</u>/  Cont'd from page 29.)

Instead, defendant takes the position that Hotels.com should be judicially estopped to argue for a valuation date other than February 24, 2000.  Defendant sees "no need" to resolve the application of the variance doctrine as a legal matter, <u>see</u> Def.'s Br. filed May 31, 2007 at 7, because evidence of "new or different facts or viable theories" was not offered.  <u>Id.</u> Defendant is correct.

Exasperated, plaintiffs chide Hotels.com for taking inconsistent positions as to the correct date of valuation and value of the restricted shares that "are completely at odds with the positions taken by Hotels.com during the six years before this litigation was filed" in its tax returns, claims for refunds, pleadings, and other evidentiary admissions. Litmans/Dieners' Br. filed June 11, 2007, at 3.  The Litmans and the Dieners, too, are correct. Although the individual taxpayers continue to assert the variance doctrine as an alternative position, the court will not apply this jurisdictional defense when the Government argues that the facts and law do not warrant it.  The court therefore does not rule on the variance doctrine.

30

1) The nature of the business and its history from inception;

2) The economic outlook in general and the condition and outlook of the specific industry;

3) The book value of the stock and financial condition of the business;

4) The earning capacity of the company;

5) The dividend paying capacity of the company;

6) Whether or not the enterprise has goodwill or other intangible value;

7) Prior sales of the stock and the size of the block to be valued;

8) The market price of the stock of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over-the-counter;

9) Resale provisions pursuant to the terms found in any restriction agreements associated with the securities; and

10) The market experience of freely tradable securities of the same class as the restricted securities.

Id. at 1-2 (cover letter).

        While urging the court to adopt Mr. Mitchell's marketability discounts, the Litmans and the Dieners emphasize that the ARAPA, which imposed the contractual restrictions on these shares of stock, does not take into consideration the non-contractual restrictions that are inherent characteristics of the transaction.  They cite SEC Rule 144 volume trading restrictions; the large number of shares that the Litmans and the Dieners owned, which amounted to almost twice the public float; and the practical restriction Messrs. Litman and Diener, as CEO and President, respectively, faced in selling their shares of HRN stock as restrictions that would have a significant impact on the value of their stock.  The Litmans and the Dieners also consider future variables that were unknown on February 24, 2000, which could have de-valued the restricted shares of HRN stock further and thereby heightened the risk of the one-to-four year restrictions.  For example, the Litmans and the Dieners stressed the "spurious volatility" of Internet stocks at the time.  Tr. at 15 (opening statement of counsel for the Litmans and Dieners).  "[T]he NASDAQ stock market where these shares were going to be traded . . . . was at an all time high," counsel for the Litmans and the Dieners noted in his opening statement.  "The internet use . . . that was where [HRN's] business was heading, . . . while gaining steam, was nowhere near what it is today.  We had a lot of dial-up modems at the time, . . ."  Id.  Counsel summarized what witnesses subsequently confirmed: "[T]he internet was by no means the done deal that it is today.  We were at the tail end of the internet bubble.  Prices of dot com companies like HRN were fluctuating wildly."  Id.

Furthermore, the Litmans and the Dieners vigorously dispute Hotels.com's claims that the ARAPA required the parties to report the 9,999,900 shares at a value of $160 million. They point to the failure of Hotels.com management to rely on the ARAPA from the inception of the dispute concerning valuation of the stock for tax purposes and Hotels.com's commission of the Deloitte & Touche Valuation Report.

2. Hotels.com

1) The effect of the ARAPA on the value of the HRN restricted stock

Hotels.com asks for a finding that the parties negotiated and agreed to report the value of the HRN restricted stock for tax purposes at $160 million. At trial Hotels.com argued that Section 3.4(ii), Section 7.11.3, and Section 7.15 of the ARAPA established the fair market value of the stock. Counsel for Hotels.com insisted in opening arguments that "the value of those earn-out rates [were] negotiated and agreed to by the parties, and the agreed value of $81.6 million is specifically stated in the agreement." Id. at 30-31. "The parties agreed that the number of shares they would receive would be determined by dividing $81.6 million by essentially the IPO price of the stock." Id. at 31. As for the shares that Messrs. Litman and Diener received due to the IPO, Hotels.com argues that the language "having an aggregate value (based on the price per share in the IPO)" of Section 7.11.3 should control. Id.; ARAPA § 7.11.3; JX 4 at 21. Moreover, Hotels.com would not consider the restrictions on resale of the HRN restricted stock because the parties understood that the stock would be restricted when they entered into the ARAPA. "[T]hey knew about the restrictions, and negotiated their deal in light of all of those restrictions." Tr. at 32.

2) Valuation date

Hotels.com argues, as alternatives, that the appropriate valuation date is March 1, 2000, or February 25, 2000. Hotels.com insists that, even if the ARAPA is not determinative with respect to the value of the restricted shares, it should control with respect to the appropriate date for valuation. The consequence would mandate a valuation date of March 1, 2000, the date on which the HRN IPO closed.

According to Hotels.com, Messrs. Litman and Diener were not entitled to receive the restricted stock until the HRN IPO was completed. Therefore, March 1, 2000, the closing date, was the date effecting Messrs. Litman's and Diener's beneficial ownership of the restricted shares "under the express terms of the Amended and Restated Asset Purchase Agreement and the authorizing resolution of the HRN Board of Directors." Hotels.com's Br. filed Feb. 26, 2007, at 5. Hotels.com relies on the language under Section 7.15, which contemplates that shares were to be "issued '[s]imultaneously with the initial closing of the

2000 IPO.'" Id. at 33.  Hotels.com also relies on the language in Section 7.11.3 that the HRN restricted shares were only to be issued when HRN "consummates an initial public offering." Id. at 34.  It argues that the court should define the term consummate to mean "close," citing the Webster's II New College Dictionary, 211 (1995).

In the alternative, Hotels.com posits that the appropriate valuation date could be February 25, 2007, the date on which HRN stock was first traded in the open market on the NASDAQ stock exchange.  Hotels.com offers one of the Dieners' tax returns, which recited a February 25, 2000 acquisition date; a valuation completed by a second appraiser retained by the Litmans and the Dieners, which used a February 25, 2000 valuation date; as well as a draft report prepared by Mr. Mitchell that reflected a February 25, 2000 date.  Hotels.com also contends that Messrs. Litman and Diener were not entitled to the stock on February 24, 2000, because Messrs. Litman and Lidji improperly directed the transfer agent to issue the stock as of that date.  Hotels.com views this action as inconsistent with the express terms of the ARAPA.  Hotels.com also relies on the Form S-1 Registration Statement, which includes HRN's final Prospectus dated February 25, 2000, and states that "'[HRN] will issue to TMF Liquidating Trust, . . . 9,999,900 shares of class A common stock immediately prior to the closing of this offering,' and that the issuance of those Shares will result in HRN having 'approximately $160 million' of additional goodwill."  Hotels.com's Br. filed Feb. 26, 2007, at 13.

       3) Hotels.com's valuation of the HRN restricted stock

Hotels.com's valuation expert, Dr. Bajaj, disagrees with the other parties that the starting price for determining the value of the 9,999,900 shares of restricted HRN stock should be the $16.00 per share IPO price.  Instead, if the court determines that March 1, 2000, is the correct valuation date, the appropriate starting price would be $26.25 per share, the closing price of HRN stock on that date.  Hotels.com similarly argues that, if the court determines that the appropriate valuation date was February 25, 2000, the closing price of that date, $26.00 per share should apply.  Even if the court determines that February 24, 2000, was the appropriate date, Dr. Bajaj advocates a starting price higher than the $16.00 per share.  He opines that the fair market value of HRN stock on February 24, 2000, is actually $23.00 per share.  He reaches this value by contending that the fair market value, defined as the price that a willing buyer would pay a willing seller on February 24, 2000, would take into account the "'pre-open bid and offer prices' on the HRN stock." Hotels.com's Br. filed Feb. 26, 2007, at 25.

Finally, although Dr. Bajaj was instructed to use three dates – March 1, 2000, February 25, 2000, and February 24, 2000 – in determining the value of the restricted HRN

stock, he applies the same 20% marketability discount to each. 7/  Thus, as its alternative position, Hotels.com urges adoption of the following valuations depending on the determination of the correct valuation date:

| Valuation Date | Starting Price (per a share) | Marketability Discount | Restricted Share Value (per a share) | Aggregate Value |
|---|---|---|---|---|
| March 1, 2000 | $26.25 | 20% | $21.00 | $209,997,900 |
| February 25, 2000 | $26.00 | 20% | $20.80 | $207,997,920 |
| February 24, 2000 | $23.00 | 20% | $18.40 | $183,998,160 |

Hotels.com's Br. filed Feb. 26, 2007, at 25.

3. Defendant

1) Notices of Deficiency

_____On January 6, 2005, the IRS sent the Litmans a Notice of Deficiency asserting underpayment of taxes by $12,584,993.00 and assessing a $2,516,998.60 penalty against the Litmans pursuant to I.R.C. § 6662(a).  On October 8, 2004, the IRS sent the Dieners a Notice of Deficiency claiming that the Dieners underpaid their taxes by $12,664,612.00 and were subject to penalties pursuant to I.R.C. § 6662(a) in the amount of $2,532,922.40.  Finally, on February 10, 2006, the IRS sent Hotels.com a Notice of Deficiency in the amount of $2,776,456.00 and assessed penalties in the amount of $491,338.00.

Because the Litmans and the Dieners, on the one hand, and Hotels.com on the other, have taken inconsistent positions with respect to the fair market value of the HRN restricted stock, the IRS issued these notices of deficiency "to seek the consistent and proper taxation of the transfer of the HRN restricted stock." Def.'s Br. filed Apr. 2, 2007, at 18.

In order to protect the United States' interests, and because of the uncertainty as to the fair market value that would ultimately be determined, the IRS used an assumed $16 per share value (Hotels.com's reported value for 2000) for determining the taxes due in the notices to Litman and Diener, and an assumed

_____

7/ Because Hotels.com must value the block of shares as one total value for purposes of calculating goodwill, a marketability discount was not calculated for each tranche of HRN stock.

34

$4.54 per share value (Litman and Diener's valuation) for determining the
taxes due in the notice issued to Hotels.com.

Id. at 18.  The procedure has been upheld by the courts when parties attempt to "whipsaw"
the IRS by reporting inconsistent values for the same property.  Fayeghi v. Comm'r, 211 F.3d
504, 508 (9th Cir. 2000); see also In re Indian Motorcycle Co. v. IRS, 452 F.3d 25, 27 n.2
(5th Cir. 2006) (citing Sherbo v. Comm'r, 255 F.3d 650, 655 (8th Cir. 2001)).

     2)  Valuation date

     Defendant, like the Litmans and the Dieners, argues that the appropriate date for
valuation of the HRN restricted stock is February 24, 2000.  Defendant contends that
Hotels.com and the Litmans and the Dieners have agreed that the HRN restricted stock was
issued to TMF Liquidating Trust on February 24, 2000.  In support of this position, defendant
cites to Hotels.com's complaint in which Hotels.com admitted that the stock was issued on
February 24, 2000.  See Compl. Ex. 6 at 6, Hotels.com, No. 06-285T.  Defendant argues that
this date, "on which TMF Trust became the record owner of the stock is, therefore, the
appropriate valuation date."  Def.'s Br. filed Apr. 2, 2007, at 19 (citing United States v.
Roush, 466 F.3d 380, 385 (5th Cir. 2006)).

     Regarding Hotels.com's argument that Sections 7.11.3 and 7.15 should be relied upon
to determine the appropriate valuation date for HRN restricted stock, defendant views these
two provisions as ambiguous with respect to the date of issuance.  While defendant
acknowledges that the parties to the ARAPA had an agreement, counsel for defendant aptly
characterizes it as "an agreement to disagree."  Tr. at 41.  Defendant interprets the IPO
Prospectus also to be "unclear and confusing on this point."  Def.'s Br. filed Apr. 2, 2007,
at 19-20 n.15.  "In one section [the IPO Prospectus] states that the 9,999,900 HRN restricted
shares will be 'outstanding' before the offering on February 25th, and, in another section, it[]
states that the shares will be issued 'immediately prior to the closing of this offering,' which
was March 1st."  Id.

     Instead, defendant asserts that "[w]hat is clear is that the stock was issued to the TMF
Trust, by HRN and its stock registrar and transfer agent, Chase Mellon Shareholder Services,
L.L.C., as of February 24, 2000 . . . ."  Id. at 20.  Defendant would hold  Hotels.com to the
judicial admission in its complaint that the HRN restricted stock was issued on February 24,
2000.  8/  "This admission is binding on Hotels.com, and withdraws the issue from any
possible contention."  Def.'s Br. filed May 31, 2007, at 5 (citing Rhone-Poulenc Agro, S.A.

---

    8/  See note 5 supra.

v. Dekalb Genetics Corp., 272 F.3d 1335, 1353 (Fed. Cir. 2001), and Keller v. United States, 58 F.3d 1194, 1199 n.8 (7th Cir. 1995)).  Because the date of issuance of the HRN restricted stock has been established "beyond dispute," according to defendant, the stock must be valued as of February 24, 2000.  Def.'s Br. filed May 31, 2007, at 6 (citing Roush, 466 F.3d at 385).

### 3) Defendant's valuation of HRN restricted stock

Defendant's expert Mr. Burns of CRA International valued the HRN restricted stock using two methodologies.  First, he examined three empirical studies: the SEC Institutional Investor Study; the Management Planning Inc. Study; and the Johnson Study.  Based on his examination of these studies, Mr. Burns concluded that a discount ranging from 6% to 22% would be appropriate.  Importantly, Mr. Burns noted that "these studies were conducted when the SEC mandated a two-year holding period for restricted shares.  As a result, they likely understate discounts for holding periods longer than two years."  DX 39, at 18.

Second, Mr. Burns applied a methodology that considers, most concisely explicated in defendant's pre-trial brief, "a hypothetical equity option collar transaction in order to estimate the theoretical economic cost of restoring the liquidity that HRN restricted stock lacks."  Def.'s Br. Apr. 2, 2007, at 14.  Based on this methodology, Mr. Burns made the following conclusions regarding the marketability discount for HRN restricted stock:

| | Tranche 1 | Tranche 2 | Tranche 3 | Tranche 4 | Total |
|---|---|---|---|---|---|
| Number of Shares | 1,959,960 | 489,990 | 489,990 | 7,059,960 | 9,999,900 |
| % of Total Shares | 19.6% | 4.9% | 4.9% | 70.6% | 100.0% |
| Liquidity Discount | 9.4% | 13.4% | 13.7% | 13.7% | |
| Key Employee Adjustment | 7.5% | 7.5% | 7.5% | 7.5% | |
| Lack of Marketability Discount | 16.9% | 20.9% | 21.2% | 21.2% | |
| **Weighted Average Lack of Marketability Discount** | | | | | **20.3%** |

DX 40, at 1.

Additionally, Mr. Burns reached the following total effective lack of marketability discount as of February 24, 2000:

| Fair Market Value of HRN Restricted Stock on February 24, 2000 | |
| --- | --- |
| IPO Price | $16.00 |
| Total Effective Lack of Marketability Discount | 20.3% |
| **Per Share Value** | **$12.75** |

DX 40, at 2.

III. Effect of the Amended and Restated Asset Purchase Agreement on the value of the HRN
        stock

The court agrees with the Litmans, the Dieners, and defendant that the ARAPA is ambiguous and is not determinative of the value of the HRN restricted stock.  Section 1060(a) of the Internal Revenue Code provides:

> If in connection with an applicable asset acquisition, the transferee and transferor agree in writing as to the allocation of any consideration, or as to the fair market value of any of the assets, such agreement shall be binding on both the transferee and transferor unless the Secretary determines that such allocation (or fair market value) is not appropriate.

I.R.C. § 1060; see Bankers Trust Co. v. United States, 207 Ct. Cl. 422, 436 (1975) ("The general rule is that while the parties may be normally bound by the value agreed upon between them, the Service is not so restricted.")  Therefore, although Hotels.com and the Litmans and the Dieners could have agreed to a fair market value of the HRN restricted stock that would be binding between the two sides, the ARAPA failed to accomplish this objective. It was, at best, nothing more than an "agreement to disagree" on the fair market value of the HRN restricted stock, as counsel for defendant stated at the beginning of trial.  Tr. at 41 .

