**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **DAVID S. LITMAN and MALIA A. LITMAN,** | **)** | |
| **Plaintiffs-Counterdefendants,** | **)** | |
| **v.** | **)** | **No. 05-956T** |
| **THE UNITED STATES,** | **)** | |
| **Defendant-Counterplaintiff** | **)** | |
| | **)** | |
| | **)** | |
| **ROBERT B. DIENER and MICHELLE S. DIENER,** | **)** | |
| **Plaintiffs-Counterdefendants,** | **)** | |
| **v.** | **)** | **No. 05-971T** |
| **THE UNITED STATES,** | **)** | |
| **Defendant-Counterplaintiff** | **)** | |
| | **)** | |
| | **)** | |
| **HOTELS.COM, INC. and Subsidiaries (f/k/a** | **)** | |
| **HOTEL RESERVATIONS NETWORK, INC.)** | **)** | |
| **Plaintiffs,** | **)** | |
| **v.** | **)** | **No. 06-285T** |
| **THE UNITED STATES,** | **)** | **(Judge Christine O.C. Miller)** |
| **Defendant** | **)** | |
| | **)** | |

**HOTELS.COM, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFFS-COUNTERDEFENDANTS, DAVID S. LITMAN, MALIA A. LITMAN, ROBERT B. DIENER AND MICHELLE S. DIENER'S MOTION FOR RECONSIDERATION AND HOTELS.COM'S CROSS-MOTION FOR RECONSIDERATION**

Plaintiffs Litmans and Dieners fail to make the requisite showing entitling them to the relief they seek—reconsideration of this Court's opinion.[1] They fail to assert an intervening change in the law, the discovery of new evidence, or "manifest injustice." Instead, their motion is inconsistent with their own expert's opinion and testimony and based on tardy arguments that were available to them throughout this litigation, but which they chose not to raise.

[1] Although Hotels.com continues to fundamentally disagree with the Court's conclusion that Mr. Mitchell's analysis is appropriate, we do agree that the Court correctly recognized many of the errors or shortcomings of that analysis.

Unlike the Litmans and Dieners, Hotels.com has suffered a manifest injustice. The Court used Mr. Mitchell's opinion as the basis for its discount conclusion, recognizing many significant errors contained therein and reducing his discount conclusion by 25% to account for these errors. Given the existence of significant, *additional* errors in Mr. Mitchell's valuation conclusion, which were not considered or addressed by the Court, Hotels.com respectfully submits this Cross-Motion for Reconsideration, and asks the Court to further reduce Mr. Mitchell's discounts for the reasons explained below.

## I. <u>The Standard for Reconsideration</u>

A party seeking reconsideration under Rule 59 of the Rules of the Court of Federal Claims must show a "manifest error of law or mistake of fact." *Simons v. United States*, 75 Fed. Cl. 506, 511 (2007) (*citing Coconut Grove Entm't v. United States,* 46 Fed. Cl. 249, 255 (2000)). A manifest error is one that is "clearly apparent or obvious." *Ammex v. United States*, 52 Fed. Cl. 555, 557 (2003), *rev'd on other grounds*, 384 F.3d 1368 (Fed. Cir. 2004). It is not sufficient merely to reassert an argument previously made and considered by the court. *Stelco Holding Co. v. United States*, 45 Fed. Cl. 541, 541-42 (2000). Indeed, the movant must show "extraordinary circumstances" before prevailing on a Rule 59(a) motion for reconsideration. *AT&T Corp. v. United States*, 63 Fed. Cl. 209, 211 (2004). Specifically, the movant must show one of three things: (1) an intervening change in the law has occurred, (2) previously unavailable evidence is now available, or (3) granting the motion is required to prevent a manifest injustice. *Pac. Gas & Elec. Co. v. United States*, 58 Fed. Cl. 1, 2 (2003) *citing Fru-Con Const. Corp. v. United States,* 44 Fed. Cl. 298, 301 (1999), *aff'd*, 250 F.3d 762 (Fed. Cir. 2000).

