**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **DAVID S. LITMAN and MALIA A. LITMAN,** | |
| **Plaintiffs-Counterdefendants,** | |
| **V.** | **No. 05-956T** |
| **THE UNITED STATES,** | |
| **Defendant-Counterplaintiff.** | |
| **ROBERT B. DIENER and MICHELLE S. DIENER,** | |
| **Plaintiffs-Counterdefendants,** | |
| **V.** | **No. 05-971T** |
| **THE UNITED STATES,** | |
| **Defendant-Counterplaintiff.** | |
| **HOTELS.COM, INC. and Subsidiaries (f/k/a HOTEL RESERVATIONS NETWORK, INC.),** | |
| **Plaintiffs,** | |
| **V.** | **No. 06-285T** **(Judge Christine O.C. Miller)** |
| **THE UNITED STATES,** | |
| **Defendant.** | |

**PLAINTIFFS-COUNTERDEFENDANTS,**
**DAVID S. LITMAN, MALIA A. LITMAN,**
**ROBERT B. DIENER AND MICHELLE S. DIENER'S REPLY**
**WITH RESPECT TO THEIR MOTION FOR RECONSIDERATION**

Plaintiffs-Counterdefendants, David S. Litman and Malia A. Litman (the "Litmans") and Robert B. Diener and Michelle S. Diener (the "Dieners")[1] file this Reply With Respect to Their Motion for Reconsideration in accordance with the Court's Order dated September 7, 2007.

**A. Manifest Injustice Will Result If the Court's Valuation Conclusions Are Not Modified to Comport With the Court's Findings and Undisputed Facts Regarding the Key Person Status of Messrs. Litman and Diener.**

In opposing Plaintiffs' request for the Court to adopt the 7.5% key person discount advocated by Defendant's expert, Francis X. Burns ("Mr. Burns"), neither Defendant nor Hotels.com attempts to challenge the legal or factual bases that warrant the application of the key person discount in this case. There is simply no dispute that Messrs. Litman and Diener were critical to HRN and that either their departure or a sale of a large block of the Restricted Shares would send a strong adverse signal and depress the market price of the Restricted Shares. Op. at 71, 79; Tr. 520-21, 828-29, 893. Under these circumstances, a key person discount is warranted as a separate discount in addition to the lack of marketability discount associated with the restrictions on transferring the Restricted Shares. *See Babin v. Comm'r*, 64 T.C.M. (CCH) 1357, 1362 (1992); *Furman v. Comm'r*, 75 T.C.M. (CCH) 2206, 2219 (1998); *Estate of Feldman v. Comm'r*, 56 T.C.M. (CCH) 118, 130 (1988).

Defendant and Hotels.com argue that Mr. Burns's 7.5% key person discount should not be applied because Mr. Mitchell impliedly considered the key person discount in his analysis as one of the factors listed in Rev. Rul. 59-60 and Rev. Rul. 77-287. They likewise assert that because neither Ruth Haney (Defendant's in-house expert) nor Deloitte & Touche (Hotels.com's initial expert) applied a separate key person discount in their put option analysis,

[1] Collectively, the Litmans and the Dieners are referred to herein as "Plaintiffs." Plaintiffs will use the same defined terms used in their Motion for Reconsideration.

the application of a separate key person discount must not be applicable under the put option valuation model. Although Mr. Mitchell did consider the factors outlined in Rev. Rul. 59-60 and Rev. Rul. 77-287 in his valuation analysis, it is clear that he did not separately determine a key person discount. The assertion that Mr. Mitchell's put option analysis impliedly considered Mr. Litman's and Mr. Diener's specific key person impact is belied by the testimony of Defendant's expert. As Mr. Burns acknowledged at trial, if the put option methodology relied upon by Mr. Mitchell, Deloitte & Touche and Ruth Haney were to be employed by the Court to determine the lack of marketability discount, his 7.5% key person discount should be added to it to properly determine the fair market value of the Restricted Shares. Tr. 1651. Thus, Defendant's opposition to the application of a specific key person discount of 7.5% is contrary to the testimony of its own expert.

Contrary to Defendant's assertion, the Litmans and the Dieners have consistently stated that one of the factors affecting the size of the lack of marketability discount to be applied to the Restricted Shares is the practical difficulties associated with Messrs. Litman and Diener -- as CEO and President of HRN -- selling the shares into the market. *See* Op. at 31. And Mr. Mitchell did not contest Mr. Burns's application of a separate key person discount in his rebuttal analysis. *See* L/D 61; Tr. 981-1206. The ***only*** expert who contested Mr. Burns's application of a separate key person discount was Hotels.com's expert, Dr. Mukesh Bajaj ("Dr. Bajaj"). See HC 197 at pp. 5-7, 27-29.[2] As the Court noted, Dr. Bajaj's express refusal to adequately account for the importance of Messrs. Litman and Diener to HRN or the depressing

[2] Dr. Bajaj did not challenge the application of a key person discount on the theory that the valuation methods employed by the experts already factored the importance of Messrs. Litman and Diener into the lack of marketability discount. He devoted most of his analysis in opposition to the discount to his nonsensical claim, inconsistent with the facts of this case, that the departure of Messrs. Litman and Diener might actually increase the price of HRN stock. *See* HC 197 at 5-7, 27-29.

effect a sale of their shares would have on the market was one of the many shortcomings in his flawed valuation analysis. Op. at 79.