The ARAPA is governed by the laws of the State of New York.  See ARAPA § 14.6; JX 4 at 40.  Under the laws of New York, "when parties set down their agreement in a clear, complete document their writing should as a rule be enforced according to its terms." W.W.W. Assoc., Inc. v. Giancontieri, 77 N.Y.2d 157, 162 (N.Y. 1990).  "Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing."  Id. (citing Mercury Bay Boating Club v. San Diego Yacht Club, 76 N.Y.2d 256, 269-70 (N.Y. 1990), Judnick Realty Corp. v. 32

W. 32nd St. Corp. v. Northville Indus. Corp., 61 N.Y.2d 819 (N.Y. 1984), Long Island R.R. Co. v. Northville Indus. Corp., 41 N.Y.2d 455 (N.Y. 1977), and Oxford Commercial Corp. v. Landau, 12 N.Y.2d 362 (N.Y. 1963)).  "Firmly established principles of contract law provided that '[a]n agreement that is clear and complete will be enforced according to the terms as written by the parties' and extrinsic evidence is proper 'only if the agreement is ambiguous or subject to more than one interpretation.'"  In re Delmar Pediatrics Asthma & Allergy Care, P.C., 828 N.Y.S.2d 589, 590 (N.Y. App. Div. 3d Dep't 2006) (quoting Hudock v. Village of Endicott, 814 N.Y.S.2d 286, 288 (N.Y. App. Div. 3d Dep't 2006)) (alteration in original); see Bailey v. Fish & Neave, 8 N.Y.3d 523, 528 (N.Y. 2007).  However, a contract will be found to be ambiguous when "'the agreement on its face is reasonably susceptible [to] more than one interpretation.'"  Nappy v. Nappy, 836 N.Y.S.2d 256, 257 (N.Y. App. Div. 2d Dep't 2007) (quoting Chimart Assoc. v. Paul, 66 N.Y.2d 570, 573 (N.Y. 1986)).  "In deciding whether an agreement is ambiguous, the court 'should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed'"  Nappy, 836 N.Y.S.2d at 256 (quoting Kass v. Kass, 91 N.Y.2d 554, 566 (N.Y. 1998)).  "[I]f the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity."  Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569-70 (N.Y. 2002).

The United States Court of Appeals for the Federal Circuit has adopted similar standards for contract construction.  "Contract interpretation begins with the plain language of the written agreement."  Hercules Inc. v. United States, 292 F.3d 1378, 1380 (Fed. Cir. 2002) (citing McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996)).  "[T]he plain and unambiguous meaning of a written agreement controls."  Craft Mach. Works, Inc. v. United States, 926 F.2d 1110, 1113 (Fed. Cir. 1991).  "When a provision in a contract is susceptible to more than one reasonable interpretation, it is ambiguous, . . . and we may then resort to extrinsic evidence to resolve the ambiguity."  Teg-Paradigm Envtl., Inc. v. United States, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (citing Edward R. Marden Corp. v. United States, 803 F.2d 701, 705 (Fed. Cir. 1986), and McAbee Constr., 97 F.3d at 1431).

Section 3.4(ii) of the ARAPA does not dictate the value of the HRN restricted stock; it merely requires that, for all tax purposes, the parties "report the transactions contemplated by the Agreement in a manner consistent with the terms of this Agreement."  ARAPA § 3.4(ii); JX 4 at 5.  The ARAPA committed each party not to "take any position inconsistent [with the ARAPA] in any Tax Return."  ARAPA § 3.4(ii); JX 4 at 5.  Therefore, Section 3.4(ii) could not constitute, in and of itself, an agreement to report any one consistent value for the HRN restricted stock: it requires the parties to interpret the contract consistently.  The contractual provisions of the ARAPA do not require the parties to reconcile their polar positions on stock valuation methodology and amount.

Hotels.com values the Section 7.11.3 Shares at $16.00 per share based on the language "aggregate value (based on the price per share in the IPO)." Hotels.com's Br. filed Feb. 26, 2007, at 11. While this language is consistent with an intention that the agreement value the stock at $16.00 per share for tax purposes, the plain language of the agreement does not encapsulate this understanding. Read in its entirety, Section 7.11.3 uses the quoted language as part of an equation to determine the number of shares that Messrs. Litman and Diener would receive in the event that an IPO took place. 9/ The effect of Section 7.11.3 is to govern the calculation of the amount of stock that would be issued to TMF Liquidating Trust in the event of an IPO. Hotels.com acknowledges that the purpose of Section 7.11.3 is to determine the number of shares to which Messrs. Litman and Diener were entitled when HRN became a publicly traded company. See Hotels.com's Br. filed Feb. 26, 2007, at 31. Although the court acknowledges that the language relied upon by Hotels.com suggests that the fair market value agreed to by the parties could have been $16.00 per share, it is equally plausible that the parties never agreed to that value for tax purposes. The term "aggregate value" is not defined in the ARAPA. The use of a term other than "fair market value," which is what must be determined for tax purposes, supports the conclusion that no agreement was reached on this issue. As stated above, Mr. Lidji, transaction attorney for the Litmans and the Dieners, was persuasive that the ARAPA did not memorialize Hotels.com's intentions.

Similarly, Hotels.com argues that the value of the Section 7.15.1 Shares should be determined by the $81.6 million figure of that provision. "The parties agreed that the number of shares they would receive would be determined by dividing $81.6 million by essentially

---

9/  Section 7.11.3 provides, in pertinent part:

7.11.3 PARTICIPATION IN EVENT OF IPO. If, prior to the payment of the 2004 payout by the Buyer pursuant to Section 7.11.1 or a payment in connection with the sale of the Business of the Buyer pursuant to Section 7.11.2 above, the Buyer consummates an initial public offering of shares of its common stock (an "IPO"), the Buyer shall issue to the Sellers a number of shares of common stock of the Buyer having an aggregate value (*based on the price per share in the IPO*) equal to the product of (x)(I) the total issued and outstanding shares of the Buyer immediately prior to the IPO (which shall include the shares issued under Section 7.15 simultaneous with the IPO) times the IPO price minus (ii) the Net Debt Capital multiplied by (y) 10%.

ARAPA § 7.11.3 (emphasis added); JX 4 at 21.

the IPO price of the stock.  Thus, regardless of the IPO price, the value of those shares was agreed to at arm's length, and that value was $81.6 million."  Tr. at 31 (opening statement of Hotels.com's counsel).  While this theory is attractive, the plain language of Section 7.15.1 is susceptible to more than one interpretation and therefore compels the conclusion that the ARAPA is ambiguous as to the value of the Section 7.15.1 Shares.

Section 7.15.1 provides, in relevant part:

> (i) In full satisfaction of its obligations under Sections 7.9.3 and 7.9.4, the Buyer shall issue to the Trust the number of shares (the "SECTION 7.15 SHARES") of Class A Common Stock equal to *the number* that can be found by dividing (x) $81.6 million dollars by (y) the price at which each share of Class A Common Stock initially sold to the public in the 2000 IPO (the "IPO PRICE")[.]

ARAPA § 7.15.1(I) (emphasis added); JX 4 at 22.  Once again, the primary purpose of Section 7.15.1, as with Section 7.11.3, is to calculate the number of shares that TMF Liquidating Trust would be issued in the event of an IPO.  Section 7.15.1 does not include the term fair market value, or even the word value.  Instead, it includes an amount, $81.6 million.  Whether this value is the agreed-to fair market value of the shares, as Hotels.com argues, or, alternatively, a figure that the parties used to compute the number of shares that TMF Liquidating Trust would be issued, as the Litmans and the Dieners contend, cannot be resolved based on the plain language of the section.

After evaluating the extrinsic evidence presented by the parties, it becomes evident that, while Hotels.com may have wanted Messrs. Litman and Diener to agree to a $160 million fair market value for the 9,999,900 shares of HRN restricted stock, such an agreement was never reached and/or reduced to writing.

According to the testimony of Mr. Khosrowshahi, now the CEO of Expedia, Inc., and formerly Vice President of Strategic Planning, for USA Networks, the ability of Hotels.com to amortize the purchase price of Hotel Reservations Network over a period of time was extremely important when it initially structured the business deal that was embodied in the Asset Purchase Agreement.

> [T]he amortization really was cash that we would avoid paying in taxes over a number of years, and the net present value of that was very, very significant. It was, you know, I think over $50 million value that we were getting of essentially taxes that we would not pay.

> And it was very important value that came into the deal consideration because then that allowed us to pay more money up front . . . .

Tr. at 769. Mr. Khosrowshahi and his employees analyzed the tax implications of the deal as negotiations with Messrs. Litman and Diener progressed toward the signing of the Asset Purchase Agreement. See HX 300 at 1-2 (analyzing payments that Hotels.com would render to Messrs. Litman and Diener, as well as a tax shield that Hotels.com would receive). One set of calculations that was completed during a mid-point in the negotiations contemplated payment of $200 million up front by Hotels.com to Messrs. Litman and Diener, which would result in a $147 million tax shield.

Eventually, the parties entered into the Asset Purchase Agreement, selling substantially all of the assets of Hotel Reservations Network to HRN. Messrs. Litman and Diener retained a 10% residual interest in the company, which was now HRN. See Asset Purchase Agreement, § 7.11.3. As Mr. Khosrowshahi, who negotiated the deal for USA Networks, explained, "If there was no liquidity event for some period of time . . . there was a buy out structure so that in 2004 [Messrs. Litman and Diener] would be bought out of this residual interest, based on the performance of the company at that time." Tr. at 775. A liquidity event, such as a sale of the company or an IPO, would allow Messrs. Litman and Diener either to be paid for their 10% residual interest or, as ultimately occurred, receive public shares.

Based on the evidence presented at trial, at some juncture before the finalization of the ARAPA, the tax implications of the exchange of earn-out rights for restricted stock, which was so important when Hotels.com entered into the Asset Purchase Agreement, were overlooked as the subsequent negotiations proceeded. Mr. Khosrowshahi admitted that "the tax shield, the second time around, was not as much of a focus, because I think the assumption was that whatever tax shield we had we would retain." Id. at 847. Perhaps the most detracting evidence was Mr. Khosrowshahi's explanation of an e-mail exchange between Messrs. Litman and Diener and himself during the negotiations that led up to the $81.6 million reflected in the ARAPA. See JX 3. Regarding his e-mail dated January 18, 2000, Mr. Khosrowshahi stated:

> Th[e] spreadsheets [attached to the e-mail] are – there's a high projection of revenue and earnings before taxes, and then that calculates the potential earn-out as a result of these projections for the company. There's a high and then there's a low.
>
> . . . .

So based on a range of – depending on the valuation of the company as a whole at the IPO, the number of shares that [Messrs. Litman and Diener] would get would differ.  And this also aligned kind of the interests of what they were getting with the earn-out as well.

And I kind of refer to it in the first paragraph where I say, you know, that the result is going to be self-correcting because there was obviously an argument and there [were] negotiations, which as [Messrs. Litman and Diener] would say, [well] we're going to hit the high projections and the high projections are going to result in a higher cash earn-out number, and therefore we should get more stock.  Right?

And we would argue for the low.  We'd say, well, you're not going to hit those numbers and the numbers should be, you know, the – I don't have the number on the low – but it should be a lower number, therefore you should get a lower amount of stock.

And the point that I was making is that to some extent it'll be self-correcting, which is, let's pick the average.  If you beat your numbers, or if you hit the high numbers, the stock[']s going to go through the roof anyway once the company's public, so you will have wound up making more.

So in the case where you would have gotten paid more in the earn-out, your stock will be worth more, so it's self-correcting, if, and then I refer to the stock getting killed, right, which is if you miss your numbers and you hit the low, the stock will be lower and we will have wound up paying you what you deserve.

Id. at 785-87.  While Mr. Khosrowshahi later testified that "we all agreed, [Messrs. Litman and Diener were] going to get [$]81.6 million worth of shares," id. at 790, after extensive examination on his understanding of the agreement, he summarized what the Agreement embodied, as follows:

The business agreement was that we would agree that the most likely pay out value for the contingent payment was $81.6 million.  That came with a tax shield, so it would be net less than $81.6 million.

We – that we then applied the $81.6 million value to come up with a number of shares.  If I had been aware that the new deal would disadvantage

us for tax purposes against the old deal, that's something that I would want to
be aware of, and that could change the negotiation of the 81.6 number.

Id. at 873-74.   Mr. Khosrowshahi also admitted that the parties never had "specific
negotiation over the value of [the Section 7.11.3 Shares].  It was just that they were going to
get 10 percent of the shares."  Id. at 832.   Moreover, he stated that the restrictions attached
to the stock never entered into the negotiation of how many shares Messrs. Litman and
Diener received.  Mr. Khosrowshahi's testimony that the agreement memorialized a formula
that would determine the number of HRN restricted shares that Messrs. Litman and Diener
would receive and not operate as an agreement on the value of those restricted shares was
echoed by both Messrs. Litman and Diener.  See id. at 77-78 (testimony of Mr. Litman); id.
at 329-30 (testimony of Mr. Diener).

        The testimony of Messrs. Litman, Diener, and Khosrowshahi regarding the
negotiations fortifies the finding and conclusion that the agreement between the parties was
not for the value of earn-out or the fair market value of the shares, but, rather, was a "self-
correcting" way of calculating the number of shares that Messrs. Litman and Diener would
receive in the event of an IPO.  Certainly, the explanations of Messrs. Litman, Diener, and
Khosrowshahi comport with plain language of Section 7.15.1 insofar as the parties agreed
to a formula for calculating the number of shares to be issued, although the evidence is
insufficient to prove that the parties agreed to anything more than a formula.

IV.  Fair market value of the HRN restricted stock

        Hotels.com emphatically argues that determination of fair market value becomes an
issue only if the ARAPA does not control.  See Hotels.com's Br. filed Feb. 26, 2007, at 4-5.
Hotels.com's able counsel set forth all references to the number of shares of restricted stock
and stated values in the ARAPA and other putatively confirming evidence to show that the
ARAPA established the value of the restricted shares.  However, statements submitted by the
Litmans and the Dieners to federal regulators and the IRS do not bind them to this value,
because, contrary to Hotels.com's position, the ARAPA did not use the figure as a limitation
on value in the first place.

        As the court has determined that the ARAPA is ambiguous and does not determine
the value of the HRN restricted stock, the central issue in this case becomes a question of
determining the fair market value of the 9,999,900 shares.  Fair market value has been
defined by the United States Supreme Court and the United States Court of Claims as "the
price at which the property [in question] would change hands between a willing buyer and
a willing seller, neither being under any compulsion to buy or to sell and both having
reasonable knowledge of relevant facts."  United States v. Cartwright, 411 U.S. 546, 551

(1973); <u>Campbell v. United States</u>, 228 Ct. Cl. 661, 681 (1981) (per curiam).  As the Supreme Court noted in <u>Cartwright</u>, "the willing buyer-willing seller test of fair market value is nearly as old as the federal income, estate, and gift taxes themselves . . . ." <u>Cartwright</u>, 411 U.S. at 551.

IRS Revenue Ruling 59-60 defines the term "fair market value" as "the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts." Rev. Rul. 59-60, § 2.02, 1959-1 C.B. 237.  All three experts agree with this basic definition.

Revenue Ruling 59-60 contemplates the judgments and suppositions inherent in making a valuation determination.  The primary purpose of this ruling is to outline the "approach, methods and factors to be considered in valuing shares of the capital stock of closely held corporations for estate and gift tax purposes." Rev. Rul. 59-60, § 1.  However, it is also applicable to "corporate stocks on which market quotations are either unavailable or are of such scarcity that they do not reflect the fair market value." <u>Id.</u>  Section 3 of Revenue Ruling 59-60 provides a context for understanding the inexact art of restricted stock valuation:

.01 A determination of fair market value, being a question of fact, will depend upon the circumstances in each case.  No formula can be devised that will be generally applicable to the multitude of different valuation issues arising in estate and gift tax cases. Often, an appraiser will find wide differences of opinion as to the fair market value of a particular stock. In resolving such differences, he should maintain a reasonable attitude in recognition of the fact that valuation is not an exact science.  A sound valuation will be based upon all the relevant facts, but the elements of common sense, informed judgment and reasonableness must enter into the process of weighing those facts and determining their aggregate significance.