**A. <u>Litmans' And Dieners' Motion Fails To Meet The Standard For Reconsideration</u>**

The Litmans and Dieners fail to meet the standard for reconsideration. The one case that they cite (Litman/Diener Motion at n.2) for the proposition that the "omission of a key person discount can be rectified by the Court's reconsideration of its judgment," *Holland v. United States*, 75 Fed. Cl. 492 (2007), is inapposite. That case denied the requested relief, does not involve a key-person discount, and simply reiterates the standard for motions for reconsideration set forth above: "[t]o prevail on a motion for reconsideration, the movant must point to a manifest error of law or mistake of fact." *Id.* at 494 (*quoting Coconut Grove*, at 255 (2000) (*citing Franconia Assoc. v. United States*, 44 Fed. Cl. 315, 316 (1999))).

The Litmans and Dieners allege no change in law to support their motion—the key-person cases they cite are between one and two decades old. They also cite no new evidence. All of the facts on which their motion relies were available throughout the course of this litigation. The Litmans and Dieners do not allege otherwise.

Moreover, the Litmans and Dieners do not claim that the granting of their motion is required to prevent a "manifest injustice." They do not contest the Court's reliance on Mr. Mitchell's methodology. Nor do they contest the Court's rationale for reducing Mr. Mitchell's computed discounts due to the numerous errors and shortcomings in his methodologies. Instead, they simply quibble with the Court's purported failure to add a key-person discount by adopting the only part of Mr. Burns' discount opinion that they like. They do not and cannot allege that the Court's failure to add the additional discount they now seek would result in manifest injustice because, as discussed in Section I.B., below, their tardy request is fundamentally inconsistent with their own expert's opinion. The Litmans and Dieners are simply attempting inappropriately

to pick and choose, post trial, from the expert "buffet" in an attempt to increase the discounts arrived at by the Court.

**B. Mr. Mitchell Fully Considered Whether And To What Extent Any Additional Key-Person Discount Should Be Applied And Concluded That None Should Be Added To His Discount Conclusion**

If the Court were to reconsider its opinion under Rule 59(a), no additional key-person discount would be warranted. Mr. Mitchell testified that in valuing the HRN restricted stock, he ultimately relied on the results of the quantitative analyses he performed—specifically, his put option methodology and the Capital Asset Pricing Model ("CAPM"). He adopted these methodologies, and rejected the other methodologies he considered, because:

> I think they are more useful in this case, in part because of the unusual nature of the restrictions. As we've pointed out, the shares could not have been sold in any manner during the contractual restriction periods. In addition, the restriction periods are longer than those for the transactions in either of the studies, and *I think that the quantitative methodologies allow us to better emphasize the factors that are most important in determining discounts, and that would include risk in terms of volatility as the primary measure of risk, and then the time related to the restriction periods*. [Tr. 1041, emphasis added.]

In reaching his ultimate discount conclusion, Mr. Mitchell did not add any additional "key-person" discount.

Mr. Mitchell plainly states that in forming his opinion, he considered "all factors listed in Revenue Rulings 59-60 and 77-287." LD Ex. 60. He evaluated the history of the company, its operations, its marketing activities, and the roles that Messrs. Litman and Diener played.

Notably, Rev. Rul. 59-60, sets forth exactly what to consider in valuing restricted stock where there is a concern that a key person's death or departure may impact a company's value:

> The loss of the manager of a so-called "one-man" business may have a depressing effect upon the value of the stock of such business, particularly if there is a lack of trained personnel capable of succeeding to the management of the enterprise. In valuing the stock of this type of business, therefore, the effect of the loss of the

> manager on the future expectancy of the business, and the absence of management-succession potentialities are pertinent factors to be taken into consideration. On the other hand, there may be factors which offset, in whole or in part, the loss of the manager's services. For instance, the nature of the business and of its assets may be such that they will not be impaired by the loss of the manager. Furthermore, the loss may be adequately covered by life insurance, or competent management might be employed on the basis of the consideration paid for the former manager's services. These, or other offsetting factors, if found to exist, should be carefully weighed against the loss of the manager's services in valuing the stock of the enterprise.