Although Hotels.com argues that there is no support in the Court's opinion for the appropriateness of a key person discount, Hotels.com ignores the Court's unequivocal criticism of Dr. Bajaj's refusal to adequately account for the importance of Messrs. Litman and Diener in his lack of marketability discount analysis. The Court noted that

> Dr. Bajaj, moreover, did not adjust his marketability discount for the fact that Messrs. Litman and Diener were CEO and President of HRN, respectively, with the not unlikely consequence that the marketability of their shares would be depressed due to the signal that a big sell-out by these officers would portend. He disagreed that such a discount would be appropriate.

Op. at 79. Unable to reconcile Dr. Bajaj's claim that this and the other onerous practical and contractual restrictions imposed on the Restricted Shares "were not significant factors" with Dr. Bajaj's claim that he actually took them into account in his valuation analysis, the Court noted that it was "flummoxed by Dr. Bajaj's testimony that he took into account all the differences between the stock in his studies and the HRN restricted stock. The evidence presented at trial convinces the Court that the HRN restricted stock was subject to substantial restrictions that were more severe than the restrictions imposed on the stock of the companies in the Bajaj Study and the FMV Study." *Id.*

The thrust of Defendant's and Hotels.com's position seems to be that if Mr. Mitchell did not expressly apply a separate key person discount then one should not be applied. But the Court is free to accept some or all of the valuation conclusions of each of the experts in this case. *See, e.g., Parker v. Comm'r*, 86 T.C. 547, 562 (1986) (noting that "[w]e can find one such report more persuasive on one ultimate element of valuation and another more persuasive on another ultimate element"); *Peracchio v. Comm'r*, 86 T.C.M (CCH) 412

(2003) (noting that "although we may largely accept the opinion of one party's expert or that of another party's expert, we may be selective in determining what portions of each expert's opinion, if any, we accept"). The undisputed testimony and the Court's findings demonstrate that Messrs. Litman and Diener were critical to HRN and that either their departure or a sale of a large block of the Restricted Stock would send a strong adverse signal and depress the market price of HRN Shares. Op. at 71, 79; Tr. 520-21, 828-29, 893. Under the unique facts of this case, Mr. Burns's 7.5% key person discount is warranted. It should be added to the discounts determined by the Court to conform the Court's evidentiary findings to its valuation findings and to prevent manifest injustice.

**B. The Court's Application of Lack of Marketability Discounts Ranging From 22% for One-Year Contractually Restricted Stock to 50% for Four-Year Contractually Restricted Stock Do Not Adequately Reflect the Risks Resulting From the Onerous Transfer Restrictions Imposed on the Restricted Shares.**

**1. By Mistakenly Applying the 25% Adjustment for a Marketability Discount Through Subtraction Rather Than Multiplication, the Court Reached a Result That Contradicts Its Other Findings and Does Not Adequately Reflect the Effect of the Onerous Transfer Restrictions.**

The Court's analysis contained two fundamental conclusions regarding the complex and conflicting expert testimony on the proper lack of marketability discount: (1) "Mr. Mitchell's analysis best withstood the attacks of his counterparts and opposing counsel" and therefore his methodology should "carry the most weight"; and (2) his approach nevertheless had some weaknesses and therefore his conclusions about the amount of the discount should be adjusted by 25 percent. Op. at 77. The mathematical way in which the Court implemented the second conclusion, however, served to defeat the first conclusion.

If Mr. Mitchell's analysis is to "carry the most weight," then it necessarily follows that the final marketability discounts, and attendant stock values, would be closer to those proposed by Mr. Mitchell than they would be to those of the other experts. In fact, the opposite is true. As reflected in the following table, for every tranche of stock the ultimate result reached by the Court is closer to the opinion of Mr. Burns than it is to the opinion of Mr. Mitchell.

| Block | Mitchell | Burns | Court |
|---|---|---|---|
| 1 | 49.5% | 16.9% | 22% |
| 2 | 61.5% | 20.9% | 36% |
| 3 | 63.5% | 21.2% | 38% |
| 4 | 79% | 21.2% | 50% |

This apparent discrepancy is attributable to a mathematical error. In its response, Defendant states that "the Court adjusted each of [Mr. Mitchell's] discounts by 25%" (Defendant's Response at p. 3[3]), and Defendant is correct that such a percentage adjustment would have been the logical way to implement the Court's conclusions. But the Court did not actually effectuate a percentage adjustment because the Court *subtracted* 25% from the base of the lower range of Mr. Mitchell's conclusions, instead of *multiplying* as is necessary to make a percentage adjustment. If, as the Court ruled, Mr. Mitchell's marketability discounts were overstated by 25% because of weaknesses in his analysis, the correct amount of the discounts would be 75% of Mr. Mitchell's conclusions (which can be calculated by subtracting an amount equal to 25% of Mr. Mitchell's conclusions). *See, e.g., Gila River Pima-Maricopa Indian Community v. United States*, 2 Cl. Ct. 12, 32 (1982) (Court used multiplication to adjust expert