.02 The fair market value of specific shares of stock will vary as general economic conditions change from 'normal' to 'boom' or 'depression,' that is, according to the degree of optimism or pessimism with which the investing public regards the future at the required date of appraisal.  Uncertainty as to the stability or continuity of the future income from a property decreases its value by increasing the risk of loss of earnings and value in the future.  The value of shares of stock of a company with very uncertain future prospects is highly speculative.  The appraiser must exercise his judgment as to the degree of risk

44

attaching to the business of the corporation which issued the stock, but that judgment must be related to all of the other factors affecting value.

.03 Valuation of securities is, in essence, a prophesy as to the future and must be based on facts available at the required date of appraisal. As a generalization, the prices of stocks which are traded in volume in a free and active market by informed persons best reflect the consensus of the investing public as to what the future holds for the corporations and industries represented. When a stock is closely held, is traded infrequently, or is traded in an erratic market, some other measure of value must be used. In many instances, the next best measure may be found in the prices at which the stocks of companies engaged in the same or a similar line of business are selling in a free and open market.

Rev. Rul. 59-60, §§ 3.01-.03.  As defendant's expert Mr. Burns candidly expressed, "I'm not even sure that [approach is] an art.  Art is beautiful . . . ."  Tr. at 1649.

## V.  The expert witnesses' valuations

### 1.  Mr. Mitchell's valuation

The Litmans and the Dieners rely on Mr. Mitchell's valuation and his marketability discounts.  Mr. Mitchell is associated with Clothier & Head, P.S. ("Clothier & Head"), as Director of Valuation Services.   He is a senior member of the American Society of Appraisers and a member of the Institute of Chartered Financial Analysts. 10/ Mr. Mitchell received a B.S. in Mathematical Sciences and a B.S. in Economics and Systems Analysis in 1982 from Southern Methodist University.  In 1983 he obtained his M.B.A. in Finance, also from Southern Methodist University.

From 1988 through 2000, Mr. Mitchell worked for BVS, a valuation consulting firm, one of the largest independent valuation firms in the Southwest, which exclusively provided valuation consulting services to its clients.  11/  By 2000, when Mr. Mitchell left BVS, he was managing principal of the Dallas, TX office.  Mr. Mitchell's practice included assisting

---

10/  To become a senior member of the American Society of Appraisers, a candidate must meet the following three requirements: (1) show proof that his or her "principal practice is valuation" for the past five years; (2) pass a written exam; and (3) submit two appraisal reports that are reviewed and approved by committee. Tr. at 986.

11/  Between 1983 and 1988, Mr. Mitchell worked for NorthPark National Bank in Dallas, TX, as a Real Estate Lending Officer; Electronic Data Systems in Dallas, TX, as a Financial Analyst; and Arthur D. Little, Inc. in Dallas, TX, as a Senior Consultant.

clients with tax-related issues, mergers and acquisitions, as well as providing litigation support and valuation consulting.  On at least fifty occasions Mr. Mitchell provided assistance on cases where the IRS was a client.  He personally was involved in analyzing the value of restricted shares of stock of a publicly traded corporation on about ten occasions. He also estimated that he had prepared at least 250 appraisals that required a determination of a lack of marketability discount.  Mr. Mitchell originally was retained to provide Messrs. Litman and Diener with a valuation of their restricted HRN stock when Mr. Mitchell was employed at BVS.  In 2000 Mr. Mitchell left BVS to join Williams Companies, a publicly traded firm in Tulsa, OK, involved in the transportation of gas and the ownership of energy assets.  He joined Clothier & Head in 2003, which was retained by the Litmans and the Dieners to render a valuation for purposes of litigation.

Mr. Mitchell's valuation analysis "involved a determination of the fair market value of the HRN common stock held by TMF Liquidating Trust giving consideration to the relevant resale restrictions."  L/DX 60 at 7.  For purposes of his report, Mr. Mitchell defined fair market value, as follows:

> the price at which property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

L/DX 60 at 7.

Mr. Mitchell testified that the term restricted stock, or stock that is restricted from resale, usually refers to shares of publicly traded stocks that cannot be resold easily because they "have certain resale restrictions that prohibit the holder of the shares from selling them in the open market, for selling them on an exchange."  Tr. at 1003.  In some instances additional restrictions apply to resale of the stocks pursuant to SEC Rule 144.  "Rule 144 addresses certain volume restrictions on resale that are specific to control persons or affiliates of an issuer, and those volume restrictions can extend the holding period, [the period of time in which a shareholder cannot sell the shares on an exchange,] beyond the restrictions mandated by the SEC . . . ."  Id.  In most circumstances, Mr. Mitchell testified, restricted shares can be "privately placed," through a private transaction, but not through the stock exchange.  In a private placement, the buyer of the restricted shares would still be bound by the original restrictions, signifying that the buyer could not resell the stock on a stock exchange until the restriction period had expired.

In calculating the fair market value of the HRN restricted shares of stock, Mr. Mitchell used a base price of $16.00 per share.  He opined that the $16.00 per share price was "the

best indication of value" for the February 24, 2000 valuation date.  Id. at 1011.  "[T]he best
indication of value at that time is going to be the share price that's agreed on between the
underwriters of the public offering and the owners of the company, the company that's
issuing the shares. . . . [A]t least as of February 24, 2000, there wouldn't be any other price
that would be relevant."  Id.  From the $16.00 per share base price, Mr. Mitchell next
calculated a marketability discount ranging from 49.5% for the one-year block of shares to
79.0% discount for the shares restricted for four years.  In developing his valuation of the
HRN restricted stock issued to TMF Liquidating Trust, Mr. Mitchell stated that he
considered all the factors listed in Revenue Rulings 59-60 12/ and 77-287. 13/  See L/DX 60

---

12/  Revenue Ruling 59-60, Section 4.01 provides:

       It is advisable to emphasize that in the valuation of the stock of closely
held corporations or the stock of corporations where market quotations are
either lacking or too scarce to be recognized, all available financial data, as
well as all relevant factors affecting the fair market value, should be
considered.  The following factors, although not all-inclusive are fundamental
and require careful analysis in each case:

       (a) The nature of the business and the history of the enterprise from its
inception.
       (b) The economic outlook in general and the condition and outlook of
the specific industry in particular.
       (c) The book value of the stock and the financial condition of the
business.
       (d) The earning capacity of the company.
       (e) The dividend-paying capacity.
       (f) Whether or not the enterprise has goodwill or other intangible value.
       (g) Sales of the stock and the size of the block of stock to be valued.
       (h) The market price of stocks of corporations engaged in the same or
a similar line of business having their stocks actively traded in a free and open
market, either on an exchange or over-the-counter.

Rev. Rul. 59-60, § 4.01.

13/ Revenue Ruling 77-287, Section 5, Facts and Circumstances Material to Valuation
of Restricted Securities provides, in part:

       .02  The following documents and facts, when used in conjunction with
those discussed in Section 4 of Rev. Rul. 59-60, will be useful in the valuation
of restricted securities:

at 1-2.  Mr. Mitchell explained his examination of these factors and how it impacted his valuation determinations of the HRN restricted stock.

The key "drivers" of the marketability discounts were the "nature of the restrictions" and the "risk of the underlying securities." Tr. at 1012.  First, Mr. Mitchell viewed the length of the restriction period as the most important consideration: "[T]he longer the restriction period, the greater the discount that's going to be required, and that's just common sense." Id.  Second, Mr. Mitchell explained as risk associated with owning the underlying security increased "the greater the discount is going to be."  Id.  He attributed this increase in the marketability discount to the "opportunity cost" associated with owning a volatile restricted asset.  Id.  To illustrate this phenomenon, Mr. Mitchell described the following scenario:

> [I]f I was relatively certain that the price of an asset wouldn't change much over a restriction period, I was restricted for two years but I looked at the asset and I said, [w]ell, other than potentially needing cash . . . . [I]f [I] said, [w]ell, it's at $16 a share now and it's going to be at $16 a share or something like that in a couple of years, selling it a week from now 16 bucks a share, selling

---

13/ (Cont'd from page. 47.)

(a) A copy of any declaration of trust, trust agreement, and any other agreements relating to the shares of restricted stock;
(b) A copy of any document showing any offers to buy or sell or indications of interest in buying or selling the restricted shares;
(c) The latest prospectus of the company;
(d) Annual reports of the company for 3 to 5 years preceding the valuation date;
(e) The trading prices and trading volume of the related class of traded securities 1 month preceding the valuation date, if they are traded on a stock exchange (if traded over-the-counter, prices may be obtained from the National Quotations Bureau, the National Association of Securities Dealers Automated Quotations (NASDAQ), or sometimes from broker-dealers making markets in the shares);
(f) The relationship of the parties to the agreements concerning the restricted stock, such as whether they are members of the immediate family or perhaps whether they are officers or directors of the company; and
(g) Whether the interest being valued represents a majority or minority ownership.

Rev. Rul. 77-287 § 5.02.

it a year from now 16 bucks a share, I'm really not impaired too much by this restriction period.

If, on the other hand, the value of that asset could go to zero, it could go to a hundred, it's much more likely that I would have a desire to want the option to sell that security.  If it drops precipitously – and like many of the internet stocks did – and I didn't have an opportunity to sell that, that would certainly be valuable to me.  On the other hand, if prices continued to rise and I thought I needed to diversify my holdings to some degree, I needed to lock in some of this gain, that's going to be valuable too.

Id. at 1012-13.

Further, Mr. Mitchell noted two primary differences between traditional restricted shares and the HRN restricted shares that were received by TMF Liquidating Trust in February 2000.  First, "[t]he shares received by the TMF Liquidating Trust could not be resold in a private placement. . . . So that element of marketability is eliminated from the TMF Liquidating Trust shares relative to typical restricted stock." Id. at 1005-06.  Second, the length of the restriction period for the majority of the HRN stock held by TMF Liquidating Trust, almost 7 million shares, was subject to contractual resale restrictions lasting four years, as opposed to a typical private placement with a restriction period of only two years.

It was Mr. Mitchell's assessment that, because the block of 9,999,900 restricted shares issued to TMF Liquidating Trust was larger than the public float – approximately 6 million shares – the ability of the holders of the restricted HRN shares to resell their stock was negatively affected.

[B]ecause the size of the block is so large relative to the public float that even in the instance where contractual restrictions lapse, you would have a situation where the size of the block relative to the total float would likely – if you tried to sell the shares all at once, there's some likelihood that you would have an impact on the value of the shares that would lower the price you receive in a transaction.

. . . .

[I]t's a pretty simple supply and demand metric. . . . [I]f you have a very large sell order it's going to be hard for the demand to absorb that sell order at a

49

single price, and typically what will happen is the price will move down in order to absorb the large amount of shares that is coming onto the market.

Id. at 1007.

The "frenzy over internet stocks," that has since become known as the "dot-com bubble," also increased Mr. Mitchell's marketability discount for HRN restricted stocks.  Id. at 1008.  "[A]t least one statistic we note in our report was that the return on public equity in the internet sector had been over a thousand percent in roughly a two-year period prior to the first quarter of 2000."  Id. at 1008.  It was in this environment that TMF Liquidating Trust was issued the almost 10 million shares of HRN stock.  As Mr. Mitchell explained:

> [A]nybody would have to ask themselves am I at the top, how can I see an index that has increased 500 percent in a matter of five years, how can I see that index do the same thing, continue to go up and up and up?
>
> And that risk has to impact any analysis associated with a restriction on marketability because you don't have a chance to sell those shares at any point during a contractual restriction period. . . . If the price goes up, you can't sell, and if the price goes down, you start to worry that the bubble is bursting and you can't sell.

Id. at 1009.

Mr. Mitchell applied two quantitative methods to directly calculate the marketability discounts using theoretical models: the Black-Scholes option pricing model and the capital asset pricing model.  He also relied on empirical studies that examined real-world transactions of restricted stock, which he considered in reaching his marketability conclusions.

### 1) Black-Scholes option pricing model

The option pricing methodology is an "economic model that tells you . . . the value of [the stock] option that's been stripped away."  Id. at 1015.  Mr. Mitchell defined a stock option, also referred to as a call option or put option, as "the right – but not the obligation – the right to buy or sell a security at a specified price with the right to do so having a specified

time period. . . . [T]he option to buy, allows the holder of that option to take advantage of increases in the stock price." Id. at 1014. 14/

The value of a theoretical option can be calculated with the Black-Scholes model using six inputs: "1) the time to expiration, 2) the expected future volatility of the underlying security, 3) the price of the underlying security, 4) the exercise price of the option, 5) the risk free-rate, and 6) dividend yield." L/DX 60 at 28. As Mr. Mitchell noted in his report, the time to expiration, the price of the underlying security and the dividend yield are all known variables. The risk-free rate, according to Mr. Mitchell, "is generally regard[ed] [as the] Treasury Bill rate." Tr. at 1016. Mr. Mitchell's report explained that "the exercise price must equal the future value of the current price of the security, compounded using the risk free rate." L/DX 60 at 20. Therefore, the variables of the equation, which Mr. Mitchell estimated, were the volatility of the underlying asset and the time to expiration.

The volatility variable was estimated, according to Mr. Mitchell's report, "because it is an unobservable variable." Id. at 28. Because "almost 80 percent of its revenues in the period immediately prior to the IPO were related to the internet," Mr. Mitchell determined that he needed to rely on the volatility of internet based stocks. Tr. at 1017. "Due to the absence of any trading history for HRN's stock, we elected to base our volatility estimate in part on data for nine companies operating in the Internet retail or Internet content industry, calculated based on data for the 52 weeks ended January 14, 2000." L/DX 60 at 20; see Tr. at 1017-18. The stocks in Mr. Mitchell's sample included: Priceline.com, Preview Travel, eBay, Ticketmaster, Online-City, Egghead.com, CMGI, DoubleClick, Network Solutions, and CNET. See L/DX 60 at 28 n.14. He also considered the 100% volatility estimate that HRN used in their S-1 filing with the SEC.

In determining the time-to-expiration of the restrictions variable, Mr. Mitchell considered two factors: (1) the contractual restrictions imposed by the ARAPA and (2) the size of the block of shares being sold. Mr. Mitchell estimated "how much of that block [of shares] could be sold [in] each quarter pursuant to Rule 144." Tr. at 1018. 15/ To determine

_____

14/ As an example, Mr. Mitchell hypothesized that an investor could buy a stock option, or call option, on Microsoft stock at $30.00 per share. The option, with a six-month expiration date, will have value if the stock goes up. The person holding the stock option "at the exercised price of $30 [could] immediately resell them at the market price . . . [of] $40." Tr. at 1014-15. Of course, if Microsoft stock goes below $30.00, the option will be worthless, and investment in the stock option will have been lost.

15/ Rule 144(e)(1) provides, in pertinent part:

the number of shares that are allowed to be sold in each quarter, Mr. Mitchell took "the greater of 1 percent of the total shares outstanding. . . . or the average of trading volume for the . . . four weeks prior to the period in which the shares will be sold." Tr. at 1019.  Mr. Mitchell, for his purposes, used "for various periods, the 170,000 share figure [based on 1% of the public float] and then increased it all the way to 500,000 shares per a quarter for the last tranche, . . . I think . . . there's some expectation you[] [would] have a little bit higher trading volume for this company, and so I made an estimate." Id. at 1019-20.  He estimated the following holding periods for each tranche of the HRN restricted stock:

_____

15/ (Cont'd from page 51.)

(e) Limitation on Amount of Securities Sold. Except as hereinafter provided, the amount of securities which may be sold in reliance upon this rule shall be determined as follows:

(1) Sales by affiliates. If restricted or other securities are sold for the account of an affiliate of the issuer, the amount of securities sold, together with all sales of restricted and other securities of the same class for the account of such person within the preceding three months, shall not exceed the greater of (I) one percent of the shares or other units of the class outstanding as shown by the most recent report or statement published by the issuer, or (ii) the average weekly reported volume of trading in such securities on all national securities exchanges and/or reported through the automated quotation system of a registered securities association during the four calendar weeks preceding the filing of notice required by paragraph (h), or if no such notice is required the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker, or (iii) the average weekly volume of trading in such securities reported pursuant to an effective transaction reporting plan or an effective national market system plan as those terms are defined in § 242.600 of this chapter during the four-week period specified in paragraph (e)(1)(ii) of this section.

17 C.F.R § 230.144 (2007).

| Year after Initial Public Offering | Average Holding Period |
|---|---|
| One | 2.00 |
| Two | 3.00 |
| Three | 3.25 |
| Four | 5.50 |

L/DX 60 at 29.