Rev. Rul. 59-60, 1959-1 C.B. 237, 239-40.[2] Mr. Mitchell's express statement that he considered all factors in Rev. Rul. 59-60 and Rev. Rul. 77-287, including the above, establishes that he either rejected any additional key-person discount outright or determined that his methodology adequately accounted for the impact of Messrs. Litman's and Diener's roles at the company.[3]

Although the Litmans and Dieners claim that "the Court acknowledged the appropriateness of a key person discount…," they cite no support for this contention. Litman/Diener Motion at 3. The Court reviewed the expert opinions and testimony in detail including the key-person discount used by Mr. Burns, the government's expert. The Court clearly considered a key-person discount, but contrary to the Litmans' and Dieners' assertion, neither acknowledged such a discount as specifically appropriate in the context of the Burns' valuation, nor determined any additional key-person discount would be appropriate in the context of any other expert's discount conclusion. The Court reached this conclusion even in

---

2 Rev. Rul 77-287 also states that a factor that must be considered in valuing restricted stock is "[t]he relationship of the parties to the agreements concerning the restricted stock, such as whether they are members of the immediate family or perhaps whether they are officers or directors of the company." Rev. Rul. 77-287, 1977-2 C.B. 319, 321.

3 In this latter instance, any additional key-person discount would be inappropriate double counting.

light of Mr. Burns' testimony that if the put option methodology were found to be valid,[4] in his view, you would add a "key-man discount." Tr. 1651. As explained above, the Court's rejection of Mr. Burn's opinion regarding key-person discounts in the context of Mr. Mitchell's methodology is consistent with Mr. Mitchell's opinion. It also is fully consistent with the valuation conclusions of Deloitte & Touche and of the IRS's valuation agent, both of whom also used the put option analysis. Deloitte & Touche, like Mr. Mitchell, considered Rev. Rul. 59-60 and also rejected the addition of a key-person discount. US Ex. 39 at 3. Similarly, the IRS's valuation agent did not add any additional key-person discount to her put option conclusion. LD Exs. 13, 15, 16.[5]

**C. <u>Conclusion</u>**

Plaintiffs Litmans and Dieners have requested relief to which they are simply not entitled. They have failed to meet the standards necessary for this Court to reconsider its opinion. In the alternative, should the Court find some justification for reconsidering its earlier determination, Hotels.com believes any inclusion of an additional key-person discount is unwarranted. Mr. Mitchell has admitted that his valuation conclusion fully considered all of the factors present in Rev. Ruls. 59-60 and 77-287, including Messrs. Litman and Diener's roles with the company. Mr. Mitchell never, in his report or at trial, opined that an additional key person discount was appropriate. If the Court were to impose such an additional, unwarranted and/or duplicative discount it would constitute manifest injustice to Hotels.com.

---

[4] Of course, Mr. Burns adamantly rejected this methodology.

[5] Notably, if Mr. Mitchell had included an additional key-person discount from the outset, his discount conclusions, which were already significant outliers from all of the other valuation conclusions, would have increased to even greater unfounded proportions. Hotels.com Ex. 544 (incorporating LD Exs. 15, 16, 51; HC Ex. 9; US Exs. 39, 40).

## II. <u>The Court's 25 Percent Reduction To Mr. Mitchell's Valuation Conclusion Should Be Increased To Prevent Manifest Injustice To Hotels.com</u>

The starting point for the Court's discount opinion was Mr. Mitchell's discount methodology. The Court recognized many of the significant errors contained therein, and adjusted Mr. Mitchell's discount accordingly. Hotels.com cross-moves for reconsideration of the Court's opinion on the ground that omitting further reductions to Mr. Mitchell's valuation conclusion for significant *additional* errors in his methodology would constitute manifest injustice to Hotels.com. As a result, Hotels.com respectfully requests that the Court reconsider its discount conclusion, as discussed below.

### A. <u>Unlike the Litmans and Dieners, Under The Court's Opinion, Hotels.com Has Suffered Manifest Injustice</u>

The standard applicable to motions for reconsideration is discussed in detail in Section I.A., above. Unlike the Litmans and Dieners, upon whose expert the Court relies for its opinion, and who belatedly seek to have an additional, duplicative and/or unnecessary discount added to their expert's valuation conclusion, Hotels.com meets this standard.