[3] Hotels.com makes the same assumption, noting "the Court used Mr. Mitchell's opinion as the basis for its discount conclusion . . . reducing his discount by 25% . . ." Hotels.com's Response at p. 2.

valuation by additional 25% discount to account for other factors). As noted in our motion, however, the method used by the Court yielded much lower results, including a 53% reduction in the discount applicable to the first tranche of stock. *See* Plaintiffs' Motion for Reconsideration at pp. 6-7.[4]

Accordingly, even if the Court adheres to its conclusion that 25% is the appropriate amount of adjustment to Mr. Mitchell's marketability discount conclusions, the Court should apply that conclusion as a percentage adjustment, rather than simply subtracting it, and then revise its conclusions concerning the proper amount of the marketability discounts accordingly. *See* Op. at 82. The following table lists the correctly calculated amounts (before the application of a key person discount), which harmonize more closely with the Court's determination that Mr. Mitchell's analysis should carry the most weight:

| Block | Mitchell | Burns | Court (corrected) |
|---|---|---|---|
| 1 | 49.5% | 16.9% | 37.125% |
| 2 | 61.5% | 20.9% | 46.125% |
| 3 | 63.5% | 21.2% | 47.625% |
| 4 | 79% | 21.2% | 56.25% |

[4] The mathematical flaw in the Court's method is even more starkly illustrated if one hypothesizes that Mr. Mitchell had found a 20% lack of marketability discount for the first tranche. In that case, the Court's subtraction of 25% from each of Mr. Mitchell's conclusions would wipe out the 20% discount entirely and call for a 5% *increase* in the value of the stock because of the marketability restrictions – a completely illogical result. The correct approach of *multiplying* by the percentage adjustment amount would yield the right result, reducing Mr. Mitchell's discount from 20% to 15%.

**2. Mr. Mitchell Correctly Declined to Reduce His Lack of Marketability Discounts by the Unlikely and Unforeseeable Possibility That HRN Would Lift the Restrictions Early or That Stock Registration Tag-Along Rights Would Be Triggered.**

Defendant argues that no adjustment should be made to the Court's concluded lack of marketability discounts because the Court' adjustment to Mr. Mitchell's discounts was "not the result of omissions or a failure to consider relevant factors." Defendant's Response at 6-7. In fact, two of the primary factors leading the Court to reduce Mr. Mitchell's determined discounts were the Court's findings that Mr. Mitchell did not consider (1) the possibility that the restrictions could lift early, and (2) the possible value of tag-along rights. Op. at 82. Mr. Mitchell did not consider these factors because it was not foreseeable on the valuation date that either the restrictions would be lifted early or that there would be an additional registration of HRN stock that would trigger the tag-along rights. Tr. at 1055-56, 1145 46. Mr. Mitchell's testimony was consistent with the Court's findings that "it was not foreseeable that the Litmans and the Dieners would have the opportunity to exercise these options." Op. at 82. Even Dr. Bajaj admitted that there was no evidence that HRN might waive the transfer restrictions or that HRN would register additional shares to trigger the tag-along rights. *See* Tr. 1403, 1408, 1425-26. Likewise, Mr. Burns acknowledged that there was no evidence that tag-along rights might be triggered, and did not assume that HRN might waive the transfer restrictions. Tr. 1615; D 39.

Mr. Mitchell's decision not to consider the possibility that the restrictions would be lifted early or that tag-along rights would be triggered was legally correct and should not have resulted in the reduction of his determined lack of marketability discounts. It is undisputed that it was not foreseeable on the valuation date that HRN would either lift the transfer restrictions early or register additional stock to trigger the tag-along rights. Op at 82.

Any assumption that such rights would be granted during the restriction period would not only be inconsistent with the Court's findings and the testimony of all the experts, it would be impermissible speculation. *See, e.g., Estate of Stevens v. Comm'r.*, 79 T.C.M. (CCH) 1519 (2000) (Court noted that "we cannot consider unforeseeable future events that may affect the value of property at a later date").

**C. Conclusion.**

For the reasons stated in Plaintiffs' Motion for Reconsideration and those stated above, Plaintiffs respectfully request the Court to reconsider the Opinion and increase the lack of marketability discount. Plaintiffs request such other and further relief to which they may be justly entitled.

Respectfully submitted,

Dated: September 27, 2007

By: s/ John W. Porter

John W. Porter
Attorney of Record
BAKER BOTTS L.L.P.
3000 One Shell Plaza
910 Louisiana
Houston, Texas 77002-4995
(713) 229-1597
(713) 229-2797 (Fax)

Jeffrey A. Lamken
Of Counsel
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2400
(202) 639-7978
(202) 585-4060 (Fax)

COUNSEL FOR PLAINTIFFS-COUNTERDEFENDANTS DAVID S. LITMAN, MALIA A. LITMAN, ROBERT B. DIENER AND MICHELLE S. DIENER