Applying the Black-Scholes analysis, Mr. Mitchell arrived at the following marketability discounts:

| Year After Initial Public Offering | Shares Available for Sale | Average Holding Period | Discount |
|---|---|---|---|
| One | 1,959,960 | 2.00 | 51.6% |
| Two | 489,990 | 3.00 | 60.8% |
| Three | 489,990 | 3.25 | 62.9% |
| Four | 7,059,960 | 5.50 | 75.0% |

Id. at 28.

2) Capital asset pricing model

Mr. Mitchell also used the capital asset pricing model (the "CAPM") to determine the lack of marketability discount. "[T]he model is used to understand the risk and the incremental return associated with the risk of not being able to sell the security . . . that's restricted from resale . . . ." Tr. at 1024. Mr. Mitchell explained that the CAPM "assumes that investors hold diversified portfolios and they are compensated only for the risk that's associated with that measure of diversification." Id. The CAPM provides "a method to estimate expected return on a publicly traded security on the basis of its 'relative market risk' (systematic risk)." L/DX 60 at 30. 16/

16/ Mr. Mitchell explained, in layman's terms:

So when we buy a stock, we have two elements of risk.

Mr. Mitchell used the following formula to estimate the marketability discount for the HRN restricted stock:

$$1 - 1/(1+r)^n$$

where:

| | | |
|---|---|---|
| $n$ | = | holding period; |
| $r$ | = | $((E(R_m) - R_f)/\sigma_m) * U_s$ |
| $E(R_m) - R_f$ | = | expected return on the market portfolio |
| $\sigma_m$ | = | estimated systematic risk for the market; |
| $U_s$ | = | $\sigma_s - (\beta * \sigma_m)$ = estimated annual unsystematic risk for the stock; |
| $\sigma_s$ | = | annual standard deviation (volatility) of stock price; and |
| $\beta$ | = | an index of the subject stock's systematic risk. |

Id. at 32.

---

16/ (Cont'd from page 53.)

There's the risk that our stock will go down just because the market goes down. . . . The question that the [CAPM] answers is how sensitive is my stock to returns in the market. So that's one element of risk, that's the risk I get compensated for.

But when I'm forced to hold securities that I can't resell, there's risk that I'm not compensated for, and that's specific company risk. So when I hold a diversified portfolio, I'm going to have some stocks that go up and some stocks that go down. . . . If I can only hold one . . . stock[], I need to understand how much extra risk I'm bearing for not being able to hold the portfolio, and the [CAPM] or volatility estimate allows us to think of total risk and break that down into market risk and company risk.

Tr. at 1025-26.

The variables that Mr. Mitchell used to estimate a marketability discount for HRN stock follow:

| | | |
|---|---|---|
| $E(R_m) - R_f$ | = | 9.4% |
| $\sigma_m$ | = | 20% |
| $U_s$ | = | $\sigma_s - (\beta * \sigma_m) = 80.0\%$ |
| $\sigma_s$ | = | 100.0% |
| $\beta$ | = | 1.00 |

Id. at 33.  Mr. Mitchell testified that, to estimate the expected return on the market portfolio, he relied on historical data published in Bonds, Bills and Inflation by Ibbotson Associates. "The premium . . . in the short term context is 8 to 10 percent.  We have a short term holding period here so I used 9.4 percent."  Tr. at 1029.  The estimated systematic risk for the market was 20%, derived from the volatility of the "S&P [which] is about 15.0% per year and the volatility of small company stocks as calculated by Ibbotson Associates [which] has been in the range of 25.0%."  L/DX 60 at 32.  Mr. Mitchell used the same volatility measurement of 100% that was used in the Black-Scholes model (represented above as $\sigma_s$).

As for beta, which is the "index of the market rise of [the] stock," Mr. Mitchell used a value of one.  Tr. at 1026-27.  According to Mr. Mitchell, a stock with a beta value of one "should rise and fall the same as the market does."  Id. at 1026.  To determine that the HRN stock should have a beta value of one, Mr. Mitchell referenced Ibbotson Associates' Cost of Capital Quarterly 1999 Yearbook.  "Absent reliable data for Internet-related companies, we chose the lodging segment as being most representative of systematic risk for HRN."  L/DX 60 at 32 n.19.  As Mr. Mitchell explained:

> [I]f we think about how sensitive they'll be to general economic conditions, they're going to react the way a stock like Hilton or Marriott reacts.  That is, if there's a reduction in travel for any reason, if the economy is bad, unemployment is up and the demand for hotel rooms declines, that is what's going to impact the sensitivity of HRN stock to the overall market.

Tr. at 1028.

Mr. Mitchell employed these estimates to determine that the incremental return (represented as r in the formula above) is approximately 37.6%.  Finally, he converted the incremental return for each of the holding periods into a marketability discount using the formula above.  The estimated marketability discount using the CAPM follows:

| Year after Initial Public Offering | Shares Available for Sale | Average Holding Period | Discount |
|---|---|---|---|
| One | 1,959,960 | 2.00 | 47.2% |
| Two | 489,990 | 3.00 | 61.6% |
| Three | 489,990 | 3.25 | 64.5% |
| Four | 7,059,960 | 5.50 | 82.7% |

L/DX 60 at 33.

### 3) Empirical studies

Mr. Mitchell also examined a number of empirical studies to "gauge whether the discount should be relatively higher or lower." Tr. at 1033. 17/ The focus in his report and at trial was on a study published in The Journal of Finance in 1993 by Michael Hertzel and Richard L. Smith titled Market Discounts and Shareholder Gains for Placing Equity Privately (the "Hertzel and Smith Study"). The Hertzel and Smith Study compares the price of restricted stock that was sold in real-world transactions. All of the securities in the Hertzel and Smith study were only restricted from resale on the public market or exchange for two

---

17/ While Mr. Mitchell focused his attention at trial and in his report on a study by Michael Hertzel and Richard L. Smith and a study by William L. Silber, he also summarized and considered the findings of several other relevant studies:

A number of other studies on restricted securities have been published over the years. Several of these studies are summarized as follows: the Milton Gelman study (89 transactions between 1968 and 1970), with an average discount of 33.0%; the Robert Trout study (60 transactions between 1968 and 1972), with an average discount of 33.5%; the Robert E. Moroney study (146 transactions prior to 1973), with an average discount of 35.4%; the J. Michael Maher study (transactions between 1969 and 1973), with an average discount of 35.4%; the Standard Research Consultants study (28 transactions between 1968 and 1972), with a median discount of 45.0%; the Williamette Management Associates study (33 transactions between 1981 and 1984), with a median discount of 31.2%; the FMV Opinions study (over 100 transactions between 1979 and 1992), with an average discount of 27.7%.

L/DX 60 at 34-35.

years.  The Hertzel and Smith Study considered private placement of unregistered stock and private placements of registered securities.  Tr. at 1037, 1039.

> [W]hat Hertzel and Smith do is they make an effort to understand [the] variability [in the marketability discounts] by looking at the characteristics of the placement, that is the characteristics of the company that's issuing the shares in the private placement.  And they determine that various measures of the company's financial health – most of which are proxy for risk, . . . – that they help explain at least some of the discount, and they use a fairly standard analytical tool called regression analysis.

Id. at 1035.  The regression analysis, to which Mr. Mitchell attributes only 40% of the variability in the marketability discounts, considers a variety of different factors as a "proxy of risk," including: market value of equity, fraction of shares placed, book-to-market-equity ratio, proceeds, ownership concentration, financial distress, speculative product, and restricted shares.  Id. at 1035-36; L/DX 60 at 36.

Applying Hertzel and Smith's regression analysis, which was adjusted to account for the fact that the HRN stock "was not part of a private placement in which HRN received proceeds from issuing the stock (which is the comparable circumstance for all of the private placements in the Hertzel and Smith sample)," L/DX 60 at 40, Mr. Mitchell calculated the following discounts:

| Year after Initial Public Offering | Shares Available for Sale | Average Holding Period | Discount |
|---|---|---|---|
| One | 1,959,960 | 2.00 | 34.9% |
| Two | 489,990 | 3.00 | 47.5% |
| Three | 489,990 | 3.25 | 50.3% |
| Four | 7,059,960 | 5.50 | 69.3% |

L/DX 60 at 40.

Although Mr. Mitchell relied on the study to "determine whether or not this is a relatively higher or lower discount situation," he recognized the shortcomings of the Hertzel and Smith Study.  Tr. at 1038.  "[W]hat happens in the private placement market is occasionally investors will buy securities in a private placement but they will immediately be registered, and by immediately I mean within a week or two . . . ."  Id. at 1037.  Registered, or soon-to-be- registered shares, are distinguishable from unregistered restricted

shares, like those issued to TMF Liquidating Trust, because, as soon as the restrictions have expired and they are registered with a stock exchange, they can be freely traded.

The second empirical study that Mr. Mitchell discussed at trial was completed by William L. Silber, published in the <u>Financial Analysts Journal</u> in 1991, titled Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices (the "Silber Study"). According to Mr. Mitchell, the Silber Study is similar, but not identical, to the Hertzel and Smith Study: "[T]he primary difference [is] . . . that the Silber study considered only sales of unregistered securities, there are no transactions that involve registered or to be registered securities." <u>Id.</u> at 1040. Using the Silber Study's regression analysis, Mr. Mitchell calculated the following marketability discounts for the HRN restricted stock:

| Year After Public Offering | Shares Available for Sale | Average Holding Period | Discount |
|---|---|---|---|
| One | 1,959,960 | 2.00 | 31.3% |
| Two | 489,990 | 3.00 | 43.0% |
| Three | 489,990 | 3.25 | 45.7% |
| Four | 7,059,960 | 5.50 | 64.3% |

L/DX 60 at 42.

4) <u>Overall conclusion</u>

_____Mr. Mitchell's overall valuation relied on the Black-Scholes model and the CAPM. He relied on these quantitative methodologies, in part, because "of the unusual nature of the restrictions." Tr. at 1041. He gave significant weight to the fact that "the restriction periods are longer than those for the transactions in either of the studies . . . ." <u>Id.</u> at 1041. By relying on the quantitative methodologies, Mr. Mitchell was able "to better emphasize the factors that are most important in determining discounts, and that would include risk in terms of volatility as the primary measure of risk, and then the time related to the restrictions period." <u>Id.</u>

| Block Size (shares) | Restriction Period | Discount | Discount Value per Share |
|---|---|---|---|
| Block One (1,959,960) | One year | 49.5% | $8.08 |
| Block Two (489,990) | Two years | 61.5% | $6.16 |
| Block Three (489,990) | Three years | 63.5% | $5.84 |
| Block Four (7,059,960) | Four years | 79.0% | $3.36 |

L/DX 60 at 38.

### 2. Dr. Bajaj's valuation

Hotels.com relied on the valuation of its expert, Dr. Bajaj, Senior Managing Director at LECG, LLC ("LECG"). In 1997 Dr. Bajaj joined LECG, "a network of scholars and experts from various universities and think tanks and other professionals who provide expertise [in the] areas of economics, finance and forensic accounting, and these experts are supported by staff." Tr. at 1228. In its thirty offices located around the world, LECG, a publicly traded company, employs between 400-500 experts.

Dr. Bajaj began working at LECG after serving for seven years as Assistant Professor of Finance and Business Economics at the University of Southern California, Marshall School of Business. Dr. Bajaj taught undergraduate and graduate level investment and corporate finance courses. He is currently a visiting lecturer at the Haas School of Business, University of California at Berkeley, where he teaches courses in corporate finance and investments for the day and evening M.B.A. programs. He also developed a financial strategy course for the Haas School of Business Masters in Financial Engineering program. As a professor Dr. Bajaj has taught the Black-Scholes model and the CAPM in his corporate finance courses. His own academic credentials include a Bachelor of Technology degree in chemical engineering from the Indian Institute of Technology in Delhi, India. In 1987 he received his M.B.A. from the University of Texas at Austin, with a focus on finance. The following year he received a Ph.D. in Business Administration from the University of California at Berkeley, with a concentration in corporate finance and investments.

Dr. Bajaj has been retained on numerous occasions to analyze the value of restricted shares of stock in publicly traded companies and to prepare a valuation that involves a lack of marketability discount. He has served as an expert in connection with approximately eighty tax cases and testified in approximately fifteen tax cases on valuation issues and marketability discounts. Recently, Dr. Bajaj published an article in the Journal of Derivatives, a peer-reviewed journal, on the pricing of employee stock options. He also co-authored an article on marketability discounts, which examined the "going-public process in initial public offering markets." Id. at 1236. Other recent publications include a co-authored paper entitled "Competition in IPO Underwriting: Time Series Evidence," which will appear in the Journal of Research in Finance.

### 1) The restricted stock approach

Dr. Bajaj relied on the restricted stock approach to reach his marketability discount conclusions. 18/ The restricted stock approach examines private placement transactions of publicly traded stock, comparing the price of the stock on the open market to stock placed in a private transaction. According to Dr. Bajaj, "the empirical evidence generally shows that on average, discounts have been in the early years about 30, 35 percent range, and starting [in the] 1990s, most of the studies find average discount of the order of 20 percent." Id. at 1264.

Dr. Bajaj relied upon a study he co-authored with David Dennis, Stephen P. Ferris, and Atulya Sarin in 2001. See HX 9 at 26. The article, titled "Firm Value and Marketability Discounts" appeared in the fall 2001 edition of Journal of Corporation Law (the "Bajaj Study"). Id. at 26, 49. The Bajaj Study was an expansion of the Hertzel and Smith Study that Mr. Mitchell considered in his report. The Bajaj Study "extends [the Hertzel and Smith Study] by considering private placement[s] that took place between 1990 and 1995, because Hertzel and Smith's data sample spanned 1981 through 1987 or 1988 period." Tr. at 1267.

In applying the restricted stock approach using the Bajaj Study, Dr. Bajaj considered three factors: First, he took into account a measure of financial health of a company called a Z-Score, which he defined as "a weighted average of several financial ratios that measure liquidity and credit worthiness." Id. at 1268. A Z-Score "has been shown to be a reliable predictor of bankruptcy risk." Id. at 1268. The higher the Z-Score, the more healthy the company; companies with the lowest Z-Scores are "deeply distressed financially" and run

_____

18/ Dr. Bajaj included a discussion of a methodology called the IPO Approach in his report. As Dr. Bajaj testified that he did not rely on this approach and did not discuss it during trial, this approach is not summarized.

a substantial risk of default.  Id. at 1269.  Second, Dr. Bajaj considered the market capitalization of the firms in his sample, "because it's well established that on average, other things being equal, smaller firm securities are harder to appraise, and are associated with larger discounts."  Id. at 1270.  Finally, Dr. Bajaj considered "the size of the block . . . relative to the total shares outstanding."  Id. at 1271.  The tables below show the classifications and conclusions Dr. Bajaj reached when comparing HRN to his own data collected in the Bajaj Study:

**Panel A**

| | Z-Score Quartiles | | | | | Discount % within Z-Score Quartiles | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Min | Max | Median | Count | Mean | Min | Max | Median | Count |
| 1st Quartile | (0.7) | (5.5) | 1.5 | 0.36 | 22 | 30.8 | (7.1) | 68.0 | 30.7 | 22 |
| 2nd Quartile | 2.2 | 1.5 | 3.1 | 2.37 | 22 | 22.1 | (5.3) | 62.1 | 18.3 | 22 |
| 3rd Quartile | 5.3 | 3.2 | 8.7 | 4.85 | 22 | 15.2 | (10.1) | 57.0 | 13.6 | 22 |
| *4th Quartile | 40.0 | 10.3 | 262.6 | 18.87 | 22 | 20.7 | (14.3) | 52.4 | 21.6 | 22 |

* HRN Inc. Z-Score of 9.80 falls between 3rd and 4th Quartile

**Panel B**

| | Mkt Cap Quartiles ($ Millions) | | | | | Discount % within Mkt Cap Quartiles | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Min | Max | Median | Count | Mean | Min | Max | Median | Count |
| 1st Quartile | 16.1 | 3.0 | 29.6 | 16.10 | 22 | 29.0 | (7.1) | 68.0 | 29.4 | 22 |
| 2nd Quartile | 44.1 | 31.2 | 56.2 | 44.17 | 22 | 27.6 | (2.4) | 60.9 | 27.3 | 22 |
| 3rd Quartile | 88.4 | 60.7 | 126.9 | 80.46 | 22 | 15.5 | (10.1) | 52.4 | 13.8 | 22 |
| *4th Quartile | 312.0 | 135.9 | 1,158.0 | 229.10 | 22 | 16.8 | (14.3) | 62.1 | 15.3 | 22 |

* HRN Inc. Mkt Cap of $883.3 million falls in 4th Quartile

**Panel C**

| | Fraction Issued Quartiles (Percent of Total Outstanding Shares) | | | | | Discount % within Fraction Issued Quartiles | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Min | Max | Median | Count | Mean | Min | Max | Median | Count |
| 1st Quartile | 5.8 | 0.9 | 9.0 | 5.61 | 22 | 13.2 | (14.3) | 62.1 | 9.4 | 22 |
| 2nd Quartile | 12.1 | 9.9 | 14.4 | 12.50 | 22 | 20.4 | (1.2) | 52.4 | 16.0 | 22 |
| *3rd Quartile | 16.4 | 14.6 | 19.5 | 16.08 | 22 | 23.8 | (5.3) | 60.9 | 20.3 | 22 |
| 4th Quartile | 29.3 | 20.4 | 44.5 | 27.29 | 22 | 31.4 | (10.1) | 68.0 | 32.0 | 22 |
| | | | | **Average:** | | 20.5 | | | 19.1 | |

\* 2000 IPO Shares (18.1%) falls in 3rd Quartile

HX 9 at 41.