Hotels.com does not allege any change in intervening law or discovery of new evidence.[6] Rather, Hotels.com asserts that the Court's opinion results in manifest injustice to Hotels.com, if the errors discussed below remain uncorrected, and which injustice would be further exacerbated if the Court were to grant the Litmans' and Dieners' Motion for Reconsideration.

---

[6] Hotels.com continues to disagree with the Court's conclusion that Mr. Mitchell's analysis is appropriate in any event. For purposes of this Cross-Motion, and Hotels.com's Response only, we do not challenge the Court's decision to rely on Mr. Mitchell or any other aspect of the Court's opinion. Hotels.com's Cross-Motion respectfully requests that the Court reconsider its adjustment to that valuation conclusion, the starting point for the Court's decision, as not being sufficient to account for the additional errors discussed herein.

**B. Even As Adjusted, Mr. Mitchell's Discount Is Significantly Overstated**

The Court correctly recognized many of the significant errors and shortcomings of Mr. Mitchell's analysis and, for the reasons discussed above, Hotels.com does not believe the addition of any additional key-person discount is warranted or appropriate. To prevent manifest injustice to Hotels.com, however, at least three significant, additional defects in Mr. Mitchell's analysis, each of which would result in even further reductions to Mr. Mitchell's computed discounts, should be reflected in the Court's overall discount conclusion.

**1. Mr. Mitchell's CAPM Beta Input Is Incorrect And The Court's Valuation Conclusion Should Be Revised To Account For This Substantial Error**

In performing his CAPM analysis, Mr. Mitchell used a Beta of 1, which heavily biased and substantially overstated his computed discounts. A proper Beta adjustment is separate and apart from the significant additional errors already found by the Court. As explained below, Mr. Mitchell admitted that his lodging industry Beta choice was not comparable to that of HRN, which he viewed as an Internet company. Further, he failed either to select a more comparable Beta, or to adjust Beta for the differences between the less comparable lodging industry and HRN.

Mr. Mitchell's trial explanation of why he used the Beta of hotel chains, like Hilton and Marriott, differed substantially from the reason offered in his report. At trial, Mr. Mitchell testified that companies like Hilton and Marriott were the most comparable for purposes of selecting a Beta. Tr. 1021-28. In contrast, his report relied on lodging industry data by default because he stated that reliable Beta data for the Internet-related companies, which he viewed as more comparable to HRN, and which he used for other purposes in his report, did not exist. LD

Ex. 60 at 24 n.19.[7] If the more comparable data did in fact exist, as he admitted at trial, Tr. 1144, he should have used it. If it did not exist, and he used instead a less comparable industry for purposes of determining Beta, then he should have adjusted that Beta to account for the significant differences between long-established, bricks and mortar companies like Hilton and Marriott, on the one hand, and HRN, on the other.[8] His failure to do one or the other is a significant error that the Court should correct.

Using, unadjusted, the lodging industry's low Beta of 1 increased Mr. Mitchell's computed discounts substantially. Indeed, a Beta of 1 represents an average amount of risk, meaning that an investment in HRN had, in Mr. Mitchell's view, the identical risk as a "composite investment of the Standard & Poor's 500 Stock Composite Index." *See Estate of Klauss v. Commissioner*, T.C. Memo 2000-191, 79 T.C.M. (CCH) 2177, 2181 (2000) (discussing the CAPM method and the selection of Beta). See also Tr. at 1027. In light of his testimony as to how risky he considered Internet companies (Tr. 1007-09), it is not credible to assume that a Beta equal to that of a "composite investment of the Standard & Poor's 500 Composite Index" is appropriate for HRN.

"A beta of 1 means that the company and the market are of equal risk; a beta greater than 1 means that the company is riskier than the market." *Estate of Hoffman v. Commissioner*, T.C. Memo 2001-109, 81 T.C.M. (CCH) 1588, 1599 n.32 (2001) (citing *Smith v. Commissioner*, T.C. Memo 1999-368, 78 T.C.M. (CCH) 745 (1999)). Although Mr. Mitchell testified that Beta for the more comparable Internet companies was available, and that it would not surprise him if such Beta was in the range of 2 to 3, he did not use this Beta input in his analysis. Tr. 1143-45.