The marketability discounts reached by Dr. Bajaj when he weighted each factor – Z-Score, market capitalization, and the size of the block of shares – equally was 20.5%, using the sample's averages, and 19.1%, using the sample's median. Tr. at 1273. As a second step, Dr. Bajaj took the weighted average of each tranche of stock, using the same methodology described above. When considering the weighted averages of each tranche, Dr. Bajaj reached the following marketability discount conclusions:

| Transfer restriction Period (in years) | No. of shares in tranche | Tranche size (as % of Subject Interest) | Relative size of tranche (as % of Company's outstanding shares) | The Fraction Issued Quartile to which Tranche Belongs | Mean Discount of Fraction Issued Quartile | Median Discount of Fraction Issued Quartile |
|---|---|---|---|---|---|---|
| 1 | 1,959,960 | 19.6% | 3.6% | 1 | 13.2% | 9.4% |
| 2 | 489,990 | 4.9% | 0.9% | 1 | 13.2% | 9.4% |
| 3 | 489,990 | 4.9% | 0.9% | 1 | 13.2% | 9.4% |
| 4 | 7,059,960 | 70.6% | 12.8% | 2 | 20.4% | 16.0% |
| | | | **Weighted Average**: | | 18.3% | 14.1% |

HX 9 at 42.

Based on these calculations, Dr. Bajaj calls for a marketability discount of 20%. His conclusions take into account the contractual restrictions, the block size, and the SEC restrictions. Tr. at 1266. He seems to reach this conclusion, in part, based on an average of the values expressed in the Hertzel and Smith Study and the Bajaj Study:

> So I considered Hertzel and Smith's study that determined 13.5 percent discount, and my own study for a later period that determined 7 percent discount, and I took the average of the two numbers roughly speaking to determine that if we were to ask how much of the discount would accrue simply because of marketability restrictions, the starting point would be 10 percent before we consider ways in which HRN shares are different from the sample points that underlie these studies.

>         . . . .

> [A] 20 percent discount would be applicable if what was relevant was the total impact of marketability, not just the contractual portion per se.

Id. at 1266.

## 2) Private placement discounts observed in FMV Opinions, Inc. database

Dr. Bajaj undertook the same analysis utilizing third-party data. He obtained his statistical data from FMV Opinions, Inc. (the "FMV data"), a consulting organization that

collects restrictive stock data and sells the information to appraisers.  As a validity check, he compared the calculations and conclusions that he reached by relying on the Bajaj Study with the FMV data.  Another benefit of using these data was that they included shares issued in 2000 "under very different market conditions."  Id. at 1274.  Dr. Bajaj used the same process with the FMV data that he used with the Bajaj Study, benchmarking the HRN restricted shares relative to the market evidence in the FMV database for the same three factors – Z-scores, market capitalization, and size of the block of shares.  His conclusions based on the FMV data follow:

**Panel A**

| | Z-Score Quartiles | | | | | Discount % within Z-Score Quartiles | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Min | Max | Median | Count | Mean | Min | Max | Median | Count |
| 1st Quartile | (16.2) | (1,227.3) | 3.5 | 1.1 | 82 | 20.6 | (57.7) | 95.4 | 19.5 | 82 |
| *2nd Quartile | 6.5 | 3.5 | 11.4 | 6.4 | 82 | 23.0 | (46.3) | 74.4 | 23.1 | 82 |
| 3rd Quartile | 32.2 | 11.6 | 78.0 | 26.3 | 82 | 19.8 | (92.0) | 68.6 | 21.0 | 82 |
| 4th Quartile | 1561.9 | 79.7 | 14,135.3 | 237.6 | 81 | 25.6 | (68.4) | 87.5 | 27.1 | 81 |

* HRN Inc Z-Score of 9.80 falls in 2nd Quartile

**Panel B**

| | Mkt Cap Quartiles ($ Millions) | | | | | Discount % within Mkt Quartiles | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Min | Max | Median | Count | Mean | Min | Max | Median | Count |
| 1st Quartile | 15.9 | 3.2 | 27.2 | 15.5 | 82 | 37.5 | (33.3) | 95.4 | 34.9 | 82 |
| 2nd Quartile | 44.2 | 27.7 | 68.3 | 44.6 | 82 | 23.0 | (44.1) | 79.4 | 23.6 | 82 |
| 3rd Quartile | 101.2 | 69.2 | 136.5 | 101.2 | 82 | 17.8 | (46.3) | 61.5 | 17.8 | 82 |
| *4th Quartile | 553.2 | 139.3 | 5726.1 | 252.1 | 81 | 10.6 | (92.0) | 75.7 | 8.0 | 81 |

* HRN Inc. Mkt Cap of $883.3 million falls in 4th Quartile

**Panel C**

| | Fraction Issued Quartiles (Percent of Total Outstanding Shares) | | | | | Discount % within Fraction Issued Quartiles | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | Min | Max | Median | Count | Mean | Min | Max | Median | Count |
| 1st Quartile | 2.7 | 0.1 | 5.4 | 2.6 | 82 | 15.0 | (92.0) | 66.4 | 19.7 | 82 |
| 2nd Quartile | 7.5 | 5.4 | 9.8 | 7.2 | 82 | 21.3 | (42.8) | 87.5 | 21.8 | 82 |
| 3rd Quartile | 12.6 | 9.8 | 15.9 | 12.6 | 82 | 23.3 | (46.3) | 87.5 | 20.4 | 82 |
| *4th Quartile | 22.4 | 15.9 | 42.8 | 20.4 | 81 | 29.5 | (38.3) | 95.4 | 25.9 | 81 |

* 2000 IPO Shares (18.1%) falls in 4th Quartile

HX 9 at 37.  Dr. Bajaj ultimately determined that the marketability discount would have been 21%, based on the "sub-sample means," and 19.4%, based on the medians.  Tr. at 1275.

In reaching his overall opinion that the marketability discount of the HRN restricted stock should be 20%, Dr. Bajaj considered the length of the restrictions of the HRN stock by comparing the HRN restricted stock to large blocks of shares that would have significant holding periods.  "[B]y benchmarking discounts to blocks that were large enough, I took the duration of restrictions into account."  Id. at 1278

### 3) Fair market value of the HRN restricted stock on February 24, 2000

Unlike the two other experts, Dr. Bajaj insists that the fair market value of the HRN restricted stock on February 24, 2000, was not $16.00 per share.  "The definition of fair market value as economists understand it requires you to determine what would the security trade [at] if the market were open and orderly and people were transacting voluntarily."  Id. at 1284.  He contends that transaction between HRN and the underwriters, which set the IPO price at $16.00 per share, cannot fit within the definition of fair market value:

> As part and parcel of the deal [between underwriters and the company going public], underwriters commit to providing valuable advice and counsel to the company in [the] going-public process.  They provide marketing services for the stock.  They agree[d] to issue research reports, an activity that is a money-losing operation for underwriters, in order to make the company's shares marketable after it is a public company.

They agree for a period of time to support the stock price if in the after-market, the price drops below the $16 offer price, called stabilization activity. They continuously promote the company, hold conferences, invite management to come and present to potential investors, provide intelligence to the company on who is trading shares, provide counsel and assistan[ce] to the company in advising on corporate capital structure matters, merger and acquisition candidates, sometimes provide leads for finding senior management positions when necessary.

It is a complex transaction, where besides buying these shares, underwriters provide a lot of valuable services to the company.

Id. at 1285. The cumulative effect of these additional services provided by the underwriter renders the transaction more similar to a "distressed seller being willing to sell at a fire-sale price[;]" therefore, the transaction should not be the basis for determining the fair market value of an unrestricted share of HRN stock on February 24, 2000. Id. at 1286.

Fair market value, according to Dr. Bajaj, should take into account events that are foreseeable. In Dr. Bajaj's opinion, foreseeable events as of February 24, 2000, included knowledge that "in a couple of hours, these [shares] are expected to be worth 50 percent more . . . ." Id. at 1288.

So how could $16 be fair market value when it was highly foreseeable that by holding on for another couple of hours, you could realize 50, 60 percent larger number, so it obviously is not consistent with the definition of fair market value. It would not meet the willing seller prong of that definition.

Id.

3. Mr. Burns's valuation

_____Defendant relied on the valuation of its expert, Mr. Burns, a Vice President of CRA International ("CRA"), a publicly traded consulting firm employing approximately 700 professionals that focuses on economic analysis, valuation work, and strategic consulting. CRA has domestic offices in Boston, MA; New York, NY; Washington, DC; and Chicago, IL, as well as on the West Coast. Internationally, CRA is present in Europe, Asia, the Pacific, Canada, and the Middle East. CRA, formerly Charles River Associates, was founded in the mid-1960s in Boston, MA, by a group of economists from MIT and Harvard.

Mr. Burns has twenty years' experience performing "valuation work, economic analyses, and developing damages claims in litigation and also assisting some clients outside of litigation." Id. at 1525. He holds a B.A. in Political Science from Stanford University and an M.B.A. in Finance and Economics from the Kellogg Graduate School of Management at Northwestern University. Mr. Burns, like Mr. Mitchell, is also a senior appraiser with the American Society of Appraisers. Mr. Burns has qualified as an expert in over thirty matters in state and federal courts, and has testified at trial in between fifteen and twenty matters.

1) Valuation of the HRN stock as of February 24, 2000

Mr. Burns sets the fair market value of the unrestricted HRN stock, the starting point for his valuation, at $16.00 per share. His opinion was based, first, on the agreement between HRN and the underwriters that established the IPO price.

> [W]hat I learned about the IPO and the fact that it was happening essentially the next day from the valuation date, it became clear to me that we had a fair market value established by virtue of the parties negotiating that price, the investment banks, the [issuing] company, arriving at a value they thought was fair for those shares, and so at that point, we did not need – it was superfluous to do any type of our own valuation analysis on the shares.

Id. at 1533-34. Second, he consulted the HRN prospectus dated January 25, 2000. The prospectus indicated to Mr. Burns that the company regarded the fair market value of the stock on February 24, 2000, to be $16.00 per share. Compare JX 7 at 49 ("Mr. Segal and Ms. Harms will receive options to purchase 5,000 shares of our class A common stock under the Director's Stock Option Plan at an exercise price equal to the initial public offering price per share upon election to our board of directors.") with JX 7 at 51 ("Options will be automatically granted with respect to 5,000 shares of class A common stock upon a director's election to office, . . . at an exercise price equal to the fair market value of such shares on the trading date immediately preceding the date of grant."). The text of the Director's Stock Option Plan "implied to [Mr. Burns] that if the shares are to be issued at fair market value and the fair market value is the IPO price, that they thought the IPO price was fair market value at that time." Tr. at 1537.

Mr. Burns also considered the historical pricing data of HRN from Bloomberg Financial Services, which showed that as of February 24, 2000, the price of HRN stock was $16.00 per share. He did not take into account the price of HRN stock on February 25, 2000, or on any subsequent date.

> Well, I think I started under the premise or the rule of thumb in valuation which is that you're not allowed to look past the valuation date, and that's something that's, you know, very adhered-to in the appraisal community. And there are exceptions, but generally when you're looking at a pricing of a security, you're not allowed to look beyond the valuation date.

Id. at 1543. According to Mr. Burns, the best indication of value on February 24, 2000, was the transaction between the underwriter and the issuing company, "because you have two sophisticated parties to that transaction, and it's really in everybody's best interest for that stock price to be fairly priced . . . ." Id. While Mr. Burns acknowledged that IPOs generally have a "bump" in price on the first day of public trading; he opined that a buyer would not pay more than $16.00 per share for a share of HRN stock on February 24, 2000. Id. at 1545.

### 2) Marketability discount

Mr. Burns examined the history of HRN and its operations and financial information. Only after understanding this information did he turn to determining a marketability discount for the HRN restricted stock. To that end, Mr. Burns considered the revenue growth, the road show, the overall United States economy, and the travel services industry, in addition to the Asset Purchase Agreement, the ARAPA, and the SEC restrictions.

The first step in calculating the marketability discount was to consider the available empirical data. "In this case, I think we have a much greater relevance with the restricted stock studies, because we're actually valuing restricted stock, so it's a lot closer. . . . [W]e identified three of the studies that had actually broken out by performing characteristic the companies and the underlying data." Id. at 1551-52. While looking at restricted stock studies is a common tool in the appraisal community, Mr. Burns specifically identified these studies because "one of the drawbacks to these studies is that you have average discounts, . . . but within the studies themselves the data set, you have a much broader range of discounts . . . ." Id. at 1552.

Accordingly, Mr. Burns examined the SEC Institutional Investor Study (the "SEC Study"), which was a report issued to Congress in March 1971. The SEC Study examined transactions that occurred between January 1, 1966 and June 30, 1969. Secondly, Mr. Burns considered a study conducted by Management Planning, Inc. (the "MPI Study"), which analyzed private placement transactions between 1980 and 1995. Finally, Mr. Burns considered a study prepared by Bruce Johnson, which was published in 1999 in Business Valuation Update (the "Johnson Study"), which examined seventy-two transactions between 1991 and 1995 involving restricted stock. The three studies examined stocks that were restricted for two years pursuant to SEC rules.

68

Mr. Burns caveated that the SEC Study showed that "discounts tend to decline as the revenues of the underlying company go up, and I think that's consistent with what you'd expect from economic theory." Id. at 1554.  The SEC Study demonstrated that the converse was true.  Taking into account the time value of money between the 1960s when the study was conducted and the 1990s, Mr. Burns benchmarked the revenues and earnings of HRN, compared to the transaction in the SEC Study, with the following results:

| Revenues | Weighted Average Discount | Earnings | Weighted Average Discount |
|---|---|---|---|
| $99,999 or less | 32.1% | | |
| $100,000-$999,999 | 47.4% | | |
| $1,000,000-$4,999,999 | 32.7% | $99,999 or less | 25.6% |
| $5,000,000-$19,999,999 | 18.3% | $100,000-$999,999 | 25.4% |
| $20,000,000-$99,999,999 | 18.7% | $1,00,000-$9,999,999 | 25.4% |
| $100,000,000 or more | 16.8% | $10,000,000 or more | 15.8% |
| **Category Applicable to HRN** | **18.7%** | **Category Applicable to HRN** | **15.0%** |

DX 39 at 16; Tr. at 1555.

Mr. Burns used the same process for the MPI Study, which compared the revenues and earnings of its data sample, to determine that, if he were to base his conclusions on this study alone, the appropriate marketability discount would be somewhere between 21.8% and 18.0%.

| Revenues (ranked highest to lowest) | Average Discount | Earnings (ranked highest to lowest) | Average Discount |
|---|---|---|---|
| Fourth Quartile | 34.7% | Fourth Quartile | 34.1% |
| Third Quartile | 31.9% | Third Quartile | 30.1% |
| Second Quartile | 23.9% | Second Quartile | 30.0% |
| First Quartile | 21.8% | First Quartile | 18.0% |
| **Category Applicable to HRN** | **21.8%** | **Category Applicable to HRN** | **18.0%** |

DX 39 at 17.