---

[7] "Absent reliable data for Internet-related companies, we chose the lodging segment as being most representative of systematic risk for HRN."

[8] Tr. 1026-28.

Instead, he used the less comparable hotel chain Beta and failed to make adjustments to account for the differences between the two industries.

Mr. Mitchell is correct that if he had used a higher Beta, all other things being equal, his computed discounts would have been lower. Tr. 1144-45. The amount by which those discounts would have changed is striking. Keeping all other factors in his CAPM analysis constant with those used in his report (including holding periods), use of a Beta of 2 or 3 has a huge impact on Mr. Mitchell's computed CAPM discounts.[9]

| | Mr. Mitchell's Computed Discount Using Beta of 1, LD 60 at 25 | Mr. Mitchell's Discount If Beta Were 2 | Mr. Mitchell's Discount if Beta Were 3 |
|---|---|---|---|
| One Year | 37.6 | 28.2 | 18.8 |
| Tranche 1 | 47.2 | 39.2 | 29.1 |
| Tranche 2 | 61.6 | 52.5 | 40.4 |
| Tranche 3 | 64.5 | 55.4 | 42.9 |
| Tranche 4 | 82.7 | 74.5 | 61.2 |

A Beta of 2 would, by itself, reduce his overall weighted average discount over 8 percentage points and a Beta of 3 would reduce his overall weighted average discount more than 20 percentage points. Because this error in Mr. Mitchell's methodology was not addressed in the Court's opinion, Hotels.com respectfully submits that this error should increase the 25 percent reduction already found by the Court.

[9] A proper Beta adjustment is separate and apart from the significant additional errors already found by the Court.

### 2. Mr. Mitchell Improperly Increased The Value Of The HRN Stock For Purposes Of His Put Option Analysis

Mr. Mitchell's view that anticipating future events is inappropriate, Tr. 1086-89,[10] is fundamentally inconsistent with a key input in his Black-Scholes Put Option analysis. Mr. Mitchell testified that in computing his put option discounts, he compounded the strike price of the HRN stock by the risk free rate he used—6.5 percent per year. Tr. 1158-60. This is the only input that he assumed would increase over time, other than the holding period. All else was held constant, including the price of the underlying stock. Others who used this same methodology, Deloitte & Touche and the IRS, held the strike price and stock price inputs constant. LD Ex. 51 at IAC000345; LD Ex. 16 at US0363. Doing so here establishes that Mr. Mitchell's unsupported adjustment to the strike price greatly increased the discounts that would otherwise be found using the Black-Scholes Put Option analysis, even using uncorrected volatility and holding period inputs:

| | Put Option Price Per Mr. Mitchell's Report | Mr. Mitchell's Computed Discount (Put Option Price/16) | Put Option Price Assuming Constant $16 Strike and Stock Price | Computed Discount Assuming Constant $16 Strike and Stock Price (Revised Put Option Price/16) |
|---|---|---|---|---|
| Tranche 1 | $8.26 | 51.6% | $6.90 | 43.1% |
| Tranche 2 | $9.73 | 60.8% | $7.57 | 47.3% |
| Tranche 3 | $10.07 | 62.9% | $7.67 | 47.9% |
| Tranche 4 | $12.00 | 75.0% | $7.98 | 49.9% |

[10] As the Court is aware, Hotels.com disagrees that facts reasonably foreseeable as of the valuation date should not be taken into account. But in light of the Court's decision to the contrary for purposes of selecting a stock price against which to apply the computed discount, Mr. Mitchell's anticipatory strike price increase also should be corrected.

Mr. Mitchell's unsupported and inappropriate adjustment to the strike price input used in his Black-Scholes Put Option Analysis is another error that Hotels.com respectfully asks the Court to correct.[11]

### 3. **<u>Mr. Mitchell's Holding Period For The Fourth Tranche Of Stock Failed To Take Into Account Registration Rights Available To Litman And Diener</u>**

An additional error in Mr. Mitchell's analysis is his failure to account for the registration rights held by the Litmans and Dieners. This error is separate and apart from the errors already recognized by the Court with respect to the holding periods Mr. Mitchell selected. As Mr. Mitchell notes in his report, LD 60 at 5-6, at the end of 4 years the Litmans and Dieners could have registered all of their remaining shares and made them freely tradable. Yet Mr. Mitchell failed to account for this fact in his analysis by using an excessively long five and one-half year holding period for the fourth tranche of stock.