Similarly, the Johnson Study found "the same relationship[;] [t]he larger the company, the greater the earnings, the lower the discount . . . ." Tr. at 1556.  Using this study, Mr. Burns found that a discount between 17.7% and 6.3 % would be appropriate.

| Revenues | Average Discount | Earnings | Average Discount |
|---|---|---|---|
| $10,000,000 of less | 23.5% | $0 or less | 22.5% |
| $10,000,000-$50,000,000 | 19.4% | $0-$1,000,000 | 26.0% |
| $50,000,00-$200,000,00 | 17.7% | $1,000,000-$10,000,000 | 18.1% |
| $200,000,000 or more | 13.0% | $10,000,000 or more | 6.3% |
| **Category Applicable to HRN** | **17.7%** | **Category Applicable to HRN** | **6.3%** |

DX 39 at 18.

Based on these three studies, Mr. Burns concluded that the appropriate range was between 16% and 22%.  He discounted the 6.3% of the Johnson Study, because "it seems to be a little bit out of the other range, so to me five of the six indicators are between 16 and 22 percent, and so that's what I would conclude based on the restricted stock studies."  Tr. at 1557.  Because the restrictions period in the study was only two years,  compared to the one-to-four year restrictions on the 9,999,900 shares of HRN restricted stock, the range of marketability discount – 16-22% – would apply to the first two blocks of stock (with one- or two-year resale restrictions).  With regard to the later years, Mr. Burns concluded that empirical studies disclosed "a time value element," so the ranges could be adjusted for the later tranches of shares.  Id. at 1558.  Therefore, he added a 4.3% "differential" to both sides of the range to reflect that the empirical studies only considered stock with "effectively a two-year holding period."  Id. at 1574-75.  The calculated range for the empirical studies was from 20% to 26%.

Mr. Burns also used a put-option methodology to value the shares, which he developed in response to the option methodologies of Mr. Mitchell and other valuation opinions that had been given in this case.  Mr. Burns's method utilized an option collar taking into account both a put option and call option.  This method, he opined, "took into account not only the cost of the put [but also] what you could receive if you sold a call option."  Id. at 1565.

> [B]y selling a call option, you're in effect selling to somebody else the upside, so you're getting rid of the upside.  On the put, in buying a put, you're getting rid of the downside, so with the two in tandem, you've eliminated all the price risk, and that's really how you kind of get to a liquidity question.

Id. at 1566.

Mr. Burns's final analysis took into account four years of theoretical borrowing costs associated with creating an option collar, which was adjusted to present value as of the valuation date. The results of his analysis, including his calculation of the holding period for each tranche of shares, based on the SEC rules, follow:

|  | Tranche 1 | Tranche 2 | Tranche 3 | Tranche 4 | Total |
|---|---|---|---|---|---|
| Number of shares | 1,959,960 | 489,990 | 489,990 | 7,059,960 | 9,999,900 |
| % of Total Shares | 19.6% | 4.9% | 4.9% | 70.6% | 100% |
| Liquidity Discount | 9.4% | 13.4% | 13.7% | 13.7% | |
| Holding period (years) | 2.52 | 4.35 | 4.50 | 4.50 | |
| Key Employee Adjustment | 7.5% | 7.5% | 7.5% | 7.5% | |
| Total Lack of Marketability Discount | 16.9% | 20.9% | 21.2% | 21.2% | |
| **Weighted Average Lack of Marketability Discount** | | | | | **20.3%** |

DX 39 at 24 (holding period); DX 40 at 1.

Taking into account what he called a "key-person" discount, Mr. Burns explained his rationale for adjusting the discount upward:

> [U]sually when you look at [key-person discounts], you're looking at a private company . . . .
>
> In this case, we have effectively a publicly traded share price, because we have the $16, and therefore there was a sense that the market price would have incorporated the key-person factor into the price, because it's all in the prospectus and everything else, and yet I was troubled by the fact that these shares are owned by Mr. Litman and Mr. Diener, and if they were to sell their shares, the buyer of those shares would know that one of the company insiders is selling their shares. . . . And so I tried to take that into account by making an adjustment of 7-1/2 percent to the discount based on research that's been done which indicates 5 to 10 percent is really the range of the key-person impact.

Tr. at 1571-72.

Finally, Mr. Burns compared his collar option approach against the three empirical studies that he examined at the beginning of his report.  Mr. Burns determined, per the restricted stock studies, an appropriate marketability discount range between 16-22%, which he increased to a range of 20-26%, having adjusted for the four-year restrictions.  Mr. Burns's ultimate opinion was that a 20.3% weighted average marketability discount would be appropriate, reflecting the values applied to all four tranches of shares.

## VI.   Valuation of the 9,999,900 shares of HRN restricted stock

### 1. Valuation date and role of judicial estoppel

Based on the evidence presented at trial, February 24, 2000, is the appropriate date for valuing the 9,999,900 shares of HRN restricted stock issued to TMF Liquidating Trust.  In making this determination, the court has relied on the date of issuance as reflected on the stock certificates, as well as other evidence to be discussed.  As an alternative ground for finding that the February 24, 2000 date is appropriate for determining the fair market value, the court has based its decision, in part, on the doctrine of judicial admission, which the parties briefed following trial.  See Order entered May 16, 2007, ¶ 3.

Although "'the issuance of [a stock] certificate is not a prerequisite to the acquisition of ownership.' . . . [A]bsent evidence to the contrary, the issuance of the stock certificates must be considered the event which creates an ownership interest in the corporation." Jupiter Corp. v. United States, 2 Cl. Ct. 58, 64-65 (1983) (internal citations omitted) (quoting Swenson v. Comm'r, 309 F.2d 672, 674 (8th Cir. 1962); see also Hawley v. Upton, 102 U.S. 314, 316-17 (1880). "Typically, stock is valued on the date the shares are issued." United States v. Roush, 466 F.3d 380, 385 (5th Cir. 2006); see also S. Tulsa Pathology Lab. Inc. v. Comm'r, 118 T.C. 84 (2002) (holding that appropriate date for determining fair market value was date on which stock was distributed to shareholders).  "When income is received, be it on the day the right to receive becomes fixed, as with an accrual basis taxpayer, or when beneficial ownership commences for a cash basis taxpayer, the amount of income received becomes set at its then value." Bankers Trust Co. v. United States, 207 Ct. Cl. 422, 433 (1975).

On March 14, 2000, Mary E. Reidy, an associate with Paul, Weiss, Rifkind, Wharton & Garrison, counsel to USA Networks, forwarded copies of two stock certificates – representing 4,654,905 and 5,100,000 shares respectively – to Mr. Lidji, counsel for the Litmans and the Dieners.  The stock certificates, issued to TMF Liquidating Trust, were dated February 24, 2000.  Ms. Reidy also included "receipts signed from a representative of Salomon Smith Barney, acknowledging receipt of the certificates." JX 13 at 2.

Although Hotels.com has presented evidence that some events associated with the stock transfer occurred after February 24, 2000, it was unable to overcome the presumption that "the issuance of the stock certificates must be considered the event which creates an ownership interest in the corporation." Jupiter Corp., 2 Cl. Ct. at 65. Hotels.com deems the language of the ARAPA to be decisive that the closing date should be March 1, 2000. Once again, the court concludes that the ARAPA is ambiguous and therefore cannot control the date of valuation. Hotels.com presents the court with a creative reading of Section 7.11.3, arguing that the language, "[i]f . . . the Buyer consummates an initial public offering . . . the Buyer shall issue to the Seller a number of shares," should determine the valuation date. ARAPA § 7.11.3; JX 4 at 21. According to Hotels.com, "consummate" is synonymous with the term "close," so March 1, 2000, the date on which the IPO closed, would be the appropriate valuation date.

Black's Law Dictionary defines the word "consummate" as "completed" or "fully accomplished," Black's Law Dictionary at 335 (8th ed. 2004), while the Oxford English Dictionary provides "completed, perfected, [and] fully accomplished" as definitions for "consummate." Oxford English Dictionary at 802 (2d ed. 1989). Because "consummate" carries more than one meaning, what "consummate" may mean in the context of this transaction is unclear. Therefore, the court cannot rely on dictionary definitions to find that March 1, 2000, is the appropriate date of valuation. A strong argument has been made that the IPO may have been "completed" or "fully accomplished" on February 24, 2000, the "effective date" of the IPO, according to the Memorandum of Closing and the date on the stock certificates sent to Messrs. Litman and Diener. Alternatively, February 25, 2000, the "offering date," could be considered the date on which the IPO was "perfected," as that was the date for initial trading of HRN stock on the NASDAQ. Still, the IPO could be considered "fully accomplished" on March 1, 2000, the "closing date," according to the Memorandum of Closing, for the 5,400,000 shares of HRN stock. HX 19 at 1.

The quandary that the court confronts in attempting to discern the valuation date from the ARAPA is that the parties apparently never reached an agreement on the date of issue, or, if such an agreement was reached, the ARAPA did not memorialize it. As has been established, the IPO price of $16.00 per share for the HRN stock was set on February 24, 2000, by the Pricing Committee of the Board of Directors of HRN. The February 29, 2000 Consent To Action by the Pricing Committee of the Board of Directors recites that Messrs. Khosrowshahi and Kaufman, acting as the two members of the Pricing Committee, were authorized by the full Board of Directors of HRN to "exercise all of the power and authority of the Board of Directors with respect to the issuance and sale of the class A common stock . . . ." HX 26 at 3. Pursuant to that authorization, on February 24, 2000, the Pricing Committee resolved "that the Public Offering price of the Offered Securities shall be $16.00 per share . . . ." Id.

73

According to Mr. Lidji, on the evening of February 24, 2000, he learned from counsel for Hotels.com, Paul Ginsberg of Paul, Weiss, Rifkind, Wharton & Garrison, that the IPO price had been set.  See Tr. at 280; HX 182 at 5.  Through the end of February, Mr. Lidji's billing records indicate that he continued to work on matters related to the IPO.  He testified, that although his billing records referred to work on a "closing" on February 25 and 29, 2000, the work involved the IPO closing, not the closing of HRN restricted stock.  His billing records also show that on February 25, 2000, Mr. Lidji began work on SEC Schedule 13D, which reflects that February 24, 2000, was the date of the event that required the filing.  Mr. Lidji, a forthright witness, accredited himself most handsomely of the transaction attorneys whose legal advice otherwise was received as testimony or recorded in deposition, and/or exhibits admitted at trial.  His testimony on operative facts was resoundingly more credible than that of other attorneys involved in any of the Asset Purchase Agreement, the ARAPA, or the IPO.

Admittedly, several documents indicate that the closing date may have been other than February 24, 2000. For example, the Secretary's Certificate, which, as Mr. Kuhn testified, operated "to certify certain matters, [such as the fact that] the company still exists – . . .there are several certifications that typically a company would make at a closing that's what this is." Tr. at 914.  The Secretary's Certificate was dated March 1, 2000.  The Memorandum of Closing for the 5,400,000 shares of class A common stock of HRN stock was also dated March 1, 2000.  No comparable memorandum of closing would exist for the shares issued to TMF Liquidating Trust.  Moreover, the Memorandum of Closing, as noted above, included an "effective date," of February 24, 2000, an "offering date" of February 25, 2000, and a "closing date" of March 1, 2000.  HX 19 at 1-2.  These documents, however, indicate the closing date, effective date, and offering date of the HRN IPO shares, are not determinative of the closing date for the HRN restricted stock.  Therefore, the court concludes, that the presumption in favor of the issuance date – the date on the stock certificates – has not been overcome.

In the alternative, the Litmans and the Dieners assert that "Hotels.com's 'new' valuation positions are disingenuous, lack credibility, and are completely at odds with the positions taken by Hotels.com during the six years before this litigation was filed." Litmans/Dieners' Br. filed June 11, 2007, at 3.  Similarly, defendant argues that "the Litmans, Dieners and Hotels.com all state in their pleadings or discovery responses that the stock was issued on that date [February 24, 2000], and the evidence presented at trial confirms this fact."  Def.'s Br. filed May 31, 2007, at 2.  The Litmans, the Dieners, and defendant contend that Hotels.com judicially admitted in its complaint that the issuance date of the HRN restricted stock is February 24, 2000.

74

"[P]leadings are judicial admissions and a party may invoke the language of the opponent's pleading to render the facts contained therein indisputable." E.C. McAfee A/C Bristol Metal Indus. of Canada Ltd. v. United States, 832 F.2d 152, 154 n.* (Fed. Cir. 1987) (holding answer to complaint to be "admission"); see also San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1598 (Fed. Cir. 1997) (holding no abuse of discretion in ruling that party to arguments before court barred by judicial estoppel from relitigating them); DataGen Corp. v. Johnson, 78 F.3d 1556, 1564-65 (Fed. Cir. 1996) (holding no abuse of discretion in ruling that judicial estoppel not applicable to bind party to stipulation). Nonetheless, while a judicial admission of a fact may bind a party, a valuation on a tax return "is not conclusive and . . . the trier of fact is entitled to determine, based on all the evidence, what weight, if any, should be given to the admission." Estate of Hinz v. Comm'r, 79 T.C.M. (CCH) 1289, 1295-96 (2000).

Hotels.com's Refund Claim, attached to its complaint, put forth, as an issue of fact, the following:

> 2.  On February 2, 2000, the asset purchase agreement was amended and restated ("Amended Purchase Agreement").  Pursuant to the Amended Purchase Agreement, Hotels.com also agreed to issue Hotels.com class A common stock ("Section 7.15 Shares") to the sellers in exchange for the sellers' release of any remaining contingent payment obligations based on the Company's performance.  Pursuant to the Amended Purchase Agreement, on February 24, 2000, Hotels.com issued the sellers 5,100,000 shares of class A common stock.

> 3.  On March 1, 2000, Hotels.com completed an initial public offering for 6.2 million shares of its class A common stock at $16.00 per share.  On February 24, 2000, Hotels.com issued the sellers 4,899,900 shares of class A common stock ("Section 7.13.1 Shares").

Compl. Ex. 6 at 6, Hotels.com, No. 06-285T (Fed. Cl. Apr. 10, 2006); see RCFC 10(c) ("Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion.  A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").  Based on the language of Hotels.com's Claim for Refund, which was included in its complaint, the court finds that Hotels.com judicially admitted that the date of issuance, and therefore the date for valuation purposes, should be February 24, 2000.

## 2.  Starting price for valuing the HRN restricted stock

Defendant and the Litmans and the Dieners argue in favor of a $16.00 per share price for the unrestricted shares of HRN stock.  Hotels.com and its expert Dr. Bajaj disagree.  In

the Addendum to Expert Report of Dr. Mukesh Bajaj, Dr. Bajaj opines that a base price between $23 and $26 on February 24, 2000, would be appropriate.  HX 1 ¶ 8; see Hotels.com's Br. filed Feb. 26, 2007, at 39.  In contrast, both Messrs. Burns and Mitchell based their evaluations on a $16.00 per share fair market value for an unrestricted share of HRN stock.

Although Mr. Mitchell was never asked to value the unrestricted stock of HRN as of February 24, 2000, he believed that "for the restricted stock the starting point should be $16 a share because [Messrs. Litman and Diener] can't flip that stock, I don't care what it is on the 25th." Tr. at 1095.  Mr. Mitchell firmly argued that a valuation expert should not include events that were not reasonably foreseeable on the valuation date in determining the fair market value of a stock.  Although he admits that the converse is also true – that an appraiser should consider events that are foreseeable – he vehemently disagrees that the price of the stock the next day should be considered.  "[T]he value on February 25 is no more important than the value of the 26th or 27th or the 28th or the 29th because my context is the TMF Trust stock that I can't flip . . . ." Id. at 1096.

Mr. Burns echoed Mr. Mitchell's opinion, stating, "I started under the premise or the rule of thumb in valuation which is that you're not allowed to look past the valuation date and that's something that's, you know, very adhered-to in the appraisal community." Id. at 1543.  He considered it improper to take into account what happened on February 25, 2000, in determining the fair market value for the stock on February 24, 2000. Id. at 1543.  "[I]t's really in everybody's best interest [referring to HRN and the underwriter] for that stock price to be fairly priced, because you have the company getting more proceeds the higher the prices and you have the underwriters getting larger fees if the price is higher." Id.  He also identified portions of the Prospectus dated January 25, 2000, that indicated to him that the company valued the unrestricted stock at $16.00 per share.  Compare JX 7 at 49 ("Mr. Segal and Ms. Harms will receive options to purchase 5,000 shares of our class A common stock under the Director's Stock Opinion Plan at an exercise price equal to the initial public offering price per share upon election to our board of directors."); with JX 7 at 51 ("Options will be automatically granted with respect to 5,000 shares of class A common stock upon a director's election to office, . . . at an exercise price equal to the fair market value of such shares on the trading date immediately preceding the date of grant.").