As an apparent justification for ignoring the registration rights, Mr. Mitchell asserts that "issues related to the affiliate status of the holder of the shares and the ability to effectively register and sell all of the shares impact our discount analysis." LD Ex. 60 at 5-6, n1. For purposes of determining any discount, the fact that the stock could be freely tradeable without any legal restrictions and at no cost to the Litmans and Dieners after four years is what matters and is not reflected in Mr. Mitchell's exceedingly long five and one-half year holding period for the fourth tranche of stock. As confirmed by Mr. Burns, "…after the fourth anniversary of the IPO closing date, Litman and Diener had a one time right to register all, or any portion, of the restricted shares they still possessed at the expenses of HRN. The exercise of this right and the

---

11 For purposes of computing the Black-Scholes put option value, Hotels.com used the BloBek option calculator found at http://www.blobek.com/black-scholes.html. Copies of the print outs reflecting the computations are attached as Exhibits 1-4.

subsequent registration of the shares under the Securities Act of 1933 would have removed the contractual and regulatory resale restrictions for years after the IPO." US Ex. 39 at 14. *See also* Tr. 1602, 1617-18. Hotels.com requests that this further error be corrected and further reduce the Court's overall discount conclusion.

**C. <u>The Experts For Two Completely Adverse Parties Reached Virtually Identical Valuation Conclusions – Even As Adjusted By The Court, Mr. Mitchell's Valuation Conclusion Is An Outlier</u>**

By adjusting Mr. Mitchell's valuation conclusion, the Court correctly recognized many of Mr. Mitchell's errors and omissions. However, even as already adjusted by the Court and without the unwarranted key-person discount the Litmans and Dieners belatedly seek, Mr. Mitchell's valuation conclusion is a complete outlier. Because his adjusted discount is more than double that found by the trial experts of two completely adverse parties in this same litigation, use of Mr. Mitchell's adjusted valuation conclusion results in manifest injustice to Hotels.com.

Mr. Burns, the government's expert, had no motive either to overstate or understate his valuation discount conclusion. Further, and importantly, in rendering his opinion, Mr. Burns considered but abandoned both the methodology and discount conclusions contained in the preliminary valuations prepared by the Internal Revenue Service.[12] Mr. Burns' original report determined an overall discount conclusion of 30.6%, and following his deposition, he further reduced his discount conclusion to 20.3%.[13] As the Court has recognized, the government in this case is a stakeholder, and Hotels.com respectfully submits that an ultimate discount conclusion

---

12 In reaching his valuation conclusions, Mr. Burns considered the Memos prepared by Ruth Haney of the IRS, dated December 21, 2004 (LD Ex. 13), April 11, 2005 (LD Ex. 15), and April 28, 2005 (LD Ex. 16), as well as the Report by Deloitte & Touche LLP, dated October 18, 2001 (LD Ex. 51). *See* US Ex. 39 at 26.

13 *See* US Ex. 39 at 25 and US Ex. 40 at 1.

significantly at odds with Mr. Burns' approximately 20 percent weighted average discount is manifestly unjust, regardless of the methodology used.

**D. Conclusion**

For the reasons discussed above, failure to correct Mr. Mitchell's discount conclusion for additional errors not already addressed by the Court, and an overall discount conclusion significantly at odds with the discount conclusion reached by the unbiased stakeholder in this case, would give the Litmans and Dieners a windfall and result in manifest injustice to Hotels.com. Hotels.com requests the opportunity to file a reply in support of this Cross-Motion if the Court were to grant the other parties to this litigation an opportunity to respond.

Dated: September 20, 2007

Respectfully submitted,

s/ Kim Marie K. Boylan_____
Kim Marie K. Boylan
Latham & Watkins, LLP
555 11th Street, NW
Washington, DC 20004
(202) 637-2235
Attorney of Record

Kari M. Larson
Latham & Watkins, LLP
Of Counsel