Dr. Bajaj puts forth an intriguing position that markets work so effectively that the transaction between the underwriter, DLJ, and HRN took into account as "part and parcel" of that deal the advice, assistance, and marketing services of DLJ, so that the transaction is not representative of the fair market value.  Tr. at 1259.  The persuasive points in the opinions of the other two experts that remained on the table after cross-examination and the balance of the evidence, however, do not favor adoption of Dr. Bajaj's approach.  Although

76

Messrs. Mitchell and Burns had not valued an IPO until their work in connection with this case, their experience in valuing stock impressed the court.  Dr. Bajaj has a deeper academic and scholarly knowledge of how IPO's operate, but his embrace of future events, or post-facto analysis, did not impress the court.  Moreover, Mr. Burns was particularly persuasive that the "rule of thumb in valuation which is that you're not allowed to look past the valuation date."  Id. at 1543.  The court is examining a stock valuation seven years after the IPO at the height of the "dot-com bubble."  It would be pure hindsight for the court now, in retrospect, to find that it was "highly foreseeable," as Dr. Bajaj argued, that the stock price would rise based on the prices collected during the road show and in the pre-bid market.  Because the valuation date is February 24, 2000, the court must limit itself to what was known on that date.  Hindsight teaches that what proved to be a great deal bore real risk at the time.  Given that Hotels.com has itself valued the unrestricted stock at $16.00 per share in its Claim for Refund, for IPO purposes, and in the Prospectus, which is fortified by the testimony of the Messrs. Burns and Mitchell, the court concludes that the February 24, 2000 value of an unrestricted share of HRN stock is $16.00.

   3.  Marketability discount

   Of the three expert witnesses, the court found Mr. Mitchell's methodology of determining a marketability discount to carry the most weight.  Both Dr. Bajaj and Mr. Burns provided the court with valuable expert testimony, but Mr. Mitchell's analysis best withstood the attacks of his counterparts and opposing counsel.  Mr. Mitchell's approach had its own weaknesses, however, and the court's marketability discount of the HRN restricted stock has been adjusted accordingly.

   1) Empirical studies of Mr. Mitchell, Dr. Bajaj, and Mr. Burns

   First, the court considered Mr. Mitchell's use of published empirical studies – especially the Hertzel and Smith Study and the Silber Study – with their aged data to be the appropriate approach.  Although Mr. Mitchell did not rely on these studies and, indeed, discussed the flaws inherent in each study, his consideration of their methodology supports his opinion that a wide range of appropriate marketability discounts can be supported.  Also, these studies reenforce the concept that one of the components driving the determination of a marketability discount is a quantifiable risk associated with purchasing a restricted stock.

   In contrast, the studies considered by Mr. Burns – the SEC Study, the MPI Study, and the Johnson Study – primarily examined the differences in marketability discounts by comparing HRN's earnings and revenues to each study's data.  While the court recognizes that earnings and revenues are two factors that should be considered in determining the marketability discount, those factors alone should not dictate the result.  For example, the

77

MPI Study, which was based on data from 1980 to 1995, published the individual transactions underlying the study's conclusions.  The individual transactions, however, reveal a wide range of discounts.  See L/DX 98 at 2 (charting range of discounts from low of 0.0% to high of 57.6%).  Furthermore, while the MPI Study displayed its data in categories, such as revenue, earnings, block-size, holding period, number of weeks to block size sell, and block-size trading volume, Mr. Burns focused only on revenue and earnings. See Tr. at 1638.  The MPI Study used data from high-tech companies, but failed to include Internet companies.  Mr. Burns did not isolate the companies that he regarded as were most comparable to HRN and examine those discounts.  See id. at 1640.

Mr. Burns also considered the SEC Study, which, although adjusted for time value, was a dated analysis of restricted stock from 1966 to 1969.  At trial it became evident that Mr. Burns did not rely on the  underlying data of the individual transactions, because they were not available; in other words, he could not consider the wide range of marketability discounts that may have been used by individual companies examined in the study.  By basing his conclusion, in part, on an outdated study using only the published averages within the earnings and revenues category, Mr. Burns is channeling his analysis to yield an average result.  The court agrees with Mr. Mitchell that considering only averages is misguided:

> You're looking at data where the observed discounts can range from less than 10 percent to more than 80 percent, and if you look at how these data points are stratified in Mr. Burns's report, taking averages will do almost nothing but lead you to the conclusion that in just about every case the right discount is the average discount.

Id. at 1046 (testimony of Mr. Mitchell).

Finally, Mr. Burns considered the Johnson Study in his empirical analysis.  Although the Johnson Study examined transactions from 1991 through 1995,  Mr. Burns admitted that he didn't "believe that we've ever had the data points for the Johnson study.  What we have is a summary of the results."  Id. at 1641.  Of course, this  presents the same problem as the SEC Study – considering averages – without taking into account the underlying data points, which inevitability leads to a conclusion that the marketability discount should be an average of these numbers.

Dr. Bajaj's marketability discount was based entirely on his restricted stock approach, which compared the results of the Bajaj Study, the FMV Study, and the available data on HRN to estimate the appropriate marketability discount. This methodology, however, did not take into account the substantial restrictions imposed on the HRN stock held by TMF Liquidating Trust.  For example, as Dr. Bajaj conceded, the stocks in the Bajaj Study and

FMV Study could be sold into private placements, could be collared, and were not subjected to SEC Rule 144 trade-volume restrictions.  <u>See</u> <u>id.</u> at 1400, 1404.  In contrast, the HRN restricted stock could not be sold into private placements, could not be collared easily, and was subject to SEC Rule 144 trade-volume restrictions.  Dr. Bajaj, moreover, did not adjust his marketability discount for the fact that Messrs. Litman and Diener were CEO and President of HRN, respectively, with the not unlikely consequence that the marketability of their shares would be depressed due to the signal that a big sell-out by these officers would portend.  He disagreed that such an adjustment would be appropriate.

Despite maintaining that the different restrictions were not significant factors, Dr. Bajaj argued that he took them into account:

> What I have said is as a starting point, you benchmark HRN shares to the most appropriate group of private placements. That gives me a starting  discount of 20 percent.  Then I specifically take into account factors that would result in an upward adjustment, including longer contractual restriction period and factors that would result in a downward adjustment.  And on balance, weighing those factors, I have concluded that 20 percent is a reasonable number, taking into account all the contractual differences that I determine to be appropriate.

<u>Id.</u> at 1423.  The court is flummoxed by Dr. Bajaj's testimony that he took into account all the differences between the stock in his studies and the HRN restricted stock.  The evidence presented at trial convinces the court than the HRN restricted stock was subject to substantial restrictions that were more severe that the restrictions imposed on the stock of the companies in the Bajaj Study and the FMV Study.  Thus, the opinions that everything evens out and an appropriate valuation is 20% percent are incongruent in the factual context of this issuance.

### 2) <u>Quantitative methodologies employed by Messrs. Mitchell and Burns</u>

The most significant disagreement between the expert witnesses, however, concerned the option-pricing methodology relied on by Mr. Mitchell, which he calculated using the Black-Scholes model.  Mr. Mitchell's option-pricing model determined the value of the option – the right to buy or sell a security at a specified price with the right to do so having a specific duration.  The value of the option is primarily related to two factors: (1) the risk of the security and (2) the time period before expiration.  Mr. Burns argued that this model was "one-sided," taking only account of "the downside risk and trying to insure against that with a put option."  <u>Id.</u> at 1559.

Mr. Mitchell challenges the accuracy of Mr. Burns's characterization of his approach as an insurance methodology:

> [T]he problem I have with characterizing it as insurance is it's insurance if you own the underlying, but the value of a put, if you and I want to buy the same put on Microsoft stock and you own the stock and I don't we're going to pay the same price for the put. And owning the put without the stock doesn't have anything to do with insurance, you're simply limiting your upside and making a bet based on put.
>
> Q  And you're avoiding the downside. Right?
> A  Well, your downside is the loss of all your premium.
> Q  But the holder of the put does not face the downside risk.
> A  Well, the holder of the put doesn't own the underlying, though. The holder of the put does not own the stock, he has simply made a bet on whether or not the stock will go up or down in value, and he's risked his put premium or the put price, and if his stock – the maximum he can make is the difference between zero and the exercise price. But that's why I want everybody to think about this option disconnected from a portfolio of the option and the underlying because that's not what this is. The value of the put does not depend on owning the underlying.

Id. at 1164-65.

Mr. Burns would rectify the problems he identified with Mr. Mitchell's method by using an option collar. This method "takes into account not only the cost of the put [but also] what you could receive if you sold a call option." Id. at 1565. Dr. Bajaj agrees "in principle" with Mr. Burns's collar approach to determine a marketability discount, although he did not utilize a similar analysis. See id. at 1302. Mr. Burns explained his methodology, as follows:

> You're in effect -- by selling a call option, you're in effect selling to somebody else the upside, so you're getting rid of the upside. On the put, in buying a put, you're getting rid of the downside, so with the two in tandem, you've eliminated all the price risk and that's really how you kind of get to a liquidity question.

Id. at 1566. This case was the first occasion for Mr. Burns to use this approach. Although Mr. Burns repeatedly emphasized, like Mr. Mitchell, that his approach was hypothetical, his analysis depended on assuming a number of real-world factors. For instance, Mr. Burns's analysis took into account the cost of borrowing in present value. To calculate the cost of borrowing, Mr. Burns looked at the cost in 100-share increments and consulted an investment

bank for the current option pricing as of February 2000.  Mr. Mitchell argued, and the court agrees, that, because the collar relies on real-world variables, it cannot be considered purely theoretical.  The size of the HRN restricted stock, as compared to the public float, render such a transaction impossible as a practical matter.  Although theoretical merit commends Mr. Burns's position to an extent, this methodology is not wholly theoretical, as it relies on real costs that have been shown not to be achievable.

The most persuasive real-world factor supporting Mr. Mitchell's methodology is the fact that Ruth Haney, IRS valuation agent, used an option-discount methodology, L/DX 13 at 3 (memorandum dated December 21, 2004 from Ms. Haney to Ms. Weiss, the IRS agent on the Dieners' audit, discussing appropriate marketability discount for restricted stock as of February 24, 2000), as did Deloitte & Touche in an earlier evaluation as of February 25, 2000, dated Oct. 18, 2001, L/DX 51.  These valuations support the finding that Mr. Mitchell's opinion is the product of an accepted method within the appraisal community of valuing restricted shares.  Moreover, the court agrees with Mr. Mitchell's conceptualization of the valuation challenge:

> The TMF Trust held shares had a valuable right stripped away from them, and what was that valuable right?  It's the option to sell, it's the option to sell that security at any time, at any price during the restriction period.  It is gone. I can't wake up any morning and decide to sell those shares.

> The option pricing methodology is a very simple economic model that tells you what the value of that option that's been stripped away, what is that value.

Tr. at 1015.

Although the court generally approves of Mr. Mitchell's approach, weaknesses were revealed that give the court pause.  For example, Mr. Mitchell chose to apply 100% volatility for all four holding periods, which is supportable by the figures provided by HRN in the prospectus, but he considered the volatility of comparable companies only over a 52-week period, as opposed to a longer period.  Furthermore, Mr. Mitchell admitted that he had to make some "simplifying assumptions" and that, if he had used "a slightly more defined methodology, you might get a higher put value." Id. at 1169-70.

Mr. Mitchell did not rely solely on his option-pricing model.  He also took into account the discounts he calculated by completing his CAPM analysis, which answered the question, "how sensitive is my stock to returns in the market." Id. at 1025.  This analysis, which assists appraisers to calculate the risk associated with holding an undiversified stock portfolio, considers two types of risk: that associated with the risk of the market going up or

down and the risk of a company's specific stock going up or down.  While it is a generally accepted model, Mr. Mitchell's application of the CAPM assumed an investor who was completely undiversified.    This assumption perhaps led to an overstatement of the marketability discount, as most investors do not hold completely undiversified stock. Moreover, Mr. Mitchell admitted that he "changed the proceeds variable and used $1 per share versus something that would have been closer to $16 per a share." Id. at 1178.  The impact of this adjustment is that his calculations would account for approximately $10 million in proceeds, instead of the $160 million, which was Hotels.com's position. Defendant elicited from Mr. Mitchell that $25 million in proceeds would be more appropriate than his $10 million figure, because Hotels.com was able to keep the $25 million Messrs. Litman and Diener would have been owed under their earn-out provisions. Accordingly, Mr. Mitchell admitted that the $25 million figure would be a more appropriate amount to use in his CAPM analysis.  After making this adjustment for larger amount in proceeds, Mr. Mitchell stated that it would only change his marketability discounts by a "couple of percent." Id. at 1182.

More generally, Mr. Mitchell's analysis failed to consider specific items.  First, he did not take into account the fact that the restrictions could lift early, nor did he consider the possible value of tag-along rights.  Even though it was not foreseeable that the Litmans and the Dieners would have the opportunity to exercise these options, the court concludes that the possibility of these opportunities, as negotiated in the contract, should have been considered.

In his expert report, Mr. Mitchell, provided a range of discounts before providing his final marketability discounts.  See L/DX 60 at 47.  In order to account for the weaknesses in Mr. Mitchell's analysis, as discussed above, the court has subtracted 25% from the lower range of his marketability discounts to reach the following conclusion regarding the fair market value of the HRN restricted stock:

| Block Size | Restriction period | Discount | Discount Value per Share | Fair Market Value |
|---|---|---|---|---|
| Block One (1,959,960) | One year | 22% | $12.48 | *$24,460,301 |
| Block Two (489,990) | Two years | 36% | $10.24 | *$5,017,498 |
| Block Three (489,990) | Three years | 38% | $9.92 | *$4,860,701 |
| Block Four (7,059,960) | Four years | 50% | $8.00 | $56,479,680 |
| Total | | | | $90,818,180 |

* Rounded to the nearest whole dollar

82

VII. <u>The Dieners' limitations defense under § 6501 to the original tax assessment</u>

The Dieners attempt to foreclose the IRS's assessment of deficiency and penalties by raising the time bar of I.R.C. § 6501(a). The Dieners filed their 2000 tax return on October 15, 2001. In August 2004 the Dieners moved from their home in Surfside, FL, into a new residence, which they had constructed in Indian Creek Village, FL. On October 1, 2004, the Dieners mailed a Form 8822 informing the IRS of their change of address, which the IRS received on October 4, 2004. The IRS on October 8, 2004, mailed a notice of deficiency to the Dieners' former address in Surfside, FL. Although the Dieners had moved from their home in Surfside, FL, they still own the property and use it occasionally when going to the beach.

Section 6501(a) provides, that "[e]xcept as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed . . . ." <u>Id.</u> The running of the limitations period is suspended for 150 days once a notice of deficiency is mailed to the taxpayer. I.R.C. §§ 6503(a)(1), 6213(a). 19/ If the amount of gross income omitted from a return is greater than 25% "of the amount of gross income stated in the [original] return, the tax may be assessed . . . at any time within 6 years after the return was filed." I.R.C. § 6501(e)(1)(A). Pursuant to Section 6212, a notice of deficiency is to be sent to the taxpayers' last known address by certified mail. <u>See</u> I.R.C. §§ 6212(a), (b)(2).

Although they received the notice, the Dieners take the position that the notice of deficiency was ineffective because it was not sent to their "last known address." In <u>Badaracco v. Comm'r</u>, 464 U.S. 386, 391 (1984), the Supreme Court held that the "'[s]tatutes of limitation sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government.'" <u>Id.</u> (quoting <u>E.I. Dupont de Nemours & Co. v. Davis</u>, 264 U.S. 456, 462 (1924)). In <u>Estate of Greenwood v. Comm'r</u>, T.C. Memo 2003-98 (U.S. Tax Ct. 2003), the United States Tax Court held that "[w]hen a taxpayer receives actual notice of deficiency and does not suffer prejudicial delay in filing a timely petition with this

_____

19/ Section 6503(a)(1) provides, in pertinent part:

The running of the period of limitations provided in section 6501 . . . on the making of assessments or the collection by levy or a proceeding in court, in respect of any deficiency as defined in section 6211 . . . , shall (after the mailing of a notice under section 6212(a)) be suspended for the period during which the Secretary is prohibited from making the assessment or from collecting by levy or a proceeding in court . . . , and for 60 days thereafter.

Court, the notice of deficiency, even though incorrectly addressed, is valid under section 6212(a)." Id. at *4.

Similar conclusions have been reached by the United States Court of Appeals for the Fourth Circuit, the United States Court of Appeals for the Tenth Circuit, and the United States Court of Appeals for the Ninth Circuit. In St. Joseph Lease Capital Corp. v. Comm'r, 235 F.3d 886 (4th Cir. 2000), for example, the court explained that the IRS's mailing of a notice of deficiency serves two functions: "First, it tolls the three-year statute of limitations, and second, it commences a process that enables the taxpayer to challenge the deficiency." Id. at 888. With respect to the former, the court declaimed that "[i]n the context of tolling the statute of limitations, a misaddressed mailing is of no consequence." Id. at 891. As for the second, as long as the taxpayer has ample time to petition the Tax Court, "any technical flaw in the mailing is harmless." Id.; see also Balkissoon v. Comm'r, 995 F.2d 525, 528 (4th Cir. 1993); Clodfelter v. Comm'r, 527 F.2d 754 (9th Cir. 1975); Scheidt v. Comm'r, 967 F.2d 1448, 1450-51 (10th Cir. 1992).

Jean M. Wharton, a 90-day reviewer for the IRS in 2004, was responsible for preparing the statutory notice of deficiency for the Dieners. Ms. Wharton, a straightforward witness, testified that on September 20, 2004, she identified the address for mailing the notice of deficiency based on an internal IRS system. Ms. Wharton also checked the address against the Dieners' last known address with the United States Postal Service, which reflected the older Surfside, FL address. According to Ms. Wharton, it is the policy of the IRS only to "pull documents" relating to a taxpayer's last known address when the documents are older than thirty days at the time the notice of deficiency is prepared. This is consistent with Revenue Procedure 2001-18, Section 5.02(3), which gives the IRS its own safe harbor: "A clear and concise written notification of a change of address will be considered properly processed after a 45-day processing period . . . ." Rev. Proc. 2001-18, § 5.02(3), 2001-1 C.B. IV. Ms. Wharton related the process of issuing and mailing the notice of deficiency so methodically that the court could make no finding other than that she knew the procedure and executed it precisely and with reasonable dispatch.

The Dieners have been unable to show that the misaddressed notice of deficiency in any way misled or otherwise prejudiced them. They have been involved in contesting the assessment since shortly after it issued. On October 12, 2004, Mr. Diener received actual notice from his attorney, who had received a copy of the notice of deficiency. Mr. Diener later informed Mrs. Diener. The misaddressed notice of deficiency is of no consequence, as the Dieners had ample opportunity to challenge the notice of deficiency in the United States Tax Court or in the Court of Federal Claims. The Dieners have not shown that the IRS unreasonably availed itself of Revenue Procedure 2001-18 to process their change of address.

VIII.  <u>Defendant's counterclaims</u>

Defendant filed counterclaims against the Litmans and the Dieners for penalties and interest pursuant to I.R.C. §§ 6662 <u>20</u>/, 6601(a) <u>21</u>/, and 6601(e)(2)(B). <u>22</u>/   Counterclaim

---

<u>20</u>/ Section 6662(a) and (b) provide, in full:

(a) Imposition of penalty. – If this section applies to any portion of an underpayment of tax required to be shown on a return, there shall be added to the tax an amount equal to 20 percent of the portion of the underpayment to which this section applies.

(b) Portion of underpayment to which section applies. – This section shall apply to the portion of any underpayment which is attributable to 1 or more of the following:

(1) Negligence or disregard of rules or regulations.
(2) Any substantial understatement of income tax.
(3) Any substantial valuation misstatement under chapter 1.
(4) Any substantial overstatement of pension liabilities.
(5) Any substantial estate or gift tax valuation understatement.

This section shall not apply to any portion of an underpayment on which a penalty is imposed under section 6663. Except as provided in paragraph (1) or (2)(B) of section 6662A(e), this section shall not apply to the portion of any underpayment which is attributable to a reportable transaction understatement on which a penalty is imposed under section 6662A.

<u>21</u>/ Section 6601(a) provides, in full:

(a) General rule. – If any amount of tax imposed by this title (whether required to be shown on a return, or to be paid by stamp or by some other method) is not paid on or before the last date prescribed for payment, interest on such amount at the underpayment rate established under section 6621 shall be paid for the period from such last date to the date paid.

<u>22</u>/ Section 6601(e)(2)(B) provides, in full:

Interest on certain additions to tax. – Interest shall be imposed under this section with respect to any addition to tax imposed by section 6651(a)(1) or 6653 or under part II of subchapter A of chapter 68 for the period which–

filed Nov. 1, 2005, ¶¶ 6-9; Counterclaim filed Nov. 7, 2005, ¶¶ 6-9.  Preserving its right to file a counterclaim against Hotels.com, defendant in its pretrial filings stated that "[w]hether Hotels.com substantially understated its tax or substantially overstated the value of HRN stock, and is subject to penalties for those reasons, is dependent on the value for the stock ultimately determined in this case."  Def.'s Br. filed Apr. 2, 2007, at 27 (citing I.R.C. § 6662(d), (e)).

"[The Commissioner of Internal Revenue's] ruling has the support of a presumption of correctness . . . ."  Welch v. Helvering, 290 U.S. 111, 115 (1933) (citing Wickwire v. Reinecke, 275 U.S. 101 (1927)); see also Montgomery Coca-Cola Bottling Co., Inc. v. United States, 615 F.2d 1318, 1322-23 (Ct. Cl. 1980) ("[O]nce the Commissioner of Internal Revenue makes an assessment against a taxpayer, a presumption of correctness attaches to that determination."); Conway v. United States, 326 F.3d 1268, 1278 (Fed. Cir. 2003) ("'The ruling of the Commissioner of Internal Revenue enjoys a presumption of correctness and a taxpayer bears the burden of proving it to be wrong.'  Transamerica Corp. v. United States, 902 F.2d 1540, 1543 (Fed. Cir. 1990)"); Pahl v. Comm'r, 150 F.3d 1124, 1131 (9th Cir. 1998) ("Commissioner's determination of a penalty is presumed correct.").  "[T]he IRS generally satisfies its burden to establish a prima facie case by offering into evidence a certified copy of the tax assessment."  Q.E.D., Inc. v. United States, 55 Fed. Cl. 140, 143 (2003) (citing Cook v. United States, 46 Fed. Cl. 110, 119 (2000)).  "The burden of proof then shifts to the taxpayer to show that it is not liable for the assessed tax and/or penalties plus interest."  Q.E.D., 55 Fed. Cl. at 143; see also Welch, 290 U.S. at 115 ("[P]etitioner has burden of proving [the ruling] to be wrong."); Bolding v. United States, 215 Ct. Cl. 148, 163-64 (1977); Conway, 326 F.3d at 1278; Pahl, 150 F.3d at 1131 ("[Plaintiff] '[ha]s the burden of proving that [his] underpayment was not the result of negligence or disregard.'" (quoting Allen v. Comm'r, 925 F.2d 348, 353 (9th Cir. 1991))).

Pursuant to Section 6664(c)(1), "[n]o penalty shall be imposed under section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the  taxpayer acted in good faith with respect to such portion."  I.R.C. § 6664(c)(1).  Treasury Regulation § 1.6664-4(b) (2006), provides, in pertinent part:

---

22/ (Cont'd from page 85.)

      (I) begins on the date on which the return of the tax with respect to which such addition to tax is imposed is required to be filed (including any extensions), and

      (ii) ends on the date of payment of such addition to tax.

The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. . . . Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. . . . Reliance on an information return, professional advice, or other facts, however, constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. . . . Reasonable cause and good faith ordinarily is not indicated by the mere fact that there is an appraisal of the value of property. Other factors to consider include the methodology and assumptions underlying the appraisal, the appraised value, the relationship between appraised value and purchase price, the circumstances under which the appraisal was obtained, and the appraiser's relationship to the taxpayer or to the activity in which the property is used.

Treas. Reg. § 1.6664-4(b); see Treas. Reg. § 1.6664(c) ("[T]he taxpayer's education, sophistication and business experience will be relevant in determining whether the taxpayer's reliance on tax advice was reasonable and made in good faith."). Reliance on professional advice can provide a defense to a negligence or disregard of rules or regulations penalty. See Van Scoten v. Comm'r, 439 F.3d 1243, 1253 (10th Cir. 2006); Illes v. Comm'r, 982 F.2d 163, 166 (6th Cir. 1992); Heasley v. Comm'r, 902 F.2d 380, 383 (5th Cir. 1990). However, reliance on professional advice must be reasonable. See United States v. Boyle, 469 U.S. 241, 242 (1985) ("When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether liability exists, it is reasonable for the taxpayer to rely on that advice. . . . [T]hat reliance cannot function as a substitute for compliance with an unambiguous statute."). When determining reasonable cause and good faith in connection with a self-prepared tax return, the pertinent regulation provides that "the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." Treas. Reg. § 1.6664-4; see also Stanford v. Comm'r, 152 F.3d 450, 460 (5th Cir. 1998). This is the crux of the Litmans and the Dieners' burden.

The court concludes that the Litmans and the Dieners are ultimately protected by Section 6664(c)(1), as the court finds that they acted with "reasonable cause" and in "good faith." TMF Liquidating Trust's tax return for 2000 was prepared by KPMG, although Mrs. Diener, a C.P.A., was responsible for the working papers. Ms. Fernandez of KPMG signed the tax return as preparer on May 8, 2001. Significantly, the Litmans and the Dieners commissioned two appraisals of the HRN restricted stock before filing TMF Liquidating Trust's tax return. The first appraisal, Mr. Mitchell's, was undertaken while he was at BVS.

The second appraisal was prepared by David J. Bohlmann, 23/ another appraiser. Although the Litmans and the Dieners ultimately relied on the appraisal completed by Mr. Mitchell, Mr. Bohlmann opined that the HRN restricted stock had a fair market value 80% higher than Mr. Mitchell's conclusion. Compare HX 365 with L/DX 58 at 3.

Moreover, KPMG provided TMF Liquidating Trust with a memorandum discussing their review of Mr. Mitchell's valuation. The memorandum states:

> The valuation was reviewed by the KPMG Valuation group in Atlanta purely for reasonableness and concurred that proper valuation methods were used. While KPMG concurred as to the methods used and reasonability of discounts, it did not perform the valuation and this should not be construed that the valuation is KPMG's.

L/DX 89 at 4. In his deposition testimony, Mr. Horan, the Litmans and the Dieners' primary contact at KPMG, stated that Mr. Nicholson of KPMG Valuation Services reviewed Mr. Mitchell's report for "reasonableness," Horan Dep. at 15, *i.e.*, to validate whether the methodology was accurate and whether the valuation was prepared in a reasonable way. Id. at 16. According to Mr. Horan, this was standard practice for KPMG in preparing tax returns: "[A]nything that's done that requires an expertise has to be reviewed by someone who has that expertise before it can be relied upon, if it's prepared outside of the firm." Horan Dep. at 16. Mr. Nicholson reviewed the report informally, issued no written report, and related his opinion orally to Mr. Horan.

Based on the testimony of Mrs. Diener and Mr. Horan, the memorandum entered into evidence, and the fact that Mr. Bohlmann's appraisal had submitted a valuation conclusion similar to that of Mr. Mitchell, the court finds that the Litmans and the Dieners acted in good faith and acted in a reasonable manner in the preparation of TMF Liquidating Trust's tax return. Although the discount is substantial, the Litmans and the Dieners obtained two valuations; they chose to rely on the more conservative of the two; and the valuation was reviewed for reasonableness by KPMG, the tax preparer for TMF Liquidating Trust. The Litmans and the Dieners adopted the value as a pass-through from TMF Liquidating Trust.

Defendant also argues that the Litmans and the Dieners were aware of the requirement to file a Form 8594 regarding the transfer of the HRN restricted stock in 2000 and disregarded applicable rules and regulations by failing to file it for the 2000 tax year. Mrs.

---

23/ The operative facts concerning the Bohlmann appraisal are that it was commissioned, when it was commissioned, and what value it yielded.

Diener, who coordinated preparation and filing of the TMF Liquidating Trust returns, testified that the 2000 return, as forwarded to her from KPMG, did not include a Form 8594. She also noted that there was no discussion of the need to file it in the April 3, 2001 memorandum from KPMG titled Various Tax Discussions Relating to TMF Liquidating Trust. Mrs. Diener testified that she did not become aware of the Form 8594 until she received the HRN tax return in September 2001. Eventually, Mrs. Diener prepared a draft Form 8594 for TMF Liquidating Trust, which she sent to Mr. Horan, but never filed with the IRS. According to Mrs. Diener, Mr. Horan did not advise her to file the Form 8594 as drafted; instead, he recommended that they "get the parties to meet and to agree on a valuation." Tr. at 573. Mr. Horan did not recall whether he gave any advice to the Litmans or Dieners about the need to file a Form 8594. His primary conclusion, consistent with the testimony of Mrs. Diener, was that he saw a "need to agree on [the] values together." Horan Dep. at 47. 24/

Pursuant to Section 6662(c), the term "negligence" "includes any failure to make a reasonable attempt to comply with the provisions of this title, and the term 'disregard' includes any careless, reckless, or intentional disregard." I.R.C. § 6662(c). The Litmans and the Dieners followed the advice of their tax advisors at KPMG to the extent that the court comfortably can find that they did not disregard the rules and regulations of the IRS.

IX.  The Litmans' and the Dieners' deductions and capital gains related to the bonus paid to Andrew Pells

Andrew Pells was Senior Vice President of Hotel Products at Hotel Reservations Network, prior to its sale to USA Networks. Mr. Pells was one of the key employees at HRN. Early in his tenure at the company, Messrs. Litman and Diener promised that if "he stayed and worked with us, and worked with us all the way through our term in the company, that we would pay him – or we would give him 5 percent of the company at the time it was sold." Tr. at 90. The agreement was not reduced to writing until after 1999. On the 2000 tax return for TMF Liquidating Trust, Messrs. Litman and Diener took a deduction for the capital gains on the transfer of 244,995 shares of HRN restricted stock to Mr. Pells in the amount of $3,919,920. See L/DX 20 at 1; JX 19 at 19. The Litmans, the Dieners, and

---

24/  Hotels.com is more impressed than the court by the fact that Mr. Ghandi, the Senior Director of Finance for HRN at the time, who completed and signed the form that set forth the value of the acquisition in the 2000 tax return, obliterated with white-out the increase in goodwill that HRN proposed to take. Hotels.com did not prove that Mr. Ghandi was acting on Mr. Diener's instruction, although Mr. Ghandi was aware that Messrs. Litman and Diener did not agree with the $16.00 per share price that was removed.

defendant agree that the proper taxation of this transfer of stock is governed by I.R.C. § 83, which requires valuation be made without regard to restrictions. 25/ Mr. Pells and TMF Liquidating Trust reported the value of his shares at $16.00 per share, despite the transfer restrictions.  As the court has determined that the fair market value of the stock, without restrictions, is $16.00 per share as of February 24, 2000, the court finds that the deduction taken by TMF Liquidating Trust was accurate.  Mr. Pells, who is not a party to this lawsuit, was obligated to report the pass-through amount.

## CONCLUSION

1.  Accordingly, based on the foregoing, the court finds and concludes that the value of the restricted stock transferred to TMF Liquidating Trust was $90,818,180 and the value of the restricted stock transferred to Mr. Pells was $3,919,920.

2.  By September 21, 2007, the parties shall file a form of judgment that sets forth the amount of judgment for the Litmans and the Dieners on their claim for refund, adjusted for

---

25/ Section 83 provides, in pertinent part:

If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of –

(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

(2) the amount (if any) paid for such property,

shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.

interest due, and the amount of judgment on defendant's protective counterclaim (to be perfected) against Hotels.com.

3.  Judgment shall enter for the Litmans and the Dieners on defendant's amended counterclaim for penalties.  Judgment shall enter for defendant on defendant's amended counterclaim for any interest due from the Litmans and the Dieners.

4.  Defendant shall advise in a separate Status Report to be filed by September 14, 2007, if it seeks penalties against Hotels.com, a course of action that the court does not consider to be warranted.

**IT IS SO ORDERED**.

No costs will be awarded upon entry of judgment.

s/ Christine O.C. Miller
_____
**Christine Odell Cook Miller**
Judge